UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------

WAYNE BALIGA, derivatively on behalf of
LINK MOTION INC. (F/K/A NQ MOBILE
INC.),

                                  Plaintiff,

            -against-

LINK MOTION INC. (F/K/A NQ MOBILE
INC.), et al.,

                                  Defendants.

----------------------------------------------------------

18cv11642 (VM) (DF)

**MEMORANDUM
AND ORDER**

**DEBRA FREEMAN, United States Magistrate Judge:**

Currently before this Court are two matters that the Honorable Victor Marrero, U.S.D.J., has referred to this Court for resolution:  (1) certain "threshold issues" related to the manner in which this case may proceed (*see* Dkt. 90); and (2) a motion by non-party China AI Capital Limited ("China AI") for leave to intervene as a plaintiff in this action (*see* Dkt 127).  (*See also* Dkts. 91, 116 (referring these matters to this Court).)  These matters are resolved as set forth below.[1]

## I.     THE "THRESHOLD ISSUES"

Initially, plaintiff Wayne Baliga ("Baliga") and former defendant Vincent Wenyong Shi ("Shi") identified four threshold issues that, they contended, needed resolution.  These included: (1) whether Robert W. Seiden. Esq. ("Seiden"), who, by Order dated February 1, 2019 (Dkt. 26)

---

[1] Although Judge Marrero initially envisioned that this Court would provide a report and recommendation as to how the so-called "threshold issues" should be resolved, this Court now understands that, as the issues are not potentially dispositive of any claim or defense in the action, they may be resolved by this Court, subject, of course, to appeal to Judge Marrero, pursuant to 28 U.S.C. § 636(b) and Rule 72(a) of the Federal Rules of Civil Procedure.

was appointed Temporary Receiver ("Receiver") for nominal defendant Link Motion Inc. (the

"Company"), exceeded his authority by purporting to remove Shi as a director of the Company;

(2) whether the appearance of CKR Law LLP ("CKR Law") on behalf of the Company for

purposes of a motion to dismiss presented a non-waivable conflict of interest, in light of CKR

Law's prior and/or simultaneous representation of Shi in this action; (3) whether the Court

should grant Baliga's application for leave to effect service of process on Shi (a resident of the

People's Republic of China (the "PRC" or "China")) by means alternative to service under the

Hague Convention for the Service Abroad of Judicial and Extrajudicial Documents in Civil or

Commercial Matters, 658 U.N.T.S. 163 (the "Hague Convention"); and (4) whether the Court

should quash the Receiver's directive to Google LLC ("Google") that it remit any Company

funds to the Receiver pending the Court's resolution of the other identified issues.  (*See*

Dkts. 88, 90.)

Eventually, however, the list of "threshold issues" was narrowed to two.  Specifically,

following a conference with this Court, CKR Law stated that it had decided to withdraw from its

representation of the Company and would proceed only with its representation of Shi in this

action, leading Baliga to withdraw any present motion to disqualify CKR Law based on the

originally alleged conflict of interest, and effectively taking issue (2) off the table.  (*See*

Dkts. 95, 96.)  Further, counsel for Shi eventually withdrew his request to quash the Receiver's

directive to Google, and, on September 25, 2019, Judge Marrero effectively resolved issue (4) by

issuing an Order (Dkt. 100) that approved the Receiver's request that Google be directed to remit

any funds belonging to the Company to the Receiver's escrow account or another Company

account controlled by the Receiver.  Thus, only issues (1) (regarding the authority of the

Receiver to remove Shi as a director of the Company), and (3) (regarding whether Shi may be

served by alternative means) remain for this Court's consideration.  As, for the reasons discussed below, the Court's resolution of the latter of these issues could affect whether Shi should be considered to have standing to raise the former, this Court will first address issue (3), and then turn to issue (1).

A.   **Relevant Procedural History**

1.   **Baliga's Claims and the Issuance of the Receivership Order**

On December 13, 2018, Baliga, claiming to be a shareholder of the Company, filed a Complaint in this action (Verified Shareholder Derivative Complaint, dated Dec. 13, 2018 ("Complaint" or "Compl.") (Dkt. 1)), asserting derivative claims on the Company's behalf.  In addition to naming the Company as a nominal defendant, Baliga asserted his claims against Shi (whom he identified as the Company's Chairman of the Board and Chief Operating Officer) and two other individuals – Jia Lian (identified as the Company's Chief Executive Officer), and Xiao Yu (identified as a director of the Company with "managerial and executive influence and power) (collectively, with Shi, the "Individual Defendants").  (*See id.* ¶¶ 6-8.)  Baliga accused the Individual Defendants – allegedly led and directed by Shi – of "gross mismanagement" of the Company, "including egregious self-dealing," as well as fraud and theft of the Company's "most valuable assets."  (*Id.* ¶¶ 2, 16.)  His Complaint sought the appointment of a receiver to preserve the Company's assets, and additionally asserted claims for breach of fiduciary duty, unjust enrichment, and violation of Sections 10(b) and 20(b) of the Exchange Act, 15 U.S.C. §§ 78j and 78t.  (*See generally id.*)

On February 1, 2019, after apparently receiving briefing from Baliga and then a stipulation of "non-opposition" by the Company, Judge Marrero issued a Preliminary Injunction (the terms of which are not relevant here) and (as *is* relevant) an Order appointing Seiden as

3

Receiver for the Company during the pendency of this action.  (Order Granting Preliminary Injunction and Appointing Temporary Receiver, dated Feb. 1, 2019 (herein, the "Receivership Order") (Dkt. 26).)  As part of the Receivership Order, Judge Marrero expressly authorized the Receiver to remove Shi as a director of the Company, stating:

> The Receiver shall assume full control of the Company by removing, as the Receiver deems necessary or advisable, any director, officer, employee, independent contractor, or agent of the Company, including any Individual Defendant, from control of, management of, or participation in, the affairs of the Company.

(*Id*. § II(2)(b).)  On March 14, 2019, acting in his capacity as Receiver, Seiden apparently then removed Shi as a director of the Company.  (*See* Letter to the Court from Michael James Maloney, Esq., dated Aug. 29, 2019 ("Shi 9/29/19 Ltr.") (Dkt. 95), at 1-2.)

### 2.    The Shi Dismissal Order

By motion dated March 27, 2019, Shi sought an order under Rules 12(b)(2), (5), and (6) of the Federal Rules of Civil Procedure dismissing all claims against him, based, *inter alia*, on lack of personal jurisdiction, and an order under Rule 60, dissolving the preliminary injunction and discharging the Receiver.  (Dkt. 35.)

In the portion of his motion directed to the jurisdictional issue, Shi argued that Baliga's purported service of process on him via service on the registered agent for the Company was inadequate under Rule 4 of the Federal Rules of Civil Procedure, and insufficient to confer personal jurisdiction over him.  (*See* Dkt. 37, at 3-6.)  In the portion of his motion addressed to his requested discharge of the Receiver, Shi argued, *inter alia*, that the Court had not made the findings necessary to support the Receiver's appointment.  (Dkt. 37, at 12-13.)  In particular, Shi highlighted the fact that the Company had been organized as a Variable Interest Entity ("VIE"), and that, to operate lawfully as such under the laws of the PRC (where it was headquartered (*see*

4

*id.*, at 1)), it was required to have a board of directors comprised of PRC citizens, like Shi (*id.*, at 14).  Shi argued that, "[t]he moment a non-PRC citizen, such as [] Seiden, deprives the board of directors of [the Company] of control over the [C]ompany, the [C]ompany's operations will be deemed illegal under PRC law."  (Dkt. 37, at 14; *see also* Dkt. 62, at 17 (raising arguments that the Court had failed to conduct a necessary conflict-of-laws analysis, and that the receivership was unenforceable, at least as to Shi, under "principles of international comity").)

In opposition to the motion, Baliga did not directly challenge Shi's argument regarding improper service of process, but rather sought leave to serve Shi via means other than through the Hague Convention, specifically "though email or via the Company's registered agent."  (*See* Dkt. 51, at 30-31 (citing, *inter alia*, *In re GLG Life Tech Corp. Sec. Litig.*, 287 F.R.D. 262 (S.D.N.Y. 2012), in which another court in this District had permitted service by alternative means of a defendant located in China).)  With respect to the Court's appointment of the Receiver, Baliga argued that consent from the Company's board had not been required to render the appointment valid.  (*See id.*, at 26.)

In a Decision and Order dated June 11, 2019, Judge Marrero found that Baliga had not properly served Shi with process, and that dismissal of Baliga's claims against Shi was therefore warranted for lack of personal jurisdiction.  (*See* Dkt. 64 (the "Shi Dismissal Order").)  The Court, however, dismissed those claims without prejudice, finding that Baliga could "rectify the dismissal of Shi in this case by properly serving him."  (*Id.*, at 14.)  Noting that Baliga was located in a foreign country, Judge Marrero specifically observed that Rule 4(f)(1) of the Federal Rules of Civil Procedure would have "permit[ted] Baliga to serve Shi 'by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by

the Hague Convention.'" (*id*. (quoting Fed. R. Civ. P. 4(f)(1))), but that Baliga "ha[d] not even

attempted to comply with the Hague Convention" (*id.*, at 14-15).

At that time, Judge Marrero rejected Baliga's request to serve Shi via alternative means,

stating the following:

> As Shi points out, whether to exercise discretion and grant
> alternative service requires courts to evaluate '(1) a showing that
> the plaintiff has reasonably attempted to effectuate service on the
> defendant, and (2) a showing that the circumstances are such that
> the court's intervention is necessary.' *Wei Su v. Sotheby's, Inc.*,
> No. 17 Civ. 4577, 2018 WL 4804675, at *3 (S.D.N.Y. Oct. 3,
> 2018). Baliga does not address either of these requirements.
>
> The Court is mindful of Baliga's allegations and desire to move
> quickly. However, those reasons are no excuse to flout procedural
> rules, especially without support for his request. The plaintiff
> seeking alterative service in *GLG Life Tech*, for example,
> attempted to obtain the defendant's residential address in China
> and submitted an affidavit regarding the difficulty and delay of
> service of process in China. 287 F.R.D. at 264, 266-68. Baliga
> has made no such showing or attempt here.

(6/11/19 Order, at 15-16.) Judge Marrero granted Baliga an opportunity to "move again for

permission for alternative service under Rule 4(f)(3) upon a proper showing that such an

alternative is required or warranted." (*Id.*, at 16.)

As for the issues that had been raised by Shi regarding the Court's appointment of the

Receiver, Judge Marrero noted that, in light of the Court's finding that it lacked personal

jurisdiction over Shi, Shi lacked standing to raise such issues. (*See id.*, at 20 (stating that

"non-parties seeking to invoke standing to be heard on a matter generally must move to intervene

and willingly subject themselves to the Court's jurisdiction").) Nonetheless, Judge Marrero

exercised his discretion to consider certain of Shi's additional arguments as if they had been

raised by an *amicus curiae* (*see id*. (citing *GLG Life Tech*, 287 F.R.D. at 265)), and rejected Shi's

argument that the appointment had been improper. On this point, the Court noted that

"[i]nternational comity comes into play only when there is a true conflict between American law and that of a foreign jurisdiction" (*id.*, at 22 (internal quotation marks and citation omitted)), and found that Shi had failed to make an adequate showing of a true conflict (*id.*, at 22-23).

### 3.    Baliga's Amended Complaint

In the Shi Dismissal Order, Judge Marrero also addressed an argument that had been raised regarding the sufficiency of Baliga's pleaded securities claims, finding that those claims were facially inadequate because Baliga had failed to allege his purchase or sale of Company securities, and dismissing those claims without prejudice to replead.  (*See* Shi Dismissal Order, at 18-19.)  On June 21, 2019, Baliga filed an amended pleading (First Amended Shareholder Derivative Complaint, dated June 20, 2019 ("Amended Complaint" or "Am. Compl.) (Dkt. 68)), adding detail regarding his purchases of securities, so as to remedy the pleading defect.  In the Amended Complaint, Baliga named the same defendants as he had originally named, and reasserted the same claims, all grounded in allegations of egregious and intentional mismanagement of the Company by the Individual Defendants, led by Shi.  (*See generally id*.)

