# EXHIBIT 2

Plaintiff<br>
R Seiden<br>
First<br>
RWS-1<br>
10th January 2020

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

CAUSE NO: FSD 4 OF 2020

**BETWEEN:**

**ROBERT W. SEIDEN, IN HIS CAPACITY AS TEMPORARY RECEIVER OF LINK MOTION INC.**

**PLAINTIFF**

**AND:**

**LINK MOTION INC.**

**DEFENDANT**

**FIRST AFFIDAVIT OF ROBERT W. SEIDEN**

I, **ROBERT W. SEIDEN**, of 469 Seventh Avenue, 5th Floor, New York, New York 10018, United States of America, do solemnly and sincerely **AFFIRM** and say as follows:

## I.      Introduction

1. I am a Partner of Seiden Law Group LLP, a law firm based in New York, New York, and an attorney licensed to practice in the State of New York. I am the temporary receiver (**Receiver**) of Link Motion Inc. (**Link Motion** or the **Company**), the defendant in this proceeding, under an order made by the United States District Court for the Southern District of New York (the **US Court**). In my capacity as Receiver, I am the plaintiff in this proceeding.

2. There is now produced and shown to me marked **RWS-1** a bundle of true copies of various documents to which I will refer in this affidavit. Except where otherwise stated, or the context requires, references in this affidavit to "pages" are to pages of Exhibit RWS-1.

3. The facts set out in this affidavit are in my knowledge. Where any matter set out in this affidavit is not within my direct knowledge, I set out the source of my knowledge

1

and believe that the matter is true. Where I refer in this affidavit to communications with or advice from attorneys, or to any ongoing legal proceedings, I do not intend to waive any privilege and no privilege is waived.

4. I make this affidavit in connection with the originating summons issued on my behalf as Receiver, seeking (*a*) recognition by this Court of my appointment as Receiver by the US Court or (*b*) in the alternative, the appointment of myself and a Cayman Islands insolvency practitioner as joint receivers of the Company under section 11A of the Grand Court Law (2015 Revision) in aid of the proceedings before the US Court.

5. This affidavit is organized as follows:

    (a) Part II (paragraphs 6 to 7) introduces the Company;

    (b) Part III (paragraphs 8 to 26) sets out the relevant history of proceedings before the US Court that resulted in my appointment as Receiver, including the serious allegations of mismanagement and self-dealing by certain Link Motion executives who continue to obstruct my efforts as Receiver;

    (c) Part IV (paragraphs 27 to 42) provides an overview of relevant events since my appointment by Receiver, including the efforts I have taken to obtain cooperation from those involved in Link Motion's management, the Hong Kong receivership made in aid of the US Proceeding and the former chairman's efforts to obstruct the receivership;

    (d) Part V (paragraphs 43 to 48) explains the need for recognition of my appointment or a standalone receivership in the Cayman Islands; and

    (e) Part VI (paragraph 49) confirms my willingness to act as a joint receiver of the Company if so appointed by this Court.

## II. The Company

6. Link Motion, formerly known as NQ Mobile Inc., is a company incorporated in the Cayman Islands. Its former registered office was at Maples Corporate Services Limited,

PO Box 309, Ugland House, Grand Cayman KY1-1104, Cayman Islands (**Maples**). A copy of a corporate search report dated 9 January 2020 showing that Maples has resigned as the Company's registered office is at page 1 of RWS-1. Link Motion and its subsidiaries carry on a multinational business in the development, licensing and sale of technology and services in the smart car and smart ride industry. The principal executive offices of Link Motion are located in Beijing, People's Republic of China (**PRC**). Link Motion has commercial offices in numerous other jurisdictions, including the US and Hong Kong. Until January 2019, the Company's American depositary shares (each representing 5 Class A common shares in the capital of the Company) were listed on the New York Stock Exchange under the ticker symbol 'LKM'.

7. As described further below, I was appointed Receiver of the Company by the US Court on 1 February 2019 and, together with Ms Lau Wu Kwai King Lauren of KLC Corporate Advisory and Recovery Limited, appointed as a joint receiver of the assets of the Company by the High Court of the Hong Kong Special Administrative Region Court of First Instance (the **HK Court**) on 5 March 2019.

