# EXHIBIT 7

[1984–85 CILR 63]

**CANADIAN ARAB FINANCIAL CORPORATION (trading as KILDERKIN INVESTMENTS GRAND CAYMAN) and KILDERKIN INVESTMENTS LIMITED (both by CLARKSON COMPANY LIMITED, Receiver and Manager) v. PLAYER**

COURT OF APPEAL (Zacca, P., Carberry and Carey, JJ. A.): May 14th, 1984

*Companies—directors—effect of appointment of receiver—directors' functions vest in receiver, who takes control of management and assets of company—legal proceedings by directors in company's name after appointment of receiver require leave of court if would interfere with or jeopardise company's assets in receiver's possession*

*Companies—receivers—receiver appointed by court—receiver entitled to defend proceedings on behalf of company whether or not specifically authorised by order of appointment—not entitled to institute proceedings on behalf of company without specific authority*

*Companies—receivers—foreign-appointed receiver—court may recognise receiver appointed by foreign court if sufficient connection between company ana jurisdiction appointing him—sufficient connection defined—power to refuse recognition exercised only if strong and compelling reasons*

*Companies—receivers—foreign-appointed receiver—procedure for recognition—English Supreme Court Act 1981, s.37(1) and O.30, r.11ay down procedure—defendant or other applicant with sufficient interest may apply ex parte for recognition in existing proceedings if sufficient connection with plaintiffs claim—sufficient connection defined*

*Confidential Relationships—consent of principal—receiver and manager of company—court-appointed receiver displaces directors, acts on behalf of company and may therefore consent to divulging confidential information as "principal" for purposes of Confidential Relationships (Preservation) Law, s.3 (2)(b)(i)*

The appellant, having been appointed the receiver and manager of a company by the Supreme Court of Ontario, applied to the Grand Court for an order recognising it as such receiver and manager within the Cayman Islands and authorising it to identify and locate all the assets of the company within the jurisdiction.

The plaintiffs were trust companies incorporated in Ontario. The second defendant was also a company incorporated in Ontario and the

---

third defendant, Mr. Player, was its sole director and the person principally interested in its funds. The first defendant was a Cayman registered company; the fourth defendant was incorporated in Ontario.

The plaintiffs were persuaded to finance a series of speculative property deals in Ontario, the ultimate purchaser of the property being the fourth defendant. It allegedly became apparent to the plaintiffs that their investments were illusory and that the ultimate beneficiaries from the property deals would be the defendants. The plaintiffs therefore instituted proceedings against the defendants in the Supreme Court of Ontario and applied *ex parte* for an order appointing the present appellant as the receiver and manager of the second defendant. The Supreme Court of Ontario granted the order and authorised the appellant to apply to it for direction and guidance or additional powers in respect of the discharge of its duties. By subsequent orders the court authorised the appellant to identify the assets of the second defendant and to receive notice of any proceedings affecting that company and, following an interim report by the appellant, authorised it to commence proceedings to preserve and recover any assets situated in the Cayman Islands.

Since the second defendant had apparently made substantial deposits in banks in the Cayman Islands, the plaintiffs instituted proceedings against the defendants in the Grand Court to recover all or part of these funds which, they alleged, were derived from the property deals in Ontario; they also claimed damages for a fraudulent conspiracy to commit a breach of trust. The plaintiffs also successfully

applied for an order freezing the second defendant's assets in the Cayman Islands pending the outcome of the litigation.

The appellant then made an *ex parte* interlocutory application to the Grand Court in the proceedings commenced by the plaintiffs for an order recognising it as the receiver and manager of the second defendant, authorising it to act on behalf of the second defendant within the jurisdiction and authorising it to identify and locate all the second defendant's assets within the jurisdiction. The Grand Court (Summerfield, C.J.) granted an order in the terms sought.

Acting in pursuance of the order the appellant obtained confidential information from Cayman banks relating to the second defendant's assets. The appellant reported its discoveries to the Supreme Court of Ontario, not intending that they should be made public but they were revealed during a court hearing and received wide publicity in Canada.

Meanwhile, the third defendant, Mr. Player, applied to the Grand Court for rescission of the order recognising the appellant as receiver and manager of the second defendant, submitting, *inter alia*, that as sole director of the company and the person principally interested in its funds, he was the proper person to conduct its litigation and defend its assets, that the circumstances did not warrant an *ex parte* application for recognition of the appointment of the appellant, and that its application for authority to identify and locate the second defendant's assets went far beyond what was required for the purposes of defending the action brought by the plaintiffs and such application should therefore have been made by originating summons, not by an interlocutory application

---

in the proceedings brought by the plaintiffs.

The Grand Court (Summerfield, C.J.) rescinded its previous order recognising the appellant as receiver and manager of the second defendant, on the grounds that (i) the Supreme Court of Ontario had authorised the appellant only to institute proceedings in the Cayman Islands on behalf of the second defendant, not to defend proceedings; (ii) it was not open to a defendant to apply to the court for the appointment of a receiver and manager, and the *ex parte* interlocutory procedure adopted by the appellant under O.30, r.1of the English Rules of the Supreme Court was inappropriate and wholly unrelated to its purpose since there was no connection between the suit brought by the plaintiffs against the second defendant and the appellant's acquisition of control over the second defendant's assets in the Cayman Islands; (iii) the appellant's application should have been made by originating summons with the second defendant, and possibly Mr. Player too, as parties to the process with an opportunity to oppose the application; (iv) the appellant was no longer entitled to be recognised as receiver and manager of the second defendant within the jurisdiction, since it had deliberately acted in breach of the Confidential Relationships (Preservation) Law, s.4(1)(a)(i), having publicised confidential information relating to the second defendant's assets, without "the consent, express or implied, of the relevant principal" within the meaning of s.3(2)(b)(i), as amended, and without seeking the authority of the court under s.3A. The court also removed the attorneys acting for the appellant from the record under r.59(3) of the Grand Court (Civil Procedure) Rules 1976, substituting for them the attorneys acting on behalf of Mr. Player.

On appeal, the appellant submitted that (i) the third defendant (now the respondent), Mr. Player, was not entitled to defend the plaintiffs' action on behalf of the second defendant in the absence of an order of the Supreme Court of Ontario authorising him to do so, since the appointment of the appellant as receiver and manager had displaced the powers of the company's board of directors leaving the appellant, as an officer of that court, in control of the company's affairs, and officers of the company were no longer entitled to interfere with the company's property without the leave of the court; (ii) the powers conferred upon the appellant as receiver and manager included the power to commence and defend proceedings on behalf of the second defendant and it was proper that the appellant, rather than Mr. Player, should represent the second defendant in the proceedings brought by the plaintiffs since the company might have claims of its own against him and might wish to join him as a third party responsible to indemnify it against the plaintiffs' claims; (iii) in the absence of relevant Cayman provisions, the court had the same jurisdiction to appoint a receiver and manager, or to recognise a receiver and manager appointed by a foreign court, as that exercised by the English courts under s.37 (1) of the Supreme Court Act 1981, the procedure being that laid down by O.30, r.1of the Rules of the Supreme Court, and this jurisdiction allowed a defendant to apply, *ex parte* if necessary, for the appointment of a receiver and manager; (iv) such an application could also properly be made by a person not

party to the proceedings but having a sufficient interest in them, and the appellant's application was justified since the claim against the company was singularly large and the appellant, having a duty to preserve the company's assets, had a duty to ensure that no possible defence went by default; prompt recognition was also required to enable the appellant to comply with various mandatory orders made against the second defendant; and (v) there was no breach of the Confidential Relationships (Preservation) Law since only the appellant was authorised to act on behalf of the second defendant and the provisions of the Law could have been invoked only if (a) there had been a communication of information in confidence by the second defendant to the appellant and (b) the latter had divulged such information without the consent of the second defendant. For all these reasons it would be proper to reinstate the order recognising the appellant as receiver and manager of the second defendant.

The respondent, Mr. Player, submitted that (i) he was not obliged to obtain leave to defend the plaintiffs' action on behalf of the second defendant since he intended to meet the costs so incurred from his personal funds and would not therefore interfere with the appellant's possession of the company's assets; (ii) having been appointed receiver and manager of the second defendant on the application of the plaintiffs who were common to the actions brought against the defendants in Canada and in the Cayman Islands, the appellant was likely to be prejudiced against the claims of the defendants and it would therefore be in the best interests of the second defendant that he, as the person principally interested in its funds, should conduct the litigation on its behalf and defend its assets; (in) he agreed that the court had the same jurisdiction in this matter as that exercised by the English courts, but observed that there were no English rules dealing specifically with the recognition of a foreign-appointed receiver and manager; assuming, however, that the provisions concerning the appointment of a receiver and manager were applicable by analogy, he did not support the lower court's finding that a defendant could not apply for such appointment to be made, but submitted that the *ex parte* interlocutory procedure adopted by the appellant would have been appropriate only if the relief sought were incidental to or arose out of the relief claimed by the plaintiffs; if, therefore, the appellant had merely sought recognition or leave to defend, the procedure adopted would have been correct but since it also sought authority to identify and locate the second defendant's assets, relief which went far beyond the scope of the plaintiffs' action, the application should have been made by originating summons; (iv) the circumstances did not in any case merit an urgent *ex parte* application since he himself would have protected the second defendant's interests and the Clerk of the Grand Court could have signed the mandatory orders; and (v) it was an offence under the Confidential Relationships (Preservation) Law to divulge information, however obtained, without the consent of the principal and the appellant should therefore have sought his consent, on behalf of the second defendant, before divulging information obtained from the banks.

**Held,** allowing the appeal:

(1)   Mr. Player could not conduct litigation on behalf of the second defendant without the leave of the Supreme Court of Ontario. The scope and nature of the functions of the appellant as receiver and manager were governed by the law of the place of incorporation of the company, *i.e.* Ontario, but it was clear that on this subject the legal position was the same in Canada as it was in England and, by derivation, the Cayman Islands. The appointment of the appellant as receiver and manager had the effect of vesting the complete control and management of the second defendant in the appellant as an officer of the court (not as an agent of the company), thereby displacing the board of directors. The second defendant did retain a residual power to institute proceedings in its own name, but if this would entail interference with the receiver's possession of its assets it had first to obtain leave of the court. If Mr. Player were allowed to defend the plaintiffs' action on behalf of the second defendant and if the plaintiffs were successful, the second defendant's assets in the Cayman Islands would be required to satisfy the judgment. Mr. Player's willingness to take personal responsibility for the costs of such defence did not, therefore, obviate the need for the leave of the court, and in the absence of such leave he could not act on the company's behalf (page 76, line 35 – page 81, line 6; page 98, lines 2–28; page 106, line 13 – page 111, line 3).

(2)   The appellant, on the other hand, having been vested with the powers and authority that Mr. Player had exercised as sole director, did have the power to defend the action on behalf of the second

defendant and would have had such power even if it had not been expressly conferred by the Supreme Court of Ontario; moreover, the Supreme Court of Ontario had expressly authorised the appellant to "commence proceedings" in the Cayman Islands, which really meant that it could take a step in legal proceedings and did not exclude entering an appearance or filing a counterclaim. This order served to emphasise the fact that Mr. Player had been deprived of his powers to act on behalf of the second defendant, and the appellant had, therefore, acted properly in applying for recognition and for leave to act on behalf of the second defendant within the jurisdiction (page 80, lines 22–25; page 81, lines 7–24; page 98, lines 2–12; page 110, line 33 – page 112, line 5; page 114, lines 13–35

(3)   The Grand Court had jurisdiction (derived from that exercised by the High Court in England) to recognise in the Cayman Islands the appellant as a receiver appointed by a foreign court if it were satisfied that there was a sufficient connection between the second defendant company and the jurisdiction in which the appellant was appointed to justify recognition of the foreign court's order. Such a connection clearly existed in the present case since (a) the second defendant was a defendant in the Canadian proceedings and had submitted to the jurisdiction of the Supreme Court of Ontario, (b) the second defendant was incorporated in Canada, and (c) the second defendant carried on busi-

ness in Ontario and the management of the company was located in Canada. A fourth test (irrelevant in this case) to determine the necessary connection was whether the courts of the jurisdiction where the defendant was incorporated would themselves recognise a foreignappointed receiver—and in fact, the Ontario courts would do so (page 81, line 34 – page 83, line 12; page 99, lines 11–14; page 102, line 14 – page 104, line 21).

(4)   In the absence of local rules dealing specifically with the procedure for the recognition of a foreign-appointed receiver and manager it was proper to follow the procedure laid down for the appointment of a receiver within the jurisdiction and, under the terms of the Grand Court Law, ss. 13(1) and 20, the English Supreme Court Act 1981, s.37(1) and the Rules of the Supreme Court, O.30, r.1 therefore applied. Under these provisions it was open to a defendant, or other applicant with a sufficient interest in the matter, to apply *ex parte* for the appointment of a receiver and an interlocutory application could properly be made if the relief claimed was incidental to or arose out of the relief claimed by a plaintiff. Since the appellant had the power to defend proceedings on behalf of the second defendant, and the duty to preserve its assets, there was a sufficient connection with the plaintiffs' claim to justify the appellant's interlocutory application for recognition and for authority to identify and locate the second defendant's assets. The urgency of the application was also justified, since the appellant had to ensure that no defence to such a singularly large claim went by default, and had also to ensure that no contempt of court was committed in respect of the mandatory orders made against the second defendant. There was no necessity to make Mr. Player a party to the application, since his authority as sole director of the second defendant had been displaced on the appointment of the appellant as receiver, nor was there any necessity to make the second defendant a party, since the appellant was entitled to act on its behalf. The appellant had, therefore, acted properly in making an *ex parte* interlocutory application (page 83, line 22 – page 84, line 24; page 85, line 5 – page 87, line 26; page 88, line 40 – page 89, line 40; page 99, lines 15–22; page 112, line 35 – page 113, line 21; page 113, line 39 – page 114, line 12; page 114, line 36 – page 115, line 3; page 116, lines 5–26). Moreover, had there been any non-compliance with the rules it would have been proper to treat it as a mere procedural irregularity under O.2, r.1and thereby to preserve the order made on the application (page 89, line 41 – page 90, line 3; page 116, line 40 – page 117, line 16).

(5)   The appellant had not committed an offence under the Confidential Relationships (Preservation) Law, as amended. Although the second defendant might be a "principal" within the terms of s.3(2)(b)(i), someone had to act on its behalf, and since the appellant had displaced the sole director and was in control of the second defendant, it was itself "the relevant principal" within the terms of that section and was therefore entitled to consent to the disclosure of the confiden-

tial information obtained from the Cayman banks relating to the second defendant's assets (page 90, line 41 – page 92, line 15; page 92, line 35 – page 93, line 4; page 99, lines 23–26; page 117, line 37 – page 120, line 37). It would, however, have been preferable for the appellant to have applied to the Grand Court for directions, under s.3A of the Law (thus protecting itself under the terms of s.3(2)(a)) since, at the date of the revelations it was, by virtue of its recognition within the jurisdiction, an officer of the court (*per* Carberry, J. A. at page 99, lines 29–33). Even assuming that there had been a breach of the Law, there was no suggestion that the appellant intended that the contents of its report to the Supreme Court of Ontario should be made public, and in the circumstances—particularly in view of the fact that the appellant was acting in accordance with its obligations to the court—such breach would not be a ground for refusing to recognise the appellant's continuing appointment as receiver and manager (page 90, lines 28–40; page 121, lines 1–13).

