# EXHIBIT 8

[2015 (1) CILR 451]

CLASSROOM INVESTMENTS INCORPORATED v. CHINA HOSPITALS INCORPORATED and CHINA HEALTHCARE INCORPORATED

GRAND COURT, FINANCIAL SERVICES DIVISION (Smellie, C.J.): May 15th, 2015

*Injunctions—Mareva injunction—aid of foreign proceedings—injunction in aid of foreign proceedings under Grand Court Law (2008 Revision), s.11A particularly justified if injunction sought in response to fraudulent behaviour—court to consider (a) reaction of foreign courts seised of dispute; (b) whether it would have granted orders sought in domestic proceedings; and (c) whether injunction inexpedient or unjust*

*Injunctions—Mareva injunction—dissipation of assets—fraudulent behaviour by defendant to injunction sufficient to establish risk of dissipation of assets—ordinarily necessary to show that defendant likely to engage in activities outside ordinary course of business to remove assets from jurisdiction*

The plaintiff sought an injunction preventing the defendants from disposing of their assets and an order requiring them to disclose the location of their assets.

The plaintiff company agreed to pay US$175m. for shares in the first defendant prior to an IPO. The first defendant agreed that the money would be used to expand its operations in China, and warranted that it had entered agreements to acquire a number of hospitals. Subsequently, the plaintiff discovered that the money had been used by the second defendant (a company connected with the first defendant, but in which the plaintiff had no interest) to purchase the hospitals, and no initial public offering ("IPO") of the first defendant was intended.

The plaintiff commenced proceedings in Hong Kong seeking various remedies from the defendants and others, and obtained injunctions from the High Court preventing the defendants from disposing of any assets and requiring them to disclose the whereabouts of the US$175m. paid to the first defendant. However, the Hong Kong court had no personal jurisdiction over the defendants as they were registered in the Cayman Islands, and the plaintiff therefore made the present *ex parte* application to the Grand Court seeking identical orders to those sought in Hong Kong in aid of actions to remedy fraudulent misrepresentation, breach of contract and unlawful means conspiracy.

2015 (1) CILR 452

The plaintiff submitted that (a) the court had jurisdiction under the Grand Court Law (2008 Revision), s.11A to make the orders sought as they were in aid of foreign proceedings; (b) in applications concerning fraudulent behaviour the court should readily exercise its jurisdiction and grant injunctions; (c) the injunctions and orders sought should be granted as it had an arguable claim, an award of damages would be inadequate as the defendants did not have sufficient assets, damages would be an adequate award to compensate the defendants for any loss caused by the injunctions, and, further, the defendants were likely to dissipate their assets in order to prevent the plaintiffs gaining access to them; (d) an *ex parte* application was justified in order to prevent the defendants from dissipating their assets prior to a court order; and (e) any delay in seeking injunctive relief was justified as it resulted from a contractual consultation period and attempts to resolve the dispute with the defendants.

**Held**, granting the injunctions:

(1) It was expedient, just and convenient that the injunctions and orders sought should be granted. Section 11A of the Grand Court Law (2008 Revision), which allowed the court to make an order in aid of foreign proceedings, was engaged as proceedings had been commenced outside the Cayman Islands and could give rise to a judgment enforceable in the Cayman courts. In applying s.11A of the Law, English case law on the ambit of s.25 of the Civil Jurisdiction and Judgments Act 1982 was of assistance, and indicated that the court should be cautious, but not reluctant, to exercise its jurisdiction, and should consider (a) the reaction of any foreign court seised of the dispute; (b) whether it would have granted the order sought if proceedings had been initiated within the jurisdiction; and (c) whether it would be inexpedient or unjust to grant the order or injunction. These considerations indicated that the court had jurisdiction as the Hong Kong court itself had approved of proceedings being brought in

the Islands and the court was best placed to make the orders sought as the defendants were Cayman-registered companies. Further, the dispute concerned fraudulent behaviour involving the misappropriation of US$175m., and the court should be ready to use its powers to assist the victim of such a fraud. The fact that the defendants might not have assets in the Cayman Islands did not prevent the court from making the orders sought, particularly as the plaintiff sought disclosure of the location of the defendants' assets (paras. 37–44).

(2) An injunction would be granted restraining the first defendant from disposing of its assets as (i) the plaintiff clearly had an arguable case that it should have a proprietary remedy, and would in fact be likely to succeed at trial; (ii) any loss caused to the first defendant by the injunction would be compensable in damages; and (iii) the plaintiff would not be adequately compensated by an award in damages as it was unclear that the defendants had adequate resources to meet any award made against it. Further, as the remedy sought against the first defendant was proprietary, strong measures were justified to ensure that the plaintiff's assets would be dissipated.

---

In addition, it would be justified to order the first defendant to disclose the location of its assets in order to allow the plaintiff to trace its assets (para. 47; paras. 51–53).

(3) A worldwide injunction preventing the second defendant disposing of its assets would also be granted as the plaintiff had an arguable case for damages and it was highly likely that the second defendant's assets would be dissipated and moved out of the jurisdiction, particularly given the defendant companies' seemingly fraudulent practices, making it likely that any award against the plaintiff would not be satisfied. A worldwide order was justified when a plaintiff had a good arguable case for damages, there was a real risk of dissipation of the defendant's assets and those assets which were within jurisdiction were likely to be insufficient to satisfy a judgment. Fraudulent behaviour on the part of a defendant to an injunction was sufficient to establish that dissipation of assets was likely, though ordinarily it must be demonstrated that the defendant is likely to engage in activities outside the usual course of business in order to remove assets from the jurisdiction, with the consequence that any judgment made would remain unsatisfied (paras. 59–65).

(4) An order for disclosure of its assets would also be made against the second defendant as it was vital for the enforcement of the freezing order that the plaintiff be able to locate and identify the defendant's assets (paras. 68–70).

(5) Delay by the plaintiff in bringing the proceedings was not in itself inequitable. While delay could render an injunction unjust, it was not determinative in deciding whether to grant or refuse the injunction. The plaintiff had followed procedures prescribed by the agreement between the parties, and attempted to conduct negotiations with the defendants in good faith before resorting to court action, and the delay in bringing proceedings was therefore justified. Further, materials exchanged between the parties in the course of negotiations were not inadmissible in evidence to explain the delay due to the "without prejudice" rule, as the negotiations were not concerned with reaching a settlement; in any event, the use of such material to explain a delay in bringing proceedings was an exception to the "without prejudice" rule (paras. 72–77; paras. 85–86).

(6) An *ex parte* application was justified as it was imperative that the defendants not have notice of the proceedings and thereby be given an opportunity to dissipate their assets. In addition, none of the potential defence arguments advanced by the plaintiffs as part of their duty of disclosure indicated that the orders should not be made; in particular, the plaintiff had only to make an arguable case that it would succeed at trial, and therefore had sufficient evidence of fraud, breach of contract and unlawful means conspiracy to justify an injunction. Further, the arbitration

---

clauses in the agreement indicated that the parties could seek arbitration but did not require the parties to do so (para. 78; para. 82; para. 87).

Cases cited:

