EXHIBIT 10

[1999 CILR 566]

KALLEY (as Trustee of E.B. Trust and P.B. Trust), E. BRAATHEN and P. BRAATHEN v. MANUS and FIVE OTHERS

GRAND COURT (Murphy, J.): December 20th, 1999

*Conflict of Laws—recognition of foreign proceedings—enforcement of judgment debt—not enforcement of foreign penal law if no assertion of foreign sovereignty, proceedings personal in nature, and benefit only private individual—may enforce foreign judgment giving private law remedy based on statutory breach*

*Conflict of Laws—recognition of foreign proceedings—enforcement of judgment debt—no defence that consent judgment against debtor obtained under fear of criminal prosecution, since may not benefit from own wrongdoing*

*Conflict of Laws—recognition of foreign proceedings—enforcement of judgment debt—judgment tainted by fraud—debtor estopped from pleading fraud if consented to judgment—foreign judgment impeachable for fraud only on basis of newly discovered material facts*

The plaintiffs sought to enforce an order of a foreign court against the defendants.

The plaintiffs brought proceedings against the defendants in Florida in relation to illegal dealings in securities. They alleged, *inter alia*, common law fraud, violations of various federal and local statutes, and the breach of an injunctive order made by a New York court in proceedings brought by the US Securities & Exchange Commission against the first defendant. The defendants' applications to strike out the claims were dismissed, and they filed defences. On the alleged advice of their US attorneys that criminal proceedings might be commenced by the Commission for breach of the New York order if they incriminated themselves in the Florida proceedings, the first defendant refused to answer questions, relying on the Fifth Amendment protection, and his wife, the second defendant, relied on the privilege relating to spousal communications. Summary judgment was entered against both defendants. Having been further advised that once a civil judgment against them had been obtained, the prosecuting authorities would not initiate criminal proceedings, neither defendant objected to judgment being entered.

The plaintiffs were unable to enforce judgment against the first and second defendants' US assets which had been placed beyond the reach of

---

1999 CILR 567

creditors. They commenced proceedings in the Grand Court to obtain execution against assets held in the Cayman Islands. The defendants filed defences arguing that the Florida judgment should not be enforced, since they had submitted involuntarily to the jurisdiction of the Florida court and had been compelled to accept judgment against them out of fear of a criminal prosecution of the first defendant. Accordingly, the Florida court had lacked jurisdiction and they had been denied natural justice. Furthermore, the judgment was unenforceable in the Cayman Islands as it was based on the provisions of a foreign penal statute, and when criminal proceedings were contemplated, civil proceedings should be stayed pending their outcome.

The plaintiff applied to have the defendants' defences struck out under the Grand Court Rules, O.18, r.19. The defendants applied to amend their defences to allege fraud by the plaintiffs in making false allegations against them in the US proceedings.

**Held**, giving judgment for the plaintiffs:

(1) The court would strike out, under O.18, r.19(1)(a) of the Grand Court Rules, the defendants' bald assertion that the Florida judgment was unenforceable and its challenge to the Florida court's jurisdiction as disclosing no reasonable defence. The former added nothing to the other parts of the defence, and the latter was without merit. The court also had powers under paras. (b) and (d) to strike out any part of a pleading which it found to be frivolous, vexatious, or otherwise an abuse of process. To be frivolous or vexatious a pleading had to be so frivolous that to put it forward would be an abuse of the court's process. The categories of abuse of process were not closed (page 574, lines 3–25; page 577, lines 17–23).

    (2) Execution in the present circumstances did not amount to enforcement of a foreign penal law, since the US proceedings had involved no assertion of foreign sovereignty, were regarded by all as personal in nature, and benefited only the plaintiffs as private individuals. Penal laws were usually those under which taxes, fines or other penalties were payable to the foreign state and were refused enforcement by the Grand Court on public policy grounds. The rule did not apply to enforcing a judgment obtained in proceedings by an individual alleging statutory breaches giving rise to a private law remedy (page 574, line 38 – page 575, line 22).

    (3) The defendants had not been compelled in any legal sense to accept the jurisdiction of the Florida court or the entering of judgment against them. They had been represented by counsel throughout, had at no stage raised this issue of compulsion, and had not, in fact, faced criminal proceedings of any kind. The logic of consenting to the entering of civil judgment against them in order to avoid future criminal proceedings was doubtful, and if they had genuinely feared prosecution, they could not

---

rely on this as a defence, since that would permit them to benefit from their own wrongdoing. Their allegations of breaches of natural justice relied on the same non-existent threat of criminal prosecution. Even if such proceedings were contemplated, the defendants would not be entitled to an automatic stay of the civil proceedings against them in any event. Under US and Cayman law the defendants were estopped, by having consented to the Florida judgment in full knowledge of all relevant circumstances, from challenging it now on evidentiary or procedural grounds. These parts of the defence would be struck out as an abuse of process (page 575, lines 23–36; page 576, line 30 – page 577, line 16; page 577, line 24 – page 578, line 12).

    (4) The defendants' allegation of fraud amounted to no more than that consenting involuntarily to judgment in Florida had denied them the opportunity to dispute the plaintiffs' claims. That allegation had been answered. Furthermore, since this defence was not pleaded in good faith, it would be an abuse of process for the court to refuse to enforce the Florida judgment on the basis of it. If fraud had been pleaded *ab initio*, it would have been struck out. In any event, a foreign judgment allegedly tainted by fraud on the part of the judgment creditor was impeachable in the Grand Court only on the basis of newly discovered material facts which were not before the foreign court. By contrast, the approach of the English courts was that enforcement could be refused even though the issue of fraud had been raised before and rejected by the foreign court. The defendants would be refused leave to amend their defences (page 578, line 45 – page 579, line 10; page 579, lines 33–43; page 582, line 31 – page 583, line 12; page 583, line 40 – page 584, line 25).

