# EXHIBIT 11

A   the policy rights, but there is nevertheless tax to pay on precisely and exactly the same amount because the consideration for the assignment must be regarded as a capital sum derived from the underlying assets." At the very least, one would have expected the introduction of the words, " subject always to any charge for duty under section 22 (3)," but there are no such words to be found. On the contrary, section 22 (3) is expressly made subject to " the exceptions in this Part of this Act," which
B   include the provisions of paragraph 10, so that if, contrary to my view, section 22 (3) is otherwise capable of applying, it is to be read subject to the exception therein contained, and not vice versa.

Accordingly, at the end of the day I have come to the conclusion that the contentions of the taxpayer are to be preferred, and this appeal must be dismissed accordingly. I realise that this is a most inconvenient con-
C   clusion to have reached, but the taxpayer has fairly brought himself within the scope of an exempting provision and the Crown has not succeeded in fairly bringing him within the scope of a charging provision.

*Appeal dismissed with costs.*

Solicitors: *Solicitor of Inland Revenue; Penningtons and Lewis &*
D   *Lewis.*

---

## SCHEMMER AND OTHERS v. PROPERTY RESOURCES LTD.
E                     AND OTHERS

[1973 S. No. 6773]

1974  May 13, 14, 15; 24                              Goulding J.

Conflict of Laws—Foreign judgment—Appointment of receiver—
F       United States court appointing receiver of assets of company
        incorporated in Bahamas and not party to action—Receiver
        appointed under provisions of penal legislation to prevent
        violation of federal law—Receiver seeking appointment as
        receiver over assets located in United Kingdom—Whether
        receiver's appointment to be recognised

            By proceedings brought in a district court of the United
        States of America under the Securities Exchange Act 1934, the
G       Securities and Exchange Commission alleged that a number of
        people controlling VCL, a company incorporated in the
        Bahamas, were involved in fraudulent practices. VCL,
        although a defendant in the action, took no part in the pro-
        ceedings. The judge of the district court appointed a receiver
        to take possession of certain assets, including all the shares and
        assets of another company, PRL, which was effectively con-
H       trolled by VCL, and of the assets of PRL's subsidiaries. PRL,
        which was also incorporated in the Bahamas, was not a
        defendant in the American proceedings, and there was no
        evidence that it had carried on business in the United States of
        America.

  The receiver, acting as directed by the district court, issued a writ in England seeking to have himself appointed receiver of the assets of PRL and its subsidiaries, located in the United Kingdom. He also sought injunctions against three banks with branches in London, which held money in the name or on behalf of PRL restraining them from transferring money otherwise than to himself as receiver. Seven shareholders of VCL were joined as plaintiffs to support the receiver in his action. Plowman J., in chambers, granted leave for service of notice of the writ on PRL out of the jurisdiction.

  On a motion by PRL to discharge the order:—

  *Held*, setting aside the order, (1) that, before the English courts would recognise the title of a foreign receiver to assets located in the United Kingdom or direct the setting up of an auxiliary receivership, the court had to be satisfied of a sufficient connection between the defendant and the jurisdiction in which the foreign receiver was appointed to justify recognition of the foreign court's order as having effect outside the foreign jurisdiction; that on English principles of conflict of laws there was no sufficient connection between PRL and the jurisdiction of the district court (post, pp. 287E—288A).

  *Houlditch* v. *Marquess of Donegal* (1834) 8 Bli.N.S. 301, H.L.(I.); *In re Maudslay, Sons & Field* [1900] 1 Ch. 602 and *Macaulay* v. *Guaranty Trust Co. of New York* (1927) 44 T.L.R. 99 considered.

  (2) That the American Securities Exchange Act of 1934 was a penal statute and, in the absence of legislation founded on treaty, unenforceable in the United Kingdom; that, whether or not a private individual could obtain a civil judgment under the Act enforceable in the United Kingdom, the receiver was in effect a public officer charged to reduce into possession money in the London branches of the banks in order to prevent the commission or continuation of offences against federal law and, in those circumstances, the receiver had no probable cause of action to support service out of the jurisdiction (post, p. 288C–D, F–G).

  *Société Générale de Paris* v. *Dreyfus Brothers* (1887) 37 Ch.D. 215, C.A. applied.

  (3) That, assuming the seven individual plaintiffs, holding shares in VCL, could bring a minority shareholders' action to protect assets of PRL, there was nothing in the present case to indicate that they were making such a claim and, in those circumstances, it would be wrong to allow service of the writ in order to keep the action alive for any future claim that the plaintiffs might consider bringing in the United Kingdom (post, pp. 288H—289B, E–F).

The following cases are referred to in the judgment:

*Foss* v. *Harbottle* (1843) 2 Hare 461.
*Houlditch* v. *Marquis of Donegal* (1834) 8 Bli.N.S. 301, H.L.(I.).
*Huntington* v. *Attrill* [1893] A.C. 150, P.C.
*Kooperman, In re* [1928] W.N. 101.
*Macaulay* v. *Guaranty Trust Co. of New York* (1927) 44 T.L.R. 99.
*Maudslay, Sons & Field, In re* [1900] 1 Ch. 602.
*North Australian Territory Co. Ltd.* v. *Goldsbrough, Mort & Co. Ltd.* (1889) 61 L.T. 716.
*Société Générale de Paris* v. *Dreyfus Brothers* (1887) 37 Ch.D. 215, C.A.
*Travers* v. *Holley* [1953] P. 246; [1953] 3 W.L.R. 507; [1953] 2 All E.R. 794, C.A.

A

The following additional cases were cited in argument:

*Chemische Fabrik vormals Sandoz* v. *Badische Anilin und Soda Fabriks* (1904) 90 L.T. 733, H.L.(E.).
*Emanuel* v. *Symon* [1908] 1 K.B. 302, C.A.
*Fontaine-Besson* v. *Parr's Banking Co. and Alliance Bank Ltd.* (1895) 12 T.L.R. 121, C.A.
*Heyting* v. *Dupont* [1964] 1 W.L.R. 843; [1964] 2 All E.R. 273, C.A.

