# EXHIBIT 13



**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD CAUSE NO: 234 of 2017 (ASCJ)**

**IN THE MATTER OF SILK ROAD FUNDS LTD.**

**AND IN THE MATTER OF SILK ROAD M3 FUND**

**AND IN THE MATTER OF A REQUEST FOR RECOGNITION**

**IN CHAMBERS**
**BEFORE THE HON. ANTHONY SMELLIE, CHIEF JUSTICE**
**THE 11TH DECEMBER 2017 AND 8TH FEBRUARY 2018**

APPEARANCES:          **Mr. Tom Wright of Solomon Harris, Attorney-at-Law for the Applicant**

*Receivers appointed by Bermuda Supreme Court over segregated account within a segregated account fund company – application by receivers for recognition of their appointment and enforcement of the terms of their order of appointment – jurisdiction of the Grand Court for the grant of recognition – how jurisdiction to be appropriately exercised - distinction between receivership and winding up proceedings – applicability of the principles of "modified universalism".*

## REASONS FOR JUDGMENT

### Introduction

1.     The Joint Receivers ("the Receivers") of the Silk Road M3 Fund ("the M3 Fund") by

       their Ex Parte Originating Summons dated 8 November 2017 ("the Recognition

Summons") seek this Court's recognition of the order made by the Supreme Court of Bermuda ("the Bermuda Court") appointing the Receivers ("the Appointment Order"). The Receivers also seek orders granting the recognition and enforcement of the functions and powers of the Receivers granted by the Bermuda Court. For reasons to be explained below, once recognized, the Receivers will also seek this Court's assistance by way of directions permitting them to bring an action for *Norwich Pharmacal*[1] relief against the Joint Official Liquidators ("the JOLs") of Caledonian Bank Limited ("CBL") and Caledonian Securities Limited ("CSL").

2.      The Receivers explain that at this early stage of the Receivership of the M3 Fund, they must obtain orders that the JOLs disclose certain documents in their possession without which the Receivers are being impeded from complying with their duties to investigate the whereabouts of the M3 Fund's assets and to take steps to recover those assets, for the benefit of the M3 Fund's stakeholder. The Receivers have therefore also filed an Ex Parte Originating Summons ("NP Summons") seeking such orders pursuant to the *Norwich Pharmacal* principles. The Recognition Summons was heard on 11 December 2017 and these are the reasons for the grant of recognition.

3.      The Receivers also filed an Ex Parte Summons ("Gagging Summons") seeking an order preventing the JOLs from informing anyone of the existence of the NP Summons and the evidence in support thereof, which, if the Recognition Summons and Gagging Summons were successful, would be served on the JOLs immediately after the hearing on 11 December 2017. In the event, having been satisfied that pre-



---

[1] *Norwich Pharmacal v Customs & Excise Comm. [1974] AC 133.*

mature disclosure of the Receivers' actions to those involved with the M3 Fund could result in prejudice to the Receivers' actions, I also granted the Gagging Orders.

## Orders Granted by this Court

4.   The orders granted in respect of recognition are as follows:

4.1.   that the Appointment Order be recognized by this Court, including recognition of the Receivers as having all the functions and powers of the directors and managers of the Silk Road Fund Ltd ("Silk Road") in respect of the business and assets linked to the M3 Fund, including the powers and functions set out in the Appointment Order;

4.2.   that in recognition of the above powers and functions, the Receivers are authorised to bring an application for *Norwich Pharmacal* type orders for disclosure against the JOLs of CBL and CSL; and

4.3.   that the Receivers shall have liberty to apply to this Court in respect of any matter concerning the M3 Fund and/or Silk Road and arising during the period of the appointment of the Receivers as Receivers of the M3 Fund and to do all such things as may be necessary to assist the Receivers, in connection with their appointment as the Receivers of the M3 Fund.

## The M3 Fund and Silk Road

5.   To ground their applications, the affidavit of Matthew Clingerman, one of the Receivers, was relied upon. He explains the following necessary background. John Wasty, a Bermudian attorney also files an affidavit in support and in which he sets out and explains the applicable Bermudian law. His evidence on that subject was

accepted for the purposes of my decision and is reflected in my findings which follow.

6.   The M3 Fund is what is known in Bermuda, its place of incorporation, as a "segregated account".

7.   Silk Road is a "segregated accounts company" incorporated in Bermuda on 19 October 2011.  It is permitted by Bermudian legislation to carry on the business of a mutual fund and to offer shares in one or more classes of one or more segregated accounts.  The M3 Fund is a segregated account of Silk Road.  In a manner identical to that in which Cayman Islands segregated portfolio companies and their segregated portfolios operate, a Bermudian segregated account such as the M3 Fund is not a separate legal entity to its segregated accounts company.  Its establishment and nature is explained in section 17(1) of the Bermuda Segregated Accounts Companies Act 2000 ("SACA") which provides as follows:

> *"Nature of segregated accounts, application of assets and liabilities*
>
> 17. (1)   *Notwithstanding any other provision of this Act, the establishment of a segregated account does not create a legal person distinct from the segregated account company.*
>
> (2)   *Notwithstanding any enactment or rule of law to the contrary, but subject to this Act, any liability linked to a segregated account shall be a liability only of that account and not the liability of any other account and the rights of creditors in respect of such liabilities shall be rights only in respect of the relevant account and not of any other account, and, for the avoidance of doubt, any asset which is linked by a segregated accounts company to a segregated account—*



      (a) *shall be held by the segregated accounts company as a separate fund which is—*

        (i) *not part of the general account and shall be held exclusively for the benefit of the account owners of the segregated account and any counterparty to a transaction linked to that segregated account, and*