### 4.    The Presentation by Baliga and Shi of So-Called "Threshold Issues"

#### a.    The Jurisdictional Issue

After Judge Marrero's issuance of the Shi Dismissal Order, in which the Court gave Baliga leave to renew his application to permit alternative service on Shi, Baliga proceeded to file such a renewed application (*see* Dkt. 95), and the parties then briefed their positions on its sufficiency (*see* Memorandum of Law of Defendant Vincent Wenyoung Shi in Opposition to Plaintiff's Application For Leave To Serve Process Upon Mr. Shi by Alterative Means, dated Sept. 25, 2019 ("Shi Alt. Service Mem.") (Dkt. 101); Plaintiff's Memorandum of Law in Support of Application To Serve Defendant Shi by Alterative Means of Service, dated Oct. 2, 2019

("Pl. Alt. Service Mem.") (Dkt. 104);[2] Reply Memorandum of Law of Defendant Vincent

Wenyong Shi in Further Opposition to Plaintiff's Application For Leave To Serve Process Upon

Mr. Shi by Alternative Means, dated Oct. 30, 2019 ("Shi Alt. Service Reply") (Dkt. 110)).

      In his renewed application, Baliga essentially contended that, through the reports of

investigators he had retained to try to identify an address in China where Shi could be served, he

learned that Shi was "deliberately and carefully concealing his whereabouts," effectively making

it impossible for service to be effectuated on him through the Hague Convention.  (*See* Pl. Alt.

Service Mem., at 6-7 (citing Affidavit of Nathaniel Francis, sworn to Oct. 2, 2019 ("Francis

Aff.") (Dkt. 105)); *see also* Francis Aff. ¶ 12 (reporting from "a source in China" that "Shi does

not sleep in the same place every night, stays mostly in different and varying hotels, and

previously employed four drivers, but out of an abundance of caution regarding revealing his

location, now only use[s] one driver[,] [who] leaves him in public places like subways and bus

stations nearby his ultimate destination").)

      Further, in renewing his application for alternative service, Baliga relied on the purported

expertise of an asset recovery specialist with experience working in China, who asserted by

affidavit that, "in a perfect situation without delays," service via the Hague Convention in China

should take from six to eight months, but, in his experience, it would be "very unlikely" for

Hague Convention service to be made on a Chinese defendant "within one year of submission of

the documents," and, indeed, he "would be very surprised if any service was ever made at all."

(Affidavit of Timothy Clissold, sworn to Oct. 2, 2019 ("Clissold Aff.") (Dkt. 106) ¶¶ 5, 7.)

---

    [2] The parties were supposed to have made simultaneous opening submissions on Baliga's renewed application for alternative service, but, after some uncertainty as to whether the Court had approved an extension of the briefing schedule, the parties ended up agreeing that Baliga's submission could be filed subsequent to Shi's.  (*See* Dkt. 102.)

According to Baliga, his investigators were able, on one occasion, to locate Shi, and they "used the opportunity to have a Chinese Associate serve [] Shi with the amended summons and complaint in this action."  (Pl. Alt. Service Mem., at 7 (citing Francis Aff. ¶ 14).)  In light of this, Baliga requested that the Court deem either that this personal service, or, in the alternative, service by email on Shi's counsel in this case, be considered sufficient service of process.  (*Id.*, at 13.)

In opposition, Shi argued that Baliga had still not met the criteria generally required by courts in this District for alternative service, as he had not demonstrated that he had reasonably attempted to effectuate service on Shi under the Hague Convention, but rather had "simply refused" to make any such attempt.  (Shi Alt. Service Mem., at 5-6; *see also* Shi Alt. Service Reply, at 1 ("[Baliga] concedes that he has made no attempt whatsoever to effect service of process on [] Shi pursuant to the mechanisms provided in the Hague Convention . . .").)  More specifically, Shi argued that, although Baliga "contend[ed] that he ha[d] not been able to verify an address for [] Shi," Baliga's submitted papers suggested the contrary, in that they showed that, through his hired investigators, Baliga had in fact been able to locate Shi and "clearly ha[d] been following [] Shi around Beijing."  (Shi Alt. Service Mem., at 7.)  Shi further argued that the Francis affidavit, proffered by Baliga to support the notion that Shi had been "'living out of hotels' and avoiding service of process," was "based entirely on hearsay" and failed to account for the fact that Baliga had actually been able to locate Shi and personally hand him papers.  (Shi Alt. Service Reply, at 2.)  In any event, in order to show that Baliga's assertions regarding Shi's purported efforts to avoid service were "incorrect," Shi – in a so-called "reply" memorandum –

provided a Beijing address, which, he stated, could be used "for purposes of attempting service of process under the Hague Convention."  (*Id.*, at 3.)[3]

Finally, as to the length of time that it might take to effectuate service under the Hague Convention, Shi argued that, even if that process might be lengthy and ultimately not succeed, this would "not obviate the need to make at least some attempt to serve process in accordance with [the Hague Convention's] terms."  (*Id.* (contending that, [t]o permit [Baliga] to simply ignore the Hague Convention entirely, without making even a single attempt to effect service thereunder, would improperly render that international agreement a dead letter").)

On July 27, 2020, Baliga filed a Notice of Supplemental Authority (Dkt. 160), in further support of his application to serve Shi by alternative means, and, on August 4, 2020, Shi responded to this submission (*see* Dkt. 162).[4]

### b.      The Issue Regarding the Authority of the Receiver

Despite the terms of the Receivership Order, expressly conferring upon the Receiver the authority to remove Shi from his position as a director of the Company, and despite the denial of Shi's earlier motion to discharge the Receiver, Shi has now sought to raise – as one of the identified "threshold" issues – an argument that the Receiver lacked the authority to remove him from his office with the Company.  (*See* Shi 8/29/19 Ltr., at 2-4.)

---

[3] Although it has now been several months since Shi provided Baliga with an address at which Shi supposedly could be served in China, Baliga has not informed this Court as to whether, through his investigators, he has made any attempt to verify that Baliga is, in fact, residing or may otherwise be found at that address.  Nor does it appear that Baliga has since initiated any attempt to serve Shi, pursuant to the Hague Convention, at the address that Shi provided.

[4] As the additional case authority submitted by Baliga is not controlling and would not, in any event, alter this Court's analysis of the service issue, this Court will not address these supplemental submissions herein.

In this regard, Shi, via a letter filed on his behalf by Michael James Maloney, Esq. ("Maloney"), of CKR Law,[5] asserted:  (1) that the Company was organized under the laws of the Cayman Islands; (2) that Baliga has pointed to no statutory provision of Cayman Islands law (and Shi is aware of none) that would provide the Court with the authority to remove a duly elected or appointed officer of a Cayman Islands company; (3) that the Court – and, by extension, the Receiver appointed by the Court to serve as a judicial officer – therefore lacked the statutory power to remove Shi as a director of the Company; and (4) the Receiver's action in purportedly removing Shi was accordingly "*ultra vires* and *void ab initio*."  (*Id.*, at 2-3.)[6]

In response, Baliga noted the tension inherent in the fact that, on the one hand, Shi previously had argued (and continued to argue) that service of process had never been properly effectuated upon him, thereby depriving the Court of personal jurisdiction over him, and, on the other hand, Shi was seemingly attempting to appear in this case for the purpose of challenging his removal as a Company director.  (*See* Letter to the Court from Michael D. Cilento, Esq., dated Sept. 9, 2019 ("Baliga 9/9/19 Ltr") (Dkt. 96), at 1.)  Indeed, Baliga pointed out that the attorney who filed the August 29 letter on Shi's behalf, arguing that Shi's removal represented an unauthorized exercise of power by the Receiver, then stated, in the very same letter, that (presumably to avoid any conflict of interest), he and his firm (CKR) were no longer seeking to appear in this action on the Company's behalf, but rather were only representing Shi – against

---

[5] Although Maloney was apparently a partner in CKR Law when he filed this letter, he notified the Court on February 4, 2020 that he had left CKR Law and become a partner in Felicello Law P.C. ("Felicello Law"), which is now representing Shi.  (*See* Dkt. 121; *see generally* Dkt.)

[6] Shi also contends that the Receiver's purported appointment of Francis Lilin Guo as a director of the Company was similarly done without proper authorization and should also be considered void.  (*See id.*, at 2, 3.)

whom Baliga's claims had been dismissed on jurisdiction grounds.  (*See id.*; *see also* Shi 8/9/19 Ltr., at 4.)  Under these circumstances, Baliga contended that counsel's submission challenging Shi's removal could only have been made on behalf of Shi, and that, without submitting to the Court's jurisdiction, Shi lacked standing to raise such a challenge.  (*Id.*)  Baliga argued that Judge Marrero had already reached this very conclusion (*id.* (quoting Shi Dismissal Order, at 20), and asserted that, "if [] Shi wishes to challenge his removal by the Receiver in this Court, he needs to subject himself to this Court's jurisdiction" (*id.*).

Shi did not respond to this argument by Baliga, but, on March 27, 2020, Maloney filed another letter with the Court on Shi's behalf, seeking leave to submit supplemental materials relevant to the question of the legality of Shi's removal from the Company's board of directors. (Letter to the Court from Michael James Murphy, Esq., dated Mar. 27, 2020 ("Shi 3/27/20 Ltr.") (Dkt. 132).)  In that letter, Maloney informed the Court that, on or about January 13, 2020, the Receiver had made an application to the Grand Court of the Cayman Islands (the "Cayman Court"), seeking "recognition" of both the "Receivership Order generally and, more specifically, the Receiver's power to remove and appoint directors.  (*Id.*, at 2.)  As an exhibit to his letter, Maloney attached a copy of the resulting February 3, 2020 Order of the Cayman Court.  (*Id.*, Ex. A (the "Cayman Court Order") (Dkt. 132-1).)  In the first paragraph of the Cayman Court Order, the court recognized the Receivership Order (*id.* ¶ 1), but, in the second paragraph, it went on to state:  "Notwithstanding paragraph 1 of this Order, the power granted to the [] Receiver in paragraph II.2(b) of the Receivership Order to appoint or replace any director of [the Company] is not recognized" (*id.* ¶ 2).

By Order dated April 6, 2020, this Court granted Shi leave to file the Cayman Court Order, without ruling on the propriety of the submission.  (*See* Dkt. 136 (Text Order).)  This

Court indicated that, if Baliga wished to respond, he should do so on a schedule to be agreed by the parties.  (*See id.*)  The parties, however, did not file a proposed schedule for a response to that submission, and Baliga filed no response.

### 5.     This Court's Order of May 4, 2020

After reviewing the submissions of Baliga and Shi with respect to the so-called threshold issues, this Court initially determined that, as pointed out by Baliga, Shi's position on the jurisdictional issue (which, fundamentally, required him to contend that the Court lacked personal jurisdiction over him) potentially undermined his standing in this action to raise other issues before the Court, including any issues regarding the validity of the Receivership Order or any of its provisions.

This Court therefore issued an Order, dated May 4, 2020 (Dkt. 140), seeking clarification from Shi of his position.  In that Order, this Court recognized that, after dismissing Baliga's claims against Shi for lack of personal jurisdiction, Judge Marrero had nonetheless exercised his discretion to consider certain of the other arguments that had been raised by Baliga in his motion to dismiss, as if those arguments had been raised by an *amicus curiae*.  (*Id.*, at 2 (citing Shi Dismissal Order, at 20).)  In its May 2020 Order, however, this Court noted that "it at least seem[ed] questionable that the Court should continue, indefinitely, to treat Shi as an *amicus*, and to continue, on that basis to consider any new arguments that Shi wishe[d] to raise."  (*Id.*, at 2-3.)  This Court also observed that, in the Receivership Order, Judge Marrero had expressly authorized the Receiver to remove Shi as a director of the Company, such that Shi's challenge to the Receiver's authority to remove him appeared, in effect, to be a motion for reconsideration of that Order.  (*Id.*, at 3.)  Yet, this Court noted, Shi had offered no explanation as to why, as a former party to this action, he should be permitted to proceed as an *amicus* to mount a challenge

that, were he still a party, would have been untimely by several months under Local Civil Rule 6.3, which dictates that such motions are to be made within 14 days of the entry of the order at issue.[7]

Under the circumstances, this Court directed Shi to clarify whether he was now prepared to consent to submit to the jurisdiction of the Court.  (*Id.*, at 3 ¶ 1.)  This Court wrote:

> If Shi states that he *does* so consent, then this Court will consider him to have waived service of process, such that he may be reinstated as a defendant in this matter, obviating the need for the Court to consider the appropriateness of alternative service.  If, conversely, Shi states that he does *not* so consent, then he should provide authority to support the proposition that he should be granted leave to proceed as an *amicus curiae* to raise that challenge at this juncture.