### III. The US Proceeding

8. On 13 December 2018 my firm filed a Verified Shareholder Derivative Complaint (the **Complaint**) with the US Court on behalf of plaintiff Wayne Baliga (**Baliga**), a Link Motion shareholder who is a US citizen and resident, commencing proceeding number 1:18-cv-11642 (the **US Proceeding**). A copy of the Complaint is at pages 2 to 19 of RWS-1. Baliga brought these claims following investigations he had undertaken in conjunction with a group of concerned shareholders organized under the name "LKMForward". These investigations included, among other things, review and analysis of various corporate filings in the US and elsewhere, and communications with certain members of Link Motion's executives and board of directors.

9. The defendants in the US Proceeding are:

    (a) Link Motion, as a nominal defendant although the action is brought by Baliga derivatively on behalf and for the benefit of the Company;

3

(b) Vincent Wenyong Shi (**Shi**), a PRC citizen who has been Chairman of the Board of Directors of Link Motion since December 2014 and Chief Operating Officer of Link Motion since October 2005;

(c) Jia Lian (**Jia Lian**), a PRC citizen who is acting Chief Executive Officer of Link Motion; and

(d) Xiao Yu (**Xiao Yu**), a PRC citizen who is a director of Link Motion with involvement in the management and operations of the Company.

Shi, Jia Lian and Xiao Yu are together referred to as the **Individual Defendants**.

10. The Complaint alleges breaches of fiduciary duties, unjust enrichment, breaches of US securities laws through failure to disclose to the investing public fraudulent conduct that has occurred in respect of Link Motion and breaches of US securities laws through failure to make accurate and truthful disclose to the investing public concerning Link Motion's financial condition. The factual allegations relied upon for these claims are set out in the Complaint (pages 2 to 19 of RWS-1) and summarized below.

*Allegations: Mismanagement of Link Motion*

11. The Complaint alleges that:

(a) The Individual Defendants, as officer and/or directors of Link Motion, each have a fiduciary duty to act in good faith, and for the best interests of Link Motion and its shareholders. Matters have now progressed to the point that Link Motion has been delisted from the New York Stock Exchange, which has caused or is expected to cause substantial damage to the Company.

A copy of the public announcement dated 24 December 2018 released by Link Motion regarding the suspension of trading in the Company's shares and the delisting process is at pages 20 to 22 of RWS-1. A copy of the documents filed by the New York Stock Exchange to cause the delisting of Link Motion's shares is at pages 23 to 26 of RWS-1.

(b) The Individual Defendants have failed to address the causes of the delisting, which include:

  (i) failure to file Link Motion's annual Form 20-F, required of Link Motion as a foreign issuer; and

  (ii) the Company's share price falling below US$1.00 for a consecutive 30 trading-day period as of at least September 2018.

(c) The long-standing mismanagement of Link Motion by the Individual Defendants includes the extraordinary conduct by the Individual Defendants of effectively abandoning substantial portions of the Company's business, by cutting these businesses off from funding, or from any contact with the central management of Link Motion.

(d) The Individual Defendants have entirely ceased communication with the Link Motion subsidiary in Finland, which has resulted in corporate waste, and the closure of the Finland office on or about 23 November 2018. With a lack of continued funding or direction from central management, the Finland office was forced to abruptly lay off employees, and to close the business despite it having previously operated profitably.

(e) The Individual Defendants have similarly ceased contact with Link Motion's offices in Dallas, Texas and in the PRC. This has led to a situation in which certain payroll obligations have been missed, and operations in Dallas and elsewhere risk complete shutdown. This blatant mismanagement and intentional refusal to communicate to or fund the Company's operations is causing serious and lasting damages to Link Motion.

*Allegations: FL Mobile and Showself Self-Dealing and Illegal Transfer of Assets*

12. Furthermore, the Complaint alleges that:

    (a) The Individual Defendants have engaged in self-dealing to transfer a substantial asset of Link Motion into the control of Shi, resulting in a substantial financial loss to the Company.