(6)   Mr. Player's application for rescission of the order recognising the appellant as receiver and manager was not "a dispute or difficulty arising as to representation" within r.59(3) of the Grand Court (Civil Procedure) Rules and the order removing the appellant's attorneys from the record should not have been made under that provision. It was particularly wrong to substitute, as attorneys for the second defendant, those acting for Mr. Player who, by virtue of the orders of the Supreme Court of Ontario had previously been deprived of his control over the company. Despite his assertions to the contrary, Mr. Player's interests did not coincide with those of the company and power over its assets and undertakings should not have been restored to him in this way (*per* Carey, J.A. at page 121, line 14 – page 122, line 31).

(7)   The court had power to refuse to confirm or recognise the appointment of a foreign-appointed receiver but should exercise it only when there were strong and compelling reasons for doing so (*per* Carey, J.A. at page 122, lines 31–34). There were no such reasons in the present case. It would be in the interest of the second defendant for the appellant to continue to be recognised in the Cayman Islands as its receiver and manager. The appeal would therefore be allowed and the order of the Grand Court recognising the appellant and authorising it to identify and locate the second defendant's assets within the jurisdiction would be restored (page 93, lines 5–11; lines 14–17; page 122, lines 35–40).

**Cases Cited:**
(1)   *Burt, Boulton & Hayward* v. *Bull*, [1895] 1 Q.B. 276; [1891–4] All E.R. Rep. 1116; (1894), 71 L.T. 810; 64 L.J.Q.B. 232; 43 W.R. 180; 11 T.L.R. 90; 39 Sol. Jo. 95; 2 Mans. 94; 14 R. 65, applied.
(2)   *Carter* v. *Fey*, [1894] 2 Ch. 541; (1894), 70 L.T. 786; 63 L.J. Ch. 723; 10 T.L.R. 486; 38 Sol. Jo. 491; 7 R. 358, applied.
(3)   *Chief Constable of Kent* v. *V.*, [1983] Q.B. 34; [1982] 3 All E.R. 36; (1982), 126 Sol. Jo. 536, *dicta* of Lord Denning, M.R. considered.

---

(4)   *Del Zotto* v. *International Chemalloy Corp.* (1976), 14 O.R. (2d) 72; 22 C.B.R.(N.S.) 268, *dicta* of Van Camp, J. applied.
(5)   *Gawthorpe* v. *Gawthorpe*, [1878] W.N. 91.
(6)   *Hadmor Prods. Ltd.* v. *Hamilton*, [1983] 1 A.C. 191; [1982] 1 All E.R. 1042; (1982), 126 Sol. Jo. 134; [1982] I.C.R. 114; [1982] I.R.L.R. 102.
(7)   *Kennedy (C.A.) Co. Ltd. and Stibbe-Monk Ltd., Re* (1976), 74 D.L.R. (3d) 87; 23 C.B.R.(N.S.) 81.
(8)   *Moss S.S. Co. Ltd.* v. *Whinney*, [1912] A.C. 254; [1911–13] All E.R. Rep. 344; (1911), 105 L.T. 305; 81 L.J.K.B. 674; 27 T.L.R. 513; 55 Sol. Jo. 631; 12 Asp. M.L.C. 25; 16 Com. Cas. 247, applied.
(9)   *Newhart Devs. Ltd.* v. *Co-operative Comm. Bank Ltd.*, [1978] Q.B. 814; [1978] 2 All E.R. 896; (1977), 121 Sol. Jo. 847, distinguished.
(10)   *Schemmer* v. *Property Resources Ltd.*, [1975] Ch. 273; [1974] 3 All E.R. 451; (1974), 118 Sol. Jo. 716, *dicta* of Goulding, J. applied.

**Legislation construed:**
Confidential Relationships (Preservation) Law (Law 16 of 1976), s.2, as amended: The relevant terms of this section are set out at page 91, line 41 – page 92, line 15.
s.3(1), as amended: The relevant terms of this sub-section are set out at page 91, lines 3–8.

(2), as substituted by the Confidential Relationships (Preservation) Amendment) Law, 1979 (Law 26 of 1979), s.3: The relevant terms of this sub-section are set out at page 91, lines 11–19.

s.3A(1), as added by the Confidential Relationships (Preservation) (Amendment) Law, 1979 (Law 26 of 1979), s.4: The relevant terms of this sub-section are set out at page 91, lines 21–27.

s.4(1), as amended: The relevant terms of this sub-section are set out at page 91, lines 32–36.

Grand Court (Civil Procedure) Rules, r.59(3): The relevant terms of this sub-rule are set out at page 121, lines 19–24.

Grand Court Law (Law 8 of 1975), s.13(1): The relevant terms of this sub-section are set out at page 82, line 39 – page 83, line 9.

s.20: The relevant terms of this section are set out at page 83, line 35 – page 84, line 2.

Rules of the Supreme Court 1965 (England, S.I. 1965/1776), O.30, r.1: The relevant terms of this rule are set out at page 83, lines 32–33.

Supreme Court Act 1981 (England, c.54), s.37(1): The relevant terms of this sub-section are set out at page 83, lines 24–27.

*Jonathan Sumption* for the appellant;
*Nicholas Patten* for the respondent.

1984–85 CILR 71

**ZACCA**, P.: This is an appeal against a decision of the learned Chief Justice whereby he ordered:

"1. That the order of this court dated April 18th, 1983 appointing the Clarkson Company Ltd. as the interim receiver and manager of Kilderkin Investments Ltd. within the jurisdiction of this court be discharged.

. . .

3. Further that pursuant to r.59(3) of the Rules of Court, Messrs. W.S. Walker & Co. be removed from the record as attorneys for the second defendant herein, and that Messrs. C.S. Gill & Co. may be placed on the record in their place."

The appellant, Clarkson Company Ltd., was appointed receiver and manager of Kilderkin Investments Ltd., by an order of the Supreme Court of Ontario dated February 15th, 1983. Kilderkin Investments Ltd. is the second defendant in Cayman Islands Cause 132 in which the plaintiffs are alleging a fraudulent conspiracy against all defendants. The third defendant, William Player, is the sole director of Kilderkin Investments Ltd. The application resulting in the order of the Chief Justice was made by William Player, the third defendant in Cause 132.

The appellant contends that the interest of Kilderkin Investments Ltd. would be better served if it were to defend Cause 132 on behalf of Kilderkin as the third defendant William Player, its sole director, is alleged to be involved in a fraud on his company.

In an *ex parte* application on February 15th, 1983, the Supreme Court of Ontario made an order whereby the appellant, Clarkson Company Ltd. was appointed interim receiver and manager of Kilderkin Investments Ltd. The order was made in the following terms:

5

10

15

20

25

30   "Upon motion duly made this day on behalf of the plain-
tiffs, in the presence of counsel for the plaintiffs and upon
reading the writ of summons herein, the affidavit of and the
exhibits thereto, and the consent of the Clarkson Company
Ltd. filed, and upon hearing what was alleged by counsel for
35   the plaintiffs:
      1. It is ordered that, until the trial of this action or until
further order of this court, the Clarkson Company Ltd. be
and is hereby appointed interim receiver and manager of all
the undertaking, business, affairs, assets and property of the
40   defendant Kilderkin Investments Ltd. (collectively referred
to hereinafter as the 'undertaking and assets'), with power to

manage the undertaking and assets to carry on the business
of the defendant Kilderkin Investments Ltd.
      2. And it is further ordered that the defendant Kilderkin
Investments Ltd., its directors, officers, employees and
5   agents and all other parties having notice of this order deliver
up to the interim receiver and manager or to such agent or
agents as it may appoint, the undertaking and assets of the
defendant Kilderkin Investments Ltd. and all books,
accounts, securities, documents, papers, deeds, leases and
10   records of every nature and kind whatsoever relating thereto.
      3. And it is further ordered that the tenants of any proper-
ties with respect to which Kilderkin Investments Ltd. as of
the date of this order, is in receipt of or entitled to the
receipt of rents do attorn and pay their rents to the interim
15   receiver and manager.
      4. And it is further ordered that no party shall terminate
or interfere with the right of the receiver and manager to
manage and collect incomes and rents from properties which
at the time of the making of this order the defendant Kilder-
20   kin Investments Ltd. has an obligation or right to manage or
in respect of which the defendant Kilderkin Investments
Ltd. has an obligation or right to collect incomes or rents
without leave of this court first being obtained.
      5. And it is further ordered that the interim receiver and
25   manager be and it is hereby authorised to borrow money
from time to time as it may consider necessary not to exceed,
in aggregate, a principal amount of $5m., for the purpose of
protecting and preserving the undertaking and assets and
carrying on the business of the defendant, Kilderkin Invest-
30   ments Ltd., and that as security therefor, the assets of the
defendant, Kilderkin Investments Ltd. of every nature and
kind do stand charged with payments of the moneys so bor-
rowed by the receiver and manager, together with interest

35  thereon in priority to the claims of the plaintiffs and, if any,
to the claims of the defendants but subject to the right of the
interim receiver and manager to be indemnified as such
interim receiver and manager out of the undertaking and
assets in respect of its remuneration to be allowed by the
court and its costs and expenses properly incurred.

40   6. And it is further ordered that the moneys authorised to
be borrowed under this order shall be in the nature of a

revolving credit and the interim receiver may pay off and re-
borrow within the limits of the authority hereby conferred so
long as the maximum amount owing in respect of such bor-
rowing at any one time does not exceed the amount hereby
5  authorised with interest.

7. And it is further ordered that the interim receiver and
manager be and is hereby empowered to enter into new
leases for apartment units contained in lands which at the
time of the making of this order, the defendant has an obli-
10  gation or right to manage or in respect of which the defend-
ant Kilderkin Investments Ltd. has an obligation or right to
collect rents and that the interim receiver and manager is
hereby appointed attorney in fact to negotiate all cheques,
remittances and drafts relating to the rents of such lands.

15   8. And it is further ordered that the interim receiver and
manager shall be at liberty to appoint an agent or agents and
such assistants from time to time as the receiver and
manager may consider necessary for the purpose of perform-
ing its duties hereunder.

20   9. And it is further ordered that the interim receiver and
manager be at liberty, out of the moneys coming into its
hands available for that purpose, to pay all expenses relating
to the management of the undertaking and assets.

10. And it is further ordered that the interim receiver and
25  manager shall be at liberty to pay itself out of moneys com-
ing into its hands, in respect of its services and disburse-
ments in a reasonable amount either monthly or at such
longer intervals as it deems appropriate, and each amount
shall constitute an advance against its remuneration when
30  fixed.

11. And is further ordered that any expenditure which shall
be properly made or incurred by the interim receiver and
manager shall be allowed it in passing its accounts and
together with its remuneration shall form a charge on the
35  undertaking and assets in priority to the claims of the plain-
tiffs and the claims, if any, of the defendants.

12. And it is further ordered that the interim receiver and

40    manager do from time to time pass its accounts and pay the
      balance in its hands as the Master of this court may direct
      and for this purpose the accounts of the receiver and
      manager are hereby referred to the said Master.

1984–85 CILR 74

      13. And it is further ordered that the interim receiver and
      manager may from time to time apply to this court for direc-
      tion and guidance or additional powers in respect of the dis-
      charge of its duties as interim receiver and manager.

5     14. And it is further ordered that the costs of the plaintiffs
      herein, including all proceedings under the reference herein
      be taxed and allowed by the Master and paid by the defend-
      ants out of amounts received by the receiver and manager
      herein on a solicitor-and-client basis."

10    Further orders dated February 28th, 1983, March 29th, 1983
      and April 13th, 1983 were made by the Supreme Court of Ontario
      as it effected the appointment of the appellant as interim receiver
      and manager. Paragraph 7 of the order of February 28th, 1983,
      stated:

15    "7. And it is further ordered that the interim receiver be
      and it is hereby authorised and directed to identify the assets
      of Kilderkin, and their location, to identify all persons hav-
      ing an interest in Kilderkin and its assets and entitled to
      receive notice of any proceedings affecting it."

20    The order of April 13th, 1983 was to the following effect:

      "Upon motion made this day on behalf of the Clarkson
      Company Ltd. as interim receiver and manager of the
      defendant, Kilderkin Investments Ltd., for advice and direc-
      tion of this court in relation to its administration of the
25    undertaking, business, affairs, assets and property of the
      said defendant, upon reading the affidavit of David I.
      Richardson, sworn the 13th day of April, 1983, and the
      interim report of the interim receiver dated the 29th day of
      March, 1983, upon hearing counsel for the interim receiver
30    and manager:

      1. It is ordered that the interim receiver and manager be
      and it is hereby authorised to commence proceedings in the
      Cayman Islands to preserve and recover any assets of Kil-
      derkin Investments Ltd. situated in that jurisdiction, or for
35    such other remedy as counsel for the interim receiver and
      manager may advise."

      Following upon these applications and orders of the Supreme
      Court of Ontario, the appellant made an *ex parte* interlocutory
      application in the Cayman Islands in Cause 132. Arising out of
40    this application the learned Chief Justice on April 18th, 1983,
      made the following order:

     "Upon hearing counsel *ex parte* for the Clarkson Com-
pany Ltd., interim receiver and manager of Kilderkin
Investments Ltd. pursuant to an order of the Supreme Court
of Ontario dated the 15th day of February, 1983, and upon
5     reading the affidavit of James Alexander Cringan sworn the
13th day of April, 1983, and exhibits thereto, and the affi-
davit of John L. Biddell sworn the 14th day of April, 1983,
and exhibits thereto, and the affidavit of John A.M. Judge
sworn the 18th day of April, 1983 and the exhibits thereto, it
10    is hereby ordered that:

     1. The Clarkson Company Ltd. as interim receiver and
manager of Kilderkin Investments Ltd. (hereinafter referred
to as 'Kilderkin') pursuant to the orders of the Supreme
Court of Ontario dated the 15th and 28th days of February,
15    the 29th day of March and the 13th day of April, 1983 is
hereby authorised to act on behalf of Kilderkin within the
jurisdiction of this court.

     2. The Clarkson Company Ltd. is authorised and permit-
ted to identify and locate all assets belonging legally or ben-
20    eficially to Kilderkin within the jurisdiction of this court and
to make inquiries and requests for information and docu-
ments, whether on paper, microfilm or tape or in any other
form relating to any asset of Kilderkin which may be in the
possession or control of any person, bank, or company
25    within the jurisdiction of this court, notwithstanding the
order of this court dated the 16th day of April, 1983.

     3. The Clarkson Company Ltd. may apply to this court for
further directions from time to time as the interim receiver
and manager of Kilderkin in relation to any matters arising
30    from paras. 2 and 3 hereof upon proper notice to such of the
parties as may be ordered by the court."

Prior to the order of April 18th, 1983 being made, an order of
the court made on April 16th, 1983 had the effect of freezing the
assets of Kilderkin in the Cayman Islands.

35    In rescinding paras. 1 and 3 of the order of April 18th, 1983 the
learned Chief Justice's decision was based on the following
grounds:

     "1. That the order of April 18th, 1983 (the order) had
been obtained by a wrong and inappropriate process wholly
40    unrelated to its purpose and, therefore, cannot be allowed to
stand.