(1)   *A* v. *C*, [1981] Q.B. 956; [1981] 2 W.L.R. 629; [1980] 2 All E.R. 347; [1980] 2 Lloyd's Rep. 200, referred to.
(2)   *A.J. Bekhor & Co. Ltd.* v. *Bilton*, [1981] Q.B. 923; [1981] 2 W.L.R. 601; [1981] 2 All E.R. 565; [1981] 1 Lloyd's Rep. 491, referred to.
(3)   *Ahmad Hamad Algosaibi & Bros. Co.* v. *Saad Invs. Co. Ltd.*, 2010 (1) CILR 553; further proceedings, 2011 (1) CILR 178, followed.
(4)   *American Cyanamid Co.* v. *Ethicon Ltd.*, [1975] A.C. 396; [1975] 2 W.L.R. 316; [1975] 1 All E.R. 504; [1975] F.S.R. 101, applied.
(5)   *Bank of Nova Scotia* v. *Emerald Seas Ltd.*, 1984–85 CILR 180, applied.
(6)   *Bankers Trust Co.* v. *Shapira*, [1980] 1 W.L.R. 1274; [1980] 3 All E.R. 353, referred to.
(7)   *CPC (United Kingdom) Ltd.* v. *Keenan*, [1986] F.S.R. 527, followed.
(8)   *Cancer Research UK Ltd.* v. *Morris*, [2008] EWHC 2678 (QB), considered.
(9)   *Credit Suisse Fides Trust S.A.* v. *Cuoghi*, [1998] Q.B. 818; [1997] 3 W.L.R. 871; [1997] 3 All E.R. 724; [1997] C.L.C. 1187, applied.
(10)  *Derby & Co. Ltd.* v. *Weldon (No. 1)*, [1990] Ch. 48; [1989] 2 W.L.R. 276; [1989] 1 All E.R. 469; [1989] 1 Lloyd's Rep. 122, referred to.
(11)  *Donelly* v. *Karess Properties Ltd.*, Grand Ct., Cause No. 818 of 1997, March 12th, 1998, unreported (noted at 1998 CILR *N*–12), followed.
(12)  *ETI Euro Telecom Intl. NV* v. *Bolivia (Republic)*, [2009] 1 W.L.R. 665; [2009] 2 All E.R. (Comm) 37; [2009] Bus. L.R. 310; [2008] 2 Lloyd's Rep. 421; [2008] C.P. Rep. 41; [2008] 2 C.L.C. 153; [2008] EWCA Civ 880, considered.
(13)  *Felderhoff* v. *Deloitte & Touche Inc.*, 2011 (2) CILR 35, referred to.
(14)  *Haiti (Republic)* v. *Duvalier*, [1990] 1 Q.B. 202; [1989] 2 W.L.R. 261; [1989] 1 All E.R. 456; [1989] 1 Lloyd's Rep. 111, considered.
(15)  *Hannice Indus. Ltd.* v. *Elite Union (Hong Kong) Ltd.*, [2012] HKCFI 413, referred to.
(16)  *J.P. Morgan Multi-Strategy Fund L.P.* v. *Macro Fund Ltd.*, 2002 CILR 569, referred to.
(17)  *Legg* v. *Inner London Educ. Auth.*, [1972] 1 W.L.R. 1245; [1972] 3 All E.R. 177, followed.
(18)  *Mediterranea Raffineria Siciliana Petroli S.A.* v. *Mabanaft GmbH*, English C.A., 1978 M No. 4019, December 1st, 1978, unreported, referred to.
(19)  *Mediterranean Shipping Co.* v. *OMG Intl. Ltd.*, [2008] EWHC 2150 (Comm), considered.
(20)  *Mothercare Ltd.* v. *Robson Books Ltd.*, [1979] F.S.R. 466, referred to.
(21)  *Ninemia Maritime Corp.* v. *Trave Schiffahrts GmbH & Co. K.G., "The Niedersachsen"*, [1983] 1 W.L.R. 1412; [1984] 1 All E.R. 398; [1983] 2 Lloyd's Rep. 600, followed.

---

2015 (1) CILR 455

(22)  *Pearson Educ. Ltd.* v. *Prentice Hall India PTE Ltd.*, [2006] F.S.R. 8; [2005] EWHC 636 (QB), referred to.
(23)  *Polly Peck Intl. plc* v. *Nadir (No. 2)*, [1992] 4 All E.R. 769; [1992] 2 Lloyd's Rep 238; [1993] BCLC 187, referred to.
(24)  *Refco Inc.* v. *Eastern Trading Co.*, [1999] 1 Lloyd's Rep. 159, followed.
(25)  *Ryan* v. *Friction Dynamics Ltd.*, [2001] C.P. Rep. 75, considered.
(26)  *Siskina* v. *Distos Cia. Naviera S.A., "The Siskina"*, [1979] A.C. 210; [1977] 3 W.L.R. 818; [1977] 3 All E.R. 803; [1978] 1 Lloyd's Rep 1; [1978] 1 C.M.L.R. 190, referred to.
(27)  *Unilever plc* v. *Procter & Gamble Co.*, [2000] 1 W.L.R. 2436; [2001] 1 All E.R. 783; [2000] F.S.R. 344, referred to.
(28)  *VTB Capital plc* v. *Malofeev*, 2011 (2) CILR 420, referred to.
(29)  *VTB Capital plc* v. *Universal Telecom Management*, 2013 (2) CILR 94, referred to.
(30)  *Walsh* v. *Deloitte & Touche Inc.*, [2001] UKPC 58, referred to.

**Legislation construed:**
Grand Court Law (2008 Revision), s.11A, as added by the Grand Court (Amendment) Law 2014, s.3: The relevant terms of this section are set out at para. 17.

*R. Levy, Q.C., N. Dunne* and *S. Solursh* for the applicant.

1   **SMELLIE**, C.J.: This is an application by the plaintiff ("Classroom") for injunctive relief against the defendants ("Hospitals" and "Healthcare") in aid of proceedings instituted in Hong Kong against them (and other defendants).

2   The application is made pursuant to the recently enacted s.11A of the Grand Court Law (inserted into the Grand Court Law by s.3 of the Grand Court (Amendment) Law 2014), which places on a statutory footing the jurisdiction of this court to grant interim relief in aid of foreign proceedings.

---

0   1   The jurisdiction to grant relief in aid of foreign proceedings was acknowledged by the Court of Appeal in *VTB Capital plc* v. *Universal Telecom Management* (29), but in earlier proceedings, *VTB Capital plc* v. *Malofeev* (28), it was held that there was no jurisdiction to serve out of the Islands upon a foreign defendant where the only relief sought was an injunction in aid of foreign proceedings. This shortcoming in the rules of court has been addressed pursuant to s.11A(7) by an amendment to the GCR, O.11, r.1 by the addition of a new paragraph, "(n)." I note, however, for reasons which will become apparent, that no question of service out arises in the present application. Earlier recognition of the jurisdiction now enacted by s.11A is to be found in *Felderhoff* v. *Deloitte & Touche Inc.* (13), in which the Court of Appeal followed and applied the Privy Council's decision in *Walsh* v. *Deloitte & Touche Inc.* (30).

---

3   It is believed that these are the first proceedings under s.11A and so I provide these written reasons for my decision to grant the relief sought.

**Brief background**

4   The evidence filed in this matter is substantial and is presented under cover of an affidavit from Jeffrey Michael Davis, a director and general counsel of Classroom.

5   A brief summary of the issues as he presents them will nonetheless suffice for setting the context for the application.

6   Classroom is a wholly-owned subsidiary of OTPP, described by Mr. Davis as one of the world's largest pension funds. In late January 2014, in return for a payment to Hospitals of US$175m. (the "subscription monies"), Classroom purchased certain shares in Hospitals from a company owned by Dr. Chuanping Frank Hu ("Dr. Hu"), and also subscribed directly for further shares in Hospitals.

7   The documents executed as part of the January 2014 transaction ("the 2014 transaction documents") gave certain representations and warranties as to the assets owned by Hospitals (namely certain hospitals in mainland China ("the PRC")), and contained provisions whereby Hospitals was to use the subscription monies towards acquiring other hospitals operating in the PRC. In that regard, Hospitals represented and warranted that it had entered into binding agreements to acquire those other hospitals ("the new hospitals").

8   The 2014 transaction documents contained a provision whereby, within 30 months, the various shareholders in Hospitals would use their best endeavours to achieve an initial public offering of Hospitals, either on the Hong Kong Stock Exchange ("HKSE") or the New York Stock Exchange ("NYSE").

9   Some time after entering into the transaction, Classroom made a number of very disturbing discoveries. The essence of the discoveries is that, far from Hospitals' subsidiaries having entered into binding contracts to acquire the new hospitals, in fact companies which came to form part of the Healthcare structure (which is a structure ultimately owned and controlled by Dr. Hu, that is, entirely separate from and parallel to the Hospitals structure, and in which Classroom has no shares) had entered into contracts to acquire the new hospitals (and purported to have completed on such purchases). Further, Classroom discovered that rather than preparing for an initial public offering ("IPO") of Hospitals, the intention was to arrange an IPO of Healthcare.

10   So, the upshot, as argued by Classroom, is that Classroom invested a total of US$175m. in the belief (as represented and warranted by various entities) that Hospitals owned various hospitals and would acquire the new

---

hospitals, and that Hospitals would be the subject of an IPO, only to find that its money has been used to enable companies in the Healthcare structure, in which Classroom has no interest whatsoever, to acquire the new hospitals.

11   On May 6th, 2015, Classroom commenced its proceedings in the High Court in Hong Kong against numerous defendants (including Hospitals and Healthcare) seeking various proprietary and/or personal

remedies against Hospitals and Healthcare and a number of their direct and indirect subsidiaries. A copy of the writ is exhibited to Mr. Davis's affidavit.

12  Also on May 6th, 2015, Classroom sought and obtained an *ex parte* injunction from Li, J. in the High Court in Hong Kong. This is injunctive relief which restricts various of the defendants in the Hong Kong proceedings from disposing of their assets (in certain cases on a worldwide basis) and requires them to provide certain information to Classroom. The Hong Kong order is also exhibited to Mr. Davis's affidavit. The Hong Kong order provides for a return day on May 16th, 2015 (unless varied or discharged in the meantime). That order also granted Classroom permission to issue a concurrent writ and to serve it, and the Hong Kong order, in Cayman.

13  However, the High Court in Hong Kong does not have personal jurisdiction over either Hospitals or Healthcare, both of which are incorporated in Cayman, and, accordingly, Classroom now seeks relief from this court in aid of the Hong Kong proceedings against those companies which are subject to the jurisdiction of this court. As explained by Mr. Levy, the freezing relief sought by Classroom is intended to ensure that the structures put in place from the time of the January 2014 transactions, and thereafter, remain in place pending the determination of the Hong Kong proceedings. Such relief is designed to protect Classroom's tracing claims, and ensure that the structure that Classroom has been told exists (as described at paras. 9 and 10 above) remains *in situ* pending that final determination.