Cases cited:
  (1)  *Abouloff* v. *Oppenheimer & Co.* (1882), 10 Q.B.D. 295; 52 L.J.Q.B. 1, not followed.
  (2)  *Att.-Gen. (Duchy of Lancaster)* v. *London & N.W. Ry. Co.*, [1892] 3 Ch. 274, *dicta* of Lindley, L.J. applied.
  (3)  *Boga* v. *Chamberlen*, [1936] 1 D.L.R. 660; (1936), 9 M.P.R. 565.
  (4)  *de Lasala* v. *de Lasala*, [1980] A.C. 546; [1979] 2 All E.R. 1146.
  (5)  *Hollender* v. *Ffoulkes* (1894), 26 O.R. 61; 16 P.R. 175.
  (6)  *House of Spring Gardens Ltd.* v. *Waite*, [1991] 1 Q.B. 241; [1990] 2 All E.R. 990, applied.
  (7)  *Huntington* v. *Attrill*, [1893] A.C. 150; (1892), 68 L.T. 326.
  (8)  *Jacobs* v. *Beaver* (1908), 17 O.L.R. 496; *sub nom. Jacobs* v. *Beaver Silver Cobalt Mining Co.*, 12 O.W.R. 803, followed.
  (9)  *Jefferson Ltd.* v. *Bhetcha*, [1979] 1 W.L.R. 898; [1979] 2 All E.R. 1108.
 (10)  *Jet Holdings Inc.* v. *Patel*, [1990] 1 Q.B. 335; [1989] 2 All E.R. 648, not followed.
 (11)  *Keele* v. *Findley* (1990), 21 NSWLR 444.
 (12)  *Manolopoulos* v. *Paniffe*, [1930] 2 D.L.R. 169; (1930), 1 M.P.R. 366.

---

 (13)  *Owens Bank Ltd.* v. *Bracco*, [1992] 2 A.C. 443; [1992] 2 All E.R. 193, distinguished.

(14) *Owens Bank Ltd.* v. *Etoile Comm. S.A.*, [1995] 1 W.L.R. 44; [1994] 3 LRC 696, followed.
(15) *Schemmer* v. *Property Resources Ltd.*, [1975] Ch. 273; [1974] 3 All E.R. 451, followed.
(16) *Stutts* v. *Premier Benefit Capital Trust*, 1992–93 CILR 605, followed.
(17) *Svirskis* v. *Gibson*, [1977] 2 NZLR 4, followed.
(18) *Syal* v. *Heyward*, *In re Foreign Judgments (Reciprocal Enforcement) Act, 1933*, [1948] 2 K.B. 443; [1948] 2 All E.R. 576, not followed.
(19) *US* v. *Inkley*, [1989] Q.B. 255; [1988] 3 All E.R. 144, considered.
(20) *Vadala* v. *Lawes* (1890), 25 Q.B.D. 310; 63 L.T. 128, not followed.
(21) *Wentworth* v. *Rogers (No. 5)* (1986), 6 NSWLR 534, followed.
(22) *Woodruff* v. *McLennan* (1887), 14 O.A.R. 242.
(23) *Young* v. *Holloway*, [1895] P. 87; (1894), 64 L.J.P. 55, *dicta* of Jeune, P. applied.

**Legislation construed**:
Grand Court Rules, O.18, r.19(1):
  "The Court may at any stage of the proceedings order to be struck out or amended any pleading … or anything in any pleading … on the ground that—
  …
  (a)  it discloses no reasonable … defence …; or
  (b)  it is scandalous, frivolous or vexatious; or
  …
  (d)  it is otherwise an abuse of the process of the court…."


*D. MacF. Murray* for the plaintiff;
*R.L. Nelson* for the first, second, third and fourth defendants.

　　　　　**MURPHY**, J.: I have before me (a) an application by the first plaintiff, brought by a summons dated September 9th, 1999, seeking to have paras. 2, 3 and 4 of the defence of the first and second defendants struck out, and judgment against them in the sum of US$1,075,000, together with interest
35　　and costs; and (b) a cross-application by the first and second defendants (part of the relief sought in a summons dated October 19th, 1999), for leave to amend their defence by the addition of a lengthy allegation of fraud (together with a corresponding counterclaim).
　　　　　The application and cross-application both relate solely to one part of
40　　the plaintiffs' claim, the debt claim based on US judgments entered on March 13th, 1997 in favour of the first plaintiff against, *inter alia*, the first and second defendants. The US judgments followed from allegations of securities fraud. I will describe the US proceedings briefly later.
　　　　　The first plaintiff ("the plaintiff") seeks to strike out all defences
45　　relating to this portion of the claim (on the basis that no reasonable

---

defence is disclosed and/or that the defences are vexatious and an abuse of process), and to have this court enter judgment accordingly. The first and second defendants ("the defendants") resist that application and seek to buttress their defence by amendment.
5　　　　　I reproduce in their entirety the allegations in the statement of claim with which these applications are concerned:
　　　　　"STATEMENT OF CLAIM BY THE FIRST PLAINTIFF AS AGAINST THE FIRST
　　AND SECOND DEFENDANTS:
　　　　　1. On March 2nd, 1996 the first plaintiff herein commenced

10    proceedings against [*inter alia*] the first defendant, Allen Manus,
      and the second defendant, Elizabeth (Libby) Manus, in the United
      States District Court for the Southern District of Florida, Miami
      Division ('the US District Court') with case No. 96–0780–
      CIV–GRAHAM ('the US action').

15          2. The US District Court was duly constituted and held in
      accordance with the laws of the Southern District of Florida, Miami
      Division and had jurisdiction in that behalf. The first and second
      defendants herein accepted the jurisdiction of the US District Court
      and summary judgment was entered against them.

20          3. On March 13th, 1997, the US District Court gave judgment in
      the US action and ordered that final judgment be entered against
      the first and second defendants in the amount of US$1,075,000
      with interest at the legal rate in force in the Southern District of
      Florida."

25    I similarly reproduce the relevant portions of the defence:
      "Defence of the First and Second Defendants to the claim of the
      First Plaintiff:
            1. Paragraph 1 of the statement of claim is admitted. The first and
      second defendants adopt the plaintiffs' definition of the US action.