B

*Indyka* v. *Indyka* [1969] 1 A.C. 33; [1967] 3 W.L.R. 510; [1967] 2 All E.R. 689, H.L.(E.).
*Rosler* v. *Hilbery* [1925] Ch. 250, C.A.
*Schibsby* v. *Westenholz* (1870) L.R. 6 Q.B. 155.
*Société Coopérative Sidmetal* v. *Titan International Ltd.* [1966] 1 Q.B. 828; [1965] 3 W.L.R. 847; [1965] 3 All E.R. 494.
*Trepca Mines Ltd., In re* [1960] 1 W.L.R. 1273; [1960] 3 All E.R. 304, C.A.

C

MOTIONS

On September 28, 1973, the first plaintiff, John Schemmer, was appointed by the United States District Court for the Southern District of New York as receiver to take possession of a great variety of securities and assets including, inter alia, the assets of Value Capital Ltd. (VCL),

D a company incorporated in 1971 in the Bahamas, and of Property Resources Ltd. (PRL), a company incorporated in the Bahamas in 1972. VCL held all the common shares and approximately 22 per cent. of the class A shares in PRL, and was able, by virtue of the rights attaching to the common shares, to control the affairs of PRL, although the remaining 78 per cent. of PRL's class A shares, representing a majority of the equity capital, were held by Investment Properties International Ltd.

E (IPI), a Canadian company, which was in liquidation following the appointment on October 22, 1973, of a liquidator by the Supreme Court of Ontario. By later orders of the district court Mr. Schemmer was authorised to take proceedings in the United Kingdom to have himself appointed receiver of the assets in the United Kingdom of PRL and its subsidiaries, and to sue the defendant banks, David Samuel Trust Ltd.,

F Société Générale Pour Favoriser le Developpement du Commerce et de L'Industrie en France S.A. and National Westminster Bank, in respect of money held by them in the name of or on behalf of PRL.

On December 12, 1973, Mr. Schemmer issued a writ against PRL, VCL, IPI, and the defendant banks, seeking in each case his appointment as receiver and an injunction restraining the relevant bank from transfer-

G ring or concurring in or assisting in (whether directly or indirectly) the transfer of sums of money in their control otherwise than to himself, and a similar injunction against PRL, VCL and IPI. Seven shareholders in VCL, Isadore Gitterman, Sophie Yacower, Graham Watson, Elsa Murdo, David Warham, Lawrence Wilkov and Doris Topping, were subsequently added as plaintiffs and, by notice of motion dated February 12, 1974, the

H plaintiffs sought similar relief to that sought in Mr. Schemmer's writ.

On February 14, 1974, Plowman J. gave the plaintiffs leave to serve notice of the writ on the first three defendants, PRL, VCL and IPI, out of the jurisdiction. IPI accepted service through solicitors in England;

VCL did not enter an appearance and PRL entered a conditional appearance only.

By a notice of motion dated March 26, 1974, PRL sought, inter alia, orders (1) that the order of Plowman J., given in chambers, be discharged on the grounds (a) that it did not fall within any of the sub-paragraphs of R.S.C., Ord. 11, r. 1, (b) that the plaintiffs had no locus standi or prima facie cause of action and (c) that in all the circumstances the case was not a proper one for service out of the jurisdiction; and (2) that all further proceedings be stayed.

The facts are stated in the judgment.

*Jeremiah Harman Q.C.* and *Leonard Hoffmann* for PRL, the first defendants. The plaintiffs have to show that Mr. Schemmer, the receiver appointed by the American court, has a case which is likely to succeed if his averments are taken as true. The defendants say that he has no cause of action in England. The other seven plaintiffs, who are shareholders not of PRL but of VCL, itself a shareholder in PRL, merely support Mr. Schemmer in his claim. In order to sue in their own right the other seven plaintiffs, would in any case, have to show that they had a sufficient interest to have a receiver appointed and there is no reported case in which it has been held that shareholders can, on their own behalf, have a receiver of the company's assets appointed. That is the position even where the company's assets are in jeopardy, and it is a fortiori so when a petition for the winding up of the company is on foot in the Bahamas. Their proper remedy would be the appointment of a provisional liquidator in the appropriate court, which in the present instance, would be a court in the Bahamas. [Reference was made to *Dicey & Morris, Conflict of Laws,* 9th ed. (1973), rule 180, pp. 993, 998.]

The master must have accepted that the basis of Mr. Schemmer's claim was his appointment as receiver by the United States court. That court had no jurisdiction over VCL or PRL according to the English rules for the recognition of foreign judgments. [Reference was made to *Dicey & Morris, Conflict of Laws,* 9th ed., rules 3, 15, 145, at pp. 75, 79, 716 and note 41, p. 717.] Accordingly, Mr. Schemmer has no locus standi or cause of action in this court.

The position would be different if Mr. Schemmer were to get himself appointed liquidator by the Bahamian court. [Reference was made to *Macaulay* v. *Guaranty Trust Co. of New York* (1927) 44 T.L.R. 99; *Société Générale de Paris* v. *Dreyfus Brothers* (1887) 37 Ch.D. 215; *North Australian Territory Co. Ltd.* v. *Goldsbrough, Mort & Co. Ltd.* (1889) 61 L.T. 716 and *Chemische Fabrik vormals Sandoz* v. *Badische Anilin und Soda Fabriks* (1904) 90 L.T. 733.]

The grounds upon which leave was granted to serve a writ out of the jurisdiction under R.S.C., Ord. 11 were nominally to restrain threatened acts within the jurisdiction, but in reality the object is to get possession of the London funds. The argument in favour of granting an injunction are specious. Mr. Schemmer says that the funds belong to PRL, and that no order would be made in the absence of PRL: see *Rosler* v. *Hilbery* [1925] Ch. 250. Assuming that Mr. Schemmer has a cause of action,

Case 1:18-cv-11642-VM-VF   Document 173-11   Filed 10/20/20   Page 6 of 19

A    it is not the action against the banks which is the substance of it, and therefore it is not within R.S.C., Ord. 11, r. 1.