        (ii) *available only to meet liabilities to the account owners and creditors of that segregated account; and*

      (b) *shall not be available or used to meet liabilities to, and shall be absolutely and for all purposes protected from, the general shareholders and from the creditors of the company who are not creditors with claims linked to segregated accounts.*

    (3) *For the purposes of this Act, the Companies Act 1981 and otherwise at law, the assets recorded in the general account shall be the only assets of a segregated accounts company available to meet liabilities of the segregated accounts company that are not linked to a segregated account."*

8.    The segregated accounts company, Silk Road in the instant scenario, holds assets separately on behalf of the M3 Fund segregated account, with the assets being segregated from those of other segregated accounts within Silk Road, and being available only to meet the liabilities of the M3 Fund segregated account. The question whether this kind of arrangement should be regarded as a kind of statutory trust or simply as giving rise to strict accounting obligations was raised but not determined in *Re SPhinX*, 2009 CILR 28, (at 36). There the view was expressed obiter, that the latter is, at minimum, the nature of the obligation imposed in the context of a similar Cayman Island segregated portfolio company.



**Receivership of the M3 Fund**

9.   On 20 January 2013, Goodwill PTC Limited (as Trustee of the Prosperity Trust) ("Goodwill") subscribed for 10,000 Participating Class A Shares in the M3 Fund for a consideration of US$10 million.  Two years later, on 19 January 2015, Goodwill served a redemption notice in respect of its entire shareholding, which was accepted by the administrator of Silk Road.

10.  Notwithstanding, as the Clingerman affidavit avers, that Goodwill explored ways in which its investment might be repaid, including by way of a share purchase agreement with the investment advisor of the M3 Fund; as at 10 April 2017 no redemption monies had been repaid.  On that date Goodwill filed an originating summons in the Bermuda Court seeking the appointment of the Receivers.  The grounds on which the appointment was sought were that it was just and equitable that the Receivers be appointed and that the appointment of the Receivers was likely to achieve the orderly management, sale, rehabilitation, run-off or termination of the business of or attributable to the M3 Fund, or the distribution of the assets linked to the M3 Fund, to those entitled to them.

11.  On 21 April 2017, the Bermuda Court appointed Mr. Clingerman and Mr. Sven Michael Schultz as Receivers. By Court Order dated 6 October 2017, Mr. Christopher Smith replaced Mr. Schulz.

**Powers Granted to the Receivers by the Bermuda Court**

12.  The full range of powers granted to the Receivers is set out in the Appointment Order. For the purpose of the instant application, it is submitted by the Receivers that the following powers are pertinent:



Page **6** of **34**

*"13.1   That the Receivers may do all such things as may be necessary for the purposes of:*

    *(a)   The orderly management, sale, rehabilitation, run-off or termination of the business of, or attributable to, the M3 Fund;*

    *(b)   The distribution of the assets linked to the M3 Fund to those entitled thereto.*

*13.2.   That the Receivers shall have all of the functions and powers of the directors and managers of Silk Road in respect of the business and assets linked to the M3 Fund.*

*13.3.   That Receivers shall have the powers:*

    *(a)   to ascertain the assets of the M3 Fund and their status and take all steps necessary including Court actions where appropriate to obtain possession of such assets and to bring the same under their control and further, where appropriate, bring the same into the jurisdiction of this Honourable Court [the Bermudian Court] and, for this purpose, to seek the assistance of the courts of the various jurisdictions in which assets of the M3 Fund are located;*

    *(b)   ....*

    *(h)   to consider and if thought advisable to commence such actions as may be necessary to protect, recover or obtain assets and or monies belonging or due to the M3 Fund and to*



*commence all other proceedings outside Bermuda as may be necessary to have their appointment recognised and to protect the assets of the M3 Fund, in particular but not limited to applications in the United States of America, Hong Kong, Canada, the Cayman Islands, Uzbekistan or Mongolia;*

(i)   *That the Receivers may bring or defend in their name or in the name of the M3 Fund any action or other legal proceedings which relate to the property belonging to the M3 Fund or which it is necessary to bring or defend for the purpose of effectually discharging the purposes set out at paragraph 3 hereof; and*

(j)   *That the Receivers be authorized to take any such action as may be necessary or desirable to obtain recognition of the appointment of the Receivers in any other relevant jurisdiction and to make applications to the courts of such jurisdictions for that purpose."* [Emphasis added.]

13.   I note especially that the Bermuda Court granted the Receivers the authorization to "*commence all other proceedings outside Bermuda as may be necessary to have their appointment recognised*" and that among the jurisdictions named in paragraph 13.3(h) above of the Appointment Order for those purposes, the Cayman Islands is named specifically.

**Reasons for seeking recognition in the Cayman Islands**

14.   Set out at paragraphs 23 to 33 of the Clingerman Affidavit is a summary of the investigations carried out by the Receivers into the whereabouts of the assets attributable to the M3 Fund.  Those investigations are said to have revealed that a significant portion of the funds paid by way of the subscription of Goodwill were transferred to (a) one or more accounts in the name of an entity connected to the sole director and shareholder of the former investment advisor, of the M3 Fund[2], and (b) an account in the name of the investment advisor itself; both accounts being held at CBL.

15.   The narrative of one of the remittance advices generated by the transfer of monies to one of these accounts at CBL, suggests that the depositor may have maintained a brokerage account at CSL.  Full details of the reasons why the *Norwich Pharmacal* relief has to be sought against the JOLs in connection with these deposits and the depositors brokerage account at CSL are contained in documents filed in support of the application for *Norwich Pharmacal* relief, with that application set to be heard on 18 December 2017.