(*Id.*)

By letter dated May 8, 2020 (Dkt. 145), Shi responded to this Court's Order by representing that he was willing to accept service of process, by entry of an order by the Court, *provided* that the Court's order specified certain "terms" that, according to Shi, would be necessary to protect him from prejudice.  In particular, Shi specified that he would consent to service on the following terms:  (1) service would only be effective as of the date of the Court's order; (2) he would not be held in contempt for any actions or omissions prior to his acceptance of service; (3) he would have 60 days to move, answer, or otherwise respond to Baliga's Amended Complaint; and (4) the Receiver would be required by the Court to cause the Company

---

[7] This Court noted that Shi had first set out his challenge to the Receiver's authority to remove him as a director in a joint submission with Baliga dated August 9, 2019 (Dkt. 90), a full six months after the Court had expressly given the Receiver that authority (*see* Receivership Order), and more than four months after the Receiver had apparently exercised it (*see* Dkt. 95, at 1).

both to reimburse him for the legal fees and expenses he had incurred to date in connection with this action and to advance to him additional requested amounts.  (*Id.*, at 1-2.)

Shi otherwise devoted his response to asserting the timeliness and propriety of his challenge to the authority of the Receiver, contesting this Court's suggestion that it be viewed as akin to a motion for reconsideration.  (*Id.*, at 2-5.)  He offered no argument as to why he should be treated as an *amicus curiae*, in the event the Court were to reject the terms on which he sought to condition his consent to the Court's jurisdiction.  (*See generally id*.)

By letter dated May 15, 2020 (Dkt. 150), Baliga argued that the Court should not permit Shi to dictate the conditions on which he would accept service, and that, as Shi had not willingly (and unconditionally) consented to submit to the Court's jurisdiction, he should be found to lack standing to challenge to the Receivership's authority (*id.*, at 1-3).  Baliga additionally argued that, should the Court decide to consider the Receivership issue, then it should in fact characterize Shi's challenge to the Receivership Order as a motion for reconsideration and reject it as untimely and, in any event, without merit.  (*Id.*, at 3-4.)

B.   **The Jurisdictional Issue**

1.   **Applicable Legal Standards**

a.   **Consent To Submit to a Court's Jurisdiction**

As previously held by Judge Marrero, "[t]he lawful exercise of personal jurisdiction by a federal court requires satisfaction of three primary requirements," including (1) proper delivery of service of process upon the defendant, (2) "a statutory basis for personal jurisdiction that renders such service of process effective," and (3) the satisfaction of due process requirements. (Shi Dismissal Oder, at 10-11 (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank*, SAL, 673 F.3d 50, 59 (2012)).)  With respect to the requirement of adequate service of process,

constitutional due process requires notice "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Oneida Indian Nation of New York v. Madison County*, 665 F.3d 408, 428 (2d Cir. 2011) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)); *Luessenhop v. Clinton County, N.Y.*, 466 F.3d 259, 269 (2d Cir. 2006) (same); *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 115 (S.D.N.Y. 2010).

A defendant, however, may waive service of process, obviating the need for the court to engage in an inquiry about the propriety of service and the constitutional sufficiency of notice. *Kogan v. Facebook, Inc.,* 334 F.R.D. 393, 398 (S.D.N.Y. 2020) (citing Fed. R. Civ. P. 4(m)). Further, a defendant may voluntarily submit to the jurisdiction of the court, obviating the need for an inquiry as to whether the defendant has sufficient contacts with the forum to justify the court's exercise of personal jurisdiction over him. *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 625 (2d Cir. 2016).

### b.    <u>Alternative Service of Process</u>

In the absence of waiver of service or express consent by the defendant to submit to the court's jurisdiction, service must be made in accordance with Rule 4 of the Federal Rules of Civil Procedure.  Where the defendant resides in a foreign country, Rule 4(f) dictates how service of process may be made:

> . . . Unless federal law provides otherwise, an individual – other than a minor, an incompetent person, or a person whose waiver has been filed – may be served at a place not within any judicial district of the United States:
>
> (1)    by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;

(2)      if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice . . .; or

(3)      by other means not prohibited by international agreement, as the court orders.

Fed. R. Civ. P. 4(f).

There is "no hierarchy" among the three subsections of Rule 4(f), *Advanced Aerofoil Techs., AG v. Todaro*, No. 11cv9505 (ALC), 2012 WL 299959, at *1 (S.D.N.Y. Jan. 31, 2012), such that service under subsection (3) has been held to be "neither a last resort nor extraordinary relief[,] [but rather] . . . merely one means among several which enables service of process on an international defendant," *id*. (internal quotation marks and citation omitted); *FTC v. Pecon Software Ltd.*, No. 12cv7186 (PAE) (and related cases), 2013 WL 4016272, at *3 (S.D.N.Y. Aug. 7, 2013) (same).  Further, no particular means of alternative service are preferred under subsection (3).  Instead, a court is free to "fashion means of service," as long as such means are not – as stated in the Rule – prohibited by international agreement, and as long as the fashioned means "comport[] with constitutional notions of due process." *Pecon Software*, 2013 WL 4016272, at *3 (quoting *SEC v. Anticevic*, No. 05cv6991 (KMW), 2009 WL 361739, at *3 (S.D.N.Y. Feb. 13, 2009)).

Not only are the subsections of Rule 4(f) not hierarchical, but "nothing in Rule 4(f) itself or controlling case law suggests that a court must always require a litigant to first exhaust the potential for service under [internationally agreed means, pursuant to Rule 4(f)(1),] before granting an order permitting alternative service under Rule 4(f)(3)." *GLG Life Tech*, 287 F.R.D. at 266 (citing Wright and Miller, *4B Federal Practice & Procedure:  Civil 3d* § 1134, at 333 (2002)); *SEC v. Cluff*, No. 17cv2460 (RMB) (KNF), 2018 WL 896027, at *2 (S.D.N.Y. Jan. 10,

2018) (quoting *GLG Life Tech*); *see also Anticevic*, 2009 WL 361739, at *3 (noting that a

plaintiff "is *not* required to attempt service through the other provisions of Rule 4(f) before the

Court may order service pursuant to Rule 4(f)(3)" (citation omitted; emphasis in original)).

Nonetheless, courts have often found it appropriate for certain threshold conditions to be

satisfied prior to the issue of an alternative-service order, so as to "prevent parties from

whimsically seeking alternate means of service and thereby increasing the workload of the

courts." *GLG Life Tech*, 287 F.R.D. at 266 (internal quotation marks and citation omitted).

Specifically, courts in this District have generally required plaintiffs "to show that they have

reasonably attempted to effectuate service on the defendant(s) and that the circumstances are

such that the district court's intervention is necessary," *Anticevic*, 2009 WL 361739, at *3

(citation omitted emphasis in original); *see also Wei Su v. Sotheby's, Inc*., No. 17cv4577 (VEC),

2018 WL 4804675, at *3 (S.D.N.Y. Oct. 3, 2018); *Pecon Software*, 2013 WL 4016272, at *4;

*United States v. Lebanese Canadian Bank SAL*, No. 11cv9186 (PAE), 2012 WL 2034997, at *4

(S.D.N.Y. June 6, 2012); *Devi v. Rajapaska*, No. 11cv6634 (NRB), 2012 WL 309605, at *1

(S.D.N.Y. Jan. 31, 2012) (citations omitted); *Madu*, 265 F.R.D. at 115-16.

"Thus, in cases involving service on a person residing in a country that is a signatory to

the Hague Convention, courts have often imposed a requirement that litigants first attempt

service by means of the Hague Convention before seeking court-ordered alternative service

under [sub]section 4(f)(3)." *GLG Life Tech*, 287 F.R.D. at 266; *see also, e.g.*, *Cluff*, 2018 WL

896027, at *2; *Holzman v. Xin*, No. 12cv8405 (AJN), 2015 WL 5544357, at *3 (S.D.N.Y.

Sept. 18, 2015).  Where a plaintiff has exercised diligence in pursuing service by means of the

Hague Convention, courts have usually found alternative service to be appropriate.  *See, e.g.*,

*SEC v. China Intelligent Lighting and Electronics, Inc.*, No. 13cv5079 (JMF), 2014 WL 338817,

at *1 (S.D.N.Y. Jan. 30, 2014); *Pecon Software*, 2013 WL 4016272, at *8-9.  Conversely, where

a plaintiff has failed to make any attempt at service under the Hague Convention prior to

requesting leave to serve the defendant through alternative means, courts have usually rejected

the request.  *See, e.g.*, *Cluff*, 2018 WL 896027, at *4-5; *Devi*, 2012 WL 309605, at *2.

Ultimately, the decision as to whether to order service of process by means alternative to

an international agreement, "is committed to the sound discretion of the district court."  *Madu,*

265 F.R.D. at 115 (internal quotation marks and citation omitted); *Cluff*, 2018 WL 896027, at *2;

*Pecon Software*, 2013 WL 4016272, at *3; *GLG Life Tech*, 83 F.R.D. at 265.  In exercising its

discretion, the court should look at the case-specific record before it.  *See Anticevic*, 2009 WL

361739, at *3 (noting that Rule 4(f)(3) "empower[s] courts to fit the manner of service utilized to

the facts and circumstances of the particular case" (citation omitted)); *GLG Life Tech*, 287

F.R.D. at 266 ("Inasmuch as Rule 4(f)(3) calls upon a court to exercise its discretion [], each case

must be judged on its facts").

### 2.   Merits of Baliga's Request To Serve Shi by <u>Means Alternative to the Hague Convention</u>

As a preliminary matter, this Court turns to the question of whether Shi has now

consented to submit to the Court's jurisdiction, by way of his May 8, 2020 submission, thereby

obviating the need for this Court to consider the appropriateness of alternative service.  In his

submission, as noted above, Shi indicated that he *would* so consent, but *only* on certain terms that

he urged the Court to adopt.  (*See* Dkt. 145.)  The first three of these proposed terms would

address when Shi would be deemed to have been served, whether he could face any adverse

consequences for his actions prior to that date, and the length of time he would be afforded to

move, answer, or otherwise respond to Baliga's operative pleading.  (*See id*., at 2.)  The fourth

proposed term would go beyond addressing the fact, timing, and consequences of service, and, if

adopted by the Court, would require the Receiver to cause the Company to reimburse Shi for legal fees expended to date in connection with this case and to advance him certain additional amounts for defense.  (*See id*.)

Shi has offered no legal support for the proposition that he should be able to dictate any of the terms upon which he would submit to the Court's jurisdiction, nor has he satisfactorily explained why the terms he proposes are necessary to protect him from "undue prejudice," as he suggests.  (*See id*.)  His insistence on the last of his proposed terms, in particular, seems grossly misplaced.  Although Shi contends that an "Indemnification Agreement between him and the Company obligates the Company to advance him the cost of his defense (*see id*.), that issue is one that should be litigated separate and apart from the question of jurisdiction.  This Court has been tasked by Judge Marrero with inquiring whether, in Baliga's renewed application for an order authorizing alternative service, he has made a sufficient showing as to the propriety of such service in this case.  In its May 4, 2020 Order, this Court merely pointed out that, if Shi were prepared to submit voluntarily to the Court's jurisdiction, then this Court would not need to engage in that inquiry.  As Shi has not indicated that he is willing to submit to the Court's jurisdiction absent conditions, this Court concludes that it must proceed to examine the merits of Baliga's renewed application.

In that renewed application, Baliga states that, after the Court denied his initial application for alternative service, in part on the grounds that he had not shown any attempt to obtain Shi's residential address in China (*see* Shi Dismissal Order, at 15-16), he retained investigators who conducted an "extensive investigation" as to Shi's whereabouts (Pl. Alt. Service Mem. (citing Francis Aff.)).  According to Baliga, this investigation included not only record searches, but also "multiple site visits to multiple potential residences and business offices

20

of Defendant Shi" (*id.*), none yielding a current address at which Shi could be served (*see id.*).

Although Shi argues that the Francis affidavit, which provides a lengthy discussion of the efforts

made during this investigation, is "based entirely on hearsay from an unidentified 'Hong Kong

investigator,' an unnamed 'investigator in China,' and a mysterious 'source in China'" (Shi Alt.