    (b) In or around March 2017, Link Motion entered into a transaction with Tongfang Investment Fund Series SPC (**Tongfang**) to sell Link Motion's businesses FL Mobile (**FL Mobile**) and Showself Live Social Video Business (**Showself**) to Tongfang in exchange for approximately US$507,000,000. Tongfang agreed to make a small initial cash payment, with payment of the balance no later than 31 May 2017. If Tongfang defaulted in payment, FL Mobile and Showself would be transferred back to the control of Link Motion.

    (c) Tongfang failed to pay the balance of the purchase price by 31 May 2017, as agreed. Link Motion issued multiple press releases during 2017 to the effect that the due date for payment by Tongfang would be extended. On or around 14 December 2017, Link Motion announced that it was accepting a promissory note (the **Note**) from Tongfang in satisfaction of the unpaid purchase price. The Note was to be fully paid one year from the date it was issued. As of the date of this affidavit, the Note remains unpaid.

    (d) Shi did not disclose to Link Motion or other investors the conflict of interest that he held in relation to the transaction. Shi is a substantial owner of Tongfang, and therefore likely to personally benefit from the transaction.

    (e) On 27 November 2018, the Tongfang subsidiary that held the FL Mobile and Showself assets (Shi Xiang Shi Dai) was transferred to the control of an entity named Shi Xiang Hui Shi.

    (f) The above course of dealings has resulted in a situation in which a substantial business of Link Motion was transferred to an entity partially controlled by Shi, without the Company having received payment in the order of

US$500,000,000. FL Mobile and Showself have now been on-sold by Tongfang, substantially frustrating the ability of Link Motion to recover the assets, or their proceeds.

A copy of an annotated printout of Chinese public records evidencing a transfer of Showself is at pages 27 to 29 of RWS-1. This evidence was also before the US Court when it granted the temporary restraining orders and receivership order referred to further below.

*Allegations: SyberOS and Rideshare Self-Dealing and Illegal Transfer of Assets*

13. The Complaint also alleges a further transfer of valuable assets away from Link Motion's control and ownership:

    (a) NQ Beijing, a Link Motion subsidiary, controls a subsidiary called Qing Yun Wu Xian. Qing Yun Wu Xian in turn previously controlled two highly profitable businesses: SyberOS (**SyberOS**) and Link Motion Rideshare (**Rideshare**).

    (b) Public records in the PRC show that on 20 October 2018, Qing Yun Wu Xian was transferred from NQ Beijing to a third party named Zhu Wei. Shareholder group LKMForward sought an explanation from the Link Motion board of directors concerning this transaction. At least two members of the Link Motion board replied by email to these enquiries that they were unaware that the transfer of Qing Yun Wu Xian had taken place. This reply indicates that the necessary approval of the Link Motion board of directors was not obtained for this transaction.

    (c) No information is currently available concerning the terms of the transaction, but in light of the FL Mobile and Showself transaction and the ignorance of two board members of the transaction, there are serious concerns as to whether Link Motion received any commensurate value in exchange for the transfer of the SyberOS and Rideshare businesses.

Copies of an annotated printout of Chinese public records evidencing a transfer of SyberOS and Rideshare, together with attached emails between Link Motion

7

shareholders and the directors referred to above, are at pages 30 to 33 of RWS-1. This evidence was also before the US Court when it granted the temporary restraining orders and receivership order referred to further below.

*Resignation of Marcum Bernstein & Pinchuk LLP*

14. On 7 January 2019, subsequent to the filing of the Complaint and commencement of the US Proceeding, Marcum Bernstein & Pinchuk LLP (**Marcum**) resigned as the independent registered public accounting firm for Link Motion.

15. By way of background, in 2016 a Special Committee comprised of independent directors of Link Motion was formed to "*deal with allegations concerning internal governance matters raised in connection with an investigation into Dr. Henry Lin's resignation as Chairman and Chief Executive Officer of the Company and the Board's decision to replace him as Chairman was Dr. Vincent Shi*". Loeb & Loeb was retained as counsel to the Special Committee to investigate the allegations. During the first half of 2018, additional allegations were made and the scope of the investigation was expanded to deal with these allegations.