     2. The receiver and manager had apparently flouted the

Confidential Relationships (Preservation) Law and, in the
exercise of this court's discretion, could not, until an accept-
able explanation by way of affidavit is placed before this
5   court, be allowed continuing recognition as receiver and
manager in this jurisdiction."
The order in terms of para. 3 was held to be a necessary conse-
quence of the order in terms of para. 1.
The learned Chief Justice also held that the appellant had no
10   authority to defend an action brought against Kilderkin by virtue
of the orders of the Supreme Court of Ontario and that in order
to do so, a direction to this appellant by the court was necessary.
For the appellant it was submitted:
"1. That the *ex parte* application made by the appellant
15   was the proper procedural course to be adopted and that the
learned Chief Justice erred in holding that a fresh originating
summons was the only available course open to the appel-
lant.
2. That the appointment of the appellant as the receiver
20   and manager for Kilderkin displaced the powers and man-
agement of the directors and the only person who could act
on behalf of Kilderkin was the appellant. The powers of the
appellant included commencing and defending actions.
3. The appellant was not in breach of the Confidential
25   Relationships (Preservation) Law as the appellant was the
only person authorised to act on behalf of Kilderkin."
Counsel for the respondent in his submissions sought to sup-
port the decision on the reasons set out in the judgment of the
learned Chief Justice.
30   It may be convenient to deal first with the question of the
powers and authority of a court-appointed receiver and manager.
Did the appellant have the authority to defend Cause 132 on
behalf of Kilderkin?
In *Kerr on Receivers*, 16th ed., at 216 (1983) the author states:
35   "The appointment of a receiver and manager over the assets
and business of a company does not dissolve or annihilate
the company, any more than the taking possession by the
mortgagee of the fee of land let to tenants annihilates the
mortgagor. Both continue to exist; but the company is
40   entirely superseded in the conduct of that business, and
deprived of all power to enter into contracts in relation to

1984–85 CILR 77

that business, or to sell, pledge or otherwise dispose of the
property put into the possession or under the control of the
receiver and manager. The powers of the directors in this
respect are entirely in abeyance so far as that business of the
5   company is concerned, and the relevant powers of the com-

pany are exercised by the receiver under the direction of the
court."

In *Burt, Boulton & Hayward* v. *Bull* (1), a case in which the
defendants were appointed receivers and managers of the busi-
10  ness of a company by the court, the question arose as to whether
the defendants were personally liable for goods which they had
ordered for the business. Lopes, L.J. said ([1895] 1 Q.B. at 282):

> "It was argued that the defendants had only given the order
> as agents. But the company after their appointment had no
15  > control over the business: it could give no orders and make
> no contracts. The defendants could not be said to be agents
> for anybody. They had the sole control of the business, sub-
> ject to the directions of the Court. They gave the order as
> receivers and managers appointed by the Court to the plain-
20  > tiffs, who knew the position of the company and that of the
> defendants. Under these circumstances, in my opinion, the
> goods must be taken to have been supplied on the credit of
> the defendants."

In *Moss S.S. Co. Ltd.* v. *Whinney* (8), a receiver and manager
25  was appointed in a debenture-holders' action. In discussing the
powers of a receiver and manager, Lord Loreburn, L.C. stated
([1912] A.C. at 257 and 259):

> "On January 5 an order was made in a debenture-holders'
> action that Mr. Whinney should be receiver and manager of
30  > Ind, Coope & Co. Nothing special is to be found in that
> order. Its effect in law was that the company still remained a
> living person, but was disabled from conducting its business,
> of which the entire conduct passed into the hands of Mr.
> Whinney . . . .
35  > I agree with Fletcher Moulton L.J. that the company was
> still alive and its business was being still carried on by Mr.
> Whinney, but he was not carrying on as the company's
> agent. He superseded the company, and the transactions
> upon which he entered in carrying on the old business were
40  > his transactions, upon which he was personally liable."

The Earl of Haisbury stated (*ibid.*, at 259–260):

> "Another reason is that I think that, if the appellants' argu-
> ment should succeed, it would be a very serious blow to a
> system at present prevailing, by which an enormous quantity
> of business is being carried on. A great many joint stock
5  > companies obtain their capital, or a considerable part of it,
> by the issue of debentures, and one form of securing deben-
> ture-holders in their rights is a well-known form of appli-
> cation to the Court, which practically removes the conduct
> and guidance of the undertaking from the directors

10     appointed by the company and places it in the hands of a
manager and receiver, who thereupon absolutely supersedes
the company itself, which becomes incapable of making any
contract on its own behalf or exercising any control over any
part of its property or assets."

15     Lord Atkinson said (*ibid.*, at 263):

     "This appointment of a receiver and manager over the
assets and business of a company does not dissolve or annihi-
late the company, any more than the taking possession by
the mortgagee of the fee of land let to tenants annihilates the

20     mortgagor. Both continue to exist; but it entirely supersedes
the company in the conduct of its business, deprives it of all
power to enter into contracts in relation to that business, or
to sell, pledge, or otherwise dispose of the property put into
the possession, or under the control of the receiver and

25     manager. Its powers in these respects are entirely in
abeyance."

     In *Del Zotto* v. *International Chemalloy Corp.* (4) an appli-
cation was made by the plaintiff to strike out a counterclaim. The
question for the decision of the court was whether the defendant

30     was precluded from delivering a counterclaim in its own name by
reason of the appointment of a receiver and manager and
whether leave of the court was necessary prior to such delivery.
On the motion of the plaintiff, the Clarkson Company had been
appointed receiver and manager of the property of the defendant

35     until trial. In considering the question the court examined a
number of authorities on the position and status of a corporation
after the appointment of a receiver and manager. The case of
*Moss S.S. Co. Ltd.* v. *Whinney* (8) was considered. Van Camp, J.
stated (14 O.R. (2d) at 75–76):

40     "The question of whether the receiver or the parties should
institute proceedings or make applications before the Court

---

     was also recently canvassed in the case of *Wahl v. Wahl et al.*
(*No. 2*), [1972] 1 O.R. 879, 16 C.B.R. (N.S.) 272. There [at
pp. 891–2], the Court referred to the case of *Ireland v. Eade*
(1844), 7 Beav. 55, 49 E.R. 983, where it was said [at p. 56,

5     *per* Lord Langdale, M.R.]:

     A receiver ought not to present a petition or origi-
nate any proceedings in a cause; any necessary appli-
cation should be made by the parties to the suit. That is
the general rule; but there is some difficulty in adhering

10     to it and many exceptions have been allowed.

     It seems that exceptions to the general rule have been per-
mitted in cases where the parties refuse or are unable to dili-
gently prosecute the action. However, this would not apply,

15    since the defendant itself desires to have carriage of the
      action. An exception might occur when the Court permits
      the receiver to institute proceedings by making such pro-
      vision in the order appointing him. However, the order of
      Mr. Justice Wright in the present case contains no such pro-
20    vision and, therefore, would not provide a ground for
      departing from the general rule. Therefore, based on the
      authorities cited, the defendant herein should be permitted
      to institute the counterclaim in its own name."
      The court then went on to consider the question of whether it
      was necessary for the defendant to obtain the leave of the court in
25    order to commence proceedings. Van Camp, J. stated (14 O.R.
      (2d) at 76–77):
          "Perhaps by considering some general principles relating
          to receiverships the issue can be determined. In *Kerr on the
          Law and Practice as to Receivers* it is said, at p. 144:
30        When the court has appointed a receiver and the
          receiver is in possession, his possession is the pos-
          session of the court, and may not be disturbed without
          its leave (*Angel v. Smith*, 9 Ves. 335 . . . ) If anyone,
          whoever he be, disturb the possession of the receiver,
35        the court holds that person guilty of contempt . . .
          Similarly, in *Law Relating to Receivers and Managers* (1912),
          Riviere points out that [p. 162]:
          Interference with property over which a receiver has
          been appointed by a party to the action in which he has
40        been appointed will be a contempt of Court, whether
          the receiver has gone into possession or not.

          Although most of the cases relating to interference with
      property in the possession of the receiver relate to instances
      of physical interference, the principles enunciated in these
      cases should be equally applicable to instances of non-
5     physical interference.
          In this case the Clarkson Company Limited has been
      appointed receiver and manager of the property, assets,
      business and undertaking of the defendant corporation. To
      the extent that corporate funds will be required to diligently
10    pursue the conspiracy claim, the defendant corporation
      would be interfering with the possession of the receiver.
      Therefore, to avoid being held in contempt of Court, leave
      should be obtained in this case, particularly in view of the
      large sums of money involved."
15    The *Del Zotto* case appears to have decided:
      (1) Although the Clarkson Company was appointed receiver
      and manager of the defendant, the defendant was permitted to

bring proceedings in its own name.

20     (2) Where there is interference with the possession of the receiver, leave of the court is necessary to institute proceedings in its own name.

    (3) The general rule is that a receiver ought not to institute pro-
ceedings, but an exception might occur where the court permits
the receiver to institute proceedings by making such provision in
25 the order appointing him.

    Both appellant and respondent rely on the *Del Zotto* case in
support of their submissions. It was submitted on behalf of the
respondent that the defendant Player was not interfering with the
possession of the receiver/manager as he had indicated that the
30 costs for defending the action on behalf of Kilderkin were to be
met out of his personal funds. In such circumstances Mr. Player
would not require leave of the court to defend on behalf of Kil-
derkin as he was not interfering with the assets or possession of
the receiver. It has been established that over $100m. of Kilder-
35 kin funds are in the Cayman Islands. The plaintiffs in bringing
their action, Cause 132, are seeking to hold on to those assets if
they are successful in the action. If the respondent Player is
allowed to defend on behalf of Kilderkin and the plaintiffs suc-
ceed, then the assets of Kilderkin in the Cayman Islands, which
40 assets have been frozen by an order of the court, could be avail-
able to satisfy the judgment. Surely this would be an interference

with the assets of Kilderkin? In such circumstances in my view it
would be necessary for the respondent to obtain an order of the
court appointing the receiver granting him leave to defend the
action on behalf of Kilderkin. Such leave of the court has not
5 been granted to the respondent and therefore he should not be
allowed to act on behalf of Kilderkin in defending Cause 132.

    What then is the position of the appellant? In my view the *Del
Zotto* case is not authority for saying that a receiver cannot
defend an action brought against a company for which he has
10 been appointed receiver and manager.

    The appointment of the Clarkson Company as a receiver and
manager had the effect of vesting in the receiver/manager com-
plete control of the business of Kilderkin. The receiver/manager
displaced the respondent Player, its sole director. The respondent
15 can no longer exercise any powers of control or management over
Kilderkin. Under para. 2 of the order of the Ontario court dated
February 15th, 1983, the respondent is directed to hand over to
the receiver/manager all documents, assets, papers, *etc.* of Kil-
derkin.

20     In my view, the appellant has the power to defend and auth-
ority to instruct solicitors to enter an appearance on behalf of Kil-

derkin. It was therefore appropriate for the appellant to make the application which it did on April 18th, 1983, before the learned Chief Justice.

25    The question now arises as to whether the correct procedure was adopted by the appellant. Could such an application be made *ex parte* and was it appropriate to make such an application arising out of Cause 132?

      As previously stated on February 15th, 1983 the Supreme
30 Court of Ontario made an order appointing the appellant as receiver and manager of Kilderkin. This application was made arising out of an action in which Kilderkin and the respondent were named as defendants.

      Does the court in the Cayman Islands have the jurisdiction to
35 recognise a foreign receiver? In *Schemmer* v. *Property Resources Ltd.* (10) the court had to consider whether a receiver appointed in the United States would be recognised in England. Goulding, J. said ([1975] Ch. at 287–288):

      "I shall not attempt to define the cases where an English
40    court will either recognise directly the title of a foreign
      receiver to assets located here or, by its own order, will set

      up an auxiliary receivership in England. To do either of
      those things the court must previously, in my judgment, be
      satisfied of a sufficient connection between the defendant
      and the jurisdiction in which the foreign receiver was
5     appointed to justify recognition of the foreign court's order,
      on English conflict principles, as having effect outside such
      jurisdiction. Here I can find no sufficient connection. First,
      PRL was not made a defendant to the American proceed-
      ings, and there is no evidence that it has ever submitted to
10    the federal jurisdiction. In that regard it is, in my judgment,
      not enough that certain subsidiary companies of PRL with
      assets in the United States of America have unsuccessfully
      contested the orders of the district court on the basis that it
      had no personal jurisdiction against them, and on other
15    grounds. Secondly, PRL is not incorporated in the United
      States of America or any state or territory thereof, so that
      the principle tacitly applied in *Macaulay's* case, 44 T.L.R.
      99, and more fully exemplified by *North Australian Territory
      Co. Ltd.* v. *Goldsbrough, Mort & Co. Ltd.* (1889) 61 L.T.
20    716 is of no direct relevance. Thirdly, there is no evidence
      that the courts of the Bahama Islands, where PRL is incor-
      porated, would themselves recognise the American decree
      as affecting English assets. Fourthly, there is no evidence
      that PRL itself has ever carried on business in the United
25    States of America or that the seat of its central management

and control has been located there."

Applying the principles here suggested by Goulding, J. to the instant case: First, Kilderkin was a defendant in the Ontario pro-
ceedings and had submitted to the jurisdiction of that court.
30  Secondly, Kilderkin was incorporated in Canada. The third prin-
ciple does not arise in this case. Fourthly, Kilderkin carried on business in Ontario and the management of the company was located in Canada.

In the Ontario case of *Re C.A. Kennedy Co. Ltd. and Stibbe-*
35  *Monk Ltd.* (7) the court there held that the courts in Ontario would recognise the appointment of a receiver in a foreign juris-
diction.

The Grand Court Law, s.13(1) states:

"The Court shall be a superior court of record and, in
40  addition to any jurisdiction heretofore exercised by the Court or conferred by this or any other law for the time

being in force in the Islands, shall possess and exercise, sub-
ject to the provisions of this and any other laws of the Islands, the like jurisdiction within the Islands which is vested in or capable of being exercised in England by—
5  (a) Her Majesty's High Court of Justice; and
(b) the Divisional Courts of that Court,
as constituted by the Supreme Court of Judicature (Consoli-
dation) Act, 1925, and any Act of the Parliament of the United Kingdom amending or replacing that act."
10  In my view the court in the Cayman Islands has the jurisdiction to recognise a receiver appointed by the Supreme Court of Ontario.

The application made by the appellant was made *ex parte* in Cause 132. In effect it was an application for the recognition in
15  the Cayman Islands of the order of the Ontario court appointing the appellant as receiver and manager of Kilderkin.

Mr. Patten submitted if all that was being sought was recog-
nition and leave to defend, then the procedure would have been correct. But he argued that para. 2 of the order went far beyond
20  the scope of Cause 132. The application could not therefore be made in Cause 132.

The English Supreme Court Act 1981, provides for the appointment of a receiver in s.37(1) which states:

"The High Court may by order (whether interlocutory or
25  final) grant an injunction or appoint a receiver in all cases in which it appears to the court to be just and convenient to do so."