---

0  2   For the avoidance of doubt, in the Hong Kong proceedings Classroom does not currently seek proprietary relief against Healthcare. As against Hospitals, the endorsement on the writ claims, *inter alia*, a declaration that Hospitals holds US$156.75m. on trust for Classroom and a host of other relief. However, as against Healthcare, the sole claim currently pleaded is for damages for unlawful means conspiracy.

0  3   I am told that leave of the Hong Kong court was not necessary to serve on Hospitals in Cayman due to the service agent provisions in the share purchase and subscription agreement ("the SPA"), which formed part of the 2014 transaction documents.

---

2015 (1) CILR 458

14  Further, an important part of the relief Classroom seeks is the disclosure of information from Hospitals and Healthcare. This relief, Mr. Levy submits, is most appropriately sought in the "home" court of those defendants (*i.e.* the Cayman courts).

15  From that summary of the factual background, it is plain that Classroom's case is one based upon allegations of fraud—the fraudulent misrepresentations as to the intended application and the alleged misappropriation of the subscription monies.

**Section 11A of the Grand Court Law**

16  The juridical purpose of the powers now codified in statute by s.11A was succinctly explained by Millett, L.J. (as he then was) in *Refco Inc.* v. *Eastern Trading Co.* (24), referring to the equivalent English provision in s.25 of the Civil Jurisdiction and Judgments Act 1982 (the "English Act") ([1999] 1 Lloyd's Rep. at 175):

"The jurisdiction of national Courts is primarily territorial, being ordinarily dependent on the presence of persons or assets within their jurisdiction. Commercial necessity resulting from the increasing globalization of trade has encouraged the adoption of measures to enable national Courts to provide assistance to one another, thereby overcoming difficulties occasioned by the territorial limits of respective jurisdictions . . . A Court which is invited to exercise its ancillary jurisdiction to provide assistance to the Court seised of the substantive proceedings need feel no reluctance in supplying a want of territorial jurisdiction but for which the other Court would have acted. But it should be very slow to grant relief which the primary Court would not have granted even against persons present within its own jurisdiction and having assets there. Assisting a foreign Court by supplying a want of territorial jurisdiction is plainly within the policy of the Act; assisting plaintiffs by offering them a lower standard of proof is not obviously within the legislative policy. I recognize, however, that the dividing line may sometimes be hard to draw, and that the distinction is not by any means necessarily decisive. I do not wish to be understood to be circumscribing a valuable jurisdiction, but rather to be indicating matters relevant to be taken into account when the Court is invited to exercise it."

17  With that framework in mind, s.11A must be construed, and provides (in relevant part) as follows:

"(1) The Court may by order appoint a receiver or grant other interim relief in relation to proceedings which—

2015 (1) CILR 459

    (a)   have been or are to be commenced in a court outside of the Islands; and

    (b)   are capable of giving rise to a judgment which may be enforced in the Islands under any Law or at common law.

(2) The Court may, pursuant to this section, grant interim relief of any kind which it has power to grant in proceedings relating to matters within its jurisdiction.

(3) An order under subsection (1) may be made either unconditionally or on such terms and conditions as the Court thinks fit.

(4) Subsection (1) applies notwithstanding that—

    (a)   the subject matter of those proceedings would not, apart from this section, give rise to a cause of action over which the Court would have jurisdiction; or

    (b)   the appointment of the receiver or the interim relief sought is not ancillary or incidental to any proceedings in the Islands.

(5) The Court may refuse an application for the appointment of a receiver or the grant of interim relief if, in its opinion, it would be unjust or inconvenient to grant the application.

(6) In exercising the power under subsection (1), the Court shall have regard to the fact that the power is—

    (a)   ancillary to proceedings that have been or are to be commenced in a place outside the Islands; and

    (b)   for the purpose of facilitating the process of a court outside the Islands that has primary jurisdiction over such proceedings.

(7) The Court has the same power to make any incidental order or direction for the purpose of ensuring the effectiveness of an order granted under this section as if the order was granted in relation to proceedings commenced in the Islands.

. . .

(10) In this section 'interim relief' includes an interlocutory injunction."

18   Thus, in placing on a statutory footing the power to grant relief in aid of foreign proceedings, s.11A is similar to (but not exactly the same as)

2015 (1) CILR 460

s.25 of the English Act. A point of distinction is that under s.25(2), the English court may refuse interim relief in aid of foreign proceedings if the fact that the court has no jurisdiction to grant relief in relation to the subject-matter of the proceedings makes it "inexpedient" for the court to grant interim relief. That is to be compared with s.11A(5), where this court may refuse relief if it is of the opinion that it would be "unjust or inconvenient" to grant it.

19   Notwithstanding that difference in wording, I am satisfied that the approach to the question of whether or not interim relief should be granted will, in substance, be the same.

20   As Millett, L.J. had earlier observed in *Credit Suisse Fides Trust S.A.* v. *Cuoghi* (9) ([1998] Q.B. at 825–26):

"On an application for interim relief . . . the court is not bound to grant relief, but may decline to do so if in its opinion the fact that it is exercising an ancillary jurisdiction in support of substantive proceedings elsewhere makes it inexpedient to grant it. It is the ancillary or subordinate nature of the jurisdiction rather than its source which is material, and the test is one of expediency."

21   In s.11A, the expression "unjust and inconvenient" invokes to my mind a test of fairness and convenience to similar effect as the English provision, for it could hardly be expedient for a court of law to grant relief where it is unjust and inconvenient to do so. And, of course, the factors which will weigh in the balance are to be assessed, as always, as they may arise from the particular circumstances of the case.

22   A similar view must be taken of s.11(A)(5) in the sense that it specifically enjoins this court to have regard to the fact that it is being asked to exercise its powers in a manner which is ancillary to foreign proceedings and for the purpose of facilitating the process of the foreign court. It is suggested by Mr. Levy, and I agree, that the absence of a

---

0   4   The English Act was passed, in part, to overcome the difficulties caused by *Siskina* v. *Distos Cia. Naviera S.A., "The Siskina"* (26), which held that the English court did not have jurisdiction to grant "free-standing" relief in aid of proceedings outside the jurisdiction—see *ETI Euro Telecom Intl. NV* v. *Bolivia (Republic)* (12), in which Lawrence Collins, L.J. explained ([2009] 1 W.L.R. 665, at para. 67) in this regard that "the main purpose of section 25 was twofold: first, to give the English court jurisdiction to order provisional or protective measures where the courts of another Brussels Convention contracting state had jurisdiction as to the substance of the matter; and second, to enable subordinate legislation to be enacted to reverse the effect of *The Siskina* so that interim relief could be granted in England where proceedings were pending abroad in non-Convention cases or where there were arbitration proceedings."

---

similar provision in the English Act is not significant. Rather, s.11A(5) represents the Cayman legislature's recognition of the doctrine of comity which, while having no corresponding statutory expression in the English provision is, of course, recognized throughout English case law as the primary guiding principle, that is: the mutual obligation of the courts of all friendly states to assist each other in the administration of justice while not interfering unduly with each other's jurisdiction.

23   And so, whilst s.11A by no means corresponds exactly with the English provision, nonetheless the policy of both enactments is broadly similar, namely (in England) to grant and (in Cayman) to recognize the court's power to grant interim relief in aid of foreign proceedings. It is for these reasons that I accept that the judicial learning on s.25 of the English Act is relevant when this court is invited to grant relief under s.11A.

**Important English authorities**

24   A very helpful review of the English cases was presented by Mr. Levy, Q.C. in passages which discuss many of the relevant principles arising for consideration upon an application for interim relief in support of foreign proceedings. I adopt and recite these passages in detail below for their value as guidance for the construction and application of s.11A.

25   A seminally important decision on s.25 of the English Act is that of the Court of Appeal already cited, *viz. Credit Suisse Fides Trust S.A.* v. *Cuoghi* (9). In that case, the court granted the plaintiff *Mareva*-type relief against a defendant to Swiss proceedings (such relief not being available in Switzerland). The defendant was resident and domiciled in England and was alleged to have been complicit in the misappropriation of the plaintiff's funds by a former employee. Millett, L.J. made the observations as already quoted above, and continued ([1998] Q.B. at 826):

"The structure of subsections (1) and (2) and the way in which their scope has been progressively widened indicate to my mind an intention on the part of Parliament that the English court *should in principle be willing to grant appropriate interim relief in support of substantive proceedings taking place elsewhere,* and that it *should not be deterred from doing so by the fact that its role is only an ancillary one unless the circumstances of the particular case make the grant of such relief inexpedient.*" [Emphasis supplied.]