30          2. (a) The first sentence of para. 2 is not admitted;
                (b)   The second sentence of para. 2 is denied. The first and
      second defendants did not voluntarily accept the
      jurisdiction of the US District Court for the Southern
      District of Florida but were compelled to accept the entry

35    of summary judgment ('the Florida judgment') against
      them in fear that the first defendant would otherwise face
      criminal prosecution.
            3. Paragraph 3 of the statement of claim is admitted but it is
      denied (if it be alleged) that the Florida judgment is a foreign

40    judgment capable of enforcement by action in Grand Cayman.
            4. The Florida judgment is impeachable on the grounds that it is
      for a sum payable pursuant to a penal statute of the United States
      and the proceedings in which it was obtained were opposed to
      natural justice by reason of the following:

45                (a)   by an order of the US District Court for the Southern

---

1999 CILR 571

      District of New York, dated December 16th, 1981, in a
      proceeding (wholly unrelated to the US action) brought
      under s.10(b) Securities Exchange Act 1934 ('the 1934
      Act') entitled *Securities & Exchange Commn.* v. *Manus*

5     ('the SEC order') the first defendant and others were
      enjoined permanently from using the mails or the means
      and instrumentalities of interstate commerce to cause any
      security to be offered for sale or purchase and were
      required to provide a copy of the SEC order to anyone with

10        whom they dealt in connection with the offer or sale of any
security even if not a registered security or not owned by
them and to notify the SEC of such provision;

        (b)   notwithstanding that the SEC order had been made some
15 years prior to the events at issue, the first plaintiff
15        characterized and founded the US action on the SEC order
and s.10(b) of the 1934 Act in the knowledge that the first
and second defendants would be compelled to allow
judgment to be entered against them in the US action in
fear of criminal prosecution for alleged breach of the SEC
20        order;

        (c)   although the first defendant had good defences on the
merits to the US action, the first defendant was compelled
to accept the entry of the Florida judgment in fear of, and
to minimize the risk to himself of, criminal prosecution for
25        alleged breach of the SEC order;

        (d)   although the second defendant had good defences on the
merits of the US action, she was compelled to accept entry
of judgment against her in fear of her husband's, and to
protect her husband from, criminal prosecution;
30        (e)   the defendants were thereby denied a fair trial in the US
action;

        (f)    the US judgment is founded on a breach of the 1934 Act;

        (g)   the 1934 Act is a penal law of the United States
unenforceable in the English and Cayman courts;
35        (h)   the foundation of the US action on a penal statute and the
exposure of defendants thereby to the risk of prejudice to
their right to a fair trial offends natural justice and the
principle of Cayman law that where there are civil
proceedings, and criminal proceedings are contemplated,
40        the criminal proceedings must be tried first and the pre-trial
proceedings in the civil action should normally be stayed in
the meantime, unless the defendants' rights can be
safeguarded by appropriate undertakings of the prosecuting
authorities not to prosecute."
45       I will deal with the defendants' proposed amendments later. Suffice it to

say at this juncture that they relate to an alleged "fraud" by the plaintiff
upon the US court in making allegations and filing evidence in the US
proceedings which the defendants say were false. The fraud defence is
put forth as what I take to be the main defence to the claim upon the US
5       judgment.

      At the outset I swept aside, with token resistance, Mr. Nelson's
preliminary objections that (a) the plaintiffs' addresses were missing from
the writ, and (b) it was unclear which of the prayers for relief was
applicable; as well as Mr. Murray's objection to the technical form of the

10    proposed amendments sought. I propose to move directly to the
      substantive issues.

      *The US proceedings*
              On March 22nd, 1996, the plaintiff filed a complaint in the US District
15    Court for the Southern District of Florida against Allen Manus, Elizabeth
      (Libby) Manus, UC'NWIN Systems Corp., UC'NWIN Systems Inc. and
      Winners All International Inc. That case is styled as *Kalley (as Trustee of*
      *E.B. Trust & P.B. Trust)* v. *Manus and Others*, Case No. 96–
      0780–CIV–Graham (S.D. Fla.) ("*Kalley* v. *Manus*").
20            In the complaint in that case the plaintiff alleged as follows:
              Count 1 (against the Manuses and UC'NWIN Florida): Violations of
      s.10(b) of the Securities Exchange Act of 1934 and r.10(b)(5)
      promulgated thereunder;
              Count 2 (against the Manuses and UC'NWIN Florida): Violations of
25    s.12(2) of the Securities Act of 1933;
              Count 3 (against the Manuses and UC'NWIN Florida): Violations of
      ss. 517.301 and 517.211, Florida Statutes;
              Count 4 (against the Manuses and UC'NWIN Florida): Common law
      fraud; and
30            Count 5 (against UC'NWIN and Winners All Intl. Inc.): Violations of
      s.18 of the Securities Exchange Act of 1934.
              The defendants brought motions to dismiss the claims on the bases that
      the allegations of fraud against them were insufficiently particularized
      and that in any event the allegations fell short of establishing liability.
35    After full argument, those motions were dismissed. The defendants had
      US legal counsel at all material times. Defences were filed. The
      defendants were subjected to lengthy pre-trial depositions.
              I pause to note that subsequent to the filing of the complaint, the first
      plaintiff learned that the first defendant was the subject of an injunctive
40    order issued in 1981 at the behest of the SEC by the US District Court for
      the Southern District of New York. That order prohibits the first
      defendant and those acting in concert with him from participating in
      certain enjoined securities transactions, and directs him to disclose the
      existence of the order to those with whom he deals. This 1981 order
45    obviously pre-dated the transactions in respect of which the plaintiff now

      sues, but would seem to be relevant to the propriety of the first defendant
      engaging in them.
              There have been no criminal investigations or proceedings in respect of
      the subject transactions. None the less, apparently on the basis of the
5     existence of the 1981 order, the first defendant asserted the Fifth
      Amendment privilege against self-incrimination and refused to answer
      nearly every substantive question posed at his deposition in 1996. In
      particular, his counsel stated for the record that the first defendant would
      not "discuss anything involving the purchase or sale of a security after

10      1975." The second defendant refused to answer many questions posed to
her on the basis of the spousal communications privilege.