The plaintiffs' claim must be not only within the letter but also within the spirit of R.S.C., Ord. 11: see *Rosler* v. *Hilbery* [1925] Ch. 250. The court should not allow the defendant banks to be sued in the English courts in respect of what are essentially foreign claims. The injunctions sought against the banks are a mere colourable excuse for claims by

B foreigners against foreigners. The injunctions should be sought against the banks' customers and not against the banks: see *Fontaine-Besson* v. *Parr's Banking Co. and Alliance Bank Ltd.* (1895) 12 T.L.R. 121.

[GOULDING J. If one of two foreigners who had a dispute abroad was a customer of a bank in England, would not that be a reason for giving leave to serve the customer abroad in an action to restrain an act in this

C country?]

The foreigner would be in contempt of the foreign court. The order should be obtained there. Mr. Schemmer could sue PRL in the Bahamas and obtain an injunction there. If the English banks received an order from PRL, the foreign court could sequestrate the assets of the customer, or the Bahamian judgment could be registered and enforced here. It is wrong to say that the action against PRL is in aid

D of an action against persons in this country; the persons in this country (the banks) should not have been sued at all.

It is for the plaintiffs to show that they have a probable cause of action. There are two main heads of jurisdiction, namely in personam and in rem. But there are two kinds of res in contemplation, one is the place of incorporation of the company and the other is the property in

E respect of which the claim arises. Under neither head did the New York court have jurisdiction over the company or its assets. If this claim is the enforcement of action taken by a regulatory body in the United States then plainly the matter comes within the rule which provides that the court has no jurisdiction to entertain an action (1) for the enforcement, either directly or indirectly of a penal, revenue, or other public law of a foreign state, or (2) founded upon an act of state: see *Dicey & Morris,*

F *Conflict of Laws,* 9th ed., p. 75.

*G. B. H. Dillon Q.C.* and *J. H. L. Leckie* for the plaintiffs. Subject to certain exceptions a foreign court has jurisdiction to give a judgment in personam which is capable of enforcement or recognition in England: see *Dicey & Morris, Conflict of Laws,* 9th ed., rule 180, p. 993. The cases there discussed are cases where the English court will enforce the

G foreign monetary judgments directly. There are numerous other forms of judgment where no money judgment is involved which are in a different category. The English courts will often appoint a receiver in respect of assets outside its own jurisdiction leaving it to the foreign court to make it effective by its own order. Similarly an English court will confer recognition on a receiver appointed by a foreign court by appoint-

H ing the foreign receiver to be receiver within the English court's jurisdiction. Such a jurisdiction should be exercised by going behind the foreign court's order, and examining the facts, not merely by enforcing the foreign court's order. PRL would not be deprived of a chance to be

heard here. One condition justifying a minority shareholders' action is fraud on a minority, which is provided for here by the position as to the Costa Rican bonds. It is not necessary in a minority shareholders' action to make the directors defendants, even though the fraud is alleged to have been carried out by those directors. There is no reason why a minority shareholders' action cannot be started by the shareholders of a company which is itself a shareholder in another company. In principle if the minority shareholders are entitled to protection, they cannot be deprived of such protection by reason of the fact that all the company's assets are in the hands of a subsidiary. There is no reason why *Foss* v. *Harbottle* (1843) 2 Hare 461 type proceedings should not be in respect of the assets of a subsidiary. [Reference was made to *Dicey & Morris, Conflict of Laws*, 9th ed., p. 1002.] The plaintiffs are seeking to proceed under the Foreign Judgments (Reciprocal Enforcement) Act 1933.

There are instances which show that the courts will expand the common law in cases outside the purely financial direct payment class, for example a measure of recognition is now accorded to foreign judgments in matrimonial law. There are dicta by Lord Denning M.R. which expand the doctrine of reciprocity. Lord Widgery C.J. had treated the Foreign Judgments (Reciprocal Enforcement) Act 1933 as a codifying Act. But outside the scope of that Act the field is wide open for developments of the common law on the most satisfactory lines for the production of justice. It would be contrary both to the common law and to equity that it should not be possible to deal with a system of international frauds by nomads using a variety of companies.

There is nothing in the common law in this field to prevent the development of the common law so as to cover the relief the plaintiffs seek. Rule 180 of the Conflict Rules has no bearing, since it relates to the direct enforcement of money judgments. *Macaulay* v. *Guaranty Trust Co. of New York*, 44 T.L.R. 99 and *In re Kooperman* [1928] W.N. 101 show that if PRL had been a company incorporated in the United States of America, Mr. Schemmer could have sued here in his own name for money owed to PRL. The true position here is otherwise with regard to the appointment of a receiver over property situated outside the territorial jurisdiction of the United States court, but application can be made to the courts of the country where the property is situated.

*In re Maudslay, Sons & Field* [1900] 1 Ch. 602 shows that the English court will often appoint a receiver of property situated outside its territorial jurisdiction but that the assistance of the foreign court is needed to put the receiver in possession of property within the jurisdiction of the foreign court. On that basis Mr. Schemmer asks for the court's assistance to perfect his appointment by the United States court as receiver quoad PRL's assets within the English court's jurisdiction. The order of the United States court is not limited to assets within the United States. [Reference was made to *Houlditch* v. *Marquess of Donegal* (1834) 8 Bli.N.S. 301 and *In re Kooperman* [1928] W.N. 101.] *Travers* v. *Holley* [1953] P. 246 where it was held it would be contrary to principle and inconsistent with comity if the courts of this country refused to recognise a jurisdiction which mutatis mutandis they claimed for them-

A selves, was approved in *Indyka* v. *Indyka* [1969] 1 A.C. 33. Lord Morris of Borth-y-Gest at p. 75, Lord Pearce at p. 84 and Lord Pearson at p. 109, agreed that, on the principle of comity, the courts of this country should recognise a jurisdiction which they themselves claim. Lord Wilberforce, at p. 103, took a more restricted view of the principle established by *Travers* v. *Holley* [1953] P. 246, making it plain that his remarks approving the principle of comity should be confined in the applications
B to matrimonial affairs. Lord Reid, at p. 58, expressed the view that " Comity has never been the basis on which we recognise or give effect to foreign judgments."