16.   As already mentioned, the purpose of the Recognition Summons was to seek this Court's recognition of the appointment of the Receivers, the powers granted to them by the Bermuda Court and this Court's assistance in permitting the Receivers to bring the proceedings for *Norwich Pharmacal* relief against the JOLs.

---

[2] Respectively, Eurasia Capital Ltd. and Silk Road Management Limited.

**Basis for recognition and assistance**

17.     It was submitted on behalf of the Receivers that there is only one available route by which the Receivers may seek recognition and assistance and that is through the common law and the principle of "*modified universalism*".  This selection of route was said to be to the exclusion of Part XVII of the Companies Law (2016 Revision) (Companies Law).  It was also said that recognition at common law, as confirmed by authorities such as *Stutts v. Premier Benefit Trust (Stutts)*[3] and *Canadian Arab Financial Corporation v Player (Player)*[4] which deal with the recognition by the Courts of the Cayman Islands of receivers of a different nature (as further detailed below), would not be the correct route.  Those receiverships involved circumstances which are unlike those here, submits Mr. Wright. He submits that these receiverships are more akin to liquidators (per the judgment of Justice Foster *In the Matter of JP SPC 1* and *In the Matter of JP SPC*[5], (discussed further below).   Mr. Wright, on behalf of the Receivers, explained why these paths to recognition – the statutory path and the common law jurisdiction for the appointment of receivers – have not been chosen.  I explain below why I agree in relation to Part XVII of the Companies Law but regard the common law on the recognition of receivers as the suitable path, rather than reliance on the principle of modified universalism.



**The Path Through Part XVII of The Companies Law**

18.     Sections 240 and 241 of the Companies Law states that:

---

[3] 1992-93 CILR 605.
[4] 1984-85 CILR 63.
[5] *In the Matter of JP SPC 1 and JP SPC 4 [2013 (1) CILR 330]*

*"240.   In this Part-*

*"debtor" means a foreign corporation or other foreign legal entity subject to a foreign bankruptcy proceeding in the country in which it is incorporated or established;*

*"foreign bankruptcy proceeding" includes proceedings for the purpose of reorganising or rehabilitating an insolvent debtor; and*

*"foreign representative" means a trustee, liquidator or other official appointed in respect of a debtor for the purposes of a foreign bankruptcy proceeding.*

*241. (1)  Upon the application of a foreign representative the Court may make orders ancillary to a foreign bankruptcy proceeding for the purposes of-*

*(a) recognising the right of a foreign representative to act in the Islands on behalf of or in the name of a debtor;*

*(b) enjoining the commencement or staying the continuation of legal proceedings against a debtor;*

*(c) staying the enforcement of any judgment against a debtor;*

*(d) requiring a person in possession of information relating to the business or affairs of a debtor to be examined by and produce documents to its foreign representative; and*

*(e) ordering the turnover to a foreign representative of any property belonging to a debtor.*

*(2)  An ancillary order may only be made under subsection (1)(d) against-*

*(a) the debtor itself; or*

*(b) a person who was or is a relevant person as defined in section 103(1)."*



19.   It was submitted quite correctly, that the Receivers are not "*foreign representatives*" as defined in Section 240. A "*foreign representative*" *is a* "*trustee, liquidator or other official appointed <u>in respect of a debtor</u> for the purposes of a foreign bankruptcy proceeding*" (emphasis added). A debtor is defined as "*a foreign corporation or other foreign legal entity subject to a foreign bankruptcy proceeding in the country in which it is incorporated or established*". Thus the requirement is that a "*debtor*" be a legal entity subject to a foreign bankruptcy proceeding. A Bermuda segregated account (like its Cayman equivalent) is not a legal entity separate from its segregated accounts company. As noted above, section 17(1) of the Bermuda SACA states that:

> "*Notwithstanding any other provision of this Act, the establishment of a segregated account does not create a legal person distinct from the segregated accounts company*."

20.   The issue that this presents is that the entity over which the Receivers have been appointed, the segregated account M3 Fund (not the segregated account company Silk Road itself), is not a legal entity and cannot therefore fall into the definition of "*debtor*" and the Receivers are therefore not "*foreign representatives*", within the meaning of the Companies Law. This is quite apart from the further consideration that the M3 Fund cannot be said to be subject to a "*bankruptcy proceeding*"; as will be explained further below.

21.   Mr. Wright referred to the judgment of Justice Foster in the *Matters of JP SPC 1* and *JP SPC 4* where he considered that the Receivers of Cayman Islands segregated portfolios were "*foreign representatives*" within the meaning of the English Cross-Border Insolvency Regulations 2009 ("CBIR"), and that the receivership of the



segregated portfolios involved was a "foreign proceeding" within the meaning of the CBIR.

22.     It must however, be recognised that the instant case is readily distinguishable from *JP SPC1* and *JP SPC4*. This is because the definition in Part XVII of the Companies Law of "debtor" (discussed above) operates to preclude the recognition of the Receivers under the Companies Law but such a definition does not appear in the CBIR.

23.     In his reference to JP SPC1 and *JP SPC2*, I think that Mr. Wright takes out of context the meaning of Justice Foster's decision in that case.

24.     Justice Foster did not equate the appointment of the joint receivers in that case with the appointment of a liquidator over a company.  In order to arrive at the conclusion that they should be regarded as "*foreign representatives*", he treated the receivership before him as "analogous" to liquidation, even while recognizing that the Fund companies themselves (as distinct from the segregated portfolios) were not the subject of liquidation proceedings.