Service Reply, at 2), Francis plainly indicates in his affidavit that he had oversight

responsibilities for the investigation (*see generally* Francis Aff.), and – without finding that the

Federal Rules of Evidence must be strictly applied before a court may make a discretionary

decision to permit alternative service – this Court accepts that he has personal knowledge of the

general nature and results of the efforts that were undertaken, at his direction, to locate Shi.

Those investigation results suggest that Shi had, relatively recently, vacated premises that had

previously been identified as his business or residence addresses, and that he had been moving

from place to place, giving rise to a reasonable inference that he may have been attempting to

evade service.  (*See id.*)  Overall, the Francis affidavit supports Baliga's position that the Court's

intervention here is necessary.  *See Wei Su*, 2018 WL 4804675, at *4 (finding judicial

intervention necessary where a defendant "appear[ed] to be evading service").

Moreover, although Shi has now provided – in his reply memorandum – a potential

service address in China, he has not represented that this address is one where either he or a

person authorized by him to accept service can regularly be found.  Rather, his counsel, on his

behalf, has merely stated that the disclosed address is being provided "for purposes of *attempting*

service of process under the Hague Convention."  (*Id.*, at 3 (emphasis added).)  For his own part,

Shi has submitted no affidavit or declaration to confirm that the provided address is correct or

that, if service of process were duly delivered there, he would commit to accepting it.  *Compare*

*Halvorssen v. Simpson*, 328 F.R.D. 30, 35 (E.D.N.Y. 2018) (requiring plaintiff to attempt service

under the Hague Convention where defendants represented that they were "all amenable to . . . service" at addresses they disclosed, and noting that, although two of the defendants had provided an office, rather than residential, address, those defendants had confirmed that "any documents delivered to that office would be accepted"), *with GLG Life Tech*, 287 F.R.D. at 264 (granting motion for alternative service where, although the corporate defendant provided a purported service address for the individual defendant (the corporation's CEO), it provided no accompanying affidavit indicating the source of the address, nor any other evidence to demonstrate that the address was correct).

In his original Order dismissing Baliga's claims against Shi, Judge Marrero also noted Baliga's failure, at that time, to make any showing regarding any obstacles that service under the Hague Convention would pose.  (*See* Shi Dismissal Order, at 15-16 (commenting that, in *GLG Life Tech*, the plaintiffs had "submitted an affidavit regarding the difficulty and delay of service of process in China," but that "Baliga ha[d] made no such showing or attempt").)  Addressing this point, Baliga has further included in his renewed application an affidavit from a person with claimed expertise regarding the Chinese legal system, who has offered opinions regarding the "process, practicality, and timeframe of serving Chinese individuals with a U.S. lawsuit through the Hague Convention."  (Clissold Aff. ¶ 3.)  As noted above, this proffered expert has opined that it could take between six months and a year to effectuate service of process in China via the Hague Convention, assuming such service would "ever made at all" – a proposition as to which he expressed doubt.  (*Id.* ¶¶ 5, 7.)

In all, this Court concludes that Baliga has now made a sufficient showing that he made significant investigatory attempts to locate Shi in China, but was not able to find a residential address for him at which he could be served under the Hague Convention.  Further, this Court

finds that it would not be reasonable, at this juncture, to require Baliga to start anew to attempt

service under the Hague Convention by using the address that Shi provided in his reply

submission, given both the belated timing of the disclosure and the fact that Shi has neither

confirmed the accuracy of that address nor committed to accept service of process if delivered

there.  *See GLG Life Tech*, 287 F.R.D. at 264 (in motion for alternative service, considering the

fact that defendant's purported address, "for which no competent supporting evidence ha[d] been

provided," had been disclosed "only after plaintiffs had gone through the expense of filing the

instant motion").

Finally, this Court concludes that allowing alternative service in this case would comport

with due process requirements for adequate notice, *see Oneida Indian Nation*, 665 F.3d at 428,

as it is clear that Shi has actual notice of this action and of the claims that are being asserted

against him.  Not only, according to Baliga, were his retained investigators able to locate Shi in

China on one occasion and serve him personally with process at that time (*see* Pl. Alt. Service

Mem., at 7), but it is readily apparent that Shi is fully aware of these proceedings, for which he

has retained counsel not only for the purpose of filing a motion to dismiss, but also for the

purpose of raising other issues that he has sought to place before the Court, even after dismissal

of the claims against him was granted.

For all of these reasons, Baliga's request for an order granting leave to serve Shi by

means alternative to the Hague Convention is granted, and service of process on Shi by mail or

email to Maloney, as his counsel, shall be deemed sufficient service.  Baliga is directed to act

forthwith to serve Shi with an Amended Summons and the Amended Complaint, through his

counsel, and to file proof of such service on the Docket of this action.  For the reasons discussed

below, however (*see infra*, at Section (I)(D)), Shi will not be required at this time to respond to

the Amended Complaint, as, to add clarity to certain issues that have been presented to the Court, Baliga is also directed to file a second amended complaint, setting out separately his derivative claims and his purported direct claims.  The second amended complaint shall be filed no later than October 5, 2020, and Shi may have until November 4, 2020, to move, answer, or otherwise respond to that amended pleading, provided he complies with Judge Marrero's Individual Practices with respect to any dispositive motion that he may wish to file.

### C.     The Issue of the Receiver's Authority To Remove Shi From Office

Until Shi is duly served with process and appears before the Court, he cannot be considered a party to this action, and, as Judge Marrero has noted, "non-parties seeking to invoke standing to be heard on a matter generally must move to intervene and willingly subject themselves to the Court's jurisdiction."  (6/11/19 Order, at 20.)  Despite this, Judge Marrero did find – at the time that Baliga's claims against Shi were being dismissed – that, in its discretion, the Court could consider other arguments that Shi was still seeking to advance, by considering his submissions as if they had been made by an *amicus curiae*.  (*Id.*)  While this Court does not believe that Shi's submissions should continue to be treated in this way, without end, the situation presented now has an end in sight, given that the Court is permitting Shi to be served by alternative means, which will presumably result in Shi's being brought back into the action shortly, as a party defendant.[8]

In any event, where the Court "would be hampered in issuing a ruling grounded on all the facts presented," it may, in its discretion, treat the submission of a non-party in "the way it would treat an affidavit or letter submitted to the Court – by giving the document the weight the Court,

---

[8] This Court notes that Judge Marrero has previously indicated that "Shi almost certainly has the minimum contacts necessary with the United States and the forum state to satisfy due process concerns."  (Shi Dismissal Order, at 12; *see also id.*, at n.3)

in its discretion, deems appropriate." *Madu, Edozie & Madu*, 265 F.R.D. at 114 (citations

omitted).  In this instance, while this Court finds that most of the arguments that are being raised

by Shi do not provide a basis for this Court to recommend to Judge Marrero that he reconsider

the scope of authority that he granted to the Receiver, there is one point raised by Shi that

warrants further evaluation.  As to this point (relating to the February 3, 2020 Cayman Court

Order), this Court, in its discretion, will accept and consider Shi's submission.

### 1.        Legal Standards for Motions for Reconsideration or Reargument

Although Shi denies that his application challenging the scope of the Receiver's authority

is in the nature of a motion for "reconsideration," it plainly asks the Court to revisit the term of

its Receivership Order – an Order that has already been challenged once and upheld.  (*See* Shi

Dismissal Order, at 19-24.)  Indeed, Shi's explanation as to why his application should not be

characterized as a motion for reconsideration focuses on the Court's denial (as part of the Shi

Dismissal Order) of his Rule 60 motion seeking discharge of the Receiver (*see* Dkt. 145, at 2),

seemingly confirming that he is seeking, at a minimum, to revisit that ruling.

In this District, motions for reconsideration or reargument are governed by Local Civil

Rule 6.3, which provides, in relevant part:

> Unless otherwise provided by the Court or by statute or rule (such
> as Fed. R. Civ. P. 50, 52, and 59), a notice of motion for
> reconsideration or reargument of a court order determining a
> motion shall be served within fourteen (14) days after the entry of
> the Court's determination of the original motion, or in the case of a
> court order resulting in a judgment, within fourteen (14) days after
> the entry of the judgment.  There shall be served with the notice of
> motion a memorandum setting forth concisely the matters or
> controlling decisions which counsel believes the Court has
> overlooked.  . . .

Local Civ. R. 6.3.

The standards set out in Local Civil Rule 6.3 are "strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked." *Power Auth. of State of New York v. Tug M/V ELLEN S. BOUCHARD,* 433 F. Supp. 3d 477, 478 (S.D.N.Y. 2019) (internal quotations and citation omitted)).  A motion for reconsideration is not an appropriate vehicle for either rehashing arguments already put forward on the initial motion, or raising new arguments that the party seeking reconsideration could have made in the initial briefing.  *Schoolcraft v. City of New York,* 248 F. Supp. 3d 506, 508 (S.D.N.Y. 2017) ("A party seeking reconsideration may neither repeat arguments already briefed, considered and decided[,] nor advance new facts, issues or arguments not previously presented to the Court." (internal quotations and citation omitted)).

Even where a motion is untimely under the Rule, however, and where it cannot be shown that the court overlooked material facts or controlling law, the court may grant reconsideration of its prior order if the movant "demonstrates 'the need to correct a clear error of law or prevent manifest injustice.'"  *Mikol v. Barnhart*, 554 F. Supp. 2d 498, 502 (S.D.N.Y. 2008) (quoting *Griffen Indus., Inc. v. Petrojam, Ltd.*, 72 F. Supp. 2d 365, 368 (S.D.N.Y. 1999)).  "In the context of a motion for reconsideration, 'manifest injustice' is defined as 'an error committed by the trial court that is direct, obvious, and observable,'" *Corpac v. Rubin & Rothman, LLC*, 10 F. Supp. 3d 349, 354 (E.D.N.Y. 2013) (quoting *Idowu v. Middleton*, No. 12cv1238 (BSJ) (KNF), 2013 WL 371657, at *1 n.1 (S.D.N.Y. Jan. 31, 2013)), and, "as a rule[,] courts should be loathe to [revisit their prior decisions] in the absence of extraordinary circumstances," *id.* (internal quotation marks and citation omitted).  Nonetheless, compelling circumstances for reconsideration may exist where later developments in a case suggest that a failure to reconsider a prior ruling could result in an unlawful or significantly unjust result.  *See Mikol*, 554 F. Supp. 2d at 498, 502-03

(reconsidering decision affirming the denial of disability benefits in light of subsequent administrative decision that was favorable to the claimant).

Ultimately, "[t]he decision to grant or deny a motion for reconsideration is left to the sound discretion of the district court" that issued the decision in question. *Power Auth. of State of New York,* 433 F. Supp. 3d at 478 (internal quotations and citation omitted).

### 2.      Merits of Shi's Application To Reconsider the Receiver's Authority

As set out above (*see supra*, at Section (I)(A)(1)), the Receivership Order expressly conferred on the Receiver the authority to remove any director or officer of the Company "from control of, management of, or participation in, the affairs of the Company" (Receivership Order § II(2)(b)).  As noted by Shi, he challenged the validity of that Order in March 2019 (*see* Dkt. 35), and, in a written decision dated June 11, 2019, Judge Marrero rejected the arguments that Shi advanced.  (*See* Shi Dismissal Order.)  Almost all of the arguments that Shi now puts forward, as to why it was supposedly improper for Judge Marrero to have conferred broad authority on the Receiver, either were, or could have been, raised within 14 days of that ruling, the period allowed for motions for reconsideration.  Instead, it appears that the first time that Shi may have sought to raise his current arguments with Judge Marrero was at a conference on July 29, 2019 (*see* Dkt. 88; *see also* Dkt. 145, at 2), and that his arguments were not set out in writing for the Court until August 29, 2019 (*see* Shi 8/29/19 Ltr., at 2-4).  To this extent, then, Shi's motion is untimely under Local Civil Rule 6.3.

Moreover, even apart from the fact that Shi has not shown that his application was timely, he has not shown that, in upholding the validity of the Receivership Order, Judge Marrero overlooked any material facts or controlling law that was presented to him in Shi's Rule 60 motion, *Power Auth. of State of New York*, 433 F. Supp. 3d at 478, and, certainly,

Shi is not entitled to reconsideration on the basis of new arguments that could have been raised in that motion, but were not, *Schoolcraft,* 248 F. Supp. 3d at 508.  For these reasons, if this Court were, at this point, to issue a recommendation to Judge Marrero on this issue, it would, for the most part, recommend that Shi's belated, and largely meritless, request for reconsideration be denied.