16. On or about 27 August 2018, Loeb & Loeb made an oral presentation to the board of Link Motion on the results of the investigation. On 10 September 2018, Link Motion issued a press release summarizing the principal findings of the investigation (the **Press Release**). A copy of the Press Release is at pages 34 to 41 of RWS-1.

17. On 7 January 2019, Marcum sent a resignation letter (the **Marcum Resignation Letter**) to Link Motion. The Marcum Resignation Letter was made public through a filing with the US Securities and Exchange Commission (the **SEC**) dated 9 January 2019 (the **9 January Filing**). A copy of the 9 January Filing, with the Marcum Resignation Letter exhibited to it, is at pages 42 to 48 of RWS-1.

18. The Marcum Resignation Letter indicates that Marcum chose to resign for the following reasons, among others:

   (a) RMB512,000,000 of term deposits should have been classified as restricted in the 31 December 2016 accounts, but was incorrectly recorded;

(b) certain agreements relating to the term deposits, including personal bank loan agreements concerning Shi, had not been disclosed;

(c) Marcum had been provided with information by Link Motion's former Chairman and CEO alleging internal governance failings of the Company following the completion of the investigation and the Press Release. Notwithstanding Marcum's repeated requests, Link Motion had been unable to provide information and documents that Marcum required to determine whether "*an investigation of adequate scope has been performed and completed, as well as the impact of the results of the investigation on [their] work and on the Company's 2016 and 2017 financial statements*"; and

(d) Marcum stated that its opinion on the Company's 2016 financial statements should no longer be relied upon, it was not in position to reissue its opinion on the Company's 2016 financial statements, nor was it in position to conclude its work and issue any opinion on the Company's 2917 financial statements.

19. The resignation of Marcum, and the reasons behind such resignation, are highly concerning. The resignation of Marcum was also relied upon by Baliga in his application to the US Court for the appointment of a temporary receiver and grant of a temporary restraining order.

*Events in the US Proceeding Leading to Appointment of Receiver*

20. The Complaint was filed with the US Court on 13 December 2018 and, as part of the relief sought, requested the appointment of a temporary receiver and the imposition of a temporary restraining order. On 14 December 2018, the US Court granted an initial temporary restraining order (the **Initial TRO**) against Link Motion and the Individual Defendants, to remain in force for 14 days, restraining and enjoining Link Motion and the Individual Defendants from "*transferring, liquidating, dissipating, assigning and/or granting a lien or security interest or other interest in, any assets belonging to [the Company] including, among other things, its subsidiaries, businesses, physical assets, and cash reserves*", and allowing a carve-out for the Company to "*process normal day-to-day operational costs, including but not limited to*

9

*payroll, attorneys' fees, and auditor fees*". A copy of the Initial TRO is at pages 49 to 50 of RWS-1.

21. On 20 December 2018, the Complaint was served on Link Motion through its registered agent, Law Debenture Corporate Services Inc. A lawyer from my firm had also previously sent a copy of the Complaint by email to Link Motion's US counsel, DLA Piper in New York (**DLA Piper**) on 13 December 2018.

22. On 21 December 2018, Baliga and Link Motion, through respective counsel, filed a joint letter with the US Court in which Link Motion consented to the Initial TRO remaining in effect pending the US Court's ruling on Baliga's request for a preliminary injunction and appointment of temporary receiver. A copy of the joint letter filed with the US Court is at pages 51 to 52 of RWS-1.

23. In the result, Link Motion did not oppose the making of a temporary restraining order and the appointment of a receiver. Its non-opposition is recorded in a 'Stipulation of Non-Opposition to a Preliminary Injunction and Consent Order to Extend Time to Answer, Move, or Otherwise Respond to the Complaint' (the **Stipulation**). The Stipulation is signed by DLA Piper as counsel for Link Motion, and records that, among others, Link Motion does not oppose Baliga's request for a preliminary injunction and appointment of a temporary receiver. A copy of the Stipulation, filed with the US Court and approved by the presiding judge, is at pages 53 to 55 of RWS-1.