Section 37(2) provides: "Any such order may be made either unconditionally or on such terms and conditions as the court

30      thinks just."
            Order 30, r.1(1) of the English Rules of the Supreme Court
        provides: "An application for the appointment of a receiver may
        be made by summons or motion."
            The Grand Court Law provides in s.20:
35          "(1) Subject to the provisions of this or any other Law, the
            jurisdiction of the Court shall be exercised in accordance
            with any Rules made under this Law.
                (2) In any matter of practice or procedure for which no
            provision is made by this or any other Law or by any Rules,
            the practice and procedure in similar matters in the High
40          Court in England shall apply so far as local circumstances

            permit and subject to any directions which the Court may
            give in any particular case."
            By reason of the provisions in the Grand Court Law, the Eng-
        lish Supreme Court Act 1981 and the English Rules of the
5       Supreme Court would be applicable to the Cayman Islands. It is
        of interest to look at some of the notes which appear in the White
        Book as applicable to O.30, r.1.
            Note 30/1/1 under the heading "Power to Appoint Receiver"
        states:
10          "There is no limit to the power of the Court under this sec-
            tion to appoint a receiver on motion, except that it is only to
            be exercised when it appears 'just or convenient' . . ."
        Note 30/1/5 states:
            "Under the old practice an *ex parte* application would be
15          granted only in exceptional circumstances. Sub-rules (3) and
            (4) now allow *ex parte* applications and give the Court power
            to put any terms that may be appropriate to the appoint-
            ment. The application can be made even before service of
            the writ in exceptional cases, but usually short notice of
20          motion should be served with the writ.
                An application by a defendant or any party other than the
            plaintiff can only be made after appearance has been
            entered, although it would seem by analogy that an appli-
            cation might be heard upon an undertaking to appear."
25      In his submissions Mr. Patten stated that he would not support
        the finding that a defendant could not apply for the appointment
        of a receiver.
            39 *Halsbury's Laws of England*, 4th ed., para. 815, at 413 in the
        section entitled "Application for Appointment of Receiver" and
30      under the heading "Application by party to an action" states:
            "An application for the appointment of a receiver under the
            Supreme Court Act 1981 must, in general, be made in a
            properly constituted action. The application may be made

35 by any party to the action, or, it would seem, by any person
served with notice of, or attending any proceeding in, the
action."

And (*ibid.*, para. 822, at 416) under the heading "Application by
defendant" it is stated:

40 "Although a plaintiff may be able in an urgent case to obtain
the appointment of a receiver even before service of the writ
or summons, a defendant may only apply after he has

---

1984–85 CILR 85

acknowledged service, and then only on notice to the plain-
tiff; nor may he apply without first filing a counterclaim or a
writ in a cross-action, unless his claim to relief arises out of
the plaintiff's cause of action or is incidental to it."

5 In the case of *Chief Constable of Kent* v. *V.* (3) Lord Denning,
M.R., in discussing s.37 of the Supreme Court Act 1981, had this
to say ([1982] 3 All E.R. at 40):

"But I am glad to say that the reasoning of those cases has
now been circumvented by statute. They were based on the

10 wording of s.25(8) of the Supreme Court of Judicature Act
1873, which said that—

' . . . an injunction may be granted . . . by an *inter-
locutory* order of the court in all cases in which it shall
appear to the court to be just or convenient that such

15 order should be made . . . '

That was re-enacted in s.45(1) of the Supreme Court of Judi-
cature (Consolidation) Act 1925 in these words:

'The High Court may grant a mandamus or an
injunction or appoint a receiver by an *interlocutory*

20 order in all cases in which it appears to the court to be
just or convenient so to do.'

I have emphasised the word 'interlocutory' because it was
the basis of the decision in the *North London Rly. Co.* case
and following cases. That was pointed out by Lord Diplock

25 in *The Siskina* [1977] 3 All E.R. 803 at 823, [1979] A.C. 210
at 254 when he said:

'That subsection, speaking as it does of *interlocutory*
orders, presupposes the existence of an action, actual
or potential, claiming substantive relief which the High

30 Court has jurisdiction to grant and to which the inter-
locutory orders referred to are but ancillary.'

. . . .

Now that reasoning has been circumvented by s.37(1) of
the Supreme Court Act 1981, which came into force on 1

35 January 1982. It says that:

'The High Court may by order *(whether interlocutory
or final)* grant an injunction or appoint a receiver in all

cases in which it appears to the court to be just and con-
venient to do so.'

40      The emphasised words in brackets show that Parliament
did not like the limitation to 'interlocutory'. It is no longer

1984–85 CILR 86

necessary that the injunction should be *ancillary* to an action
claiming a legal or equitable right. It can stand on its own.
The section as it now stands plainly confers a new and exten-
sive jurisdiction on the High Court to grant an injunction. It

5      is far wider than anything that had been known in our courts
before. There is no reason whatever why the courts should
cut down this jurisdiction by reference to previous technical
distinctions. Thus Parliament has restored the law to what
my great predecessor Jessel M.R. said it was in *Beddow v.*

10    *Beddow* (1878) 9 Ch. D. 89 at 93 and which I applied in the
first Mareva injunction case, *Mareva Compania Naviera SA
v. International Bulkcarriers SA* (1975) [1980] 1 All E.R. 213
at 214: 'I have unlimited power to grant an injunction in any
case where it would be right or just to do so . . . ' Subject,

15    however, to this qualification: I would not say the power was
'unlimited'. I think that the applicant for an injunction must
have a sufficient interest in a matter to warrant his asking for
an injunction. Whereas previously it was said that he had to
have a 'legal or equitable right' in himself, now he has to

20    have a locus standi to apply. He must have a sufficient inter-
est. This is a good and sensible test . . . . Next, it must be
just and convenient that an injunction should be granted at
his instance as, for example, so as to preserve the assets or
property which might otherwise be lost or dissipated."

25    In what circumstances can a defendant apply for the appoint-
ment of a receiver and can it be an *ex parte* application? The
order of the Supreme Court of Ontario was made on an *ex parte*
application. *Kerr on Receivers*, 16th ed., at 105 (1983) states:
"An application for a receiver may be made by any party. It

30    is provided by R.S.C., Ord. 30, r.1, that the application may
be made either *ex parte* or on notice. It is conceived that, in a
very urgent case, a defendant may obtain the appointment
of a receiver on such an application. Under the old practice a
defendant could not apply before decree, but he may now

35    apply at any stage, even if the plaintiff has applied. In such a
case one order is made on both motions, the conduct being
usually given to the plaintiff. The relief sought by the
defendant must be incidental to, or arise out of, the relief
claimed by the plaintiff, or the defendant must counterclaim

40    or issue a writ before be can obtain a receiver."
And (*ibid.*, at 106) the learned author states:

1984−85 CILR 87

"The appointment may be made at any stage of an action
according as the urgency of the case may require without
formal application if necessary. A receiver may be
appointed *ex parte* even after judgment where there is risk of
5    the defendant making away with the property: but an injunc-
tion is preferred in such cases if it will be effective."

In *Carter* v. *Fey* (2) it was held that a defendant could apply for
an injunction against the plaintiff without filing a counterclaim or
issuing a writ in a cross-action but only in cases where the defend-
10   ant's claim to relief arises out of the plaintiff's cause of action, or
is incidental to it.

I have no doubt that it is open to a defendant to apply to the
court for the appointment of a receiver and manager.

It will be necessary to look at the findings of the learned Chief
15   Justice on the question of procedure. In his judgment it is stated:
"Kilderkin, as such, and its sole director could not have been
aware of the original application. As will be considered later,
Clarkson, as interim receiver and manager, did not assume the
personality of Kilderkin."

20   The appellant having the control and management of Kilder-
kin, and having displaced the sole director, it cannot be said that
Kilderkin would not have been aware of the application made by
the appellant. As far as the respondent is concerned, if the appli-
cation could be made *ex parte* then it would not be necessary for
25   notice to be served on the respondent who was a defendant in
Cause 132.

The learned Chief Justice held that O.30, r.1 was not appli-
cable, and stated:

"The original application was not an application for the
30   appointment of a receiver as contemplated by that pro-
vision. It was an application by the receiver and manager
appointed by the Ontario court for the recognition of that
receiver and manager and for authority for that receiver and
manager to perform certain functions within this jurisdic-
35   tion. Furthermore, O.30, r.1 provides machinery for a plain-
tiff to have a receiver appointed to take possession of and
preserve the assets of a defendant for the purpose of satisfy-
ing a judgment in the plaintiff's favour. That is not what the
original application was about. It was an application by a
40   receiver and manager of a defendant in relation to the assets
and operations of that defendant. Clarkson was already the

1984−85 CILR 88

receiver and manager of Kilderkin. Order 30, r.1 is not

designed to give to such a receiver and manager authority
over that company for the purpose of the suit (Cause 132).
Its control over the assets of Kilderkin had no connection
5   with the suit against Kilderkin. Clarkson's preservation of
the assets of Kilderkin in this jurisdiction in its capacity as
receiver and manager of Kilderkin had no relevance to the
suit (Cause 132) in this jurisdiction. The original application
was not at the instance of the plaintiffs in the suit in this jur-
10   isdiction to have Clarkson or some other fit and proper per-
son appointed receiver. It would have been an altogether
different matter had it been. What Clarkson was seeking to
do was to locate assets of Kilderkin for the benefit of and at
the instance of the plaintiffs in the Ontario action, albeit the
15   same plaintiffs, for the purpose of the action. Hence Clark-
son's report to the Ontario court dated June 15th, 1983. No
report to this court was contemplated or made. The order
had no relation to the suit (Cause 132) in this jurisdiction. Its
only possible connection with the local suit would have been
20   to authorise Clarkson to defend that suit, an aspect dealt
with elsewhere, and an aspect not adverted to at all in the *ex
parte* summons."

And later the learned Chief Justice stated:

"The terms of the order have no connection with Cause 132
25   or the subject-matter of it save in one very limited respect
and that is that the words 'is hereby authorised to act on
behalf of Kilderkin within the jurisdiction of this court'
could be construed as authorising Clarkson to defend suits
against Kilderkin in that jurisdiction, assuming it to have
30   power to do so. It did not have that power. Hence the obser-
vation that the resulting order (and application) bore no
relationship to Cause 132 and could not properly be an inter-
locutory application in that cause. Clarkson did not need the
powers set out in para. 2 of the order for the purposes of
35   Cause 132."

The appellant in attempting to locate the assets of Kilderkin in
the Cayman Islands cannot be said to be locating them for the
benefit of the plaintiffs. It is true that it was on the plaintiffs'
application that the appellant was appointed receiver and
40   manager in Canada. However, once appointed the receiver is an
officer of the court and if he has full control and management

over the affairs of Kilderkin then once appointed he is acting in
the interest of Kilderkin. He is, therefore, entitled to seek out
and establish the whereabouts of assets belonging to Kilderkin.

The plaintiffs having sued Kilderkin (Cause 132) if successful
5   the assets of Kilderkin would be in jeopardy. It cannot therefore

be said that the application has no connection with Cause 132.
One of the reasons for the learned Chief Justice holding that the
order (and application) bore no relationship to Cause 132, and
that it could not be an interlocutory application was because he
10  held that the appellant had no power to defend.

In my view, the application made by the appellant had a real
connection with the suit. An application to appoint a receiver can
in a proper case be made *ex parte.*

There is no reason, therefore, why an application to recognise
15  a receiver cannot be made *ex parte* since the Cayman Islands
courts could recognise the appointment of a receiver in Canada.
Having regard to the circumstances of the instant case, it would
be prudent for the appellant to be recognised in the Cayman
Islands.

20  In holding that the procedure was irregular the learned Chief
Justice said:

"An important consequence of the procedural irregularity is
that it has led to a denial of natural justice. With the benefit
of hindsight one can see that the order was more than a for-
25  mality. The company, Kilderkin, should have been made a
party to the originating process—perhaps the sole director as
well—and any such party should have been entitled to
oppose the making of the order. The company would have
been exercising its residual powers in opposing the original
30  application. The right to do so was denied to the company."

If the appellant has the power to defend on behalf of Kilderkin,
then it follows that no right has been denied Kilderkin. If the sole
director has been displaced, then it is unnecessary to make him a
party to the proceedings. There would be no denial of natural
35  justice.

I hold that the appellant as manager and receiver has the power
to defend on behalf of Kilderkin. The application was properly
made as an *ex parte* application arising out of Cause 132 as there
was a connection with that case and it arises out of the relief
40  claimed by the plaintiffs.

Although I hold that there was no irregularity in the

1984–85 CILR 90

proceedings, if it became necessary, O.2, r.1 of the Supreme
Court Rules could be invoked in order to preserve the order
made on April 18th, 1983.

The irregularity of the procedure was only one ground on
5  which it was held that the order of April 18th, 1983, should be dis-
charged. It was also held that the appellant had disregarded the
provisions of the Confidential Relationships (Preservation) Law.
The learned Chief Justice in his judgment said:

"There is no doubt in my mind that Clarkson acted in breach

10        of the Confidential Relationships (Preservation) Law. In the
          absence of an acceptable explanation, that breach appears to
          have been deliberate.
              That in itself disentitles Clarkson to continue to be recog-
          nised as receiver and manager of Kilderkin in this jurisdic-
15        tion and justifies the exercise of this court's discretion to
          discharge the order."
          In a report by the appellant, dated June 15th, 1983 addressed
          to the Chief Justice of the Ontario Supreme Court, confidential
          information relating to transactions in the Cayman Islands'
20        banks, concerning Kilderkin was disclosed. The contents of the
          report apparently received wide publicity in the press in Canada.
              This report followed upon the order of April 18th where in
          para. 2 of the order the appellant was authorised and permitted to
          identify and locate all assets belonging to Kilderkin in the Cay-
25        man Islands. The report of June 15th, 1983 although marked
          "Strictly Confidential" and sent to the Chief Justice of the
          Ontario court, became public property.
              There is no evidence to suggest that the appellant intended the
          contents of the report to be made public. As an officer of the
30        court he made his report. Assuming a breach of the Confidential
          Relationships (Preservation) Law there is no evidence to suggest
          that the breach was a deliberate act. The appellant has not been
          charged with a breach of the Law but it became necessary to con-
          sider the breach because the learned Chief Justice relied on it as a
35        ground for discharging the order of April 18th, 1983.
              In my view, even assuming a breach of the Confidential Rela-
          tionships (Preservation) Law, having regard to the circumstances
          under which the breach was committed, I would hold that this
          should not be a ground for not recognising the receiver and
40        manager appointed by the Ontario court.
              I will now consider whether in fact there was a breach of the

          Law. The Confidential Relationships (Preservation) Law, s.3(1),
          as amended, states:
              "Subject to subsection (2), this Law has application to all
          confidential information with respect to business of a pro-
5         fessional nature which arises in or is brought into the Islands
          and to all persons coming into possession of such infor-
          mation at any time thereafter whether they be within the jur-
          isdiction or thereout."
          Section 3(2), as substituted by the Confidential Relationships
10        (Preservation) (Amendment) Law, 1979 states:
              "This Law has no application to the seeking, divulging, or
          obtaining, of confidential information—
            (a) in compliance with the directions of the Grand Court

pursuant to section 3A;
15        (b) by or to—
            (i) any professional person acting in the normal
                course of business or with the consent,
                express or implied, of the relevant princi-
                pal .. . ."
20    Section 3A(1) states:
        "Whenever a person intends or is required to give in evi-
        dence in, or in connection with, any proceeding being tried,
        inquired into or determined by any court, tribunal or other
        authority (whether within or without the Islands) any confi-
25      dential information within the meaning of this Law, he shall
        before so doing apply for directions and any adjournment
        necessary for that purpose may be granted."
      No application was made by the appellant under s.3A(1). This
    section applies to a person who intends to divulge confidential
30  information in evidence contrary to s.4(1) of the Law. Section
    4(1), as amended, states:
        "Subject to the provisions of sub-section (2) of section 3,
        whoever—
        (a) being in possession of confidential information how-
35          ever obtained;
            (i) divulges it . . . ."
      The question now arises as to whether the appellant falls within
    s.3(2)(b). If so, then there would be no breach of the Law.
      Section 2 defines "confidential information," "principal," and
40  "professional person" as follows:
        " 'confidential information' includes information concerning

---

1984–85 CILR 92

any property which the recipient thereof is not, otherwise
than in the normal course of business, authorized by the
principal to divulge;
. . . .
5   'principal' means a person who has imparted to another con-
fidential information in the course of the transaction of busi-
ness of a professional nature;
'professional person' includes a public or government
official, a bank, trust company, an attorney-at-law, an
10  accountant, an estate agent, an insurer, a broker and every
kind of commercial agent and adviser whether or not ans-
wering to the above descriptions and whether or not licensed
or authorized to act in that capacity and every person sub-
ordinate to or in the employ or control of such person for the
15  purpose of his professional activities . . . ."
  The learned Chief Justice said:
    "There can be no doubt that Clarkson, as receiver and

manager, never became the principal in relation to the confi-
dential information for the purposes of the Confidential
20  Relationships (Preservation) Law. The receiver and
manager is not the agent of the company. The receiver and
manager does not merge its identity with that of the com-
pany. The case law cited points clearly to the receiver and
manager being a principal in his own right in relation to the
25  control of the assets of the company and managing its busi-
ness affairs . . . .