26   His Lordship continued (*ibid.*):

"Accordingly, the question resolves itself into this: does the fact that the substantive proceedings are taking place in Switzerland and not in England make it inexpedient to grant worldwide, as distinct from merely domestic, *Mareva* relief?"

27   And, further (*ibid.*, at 826–828):

---

"I cannot accept the submission that it is inappropriate to exercise the jurisdiction conferred by section 25 to grant a worldwide *Mareva* injunction in support of proceedings pending in another country. As Lawrence Collins points out in *Essays in International Litigation and the Conflict of Laws*

(1994), there is no reason in principle why an English injunction should not restrain a person properly before the court from disposing of assets abroad. The order operates in personam. It is

'not grounded upon any pretension to the exercise of judicial or administrative rights abroad, but on the circumstance of the person to whom the order is addressed being within the reach of the court:' see *Kerr on Injunctions*, 6th ed. (1927), p. 11.

It is, of course, the case that, statute and Convention apart, the jurisdiction of the English court does not depend on domicile but on service. Proceedings may be served on persons temporarily present within the jurisdiction, or with leave under R.S.C., Ord. 11, r.1 on persons outside the jurisdiction. It is a strong thing to restrain a defendant who is not resident within the jurisdiction from disposing of assets outside the jurisdiction. But *where the defendant is domiciled within the jurisdiction such an order cannot be regarded as exorbitant or as going beyond what is internationally acceptable. To treat it as such merely because the substantive proceedings are pending in another country would be contrary to the policy which informs both article 24 [of the Brussels Convention] and section 25.*

*Where a defendant and his assets are located outside the jurisdiction of the court seised of the substantive proceedings, it is in my opinion most appropriate that protective measures should be granted by those courts best able to make their orders effective.* In relation to orders taking direct effect against the assets, this means the courts of the state where the assets are located; and *in relation to orders in personam, including orders for disclosure, this means the courts of the state where the person enjoined resides.*

I recognise that an ancillary jurisdiction ought to be exercised with caution, and that care should be taken not to make orders which conflict with those of the court seised of the substantive proceedings. But I do not accept that interim relief should be limited to that which would be available in the court trying the substantive dispute; or that by going further we would be seeking to remedy defects in the laws of other countries. *The principle which underlies article 24 is that each contracting state should be willing to assist the courts of another contracting state by providing such interim relief as would be available if its own courts were seised of the substantive proceedings:* see *Alltrans Inc.* v. *Interdom Holdings Ltd.* [1991] 4 All E.R.

2015 (1) CILR 463

458, 468, *per* Leggatt L.J. By going further than the Swiss courts would be prepared to go in relation to a defendant resident outside Switzerland, we would not be seeking to remedy any perceived deficiency in Swiss law, but rather to supplement the jurisdiction of the Swiss courts in accordance with article 24 and principles which are internationally accepted.

*In other areas of law, such as cross-border insolvency, commercial necessity has encouraged national courts to provide assistance to each other without waiting for such co-operation to be sanctioned by international convention. International fraud requires a similar response. It is becoming widely accepted that comity between the courts of different countries requires mutual respect for the territorial integrity of each other's jurisdiction, but that this should not inhibit a court in one jurisdiction from rendering whatever assistance it properly can to a court in another in respect of assets located or persons resident within the territory of the former.*

*In the present case it is the disclosure order which is the most valuable part of the relief granted by the judge. Without it C.S.F.T. would be unable to apply to the local courts for effective orders against assets abroad.* Mr. Cuoghi makes much of the fact that the order extends to assets in Switzerland, and submits that this is an unwarranted interference with the jurisdiction of the court trying the substantive dispute. The short answer to this is that the terms of the order will not allow it to be directly enforced in Switzerland without an order of the Swiss courts. We do not seek to force our co-operation on those who do not welcome it." [Emphasis supplied.]

28  Millett, L.J. continued (*ibid.*, at 829):

"The question for consideration is not whether the circumstances are exceptional or very exceptional, but whether it would be inexpedient to make the order. *Where an application is made for in personam relief in ancillary proceedings, two considerations which are highly material are the place where the person sought to be enjoined is domiciled and the likely reaction of the court which is seised of the substantive dispute.* Where a similar order has been applied for and has been refused by that court, it would generally be wrong for us to interfere. But where the other court lacks jurisdiction to make an effective order against a defendant because he is resident in England, it does not at all follow that it would find our order objectionable.

Mr. Cuoghi is resident and domiciled in England. He carries on business here in a substantial way, and he is alleged to have committed acts in England which were part of the fraud. He is believed to have assets in other jurisdictions, but the Swiss court has no power to order him to disclose their whereabouts. *Unless we make*

2015 (1) CILR 464

*such an order, C.S.F.T. cannot apply to the courts where the assets are located for appropriate protective measures, and any final judgment obtained in Switzerland may be rendered ineffective.*" [Emphasis supplied.]

29   In a concurring judgment, Lord Bingham, C.J. observed (*ibid.*, at 831):

"It would be unwise to attempt to list all the considerations which might be held to make the grant of relief under section 25 inexpedient or expedient, whether on a municipal or a worldwide basis. *But it would obviously weigh heavily, probably conclusively, against the grant of interim relief if such grant would obstruct or hamper the management of the case by the court seized of the substantive proceedings ('the primary court'), or give rise to a risk of conflicting, inconsistent or overlapping orders in other courts. It may weigh against the grant of relief by this court that the primary court could have granted such relief and has not done so, particularly if the primary court has been asked to grant such relief and declined.* On the other hand, *it may be thought to weigh in favour of granting such relief that a defendant is present in this country and so liable to effective enforcement of an order made in personam, always provided that by granting such relief this court does not tread on the toes of the primary court or any other court involved in the case. On any application under section 25 this court must recognise that its role is subordinate to and must be supportive of that of the primary court.*" [Emphasis supplied.]

30   Further informative passages appeared in the judgments in *Refco Inc.* v. *Eastern Trading Co.* (24). With reference to *Cuoghi* (9), Morritt, L.J. observed ([1999] 1 Lloyd's Rep. at 170–171):

"For present purposes it is sufficient to point out that it was implicit in all the judgments that the approach of the Court in this country to an application for interim relief under s.25 is to consider first if the facts would warrant the relief sought if the substantive proceedings were brought in England. If the answer to that question is in the affirmative then the second question arises, whether, in the terms of s.25(2), the fact that the Court has no jurisdiction apart from the section makes it inexpedient to grant the interim relief sought."

31   With reference to Lord Bingham's observation in *Cuoghi* that it may weigh against the grant of relief that the primary court could have granted relief but declined, Morritt, L.J. held (*ibid.*, at 173):

"... [W]here, as here and as Mr. Justice Rix [as he then was] recognized at p.8 of the second judgment, the principles are substantially different *I do not see why it should make a difference that the*

2015 (1) CILR 465

*foreign Court has jurisdiction but is, in principle, unable to exercise it as opposed to a case where it has no jurisdiction at all.* In the latter case both the Lord Chief Justice and Lord Justice Millett recognized that the Court in England is not limited to exercising the jurisdiction available to the foreign Court. In the former case they both recognized that the refusal of the foreign Court might preclude the grant of relief by the Court in England but *neither of them considered that it would*.

It seems to me that in both cases the question must be, if the relief is otherwise appropriate for this Court to grant, whether to grant it would be inexpedient within s.25(2)." [Emphasis supplied.]

32   In a similar vein, Potter, L.J. said (*ibid.*):

"I do not read the remarks of Lord Justice Millett or of the Lord Chief Justice in *Cuoghi* ... as indicating that it is inevitable that ancillary relief under s.25 will be refused whenever an earlier application has been made and refused in the primary Court, or when for some reason the plaintiff has had, but has not exercised, the opportunity to apply to that court for *Mareva*-type relief. In the latter case, there may well be some legitimate tactical reason (other than fear of failure) for first seeking such relief in the jurisdiction where the defendant's assets are known to be located. The remedy is, after all, designed to prevent deliberate disposal or disbursement of the defendant's assets beyond the reach of the plaintiff should he obtain judgment."

33   In *Ryan* v. *Friction Dynamics Ltd.* (25), Neuberger, J. (as he then was), having referred to some of the earlier authorities, sought to distill the principles which the court should apply when asked to grant relief under s.25 of the English Act. He held ([2001] C.P. Rep. at 86–87):

"In my judgment, in light of the guidance from the authorities and sensible practice, the following general principles apply when the court is asked to examine its jurisdiction under section 25.

1. The court should always exercise caution before granting any freezing order. The decision and observation of the US Supreme Court in the Grupo Mexicano case emphasises the potentially draconian nature of a freezing order in personam, but, before the court has ruled definitively on the parties' rights, it can be said that such an order is obviously potentially harsh, even when it is made on a proprietary basis.

2. As Millett L.J. indicated in *Cuoghi*, particular caution is appropriate where a freezing order is sought under section 25. The fact that the primary forum for the litigation is abroad means that this court is

2015 (1) CILR 466

likely to be even less fully appraised of all the facts than in a case where it is exercising primary jurisdiction . . .