     On March 13th, 1997, the day following the pre-trial conference in this
matter, Judge Graham, US District Court Judge for the Southern District
of Florida presiding over *Kalley* v. *Manus*, entered two orders. The first

15      order granted the plaintiff his motion for summary judgment and entered
final judgment against the first defendant on Counts 1–4 of the complaint
in the amount of $1,075,000, plus interest at the statutory rate. The
second order entered final judgment against the second defendant on
Counts 1–4 of the complaint in the amount of $1,075,000, plus interest at

20      the statutory rate.

     Significantly, the order against the first defendant contains this recital:
"The court has considered the motion, the pertinent portions of the
record, and having noticed that the defendant, Allen Manus, has no
objection to the entry of summary judgment against him…." The order

25      against the second defendant recites that it was the second defendant who
moved for judgment against herself!

     It is obvious on the record before me that both defendants effectively
consented to judgment. As will be explained later, this was done for
strategic reasons on the advice of attorneys, apparently in an attempt to

30      preclude possible criminal prosecution. After over two years of attempts
by the plaintiffs' attorneys in the US to levy execution, the conclusion
seems inescapable (and I base this not just upon the present record but
also upon the material that was before me in respect of the *Mareva*
injunction on October 29th, 1999) that these defendants have substan-

35      tially judgment-proofed themselves in the United States by employing a
web of companies and trusts. The defendants maintain that they have no
assets or personal income sources in the United States.

     The plaintiffs' application is to strike out the existing defences to the
action on the US judgments. As can be seen from the defences (in

40      particular paras. 2 and 4) raised, and set out above, they fall into four
categories:

           (a)    that the present action upon the US judgments amounts to
enforcement of a foreign penal statute;

           (b)    that the defendants were "compelled to accept" the entry of

45      judgment for fear of criminal sanction;

           (c)    that the defendants were denied natural justice; and

           (d)    that the US court lacked jurisdiction.

     Paragraph 3 of the defence is so baldly pleaded that it raises no defence at
all. I do not hesitate formally to strike it out as disclosing no reasonable

5      defence under O.18, r.19(1)(a). Presumably it was not meant to add
anything to the defences alleged in paras. 2 and 4. I approach these
defences, as did Mr. Murray, under the "frivolous and vexatious" and
"abuse of process" heads of O.18, r.19(1)(b) and (d). Accordingly, I can
have regard to the evidence put before me.

10    The test in relation to whether a case is vexatious was described by
Lindley, L.J. in *Att.-Gen. of Duchy of Lancaster* v. *London & N.W. Ry.
Co.* (2) ([1892] 3 Ch. at 277). He referred to "cases which are obviously
frivolous or vexatious, or obviously unsustainable…." The pleading
must be "so clearly frivolous that to put it forward would be an abuse of
15    the process of the Court" (see *Young* v. *Holloway* (23) ([1895] P. at
90–91, *per* Jeune P.), cited in 1 *The Supreme Court Practice 1999*, para.
18/19/16, at 350). As regards abuse of the process of the court, para.
(1)(d) of r.19 confers upon the court in express terms powers which were
previously exercised under its inherent jurisdiction. The connotation is
20    that the process of the court must be used *bona fide* and properly and
must not be abused. The court will prevent the improper use of its
machinery and will in a proper case summarily prevent its machinery
from being used as a means of vexation and oppression in the process of
litigation. The categories of vexation and abuse are not closed and depend
25    on the relevant circumstances.

    The principles relating to the striking out of pleadings, and to the
enforcement of foreign judgments are, of course, matters of Cayman law.
Issues of the nature and effect of US proceedings are matters of fact. In
respect of the latter, I have before me unchallenged evidence of the
30    plaintiffs' US legal adviser as well as supporting evidence of independent
US legal experts.

    To the extent that the second defendant, who is apparently a housewife,
purports, in her affidavit sworn on October 22nd, 1999, to mouth opinion
evidence on legal matters, I shall ignore that evidence. There was no
35    evidence from the first defendant or his legal advisers, though I had
adjourned these applications on October 29th, 1999, in part to allow for
any further filing of evidence the parties wished to make.

    The defendants assert that enforcement of the US judgments is
tantamount to enforcement of US penal statutes. The defendants'
40    argument proceeded on the basis that by virtue of the fact that US
securities statutes were referred to in the US proceedings, the present
action was "tainted."

    Clearly, Cayman courts will not enforce a debt judgment of a foreign
court which is shown to be a judgment payable in respect of taxes, a fine
45    or other penalty. There is no jurisdiction to enforce the penal laws of a

1999 CILR 575

foreign country: see *Huntington* v. *Attrill* (7) and *US* v. *Inkley* (19). It is
clear, however, that that is not what happened here. Two of the counts in
the US action were based on State statutes and "common law fraud." The
other counts alleged statutory breaches which gave rise to a private right
5    of action and remedy. The term "penal," when used in this context,
usually refers to a sum payable to the state and not a private plaintiff. In
my view, it is clear that a private plaintiff, as here, who recovers a
judgment based on US securities statutes, can enforce it in this
jurisdiction: see *Stutts* v. *Premier Benefit Capital Trust* (16) and

10      *Schemmer* v. *Property Resources Ltd.* (15).

The basic question is whether enforcing the judgment at the suit of a private citizen would amount to the enforcement of a penal law contrary to Cayman public policy. I consider these fairly obvious criteria (based on *US* v. *Inkley*): (i) whether the claim sought to be enforced is one which

15 involves the assertion of foreign sovereignty; (ii) the view of the remedy adopted by the foreign court; and (iii) the identity of the plaintiff or the person in whose favour the right is created. On these bases, it is clear that the plaintiff here is not seeking to have this court enforce a foreign penal statute. My view, based on the proceedings on their face, is buttressed by

20 the uncontradicted expert evidence characterizing the nature of the US proceedings here as personal in nature. I regard this defence as vexatious and an abuse of process.