[GOULDING J. In giving recognition to a receiver appointed by a foreign court, is the test to be applied the existence of a real or substantial interest or connection?]

C No rules have been laid down in this field. The plaintiffs contend that such a connection, and the principles of reciprocity and comity, are factors which enable the court to act. Rule 180 of the Conflict Rules does not apply, in all its strictness, to the kind of relief sought here. *Travers* v. *Holley* [1953] P. 246 and *Indyka* v. *Indyka* [1969] 1 A.C. 33 demonstrate the plastic nature of the common law and the importance of the comity principle.

D *Travers* v. *Holley* [1953] P. 246 is referred to in *In re Trepca Mines Ltd.* [1960] 1 W.L.R. 1273, 1280–1282, where the Court of Appeal appear to state that the decision in that case was limited to a judgment in rem in a matter affecting matrimonial status and had not been followed except in a matrimonial case but what was said by Harman and Ormerod L.JJ. in that case was really obiter and not part of the ratio decidendi.

E The rules in *Emanuel* v. *Symon* [1908] 1 K.B. 302, which is also referred to in *In re Trepca Mines Ltd.* [1960] 1 W.L.R. 1273, 1280, may indicate a field of law where the law has crystallised, but the present case does not come within that field. *Emanuel* v. *Symon* is only concerned with the particular form of judgment in that case.

It is not suggested in *Société Coopérative Sidmetal* v. *Titan International Ltd.* [1966] 1 Q.B. 828 that comity is the basis of judgments in
F personam. There was no procedure for the direct enforcement of foreign judgments, but the principle of comity was applied in appropriate cases so that judgment could be obtained for an equivalent amount. The broad principle in *Schibsby* v. *Westenholz* (1870) L.R. 6 Q.B. 155 that " the judgment of a court of competent jurisdiction over the defendant imposes a duty or obligation on the defendant to pay the sum for which
G judgment is given, which the courts in this country are bound to enforce " is limited to money judgments. It only applied where it is sought to set up a judgment as a cause of action or as conclusive proof of it.

Here what is sought is discretionary relief, namely the appointment of a receiver. It is not suggested that the foreign court has already appointed a receiver and that that concludes the matter. The court is to
H go into the question, and if satisfied that it is proper to do so make the appropriate order appointing Mr. Schemmer receiver in this country. The only difference between a foreign judgment and a foreign order is in the nature of the relief given.

*Société Coopérative Sidmetal* v. *Titan International Ltd.* [1966] 1 Q.B. 828 was concerned not only with the question whether the judgment which it was sought to enforce was one which would not have been enforced here because it did not come within any of the categories in Buckley L.J.'s classification in *Emanuel* v. *Symon* [1908] 1 K.B. 302 but also with whether the Foreign Judgments (Reciprocal Enforcement) Act 1933 had made a fundamental change in the basis on which foreign judgments are recognised as being enforceable in this country (see *per* Widgery J. at p. 844 et seq.). The Act of 1933 is not a codification of the common law. What Hodson L.J. said in *In re Trepca Mines Ltd.* [1960] 1 W.L.R. 1273 was per incuriam. The matter comes within the Act; reliance is placed on section 4 (2) thereof, but if the Act does not apply, if the judgment is of the same type as that in *Emanuel* v. *Symon* [1908] 1 K.B. 302 one applies the principle in that case. In so far as *Emanuel* v. *Symon* depends on whether there is a duty to observe or comply with the terms of a foreign judgment it is not contended here that the judgment should be enforced without further inquiry. It is therefore beside the point to consider whether there is any duty here to comply with the order of the foreign court.

The facts should be considered as they exist today, not as they existed at the date of the writ, when IPI was a defendant and not a plaintiff. Here the appropriate and sensible course is to appoint as the receiver the person appointed by the United States court, namely Mr. Schemmer.

The parts of R.S.C., Ord. 11, which apply are r. 1 (1) (*i*) and (*j*). The purpose of an injunction is to protect the assets until they can be got into the hands of a receiver. It is nonsense to say that they should be left unprotected, and that the plaintiff should go first to the Bahamas and get a court order there, and only then come to this court. There is nothing to show that the question of the appointment of a receiver is within the jurisdiction of the Bahamian court. It would be startling if a foreign company with funds in this country could say that the English court could do nothing and was powerless to protect the assets from dissipation.

There is nothing to prevent a minority shareholders' action at second remove, the only difference is that the assets are held not directly by the company but by a company which it controls, viz. in this case PRL. [Reference was made to *Heyting* v. *Dupont* [1964] 1 W.L.R. 843.]

*Harman Q.C.* in reply. It is said that the omission of the seven other plaintiffs to sue on behalf of themselves and all other shareholders is no more than an inadvertent and trifling omission and the absence of any assertion that they are seeking to protect the interests of all right-thinking shareholders is unimportant, but the relief of the appointment of a receiver is not known in the *Foss* v. *Harbottle*, 2 Hare 461 type of case. What their claim is based on is a wish to support the claim of Mr. Schemmer, not a wish to assert a claim of their own. They are not even minority shareholders of PRL at all, but of VCL, itself a minority shareholder in PRL. While it is not contended that a minority shareholders' action at second remove would be imposible, it would stretch the exception to the rule in *Foss* v. *Harbottle* exceptionally far. The proper

A  place for such a minority action would, in any case, be in the place where the company is incorporated, i.e., in this case in the Bahamas, or where the individual wrong-doing directors are resident. It is wrong that the proceedings should be in England, which has nothing to do with the company's business, and no connection with it save that there are some bank accounts in London. [Reference was made to R.S.C., Ord. 11, r. 4, note 3.] Mr. Schemmer's claim must be based exclusively on the

B  New York judgment, since he has no other connection with the company. He must therefore show that the judgment gives him a cause of action or locus standi. There are only two ways in which a foreign judgment can give rise to such a cause of action: it can create proprietary rights by vesting the company's property in a receiver (see *Macaulay* v. *Guaranty Trust Co. of New York*, 44 T.L.R. 99 and *In re Kooperman* [1928] W.N. 101); or by creating personal obligations in favour of a receiver against