25.     What he determined was that the terms and incidences of the appointment were such as to enable the receivers before him to act in respect of the assets of their segregated portfolios in a manner akin or analogous to how a liquidator would be allowed to act in relation to the assets of a company in liquidation.  That determination then led him to declare that the joint receivers should be deemed "*foreign representatives*" for the purposes of seeking recognition in England pursuant to the CBIR, to allow them to bring legal action in order to recover the assets of their segregated portfolios.



26.     That is not the same thing as a finding that for all purposes of the law the receivers should be deemed the same as liquidators of a company in liquidation and so appropriately to be recognised under the principle of modified universalism.  I will return to deal with this issue more fully below.

## Modified Universalism

27. In his argument based upon modified universalism, Mr. Wright also argued that the principles and guidance most applicable to the instant application are to be found in the line of authorities culminating in the recent decision of Justice Segal of this Court in *China Agrotech Holdings Ltd*[6] ("*China Agrotech*"); applying the principles of the Privy Council decision in the case of *Singularis Holdings Limited v. PricewaterhouseCoopers*[7] ("*Singularis*").

28.     It was however, recognised by Mr. Wright that the instant application is not on all fours with *Singularis*.  In *Singularis*, the Cayman Court-appointed liquidators were asking for the assistance of the Bermuda Court in exercising a power which would not have been available to them in Cayman, being the power to compel PWC the former auditors of *Singularis*, to provide the documentation requested.  But for their appointment over *Singularis*, the company which was in liquidation, the liquidators would have had no standing to seek the Court's assistance.

29.     *China Agrotech* is a matter in which Justice Segal recognized liquidators appointed in Hong Kong over an entity incorporated in the Cayman Islands and granted those

---

[6] *Unreported, 19 September 2017*
[7] *Singularis Holdings Limited v. PricewaterhouseCoopers [2014] UKPC 36*

liquidators the power to apply to the Cayman Court for approval of a scheme of arrangement pursuant to section 86 of the Companies Law.

30.   In *China Agrotech*, the power which the liquidators sought to exercise (the power to promote and apply for approval of a Scheme of Arrangement) was again a power which, on the facts of that case, would not have been available but for the fact that the company itself was in liquidation.

31.   While acknowledging that the legal entity here, Silk Road, is itself not in liquidation nor receivership, Mr. Wright submitted that, in the instant case, the Receivers are seeking recognition by this Court in order that it is they through whom the M3 Fund may act in this jurisdiction – and later in terms of the *Norwich Pharmacal* relief – it would be relief which the M3 Fund, through the Receivers, could seek in its own right.

32.   It was submitted that the cases leading up to and including *Singularis* and *China Agrotech* provide this Court with authority to recognize the Receivers and the functions and powers which have been bestowed upon them by the Bermuda Court, as well as authorizing the Receivers to seek *Norwich Pharmacal* relief in this jurisdiction.

33.   Primarily for the reason that the principles of universality of insolvency or bankruptcy upon which *Singularis* and *China Agrotech* were decided have no applicability here, I declined to recognise the Receivers by reliance on them.  I think  the reasons for this become clearer from the following discussion of the cases.



### *Singularis* – **Bermuda Court of Appeal Decision**[8]

34. PWC appealed orders made at first instance by the Bermuda Court recognizing the Cayman Court-appointed liquidators of Singularis and requiring PWC to hand over documents to the liquidators by way of an analogous use of Bermudian legislation (Section 195 of the Companies Act 1981). Under Cayman legislation (section 106 of the Companies Law), the liquidators were seen as not entitled to the documents sought and so unable to apply to the Cayman Court for their production.

35. The difficulty was that under section 195 of the Bermudian Companies Act 1981, the Court was allowed to grant such assistance only as might be available to a foreign liquidator before his home Court.

36. The Court of Appeal of Bermuda condensed PWC's argument with reference to and in paraphrase of the Privy Council's decision in *Al Sabah v Grupo Torras SA*[9] in this way:

> "*If the Supreme Court had no statutory jurisdiction to act in favour of a foreign liquidator, it might have had some limited inherent power to do so. But it cannot have had inherent jurisdiction to exercise the extraordinary powers conferred by Section 195 of the 1981 Act in circumstances not falling within the terms of that section.*"

37. Mr. Wright emphasized that the Receivers are not asking this Honourable Court to find that it has a separate route to enforcement of the Appointment Orders, in a manner similar to that in which the Bermuda Court did in the first instance decision in

---

[8] *PricewaterhouseCoopers v. Saad Investments Company Limited & Singularis Holdings Limited [2013] CA (BDA) 7 CIV*

[9] *Al Sabah and another v. Grupo Torras SA [2005] UKPC 1, cited and paraphrased by the Court of Appeal at p.15.*

*Singularis*. Nor are the Receivers suggesting that this Court must "shape" or "tailor" Cayman insolvency law so that the order sought may be made.

38.    It was, however, submitted that Lord Hoffman's following reference to the doctrine of universalism in paragraph 22 of his judgment in *Cambridge Gas Transportation Corporation v Official Committee of Unsecured Creditors of Navigator Holdings Plc* [2007] 1 AC 508[10] ("*Cambridge Gas*") can, by analogy, be "*ratio referable*" to the instant case, given that the order which this Court is being asked to recognize does not conflict with local Cayman insolvency law.  It was submitted that this Court is not being asked to use common law to dis-apply, disregard or dispense with Cayman legislation:

> "*At common law, their Lordships think it is doubtful whether assistance could take the form of applying provisions of the foreign insolvency law which form no part of the domestic system. But the domestic court must at least be able to provide assistance by doing whatever it could have done in the case of a domestic insolvency. The purpose of recognition is to enable the foreign office holder or the creditors to avoid having to start parallel insolvency proceedings and to give them the remedies to which they would have been entitled if the equivalent proceedings had taken place in the domestic forum*."