This Court, however, will hold off on making such a recommendation at this time, as it is has some concerns regarding the potential ramifications of the Cayman Court Order, and needs additional information in order to understand those ramifications and determine whether they would justify belated reconsideration to correct "clear error" or prevent "manifest injustice."  At present, this Court does not understand, from the materials that have been placed before it, why the Receiver seemingly thought it necessary to make an application to the Cayman Court, seeking specific "recognition" of his authority to remove or appoint directors of the Company (Shi 3/27/20 Ltr , at 2), nor does it understand the meaning or import of that court's decision "not [to] recogniz[e]" that authority (*see* Cayman Court Order ¶ 2).  Thus, this Court will defer making a recommendation to Judge Marrero as to whether he should reconsider the validity of the Receivership Order, specifically with respect to the scope of the Receiver's granted authority, pending this Court's receipt of additional information from the Receiver himself.

Accordingly, no later than September 9, 2020, Baliga is directed to provide a copy of this Memorandum and Order to the Receiver, and, no later than October 9, 2020, the Receiver is directed to make a submission to this Court, providing (1) an explanation as to why he made an application to the Cayman Court for an order "recognizing" his authority, (2) copies of the papers that he submitted to the Cayman Court in connection with that application, and (3) an

explanation, supported by legal authority, of his understanding of the ramifications of the

Cayman Court Order with respect to his authority to remove or appoint Company directors.

 As set out below, this Court is scheduling a telephonic case-management conference in

this case for October 15, 2020, at 10:00 a.m.  The Receiver is directed to make himself available

to participate in that conference, and should be prepared to address this issue.

## II. CHINA AI'S MOTION TO INTERVENE

###  A. Relevant Procedural History

 On November 1, 2019, China AI filed a Notice of Motion To Intervene as of Right

(Dkt. 111), and, on November 5, 2019, Judge Marrero ordered the parties to show cause why the

requested relief should not be granted (Dkt. 112).  In response to the Court's Order, Baliga filed

a letter setting out a number of reasons why, in his view, intervention should not be granted

(Dkt. 113), while Shi, through counsel, submitted a letter voicing no objection to China AI's

motion (Dkt. 114).  In addition, the Receiver submitted a letter to the Court, indicating that he

was in the process of investigating whether China AI was a possible "front" for Shi.  (Dkt. 115.)

 After Judge Marrero then referred the matter to this Court for resolution, China AI filed

its proposed intervenor complaint (*see* Complaint in Intervention, dated Mar. 5, 2020 ("Proposed

Interven. Compl.") (Dkt. 122)), together with a more fully supported motion for intervention (see

Dkt. 123), but that motion was rejected as improperly filed.  China AI then tried to file an

"amended motion" on March 10, 2020 (Dkt. 127), but that filing was again rejected as deficient,

as China AI did not separately file its supporting papers.  By Text Order dated April 6, 2020, this

Court noted that, although the amended motion was not then refiled as directed, China AI did

proceed, on March 26, 2020, to file its supporting memorandum of law and declarations as

separate Docket entries,[9] thereby "effectively addressing the filing defect."  (Dkt. 137).  For this

reason, and to as to avoid "having the Docket cluttered with more amended submissions," this

Court accepted the amended motion, deeming it filed as of March 26, 2020.  (*Id*.)

Through its proposed intervention, China AI – which itself claims to be a shareholder of

the Company and to have the right to bring derivative claims – does *not* seek to challenge any

conduct of Shi or the other Individual Defendants whom Baliga has accused of wrongdoing.

Instead, China AI seeks to challenge the conduct of *Baliga*, contending that his very act of

commencing this action (and, in connection with its commencement, seeking and obtaining the

Receivership Order) was based on fraud and has caused the Company harm.  (*See generally id.*)

In fact, China AI seeks to plead derivative claims not only against Baliga himself, but also

against those who, according to China AI, have conspired in bad faith with him to tortiously

interfere with the Company's business relations through the means of this lawsuit, including

three named individuals and "John Does 1 through 100," as well as an unincorporated

association known as "LKMForward," of which these individuals are allegedly members.  (*See

generally id*. (referring, *passim*, to the "LKM Conspirators").)

In particular, as against Baliga and the additional proposed third-party defendants,

China AI seeks to assert five derivative claims, which may be summarized as follows:

> (1)  a claim for a declaratory judgment that Baliga lacks
> standing to assert derivative claims on behalf of the
> Company;
>
> (2)  a claim for a declaratory judgment that Baliga cannot bring
> derivative claims that were previously considered and

---

[9] Although this Court's Text Order only referred to one supporting declaration, China AI actually filed two:  a declaration by China AI's counsel of record in this action, attaching certain exhibits (*see* Declaration of Jae H. Cho in Support of Motion To Intervene dated Mar. 5, 2020 ("Cho Decl.") (Dkt. 130)), and a declaration by a Cayman Islands attorney (*see* Declaration of Katharine L.B. Pearson, dated Mar. 3, 2020 ("Pearson Decl.") (Dkt. 131)).

rejected by special committee of the Company's board of directors, and that those claims should therefore be dismissed;

(3)    a claim for injunctive relief (a) enjoining Baliga and those allegedly associated with him from asserting derivative claims, (b) enjoining the Court-appointed Receiver from removing or appointing directors, officers, or attorneys-in-fact for the Company and other specified entities; and (c) enjoining the Receiver from interfering with lawful actions of the Company's board of directors;

(4)    a derivative claim against Baliga for tortious interference with the Company's business relations, based on Baliga's having allegedly wrongfully commenced this action and sought the appointment of the Receiver; and

(5)    a derivative claim against Baliga and his alleged associates for "conspiracy to tortiously interfere" with the Company's business relations.

(*Id.*)

In its moving brief, China AI argues solely that it is entitled to intervene in this action "as of right," raising no argument for permissive intervention.  (Memorandum of Law of Intervenor-Plaintiff China AI Capital Limited in Support of Motion To Intervene as of Right," dated Mar. 5, 2020 ("China AI Mem.") (Dkt. 129).)  Its principal contention in support of its motion is that, as a factual matter, Baliga has falsely alleged that he is a "shareholder" of the Company, and that, as a matter of law, Baliga's lack of actual status as a registered shareholder deprives him of standing to assert any claim, derivatively, on the Company's behalf.  (*Id.*, at 1; *see generally id*.)

More specifically, China AI contends, first, that "Baliga is merely the holder of American Depository Shares ('ADSs'), which are not the same as shares of stock in the Company" (China AI Mem., at 1; *see also id.*, at 3 ("Holders of ADSs are not registered shareholders of the Company."); Cho Decl., Ex. 2); second, that the question of whether Baliga has standing to assert derivative claims on behalf of the Company is governed by the law of the Cayman Islands,

where the Company was incorporated (China AI Mem., at 1, 7-8); and, third, that, under Cayman Islands law, a holder of ADSs is considered to be "merely a beneficial owner," without standing to bring such claims (*id.*, at 1, *see also id.*, at 8; *see generally* Pearson Decl.).  China AI asserts that it is entitled to intervene because, under these circumstances, "the Company's interest[s] are not and cannot be adequately represented by Baliga" (*id.*, at 8), and because, unlike Baliga, China AI is, itself, a registered shareholder of the Company (and has been since before Baliga filed his claims), and thus would have the standing that Baliga lacks, to raise any claims on the Company's behalf (*see id.*, at 2; *see also id.*, at 8 ("As between Baliga and China AI, only China AI can adequately represent the registered shareholders of the Company.")).

China AI also asserts that the appointment of the Receiver (who, China AI points out, is the managing partner of the same law firm that serves in this case as Baliga's counsel[10]) has made it impossible for the Company's board of directors to "act independently to defend the Company from Baliga's baseless claims," and has rendered demand on the board futile.  (*Id.*, at 2; *see also id.*, at 5-6.)  China AI additionally contends that its motion is timely because "none of the individual defendants have been served with process and no discovery has occurred." (*Id.*, at 7.)  Finally, although without any further explanation (and without having included any such request in its Amended Notice of Motion (Dkt. 127)), China AI states in the "Conclusion" of its brief that the Court should not only grant its motion to intervene, but should also, at this point, "modify[]" the Receivership Order (China AI Mem., at 9).

---

[10] Seiden's connection to Baliga's counsel of record in this litigation was known to the Court at the time it issued the Receivership Order, as well as at the time it upheld the validity of the appointment.  (*See* Receivership Order, at § II(1); *see also* Dkt. 37, at 2; Dkt. 24 ¶ 3 (Baliga asserting, in support of his application for Seiden to be appointed as the temporary receiver, that he "specifically hired Mr. Seiden's law firm to pursue this action . . . due to Mr. Seiden's extensive experience as a court-appointed Receiver").)

In opposition to China AI's motion, Baliga filed a memorandum of law (Plaintiff's Memorandum of Law in Opposition to China AI Capital Limited's Motion To Intervene, dated May 4, 2020 ("Pl. Mem. in Opp. to Intervention") (Dkt. 141)), together with a supporting attorney declaration, with exhibits (Declaration of Jake Nachmani, dated May 4, 2020 ("Nachmani Decl.") (Dkt. 142)).  In his brief, Baliga first contends that, based on information provided by the Receiver (*see* Nachmani Decl., Ex. 1), China AI and Shi "are, if not one and the same, then closely related," and that they are "colluding to perpetuate a fraud."  (Pl. Mem. in Opp. to Intervention, at 1; *see also id.*, at 2 (stating that, if China AI "is either an alter ego or an affiliate of Shi's," then it "can have no legitimate interest as an intervenor"), 3-6, 8-9).)  Second, Baliga argues that China AI's intervention motion is untimely, as it was filed at least 15 months after China AI had notice of this action.  (Pl. Mem. in Opp. to Intervention, at 2, 10-12.)  Third, Baliga contests China AI's contention that he lacks standing to assert his claims, explaining that, although framed as a derivative pleading, his Amended Complaint should also be read to plead direct claims, and arguing that, in any event, the law of New York, as well as of the Cayman Islands, supports finding that he has standing to pursue derivative claims and can adequately protect the interests of the Company's shareholders.  (*Id.*, at 2, 12-16.)  Finally, Baliga requests that, should the Court find that he lacks standing to maintain his derivative claims, he be permitted to file a second amended complaint, to "remove any derivative claims and allege direct claims only, as well as provide additional allegations concerning Defendant Shi's continued fraud against [the Company's] shareholders, uncovered as a result of the Receiver's ongoing investigations."  (*Id.*, at 16.)  According to Baliga, such an amended pleading would render moot any standing arguments that have been raised by China AI.  (*Id.*)

On May 29, 2020, China AI filed a substantial reply submission, consisting of a letter from counsel (Letter to the Court from Jae H. Cho, Esq., dated May 29, 2020 (Dkt. 153)), a reply brief (Reply Memorandum of Law of Intervenor-Plaintiff China AI Capital Limited in Further Support of Motion To Intervene as of Right and For Modification of the Court's Order dated February 1, 2019, dated May 29, 2020 ("China AI Reply Mem.") (Dkt. 158)), and three declarations, with a number of annexed exhibits (Second Declaration of Katharine L.B. Pearson, dated May 22, 2020 ("Pearson Reply Decl.") (Dkt. 154); Declaration of Hua Jingyuan in Further Support of Motion to Intervene, dated May 27, 2020 (Dkt. 155); Reply Declaration of Jae H. Cho in Further Support of Motion To Intervene, dated May 29, 2020 (Dkt. 156); Declaration of Xu Zemin, dated May 29, 2020 (Dkt. 157)) – all largely to contest the assertions made by the Receiver regarding his suspicions of collusion by China AI and Shi.  Relying heavily on its submitted documents, China AI's reply brief sets out a lengthy new statement of facts (China AI Reply Mem., at 2-10), purporting to show that the conclusions reached by the Receiver regarding the supposed "alter ego" relationship between China AI and Shi were "based on a selective and out-of-context reading of certain documents," and "are contradicted by corporate and judicial records" (*id.*, at 1; *see also id.*, at 14).