24. On 1 February 2019, the US Court made an Order Granting Preliminary Injunction and Appointing Temporary Receiver (the **Receivership Order**) in which, among other things, the following orders were made:

    (a) I was appointed as Receiver of Link Motion during the pendency of the US Proceeding, to assume full control over Link Motion, including its assets, operations and employees (including Link Motion's subsidiaries); and

    (b) An injunction was granted against Link Motion and the Individual Defendants enjoining them from transferring, liquidating, dissipating, assigning and/or granting a lien or security interest or other interest in any assets belonging to

10

        Link Motion including, among other things, its subsidiaries, businesses, physical assets and cash reserves.

A copy of the Receivership Order is at pages 56 to 62 of RWS-1.

25. The Receivership Order remains in force and I remain in office as the Receiver. Link Motion has not taken any action before the US Court to discharge the receivership or otherwise have the Receivership Order varied or set aside. Shi did apply for the Receivership Order to be vacated, in a motion that included requests for various other relief, but the US Court rejected his arguments in its Decision and Order dated 11 June 2019. In its decision, the US Court noted that neither Link Motion or Shi "*ever opposed the motion leading to the* [Receivership Order]" and that the evidence filed on behalf of Baliga regarding his allegations and the status of the Company remain unrefuted (page 83 of RWS-1). A copy of the Decision and Order is at pages 63 to 89 of RWS-1.

26. I note that, even despite Link Motion's non-opposition to the Receivership Order, the US Court still will only grant an injunction if the movant has established a likelihood of success on the merits of the underlying action. Thus, the US Court in granting the Receivership Order has deemed the underlying allegations in the Complaint likely to succeed on the merits.

**IV.   Events Since Appointment as Receiver**

27. Since my appointment as Receiver, I have taken steps in various jurisdictions to investigate the affairs of Link Motion and to take control of its assets and undertaking as contemplated by the Receivership Order. We have also encountered difficulties in dealing with the Individual Defendants and their efforts to thwart our recovery efforts. In this section I provide the Court with a summary of events since my appointment as Receiver impacting the Company, what steps we have taken and where they have led me and my team.

*Withdrawal of DLA Piper as Company Counsel*

28. On 1 March 2019, DLA Piper wrote to the US Court requesting permission to withdraw as counsel for Link Motion. In its letter and supporting declaration, DLA Piper states

that Link Motion has been unable to pay DLA Piper's fees and has not cooperated in its representation by failing to respond to inquiries. The filing also includes an email exchange between a DLA Piper lawyer and Shi in which the lawyer reports that Shi apparently informed DLA Piper that "*Link Motion does not have sufficient assets to pay DLA's legal fees*" (see page 98 of RWS-1). The US Court granted DLA Piper's request to withdraw. A copy of DLA Piper's letter, with attachments, is at pages 90 to 99 of RWS-1.

*Identification of Hong Kong Assets and Hong Kong Receivership*

29. My team and I have made numerous attempts to get in touch with the Individual Defendants, as well as other key personnel working for Link Motion, to obtain information and documents relating to Link Motion to assist me with my investigations as well as my duties as Receiver. Such attempts have been primarily made by email, WeChat, letter and any other forms of communication by which we may be able to reach such persons. To date, we have received very little cooperation from any of the Individual Defendants or other key personnel.

30. One exception has been a former Link Motion employee, Matthew Mathison, who is also a member of the LKMForward shareholder group. Mr Mathison served as Link Motion's Vice President, Capital Markets, from in or about July 2013 to October 2018. He was able to confirm to us that Link Motion had substantial operations outside of the PRC, including subsidiaries and/or businesses in the US, Finland, Southeast Asia, Korea, Japan and Hong Kong. He also provided information on potential bank accounts belonging to the Company located in Hong Kong.

31. I also obtained useful cooperation from Marcum. I wrote to Marcum requesting that they provide me with any information they had relating to Link Motion's or any of its subsidiaries' bank accounts. In February 2019 Marcum provided me and my team with a spreadsheet setting out the known bank accounts of Link Motion and its subsidiaries as at 31 December 2017.