The company, Kilderkin (and the fourth defendants in
relation to their affairs) remained the principal for the pur-
poses of the Confidential Relationships (Preservation) Law
30  and continue to be the principal in relation to the confiden-
tial information relating to the company—in particular all
the confidential information in relation to which the com-
pany was the principal before the receiver and manager was
appointed."

35  It may be that the company Kilderkin is a principal for the pur-
poses of the Confidential Relationships (Preservation) Law. But
someone has to act on behalf of the company. Surely if the sole
director of the company is in control and management it could be
40  said that he had breached the law if he had divulged confidential
information. If, therefore, as I hold, the receiver and manager
had displaced the sole director and is in the control and manage-

ment of the company then can it be said that he has breached the
law if he divulged confidential information? In effect the appel-
lant would be acting as a principal under the law and could not be
in breach of the Confidential Relationships (Preservation) Law.
5  In my view it would be in the interest of Kilderkin for the
appellant to continue to be recognised in the Cayman Islands as
manager and receiver for Kilderkin.

For the reasons stated I would allow the appeal and vacate the
order of the Chief Justice made on July 20th, 1983. I would in the
10  circumstances restore the order of the Chief Justice made on
April 18th, 1983. The appellant is to have the costs of the appeal
and the costs of the application below.

CARBERRY, J.A.: I have had the opportunity of reading the
15  judgments of Zacca, P. and Carey, J.A. herein, and I agree with
the conclusions to which they have come, and the reasons that
have led them to those conclusions. In doing so I have borne in
mind, as 1 am sure that they have also, the views expressed by
Lord Diplock in his speech in *Hadmor Prods. Ltd.* v. *Hamilton*
20  (6) as to the relatively limited function of a court of appeal asked
to review the exercise of discretion by a trial judge as to whether

or not to grant an interlocutory injunction. We are not to proceed
as if we were exercising an independent discretion of our own,
and must not interfere merely on the ground that we would have
25    exercised that discretion differently. Our function is one of
review only: we may set aside the judge's exercise of his dis-
cretion on the ground that it was based on a misunderstanding of
the law, or the evidence before him, or possibly on the ground of
a change of circumstances since the order was granted. I think
30    that the two judgments of Zacca, P. and Carey, J.A. have
demonstrated that at least the first-mentioned grounds for inter-
vention exist. In as much as the appellants have now themselves
initiated an independent action against their adversaries it may be
that the third ground for intervention also exists, but that has not
35    been actively canvassed before us.

    This was a complicated case, and a complicated situation, and
reading the two judgments of my brothers carefully, and more
than once, I will try to avoid any unnecessary repetition of either
the arguments they have discussed, or the conclusions to which
40    they have come. It may however be useful to attempt to set out
the general situation out of which litigation has arisen, without of

course attempting to reach any conclusion as to its merits, which
fortunately is not before us.

    It appears that the starting point of the litigation was the series
of dealings that took place with regard to some 26 large blocks of
5    apartment buildings in Toronto. These were owned by the Cadil-
lac Fairview Corporation Ltd. and were sold to the Greymac Cor-
poration for some CAN$270m. Leaving out the details of the
intermediate dealings, a series of resales and other dealings, it
appears that the ultimate resale price to the fourth defendants
10    was somewhere in the region of CAN$500m. It appears that the
basic foundation for this speculation lay in the hope and intention
of the ultimate purchasers to increase very substantially the ren-
tals that would be paid by the actual apartment dwellers for the
privilege of living therein. This despite the Rent Control Acts of
15    Toronto. Along the way, it is alleged that the three plaintiffs,
trust companies deriving their assets from the investments of pos-
sibly thousands of small investors (and larger ones), were per-
suaded to use their assets to finance these dealings. It seems to be
alleged that the trust companies may find their investments illu-
20    sory, and that the only substantial beneficiaries (if there prove to
be any such), are the defendants in the present proceedings. As
to these we have been principally concerned with the second and
third defendants, Kilderkin Investments Ltd. and Mr. William
Player.

25    The transactions mentioned seem to have caused the greatest

concern in Toronto, the city, and Ontario, the province, in which
all of the parties concerned (save the first-named defendant, a
Cayman registered company) have their roots, and in which they
are incorporated.

30    Receiver-managers have been appointed to run the three trust
companies, the plaintiffs, and to attempt to see what can be sal-
vaged. As to the second defendant Kilderkin Investments Ltd.
the Clarkson Company Ltd. was appointed receiver-manager, at
the instance of the plaintiffs in the first place but having been
35  appointed by the Supreme Court of Ontario on February 15th,
1983; they are so to speak officers of the court, beholden to no-
one, but under a duty to that court, to supervise, manage and
take control of the property of the second defendant in the inter-
est of that company. It has facing it claims from the trust com-
40  panies, from its own creditors, and also from its own
shareholders, or as we understood it, shareholder, for the third-

1984–85 CILR 95

named defendant Mr. William Player was Kilderkin's sole direc-
tor and the person principally interested in its funds.
    This highly complicated piece of litigation extended itself to the
Cayman Islands because it is alleged that Kilderkin Investments
5  Ltd. has deposited in the banks of these Islands a substantial sum
of money said to amount to over $100m., and this money, alleged
to be derived from what is called the "Cadillac" transaction, and
possibly other legitimate dealings by that company, represents
what the plaintiffs see as their only hope of salvaging something
10  for their investors. It should of course be pointed out that Mr.
Player defends or will defend all of the transactions as legitimate
exercises in the business world. He denies both personally and on
behalf of Kilderkin Investments Ltd. the charges of conspiracy,
deceit, *etc.* that have been levelled against these dealings. As I
15  understood it, he suggests that all would have been well but for
the extension of Rent Control Laws of Toronto or Ontario to the
actual apartments.
    The struggles which have taken place in that part of the litiga-
tion which has come before us relate to the efforts of the plaintiffs
20  (the trust companies) to secure that the "Cadillac funds" now
said to be in the hands of Kilderkin Investments stay "frozen"
and available within the Cayman Islands to await the outcome of
the litigation, whether it takes place in Canada or these Islands.
More particularly the present appeal involves the efforts of the
25  Clarkson Company, the receiver-managers of Kilderkin Invest-
ments Ltd., to secure not only the "Cadillac funds" but any other
funds which that company may be entitled to and which are pre-
sently within the jurisdiction. The Clarkson Company Ltd. have
also been concerned to establish, as part of their duty, their own

30 control of the litigation that has been brought against Kilderkin
Investments Ltd. They wish to appear for it and to defend and be
involved in that litigation and they contend that Kilderkin Invest-
ments Ltd. may have claims of its own against its director Mr.
Player, which they wish to pursue, and so they may wish to join

35 him as a third party, responsible to indemnify them against claims
made by the plaintiff trust companies.

Mr. Player, while through his counsel eschewing any alle-
gations against the integrity of the Clarkson Company, has con-
tended that as the sole director of Kilderkin Investments Ltd.

40 (and the person principally interested in its funds), whatever may
have happened in Ontario he is, in the Cayman Islands, the

1984–85 CILR 96

person entitled to conduct its litigation and to defend its assets.
He suggests that as the receiver-manager originally appointed by
the Supreme Court of Ontario on the application of the plaintiffs,
the Clarkson Company is so to speak likely to be prejudiced

5 against his claims and less likely to defend Kilderkin with the
same vigour that he would.

One other background factor that may be mentioned in this
brief note is that the Cayman Islands have with skill and manage-
ment created an offshore banking industry; they are anxious to

10 secure foreign investment and as part of their services to such
investors passed a law, the Confidential Relationships (Preserva-
tion) Law, amended by the Confidential Relationships (Preserva-
tion) (Amendment) Law, 1979, the object of which is to preserve
the confidence of those who invest in Cayman banks by punishing

15 unauthorised disclosures of their investors' affairs.

After the preliminaries begun in the jurisdiction of the Ontario
Supreme Court with the appointment of Clarksons as receiver-
manager to Kilderkin (and prior to that with the appointment of
receiver-managers to the trust companies, who initiated the main

20 Canadian litigation), the scene of the litigation shifted to the Cay-
man Islands, where the Kilderkin moneys now lie.

The plaintiffs on April 16th, 1983 obtained an order from the
Chief Justice which in effect appointed a Caymanian citizen, Mr.
C D . Johnson, receiver of the "Cadillac assets" and gave an

25 interlocutory injunction against the first, second and fourth
defendants transferring any assets out of the jurisdiction, or deal-
ing with them save to transfer them to Mr. Johnson, and requir-
ing all the defendants to refrain from parting with the relevant
documents relating to the transactions referred to earlier.

30 On April 18th, 1983, Clarksons obtained from the Chief Jus-
tice, an *ex parte* order that recognised them as receiver and
manager of Kilderkin, and gave them authority to identify and
locate *all* assets belonging legally or beneficially to Kilderkin

within the jurisdiction of the court.

35    Clarksons acted in pursuance of this order, and in course of
their duty to report back to the Ontario court, reported to that
court the result of their investigations. It appears that such
reports are from time to time the subject of mention in open court
on the occasion of applications by receiver-managers for further
40    directions from the Ontario court. That happened in this case,
and in view of the public interest which already existed for the

---

1984–85 CILR 97

reasons mentioned earlier, their interim report received wide
publicity in the ordinary press in Toronto. Though apparently
aware of the Cayman Islands Confidential Relationships (Preser-
vation) Law it had not occurred to Clarksons that they could or
5    should have got permission under that law from the court in Cay-
man to report to the Ontario court on their investigations.

    In the mean time the litigation in Cayman was proceeding;
claims were filed and appearances and defences were due to be
put in. Mr. Player for his part moved before the Chief Justice for
10    the *ex parte* order given to Clarksons on April 18th, 1983 to be set
aside. It was set aside on July 20th, 1983 by the Chief Justice for
the reasons set out in his written judgment of October 12th, 1983.
The new order of July 20th, 1983 purported to revoke the order
of "April 18th, 1983, appointing the Clarkson Company Ltd. as
15    the interim receiver and manager of Kilderkin Investments Ltd.
within the jurisdiction of this court" and it went on to remove
from the record as attorneys for Kilderkin the attorneys
appointed by Clarksons, and to substitute therefor the attorneys
appointed by Mr. Player.

20    It may be said that three reasons seem to have induced the
learned Chief Justice to reverse the previous order of April 18th,
1983: (a) his view of the authority vested in Clarksons by the vari-
ous orders made by the Supreme Court of Ontario from time to
time—he held that those orders did not give them any authority
25    to defend the litigation now coming to a head in Cayman between
the trust companies and the defendants; (b) he held that the pro-
cedure adopted by Clarksons in seeking their order in the suit
already begun by the trust companies was wrong—they should
have initiated a separate and independent application; and (c)
30    disturbed by the publicity given to their interim report to the
Ontario Supreme Court in the newspapers in Toronto, he
decided that Clarksons had broken the Confidential Relation-
ships (Preservation) Law and in effect that in the absence of
explanation or apology were not entitled to enjoy the powers pre-
35    viously given to them.

    For the reasons given by both Zacca, P. and Carey, J.A. I am
of the view that the learned Chief Justice was wrong on all three

reasons. And apropos of the advice given by Lord Diplock, and referred to earlier above, it should be noted that this appeal from the decision of July 20th, 1983, treating it as a refusal of something in the nature of an interlocutory injunction, followed on an

40

1984–85 CILR 98

earlier *ex parte* grant.

   As to (a) it appears to me that the learned Chief Justice misapprehended the effect of the orders made in the Ontario Supreme Court (the court of the country in which Kilderkin was incorporated) in two respects: (i) those orders suspended completely the management powers and authority of Mr. Player as director of Kilderkin; (ii) they vested the powers he previously enjoyed in the Clarkson Company, the receiver-managers appointed by the court, and whether expressly mentioned or not (and in my view they were sufficiently mentioned) those orders gave Clarksons the right and duty to defend the Kilderkin company in any action taken against it by the trust companies or otherwise. With great respect, I think that the position set out in 2 Dicey & Morris, *The Conflict of Laws*, 10th ed., at 730 and 741 (1980) in rr. 139 and 143 is correct. As they have not been otherwise cited I set out the rules here:

5

10

15

   "**Rule 139.**—(1) The capacity of a corporation to enter into any legal transaction is governed both by the constitution of the corporation and by the law of the country which governs the transaction in question.

20

   (2) All matters concerning the constitution of a corporation are *governed by the law of the place of incorporation.'* [Emphasis supplied.]

   " . . . Effect of a Foreign Winding up Order

   **Rule 143.**—The authority of a liquidator appointed under the law of the place of incorporation is recognised in England."

25

For "liquidator" I would substitute "receiver-manager."

   Counsel for the respondent, Mr. Player, pressed on us the case of *Newhart Devs. Ltd.* v. *Co-operative Comm. Bank Ltd.* (9). In that case developers had enlisted the aid of a bank to provide financial backing under a debenture that granted the bank the power to send in a receiver. The bank did so. This had the effect of suspending the powers of the directors. However, they wished to sue the bank for breach of contract and did so. The bank moved to strike out their claim on the ground that the directors no longer had the power to do anything like bring an action on behalf of the company, seeing that a receiver had been appointed. The bank failed. The court held that the directors could bring such an action; provided it did not touch the assets of the company it could if successful only go to swell those assets.

30

35

40

The case did not deal with the status of a *receiver appointed by the court*, owing a duty to the court, not to a mere creditor. Further, if by chance a director were to find that a receiver appointed by the court was to be put in a similar position of conflict as in the

5 *Newhart* case, I would think his proper course would be to apply to the court, in much the same way as a cestui que trust would in the case of a trustee wasting the assets. This would not involve the survival of any powers in the director as such, but merely his right as an interested person to complain of the conduct of an officer

10 appointed by the court.

For the rest I adopt without reiterating the conclusions arrived at by Zacca, P. and Carey, J.A. as to the law relating to the rec- ognition of a foreign receiver-manager appointed by the court of the country in which the subject corporation is incorporated.

15 As to (b), the procedural point: here again I would express agreement with the conclusions reached by Zacca, P. and Carey, J.A. and agree that the learned Chief Justice misapplied the effect of the English Supreme Court Act 1981, s.37, and also the effect of the English Rules of the Supreme Court, O.30, r.1 relat-

20 ing to such applications for interlocutory orders, both of which are incorporated into Cayman law, the former by virtue of s.13 of the Grand Court Law, and the latter by s.20 of the same Law.

As to (c) the question of whether or not a breach took place of the Confidential Relationships (Preservation) Law, I agree for

25 the reasons expressed by Zacca, P. and Carey, J.A. that in fact no breach of that Law took place. It is proper and understandable that those who administer the laws of Cayman should be anxious to see that those laws are given the respect which is their due, and judging by hindsight it would have been better for all concerned if

30 Clarksons, who by virtue of their recognition in that jurisdiction had become officers of the Cayman court also, had made an application under s.3A of that Law to the Grand Court for direc- tions, but they did owe a duty to the Supreme Court of Ontario by whom they were originally appointed, and I suppose that the

35 investigative capacity of the members of the Press in the Western world is something which from time to time appears both unpre- dictable and startling.