3. However, factors such as comity and the need to stop international fraud mean that *this court should not be timid about granting an injunction under section 25, if satisfied that good grounds exist. It should be remembered, as pointed out in Cuoghi, that section 25(2) indicates that an order should be made unless it is 'inexpedient' to do so.*

4. *Just as when exercising its primary jurisdiction to grant a freezing order, the court should not make such an order under section 25 unless the basic requirements are satisfied, namely that the claimant has a good arguable case and there is a real risk of dissipation.* See *Refco* at p.164 per Rix J., and at p.171 per Morritt L.J.

5. Where a foreign court has refused to grant a freezing order then this court should be slow to grant a freezing order. However, as is clear from the majority view in *Refco*, it *may be appropriate nonetheless for this court to grant a freezing order under s.25*: see per Morritt L.J. at 173 and Potter L.J. at 174.

6. The fact that there is a worldwide freezing order granted by the principal foreign court does not prevent this court from granting a freezing order, at least in relation to British assets *and/or against defendants resident and domiciled within the jurisdiction.* As Mr. Smith points out, to hold otherwise would be inconsistent with the practice of this court. Worldwide freezing orders are frequently granted by this court, as the primary court, on terms which specifically envisage that the claimant will apply for freezing orders in the courts of the Channel Islands, or the Isle of Man, or Gibraltar in respect of assets within their jurisdiction. Further, to hold otherwise would involve implying an absolute fetter on *a statutory jurisdiction which on its face appears to be intended to give a wide and flexible discretion.*

7. However, before such an overlapping freezing order is made under s.25 the court should expect to be given cogent reasons to justify it. *Overlapping orders mean overlapping applications, which in turn result in substantial increased costs and court time . . .*

*Furthermore, overlapping injunctions in different jurisdictions can lead to a risk of double jeopardy for defendants and the opportunity for forum shopping by a claimant . . .*

8. Where it is appropriate to grant a freezing order under s.25 in respect of British assets, and the order overlaps with a worldwide or similar freezing order of the foreign court with primary jurisdiction, it is sensible to have some indication as to which court is to have the

2015 (1) CILR 467

primary role for enforcing the overlapping injunctions. This would at least substantially reduce the risk of double jeopardy and forum shopping. In general, I would have thought that, save where there is good reason to the contrary, it should be the foreign court to which such applications should normally be made.

9. Where an overlapping order is made under s.25, it is in general desirable that it should track the terms of the order made by the foreign court. Any inconsistency could lead to uncertainty and extra

complications for a defendant, which would be unfair. Worse, it could in some cases lead to a position where a defendant finds itself bound to be in breach of one order or the other. I derive support for this view from a decision of Jacob J., *The State of Brunei Darussalam* v. *Prince Jefri Bolkiah* (unreported) 20th March 2000, to which I will refer in more detail below. I should add that, of course, there may be good reasons in a particular case why an order made under s.25 should be in different terms from the order made by the primary court."

34  Later English decisions have restated the test for relief under the English provision. Thus, in *ETI Euro Telecom Intl. NV* v. *Bolivia (Republic)* (12), Lawrence Collins, L.J. said ([2009] 1 W.L.R. 665, at para. 72) that there was a two-stage test, and that—

"the first stage was to consider whether the English court would grant interim relief if the substantive proceedings were in fact being conducted in England. The second was whether the fact those substantive proceedings were abroad made it inexpedient for the purposes of section 25(2) to grant the relief."

35  Later, he observed (*ibid.*, at para. 101), with reference to an earlier decision:

". . . [A]mong the considerations which had to be borne in mind in relation to the question whether it was inexpedient to make an order under [the] section were (adapting the language to a case such as the present) (1) whether the making of the order would interfere with the management of the case in the foreign tribunal; (2) whether it was the policy of the foreign tribunal not itself to make orders of the type sought in England; and (3) whether, in a case where jurisdiction was resisted and disobedience was to be expected, the court would be making an order which it could not enforce."

36  In *Mediterranean Shipping Co.* v. *OMG Intl. Ltd.* (19), Walker, J., granted a worldwide freezing order against a Chinese corporate defendant, Ningbo, who did not have a significant presence in the United Kingdom, but in relation to which he found there was strong evidence that it was

---

2015 (1) CILR 468

involved in an international conspiracy. He observed ([2008] EWHC 2150 (Comm), at para. 4):

"If Ningbo had been a company incorporated in this country or with a significant presence in this country, I would have had no hesitation in granting the worldwide freezing order that is sought. That is because the material that has been put before me shows cogent evidence of fraud on the part of Ningbo. It is fraud with an international character and which, subject to the points that I shall mention shortly, would clearly, in my view, warrant a worldwide freezing order. Ningbo, however, is not a company incorporated in this country, nor is it a company with any significant presence here."

**Drawing the principles together from the cases**

37  Returning to s.11A, in my view the gateway test in s.11A(1) has been met: proceedings have been commenced in a court outside the Islands (*viz.* the Hong Kong proceedings), and they could give rise to a judgment enforceable in the Cayman Islands "under any Law or the common law." As against Hospitals, apart from the claim to proprietary relief, amongst the reliefs sought are claims for damages which could be enforced at common law by Classroom suing on the judgment. As against Healthcare, whilst no proprietary claims are (currently) made, the writ seeks damages for unlawful means conspiracy. Thus, both claims could result in money judgments which could be enforced at common law.

38  As to whether it would be "unjust or inconvenient" to grant the relief, I accept that even if this limiting factor on the court's jurisdiction could be regarded as possibly broader than the "inexpedient" test in the English provision, nothing turns on any such distinction on the facts of the present case: the interests of comity suggest to my mind that it is altogether expedient, just and convenient that relief should be granted in this case. And far from there being concerns about overlapping orders here and in Hong Kong, or about "double jeopardy" or "forum shopping" (see *per* Neuberger, J. in *Ryan* v. *Friction Dynamics* (25)), the Hong Kong court has expressly given its approval to this application being brought here.

39  Invoking the guidance from the English authorities, Mr. Levy submitted that this court should be willing to grant relief, even though its role is ancillary (see *Cuoghi* (9)), and it should not be "timid" (see *Friction Dynamics*). I accept that the granting of relief, particularly in a fraud case, with entities incorporated in different continents, is very much a part of comity in today's world.

40   I also accept that the fact that the defendants are Cayman companies over whom this court has personal jurisdiction means that this court is not exercising an exorbitant jurisdiction, and to consider it exorbitant merely because the main proceedings are in Hong Kong would be contrary to the

policy underlying s.11A—namely, to aid foreign proceedings (which policy is expressly referred to in s.11A(6)). Indeed, the fact that the defendants are Cayman companies renders it "most appropriate that protective measures should be granted by those courts best able to make their orders effective," *i.e.* here the Cayman court—see *Cuoghi*.

41   Also, the fact that Hospitals' and Healthcare's assets may be said not to be in Cayman is nothing to the point. As Millett, L.J. pointed out in *Cuoghi*, where disclosure is needed, that is most appropriately requested from the court of a defendant's home jurisdiction. Moreover, as Millett, L.J. also observed in *Cuoghi*, disclosure can be the most valuable part of the relief sought in the home jurisdiction, without disclosure an applicant may not be able to apply to local courts for effective orders against assets abroad. That is obviously all the more important in relation to proprietary claims (*viz.* Classroom's claim against Hospitals).

42   Further, the fact that relief was not obtained in Hong Kong as against Hospitals and Healthcare (but against others), is again nothing to the point. Had Classroom sought relief there, and been refused, that would have been a material consideration, but as Lord Bingham, C.J. observed in *Cuoghi*, even if the foreign court had refused relief, the fact that the defendant is present in its home jurisdiction might nonetheless weigh in favour of granting relief there. Further, in *Refco* (24), Morritt, L.J. was by no means certain that earlier *dicta* necessarily meant that the home court would be precluded from granting relief where the foreign court had not exercised a jurisdiction to grant relief. Likewise, in *Refco*, Potter, L.J. did not consider that earlier cases had decided that even a refusal of relief in the foreign court would necessarily mean that the home court should not grant it. Finally, in *Friction Dynamics* (25), Neuberger, J. considered it could well be appropriate to grant relief even where a foreign court had actually refused it.

43   In any event, Classroom did not apply for relief against Hospitals and Healthcare in Hong Kong (but against other defendants) and so that leaves this court with a free hand to determine whether relief is appropriate.

44   On the basis that I should apply the same test as if considering the grant of domestic injunctive relief, by exercise of the primary jurisdiction (*per* Morritt, L.J. in *Refco*), I accept that this is an appropriate case to grant relief under s.11A. Like Li, J. in the Hong Kong proceedings, I accept that the evidence discloses a very disturbing state of affairs whereby a vast sum of money was paid into the Hospitals structure and appears to have been misapplied, in breach of contract and trust. The writ in Hong Kong shows that allegations, *inter alia*, of fraudulent misrepresentation (against Hospitals) and unlawful means conspiracy (against both Hospitals and Healthcare) are made. This is a serious case and this court

will not be timid in exercising its jurisdiction in aid of, and so as to facilitate, the proceedings in Hong Kong.