The defendants also plead that the judgments cannot be enforced because they were "compelled" to consent to them by the threat of

25 criminal proceedings. I am bound to say that I know of no authority that would justify such a defence. There can be a defence of real duress (see, *e.g. Jet Holdings Inc.* v. *Patel* (10)) but that is quite a different matter. I reiterate some uncontested facts: In respect of the US case of *Kalley* v. *Manus*, the defendants were represented by counsel throughout. There

30 was no criminal investigation in respect of the fraud alleged, let alone any criminal proceedings. The defendants refused to be examined in any substantive way, on the basis of Fifth Amendment protection and spousal privilege.

The only basis upon which the defendants seem to have perceived a

35 threat of criminal sanction was by virtue of the existence of the 1981 SEC order. I assume, though it is not entirely clear, that that is what the second defendant refers to when she rather brazenly deposes:

"As the court will be aware, there was no trial in the Florida proceedings. Instead the plaintiffs pursued a vigorous pre-trial

40 discovery procedure which enabled them to call the first defendant and myself as their witnesses and to cross-examine us. With respect, that procedure in the context of this case caused great prejudice to the ability of my husband and myself to properly defend ourselves against the allegations advanced in the plaintiffs' complaint. As can

45 be seen from the complaint, the claim was founded on the basis of

1999 CILR 576

three breaches of Federal and State Securities Exchange statutes, as allegedly entitling the plaintiffs to damages. The plaintiffs knew that the effect of pursuing that course would require the first defendant to raise his right to privilege against self-incrimination, having agreed

5 to the terms of the SEC injunction of 1981, which was apparently unlimited in time. I was placed in an unenviable position because the thrust of the questions directed at me at the pre-trial deposition hearing were designed to exploit that claim to privilege which had been taken by my husband. In those circumstances, I was obliged to

10       raise a plea of spousal privilege. These claims to privilege against
self-incrimination and spousal privilege were taken on the advice of
our US attorney, Mr. Lipman, who repeatedly expressed concern
about the likely intervention of the prosecution authorities in the
form of the SEC, if these pleas were not taken. *This advice was in*
15       *contrast to the earlier advice which had been tendered to my*
*husband by his New York lawyer that he would not be in violation of*
*the 1981 SEC stipulation or injunction* if he acted as an intermediary
for the Braathens and the companies whose shares they were
purchasing and did not become the beneficiary of any of the funds
20       passing in consideration of the share transfers. I should point out
that the advice of Mr. Lipman was not simply accepted without
further enquiry. A criminal law attorney in Florida was consulted
and he confirmed the advice that privilege against self-incrimination
should be raised, and further advised that *the prosecuting authorities*
25       *in Florida had a work-load which was such that when a civil*
*judgment was obtained they tended not to bother with criminal*
*proceeding, a remedy having been obtained by the complainant, and*
*where no civil claim was pursued, criminal proceedings were likely*
*to follow.*" [Emphasis supplied.]
30       As is perhaps not surprising, the uncontradicted evidence of the
independent US experts is that consent to a civil judgment, as here, would
normally tend to increase the chances of criminal prosecution, not lessen
it. It is rather odd that this course should have been adopted if the
defendants genuinely feared some criminal consequences.
35          In any case, these defendants have never taken any steps to challenge
or set aside these US judgments on that basis or to resist (what have
proved to be fruitless) execution attempts to date. The evidence is that
neither defendant ever suggested at any point in the US proceedings that
they were prejudiced by parallel criminal proceedings. They took no
40       formal steps to stay the civil proceedings on that basis. I do not accept, as
a matter of fact, that these sophisticated litigants, represented throughout,
were coerced or compelled in any legal sense to do anything they did not
want to do for their own strategic reasons.
          Even if they were "compelled" by what the second defendant refers to
45       in her affidavit as "an alleged breach of the SEC order," this whole novel

scenario must necessarily raise a substantial issue of public policy and
abuse of process. If the defendants were not under imminent threat of
criminal proceedings for some wrongdoing, this defence is bogus, a sham
and clearly unsustainable. If they *were* under such a threat because of
5       their criminal conduct it must be contrary to public policy (and principles
of comity) for this court to allow them to set up this defence to an action
on the foreign judgments, the propriety of which it cannot lie in their
mouths to challenge. In short, it cannot be open to the defendants to stall
the enforcement of this foreign judgment by virtue of their own

10   criminality (real, or even as perceived by them). To do so would be a
classic example of ignoring the "well-established rule of law that no man
shall take advantage of his own wrong…": see *Abouloff* v. *Oppenheimer
& Co.* (1) (10 Q.B.D. at 300, *per* Lord Coleridge, C.J.), an authority
relied upon by the defendants in support of their own application for
15  amendments alleging fraud. On that basis I would strike out this entire
line of defence as vexatious and an abuse of process.

    The defendants make a rather half-hearted attack on the US court's
jurisdiction. On the evidence, no such objection was ever taken in the US
proceedings themselves, and the defendants participated therein and
20  effectively consented to judgment in the end. The unchallenged expert
evidence is that the US court had jurisdiction. This defence is an
afterthought for purposes of the Cayman action, and it is without any
merit whatsoever.

    The defendants also plead a "denial of natural justice" defence, both in
25  the existing defence, and in the proposed amendments. Part of the
"natural justice" defence overlaps and restates the "duress" defence
which I have addressed above. Other aspects alleged are prejudiced by
virtue of simultaneous civil and criminal proceedings (the "stay"
argument), and perceived procedural and evidentiary disadvantages by
30  virtue of the threat of criminal proceedings forcing the defendant to rely
on the Fifth Amendment and spousal privilege.

    The obvious answer is that as a matter of fact there never were any
criminal proceedings instituted or even threatened. Even if there were,
there is, according to the unchallenged US expert evidence, no right to a
35  stay of a civil action pending criminal proceedings; in fact, pre-
indictment requests for a stay of civil proceedings are usually denied. As
a matter of English and Cayman law, a defendant in a civil action is not
entitled to an automatic stay pending the outcome of parallel criminal
proceedings: see *Jefferson Ltd.* v. *Bhetcha* (9).