C  the company which are enforceable in the United Kingdom. A New York court could only create proprietary rights over property within its own jurisdiction: see per Cozens-Hardy J. in *In re Maudslay, Sons & Field* [1900] 1 Ch. 602, 609, 611. It is not suggested here that the New York judgment created any rights over the funds in London. The New York court could only create personal obligations towards Mr. Schemmer,

D  as receiver, if it had jurisdiction over PRL according to the English rules as to the Conflict of Laws. It is disputed that the New York judgment created any such obligations. The Securities Exchange Control Act has no application in this country. What the plaintiffs seek to conjure up is some right which is neither in personam nor in rem. The plaintiffs refer to the judgment as not being conclusive, but if so it cannot create any cause of action at all. In these circumstances it is no use to rely

E  on the principles of comity or reciprocity. [Reference was made to *Travers* v. *Holley* [1953] P. 246; *Indyka* v. *Indyka* [1969] 1 A.C. 33; *North Australian Territory Co. Ltd.* v. *Goldsbrough, Mort & Co. Ltd.*, 61 L.T. 716; and *Rosler* v. *Hilbery* [1925] Ch. 250.]

*Cur. adv. vult.*

F
May 24. GOULDING J. read the following judgment. This is a motion by the first-named defendant in an action between eight plaintiffs and six defendants. The action was begun by a writ issued on December 12, 1973, by the first-named plaintiff, John Schemmer, of 2, Wall Street, New York City. He remains the leading and principal plaintiff. About two months later the other seven plaintiffs were added as persons wishing to support Mr.

G  Schemmer's application to this court. Four of them reside at Calgary in Alberta, the other three in Florida. I shall have to consider their interest in the action at a later stage.

The six defendants are all companies. The first two, Property Resources Ltd. (PRL) and Value Capital Ltd. (VCL) were incorporated and are resident in the Bahama Islands. The third, Investment Properties International Ltd. (IPI), now in liquidation, was incorporated and is resident in

H  Ontario. I shall follow counsel in referring to those three companies by initials. The remaining three defendants, whom I will call "the defendant banks," are banking companies with places of business in London.

It will be convenient to state at once the relationship between the several defendants. The defendant banks hold large sums of money in London in the name, or otherwise on behalf, of PRL. I will call them "the London funds." PRL has only two shareholders, namely, VCL and IPI. It has issued shares of two classes called common shares and class A shares. VCL holds the whole of the common shares and about 22 per cent. of the class A shares that have been issued. IPI holds the remaining 78 per cent. approximately of the class A shares. In nominal amount the common shares represent only a minute fraction of PRL's issued and paid-up capital. The two classes of shares rank pari passu with regard to distributions of income or capital, and generally with regard to voting. The small class of common shares have, however, special voting rights which enable VCL to control PRL. First of all the two classes of shareholders are entitled to appoint separate groups of directors, who together constitute the board of the company, and the holders of the common shares are entitled to appoint the larger group. Secondly, the holders of class A shares have no right to vote on certain specified questions of importance such as a winding up or a sale of property.

On February 14, 1974, the plaintiffs obtained leave to serve notice of the writ on PRL, VCL and IPI out of the jurisdiction. IPI shortly afterwards accepted service through solicitors in England, VCL has not appeared, PRL has entered a conditional appearance and now moves to set aside the order giving leave to serve out of the jurisdiction. The main, although not the only ground of PRL's argument, is that the plaintiffs have no locus standi or prima facie cause of action, and I shall deal with that submission first.

Mr. Schemmer's claim in the action arises out of proceedings taken in the United States of America under an Act of Congress called the Securities Exchange Act 1934. I shall call it shortly "the Act of 1934." The American law relevant to this motion is not formally in evidence, but there seems to be no dispute about its terms or effect, and counsel on instructions have furnished me with a copy of the Act of 1934 and with other necessary information. The long title of the Act of 1934 is as follows:

> "To provide for the regulation of securities exchanges and over-the-counter markets operating in interstate and foreign commerce and through the mails, to prevent inequitable and unfair practices on such exchanges and markets, and for other purposes."

Section 2 of the Act declares its purposes and objects in these terms:

> "For the reasons hereinafter enumerated, transactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are affected with a national public interest which makes it necessary to provide for regulation and control of such transactions and of practices and matters related thereto, including transactions by officers, directors, and principal security holders, to require appropriate reports, and to impose requirements necessary to make such regulation and control reasonably complete and effective, in order to protect interstate commerce, the national credit, the federal taxing power, to protect and make more effective the national banking system and federal reserve system, and to insure the maintenance of fair and honest markets in such transactions: . . ."

A The section then enumerates at some length the reasons of Congress for the foregoing proposition. I shall not try to state them in full. They include the volume and importance of stock market transactions in interstate commerce (an expression defined to include commerce with foreign countries as well as that among the several states of the American Union); the effect of stock market prices and of fluctuations therein on the calculation of federal and state taxes, on the volume of commercial credit,

B and on the valuation of security for bank loans; and likewise the alleged role of the manipulation of security prices and fluctuations therein in producing national emergencies, with widespread unemployment and dislocation of the economy, and resultant great expense to the federal government. Section 4 of the Act of 1934 sets up an agency called the Securities and Exchange Commission, which I shall refer to simply as "the commission,"

C to be appointed by the President of the United States, by and with the advice and consent of the Senate. The Act of 1934 contains very elaborate provisions for the regulation of stock exchanges, of other markets and traders in securities, of bank loans made upon securities, of companies whose securities are publicly dealt in, and of many allied matters. Large powers of investigation and of making rules and regulations are conferred on the commission. Some of the more general provisions of the Act of

D 1934 are contained in section 10, which I shall read:

> "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—(a) To effect a short sale, or to use or employ any stop-loss order in connection with the purchase or sale, of any security registered on a national securities
>
> E exchange, in contravention of such rules and regulations as the commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the commission may prescribe as
>
> F necessary or appropriate in the public interest or for the protection of investors."