39.    But the premise of Mr. Wright's argument here was different, as will become clearer below.

### *Singularis* – Privy Council

40.    The Privy Council in *Singularis* upheld the Bermuda Court of Appeal's decision to overturn the first instance decision enforcing the order for PWC to produce the

---

[10] *Cambridge Gas Transportation Corp. v. Official Committee of Unsecured Creditors of Navigator Holdings PLC [2006] UKPC 26*

documents. Lord Sumption confirmed[11] that of the three propositions for which *Cambridge Gas* would be authority, if it were correct, the following proposition survived the criticism leveled in *Singularis* and *Rubin v Eurofinance* SA[12] (**Rubin**) and had not been discredited:

> "*The principle of modified universalism, namely that the Court has a common law power to assist foreign winding up proceedings so far as it possibly can.*"[13]

41.   Lord Sumption went on to elaborate:

> "*In the Board's opinion, the principle of modified universalism is part of the common law, but it is necessary to bear in mind, first, that it is subject to local law and local public policy and, secondly, that the court can only ever act within the limits of its own statutory and common law powers. What are those limits? In the absence of a relevant statutory power, they must depend on the common law, including any proper development of the common law. The question how far it is appropriate to develop the common law so as to recognise an equivalent power does not admit of a single, universal answer. It depends on the nature of the power that the court is being asked to exercise. On this appeal, the Board proposes to confine itself to the particular form of assistance which is sought in this case, namely an order for the production of information by an entity within the personal jurisdiction of the Bermuda court. The fate of that application depends on whether, there being no statutory power to order production, there is an inherent power at common law to do so.*"

42.   The relationship between, on the one hand, relief sought by the liquidators for the production of information for the purpose of the performance of their ordinary functions attaching to their status as officers of the court, and on the other hand, the

---

[11] *Supra, para 19*
[12] *Rubin and another v. Eurofinance SA and others [2013] 1 AC 236*
[13] *Supra, para 15*

principle of modified universalism, is helpfully set out at paragraph 23 of Lord Sumption's judgment, as follows:

> "*The principle of modified universalism is a recognised principle of the common law. <u>It is founded on the public interest in the ability of foreign courts exercising insolvency jurisdiction in the place of the company's incorporation to conduct an orderly winding up of its affairs on a world-wide basis, notwithstanding the territorial limits of their jurisdiction. The basis of that public interest is not only comity, but a recognition that in a world of global businesses it is in the interest of every country that companies with transnational assets and operations should be capable of being wound up in an orderly fashion under the law of the place of their incorporation and on a basis that will be recognised and effective internationally. This is a public interest which has no equivalent in cases where information may be sought for commercial purposes or for ordinary adversarial litigation.</u> The courts have repeatedly recognised not just a right but a duty to assist in whatever way they properly can. The Bermuda court has properly recognised the status of the liquidators as officers of that court<u>. The liquidators require the information for the performance of the ordinary functions attaching to that status. Their acknowledged right to take possession of the company's world-wide assets is of little use without the ability to identify and locate them, if necessary with the assistance of the court.</u> The information is unlikely to be available in any other way. None of the reasons which account for the common law's inhibition about the compulsory provision of evidence have any bearing on the present question. The right and duty to assist foreign office-holders which the courts have acknowledged on a number of occasions would be an empty formula if it were confined to recognising the company's title to its assets in the same way as any other legal person who has acquired title under a foreign law, or to*



> *recognising the office-holder's right to act on the company's behalf in the same way as any other agent of a company appointed in accordance with the law of its incorporation. The recognition by a domestic court of the status of a foreign liquidator would mean very little if it entitled him to take possession of the company's assets but left him with no effective means of identifying or locating them."[Emphasis added.]*

43.   The words in emphasis identify the reasons for my view that the principle of universalism of insolvency are inapposite to a case like the present here: the company Silk Road is itself not the subject of the Appointment, is not in liquidation and so there is no question of assisting a process for the "*orderly winding up of its affairs on a world-wide basis*".  Here, the Appointment Order is much more narrowly premised and confined, relating as it does only to the assets of the M3 Fund, a specified segregated portfolio within Silk Road which itself continues to operate entirely outside any winding up process.  As Lord Sumption explains, the public interests attendant upon the orderly completion of the liquidation process has no equivalent in other cases of ordinary adversarial litigation.   While parallels might certainly be drawn with a court-appointed receivership process, to justify regarding a receiver as the Court would a liquidator for the purposes of gathering information abroad about assets of the estate; in my view, the case law does not justify so complete an analogy as to regard the two offices in the same way for the purposes of recognizing title to assets and so to justify applying by analogy the principle of universalism to a receivership.  As Lord Sumption also explained in *Singularis* at [11]:



> *"Winding up proceedings have at least four distinct legal consequences, to which different considerations may apply. First, the proceedings are a "mechanism of collective execution against the property of the debtor by creditors whose rights are admitted or established", to use the expression of Lord Hoffmann in Cambridge Gas..... Inherent in this function of a winding up is the statutory trust of the company's assets... and an automatic stay of other modes of execution. Second, it provides a procedural framework in which to determine what are the provable rights of creditors in cases where they are disputed. Third, it brings into play statutory powers to vary the rights of persons dealing with the company or its assets by impugning certain categories of transaction.... Fourth, it brings into play procedural powers, generally directed to enabling the liquidator to locate assets of the company or to ascertain its rights and liabilities."*

44.   Those are the "*distinct legal consequences*" of a winding up order which are regarded as justifying, in the public interest, the application of the principle of universalism to winding up proceedings.  They find no complete parallel in receivership so as to justify the application by analogy, of the principle of universalism as settled in the case law discussed above, to receivership proceedings.  Certainly, no case law to that effect has been identified by Mr. Wright.