China AI also seeks to refute Baliga's challenge to the timeliness of its intervention motion (*id.*, at 14-16), and expands on its initial argument that Baliga does not adequately represent its interests – again, focusing that argument on Baliga's supposed lack of standing to bring derivative claims (*id.*, at 16-19).  Lastly, China AI turns its attention to the Receivership Order, contending that, in his opposition, Baliga has "fail[ed] to contest" its argument for "modification" of that Order.  (*Id.*, at 20.)  Arguing that the Receivership Order was obtained by way of Baliga's "misrepresentations as to his legal standing," and that, "[h]ad the Court known

34

the truth, it would have never entertained [Baliga's] application or entered the [Receivership]

Order," China AI now asserts that the Order should simply be "vacate[d]." (*Id.*, at 20-22.)  In

response to Baliga's argument that, even if he lacked standing to assert derivative claims, he had

standing to assert his supposed direct claims, China AI further argues that any such direct claims

are "legal" in nature, rather than "equitable," and therefore could not have entitled Baliga to the

appointment of a receiver.  (*See id.*, at 21-22.)

### B. <u>Applicable Legal Standards</u>

"Intervention is a procedural device that attempts to accommodate two competing

policies:  efficiently administrating legal disputes by resolving all related issues in one lawsuit,

on the one hand, and keeping a single lawsuit from becoming unnecessarily complex, unwieldy

or prolonged, on the other hand."  *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 69 (2d Cir.

1994).  Rule 24(a) of the Federal Rules of Civil Procedure, which sets out the standards

governing motions to intervene as of right,[11] provides that the district court must allow any party

to intervene who, "[o]n timely motion,"

> . . . claims an interest relating to the property or transaction that is
> the subject of the action, and is so situated that disposing of the
> action may as a practical matter impair or impede the movant's
> ability to protect its interest, unless existing parties adequately
> represent that interest.

Fed. R. Civ. P. 24(a)(2).

When seeking intervention under this provision of the Rule, "the proposed intervenor

bears the burden of demonstrating that it meets the requirements for intervention."

*Kamdem-Ouaffo v. Pepsico, Inc.*, 314 F.R.D. 130, 134 (S.D.N.Y. 2016).  Based on the Rule,

---

[11] Rule 24(b) governs permissive joinder, which, as noted above, is not being sought here,
even in the alternative.

courts have held that intervention as of right will be granted when all four of the following

conditions are met:

> (1) the motion is timely; (2) the applicant asserts an interest
> relating to the property or transaction that is the subject of the
> action; (3) the applicant is so situated that[,] without intervention,
> disposition of the action may, as a practical matter, impair or
> impede the applicant's ability to protect its interest; and (4) the
> applicant's interest is not adequately represented by the other
> parties.

*Mastercard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 389 (2d Cir. 2006) (citing

*United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir. 1994)).

"Failure to meet any one of these requirements suffices for a denial of the motion."  *In re*

*Holocaust Victim Assets Litig.*, 225 F.3d 191, 197-98 (2d Cir. 2000) (citation omitted); *see also*

*Pitney Bowes*, 25 F.3d at 70 ("The intervention application will be denied unless all four

requirements are met.").  Whether each requirement is satisfied, however, is a determination that

cannot be made through the application of "bright line" tests.  *Floyd v. City of New York*, 302

F.R.D. 69, 83-84 (S.D.N.Y. 2014) (noting that, "[i]n applying the Rule, courts must be cognizant

that its "various components . . . are not bright lines, but ranges – not all 'interests' are of equal

rank, not all impairments are of the same degree, representation by existing parties may be more

or less adequate, and there is no litmus paper test for timeliness").  "Courts applying Rule 24

accept as true the non-conclusory allegations of the motion," but "must be mindful that each

intervention case is highly fact specific and tends to resist comparison to prior cases."  *Aristocrat*

*Leisure Limited v. Deutsche Bank Trust Co. Americas*, 262 F.R.D. 348, 352 (S.D.N.Y. 2009)

(internal quotation marks and citation omitted).

C.     **Merits of China AI's Motion**

As set out above, a motion for intervention as of right cannot succeed unless the proposed intervenor demonstrates that it meets all four of the requirements of Rule 24(a)(2).  Here, China AI's motion for intervention fails because China AI has not carried its burden of showing that it satisfies any of those requirements.

1.     **Timeliness**

The "threshold inquiry [on a motion to intervene] is whether the application for intervention is timely."  *Kamdem-Ouaffo*, 314 F.R.D. at 135.  Timeliness "defies precise definition" and "is not confined strictly to chronology."  *Pitney Bowes,* 25 F.3d at 70.  Rather, "the determination of whether a motion to intervene is timely must be 'evaluated against the totality of the circumstances before the court.'"  *Kamdem-Quaffo*, 314 F.R.D. at 135 (quoting *D'Amato v. Deutsche Bank*, 236 F.3d 78, 84 (2d Cir. 2001)); *see also Pitney Bowes*, 25 F.3d at 70 ("Whether a motion to intervene is timely is determined within the sound discretion of the trial court from all the circumstances" (quoting *NAACP v. New York*, 413 U.S. 345 (1973))).

To "guide" this determination, *Kamdem-Quaffo*, 314 F.R.D. at 135, courts generally consider the following factors:  "(1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness," *id.* (citing *Pitney Bowes, Inc.*, 25 F.3d at 70); *accord United States v. New York*, 820 F.2d 554, 557 (2d Cir. 1987)).  The first of these factors – "the length of time the applicant knew or should have known of [its] interest before making the motion" is "[a]mong the most important factors" to be considered in determining timeliness. *Catanzano by Catanzano v. Wing*, 103 F.3d 223, 233 (2d Cir. 1996).  Still, courts take into

account all of the relevant factors, and it has been held by some courts that the question of "whether the delay has prejudiced any of the existing parties" is "the most significant criterion in determining timeliness." *United States ex rel. Preferred Masonry Restoration, Inc. v. Int'l Fid. Ins. Co.*, No. 17cv1358 (KMK), 2019 WL 4126473, at *3 (S.D.N.Y. Aug. 30, 2019) (internal quotation marks and citation omitted); *see also Authors Guild v. Google, Inc.*, No. 05cv8136 (DC), 2009 WL 3617732, at *2-3 (S.D.N.Y. Nov. 4, 2009) (finding timeliness evaluation to be "driven heavily" by an evaluation of the relative prejudice to the parties and the proposed intervenor). Further, where a proposed intervenor's delay in bringing its motion has been lengthy, courts have considered whether there are special circumstances that would reasonably explain why the motion was not brought sooner. *See, e.g.*, *Preferred Masonry Restoration*, 2019 WL 4126473, at *3-4.

### a.   <u>Length of Delay</u>

In arguing that its motion is timely, China AI focuses principally on the factors relating to prejudice, rather on the first, "important" question of how long it has been since it "knew or should have known" of its interest in this case, *Kamdem-Quaffo*, 314 F.R.D. at 135. Baliga, on the other hand, emphasizes that China AI delayed for a substantial period of time before making its motion. He asserts, more specifically, that the filing of a lawsuit operates to "trigger[] notice" to a potential intervenor because court filings are publicly accessible (Pl. Mem. in Opp. to Intervention, at 10-11 (citing *Mastercard Int'l*, 471 F.3d at 390)), and argues that China AI "had notice of [this] lawsuit since the day it was filed in December 2018" (*id.*, at Pl. Mem. in Opp. to Intervention, at 11), fully 15 months before the March 2020 date when China AI's motion was deemed filed. Further, Baliga not only contends that the filing of his suit put China AI on *constructive* notice of the claims raised in this action, but he additionally contends that, because

38

the Company's "entire [b]oard [of directors]" was informed of both the suit and the Receivership Order, and directors of China AI sat on the Company's board, China AI had *actual* notice of these proceedings at the time they were commenced.  (*See id.*, at 11.)  In fact, Baliga argues that, through its representatives on the Company's board, China AI knew of his allegations even before this suit was filed, as a result of his having made a demand to the board.  (*Id.*)  Finally, Baliga notes that, even after Judge Marrero directed China AI to brief the intervention issue before this Court, China AI delayed for another three months before raising the issue again, and four months before filing a motion that this Court accepted as "non-defective."  (*Id.*)  According to Baliga, the Second Circuit has "routinely denied" motions to intervene that have been made in shorter time periods than the time period at issue here (*see id.*, at 11), and China AI's motion should be denied for this reason, especially as, according to Baliga, China AI has failed to provide any explanation for its delay (*id.*, at 13).

On reply, China AI does not take issue with Baliga's assertions that it had actual, or at least constructive, notice of this suit at least 15 months before it was deemed to have filed its motion to intervene – although this Court notes that China AI actually first sought to file its motion on November 1, 2019 (Dkt. 111), approximately 10 and a half months from when the Complaint was filed (*see* Dkt. 1).  In any event, China AI apparently concedes a lengthy delay, but contends that it has "offered a well-reasoned explanation for the length of time between the commencement of the action and its motion to intervene."  (China AI Reply Mem., at 14.)  This Court will consider that explanation below, as part of its review of the totality of the circumstances presented in this particular case.  On the first-level question, though, of whether China AI's delay was long enough to weigh in favor of this Court's denial of its motion to intervene, this Court agrees with Baliga that a delay of 15 months – or even 10 and a half

months – from when the action was commenced can be sufficient to render the motion untimely. *See Kamdem-Ouaffo,* 314 F.R.D. at 135 (denying motion to intervene after 16 months of actual notice and collecting cases where intervention was untimely after, *inter alia,* 10 months and 15 months).

### b.   Explanation for the Delay

As for its supposedly "well-reasoned explanation" for its delay, China AI states that, even if it believed, upon learning of the suit, that Plaintiff's claims were meritless, "there was no reason for [it] to believe that Plaintiff would falsely allege such a fundamentally basic fact as share ownership."  (China Reply Mem., at 14; *see also* China AI Mem., at 7 (arguing that "its ability to discovery the truth about Baliga's false allegations of standing was hindered by Baliga's concealment from the Court that he is [] merely the holder of ADSs and not a registered shareholder).)   In addition, China AI states that, at the time the Receiver was appointed, it "reasonably believed that the Receiver would, in fact, act as a fiduciary in the best interests of all shareholders," instead of "mismanag[ing] the [C]ompany."  China AI contends that it "moved promptly after the true facts started to surface."  (*Id.*, at 16.)

China AI's explanation for its delay is not credible on its face.  As an initial matter, China AI's contentions that its ability to learn the nature of Baliga's stock ownership was "hindered by . . . concealment" (China AI Mem., at 7), and that it filed its motion "promptly" after facts "started to surface" (China AI Reply Mem., at 16), are vague and conclusory. China AI does not explain why it could not have known, from the outset, that Baliga held Company ADSs (rather than registered shares), how it later came to learn this fact, or when it came to learn it.  It is perhaps unsurprising that China AI has avoided addressing these points, given that, in the context of opposing Shi's motion to dismiss the Complaint, Baliga filed an

affidavit in this action on April 26, 2019, in which he described the Company's ADS offerings and attested, in detail, to his purchases of those securities.  (*See* Dkt. 49; *see also* Shi Dismissal Order, at 19 (noting that "Baliga has now provided ample evidence . . . that he did, in face, purchase or sell Link Motion ADS").)  Thus, based on the filings in this case, of which China AI had at least constructive notice, China AI should have known of the nature of Baliga's holdings by April 2019 at the latest – at least six months before it sought to intervene.

Moreover, China AI's implicit argument that it would have sought to intervene sooner, had it only known that Baliga was not a registered shareholder, makes no sense.  From the beginning, Baliga has asserted claims in this case that accuse Shi of serious wrongdoing, including fraud and large-scale theft of corporate assets.  (*See generally* Compl.; *see also* Am. Compl.)  It would be one thing if China AI had been equally concerned about Shi's conduct, and did not seek to intervene to challenge Shi's actions because it had lulled into complacency by a misplaced belief that Baliga had standing to advance those claims and thus could adequately protect its interests.  It is another thing for China AI to claim that Baliga has wrongfully attacked Shi, that the Receiver has damaged the Company by removing Shi, and that Shi should be reinstalled as a director of the Company and its acting CEO.  (*See generally* Proposed Interven. Compl.; *see also id.*, at 28 (Prayer for Relief ¶ g).)