32. As a result of the information received from Mr Mathison and Marcum, I identified two bank accounts maintained by Link Motion in Hong Kong. Through my Hong Kong solicitors, I made an application to the High Court of Hong Kong (the **HK Court**)

requesting that the HK Court grant a receivership order and freezing injunction in aid of the US Proceeding. A copy the Originating Summons filed with the HK Court, without the schedules attached, is at pages 100 to 102 of RWS-1.

33. On 1 March 2019, the HK Court granted the relief sought on my application and I was appointed, together with Ms Lau Wu Kwai King Lauren of KLC Corporate Advisory and Recovery Limited, as a joint receiver of Link Motion. A copy of the receivership and injunction order is at pages 103 to 110 of RWS-1.

*Hong Kong Arbitration Proceedings*

34. Before my appointment as Receiver, arbitration proceedings were commenced through the Hong Kong International Arbitration Centre against Link Motion by Zhongzhi Hi-Tech Overseas Investment Ltd. I have now intervened in the proceedings as Receiver, with the authority of the US Court. The arbitration remains pending and concerns a dispute over a significant amount of the Company's assets. Due to the confidential nature of the proceedings, I am not at liberty to disclose any further details at this time. My team and I continue to work with my Hong Kong lawyers, Kobre & Kim LLP, on that arbitration proceeding, the asset transfers and the legal issues raised therefrom. I have not yet received any cooperation from Link Motion or any of its employees in these efforts.

*Efforts to Establish Control Over Company and Subsidiaries*

35. Section 1(b) of the Receivership Order grants me broad power to remove and replace Company personnel (see page 58 of RWS-1):

> The Receiver shall assume full control of the Company by removing, as the Receiver deems necessary or advisable, any director, officer, employee, independent contractor, or agent of the Company, including any Individual Defendant, from control of, management of, or participation in, the affairs of the Company. The Receiver shall further be authorized to appoint or replace, as the Receiver deems necessary or advisable, any such director, officer, employee, independent contractor, or agent of the Company.

13

36. Since my appointment, I have exercised this power, and my general authority over the affairs of the Company, in attempts to more fully assume control of the Company and its subsidiaries, and remove control of valuable subsidiaries from the Individual Defendants, as contemplated by the Receivership Order:

    (a) On 14 March 2019, I removed Shi from his positions as Chairman and Chief Executive Officer of the Company, and appointed Mr Lilin "Francis" Guo as his replacement, subject to the laws of the Cayman Islands. A copy of the Form 6-K filed on behalf of the Company by me with the SEC dated 26 March 2019, publicly disclosing this matter, is at pages 111 to 113 of RWS-1.

    (b) On 14 March 2019, I caused Mr Guo and Belbix Limited to be appointed as directors of Link Motion International Limited, a wholly-owned subsidiary of Link Motion incorporated in Hong Kong. Following that appointment, on 17 April 2019 Mr Guo, with my consent, removed the Legal Representative of Link Motion International Limited's wholly owned subsidiary (also known as a wholly foreign-owned enterprise or **WFOE**) in the PRC, NQ Mobile (Beijing) Co., Ltd., and officially assumed the position of Legal Representative. Mr Guo was subsequently issued a new business license reflecting his position and new company seals for NQ Mobile (Beijing) Co., Ltd. A copy of the Form 6-K filed on behalf of the Company by me with the SEC dated 23 April 2019, publicly disclosing these matters, is at pages 114 to 116 of RWS-1.

    (c) I have also appointed Mr Guo to act as Chairman and Legal Representative of Link Motion in the PRC. Mr Guo is currently working to secure and maintain the Company's assets within the PRC.

*Shi's Efforts to Obstruct the Receivership*

37. My efforts to contact and obtain cooperation from Shi, and his behavior since the making of the Receivership Order, warrant particular emphasis. On 4 February 2019, DLA Piper advised me in a telephonic conference that a copy of the Receivership Order had been sent to Shi via his Link Motion email, which DLA Piper informed me was the main avenue of their communication with Shi, and that DLA Piper had discussed the Receivership Order with Shi further by telephone.