Overall, it sometimes happens that first impressions prove better than second thoughts, and with respect, this seems to have

40 happened here. It would I think seem a little odd that a director who had been relieved of his corporate powers in the country in

which the company was incorporated, should nevertheless be

held to be still in control of the company in the friendly foreign country in which it seems the litigation arising out of his and the company's transactions is destined to be fought out.

5    I would close by thanking the several counsel and attorneys involved for the great assistance provided to us by their argu-ments, and by the careful preparation of the documents, and the photocopies of the authorities and cases which they wished to place before us. They did much to lighten a difficult task.

10

CAREY, J.A.: A remarkable feature of this appeal is that the Caymanian connection is altogether tenuous; only one of the several companies involved is incorporated in the Cayman Islands and even so, its solitary Caymanian shareholder owns a mere 2%
15   of the issued share capital. Be that as it may, the matters arising on this interlocutory appeal concern firstly, a procedural point and secondly, the construction of the Confidential Relationships (Preservation) Law, as amended by the Confidential Relation-ships (Preservation) (Amendment) Law, 1979. The resolution of
20   these questions will determine which of the two parties, the pro-tagonists in this appeal, *viz.*, William Player, the sole director of Kilderkin Investments Ltd. or the Clarkson Company, appointed by the Ontario Supreme Court as receiver and manager of the company will have the right to act on behalf of the company in
25   defending the suit (Cause 132) filed in this jurisdiction against that company and other defendants.

Both points arise from an order of the Chief Justice dated July 20th, 1983, discharging his earlier *ex parte* order made on April 18th, 1983. This latter order (the first in point of time) was in the
30   following terms:

"Upon hearing counsel *ex parte* for the Clarkson Com-pany Ltd., interim receiver and manager of Kilderkin Investments Ltd. pursuant to an order of the Supreme Court of Ontario dated the 15th day of February, 1983, and upon
35   reading the affidavit of James Alexander Cringan sworn the 13th day of April, 1983, and exhibits thereto, and the affi-davit of John L. Biddell sworn the 14th day of April, 1983, and exhibits thereto and the affidavit of John A.M. Judge sworn the 18th day of April, 1983 and the exhibits thereto, it
40   is hereby ordered that:

1. The Clarkson Company Ltd. as interim receiver and

1984–85 CILR 101

manager of Kilderkin Investments Ltd. (hereinafter referred to as 'Kilderkin') pursuant to the orders of the Supreme Court of Ontario dated the 15th and 28th days of February, the 29th day of March and the 13th day of April, 1983, is
5    hereby authorised to act on behalf of Kilderkin within the

jurisdiction of this court.

    2. The Clarkson Company Ltd. is authorised and permitted to identify and locate all assets belonging legally or beneficially to Kilderkin within the jurisdiction of this court and to make inquiries and requests for information and documents, whether on paper, microfilm or tape or in any other form relating to any asset of Kilderkin which may be in the possession or control of any person, bank, or company within the jurisdiction of this court, notwithstanding the order of this court dated the 16th day of April, 1983.

    3. The Clarkson Company Ltd. may apply to this court for further directions from time to time as the interim receiver and manager of Kilderkin in relation to any matters arising from paras. 2 and 3 hereof upon proper notice to such of the parties as may be ordered by the court."

The learned Chief Justice in discharging this *ex parte* order, and thereby removing the appellants as interim receiver and manager of Kilderkin Investments Ltd., made the following order as well:

    "3. Further that pursuant to r.59(3) of the Rules of Court, Messrs. W.S. Walker & Co. be removed from the record as attorneys for the second defendant herein, and that Messrs. C.S. Gill & Co. may be placed on the record in their place."

In a considered judgment, the learned Chief Justice rested his decision on two bases: First, the interlocutory application made by the appellants for recognition as receiver and manager of Kilderkin Investments Ltd. was made by a wholly inappropriate procedure; secondly, the conduct of the appellants in breaching provisions of the Confidential Relationships (Preservation) Law disentitled them to hold the position of interim receiver and manager within this jurisdiction.

Before I make my own observations on the questions which arise for consideration, I desire to pay tribute to the lucidity of the submissions of counsel who appeared before us and, for my part, I wish to express my appreciation for their helpfulness and refreshing candour.

It now becomes necessary to examine the reasons of the Chief

Justice stated in his judgment in order to deal with the grounds of appeal which challenged both bases of his decision. The *ex parte* order originally made by him did not appoint the appellants receiver and manager of Kilderkin Investments Ltd.; it was an order *recognising* them as such. This is plain from the nature and terms of the order which he made:

    "The Clarkson Company Ltd. as interim receiver and manager of Kilderkin Investments Ltd. . . . *pursuant to the orders of the Supreme Court of Ontario* dated the 15th and

10    28th days of February, the 29th day of March and the 13th
      day of April, 1983 *is hereby authorised to act on behalf of
      Kilderkin within the jurisdiction* of this court" [Emphasis
      supplied.]
      The appellants having been previously appointed as receiver and
15    manager by the Ontario court now received the "imprimatur" of
      the competent court within this jurisdiction, *i.e.* the Grand Court.
      The basis of the jurisdiction then being exercised, is, it is
      accepted, derivative. Section 13(1) of the Grand Court Law pro-
      vides as follows:
20          (1) The Court shall be a superior court of record and, in
      addition to any jurisdiction heretofore exercised by the
      Court or conferred by this or any other law for the time
      being in force in the Islands, shall possess and exercise, sub-
      ject to the provisions of this and any other laws of the
25    Islands, *the like jurisdiction within* the Islands which is vested
      in or capable of being exercised in England by—
      (a) Her Majesty's High Court of Justice; and
      (b) the Divisional Courts of that Court,
      as constituted by the *Supreme Court of Judicature (Consoli-*
30    *dation) Act, 1925, and any Act of the Parliament of the*
      *United Kingdom amending or replacing that act.*" [Emphasis
      supplied.]
      Section 20(2) of the same Act is also relevant. It recites:
          "(2) In any matter of practice or procedure for which no
35    provision is made by this or any other Law or by any Rules,
      the practice and procedure in similar matters in the High
      Court in England shall apply so far as local circumstances
      permit and subject to any directions which the Court may
      give in any particular case."
40    For completion, it should be noted that since no Rules of Court
      exist in the Grand Court in relation to the appointment or recog-

1984–85 CILR 103

nition of a receiver and manager, it is the appropriate Rules of
the Supreme Court in England, if such there are, to which refer-
ence must be made. There are, however, no specific Rules of the
Supreme Court in England either, dealing with the recognition of
5     a foreign-appointed receiver and manager, and in his observation
to that effect, Mr. Patten for the respondent was undoubtedly
correct. But that the High Court in England exercises an
undoubted jurisdiction to recognise a foreign-appointed receiver
and manager, is no less true and he was not so bold as to suggest
10    otherwise. He was careful to say no more than that the sub-
missions of Mr. Sumption were mainly concerned with the
appointment of a receiver and manager by the High Court in
England.

15    I do not put forward any heretical view if I venture to suggest
that the Grand Court, as does the High Court in England, has an
inherent power to recognise foreign-appointed receivers and
managers over assets within the jurisdiction based on well-recog-
nised conflict of laws principles. Illustrative of the exercise of this
jurisdiction, is *Schemmer* v. *Property Resources Ltd.* (10) where
20    one of the points raised before Goulding, J. was that the plaintiff,
a foreign-appointed receiver had no *locus standi.* The plaintiff
had been appointed a receiver by a district court judge in the
United States of America and had issued a writ in England seek-
ing to have himself appointed receiver and manager of the assets
25    of a company and its subsidiaries in England. The learned judge
in a considered judgment held ([1975] Ch. at 287), rightly as I
think, that before the English courts would recognise the title of a
foreign- receiver to assets located in the United Kingdom or direct
the setting up of an auxiliary receivership, the court had to "be
30    satisfied of a sufficient connection between the defendant and the
jurisdiction in which the foreign receiver was appointed . . . ."
     There can be little doubt that Kilderkin Investments Ltd. has a
real connection with the jurisdiction in which the Clarkson Com-
pany was appointed. Kilderkin Investments Ltd. is a limited com-
35    pany incorporated under the Laws of Ontario, while the Clarkson
Company, the receiver and manager, has been appointed by the
Ontario Supreme Court. Goulding, J., in *Schemmer* v. *Property
Resources Ltd.* ([1975] Ch. at 287–288) suggested four tests to
determine whether that connection existed or not:
40    1. Has the company in respect of whose assets the receiver and
manager has been appointed, been made a defendant in the

action in the foreign court? The answer to this is "Yes." Kilder-
kin Investments is a defendant in the suit.
     2. Has the company in respect of whose assets the receiver and
manager has been appointed, been incorporated in the country
5    which appointed the receiver and manager? Again the answer is
"Yes."
     3. Would the courts of the country of incorporation recognise a
foreign appointed receiver? Answer—the Ontario Supreme
Court would recognise the appointment of a receiver of a foreign
10    jurisdiction. See *Re C.A. Kennedy Co. Ltd. and Stibbe-Monk
Ltd.* (7).
     4. Has the company carried on business in Canada or is the seat
of its central management and control been located there?
Answer—"Yes." Kilderkin Investments carries on business in
15    Ontario, Canada. It is as a result of their business operations in
Canada that an action has been launched against them by the
plaintiffs.

The result of this excursus is that the Grand Court has an undoubted power to make orders recognising a foreign-appointed receiver and manager and accordingly had the power to recognise these appellants.

The Chief Justice in discharging his *ex parte* order was of the view, not that he did not have a jurisdiction to recognise a foreign-appointed receiver and manager but that the procedure adopted by the appellants, *viz.*, an application *ex parte* in the suit then pending before his court, was inappropriate. Perhaps it would be helpful if the *ipsissima verba* of the Chief Justice on this aspect were recited:

"The original application was not an application for the appointment of a receiver as contemplated by that provision. It was an application by the receiver and manager appointed by the Ontario court for the recognition of that receiver and manager and for authority for that receiver and manager to perform certain functions within this jurisdiction. Furthermore, O.30, r.1 provides machinery for a plaintiff to have a receiver appointed to take possession of and preserve the assets of a defendant for the purpose of satisfying a judgment in the plaintiff's favour. That is not what the original application was about. It was an application by a receiver and manager of a defendant in relation to the assets and operations of that defendant. Clarkson was already the

1984–85 CILR 105

receiver and manager of Kilderkin. Order 30, r.1 is not designed to give to such a receiver and manager authority over that company for the purpose of the suit (Cause 132)."

I understood the learned judge to be saying as well that the procedure was inappropriate because the Ontario Supreme Court did not by any order authorise the Clarkson Company to enter an appearance on behalf of Kilderkin Investments and defend any proceedings brought against that company. The purpose of the application made by the Clarkson Company was to locate assets of Kilderkin for the benefit of and at the instance of the plaintiff in the Ontario action. The terms of the order were far wider than was necessary for the purpose of the suit.

The *ex parte* order of the Chief Justice was made pursuant to several orders of the Ontario Supreme Court, the entirety of which it would be really unnecessary to rehearse, but I propose to set out the salient segments of the relevant orders, the better to appreciate the reasoning of the Chief Justice. The first order appointing the Clarkson Company receiver and manager was dated February 15th, 1983, and provided:

" 1. It is ordered that, until the trial of this action or until further order of this court, the Clarkson Company Ltd. be

and is hereby appointed interim receiver and manager of all the undertaking, business, affairs, assets and property of the defendant Kilderkin Investments Ltd. (collectively referred
25   to hereinafter as the 'undertaking and assets'), with power to manage the undertaking and assets and to carry on the business of the defendant Kilderkin Investments Ltd.

     2. And it is further ordered that the defendant Kilderkin Investments Ltd., its directors, officers, employees and
30   agents and all other parties having notice of this order deliver up to the interim receiver and manager or to such agent or agents as it may appoint, the undertaking and assets of the defendant Kilderkin Investments Ltd. and all books, accounts, securities, documents, papers, deeds, leases and
35   records of every nature and kind whatsoever relating thereto."

     "13. And it is further ordered that the interim receiver and manager may from time to time apply to this court for direction and guidance or additional powers in respect of the
40   discharge of its duties as interim receiver and manager."
The second was dated February 28th, 1983:

1984–85 CILR 106

     "7. And it is further ordered that the interim receiver be and it is hereby authorised and directed to identify the assets of Kilderkin, and their location, to identify all persons having an interest in Kilderkin and its assets and entitled to
5   receive notice of any proceedings affecting it."
The third was dated April 13th, 1983:
     "1. It is ordered that the interim receiver and manager be and it is hereby authorised to commence proceedings in the Cayman Islands to preserve and recover any assets of Kil-
10   derkin Investments Ltd. situated in that jurisdiction, or for such other remedy as counsel for the interim receiver and manager may advise."
My first concern is to consider what these orders empowered the Clarkson Company to do as respects Kilderkin Investments. It is,
15   I think, well-established that the scope and nature of the functions of a receiver and manager is governed by the law of the place of incorporation, in this case, Ontario law. The Chief Justice so stated and in that view, both Mr. Sumption and Mr. Patten are agreed. There were two affidavits of law, one each on behalf
20   of the respective parties in this appeal. The learned judge dealt with these offerings in this way:
     "While there is very little difference of opinion between them in the sphere covered by both, one goes very much further than the other in setting out the scope of a receiver
25   and manager's powers. As each, presumably, purports to be

exhaustive in setting out the opinion of the respective
deponent as to the extent of the powers of a receiver and
manager under the law of Ontario this difference in the
bounds amounts to a discrepancy or conflict of fact. I cannot
30      choose between the two on affidavit evidence only. I could
only accept the common ground in the opinions put forward
by two deponents. Further assistance was to be found in *Del
Zotto* v. *International Chemalloy Corp.* (1976), 14 O.R. (2d)
72."

35      Seeing that the judge said he was unable to choose between the
two this court is entitled to consider this question of fact and
make up its own mind as to the true view it should form. Mr.
Lederman's affidavit which was filed on behalf of the appellants
was full and, if I may say so, appears the more helpful. The two
40      most important pieces of information he vouchsafed are to be
found in paras. 5 and 6 of his affidavit:

     "5. It is a general rule of receivership law in Ontario that a
receiver and manager of a corporation appointed by the
court is an officer of the court and not an agent of the cor-
poration. Upon appointment, the receiver and manager
5      takes possession of the corporation's property which is the
subject of the appointment. He also takes control of the con-
duct of the business of the corporation, exercising the
powers of the company as an officer of the court and as prin-
cipal. The receiver and manager acts for the benefit of all
10      parties in accordance with the directions of the court: *Del
Zotto* v. *International Chemalloy Corp.* (1976), 14 O.R. (2d)
at 74–75; *Kerr on Receivers*, 15th ed., at 145, 165 and 232
(1978).

     6. While the corporation against whom an order is made
15      appointing a receiver and manager is not dissolved, the
receiver-manager displaces the board of directors in exercis-
ing control over the assets and affairs of the corporation.
The officers and directors of the corporation may not inter-
fere with the property over which the receiver has been
20      appointed without first obtaining leave of the court. Any
party who interferes with the possession of the receiver with-
out first obtaining leave may be in contempt of court: *Del
Zotto* v. *International Chemalloy Corp. (supra)* at 73, 74, 76,
77; *Federal Business Dev. Bank* v. *Shearwater Marine Ltd.*
25      (1979), 102 D.L.R. (3d) 257."