**The relief sought**

(i) *Hospitals*

45   The order proposed is, in terms, a worldwide freezing order against both defendants.

46   I had to be satisfied that this, and the other relief sought, would be of the kind I would grant had the alleged fraud been committed in this jurisdiction.

47   As the writ in Hong Kong shows, the claim against Hospitals is, in part, a proprietary claim. Accordingly, so far as the injunction is sought in support of a proprietary claim, the courts have never hesitated to use the strongest powers to protect and preserve assets pending claims as to true ownership (see *Mediterranea Raffineria Siciliana Petroli S.A.* v. *Mabanaft GmbH* (18), *per* Templeman, L.J., cited by Lord Denning, M.R. in *Bankers Trust Co.* v. *Shapira* (6) ([1980] 1 W.L.R. at 1280–1281); as to the wider powers of a court where there is a proprietary or tracing claim, see *Republic of Haiti* v. *Duvalier* (14) ([1990] 1 Q.B. at 214 (*per* Staughton, L.J.))).

48   In *Haiti*, Staughton, L.J. stated, as regards the grant of worldwide injunctive relief (*ibid.*, at 213 –214):

"It may be that the powers of the court are wider, and certainly discretion is more readily exercised, if a plaintiff's claim is what is called a tracing claim. For my part, I think that the true distinction lies between a proprietary claim on the one hand, and a claim which seeks only a money judgment on the other. A proprietary claim is one by which the plaintiff seeks the return of chattels or land which are his property, or claims that a specified debt is owed by a third party to him and not to the defendant . . . A plaintiff who seeks to enforce a claim of that kind will more readily be afforded interim remedies, in order to preserve the asset which he is seeking to recover, than one who merely seeks a judgment for debt or damages."

49   Here, Classroom asserts a proprietary claim, *inter alia*, over the shareholding or other ownership interests or entitlements that the defendants have in HK Dongjun Hospitals Investment and Management Ltd. and Maple Beauty Ltd., the subsidiary entities used by Dr. Hu in his parallel structures under the defendants to acquire the new hospitals by use of the bulk of the subscription monies.

50   So far as the proprietary interlocutory injunction is concerned, I accepted Mr. Levy's submission that when considering whether to exercise its discretion to make an order the court applies the well-known principles in *American Cyanamid* v. *Ethicon Ltd.* (4) (see in this connection *Polly Peck Intl. plc* v. *Nadir (No. 2)* (23) ([1992] 4 All E.R. at 784 (*per* Scott, L.J.) and 787 (*per* Lord Donaldson, M.R.))).

51   As to the *American Cyanamid* principles, I accepted that Classroom plainly has an arguable proprietary case—it paid over US$175m. pursuant to a contract which required that money to be spent in a particular manner. The court is not concerned at this stage whether Classroom is likely to succeed in its claim—see Megarry, V.-C. in *Mothercare Ltd.* v. *Robson Books Ltd.* (20)—but in any event, as the evidence stands at the moment, I accept that Classroom would meet even that test.

52   The next question under *American Cyanamid* is whether any loss to be caused to the defendants by the grant of an interlocutory injunction would be compensable by an award of damages. There is no reason to believe in this case that such loss would not be. Such a claim for damages would probably be premised on a loss of opportunity to operate in a timely and effective manner or sell on the new hospitals.

53   The next limb of the *American Cyanamid* test is whether Classroom itself would be adequately protected by an award of damages and whether the defendants would be likely to meet any award obtained by Classroom so that there is no need for an injunction. If so, the imposition of the injunction may become an excessive remedy. Classroom submitted, and I accept, that damages would not be an adequate remedy. It is Classroom's money that has been allegedly misappropriated and it should be entitled to protect and follow that money. Additionally, the figures involved are very substantial indeed and Classroom is not aware that Hospitals has the financial wherewithal to meet an award of damages that could well be in excess of US$100m.

54   Insofar as the balance of convenience test is concerned, I was satisfied that, in this case, the balance favours the grant of an injunction to maintain the *status quo*.

55   Classroom also seeks disclosure in relation to the proprietary claim. The case law advises that such an order is particularly appropriate in cases where a fund has gone missing, and Classroom will be denied practical justice if it is unable to discover what has become of the fund (see the authorities cited above, and further, the decision in *Cancer Research UK Ltd.* v. *Morris* (8)). The disclosure is directed at identifying precisely what has become of the money that Classroom injected into the Hospitals structure and taking any appropriate steps (subject to the court's permission) to enforce the claim in other jurisdictions, if necessary. It is a

sensible and proportionate measure, described by Millett, L.J. in *Cuoghi* (9), as "the most valuable part of the relief granted by the judge."

56   As King, J. also stated in *Cancer Research* ([2008] EWHC 2678 (QB), at para. 13):

"... [T]here is a legitimate two fold purpose which will be achieved by this order [for disclosure]. First it will aid the claimant to police the injunction in support of its proprietary claim. It will assist the claimant to identify precisely what monies have been obtained from it and for what alleged

purpose and hence aid it to identify 'the applicant's assets' for the purposes of the injunction. Secondly, it will enable the claimant to identify any third party who may now on the claimant's case be in possession of trust property, with a view to obtaining orders against third parties for the purpose of protecting the claimant's rights to the funds. I was referred to the propositions set out in *Gee* at paragraph 22.053 which I accept are applicable in this context. The court has an equitable jurisdiction to safeguard trust assets and to that end to find out what has happened to missing trust funds."

57   This *dictum* is obviously applicable here on the premise, which must be correct, that the assets which represent the US$175m., invested by Classroom but misappropriated, are impressed with a constructive trust in its favour.

(ii) *Healthcare (and non-proprietary claim against Hospitals)*

58   As against Healthcare, the Hong Kong writ claims damages for unlawful means conspiracy. The analysis below (proffered by Mr. Levy and which I accept) therefore addresses this non-proprietary claim against Healthcare and includes the non-proprietary claims against Hospitals.

59   To obtain a personal worldwide freezing order, the court must be satisfied that Classroom has a good arguable case for damages on the merits, that there is a real risk of dissipation of assets, and that there is a reason to believe that the defendant's assets within the jurisdiction may be insufficient to meet the claimant's claims: see *Derby & Co. Ltd.* v. *Weldon (No. 1)* (10), *per* Parker, L.J.

60   As to "good arguable case," in *Ninemia Maritime Corp.* v. *Trave Schiffahrts GmbH & Co. KG, "The Niedersachsen"* (21), Mustill, J. pointed out ([1984] 1 All E.R. at 404) that an applicant for relief need not prove to the judge that it is likely to win at trial: it is sufficient for an applicant to show a case that is "more than barely capable of serious argument, and yet not one which the judge believes to have a better than 50% chance of success." On appeal, Kerr, L.J., giving the judgment of the

---

2015 (1) CILR 473

Court of Appeal, expressly approved Mustill, J.'s decision ([1983] 1 W.L.R. at 1412), and his approach has been adopted by this court in *Donelly* v. *Karess Properties Ltd.* (11), *per* Harre, C.J. Mr. Levy for Classroom submits, and I accept, that its claim easily passes the "good arguable case" threshold.

61   As regards the risk of dissipation, as Kerr, L.J. said in *The Niedersachsen*, the test is whether, on the whole of the evidence before it, the court is of the view that the refusal of a freezing order would involve a real risk that a judgment or award in favour of the plaintiff would remain unsatisfied. It is submitted, and I accept, that the evidence in this case shows there is a real risk that the defendants, unless restrained, would take steps to put their assets beyond Classroom's reach. This is a case involving the alleged wholesale disregard for clear contractual obligations and the creation of multiple sets of documents for transactions which were not disclosed to Classroom during its due diligence but which have only "dripped out" piecemeal. There are credible claims for unlawful means conspiracy and dishonest assistance in breach of trust. The risk of dissipation, I accept, is sufficiently substantial to meet the test laid down in the case law. I elaborate as follows.

**Risk of dissipation**

62   The evidence strongly suggests that Hospitals made fraudulent misrepresentations that induced Classroom to enter into the 2014 transactions and pay over US$175m. Given the likely presence of fraud, it is unnecessary for there to be any further specific evidence on risk of dissipation for the court to be entitled to take the view that there is a sufficient risk to justify granting relief: see *e.g. Gee on Commercial Injunctions*, 5th ed., at para. 12.040 (2004), and the many cases cited there.