40    The unchallenged evidence of the US experts is that the defendants by
their conduct in the US proceedings have effectively waived any
perceived evidentiary or procedural objections. Similarly, from an
English and Cayman law perspective, the defendants, by submitting to
judgment, are clearly now estopped from taking any objection to the US
45  proceedings. This is a complete overriding answer to the existing

1999 CILR 578

defences, and is crucially important to the proposed fraud amendments as
well.

    The US judgments cannot be characterized as anything other than
consent judgments. The defendants were in possession of all facts, and
were legally represented, when they submitted to judgment. They have
5  never resiled therefrom to this day. As a matter of English and Cayman
law (in the absence of factors which are not present here) they are
estopped from challenging those judgments: see 2 *The Supreme Court
Practice 1999*, para. 17A–23, at 1462, and authorities cited there

10      including *de Lasala* v. *de Lasala* (4) ([1980] A.C. at 561). That,
        incidentally, is also the US position, according to the uncontradicted
        evidence before me.
               As a result of the foregoing, I have no hesitation in striking out all
        defences presently pleaded to the claim on the US judgments, on the
15      bases that they are frivolous, vexatious and/or an abuse of process. For
        the same reasons I refuse to grant leave to amend in respect of the natural
        justice defence.

               *The defendants' application to amend to plead allegations of fraud*
20             Two years after the defendants delivered their defence in this action,
        they now seek leave to amend by the addition of allegations to the effect
        that the plaintiff obtained the US judgments by fraud. These proposed
        amendments consist of 19 pages of single-spaced type. The application
        for these amendments was a direct reaction to the plaintiff's September
25      9th, 1999 application to strike out the existing defences, and for
        judgment. It is a buttressing exercise. Such a defence was apparently
        never contemplated at the original pleading phase, though the defendants
        were in possession of all facts at all material times.
               I do not intend to reproduce these proposed amendments. They consist
30      almost entirely of a lengthy recitation of allegations made by the
        plaintiff against them in the US proceedings, or the affidavit evidence
        put against them in those proceedings. The defendants' basic plea is that
        the case put against them was false and that accordingly this amounted to
        "fraud." It is encapsulated in para. 9 of the proposed amendment:
35             "But for the plaintiffs' refusal to apprise the Florida court of the
               true facts and/or their refusal or knowing failure to inform the said
               court thereof, the Florida court was misled by the plaintiffs'
               suppression of the evidence and/or material facts and/or false
               evidence into agreeing to enter summary judgment when, had it
40             been fully and properly informed and not misled, it would not have
               entered such judgment. In the aforesaid circumstances, the
               plaintiffs obtained the said judgments by fraud and/or dishonest or
               misleading evidence and the defendants are entitled to have them
               set aside."
45      What the allegations really amount to is little more than that the

1999 CILR 579

        plaintiffs' complaint was accepted, while the defendants' story did not
        emerge in evidence.
               For the purposes of the application for leave to amend, counsel agreed
        that I might approach the matter as if the amendments had been
5       incorporated in the defence *ab initio*, and to consider whether they ought
        to be struck out.
               A foreign judgment relied upon may be impeachable for fraud. Such
        fraud may be either fraud on the part of the party in whose favour the
        judgment is given (as is alleged here), or fraud on the part of the court

10   pronouncing the judgment. The English position is summarized in Dicey
     & Morris, *The Conflict of Laws*, 12th ed., Rule 43, at 505–506 (1993):
         "Any judgment whatever, and therefore any foreign judgment, is, if
         obtained by fraud, open to attack. A party against whom an English
         judgment has been given may bring an independent action to set
15       aside the judgment on the ground that it was obtained by fraud; but
         this is subject to very stringent safeguards, which have been found
         to be necessary because otherwise there would be no end to
         litigation and no solemnity in judgments. The most important of
         these safeguards is that the second action will be summarily
20       dismissed unless the plaintiff can produce evidence newly
         discovered since the trial, which evidence could not have been
         produced at the trial with reasonable diligence, and which is so
         material that its production at the trial would probably have affected
         the result, and (when the fraud consists of perjury) so strong that it
25       would reasonably be expected to be decisive at the rehearing and if
         unanswered must have that result. But it does not matter whether the
         fraud is extrinsic, *e.g.* consists in bribing witnesses, or intrinsic, *e.g.*
         consists in giving or procuring of perjured or forged evidence.
             A foreign judgment, on the other hand, can be impeached for
30       fraud even though no newly discovered evidence is produced and
         even though the fraud might have been, and was, alleged in the
         foreign proceedings."
     When fraud is alleged English courts have gone into the merits of the
     foreign judgment. This has happened both in the situation where the
35   allegation of fraud has been raised and dismissed abroad, and in the
     situation where the defendant failed to raise this defence abroad, although
     it was available to him. As the editors of *Cheshire & North's Private
     International Law*, 12th ed., at 378 (1992) observe:
         "In the case of foreign, as distinct from domestic judgments, the
40       [English] Court of Appeal has on [several] occasions proceeded on
         the same evidence that was given at the original trial and have
         sustained a charge of fraud that had been investigated and dismissed
         by the foreign court."
     The first two cases were 19th century decisions: *Abouloff* v. *Oppenheimer
45   & Co.* (1) and *Vadala* v. *Lawes* (20). They reflect the rather remarkable

     paternalism of the English courts of the time, a factor not lost on Stuart-
     Smith, L.J. in the later case of *House of Spring Gardens Ltd.* v. *Waite* (6),
     when he observed ([1991] 1 Q.B. at 251) that both *Abouloff* and *Vadala*
     "were decided at a time when our courts paid scant regard to the
5    jurisprudence of other countries…."
         In *Abouloff* the Court of Appeal had some difficulty in reconciling its
     decision with the then established principle that foreign judgments were
     conclusive on the merits and cannot be impeached for any error of fact or
     law. As the editors of *Dicey & Morris* observe (*op. cit.*, at 506):

10        "Lord Coleridge C.J. and Brett L.J. solved the difficulty by holding
that the issue whether a foreign court had been deliberately misled
was not, and never could be, one on which that court had passed.
Hence to examine the judgment in subsequent English proceedings
was not to re-open the merits of the judgment pronounced by the
15    foreign court. The technical nature of this hypothesis was admitted
in *Vadala* v. *Lawes*, where the evidence necessary to establish the
fraud was precisely the same as that which had been rejected by the
foreign court. But Lindley L.J. refused to 'fritter away' the judgment
in *Abouloff* v. *Oppenheimer*; and he observed that 'if the fraud upon
20   the foreign court consists in the fact that the plaintiff has induced
that court by fraud to come to a wrong conclusion, you can re-open
the whole case even although you will have in this court to go into the
very facts which were investigated and which were in issue in the
foreign court.'"