The phrase which comes at the end of both the foregoing subsections is worth noticing, for it recurs at intervals throughout the Act of 1934. I will read it again: "necessary or appropriate in the public interest or for the protection of investors." One of the rules made by the commission

G under section 10 (b) of the Act of 1934, rule 5 of those rules, includes the following provisions:

> "It shall be unlawful for any person directly or indirectly by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, (1) to employ any device, scheme, or artifice to defraud, (2) to make any
>
> H untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, or in the light of the circumstances under which they were made, not misleading, or (3) to engage in any act, practice, or course of business which operates or

would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

The judicial enforcement of the Act of 1934 is provided for by the last two subsections of section 21 thereof as follows:

"(e) Whenever it shall appear to the commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this title, or of any rule or regulation thereunder, it may in its discretion bring an action in the proper district court of the United States, the Supreme Court of the District of Columbia, or the United States courts of any territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond. The commission may transmit such evidence as may be available concerning such acts or practices to the Attorney-General, who may, in his discretion, institute the necessary criminal proceedings under this title.

"(f) Upon application of the commission the district courts of the United States, the Supreme Court of the District of Columbia, and the United States courts of any territory or other place subject to the jurisdiction of the United States, shall also have jurisdiction to issue writs of mandamus commanding any person to comply with the provisions of this title or any order of the commission made in pursuance thereof."

Section 27 of the Act of 1934 gives exclusive jurisdiction to the federal courts of the United States over all violations of the Act of 1934, and over all suits in equity and actions at law to enforce any liability or duty thereunder. The same section authorises service of civil process wherever the defendant may be found. Section 32 provides for the punishment by fine and imprisonment of persons convicted of violating the provisions of the Act of 1934. I have seen nothing in the Act of 1934 expressly authorising the appointment of a receiver of assets at the suit of the commission, a remedy which I have to consider in the present case. Counsel have, however, informed me that the federal courts possess a general equitable jurisdiction in fields within their competence, and under that jurisdiction appoint receivers when appropriate. If I understand the matter correctly, such an appointment at the suit of the commission under the Act of 1934 is purely conservative and directed to prevent the dissipation of assets by practices in violation of the Act of 1934. It does not effect any expropriation or involve the court or the commission in any execution of trusts or general administration of assets.

In addition to the public sanctions, civil and criminal, which I have tried to summarise, the Act of 1934 in some cases confers a private right of action for damages or other relief upon injured persons, for example on those suffering from any manipulation of security prices in contravention of section 9 of the Act of 1934, and on companies affected by the insider dealings mentioned in section 16 thereof. Counsel have told me that a like private right of action has been recognised by judicial construction in some cases where it is not expressly enacted, notably for violations of section 10

A  (b) of the Act of 1934, and there is in evidence a sworn opinion to that effect of Professor Moore of the Yale Law School, the author of *Moore's Federal Practice*.

Late in 1972, the commission began proceedings under the Act of 1934 in the United States District Court for the Southern District of New York against Mr. Robert L. Vesco, Mr. Norman LeBlanc, and a large number of other individual and corporate defendants, charging violations of section
B  10 (b) of the Act of 1934, and of rule 5 thereunder, both of which I have read. The commission's complaint alleged an elaborate scheme of fraudulent practices by persons controlling (among other companies) VCL. The commission claimed injunctions, the appointment of receivers and other equitable relief which I need not specify, in express reliance on sections 21 (e) and 27 of the Act of 1934. Only one of the defendants to the present English action was named as a defendant in the American
C  proceedings, namely, VCL. VCL, so far as I know, has never appeared in the suit, and a number of default orders have been made against it.

I do not think it necessary to narrate the successive orders of the district court. For present purposes I can go straight to an order of Judge Stewart of that court dated September 28, 1973, and need only recite one paragraph thereof. It appointed Mr. Schemmer as receiver to take possession of a
D  great variety of securities and assets, among them the assets of VCL and its subsidiaries, including (inter alia) all the shares and assets of PRL, with large administrative powers subject to the control of the court. By later orders of the district court, Mr. Schemmer was authorised to take proceedings in the United Kingdom to have himself appointed receiver of the assets of PRL and its subsidiaries, located in the United Kingdom, and also
E  to sue the defendant banks and PRL for the London funds in the district court itself.

Mr. Schemmer accordingly began the present action in order that he may, as he says, comply properly with the directions given to him by the United States district court. By his writ he prays that he or some other fit and proper person may be appointed receiver and manager to get in and
F  receive and administer the London funds; secondly, injunctions restraining the defendant banks from parting with the London funds except to such receiver and, thirdly, injunctions restraining PRL, VCL and IPI from transferring or ordering the transfer of the London funds except to such receiver.

There seems to be little reported authority on the enforcement in this
G  country of foreign decrees appointing a receiver. I must mention four cases cited in argument. *Houlditch* v. *Marquis of Donegal* (1834) 8 Bli.N.S. 301, was an Irish appeal in the House of Lords. The appellants claimed as beneficiaries under a deed of arrangement whereby Lord Donegal had settled a term of years in Irish lands for the benefit of his creditors. The Court of Chancery in England had appointed a receiver of the rents applicable under the deed of arrangement, whom Lord Donegal
H  persistently obstructed. The appellants therefore took proceedings in Ireland for the appointment of a receiver in that country, to account to the master in the English suit, and for an injunction against the interference of

Lord Donegal. It was proved that, although originally an absentee, Lord Donegal had repeatedly appeared in the English proceedings. The Lord Chancellor of Ireland (Lord Plunket L.C.) nevertheless held that he had no jurisdiction to enforce or give effect to the English decree. The House of Lords, whose judgment was expressed by the speech of Lord Brougham L.C. reversed his order, and gave the appellants the relief they sought, except that the receiver was made accountable to the Irish (and not directly to the English) court. Lord Brougham's observations contain much general discussion of the effect of a foreign judgment, some of which might not now be accepted as good law. He certainly held that Lord Plunket could have gone behind the English order and inquired afresh into the merits, but in the end he did not think it necessary to move to remit the case for further consideration. The essential grounds of the decision of the House of Lords, put into more modern language, seem to me to be as follows: the English proceedings against Lord Donegal were proceedings in personam, Lord Donegal had submitted to the jurisdiction of the English court, therefore the English decree was binding on him unless shown to be wrong, and consequently the Irish court should enforce his obligations thereunder.