45.   As reflected in my decision, that conclusion does not however, preclude the grant of recognition to the Receivers for the purposes of fulfilling their mandate as defined by

the terms of the Appointment Order within the jurisdiction of this Court.  For as Lord

Hoffman declared in *Cambridge Gas* [14]:

> *"The purpose of recognition is to enable the foreign office holder or*
> *the creditors to avoid having to start parallel insolvency proceedings*
> *and to give them the remedies to which they would have been entitled*
> *if the equivalent proceedings had taken place in the domestic forum."*

46.   That is what my order granting recognition will allow here.  It hardly matters

therefore what label is placed upon the manner of the exercise of the jurisdiction.  It is

the undoubted inherent jurisdiction of the Court at common law to recognise the

foreign Court-appointed representative to act, but only in keeping with the terms of

the appointment.

**Conclusion following *Singularis***

47.   Nor, contrary to Mr. Wright's submissions, does the following dictum from Lord

Collins from *Singularis* (paragraph 33) take the matter any further:

> *"As the Supreme Court confirmed in Rubin v Eurofinance SA [2012]*
> *UKSC 46, [2013] 1 AC 236 the court has a common law power to*
> *assist foreign winding up proceedings so far as it properly can. In my*
> *view, in common with Lord Sumption and despite Lord Mance's*
> *powerful opinion to the contrary, the Bermuda court has the power to*
> *make an order against persons subject to its personal jurisdiction in*
> *favour of foreign liquidators for production of information for the*
> *purpose of identifying and locating assets of the company, provided*
> *they have a similar right under the domestic law of the court which*
> *appointed them. I therefore agree with Lord Sumption that this was not*
> *a proper case for exercise of that power."*



---

[14] [2006] UKPC 16

48.   Whatever may be the state of the analogous powers of the Bermudian and Cayman Courts for the purposes of recognizing each other's appointed office holders, that dictum is clearly stated as applying to foreign winding up proceedings.

**The Stutts Kilderkin/Player Line of Authorities**

49.   I take a different view of the applicability of the common law recognition jurisdiction for receivers.   Indeed, it is that which I consider to be most apposite here.   There is a settled line of authorities whose subject matter is the criteria to be satisfied in order for a foreign receiver to be recognized by the Cayman Islands courts. Those criteria are set out in *Schemmer v. Property Resources Ltd.*[15] ("*Schemmer*") and were applied by the Cayman Islands Court of Appeal in *Kilderkin v Player*[16].   In *Schemmer, Goulding* J. stated at page 287:

> "*I shall not attempt to define the cases where an English court will either recognise directly the title of a foreign receiver to assets located here or, by its order, will set up an auxiliary receivership in England. To do either of those things the court must previously, in my judgement, be satisfied of a <u>sufficient connection</u> between the defendant and the jurisdiction in which the foreign receiver was appointed to justify recognition of the foreign court's order, on English conflict principles, as having effect outside such jurisdiction.*"
> (emphasis added)

50.   In *Kilderkin v Player* the Court of Appeal (per Carey JA at 102-103), described the jurisdiction of the Court to recognize a foreign-appointed receiver in the following terms which I apply here:

---

[15] *Schemmer and Others v. Property Resources Ltd. [1975 Ch. 273]*
[16] Supra.

> *"The appellants having been previously appointed as receiver and manager by the Ontario Court now receive the "imprimatur" of the competent Court within this jurisdiction, i.e. the Grand Court. The basis of the jurisdiction then being exercised, is, it is accepted, derivative.*

[The learned Justice of Appeal then cited section 13(1) of the Grand Court Law as the basis for the exercise by the Grand Court of the "*like jurisdiction within the Islands which is vested in or capable of being exercised in England*" by Her Majesty's High Court of Justice.]

51.    He then continued:

> *"I do not put forward any heretical view if I venture to suggest that the Grand Court, as does the High Court in England, has an inherent power to recognize foreign-appointed receivers and managers over assets within the jurisdiction based on well-recognised conflict of laws principles. Illustrative of the exercise of this jurisdiction, in Schemmer v Property Reserves Ltd…. The learned judge [Goulding J] in a considered judgment held ([1975 Ch. At 287), rightly as I think, that before the English courts would recognize the title of a foreign receiver to assets located in the United Kingdom or direct the setting up of an auxiliary receivership, the Court had to 'be satisfied of a sufficient connection between the defendant and the jurisdiction in which the foreign receiver was appointed…."*

52.    In *Kilderkin v Player*, the Court of Appeal (per Carey JA at p104) then went on to adopt four tests to establish whether there existed a "*sufficient connection*" between the defendant (viz: the subject of the receivership) and the jurisdiction in which the receiver was appointed.  These four tests are summarised as follows:



1.    Has the company in respect of whose assets the receiver and manager has been appointed, been made a defendant in the action in the foreign court?

2.      Has the company in respect of whose assets the receiver and manager has been appointed, been incorporated in the country which appointed the receiver and manager?

3.      Would the courts of the country of incorporation recognise a foreign appointed receiver?

4.      Has the company carried on business in [the jurisdiction of the appointment] or is the seat of its central management and control located there?"