China AI knew, from the outset, the premise of Baliga's claims (*i.e.*, that Shi's conduct, on his own and in directing the actions of the other Individual Defendants, posed a danger to the Company and its shareholders), and if it was concerned that these claims would *themselves* harm the Company or China AI's own interests as a shareholder, then it could and should have sought to intervene upon first learning of the assertion of these claims.  Similarly, China AI knew or should have known, from the time the Receivership Order was issued, that the Receiver was

41

being appointed to preserve assets of the Company, in the face of Baliga's allegations regarding Shi's misconduct, and that the Order expressly granted the Receiver the authority to remove and appoint directors and officer of the Company.  If China AI was concerned about Shi's potential removal – or even his actual removal in March 2019 – then it could and should have sought leave to intervene then, rather than a year or more later.

China AI's proffered reasons for its delay are a far cry from the reason asserted in the case on which it primarily relies, *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 262 F.R.D. 348 (S.D.N.Y. 2009), to support its argument that its delay should be excused (*see* China AI Reply Mem., at 15).  In that case, the proposed intervenor explained that, during the lengthy history of the litigation, including during the discovery process, both of the named parties to the suit had treated it as if it were also a party to the action, and that a dispute as to whether it should *actually* be considered a party did not arise until just before the trial was set to begin.  *Id.* at 351.  The court, finding the case to present "highly unusual circumstances," held that, because the proposed intervenor had been treated as a party by the other litigants at "various key points throughout" the litigation, the intervenor had a well-reasoned explanation for why it did not file its motion to intervene until several years had passed since it received notice of the suit.  *Id.* at 353.  The other cases cited by China AI as illustrative of delays that had been excused by courts for good reason are equally distinguishable.  In *Preferred Masonry Restoration*, 2019 WL 4126473, at *3-4 (cited in China AI Reply Mem., at 15), the court found that particular, case-specific circumstances made the movant's lengthy delay understandable, as the action had been dormant for months at a time, as the result of an unsuccessful mediation, a party's serious health issues, and the court's own scheduling, all of which had been outside the movant's control, *id.*, at *3-4, and, in *Citizens for an Orderly Energy Policy, Inc. v. County of Suffolk*, 101

F.R.D. 497 (E.D.N.Y. 1984) (also cited in China AI Reply Mem., at 15), the delay at issue was far shorter than China AI's delay here, as the motion in that case was brought "barely four and a half months" from when the complaint was filed, *id*. at 500.

Absent a compelling reason for its failure to seek leave to intervene for at least 10 and a half months following the commencement of this action, China AI's delay cannot be considered justified. *See Kamdem-Ouaffo*, 314 F.R.D. at 135; *see also Andrews v. Sony/ATV Music Publ'g, LLC,* No. 15-CV-7544 (AJN), 2017 WL 770614, at *10 (S.D.N.Y. Feb. 24, 2017) (motion to intervene found untimely where party "only vaguely assert[ed] that it did not have knowledge of [the] dispute," and otherwise "offer[ed] no compelling justification for its delay").

### c.   <u>Prejudice to Existing Parties If Intervention Is Allowed</u>

Turning to the factor of "prejudice," China AI primarily contends, in its moving brief, that its motion should be considered timely "because none of the individual defendants have been served with process and no discovery has occurred."  (*See* China AI Mem., at 7 ("China AI's motion is timely).)  On reply, it adds that "liability has not been adjudicated, and there are no scheduling orders in place that would require modification," describing this action as "still at the pleading stage."  (China AI Reply Mem., at 16.)  It also argues that the question of whether the existing parties to the action would be prejudiced by intervention – and the additional question of whether *it* would be prejudiced by being *excluded* from the action (discussed separately below) – should determine, "in large part," whether its motion should be found timely. (*Id.*, at 15 (quoting *CIFI Latam, S.A. v. Tach*, No 19cv05607 (LTS) (SN), (S.D.N.Y. Mar. 11, 2020)).)

China AI's argument that its intervention would not unduly prejudice the parties to this action has somewhat more force than its arguments regarding the reasons for its delay.  While, in

opposition, Baliga argues that "this action is sufficiently far along to warrant holding China AI's [m]otion untimely" (Pl. Mem., in Opp. to Intervention, at 12), the single fact that Baliga offers to support this argument is that "Defendants' motions to dismiss have already been adjudicated" (*id.*). Yet, while it is true that the parties to this case have not been engaging in discovery, that no existing scheduling order would be affected by China AI's intervention, that no trial date has been set, and that the parties are not, to this Court's knowledge, engaged in advanced settlement discussions,[12] it would be a mischaracterization of the status of this action to suggest that the proceedings have not advanced. Indeed, the Docket of this action currently reflects 162 Docket entries. The Court's issuance of a preliminary injunction and appointment of the Receiver were apparently made upon briefing by Baliga (*see* Dkt. 24), and the parties have also been through, *inter alia*, full briefing of both motions to dismiss and a challenge to the Receivership Order, which led to rulings by the Court, not only with respect to jurisdictional issues, but also with respect to issues of *forum non conveniens*, the adequacy of Baliga's securities-fraud claims, and the validity of the preliminary injunction and Receivership Order. (*See generally* Shi Dismissal Order.)

From this, it is reasonable to conclude that, while the prejudice to the parties that would result from the Court's allowing China AI to intervene may not be severe, Baliga would suffer at least some prejudice if he were forced to go through initial motion practice again (this time with China AI) – either with respect to the sufficiency of his claims or the validity of the

---

[12] In at least two of the cases cited by Plaintiff to support denial of intervention, settlement negotiations between the parties were already well advanced, leading the courts to be hesitant to let a new party intervene at that stage. *See D'Amato*, 236 F.3d at 84 (reasoning that late intervention would prejudice the existing parties by potentially derailing the settlement negotiations that had taken place for several months); *Holocaust Litigation*, 225 F.3d at 199 (reasoning that intervention at such a late stage would prejudice the existing parties by "destroying their [s]ettlement and sending them back to the drawing board").

Receivership Order.  In addition, the intervenor complaint on which China AI seeks to proceed would significantly alter and expand the action, raising new claims against Baliga and numerous other individuals not currently parties to the action.  This would also be prejudicial to Baliga's ability to move forward with the prosecution of his claims.

### d. <u>Prejudice to China AI If Intervention Is Not Allowed</u>

In addition, China AI has not demonstrated how it would be unduly prejudiced if not permitted to intervene at this stage.  The issue of whether China AI would be prejudiced by a denial of its motion is less obviously related to the question of whether its motion should be considered "timely" than to the questions of whether, absent intervention, its interests would be protected and adequately represented by the other parties to the action.  These are separate requirements for intervention under Rule 24(a)(2), *see Mastercard Int'l*, 471 F.3d at 389, which this Court will address below.  Nonetheless, it is worth briefly noting here that China AI's underlying position is that Baliga's claims – which all relate to alleged misconduct by Shi – are without merit, and that, by asserting those claims, Baliga tortiously interfered with the Company's business and improperly effected the removal of Shi from a position of control within the Company.  Yet, for the reasons already discussed, this Court is allowing Shi to be served with process by means alternative to the Hague Convention, and this Court has no reason to believe that, once served, Shi will not appear and defend against Baliga's claims.  Indeed, even without having had standing to do so since his earlier dismissal from the case, Shi has actively and repeatedly sought, through his counsel of record, to challenge his removal from the Company by the Receiver, as well as the propriety of other actions that the Receiver has taken since being appointed.  In these circumstances, and for the reasons discussed more fully below

(*see infra*, at Section (II)(C)(3)), it is difficult to see how China AI would be substantially prejudiced by the denial of its belated motion to intervene.

Apart from the arguments addressed above, China AI has shown no unusual circumstances that would militate in favor of a finding that its motion is timely, as required by Rule 24(a)(2).  Thus, based on the totality of the circumstances discussed above, this Court concludes that China AI has failed to meet its burden to demonstrate timeliness.

### 2. Interest Relating to the Property or Transaction That Is the Subject of the Action

The second requirement of Rule 24(a)(2) is that the proposed intervenor must demonstrate that it is seeking to assert "an interest relating to the property or transaction that is the subject of the action."  *Mastercard Int'l*, 471 F.3d at 389.  The intervenor's interest be "direct, substantial, and legally protectable," *Wash. Elec. Coop.*, 922 F.2d at 96-97 (2d Cir. 1990), and neither "remote" nor "contingent," *id.* (citation omitted).  As a general matter, this prong of the test for intervention as of right recognizes that, while "[t]he purpose of the rule allowing intervention is to prevent a multiplicity of suits where common questions of law or fact are involved," *id.*, at 97 (citation omitted), "the rule is not intended to allow for the creation of whole new suits by intervenors," *id.* (citations omitted).  Rather, "[i]ntervenors must take the pleadings in a case as they find them."  *Id.* (citations omitted).  Thus, intervention should be denied where the claims of the proposed intervenor would "render[] the single lawsuit more complex and protracted," *Oneida Indian Nation of Wisconsin v. New York*, 102 F.R.D. 445, 449 (N.D.N.Y. 1983), or would "inject collateral issues into an existing action," *Wash. Elec. Coop.*, 922 F.2d at 97.

In this instance, China AI (like Baliga) is purportedly seeking to plead derivative claims on behalf of the Company, and thus the "interest" that China AI is seeking to assert is not its

own, but rather that of the Company.  *See Koster v. Lumbermens Mutual Casualty Co.*, 330 U.S. 518, at 522-23 (1947) (explaining that, in a shareholder derivative suit, "[t]he cause of action which [the] plaintiff brings before the court is not his own but the corporation's," which is the "real party in interest").  Yet, in seeking to assert the Company's interest, China AI is hardly "tak[ing] the pleadings in [this] case as [it] find[s] them."  *Wash. Elec. Coop.*, 922 F.2d at 97. While its proposed claims are obviously directed to the claims that Baliga has pleaded, they are "related" to Baliga's claims only in the sense they seek to turn them on their head, casting Baliga as a wrongdoer who as tortiously interfered with the Company's business by his very act of commencing the suit.

The purpose of a shareholder derivative action is "to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers,'" *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991) (quoting *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 548 (1949)), and, rightly or wrongly, Baliga has commenced such an action to protect the Company from the alleged misfeasance and malfeasance of *Shi*.  If the proposed intervention were permitted, China AI would not only attempt to flip this case into one directed, instead, against *Baliga*, but would also seek to add claims that multiple other individuals conspired with Baliga in his allegedly tortious conduct.  (*See generally* Proposed Interven. Compl.)  As noted above, this would inject wholly new issues into the lawsuit and change its focus entirely, from one challenging the alleged misconduct of Shi into one examining the reasons for, and consequences of, Baliga's conduct in bringing the suit, as well as the conduct of others who not even parties to the existing action.

Viewed in this light, this Court concludes that China AI is attempting, via intervention, to create a "whole new suit[]," *id.*, and thus it cannot be said that the interest China AI is trying to

assert in this action is sufficiently related to the pleaded subject matter of the existing action to satisfy the second requirement of Rule 24(b)(2), providing another reason for the denial of its motion.

### 3.   Ability of Intervenor To Protect Its Interests Absent Intervention, and Adequacy of <u>Representation of Its Interest in the Litigation</u>

The third and fourth requirements for intervention under Rule 24(a)(2) are related.  These requirements are that the proposed intervenor demonstrate both that it "is so situated that without intervention, disposition of the action may, as a practical matter, impair or impede [its] ability to protect its interest" and that "[its] interest is not adequately represented by the other parties." *Mastercard Int'l*, 471 F.3d at 389.  China has not actually argued that, absent intervention, its ability to protect its interests would be impaired or impeded (*see generally* China AI Mem.; China AI Reply Mem.), and, in this case, there is no reason to believe that the interests of the Company – which are the only interests that China AI seeks to assert – cannot be adequately represented by an existing party.

When a shareholder other than the plaintiff wishes to intervene in an existing shareholder derivative suit, the question usually presented is whether, without intervention, the existing *plaintiff* would adequately protect the interests of the proposed intervenor.  Typically, in this situation, adequacy of representation will be found, as the plaintiff and any "other shareholders who seek to join a derivative action as plaintiffs share an identity of interest almost by definition, since the true party in interest is the corporation itself."  *See In re Ambac Fin. Grp., Inc., Derivative Litig.*, 257 F.R.D. 390, 393 (S.D.N.Y. 2009); *see also* Pl. Mem. in Opp. to Intervention, at 12-13 (citing *Ambac* for the proposition that, in the shareholder derivative context, the proposed intervenor "bears the burden of establishing that the plaintiff will not

adequately represent the interest of the corporation").  In the unusual situation presented here, however, it is clear that China AI does not believe that Baliga, if permitted to proceed with his claims, will speak in the Company's best interest, rather, China AI has asserted that Baliga's conduct has been *harmful* to the Company.  In this circumstance, a different question should be asked:  whether China AI has shown that the Company's actual interest, as China AI would describe it, can be adequately represented in the litigation by Shi.