38. I made numerous attempts in February and March 2019 to contact Shi directly without success:

    (a) On 8 February 2019 I sent a demand letter to Shi by email notifying him of the Receivership Order and requesting that he promptly fund the receivership, comply with the Receivership Order and set up a meeting with me within 24 hours. Shi has not responded to this letter.

    (b) On 14 February 2019, I sent a second demand letter to Shi by email further to my first letter. Shi has not responded to this letter.

    (c) On 26 February 2019, I sent a third demand letter to Shi by email further to my previous two letters. Shi has not responded to this letter.

    (d) Between 6 February 2019 and 5 March 2019, my local China agent made numerous attempts to communicate with Shi via his personal phone. Shi ignored these calls.

    (e) On 8 February 2019, my local China agent sent the Receivership Order and a copy of my first demand letter to Shi via WeChat (a common communication method in China). Shi has not responded to that message.

39. Rather than engage with me, Shi has instead ignored the Receivership Order and actively taken steps to frustrate and obstruct the receivership:

    (a) On 12 March 2019, via its WeChat account, Link Motion issued a press release stating, among other things, that the Company believed neither US nor Hong Kong courts had jurisdiction over Link Motion, that the Company has now authorized the management and board to pursue action against shareholders and other responsible individuals and to challenge the jurisdiction of the US and Hong Kong courts. A copy of the press release and a translation into English is at pages 117 to 118 of RWS-1.

    (b) Mr Mathison has received reports that Shi has actively taken steps to obstruct the receivership and to damage the Company. These reports are set out in an

15

affidavit sworn by Mr Mathison on 28 March 2019 and filed with the US Court, which includes statements to the effect that, among other things:

(i) Shi has taken steps to force certain Company employees to resign, then offered to rehire them to continue their work on the Company's revenue-generating applications through a different entity set up to receive those revenues; and

(ii) Shi attended at the Company's offices to cause accounting and legal documents to be removed and to destroy and damage operating data systems and the Company's main contract management system.

A copy of Mr Mathison's affidavit, with exhibits, is at pages 119 to 143 of RWS-1.

40. Further, in July 2019, some months after I exercised my power under the Receivership Order to remove him from his position as Chairman and Chief Executive Officer, Shi purported to engage on behalf of the Company the same US lawyers he had engaged to represent his personal interests in the US Proceeding. This matter came to my attention through an exchange of correspondence between Shi's US lawyers, the US Court and my firm:

(a) On 16 July 2019, CKR Law (**CKR**) wrote to the US Court reporting that they were in discussions with directors of Link Motion to act as counsel for the Company and requesting an extension of time for Link Motion to respond to the Complaint. A copy of CKR's 16 July 2019 letter is at page 144 of RWS-1.

(b) On 16 July 2019, my firm responded to CKR's letter with our own letter to the US Court, questioning whether CKR had properly secured board approval to act for Link Motion given our understanding that the majority of the board of directors were cooperating with the Receiver and wanted the Receiver to remain in place. A copy of my firm's 16 July 2019 letter, with attachments, is at pages 145 to 148 of RWS-1.

(c) On 19 July 2019, CKR responded with a letter to the US Court attaching a document entitled "Minutes of a Meeting of the Board of Directors of the Company Held in Beijing on July 17, 2019". According to these minutes, the individuals in attendance authorized the engagement of CKR in respect of the US Proceeding. A copy of CKR's 19 July 2019 letter, with attachments, is at pages 149 to 164 of RWS-1.

I note that the minutes attached CKR's letter list Shi as the Chairman and Chief Operating Officer of the Company and that Shi acted as chairman of the meeting. The other Individual Defendants also purportedly attended.

(d) On 22 July 2019, my firm responded with a letter to the US Court advising that, pursuant to the exercise of my powers under the Receivership Order to remove him, Shi no longer had the authority to call a directors' meeting. Further, it would be a clear conflict of interest for CKR to act for Link Motion and Shi personally in the US Proceeding given that the underlying claim in the US Proceeding is that Shi breached certain duties owed by him to the Company. A copy of my firm's 22 July 2019 letter, with attachments, is at pages 165 to 169 of RWS-1.

41. In the result, CKR is not currently acting for Link Motion in the US Proceeding, and no other law firm is currently on record for the Company. However, this chain of events demonstrates how Shi and the other Individual Defendants continue to actively obstruct the receivership.