The other affidavit of law was that of Donald J. Brown. I give an
extract below of the three important paragraphs of this affidavit,
*viz.*, paras. 7,8,9:

     "7. The general rule in Ontario is that the company

30 against whom a receiving order has been made pursuant to
s.19 has the status to commence proceedings and has an
independent status: *Del Zotto* v. *International Chemalloy
Corp.* (1976), 14 O.R. (2d) 72; *Clarkson Co. Ltd.* v. *Canadian Acceptance Corp. Ltd.* (1977), 24 C.B.R. (N.S.) 197.

35  8. In fact, Kilderkin Investments Ltd. has commenced
proceedings in the Province of Ontario in connection with a
libel and slander action. These proceedings were expressly
authorised by the Honourable Mr. Justice Galligan as
appears by the true copy of his order annexed hereto and
40 marked as Exhibit DJB 1.

  9. As can be seen from the letter dated June 20th, 1983

1984–85 CILR 108

 annexed hereto and marked as Exhibit DJB 2, Ontario
counsel for the Clarkson Company Ltd. expressly recognise
that there is a separate existence or residuary power in the
company notwithstanding the appointment of the receiver."

5 It is of interest that both learned and distinguished members of
the Ontario Bar referred to and relied on *Del Zotto* v. *International Chemalloy Corp.* (4), a decision of the Ontario Supreme
Court, *per* Van Camp. J. And this court is entitled to look at this
case and consider it to confirm or reject the validity of the
10 opinions proffered. Mr. Brown suggested that a company in
respect of which a receiver and manager is appointed has the
power to commence proceedings if leave of the court is obtained.
I am not at all certain what the deponent means when he says that
"the company . . . has an independent status." Doubtless this
15 opinion should be understood as meaning no more than that the
original directors have some residual powers, even when the company is in receivership. Mr. Lederman made the point quite
clearly that the receiver and manager when appointed becomes
an officer of the court and not an agent of the company. He takes
20 the place of the board of directors and exercises control as an officer of the court and as principal. The directors who have been
superseded are, nonetheless, entitled to bring an action or defend
proceedings with respect to the corporation only where leave of
the court has first been obtained. Understood in this light, I for
25 one do not see any divergence of view. Where Mr. Lederman was
explicit, Mr. Brown was less than direct, but what was implied is,
I think, plain. Paragraph 8 of his affidavit, I suggest, purports to
explain para. 7 which otherwise would convey the impression that
the directors of the company in respect of which a receiver has
30 been appointed could act at their own discretion in initiating proceedings. But para. 8 derogates from that expansive view and
indicates quite plainly that such a director requires the leave of
the court. This must mean therefore that since the company does

35  not cease to exist, its management is in the hands not of the direc-
tors but of the receiver and manager who on appointment by the
court, assumes responsibility for the company's assets and under-
takings.

    I can now turn to *Del Zotto* v. *International Chemalloy Corp.*,
in which two questions arose for consideration by the learned
40  judge, Van Camp, J., but only one of these is material for our
purposes, namely, whether a company in respect of which a

1984–85 CILR 109

receiver and manager is appointed, is able to prosecute a counter-
claim, "which requires corporate funds. In other words, can the
directors interfere with the company's assets, control of which the
receiver and manager has been given? The learned judge came to
5  the conclusion that in pursuing a claim in damages, the company
would be interfering with the possession of the assets which
would constitute a contempt of court. In those circumstances,
leave would be required. As to the status of a corporation after
appointment of a receiver and manager, Van Camp, J. relied
10  strongly on *Moss S.S. Co. Ltd.* v. *Whinney* (8) the *locus classicus*
on this point. It seems to me to follow ineluctably that the legal
position with respect to a receiver and manager is the same in
Canada as it is in England and by derivation in the Cayman
Islands. The result of all this, in my view, is that there does not
15  appear to be any divergence of view between the two affidavits
of law put forward by each of the parties to this appeal. The one was
explicit, the other impliedly made the same point. It is essential to
understand this, as the status of Mr. Player, the director, who has
been superseded by the appointment is plainly at issue. Has he a
20  *locus standi* to apply to the Grand Court to remove the receiver
and manager without first obtaining leave of the Ontario court?
This question must in my view underlie any proper consideration
of the issues involved in this appeal.

    Seeing then that the law of England in regard to receivers and
25  as a consequence, the law of Cayman and the law of Canada,
more particularly the law of the province of Ontario, are similar,
it is right to set out that law. In *Moss S.S. Co. Ltd.* v. *Whinney*,
Lord Atkinson provided the most definitive formulation as to the
effect of the appointment of a receiver and manager in these
30  words ([1912] A.C. at 263):

    "This appointment of a receiver and manager over the
    assets and business of a company does not dissolve or annihi-
    late the company, any more than the taking possession by
    the mortgagee of the fee of land let to tenants annihilates the
35      mortgagor. Both continue to exist; but it entirely supersedes
    the company in the conduct of its business, deprives it of all
    power to enter into contracts in relation to that business, or

40    to sell, pledge, or otherwise dispose of the property put into
the possession, or under the control of the receiver and
manager. Its powers in these respects are entirely in
abeyance."

1984–85 CILR 110

To the like effect was the Earl of Halsbury who stated (*ibid.*, at
260) that the effect of the appointment was that it—
" . . . removes the conduct and guidance of the undertaking
from the directors appointed by the company and places it in
5     the hands of a manager and receiver, who thereupon absol-
utely supersedes the company itself, which becomes incap-
able of making any contract on its own behalf or exercising
any control over any part of its property or assets."
These authoritative statements which, so far as I know, have
10    never been doubted, make it abundantly clear that the powers of
the directors of a company are suspended during the tenure in
office of the receiver and manager. The receiver is an officer of
the court in the performance of his functions and has for that pur-
pose all the powers of the company. He is not an agent of the
15    company but a principal and as such is personally liable on con-
tracts made by them. This aspect of the legal position of receivers
and managers is exemplified in *Burt, Boulton & Hayward* v. *Bull*
(1) in which Lopes, L.J. observed ([1895] 1 Q.B. at 282):
"But the company after their appointment had no control
20    over the business: it could give no orders and make no con-
tracts. The [receivers and managers] could not be said to be
agents for anybody. They had the sole control of the busi-
ness, subject to the directions of the Court."
And Rigby, L.J., as to personal liability, said (*ibid.*, at 285):
25    "The rule has always been that such persons are prima facie
themselves personally liable, and they cannot get rid of liab-
ility on the contracts made by them merely by describing
themselves in the contract as executors or trustees."
In so far as this case is concerned, the Clarkson Company Ltd.
30    were specifically given the control and management of all the
assets and undertaking of Kilderkin Investments Ltd. and notice
was given to the directors to deliver up the assets of the company
to the appellants. It appears to me that the Clarkson Company
Ltd. had completely ousted the director William Player. In so far
35    as the control and management of the company was concerned,
William Player, in my view, had no *locus standi.* When the
Ontario Supreme Court by its order of February 28th, 1983,
directed (see para. 7) the Clarkson Company Ltd. to identify and
locate the assets of Kilderkin, it was not enlarging the powers of
40    the receiver and manager; it was giving specific authorisation as
opposed to the comprehensive powers conferred upon the

appointment of the Clarkson Company Ltd. as a receiver and manager. This specific authority could not be exercised by William Player, the sole director of Kilderkin. Further, by parity of reasoning, when by its order dated April 13th, 1983, the Ontario
5  Supreme Court, gave the appellants authority "to commence proceedings in the Cayman Islands to preserve and recover any assets of Kilderkin Investments Ltd." it effectively and expressly confirmed removal of such a power from the hands of its sole director, William Player.
10    The reason for subsequent applications seeking, for example, authority to institute or defend proceedings is not far to seek. The receiver and manager who institutes or defends proceedings without the prior approval of the court, runs the risk of having his costs disallowed, if subsequently his action is not sanctioned. See-
15  ing that the receiver and manager is personally liable, ordinary prudence would seem to dictate self-preservation by recourse to prior judicial sanction. It is to be noted that in para. 13 of the first order of the Ontario Supreme Court, the appellants were given liberty to apply "for direction and guidance or additional powers
20  in respect of the discharge of its duties as interim receiver and manager." They did take advantage of this provision in order to make applications to the court "for the advice and direction of this court *i.e.* the Ontario Supreme Court," first on February 28th, 1983 when an order was made authorising the receiver and
25  manager to receive and account for rental payments accruing from the undertaking (para. 2) and further, by para. 7, authorising the Clarkson Company Ltd. "to identify the assets of Kilderkin, and their location, to identify all persons having an interest in Kilderkin and its assets . . . . " Secondly, by an order dated
30  March 29th, 1983, authorisation was sought to scale down the organisation of Kilderkin. Thirdly, by the order dated April 13th, 1983, authority was given to the receiver and manager—

    " . . . to commence proceedings in the Cayman Islands to preserve and recover any assets of Kilderkin Investments
35    Ltd. situated in that jurisdiction or for such other remedy as counsel for the interim receiver and manager may advise."

    In my view, there was no necessity in point of law for any application for the powers set out in these subsequent orders. The purpose of the applications was to prevent claims being successfully
40  made against the receiver and manager who, as is well-known, is liable personally for his acts. But they demonstrated another

important factor. Where the receiver and manager was specifi-

cally authorised to act, it was notice to William Player that he had
no power to act in those respects. He had been dispossessed of
those powers which as a director he would undoubtedly have
5   been able to exercise.

     I should at this point say something about a point raised by Mr.
Patten for the respondent, William Player. It was submitted that
the court should never lose sight of the fact that the appellants
were appointed at the instance of the plaintiffs who are common
10  to the actions filed in both jurisdictions. Clarkson were fulfilling
functions brought into being, he said, at the suit of the plaintiffs.

     The law is that once a receiver and manager is appointed by the
court, he becomes an officer of the court and is required to act
fairly, and not take sides. In the absence of evidence to the con-
15  trary, he is presumed to be acting fairly in the interests of the
company to preserve the assets for the benefit of all parties. Mr.
Patten, as I recall, expressly disclaimed any suggestion that the
Clarkson Company Ltd. were acting other than with perfect pro-
priety. He said there was no basis for alleging any conspiracy
20  between the plaintiffs and the receiver and manager. In the light
of that concession, whatever Player might have been entitled to
think, and it was mooted that he believed that there had been an
element of co-operation between the plaintiffs and the Clarkson
Company Ltd., plainly, the point really is without substance.
25     I can therefore return to matters of substance. Were Clarkson
entitled to make the particular application which was in fact made
and granted? Was there the necessity for an *ex parte* application?
The question which is prompted by this mode of application must
then be: In what circumstances is it appropriate to apply *ex parte*
30  for the recognition of the appointment of a receiver and a
manager? And then to go on to consider whether those circum-
stances obtained in the present case. It was Mr. Patten's sub-
mission that the circumstances did not warrant such an
application.
35     Earlier in this judgment, I concluded that the Grand Court had
an inherent jurisdiction to recognise a foreign-appointed receiver
and manager. It is as well to observe that there are no specific
rules either for making such an application. But as I can see no
juridical difference between a power to appoint a receiver and the
40  power to recognise a receiver and manager, I can see no serious
objection to a resort to the procedure for the appointment of

receivers within the jurisdiction. By s.37(1) of the English
Supreme Court Act 1981—

    "the High Court may by order (whether interlocutory or
    final) grant an injunction or appoint a receiver in all cases in
5   which it appears to the court to be just and convenient to do

so."

The procedure for such appointment is to be found in O.30, r.1of the English Rules of the Supreme Court. As long ago as *Gaw-thorpe* v. *Gawthorpe* (5) Jessel, M.R. wisely observed that there

10   was no limit to the power of the court except that it appears just and convenient. In so far as *ex parte* applications go, it is trite that such applications are made only in urgent cases. The circum-stances which, it was urged, warranted an urgent application was the need for prompt recognition of the appointment of Clarkson

15   Company Ltd. by the court below. The claim made against Kil-derkin Investments Ltd. was singularly large, in excess of CAN$109m. and this obliged the receiver and manager in pre-serving the company's assets, first, to prevent any defence open to the company from going by default and secondly, to take

20   prompt action in the light of the mandatory orders against the company, which required timely compliance.

The response made to these submissions by Mr. Patten was that there was a coincidence of interests as between the company and its sole director and shareholder, Player, who all along

25   intended to protect the company's interest. As to the mandatory orders made, there could be no cause for concern since the Clerk of the Grand Court under powers in the Grand Court Act, would have signed the orders as had occurred in the case of the fourth defendants.

30   I must confess that I remain wholly unconvinced by these argu-ments of learned counsel for the respondent, attractive though they appear to be. In the first place, even if there is a coincidence of interest, the receiver and manager is obliged by the nature of his responsibility to act at his discretion for it is on him the mantle

35   of management of the company has fallen. But this coincidence of interest has certainly not been demonstrated in any shape or form. Indeed, far from that being the case, we were advised that the company has launched its own action against the sole direc-tor, William Player (being Cause 183). As respects timely com-

40   pliance with the mandatory orders in favour of the plaintiffs and against all the defendants, the receiver and manager, who has the

1984–85 CILR 114

control and management of the company in carrying out his func-tions, has the responsibility of seeing that so far as the orders touch and concern the company, no contempt of court was com-mitted. I think this was a positive duty and part of what Mr.

5   Sumption categorised as managerial functions of a director. In endeavouring to see whether the *ex parte* application was justi-fied, it is the circumstances at the time of the application that should be looked at and these have been indicated earlier. For with the benefit of hindsight, it might well be thought that there

10    was scarcely any need for precipitate action. In my view, having
regard to those circumstances, the appellants were entitled to
make an application *ex parte.*

One of the arguments mounted in support of the Chief Justice's
order discharging the *ex parte* order, was that the appellants, as
15    defendants in an action were not entitled to make the application
largely because the Ontario Supreme Court orders did not auth-
orise the appellants to defend any action but "to commence pro-
ceedings . . . to preserve and recover any assets of Kilderkin
Investments Ltd. situated in that jurisdiction . . . ." The learned
20    Chief Justice was clearly of opinion that "Clarkson, as manager
and receiver, had no authority under the orders of the Supreme
Court of Ontario to defend on behalf of Kilderkin in Cause 132."

In my view the phrase "commence proceedings" is not a term
of art. It is plain English and means, in my view, no more than to
25    begin a step in legal proceedings. To ascribe any other meaning
would lead to a clear absurdity, for it would mean that while the
Clarkson Company Ltd. would be acting perfectly legitimately in
filing an action on behalf of the company to preserve or recover
the company's assets, they would, on the other hand, be acting
30    illegitimately if they entered an appearance on behalf of the same
company and filed a counterclaim, for example, to preserve or
recover the same assets. I would reject a construction which leads
to such a patent absurdity. I must therefore record my dissent to
the contrary view expressed by the learned Chief Justice. In my
35    respectful view, he was patently in error.

Further, it should be said that there is no question but that such
an application can be made either by the plaintiff or a defendant
in the action. Where the relief is sought by the defendant, how-
ever, there is authority for saying that it must arise out of the
40    relief claimed by the plaintiff or the defendant must counterclaim
or issue a writ before he can obtain a receiver: *Carter* v. *Fey* (2).

---

1984–85 CILR 115

The learned Chief Justice was plainly in error when he observed :
"Furthermore, O.30, r.1 provides machinery for a *plaintiff* to
have a receiver appointed . . . ." [Emphasis supplied.] Mr. Pat-
ten candidly acknowledged that the view here expressed was
5    erroneous and nothing further need be said about it.