63   This court is also well aware of the following general principles to be applied in dealing with the question of risk of dissipation:

   (a) The applicant must demonstrate a real risk that the respondent will engage in activities outside of the usual and ordinary course of its business which will have the effect of dissipating its assets and making it more likely that a judgment in favour of the plaintiff would go unsatisfied: *J.P. Morgan Multi-Strategy Fund L.P.* v. *Macro Fund Ltd.* (16) (2002 CILR 569, at para. 14). Pausing here, I simply observe that it cannot seriously be suggested that dealing with assets (the shares in the underlying companies or other liquid assets representing the subscription monies) in a manner inconsistent with the way they were meant to be dealt with under a contract negotiated at arm's length would be dealing "in the ordinary course of business";

(b) The applicant must adduce solid evidence of a real risk of the judgment remaining unsatisfied unless the defendant is prevented from

dealing with his assets within the jurisdiction: *Bank of Nova Scotia* v. *Emerald Seas Ltd.* (5) (1984–85 CILR 180, at para. 35). While this requirement may be entirely appropriate in a purely domestic *Mareva*-type situation, as Mr. Levy submits, the notion of allowing a defendant access to its "assets within the jurisdiction" has to yield somewhat in a case where assets are held through a chain of entities across the globe, so that no one court would have jurisdiction over the defendant in the place where the relief is sought. In such a situation, there is the real risk of a legal void developing, where the court of the defendant's home territory (as in the case of Hospitals and Healthcare) has personal jurisdiction, but the court (or courts) where the assets are physically located does (or do) not.

(c) "Solid evidence," moreover, must be judged on a case-by-case basis. It may be possible to infer risk of dissipation from the surrounding circumstances, but it is impossible to lay down any general guidelines. The court must investigate not only the plaintiff's evidence but also the merits of a defendant's evidence presented in opposition: *Ahmad Hamad Algosaibi & Bros. Co.* v. *Saad Invs. Co. Ltd.* (3) (2011 (1) CILR 178, at para. 69). As the Court of Appeal's decision in *Ahmad* explains (*ibid.*, at para. 70), the court ordinarily requires evidence to show—

"(a) that there was reason to suppose that the defendant has some assets which (absent [injunctive] relief) were at risk of dissipation; or (b) that there was a real prospect that assets would be transferred to, or otherwise be acquired by, that defendant in the future which (i) would then become available to satisfy a judgment (whether against that, or some other, defendant), and (ii) would (absent *Mareva* relief) be at risk of dissipation while held by that defendant. In addressing the question whether there was a real prospect that assets would be transferred to a defendant in the future, the court needs to have in mind that—if it were to grant *Mareva* relief at a time when that defendant had no assets—the relevant question is whether there is a real prospect that assets would be transferred to a defendant who was already the subject of a freezing order."

(d) A strong emphasis is placed on the need to show a belief in the risk of removal of assets from the jurisdiction; however, risk may be more readily inferred where the defendant is a holding company without any substantial physical presence or operations within the jurisdiction. Furthermore, it is submitted, and I accept, that this requirement has to yield somewhat in cases where assets are held by a Cayman entity through a string of subsidiaries across the globe.

64  In any event, there is cogent evidence that Dr. Hu, who is the ultimate majority owner and controller of both the Hospitals Group and the Healthcare Group, has himself engaged, and as the controller of Hospitals and Healthcare, caused them to engage, in practices which are, putting it

at its lowest, commercially sharp. In fact, the endorsement on the Hong Kong writ accuses numerous of the defendants of fraudulent misrepresentation.

65  Classroom argued:

(a) Hospitals made fraudulent misrepresentations as to the intended application of the subscription monies—I note, for example, how it is put in the skeleton argument in support of the Hong Kong order;

(b) Dr. Hu, the person who is Hospitals' ultimate controller, it is alleged, continued to make misleading, if not outright dishonest, statements after the January 2014 transactions were entered into. For instance, by email sent on May 8th, 2014, Dr. Hu informed OTPP that "the official title/ownership of Puyang Hospital [one of the new hospitals] is changed to Beijing Dongjun [a company within the Hospitals structure] as of yesterday." This statement, however, is flatly contradicted by Puyang Hospital's articles of association dated March 27th, 2014, showing BJ WSTP [a company within the Healthcare structure] as its owner. This set of articles was circulated by Healthcare (which is ultimately controlled by Dr. Hu) along with its March 16th, 2015 response.

(c) Dr. Hu, Hospitals and Healthcare are said to have provided information and documents to Classroom only in a piecemeal manner. A number of examples of this behaviour were cited in support by Mr. Levy in his written submissions.

(d) The information and documentation supplied by Dr. Hu, Hospitals and Healthcare in the said piecemeal manner are said to give rise to more questions than answers. Here, too, a number of examples are cited.

(e) Fifth, there are legitimate concerns that Hospitals and Healthcare have fabricated documents to suit their needs. Here, too, a number of instances are cited.

66   In the circumstances, there is a real risk, says Mr. Levy, that the parties to the Hong Kong proceedings (being associates of or controlled by Dr. Hu) would have dissipated their assets had they received notice of the application for relief there before it was made. However, admittedly, now that Dr. Hu has notice of the Hong Kong proceedings (through his various defendant companies) he will be on notice that Classroom also intended to apply for relief in this jurisdiction. In the peculiar circumstances, this was practically unavoidable but does not diminish the need for protective orders.

67   I accept that it was obviously appropriate for Classroom to wait and see what course the Hong Kong court would take before troubling this court. Further, as the defendants' reputed assets are shares in the underlying entities, these could obviously be transferred in an instant (as could

any cash they might still have), which was a further reason for giving minimal formal notice of this application to the defendants, a point which I specifically address further below.

## Orders for disclosure

68   The disclosure obligations in the proposed *Mareva* order (as in the proprietary injunctive order) are also vitally important aspects of a freezing order. Disclosure has long been a standard feature of freezing orders (see, for example, Goff, J. in *A* v. *C* (1) ([1981] Q.B. at 959–960), *A.J. Bekhor & Co. Ltd.* v. *Bilton* (2), Millett, L.J.'s observations in *Cuoghi* (9), and King, J.'s observations in *Cancer Research* (8) ([2008] EWHC 2678 (QB), at para. 13)).

69   I accept that it is the imposition of disclosure obligations which really makes the order effective, enabling the plaintiff to see, and if necessary take steps to protect (with the court's permission (again if necessary)) the assets claimed. As Goff, J. observed in *A* v. *C* ([1981] Q.B., at 959–960), "without information about the state of each account it is difficult, if not impossible, to operate the *Mareva* jurisdiction properly . . ."

70   That principle was reflected in *Ahmad Hamad Algosaibi & Bros. Co.* v. *Saad Invs. Co. Ltd.* (3) (2010 (1) CILR 553, at para. 116), where this court observed that disclosure orders ordinarily followed freezing orders as the purpose was to police the injunction, although the power to order disclosure in that context was not to be confused with the court's general and wider power to compel disclosure as part of the ordinary duty of parties to civil litigation.

71   The draft proposed order contains a number of questions which it is proposed that each of Hospitals and Healthcare should answer. Whilst there are quite a few questions, I accepted that these are questions which should be readily capable of being answered, and confirmed in sworn evidence in the usual way.

## Classroom's duty of full and frank disclosure

### Delay

72   Notwithstanding the statutory footing on which my jurisdiction stands, as an injunction is an equitable remedy, unexplained, inordinate delay can be fatal to an application for an interlocutory injunction. Thus, it could be argued that as Classroom first became aware of the existence of Healthcare and the acquisition of Puyang Hospital by BJ WSTP (instead of Beijing Dongjun) in late October 2014, there has been inordinate delay in seeking interlocutory injunctive relief.

73   However, it is settled, and I accept, that delay *per se* is not a bar to interlocutory injunctive relief. Rather, as Megarry, J. held in *Legg* v. *Inner London Educ. Auth.* (17) ([1972] 1 W.L.R. at 1259–1260): "What seems to me important is not so much the length of the delay per se, but whether the delay has in some ways made it unjust to grant the injunctions claimed."

74   In the present case, Mr. Levy submitted that delay arises from (i) the 30-day consultation period during which Classroom was obliged under the SPA to enter into good faith negotiations with its

contractual counterparties; and (ii) Classroom's good faith attempt to resolve the dispute with Dr. Hu, Hospitals and Healthcare after the said 30-day period. Thus, over the period between October 27th, 2014 and April 2015:

(a) Classroom had numerous meetings and conference calls with Dr. Hu, Hospitals, Healthcare, lawyers and professional accountants to explore possible ways to resolve the dispute, and/or to restructure the Hospitals Group and the Healthcare Group.

(b) Classroom sent multiple requests to Dr. Hu, Hospitals and Healthcare for information and documents, which resulted in various responses given by them and Skadden, Arps, Slate, Meagher & Flom (their firm of attorneys).

(c) Classroom requested Dr. Hu, Hospitals and Healthcare to execute a deed of undertaking to preserve the assets pending the parties' discussions, only to have the request flatly rejected.

(d) Classroom thoroughly considered a settlement proposal dated December 23rd, 2014, made by Dr. Hu, retaining and instructing (i) KPMG to analyse the tax implications of the proposed restructure and (ii) Kirkland & Ellis to draft the draft restructuring documents.