25   The English Court of Appeal has gone so far as to hold that it is
immaterial that the facts relied upon to establish a *prima facie* case of
fraud were known to the party relying on them at all material times and
could thus have been raised by way of defence in the foreign proceedings:
see *Syal* v. *Heyward* (18), a case in which the foreign action apparently
30   had not been defended. The *Cheshire & North's* commentary on *Syal* is as
follows (*op. cit.*, at 380):

       "The strange result appears to follow that an English defendant to a
foreign action may reserve a defence of fraud available to him with
the intention of raising it if he is sued on the judgment in England.
35   This is an indulgence that has nothing to commend it….

       The effect of the above decisions [*Syal* (18) and *Owens Bank Ltd.*
v. *Bracco* (13)] is that the doctrine as to the conclusiveness of
foreign judgments is materially and most illogically prejudiced."
The *Abouloff* (1), *Vadala* (20), *Syal* (18) line of authority has received
40   strident criticism from academics, *e.g.* Read, *Recognition and
Enforcement of Foreign Judgments*, 279–293 (1938) and in 8 *Canadian
Bar Review*, 231–237 (1930); Cowen, *Foreign Judgments & the
Defence of Fraud*, 65 *Law Quarterly Review*, 82 (1949); and Wolff,
*Private International Law*, 2nd ed., para. 247, at 267–270 (1950), as well
45   as in current textbooks.

1999 CILR 581

       Canadian courts have taken a different view, as articulated by Garrow,
J.A. in the early case of *Jacobs* v. *Beaver* (8) (17 O.L.R. at 506):
       "…[T]he fraud relied on must be something collateral or
extraneous, and not merely the fraud which is imputed from alleged
5   false statements made at the trial, which were met by counter-
statements by the other side, and the whole adjudicated upon by the
Court and so passed on into the limbo of estoppel by the judgment.
This estoppel cannot, in my opinion, be disturbed except upon the
allegation and proof of new and material facts, or newly discovered

10   material facts which were not before the former Court, and from
     which are to be deduced the new proposition that the former
     judgment was obtained by fraud."
     See also Castel, *Canadian Conflict of Laws*, 2nd ed., para. 155, at 251
     (1986); *Woodruff* v. *McLennan* (22); *Hollender* v. *Ffoulkes* (5);
15   *Manolopoulos* v. *Paniffe* (13); and *Boga* v. *Chamberlen* (3).
     In *Keele* v. *Findley* (11), the New South Wales Commercial Division
     rejected the English authorities and preferred the Canadian authorities. It
     was held that the current state of English law reflected an historical error:
     the authorities had failed to take proper account of the developments in
20   the law relating to domestic judgments. Consequently, fraud was a
     defence to an action on a foreign judgment only if there had been a new
     discovery of material evidence which will establish fraud and make it
     reasonably probable that the opposite result would have been reached: see
     also *Wentworth* v. *Rogers (No. 5)* (21) (6 NSWLR at 541).
25   The strict view taken by the English Court of Appeal has not been
     followed in New Zealand: see *Svirskis* v. *Gibson* (17) ([1977] 2 NZLR at
     10).
     In *Jet Holdings Inc.* v. *Patel* (10) the English Court of Appeal also
     reaffirmed that it was irrelevant that in the view of the foreign court there
30   was no fraud. But in *House of Spring Gardens Ltd.* v. *Waite* (6) some of
     the judgment debtors commenced a fresh action in the foreign country to
     set aside the original foreign judgment on the ground of fraud. That
     action failed after a 22-day trial. It was held that the judgment debtors
     (including one who had not been a party to the fresh action) were
35   estopped by the decision of the foreign court that there had been no fraud.
     This decision has been held to lay down a general principle that a
     decision by a foreign court that a foreign judgment was or was not
     obtained by fraud can create an estoppel in English proceedings to
     enforce that judgment.
40   It is noteworthy that in *Jet Holdings* the foreign judgment went by
     default and the suggestion was that there had been a misrepresentation of
     the (absent) defendant's position.
     In *Owens Bank Ltd.* v. *Bracco* (13) the House of Lords followed the
     *Abouloff* line of authority. It is important to note, however, that their
45   Lordships were actually considering the effect of statutory provisions

1999 CILR 582

     relating to registration of foreign judgments, and in particular a provision
     by which no judgment can be registered if it was obtained by fraud. The
     House of Lords was bound to give the statutory provision a construction
     that adopted the approach of the common law as understood in 1920, the
5    time of enactment.
     In the absence of that consideration, the result might well have been
     different. As Lord Bridge of Harwich observed ([1992] 2 A.C. at 489):
     "I recognise that, as a matter of policy, there may be a very
     strong case to be made in the 1990s in favour of according to