*In re Maudslay, Sons & Field* [1900] 1 Ch. 602 relates to a receiver appointed by the English court in a debenture holders' action against an English company. The terms of the appointment comprised all the company's property whatsoever and wheresoever. Subsequently an English creditor of the company sought to attach a debt owing to the company in France. Cozens-Hardy J. held that the creditor committed no contempt of court by taking proceedings in France and was entitled to continue them. He said, at p. 611:

> "It is well settled that the court can appoint receivers over property out of the jurisdiction. This power, I apprehend, is based upon the doctrine that the court acts in personam. The court does not, and cannot attempt by its order to put its own officer in possession of foreign property, but it treats as guilty of contempt any party to the action in which the order is made who prevents the necessary steps being taken to enable its officer to take possession according to the laws of the foreign country. . . . In other words, the receiver is not put in possession of foreign property by the mere order of the court. Something else has to be done, and until that has been done in accordance with the foreign law, any person, not a party to the suit, who takes proceedings in the foreign country is not guilty of a contempt either on the ground of interfering with the receiver's possession or otherwise. For this purpose no distinction can be drawn between a foreigner and a British subject."

The third case cited was *Macaulay* v. *Guaranty Trust Co. of New York* (1927) 44 T.L.R. 99. The plaintiffs there were receivers appointed by the court in Delaware of all the assets of an insolvent company incorporated in that state. The order of the American court was described by counsel as really a combination of a winding-up order and an administration order,

A and there was evidence that in Delaware the plaintiffs could sue in their own name for assets of the company. Clauson J. gave judgment in favour of the plaintiffs for a balance standing to the company's credit at a bank in London, treating their position as analogous to that of foreign assignees in bankruptcy.

The remaining authority is *In re Kooperman* [1928] W.N. 101, where Astbury J. appointed the curator in a Belgian bankruptcy to be receiver
B of the bankrupt's immovable property in Walthamstow, so that it might be sold in obedience to an order of the Belgian court. The bankrupt had been trading in Belgium and had appeared in the bankruptcy proceedings there, though resident in France at the time of the English court's order.

Founding his argument on the foregoing authorities, Mr. Dillon, for the plaintiffs, contends that the court should appoint Mr. Schemmer to be
C receiver of the London funds in pursuance of the American decree. Because PRL is not incorporated in the United States of America, Mr. Dillon does not assert that Mr. Schemmer is immediately entitled to the London funds by virtue of that decree, and he concedes that the English court has power to go behind it and look into the circumstances. The present case is to be compared, he says, with *Houlditch* v. *Marquis of Donegal*, 8 Bli.N.S. 301, rather than with *Macaulay's* case, 44 T.L.R. 99. Mr. Dillon also
D founds himself largely on the *Maudslay* case [1900] 1 Ch. 602. If the English court expects its receivers to be able to perfect their title to foreign assets, he says, it must similarly assist receivers of English assets appointed by foreign courts, and he relies on the principle of reciprocity or comity applied in *Travers* v. *Holley* [1953] P. 246. I think, however, that in view of well-known later decisions *Travers* v. *Holley* must be followed
E only with caution outside its own subject matter of matrimonial status.

I shall not attempt to define the cases where an English court will either recognise directly the title of a foreign receiver to assets located here or, by its own order, will set up an auxiliary receivership in England. To do either of those things the court must previously, in my judgment, be satisfied of a sufficient connection between the defendant and the jurisdiction in which
F the foreign receiver was appointed to justify recognition of the foreign court's order, on English conflict principles, as having effect outside such jurisdiction. Here I can find no sufficient connection. First, PRL was not made a defendant to the American proceedings, and there is no evidence that it has ever submitted to the federal jurisdiction. In that regard it is, in my judgment, not enough that certain subsidiary companies of PRL with
G assets in the United States of America have unsuccessfully contested the orders of the district court on the basis that it had no personal jurisdiction against them, and on other grounds. Secondly, PRL is not incorporated in the United States of America or any state or territory thereof, so that the principle tacitly applied in *Macaulay's* case, 44 T.L.R. 99, and more fully exemplified by *North Australian Territory Co. Ltd.* v. *Goldsbrough, Mort
H & Co. Ltd.* (1889) 61 L.T. 716 is of no direct relevance. Thirdly, there is no evidence that the courts of the Bahama Islands, where PRL is incorporated, would themselves recognise the American decree as affecting English assets. Fourthly, there is no evidence that PRL itself has ever

carried on business in the United States of America or that the seat of its central management and control has been located there. I express no view, one way or the other, on the materiality of those two circumstances.

The situation relied on by the plaintiffs is that PRL is actively or passively concerned in a violation of the laws of a foreign country, and a court in that country has in consequence appointed a receiver of its assets. Under those circumstances (and in the absence of any other ground of foreign jurisdiction) the English court ought not, in my judgment, to regard the appointment as having any effect on assets outside the foreign court's territorial limits. A little imagination will show that any different rule might produce a multiplicity of claims, and confusing and unnecessary questions of competing priorities.

I am naturally led on to a different and alternative ground for denying Mr. Schemmer's alleged cause of action. The Act of 1934 is, in my judgment, a penal law of the United States of America and, as such, unenforceable in our courts. I have read enough of it to show that it was passed for public ends and that its purpose is to prevent and punish specified acts and omissions which it declares to be unlawful. It was, of course, enacted not merely in the interest of the nation as an abstract or political entity, but to protect a class of the public. In that it resembles the greater part of the criminal law of any country. Like many other penal laws, the Act of 1934 also provides in some cases a private remedy available to the victims of the offences which it forbids, and it may possibly be that a private plaintiff who recovers a judgment in a federal court under the Act of 1934 can enforce it by action here. As Lord Watson said in *Huntington* v. *Attrill* [1893] A.C. 150, 161:

> ". . . a delict may give rise to a purely civil remedy, as well as to criminal punishment. Although a right of action is given to the party aggrieved, it does not follow that the law of nations must regard his action as a suit in favour of the state."