53.     It was submitted by Mr. Wright that though helpful, the principles espoused and the tests set out in *Schemmer* and applied in *Kilderkin v Player* are applicable to scenarios in which a receiver has been appointed by a foreign court over a specific asset to which the receiver has title. That those principles and criteria do not apply to a scenario in which the receiver's role is more akin to that of a liquidator (as Justice Foster found in *JP SPC1* and *JP SPC2*), appointed over an entity's entire estate, rather than a specific asset.  But that is not how I regard the Receiver's appointment as operating here (or as having operated in *Kilderkin v Player*, for that matter). Rather, in keeping with the primary position that the M3 Fund is not itself a legal entity but a segregated portfolio of Silk Road the segregated account company, I consider that the Receiver has been appointed over all its assets, that is, the segregated account of which the M3 Fund is itself comprised.   Indeed, in *Kilderkin v Player* itself, the receivers had been appointed over the affairs of Kilderkin the company, supplanting the board of directors.



54.     I am satisfied therefore, that it is entirely appropriate to grant recognition to the Receivers on the basis of the principles established in *Kilderkin v Player*.

55.   My analysis, by application of the principles, is as follows.

56.   Firstly, there is no question but that the M3 Fund has a "sufficient connection" to Bermuda, the jurisdiction in which the Receivers were appointed.   As explained above, the M3 Fund is a segregated portfolio of Silk Road which is itself incorporated in Bermuda and that was the basis upon which the Bermuda Court made the Appointment Order.

57.   Secondly, Silk Road and the M3 Fund as one of its segregated portfolios, were the very subject of the proceedings before the Bermuda Court, Silk Road having been joined as a defendant to those proceedings.

58.   Thirdly, as the Wasty Affidavit explains, the Bermuda Court would recognise a foreign-appointed receiver.

59.   Fourthly, as the Clingerman affidavit explains, Silk Road itself is not in liquidation but carries on business in Bermuda although powers of the directors of Silk Road in relation to the M3 Fund, have been subsumed by the powers of the Receivers.

60.   For these reasons, I was satisfied that the inherent jurisdiction to recognise the appointment of the Receivers to act as such within the Cayman Islands, is appropriately to be exercised in this case.

**Further comparison with the nature and**
**extent of the powers granted by the Bermuda Court**

61.   In granting recognition, pursuant to the *Kilderkin v Player* jurisdiction, I accept the following premises:

(1)   The Receivers seek this Court's recognition of all the powers granted to the Receivers by the Bermuda court as set out in the Appointment Order.

(2)     The Receivers are not seeking recognition of any powers which would not be capable of being granted under Cayman Islands Law. The Receivers are not seeking to use this Court to do something which they could not do in Bermuda.

(3)     Additionally, as per paragraph 7 above and its footnote, the Receivers do not seek this Court's order that the powers and functions granted by the Bermuda Court be recognized as if the Receivers had been appointed in the Cayman Islands. They seek a more specific and confined order of recognition.

(4)     As is set out in John Wasty's Affidavit at paragraph 17, the Bermuda SACA provides the legislative blueprint for the appointment of the Receivers and the powers and functions that they have been granted. The relevant provisions of the SACA are as follows:

*"**Receivership orders***

*19. (1)    Subject to the provisions of this section, if, in relation to a segregated accounts company, the court is satisfied that-*

      *(a)    a particular segregated account is not solvent, the general account is not solvent, a liquidation has been commenced in relation to the company, or for other reasons it appears to the court just and equitable that a receiver should be appointed;*

      *(b)    the making of a receivership order under this section would achieve the purposes set out in subsection (3),the court may make a receivership order in respect of that segregated account.*

    *(2)    A receivership order may be made in respect of one or more segregated accounts.*



(3)   A receivership order shall direct that the business and assets linked to a segregated account shall be managed by a receiver specified in the order for the purposes of-

    (a)   the orderly management, sale, rehabilitation, run-off or termination of the business of, or attributable to, the segregated account; or

    (b)   the distribution of the assets linked to the segregated account to those entitled thereto.

(4)   No resolution for the winding up of a segregated accounts company of which any segregated account is subject to a receivership order shall be effective without leave of the court.

***Functions and powers of receiver***

21  (1)   The receiver of a segregated account-

    (a)   may do all such things as may be necessary for the purposes set out in section 19(3); and

    (b)   shall have all the functions and powers of the directors and managers of the segregated accounts company in respect of the business and assets linked to the segregated account.

(2)   The receiver may at any time apply to the court for-

    (a)   directions as to the extent or exercise of any function or power; or

    (b)   the receivership order to be discharged or varied.

(3)   In exercising his functions or powers the receiver is deemed to act as the agent of the segregated accounts company in respect of the segregated account, and does not incur personal liability except to the extent that his conduct amounts to misfeasance.



(4)   Any person dealing with the receiver in good faith is not concerned to enquire whether the receiver is acting within his powers.

(5)   *During the period of operation of a receivership order the functions and powers of the directors and managers and any liquidator of the segregated accounts company cease in respect of the business and assets linked to the segregated account in respect of which the order was made.*

(6)   *At any time after the appointment of a receiver in respect of a segregated account, the company or any account owner or creditor of that account may, where an action or proceeding against the company in respect of that account is pending, apply to the court for a stay of those proceedings, and, on such an application being made, the court may stay the proceedings accordingly on such terms as it thinks fit.*

**Comparison with Segregated Portfolio Companies**
**under Part XIV of the Cayman Islands Companies Law**

62.    Important similarities (not all) between the two sets of statutory provisions are as

follows:

### Test for Receivership – Companies Law

"224(1)   Subject to subsections (2) to (5), if in relation to a segregated portfolio company, the Court is satisfied-