While the Supreme Court has generally characterized a proposed intervenor's burden to demonstrate inadequacy of representation in the existing lawsuit as "minimal," *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10, the Second Circuit has "demanded a more rigorous showing of inadequacy in cases where the putative intervenor and a named party have the same ultimate objective," *Butler, Fitzgerald & Potter v. Sequa Corp*., 250 F.3d 171, 179 (2d Cir. 2001) (citing *Wash. Elec. Coop., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 922 F.2d 92, 98 (2d Cir. 1990); *U.S. Postal Serv. v. Brennan*, 579 F.2d 188, 191 (2d Cir. 1978)).  Merely because a would-be intervenor's "motive to litigate" may be different from that of party does not mean that their interests are unaligned.  *Wash. Elec. Coop.*, 922 F.2d at 98.

The only arguments asserted by China AI as to why Shi cannot adequately represent its interests is that Shi is not a shareholder, and that Shi's objective in the action would be to "overturn his purported removal as a director by the Receiver," whereas China AI's objective "is to protect its $10 million investment in the Company."  (China AI Reply Mem., at 17.)  These arguments gloss over the fact that China AI's only interests on its derivative claims would be those of the Company, and that China AI has itself sought to plead that it would be in the Company's interest to have Shi reinstated.  (*See* Proposed Interven. Compl., at 28 (Prayer for

Relief ¶ g (seeking "[a]n Order directing the Receiver to take all actions necessary to reinstate Shi as a director and acting CEO of the Company")).)

Regardless of whether Baliga is correct that China AI should be considered an "alter ego" or collusive "affiliate" of Shi (*see generally* Pl. Mem. in Opp. to Intervention), and even if their interests are not "identical," it seems clear that China AI considers the Company's interests to be closely aligned with those of Shi. Certainly, both China AI and Shi would apparently seek – one in the name of the Company, and the other in his own right – to defeat Baliga's claims, remove the appointed Receiver, and reinstate controlling authority in the Company's prior board. Indeed, China AI has not set out any way in which the outcomes that it would promote in this action would diverge from the outcomes that would presumably be desired by Shi, and Shi's past filings, in fact, reflect the same goals that China AI is seeking to advance, argued on largely the same grounds. (*See, e.g.*, Dkt. 62, at 10-11 (Shi arguing that the Receiver should be discharged because, *inter alia*, his actions have purportedly caused harm to the Company).) Moreover, even a cursory review of the arguments that Shi has recently sought to advance shows that he is readily echoing the legal positions that China AI has taken on its motion. (*See, e.g.*, Dkt 145, at 3 (Shi arguing that "recent developments demonstrate that the [R]ecceivership [O]rder was entered as a result of fraud, misrepresentation, or misconduct by [Baliga], his lawyers, and/or the [R]eceiver[,] . . . [as] it is now clear that [Baliga] is not, and has never been, a shareholder of [the Company] with standing to sue derivatively" (citing, *inter alia*, declaration submitted by China AI in connection with its motion to intervene)).)

Having considered whether anything in China AI's submissions could be sufficient to constitute the necessarily "rigorous" showing that the existing parties cannot adequately represent the interests that China AI seeks to protect, *Butler, Fitzgerald & Potter*, 250 F.3d

at 179, this Court finds that such a showing has not been made, and that it cannot be made in the circumstances presented.  Accordingly, China AI's motion to intervene is denied on this ground as well.

### D.    Issue Raised by China AI, in Its Motion, Regarding Baliga's Standing To Proceed in This Action

Even though this Court has found that China AI's motion to intervene must be denied, it notes that China AI has brought to the Court's attention a question as to whether Baliga has standing to maintain this action.  Standing is an essential component of the case-or-controversy requirement of Article III of the Constitution, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), and, because a federal court must satisfy itself that it has subject-matter jurisdiction over a case before it may act, it may consider the issue of standing *sua sponte* at any time, *see Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 107 (2d Cir. 1997) ("[A] challenge to subject matter jurisdiction cannot be waived and may be raised [either by motion or] *sua sponte* at any time." (citations and quotation marks omitted)).

China AI's entire challenge to Baliga's standing rests on two assumptions:  (1) that the only claims that Baliga has pleaded in this action are shareholder derivative claims, and (2) that he lacked standing, *ab initio*, to raise such claims under the substantive law of the Cayman Islands, which controls on that issue.  It is unclear, however, whether either of these assumptions is correct.

First, in response to China AI's standing argument, Baliga asserts that "[a]lthough . . . styled as a derivative action, the [Amended Complaint] asserts numerous direct claims under common law and the federal securities laws."  (Baliga Mem. in Opp. to Intervention, at 13.)  Yet, upon reviewing his Amended Complaint, this Court notes that Baliga has made no attempt to

segregate the claims that he is supposedly asserting as derivative claims from those that he is

supposedly asserting as direct claims.  Although it is possible that he has standing to assert some

of his claims and not others, this Court cannot determine this, without first understanding the

nature of the asserted claims.  Moreover, Baliga's potential lack of standing with respect to

certain of his claims would not defeat the Court's subject-matter jurisdiction over the action, if

he has standing with respect to others.[13]

Second, while it is true that, in a diversity action commenced in this District, the

substantive parameters of a shareholder's right to bring a derivative suit will be determined in

accordance with New York's conflict-of-law principles, including its "internal-affairs doctrine,"

which dictates that questions relating to the internal affairs of corporations must be decided in

accordance with the law of the place of incorporation, *Galef v. Alexander*, 615 F.2d 51, 58

(2d Cir. 1980), the Court has federal-question jurisdiction over this action, as well as diversity

jurisdiction, given Baliga's assertion of federal securities claims (*see* Compl. ¶ 9; Am. Compl.

¶ 9).  Neither China AI nor Baliga has parsed out exactly how, if at all, this might impact the

choice-of-law analysis here regarding derivative claims, and, once again, it is difficult for this

---

[13] Nor, despite China AI's suggestion, would it necessarily defeat the Receivership Order.
According to China AI, any claims that Baliga may be attempting to assert directly are "only
legal in nature," such that, on their own, they could not support the appointment of a Receiver,
which is a form of equitable relief.  (*See* China AI Reply Mem., at 21 (arguing that, "[o]rdinarily,
a party who brings only legal claims is not entitled to equitable relief, such as the appointment of
a receiver" (quoting *Owens v. Gaffken & Barriger Fund LLC*, No. 08cv8414 (WCC), 2009 WL
773517, at *2 (S.D.N.Y. Mar. 24, 2009)).)  Apparently, China AI is assuming that Baliga's only
potential direct claims are his securities claims, as opposed to his breach-of-fiduciary-duty or
unjust-enrichment claims.  Baliga, however, has drawn the Court's attention to *Steginsky v.
Xcelera Inc.*, 741 F.3d 365 (2d Cir. 2014) (cited in Pl. Mem. in Opp. to Intervention, at 13), in
which the Second Circuit referenced a plaintiff's direct common-law claim that, under Cayman
Islands law, the defendants breached their fiduciary duties to the company's minority
shareholders, *see id.*, at 372.  By reference to *Steginsky*, Baliga seems to be suggesting that he is,
in fact, seeking to maintain a direct breach-of-fiduciary-duty claim against the Individual
Defendants – a claim on which equitable relief could well be available.

Court to sort this out, as it is entirely unclear, from Baliga's pleading, which of his claims – federal, state, or both – he is purporting to assert as derivative claims, and which as direct claims. (*See, e.g.*, Am. Compl. ¶ 50 (alleging, in connection with securities-fraud claim, that "[t]he Individual Defendants participated in a scheme to defraud the Company and its shareholders . . . ").)

For these reasons, Baliga is directed to file a second amended complaint, clarifying which of his asserted claims are derivative claims, and which are direct claims.  As stated above, Baliga should file this second amended complaint no later than October 5, 2020.  If, after reviewing this second amended pleading, Shi concludes that the Court lacks jurisdiction over this matter because, under applicable law, Baliga lacks standing to assert all of his claims, then Shi's counsel should raise this with this Court, in the telephonic case-management conference that this Court has scheduled for October 15, 2020, at 10:00 a.m.

Finally, this Court notes that it has received a letter from the Receiver, dated July 17, 2020 (Dkt. 161), setting out information that, according to the Receiver, suggests that, during the period from May 15, 2019 to November 5, 2019, Shi acted, "through his associates," to gain access to a bank account that held Company asserts, and to transfer $89 million from that account to a separate account that Shi "is believed to" control (*see id.*).  By letter dated July 22, 2020 (Dkt. 159), Shi, through counsel, has asked the Court to strike and disregard the Receiver's letter, labelling the Receiver's accusations "false" (*see id.*).  Absent a discovery record, the conflicting factual assertions made by the Receiver and Shi cannot be resolved.  Nor, for that matter, could a finder of fact resolve, without discovery, any of the numerous factual disputes that were raised, at length, in the submissions received by the Court in connection with the motions that are the subject of this Memorandum and Order.  (*See, e.g.*, Pl. Mem. in Opp. to

Intervention, at 2-6 (raising allegations regarding the relationship between Shi and China AI); China AI Reply Mem., at 2-8 (disputing same).)  Under the circumstances, Baliga may include, in his second amended complaint, any factual allegations that he believes are material to his claims, and, the parties are directed to submit a jointly proposed discovery schedule, no later than October 13, 2020.

## **CONCLUSION**

For all of the foregoing reasons, it is hereby ORDERED as follows:

(1)    Plaintiff Wayne Baliga's renewed request for leave to serve defendant Vincent Wenyong Shi by means alternative to the Hague Convention is granted.  Service of an Amended Summons and the Amended Complaint on defendant Shi by mail or email to Michael James Maloney, Esq., as his counsel, shall be deemed sufficient service.  Plaintiff is directed to act forthwith to effect such service and to file proof of service on the Docket.  Defendant Shi, however, need not respond to the Amended Complaint, in light of ¶¶ 2 and 3, below.

(2)    No later than October 5, 2020, Plaintiff shall file a second amended complaint, clarifying which of his claims are being asserted as shareholder derivative claims, and which are being asserted as direct claims.  In addition, Plaintiff may add, to his second amended complaint, any new factual allegations that he believes are material to his claims.

(3)    Defendant Shi may have until November 4, 2020, to move, answer, or otherwise respond to Plaintiff's second amended complaint. Any dispositive motion, however, should be made in accordance with Judge Marrero's Individual Practices, and, in any event, any issue of standing that may be presented by the second amended pleading should be raised before this Court, at the conference referenced in ¶ 7, below.

(4)    No later than September 9, 2020, Baliga shall provide a copy of this Memorandum and Order to the Temporary Receiver appointed by Judge Marrero (Robert W. Seiden. Esq.), and, no later than October 9, 2020, the Temporary Receiver shall make a submission to this Court, providing (a) an explanation as to why he made an application to the Grand Court of the Cayman Islands for an order "recognizing" his authority as Temporary Receiver, (b) copies of

the papers that he submitted to the Grand Court of the Cayman Islands in connection with that application, and (c) an explanation, supported by legal authority, of his understanding of the ramifications of the Order that was then issued by the Grand Court of the Cayman Islands, with respect to his authority to remove or appoint directors of Link Motion, Inc.

(5)     The motion by non-party China AI Capital Limited to intervene in this action as of right (Dkt. 127; *see* Dkt. 137) is denied.

(6)     The parties are directed to confer in good faith regarding the scope of discovery that need to be conducted in this case, and to submit a jointly proposed discovery schedule to this Court no later than October 13, 2020.

(7)     This Court will hold a telephonic case-management conference with all parties on October 15, 2020, at 10:00 a.m.  For that conference, counsel are directed to call the following Toll-Free Number:  (877) 411-9748 and use Access Code:  9612281. The Receiver is directed to participate in that conference, together with counsel for the parties.

Dated:  New York, New York
        September 4, 2020

                              SO ORDERED

                              _____
                              DEBRA FREEMAN
                              United States Magistrate Judge

Copies to:

All counsel (via ECF)