*Service Providers in the United States*

42. My team and I have obtained documents and communications produced by third party service providers located in the US that had been engaged by Link Motion. We are currently analyzing these documents.

**V.    Need for Recognition or Standalone Receivership in the Cayman Islands**

43. As set out above, the Individual Defendants, and Shi in particular, have consistently acted in a manner intended to frustrate, obstruct and thwart my efforts as Receiver to

assert control over the Company's assets and affairs. One of the objections that the Individual Defendants have continually raised in their obstruction, for example in the press release orchestrated by Shi in March 2019, is that my appointment as Receiver does not have effect under Cayman Islands law and is therefore not binding on the Company or should not be recognized in other jurisdictions. Accordingly, I am making the current application so that either my appointment as Receiver by the US Court may be recognized in the Cayman Islands or that a standalone receivership may be commenced in aid of the US Proceeding.

44. Without some form of relief in the Cayman Islands, Shi and others involved in the mismanagement and asset-stripping of Link Motion will be able to continue to rely on arguments that the Receiver, and the receivers appointed in the HK Court, have no status under the law of the jurisdiction of incorporation of the Company and therefore no valid claim to act for or on behalf of Link Motion. Accordingly, recognition of my appointment, or a standalone receivership, will aid the US Court and the US Proceeding in recovering and protecting the assets of Link Motion pending the resolution of these serious allegations of wrongdoing.

45. Further, my team has discovered that Link Motion has failed to pay its corporate filing fees due in the Cayman Islands for at least the past year. I understand from my Cayman Islands attorneys that a further annual payment for corporate filing fees will become due in 31 January 2019, and that failure to pay these fees may result in the Registrar of Companies striking off the Company and causing it to be dissolved. As described in paragraph 6 above, the Company is also currently without a registered office because Maples has resigned from that role, which I also understand from my Cayman Islands attorneys may result in a strike off and dissolution. The failures to pay the corporate filing fees and maintain a registered office services provider are serious risks to the viability of the receivership and the continued efforts to recover value for the Company and its shareholders, as a strike off and dissolution could potentially raise concerns as to the Company's title to its asset and jeopardize my ability to carry out my duties as Receiver. This dereliction of duty is consistent with the failure to file necessary documents with the SEC as a foreign issuer and allowing the Company's shares to be delisted from the New York Stock Exchange.

46. Recognition of my appointment by this Court, or the appointment of receivers in aid of the US Proceeding, will allow me or the joint receivers to ensure that the corporate filing fees are properly paid, and that the Company is not at risk of being struck off and dissolved administratively. My team has been in contact with representatives of Maples, and our understanding from those discussions is that Maples would be able to facilitate payment of the corporate filing fees and continued provision of registered office services if I had appropriate authority under Cayman Islands law to act on behalf of Link Motion.

47. I confirm that the US Court approved my engagement of Cayman Islands attorneys in order to make this application.

48. If the Court recognizes my appointment or appoints joint receivers in aid of the US Proceeding, I do not foresee the need for any action in the Cayman Islands except ensuring payment of the corporate filing fees so that the Company is not struck off. I am not aware of any Company assets located in the Cayman Islands, nor of any circumstances in which litigation would be pursued in the Cayman Islands.

**VI.  Consent to Act as Joint Receiver**

49. I confirm that I am willing to act as one of the joint receivers of the entire assets, undertaking and business of Link Motion under section 11A of the Grand Court Law (2015 Revision) in aid of the US Proceeding, if so appointed by the Court.

AFFIRMED before me at New
York, New York, this 16th
day of January, 2020

**ROBERT W. SEIDEN**

MICHAEL D CILENTO
NOTARY PUBLIC-STATE OF NEW YORK
No. 01CI6337025
Qualified in Bronx County
My Commission Expires February 16, 2020

This affidavit is filed by KSG Attorneys at Law, attorneys for the Plaintiff, whose address for service is 4th Floor Harbour Centre, 42 North Church Street, PO Box 2255, Grand Cayman KY1-1107, Cayman Islands.