Another of the reasons put forward by the Chief Justice for dis-
charging his order was that the order sought on the *ex parte* appli-
cation, and in the result granted, was wider than was necessary
for the purposes of recognition of a receiver and manager within
10    the jurisdiction. The particular wider order was numbered 2 and
recited as follows:

    "2. The Clarkson Company Ltd. is authorised and permit-
    ted to identify and locate all assets belonging legally or ben-

15   eficially to Kilderkin within the jurisdiction of this court and
to make inquiries and requests for information and docu-
ments, whether on paper, microfilm or tape or in any other
form relating to any assets of Kilderkin which may be in the
possession or control of any person, bank, or company
within the jurisdiction of this court, notwithstanding the
20   order of this court dated the 16th day of April, 1983."
The view of the Chief Justice was "that Clarkson did not need the
power [as set out above] for the purposes of Cause 132," and "the
resulting order went far beyond what was necessary for the pur-
poses of Cause 132." The action against Kilderkin and the other
25   defendants sought *inter alia*:

"1. Damages for fraudulent or illegal conspiracy to apply
in breach of trust the moneys of the plaintiffs or one or more
of them."

"3. An enquiry as to what moneys, investments and
30   securities now represent or, but for the wilful default of the
defendants, would represent the said profits and an order
that the defendants and each of them pay to the plaintiffs
what may be found due upon making such an enquiry."

"5. An order that the defendants and each of them to the
35   extent of any estate or interest respectively vested in them in
the said moneys, securities and investments or any of them
or any part or parts thereof, and in respect of the said
profits, investments and dividends or any of them or any part
or parts thereof, pay or transfer the same to the plaintiffs or
40   as they direct."

"7. Insofar as necessary, an enquiry and/or account of all

---

1984–85 CILR 116

dealings with the said moneys, securities and investments
and the said profits, interests and dividends, an order that
payment of any sum found due to the plaintiffs and the tak-
ing of such enquiry and/or account."
5   Plainly, all the assets of Kilderkin Investments would be at risk in
the event that this action was successfully concluded in the plain-
tiffs' favour. Moreover, during the hearing of the present appeal,
the appellants on behalf of Kilderkin filed an action against Wil-
liam Player to protect the assets and undertaking of Kilderkin. A
10   responsible receiver and manager would enquire where his com-
pany's assets are so that they may be protected. It is difficult to
conceive how the receiver and manager could properly function
in accord with his prime duty, if he was quite unaware where the
assets of the company were located. The claims against the com-
15   pany sought to trace funds which the plaintiffs were alleging were
theirs, while the company would be asserting its own entitlement
to those funds. Indeed, it is right to say that in locating funds of

the company, the appellants were doing no more than was essen-
tial or prudent for the proper discharge of their duties. They
would be acting consistently with their duties and in my view,
need not have sought the order in terms of para. 2 of the appli-
cation, which have earlier been set out. In these circumstances, I
cannot regard the view of the learned Chief Justice that "Clark-
son's preservation of the assets of Kilderkin in this jurisdiction in
its capacity as receiver and manager of Kilderkin had no rel-
evance to the suit (Cause 132) in this jurisdiction," as correct.

    The assets of Kilderkin had to be protected and preserved not
only by reason of the plaintiffs' claim but also (and this is a mere
allegation) by reason of the illegal activity of William Player, the
sole director, and himself a defendant in the action (Cause 132).
There was some suggestion that the assets of Kilderkin were no
longer at risk by reason of the Mareva injunction obtained by the
plaintiffs and further an undertaking in costs. As to the first
suggestion, relief sought and obtained by the plaintiffs cannot in
my view relieve the receiver and manager of his responsibilities in
respect of the company. As to the second, I am content to say
that the same reasoning applies. At all events, I cannot see how
these considerations have any bearing on whether the procedure
adopted was appropriate or not.

    But even if, contrary to the conclusion at which I have arrived,
the procedure adopted by the appellants was inappropriate and

1984–85 CILR 117

an original application would have been proper, I would have
been prepared to hold nonetheless that the order should not have
been discharged for in my judgment no prejudice has resulted to
the respondent. He was heard by the Chief Justice and by this
court and was afforded every opportunity to represent his cause.
There is, moreover, power in the court (see O.2, r.1) to treat
non-compliance with the rules as an irregularity and not as nul-
lity. I did not understand the Chief Justice's judgment as deciding
that the procedure was a nullity for he did not appear to think
that Clarkson were not entitled to be recognised as receiver and
manager within the jurisdiction, but that the procedure was not
the correct method. In fact he himself identified the non-com-
pliance as a "procedural irregularity." That being so, unless some
injustice could be shown and none has been, although the Chief
Justice thought that it led to a breach of the *audi alteram partem*
rule, the irregularity should not be allowed to affect the matter. I
have dealt with the fact of prejudice previously. It is enough to
repeat that the circumstances in my view warranted an *ex parte*
order and at all events, the other side has now been heard. I think
Mr. Sumption was eminently right when he observed that the
point of procedure was the purest technicality, which might well

suggest that it did not merit as exhaustive a consideration as it in fact received. But the matter is of some interest in this jurisdiction; the careful research and arguments of counsel were deserv-
25   ing of serious consideration and treatment both in their own right and out of deference to the judgment of the Chief Justice.

I pass now to the question of construction mentioned earlier. The learned Chief Justice discharged his *ex parte* order by reason of their conduct in flouting, as he found, the provisions of the
30   Confidential Relationships (Preservation) Law. He found that—
"Clarkson has been responsible for the disclosure of confidential information within the meaning of that Law in the report of June 15th, 1983 addressed to the Chief Justice of the Ontario Supreme Court." And that—" . . . no application was made under s.3A.
35   The confidential information was divulged without authority."
He concluded that the breach appeared to be deliberate.

We must now examine the relevant provisions of the Act. Section 4(1)(a)(i) creates the offence of divulging confidential information. It states as follows:
40      "(1) Subject to the provisions of sub-section (2) of section 3, whoever—

---

(a) being in possession of confidential information how-
    ever obtained;
      (i) divulges it . . . "
is guilty of an offence. This provision, plainly all-embracing in
5   scope, is limited however by s.3(2), as amended, which recites as follows:
    "(2) This Law has no application to the seeking, divulg-
    ing, or obtaining of confidential information—
    (a) in compliance with the directions of the Grand Court
10      pursuant to section 3A;
    (b) by or to—
      (i) any professional person acting in the normal
        course of business or with the consent,
        express or implied, of the relevant princi-
15      pal . . . ."
For completeness, the provisions of s.3A(1) should be recited. These provisions are in the following form:
    "(1) Whenever a person intends or is required to give in
    evidence in, or in connection with, any proceeding being
20    tried, inquired into or determined by any court, tribunal or
    other authority (whether within or without the Islands) any
    confidential information within the meaning of this Law, he
    shall before so doing apply for directions and any adjourn-
    ment necessary for that purpose may be granted."
25   The Chief Justice by his findings came to the conclusion that the

appellants had acted contrary to s.4(1)(a)(i) of the Law. There
was no question but that the appellants had submitted a report
dated June 15th, 1983, to the Ontario Supreme Court concerning
the affairs of Kilderkin which they had doubtless obtained from
30   banks in these Islands.

   Mr. Sumption submitted that in order to invoke the provisions
of the Law, two conditions must be satisfied, *viz.*: (i) there must
be a communication of information in confidence by a principal to
someone else, *i.e.* Clarkson, and (ii) it must be shown that Clark-
35   son divulged that information without the consent of Kilderkin;
and these had not been met. Mr. Patten contended that it was an
offence to divulge information "however obtained." This would
be so even if Clarkson obtained information from a bank notwith-
standing that the information was originally given to the bank by
40   Kilderkin and by the bank to Clarkson. So the offence was com-
mitted not only by the person to whom the information is commu-

nicated but anybody else who subsequently receives it and
divulges it.

   Under the Law, the information which it is forbidden to
divulge is "confidential information" which is defined by the Law
5   as including—"information concerning any property which the
recipient thereof is not, otherwise than in the normal course of
business, authorized by the principal to divulge . . ."

   In the present appeal, it is accepted that the "principal" is Kil-
derkin Investments. "Principal" means under the Law—"a per-
10   son who has imparted to another confidential information in the
course of the transaction of business of a professional
nature. . . ." So that we are concerned with confidential infor-
mation, which Kilderkin did not authorise to be divulged. Mr.
Patten urged that Clarkson in order to obtain the consent of Kil-
15   derkin had to ask for it. In my view, this cannot be right. The con-
sent of Kilderkin if no receiver and manager had been appointed
would have been given by its director, William Player. But in the
circumstances of this case, the managerial functions of Player
were in abeyance, and management of the assets and undertaking
20   of the company had been entrusted to the receiver and manager.
The Ontario Supreme Court's order make that abundantly clear
and in point of law, the managerial functions of Player were
ousted. It would be no more than solemn farce for Clarkson to
obtain consent from themselves, to divulge information in the
25   normal course of business. "Normal course of business" is
defined in the Law as meaning—

   "the ordinary and necessary routine involved in the efficient
   carrying out of the instructions of a principal including com-
   pliance with such laws and legal process as arises out of and

30       in connection therewith and the routine exchange of infor-
         mation between licensees . . . ."
     Clarkson did not therefore require any consent. The information
     which was disclosed to them and which they divulged to the
     Ontario court, was received in virtue of their position as replacing
35   the director of the company. Section 3(2)(b)(i) exempts from the
     operation of the Law the divulging of information by any pro-
     fessional person acting in the normal course of business or with
     the consent of the principal, express or implied. The combined
     effect of s.4(1)(a)(i) and s.3(2)(b)(i) is not to forbid absolutely
40   the divulging of confidential information but to prevent a finding
     of guilt where the communication occurs in the normal course of

     business or where the principal consents to the dissemination.
         In the result, there is merit in the submission of Mr. Sumption
     as to the conditions which must be satisfied in order to invoke the
     provisions of the Law. I entirely agree that the conditions have
5    not been satisfied and accordingly there has been no breach of the
     Law by the appellants.
         Having regard to the approach which the Chief Justice took in
     relation to the position of a receiver and manager *vis-à-vis* the
     company in respect of which they have been appointed, it fol-
10   lowed logically that he would conclude, as indeed he did, that—
         "the company, Kilderkin (and the fourth defendants in
         relation to their affairs) remained the principal for the pur-
         poses of the Confidential Relationships (Preservation) Law
         and continue to be the principal in relation to the confiden-
15       tial information relating to the company—in particular all
         the confidential information in relation to which the com-
         pany was the principal before the receiver and manager was
         appointed."
     He was right in holding that the company was the "principal" for
20   the purpose of the Law, but fell into error in thinking that the
     receiver and manager had not replaced the company's director in
     respect to its management. I do not think there would be any
     doubt that if Kilderkin through its director had divulged confi-
     dential information prior to the appointment of the receiver and
25   manager, anyone could successfully assert they had breached the
     Law. Seeing then that Clarkson have stepped into the shoes of
     Player, they are in the same position as the erstwhile director and
     equally exempt from liability under the Law. Mr. Sumption
     pointed out, as I think correctly, that the information belongs to
30   the company. He regarded this information as an asset. Mr. Pat-
     ten disagreed as to the information being an asset, but he did not
     dissent from the view that as business information, the company
     retained the privilege of non-disclosure. It is the director who has

35   the right to this information and who exercises a managerial func-
tion in respect of it. In the present case, it is the appellants who
exercised that power; they have the control and management of
the assets and undertaking of the company.

    If what has been said is correct, it is really unnecessary to con-
sider whether the receiver and manager was required to comply
40   with the provisions of s.3A(1), *viz.*, obtain directions from the
court. The fact of the matter was that no such application was

made. A factor which I think should be kept in mind is that Clark-
son as receiver is an officer of the court and a report to the court
by its officer cannot surely qualify as conduct which should disen-
title the receiver and manager to continue to act. In my view,
5   these appellants in reporting to the Ontario Supreme Court with
respect to their stewardship, could scarcely be categorised as
busybodies interfering in the affairs of strangers; they would be
acting in consonance with their obligations to the court as officers
of the court and in accord with their responsibilities as managers
10   of the company. I am therefore constrained with respect to dis-
agree with the conclusion of the learned Chief Justice that—"that
justifies the exercise of this court's discretion to discharge the
order."

    It only remains to consider that part of the order whereby the
15   attorneys acting for the receiver and manager were removed from
the record and the attorneys for Player placed thereon. The Chief
Justice acted pursuant to r.59(3) of the Grand Court (Civil Pro-
cedure) Rules 1976 which decrees:

    "If a dispute or difficulty arises as to the representation of
20     any party to a suit or any person claiming to be the attorney-
at-law of any party to that suit or to have acted in that suit
may make application by summons to the judge in chambers
who may make such order in that behalf as appears just and
expedient."
25   There was not a deal of argument in relation to this rule but I
would be inclined to think that it is based on O.67 of the English
Rules of the Supreme Court. There is, however, no rule in that
order in similar terms. I am not at all clear what was the intention
of the draftsman in the use of the words "dispute or difficulty."
30   Order 67, r.5 appears to be the only rule where a party other than
a party to the cause or action is entitled to apply, in effect for a
declaration that the solicitor has ceased to be the solicitor acting
for the party. Rule 5 provides:

    "(1) Where—
35     (a) a solicitor who has acted for a party in a cause or
matter has died or become bankrupt or cannot be
found or has failed to take out a practising certificate

40 or has been struck off the roll of solicitors or has
been suspended from practising or has for any other
reason ceased to practise, and

(b) the party has not given notice of change of solicitor

1984–85 CILR 122

or notice of intention to act in person in accordance
with the foregoing provisions of this Order,
any other party to the cause or matter may apply to the
Court or, if an appeal to the Court of Appeal is pending in
5 the cause or matter, to the Court of Appeal for an order dec-
laring that the solicitor has ceased to be the solicitor acting
for the first-mentioned party in the cause or matter, and the
Court or the Court of Appeal, as the case may be, may make
an order accordingly."

10 The occasions in which a situation such as occurred in this case
came about are so rare that it is unlikely that the rule could have
been devised for such an unusual eventuality. But even if I am
wrong in this view, it is difficult to regard the application by the
respondent as "a dispute or difficulty arising as to represen-
15 tation." Having removed the attorneys on the record for Kilder-
kin, some other attorney was required on the record as acting for
the company. I do not think that the rule could be prayed in aid in
these circumstances.

Perhaps of more fundamental importance is the fact that by
20 that order, Player, the director of Kilderkin who had been
required to hand over all the assets and undertaking of the com-
pany under orders of the Ontario Supreme Court, was being
placed once more in a position where the assets and undertaking
of the company would be at risk. For it is evident that while
25 Player considered his interests and those of the company to
coincide, that was a picture the duly-appointed receiver and
manager did not share. We understood during these hearings that
Kilderkin had filed an action against Player and others in relation
to the assets of Kilderkin within the jurisdiction. So startling a
30 result is not, in my respectful opinion, in keeping with the prin-
ciple of comity. I am not to be taken as suggesting for one
moment that the court has not the power to refuse to confirm or
recognise the appointment of a foreign receiver, but there must
exist strong and compelling constraints against such recognition.
35 None in my view has been shown. For these reasons I am led to
hold that that portion of the order was also erroneously made.

Accordingly, I would set aside the order of the Chief Justice
which discharged his *ex parte* order and removed the appellants'
attorneys from the record. The appeal should be allowed with
40 costs both here and below.

*Appeal allowed.*