(e) It was only when the parties reached an impasse in mid-April 2015 that Classroom decided to explore the option of legal proceedings.

75  Mr. Levy submits that no blame could be laid at Classroom's doorstep for taking 6 months to engage in good faith discussions with Dr. Hu, Hospitals and Healthcare. That is because:

(a) The amount at stake is substantial, being at least US$175m.

(b) It appeared that, upon restructuring, Hospitals Group would effectively be transposed to Healthcare Group, with Classroom receiving a 19.77% stake in Healthcare Group. Provided that Classroom's rights and interests could be adequately protected during negotiations and after the restructuring, it was commercially sensible for Classroom to negotiate with Dr. Hu, Hospitals and Healthcare instead of immediately commencing legal proceedings.

---

2015 (1) CILR 478

(c) The negotiations were protracted partly because Dr. Hu, Hospitals and Healthcare provided information and documents in a piecemeal manner, and such information often contradicted information previously supplied, thus giving rise to further concerns on the part of Classroom.

76  "Delay" resulting from negotiations has previously been excused by the courts. Thus, in *CPC (United Kingdom) Ltd.* v. *Keenan* (7), Peter Gibson, J. exonerated a plaintiff who had spent some months seeking to negotiate an amicable solution. Applying Megarry, J.'s *dictum* from *Legg* (17), he held that the test was not so much related to the length of the delay, but rather whether such delay made it unjust to grant relief.

77  I was satisfied that despite the delay, the grant of injunctive relief in the present case remained appropriate.

*Is there justification for an ex parte application on short notice?*

78  This application is moved *ex parte* on short notice. The application in Hong Kong was made *ex parte*, and the court there, having granted relief, was plainly satisfied that it was appropriate to move in that way. The reason for moving without notice was explained in the skeleton argument before the Hong Kong court. In short, it was for fear of steps being taken to render any injunction nugatory. Whilst as a result of the Hong Kong injunctions the defendants to the Cayman proceedings will have had notice of the litigation and claims made (Classroom having been obliged to disclose the fact of the pending Cayman application during the application for the Hong Kong injunction), nonetheless, it was considered expedient that Classroom should be protected as soon as possible, and that that is consistent with the Cayman court acting to facilitate the Hong Kong proceedings.

79  I accepted this proposition.

*No clear assets within the jurisdiction*

80  I adverted above to Classroom's "legal void" argument. To the extent that the defendants do not have assets within Cayman (and it is not known for sure that they do not have assets here) then the presence of assets there should not be a necessary prerequisite of worldwide relief. Both are Cayman companies. If the ability to demonstrate assets in Cayman were a fundamental requirement of relief, then observations in the case law discussed above, regarding the importance of the "home" court

ordering disclosure, would be misplaced. The jurisdiction is to be exercised *in personam*. Furthermore, without the exercise of that jurisdiction by the home court, there would be a danger of the court sitting where the assets were situated not being empowered to grant relief for lack of disclosure, with the result that a plaintiff with a good claim would possibly have to sit idly by whilst assets were dissipated (regardless of whether its claim was

proprietary or not), so that any judgment could become nugatory. While on the evidence it is shown that the defendants are likely to hold assets, being the aforesaid shares in HK Dongjun Hospitals and Maple Beauty (and probably cash balances in a bank account in Hong Kong), there is a demonstrated basis for the grant of worldwide injunctive relief.

*Potential defences and arguments*

81   By way of its duty of full and frank disclosure, Classroom must also reveal such potential defences available to the defendants of which it might be aware.

82   Mr. Levy acknowledged that the defendants might argue that there is insufficient evidence to support Classroom's causes of action in fraudulent misrepresentation, breach of contract and conspiracy. In particular, it might be said that fraud is a serious allegation and there is simply no cogent evidence to support such an allegation.

83   Similarly, the defendants may argue that Classroom is not entitled to rescind the SPA and the shareholders' agreement (parts of the 2014 transaction documents) because Classroom has affirmed the contracts and/or because there has been unreasonable delay.

84   As against that, Classroom submits that at the interlocutory stage, this court does not resolve factual disputes or difficult questions of law. The threshold of "serious issue to be tried" (which applies to the application for proprietary injunction) is not very high. For the reasons set out in the evidence, it is submitted, and I accept, that there is, at the very least, a good arguable case in respect of Classroom's respective causes of action.

*The negotiations*

85   Mr. Levy also recognized that the defendants might also argue that the parties were in settlement negotiations following Classroom's discovery of the existence of the Healthcare Group and issuance of the breach notice on November 3rd, 2014. Accordingly, Classroom should not rely for the purposes of these applications on any materials discussed or circulated between the parties thereafter. However, it is arguable that the parties' discussions after the breach notice was sent did not constitute settlement negotiations so as to render the contents discussed privileged under the "without prejudice" rule. For instance, I am told that Dr. Hu, Hospitals Group and Healthcare Group never admitted any liability, contractual or otherwise. It therefore appears that they genuinely treated the discussions as commercial negotiations to "restructure" the Hospitals Group. Thus, the restructuring memos are titled "reorganization memo" or "restructuring memorandum" and are not marked "without prejudice."

86   In any event, Classroom relies on the evidence of such discussions to explain its delay in making this application for injunctive relief. This, at least arguably, falls within one of the exceptions to the application of without prejudice privilege: see *e.g.* Thanki, ed., *The Law of Privilege*, 2nd ed., at paras. 7.29–7.38 (2011), discussing the leading judgment of Walker, L.J. (as he then was) in *Unilever plc* v. *Procter & Gamble Co.* (27) ([2000] 1 W.L.R. at 2444–2445). Further, given Classroom's duty to make full and frank disclosure in this application, Classroom, arguably, lies under an obligation to disclose the *inter partes* correspondence and, in particular, the deed of undertaking (propounded in the negotiations) which may affect this court's assessment of the need for secrecy in this application and the risk of dissipation of the relevant defendant's assets: see *e.g. Pearson Educ. Ltd.* v. *Prentice Hall India PTE Ltd.* (22) ([2006] F.S.R. 8, at para. 35, *per* Crane, J.), where it was held, *inter alia*, that the label "without prejudice" was not by itself conclusive of whether a document should be disclosed in fulfilment of the duty to make full and fair disclosure to the court. If the document was plausibly issued in the context of negotiations, that fact by itself could operate to protect it from disclosure. But, even where labelled "without prejudice," the situation in which the duty of full and fair disclosure might require its disclosure to the court was an additional instance of the types of situations where the "without prejudice" rule did

not prevent the admission into evidence of what one or both parties said or wrote (citing *inter alia*, *Unilever plc*).

*Arbitration clause*

87   The 2014 transaction documents contain arbitration clauses which provide that "any party may in its sole discretion elect to submit the matter to arbitration." The use of the permissive word "may" as opposed to the mandatory word "shall," arguably indicates that arbitration is not mandatory and the parties may resort to court proceedings in the event of dispute: see *e.g. Hannice Indus. Ltd.* v. *Elite Union (Hong Kong) Ltd.* (15) ([2012] HKCFI 413, at paras. 13–20, *per* Burrell, J.) construing a share transfer agreement which, like the 2014 transaction documents, was governed by Hong Kong law.

88   I am informed that, in any event, no party in this matter has called for arbitration.

89   With the foregoing factors in mind, I accept that Classroom has met its duty of full and frank disclosure sufficient for the purposes of its present application for injunctive relief.

*Undertaking in damages*

90   As the evidence discloses, and as Mr. Levy submits, Classroom is aware of the obligation to give the usual undertaking in damages, and is

---

2015 (1) CILR 481

content to give the usual undertaking. But it is submitted that this is not an appropriate case to require the undertaking to be fortified by a payment in or guarantee, and this is a proposition that I also accept. Whilst Classroom is established in Ontario as a special purpose vehicle, it does have assets within this jurisdiction, *viz.* its not insubstantial acknowledged shareholding in Hospitals. Even if that has been rendered valueless as a result of the matters complained of in the Hong Kong proceedings, it is submitted that I should remember that Classroom is a subsidiary of OTPP, a pension fund of the utmost renown, and the notion that it would permit a subsidiary not to meet any claim on the undertaking in damages is highly improbable.

91   Given the narrow nature of the risk of loss to the defendants as discussed above, and the likelihood that any such loss would be recoverable by action and enforceable against Classroom, I accepted that an unfortified undertaking in damages from OTPP as its principal, is acceptable.

**Conclusion**

92   For the reasons set out herein and in the evidence tendered in support, I granted the various reliefs set out in the order under s.11A, in aid of the proceedings in Hong Kong.

93   I acknowledge with appreciation, the very helpful and comprehensive arguments of Mr. Levy, Q.C. and his instructing attorney, Mr. Dunne.

*Injunctions granted.*

Attorneys: *Walkers* for the applicant.