10    overseas judgments the same finality as the courts accord to English
      judgments. But enforcement of overseas judgments is now
      primarily governed by the statutory codes of 1920 and 1933. Since
      these cannot be altered except by further legislation, it seems to me
      out of the question to alter the common law rule by overruling
15    *Abouloff* v. *Oppenheimer & Co.* and *Vadala* v. *Lawes.* To do so
      would produce the absurd result that an overseas judgment creditor,
      denied statutory enforcement on the ground that he had obtained his
      judgment by fraud, could succeed in a common law action to
      enforce his judgment because the evidence on which the judgment
20    debtor relied did not satisfy the English rule. Accordingly the
      whole field is effectively governed by statute and, if the law is now
      in need of reform, it is for the legislature, not the judiciary, to effect
      it."
      One difficulty with Lord Bridge's final comments, as pointed out by the
25    editors of *Dicey & Morris* (*op. cit.*, at 508), is that the whole field is not
      covered by statute, since the legislation applies only to two countries
      outside the Commonwealth and Western Europe. It does not, for example,
      relate to US judgments: see a criticism of the House of Lords decision in
      this regard in Collier, *Fraud Still Unravels Foreign Judgments*, 51
30    *Cambridge Law Journal* at 441 (1992).
          In the present case the defendants consented to judgment. They were
      professionally advised at all material times. They were in possession of
      all relevant facts at all material times. The "fraud" alleged arises from
      their purposely and deliberately (for a strategic reason apparently
35    acceptable to them) not resisting the proceedings in the US. They are,
      accordingly, subject to an estoppel and cannot now raise a "fraud"
      defence of this nature.
          As such this is quite a different case from those authorities relied upon
      by the defendants. I am aware of no authority in which defendants who
40    consent to a foreign judgment, with their eyes fully open, have
      subsequently been allowed to raise a fraud defence.
          To the extent there is authority, the present case is most akin to *House
      of Spring Gardens*, where the defendants were estopped by the result of a
      second foreign proceeding (and the attempt to re-litigate in the country of
45    enforcement deemed to be an abuse of process). Arguably the same result

1999 CILR 583

      must pertain here, *a fortiori*, where the defendants, who had full
      knowledge, simply consented to judgment.
          *Owens Bank Ltd.* v. *Etoile Comm. S.A.* (14) is a significant Privy
      Council decision in this area, in which it was held that the *Abouloff*
5     principle does not remove a court's inherent power to prevent abuse of its
      process. In that case a fraud defence was rejected by French trial and
      appellate courts. Proceedings commenced by the appellants in Saint
      Vincent and the Grenadines, claiming damages for fraud and alleging that
      the respondents had produced to the French courts a guarantee with a

10    forged date, were struck out as being an abuse of process on the ground
      that the appellants had not shown *bona fides* in the plea of fraud. When
      the respondents sought to enforce the French judgment in Saint Vincent
      and the Grenadines, the appellants pleaded that the judgment had been
      obtained by fraud. The Privy Council upheld the Court of Appeal's

15    decision that it would be an abuse of the process of the court to permit the
      appellants to continue to defend the proceedings, having regard to the
      history of the litigation. Lord Templeman, for the Board, said ([1995] 1
      W.L.R. at 51):

              "There is nothing in the authorities which precludes a party from

20        obtaining summary judgment or an order striking out a pleading on
          the grounds of abuse of process where a fraud is alleged. It is
          axiomatic that where fraud is alleged full particulars should be
          given. Where allegations of fraud have been made and determined
          abroad, summary judgment or striking out in subsequent

25        proceedings are appropriate remedies in the absence of plausible
          evidence disclosing at least a prima facie case of fraud. *No strict
          rule can be laid down; in every case the court must decide whether
          justice requires the further investigation of alleged fraud or requires
          that the plaintiff, having obtained a foreign judgment, shall no*

30        *longer be frustrated in enforcing that judgment.*" [Emphasis
          supplied.]
      As for the broader principles in this area, it should be noted that Lord
      Templeman observed (*ibid.*, at 50) that the result in *Owens Bank Ltd.* v.
      *Bracco* "may be regretted" and that—

35        "their Lordships do not regard the decision in *Abouloff's* case …
          with enthusiasm, especially in its application to countries whose
          judgments the United Kingdom has agreed to register and enforce.
          In these cases the statutory rule which favours finality in litigation
          seems more appropriate."

40    In my view, the decision of the Privy Council in *Owens Bank Ltd.* v.
      *Etoile* Comm. S.A. (14) applies *a fortiori* here where the defendants
      consented to the foreign judgment with a view, purportedly, to avoiding
      criminal consequences. To allow such a defence to be raised in the
      Cayman action on the US judgments in the present circumstances would

45    be a clear abuse of this court's process.

                                                                    1999 CILR 584

      I adopt Mr. Murray's written submission to the effect that—
          "it is difficult to see how the Manuses can consent to a fraud
          judgment against them and now say that this court should ignore the
          fact that they consented to such judgment and reopen the issue based

5         upon an assertion that the very facts upon which the fraud judgment
          they consented to was based on are, themselves, fraudulent."
      The present case is distinguishable, on this basis alone, from the *Abouloff*
      (1) line of authority. I regard the defendants' formal acceptance of the US
      judgments as a complete answer to their application to amend.

10             Were it otherwise, I would in any case decline to follow the line of authority in the English Court of Appeal, which is not binding upon this court. (Nor would I follow the House of Lords decision in *Owens Bank Ltd.* v. *Bracco* (13), which involved the application of an English statute incorporating the English common law as at 1920.) In this regard, I would

15    adopt and follow the Commonwealth authority cited above and approved by academic commentators, to the effect that where the facts relied upon to establish an alleged *prima facie* case of fraud were known to the party relying on them at all material times, and could thus have been raised by way of defence in the foreign proceedings, he ought not subsequently to

20    be allowed to defend against the domestic enforcement action on that basis.

             I am of the view that had these fraud allegations been pleaded *ab initio* they could properly have been struck out as an abuse of process. Accordingly, I decline to grant leave to the defendants to amend their

25    defence by the addition of the words proposed.

             As there is no defence to the claim brought on the US judgments, I grant judgment in favour of the first plaintiff against the first and second defendants in the terms of paras. 1 and 2 of the first prayer for relief in the statement of claim, together with the costs of this action to be taxed if not

30    agreed.

*Judgment for the plaintiffs.*

Attorneys: *Walkers* for the plaintiffs; *Nelson & Co.* for the first, second, third and fourth defendants.