Here, however, I have nothing of that sort. Mr. Schemmer comes before this court, in effect, as a public officer charged to reduce the London funds into possession in order to prevent the commission or continuation of offences against federal law. In my judgment, and in the absence of specific legislation founded on treaties, preventive criminal justice is no more a proper subject of international enforcement than retributive criminal justice. The point would be obvious if the plaintiff here were the plaintiff in the district court, namely, the commission (in effect, the financial police of the American Union) and its character is not altered by the substitution of Mr. Schemmer, the receiver appointed on the commission's application.

I conclude, therefore, that Mr. Schemmer has no probable cause of action to support service out of the jurisdiction within the principle of *Société Générale de Paris* v. *Dreyfus Brothers* (1887) 37 Ch.D. 215.

Foreseeing that conclusion as a possible outcome of the argument, Mr. Dillon said, in the alternative, that the necessary cause of action is vested in the other seven plaintiffs alone. They appear all to be shareholders in VCL, one of them being also a shareholder in IPI. Mr. Dillon asks me to

A   regard them as bringing an action for the protection of the assets of PRL of the sort commonly called a minority shareholders' action. Such a suit is based on the exception to the well-known rule in *Foss* v. *Harbottle* (1843) 2 Hare 461 which arises where the persons in control of a company have committed, or are about to commit, acts that are fraudulent or that are ultra vires the company. The action postulated by Mr. Dillon's argument is unusual in that Mr. Schemmer's co-plaintiffs are not members of PRL
B   but of VCL, itself a shareholder in PRL, but I will assume (without deciding) that that is no insuperable objection. I find, however, no hint in the writ or in the material evidence that the co-plaintiffs are making such a claim as Mr. Dillon suggests. The written authority which they have given to the plaintiffs' solicitors is to take proceedings in England for the purpose of obtaining the appointment of Mr. Schemmer as a receiver together
C   with such injunctive or further relief as the solicitors may determine to be necessary or appropriate. The affidavit in support of the application to add the seven additional plaintiffs accordingly stated quite correctly that they wished to support Mr. Schemmer's application to be appointed receiver, and were willing to be joined *for that purpose.* Mr. Schemmer says substantially the same thing about them in paragraph 28 of an affidavit
D   sworn on February 20, 1974, with a view to obtaining, if necessary, an interlocutory injunction. There is nothing to suggest any wider claim in the writ, and the indorsement thereon remains (so far as I can see) as it was before the further plaintiffs were added, except for the alteration of the expression "the plaintiff" to "the first plaintiff." The writ does not suggest any representative capacity of the additional plaintiffs, nor are the
E   allegedly culpable officers of VCL or PRL named as defendants. The affidavit in support of the application for leave to serve notice of the writ out of the jurisdiction appears to have been sworn while Mr. Schemmer was the sole plaintiff, and as to the cause of action says only that the basis of his claim is his appointment as receiver by the United States district court and that the London funds are moneys which are affected by the order of that
F   court. In all those circumstances it would, in my judgment, be unjust to PRL to keep the existing service alive as a basis for future proceedings of a different sort.

Thus PRL, in my view, must succeed in its main contention. Mr. Harman also submitted a further argument on PRL's behalf. He said that leave for service out of the jurisdiction ought not, on the facts of this case,
G   to have been given, even if the plaintiffs, or some of them, have a probable cause of action which the court would have to adjudicate upon had PRL an address for service within the jurisdiction. That alternative submission requires me not only to examine the language of R.S.C., Ord. 11, but also to consider the exercise of the court's undoubted discretion thereunder. I always find it difficult to say how I would exercise a discretion if things were not as I believe them to be. Counsel must therefore not think me
H   unappreciative of their industry and advocacy if I say nothing about this branch of the debate and decide the motion on Mr. Harman's main point alone. His motion succeeds. I must set aside the order giving leave to

serve out of the jurisdiction so far as regards PRL, the service effected on PRL, and all subsequent proceedings against PRL.

> *Order granting leave to serve notice of writ out of jurisdiction on PRL set aside.*
> *PRL to have their costs of conditional appearance and all subsequent proceedings.*
> *Leave to appeal.*
> *No order, on plaintiffs' motion, except costs of third to sixth defendants, who were not respondents to PRL's motion, be defendants' costs in cause.*

Solicitors: *Bircham & Co.; Courts & Co.; Lovell, White & King; Slaughter & May; Bischoff & Co.; Wilde, Sapte & Co.*

T. C. C. B.

---

*In re* WHITFIELD'S ESTATE
INLAND REVENUE COMMISSIONERS *v.*
WHITFIELD AND ANOTHER

[1973 W. No. 236]

1974 July 5, 8; 18                                              Walton J.

> Revenue—Estate duty—Gift inter vivos—Donor borrowing money to purchase policies of assurance on her life for benefit of donees—Money under policies to be used by donees for payment of duty on gifts after donor's death—Whether debt incurred wholly for donor's benefit and deductible from estate —Finance Act 1894 (57 & 58 Vict. c. 30), s. 7 (1) (a)
>
> Just before the deceased's death on November 17, 1963, she was worried about the liability of her relatives to estate duty on certain inter vivos gifts which she had made. The second defendant, as her solicitor, made arrangements on her behalf to take out assurance policies at her expense. Under the policies certain sums were to become payable to the relatives on the deceased's death and were to enable them to meet the liability. She did not have cash available. Negotiations were made with her bank to lend her £80,000 against her securities. She gave two powers of attorney to her son, the first defendant. One was of a general nature and the other specifically authorised him to effect the proposed policies and to borrow for the purpose of paying the premiums thereon. On November 16, the two defendants, the bank manager, and the insurer's