(a)   *that the segregated portfolio assets attributable to a particular segregated portfolio of the company (when account is taken of the company's general assets, unless there are no creditors in respect of that segregated portfolio entitled to have recourse to the company's general assets) are or are likely to be insufficient to discharge the claims of creditors in respect of that segregated portfolio; and*

(b)   *that the making of an order under this section would achieve the purposes set out in subsection (3),*

*the Court may make a receivership order under this section in respect of that segregated portfolio.*



"224(3) *A receivership order shall direct that the business and segregated portfolio assets of or attributable to a segregated portfolio shall be managed by a receiver specified in the order for the purposes of-*

    (a) *the orderly closing down of the business of or attributable to the segregated portfolio; and*

    (b) *the distribution of the segregated portfolio assets attributable to the segregated portfolio to those entitled to have recourse thereto."*

## Test for Receivership – SACA

"19(1) *Subject to the provisions of this section, if, in relation to a segregated accounts company, the court is satisfied that-*

    (a) *a particular segregated account is not solvent, the general account is not solvent, a liquidation has been commenced in relation to the company, or for other reasons it appears to the court just and equitable that a receiver should be appointed;*

    (b) *the making of a receivership order under this section would achieve the purposes set out in subsection (3),*

*the court may make a receivership order in respect of that segregated account.*

    (3) *A receivership order shall direct that the business and assets linked to a segregated account shall be managed by a receiver specified in the order for the purposes of-*

    (a) *the orderly management, sale, rehabilitation, run-off or termination of the business of, or attributable to, the segregated account; or*

    (b) *the distribution of the assets linked to the segregated account to those entitled thereto.*



**<u>Functions and Powers of Receivers</u>**

*__Section 226(1) of the Companies Law__*

226(1)   *The receiver of a segregated portfolio-*

(a) *may do all such things as may be necessary for the purposes set out in section 224(3); and*

(b) *shall have all the functions and powers of the directors in respect of the business and segregated portfolio assets of or attributable to the segregated portfolio.*

*__Section 21(1) of SACA__*

21 (1)   *The receiver of a segregated account-*

(a) *may do all such things as may be necessary for the purposes set out in section 19(3); and*

(b) *shall have all the functions and powers of the directors and managers of the segregated accounts company in respect of the business and assets linked to the segregated account.*

**<u>Position of Receivers as Regards Segregated</u>**
**<u>Portfolio Company/Segregated Accounts Company</u>**

*__Section 226(3) of the Companies Law__*

*In exercising his functions and powers the receiver shall be deemed to act as the agent of the segregated portfolio company, and shall not incur personal liability except to the extent that he is fraudulent, reckless, negligent, or acts in bad faith.*

*__Section 21(3) of SACA__*

*In exercising his functions or powers the receiver is deemed to act as the agent of the segregated accounts company in respect of the segregated account, and does not incur personal liability except to the extent that his conduct amounts to misfeasance.*

63.     From the above, it is clear that the Bermuda statutory basis under SACA for the appointment of the Receivers, and the purpose for which the Receivers have been appointed, is virtually identical to its Cayman Islands counterpart. It is therefore accepted that the powers and functions of the Receivers, when recognized by this Court, would not offend Cayman Islands public policy nor would they be inconsistent with the substantive law of the Cayman Islands, as they are precisely the types of powers and functions which this Court could grant to a Receiver of a Cayman Islands segregated portfolio.

64.     It is clear, however, that absent from the above, or from any other provision either of SACA or the Companies Law, is any provision for the recognition of a foreign receiver; hence the need for recognition by application of the common law principles.

**Conclusion**

65.     This Court has a common law jurisdiction to assist not only liquidation but also receivership proceedings taking place under the supervision of the Bermuda Court.

66.     The scope of this Court's jurisdiction is subject to the law and public policy of the Cayman Islands in so far as this Court can only act within the limits of its statutory and common law powers.

67.     This Court has statutory power to recognize foreign practitioners or Court-appointed representatives and has done so on a number of occasions.  However, for the reasons set out above, Part XVII of the Companies Law does not apply to the Receivers.

68.     This Court has a common law power to order a third party to provide information pursuant to a recognized legal principle, such as modified universalism (paragraph



22, 23 of *Singularis*) but that principle is inapposite for application here because the company involved, Silk Road, is not in liquidation.

69.  It is however accepted, that this Court may recognize and assist the Receivers because the following criteria are met:

(1)  The Receivers are duly appointed as such over the assets of the M3 Fund by the Bermuda Court and are officers of the Bermuda Court. The M3 Fund is a segregated portfolio of a company (Silk Road) incorporated in Bermuda.  Silk Road carries on business and the seat of its central management is located in Bermuda.

(2)  The Receivers are seeking assistance in order to tackle the logistical obstacles presented by the territorial limits of their appointment but in keeping with the terms of the Appointment Order and by application of similar common law powers, the Court of Bermuda could grant reciprocal recognition to a Cayman appointed receiver;

(3)  The exercise of this Court's power is necessary for the performance of the Receiver's duties and functions;

(4)  The exercise of this Court's power is consistent with the substantive law and public policy of the Cayman Islands;

(5)  As will be put into evidence in support of the application for the *Norwich Pharmacal* relief, in the case of the Receivers' request to bring those proceedings, the Receivers are prepared to pay the reasonable costs of the JOLs' compliance with any such order for relief;



      (6)    The Receivers are not asking this Court for any powers which they could not exercise in Bermuda.

70.    It is therefore confirmed that this Court has the jurisdiction to make the orders which it made on 11 December 2017, recognizing the appointment of the Receivers.


Honourable Anthony Smellie
Chief Justice

February 8, 2018

The embargo from publication of this Judgment is hereby released this 30th day of May 2019.