# EXHIBIT 18

**[1997 CILR 90]**

**ARGENTINE HOLDINGS (CAYMAN) LIMITED v. BUENOS AIRES HOTEL CORPORATION S.A. and SEVEN OTHERS**

GRAND COURT (Smellie, J.): March 24th, 1997

*Civil Procedure—judgments and orders—default judgment—under Grand Court Rules, O.13, r.6(1) and O.14, r.1(1), plaintiff with claim falling outside O.13, rr. 1-4 and within O.14, r.1(2) may apply for summary judgment against defendant properly served who fails to acknowledge service or give notice of intention to defend and has no defence to claim*

*Attorneys-at-Law—professional privilege—conduct of company business—evidence of attorney concerning his conduct of corporate client's business not privileged if acted in capacity as company officer rather than as legal adviser—evidence of own involvement in fraudulent dealings admissible against client*

*Evidence—privilege—unlawful purposes—evidence concerning events and documents arising from fraudulent scheme not privileged*

*Evidence—witnesses—credibility—evidence of witness testifying under civil immunity admissible—witness's participation in defendants' fraudulent dealings relevant only to weight given to evidence*

*Companies—receivers—effect of receivership order—directors' powers to conduct company business lapse upon court's appointment of receiver—business transacted by directors with notice of court order may be set aside*

*Companies—directors—breach of fiduciary duty—breach for directors to transfer shares despite receivership order with intention of defeating company's creditors—transfers may be declared void*

The plaintiff company brought an action against the defendants seeking declaratory relief and damages in respect of fraud and breach of fiduciary duty.

The plaintiff, a Cayman company, was the sole shareholder in the first and second defendants, both Panamanian companies. In the course of the liquidation of the BCCI group of companies, both the Grand Court and the English High Court ordered that certain companies—including that owning the plaintiff—and the assets of companies controlled by them, not be dealt with or disposed of by Ghaith Pharaon, a director and major

1997 CILR 91

shareholder in the group. The plaintiff company was placed in receivership by the Grand Court.

Following the trial of related proceedings against Ghaith Pharaon and several companies under his control (reported at 1996 CILR 89) in which the receiver was instructed to collect in those companies' assets, the present proceedings were commenced. The sixth defendant, a former director and secretary of the plaintiff and the first defendant and legal adviser to companies in the BCCI group, gave evidence that following the receivership order he and the fifth and seventh defendants held meetings of those companies and passed resolutions transferring shares in the first and second defendant companies to the third and fourth defendant companies for no consideration, with the intention of defeating the creditors of the owner of the plaintiff company. He gave his evidence in exchange for immunity from liability, under an agreement with the liquidators of BCCI. His evidence included details of how, on the instructions of Ghaith Pharaon's own attorney, company accounts had been falsified to conceal the transactions.

The plaintiff was unable to effect service of the proceedings on the third and fourth defendant companies by any practicable means, whilst the fifth and seventh defendants failed to acknowledge service or give notice of intention to defend. The plaintiff applied for summary judgment against all the defendants except the third, fourth and sixth.

The defendants submitted that (a) the plaintiff company could not obtain summary judgment against the fifth and seventh defendants since O.14, r.1 laid down that this remedy was available only against a defendant who had issued notice of intention to defend within the prescribed time; (b) the plaintiff could not show that the defendants had no defence to its claims, since its cause of action was founded upon evidence of communications between the sixth defendant and the companies to which he was legal adviser, which was subject to legal professional privilege and therefore inadmissible; (c) alternatively, such evidence was protected from disclosure by reason of the confidential relationship between the companies as employers and the sixth defendant as employee; and (d) in any event the evidence was unreliable since the sixth defendant was induced by the promise of immunity from liability and had breached undertakings given to his former employers, in reliance on which they had not sought injunctions to restrain him from testifying.

The plaintiff submitted in reply that (a) since the remedies it sought were equitable, it was entitled under the Grand Court Rules, O.13, r.6(1) to proceed against the fifth and seventh defendants as if they had given notice of intention to defend, and could therefore properly apply for summary judgment against them and all other defendants upon whom service had been effected; (b) the evidence of the sixth defendant could not be challenged as privileged and inadmissible, since he had been acting at the material time not as a legal adviser but as an officer of the plaintiff and first defendant companies and, indirectly, upon the advice of Ghaith Pharaon's own attorney; (c) moreover, communications between

1997 CILR 92

an employer and its employee were not subject to privilege under any circumstances; (d) privilege could not, in any event, attach to documents and communications (such as the relevant share transfers and company accounts) which had come into being in furtherance of an unlawful scheme; and (e) the sixth defendant's motives for giving his evidence did not affect its admissibility, but were relevant only to its weight and in the present case, the court had before it corroborative evidence from independent sources.

Held, granting the declarations and awarding the damages sought:

(1) Since the plaintiff claimed relief which fell within the scope of O.13, r.6(1)—namely, outside rr. 1-4—and within O.14, r.1(2) of the Grand Court Rules, it was entitled, as against those defendants whom it had proved had been served with process, to proceed as if they had given notice of intention to defend the proceedings, and to apply for summary judgment against them under O.14, r.1(1) (page 95, lines 1–34; page 96, lines 22–34).

(2) An examination of the merits of the plaintiff's application, without which the court could not grant declaratory relief, revealed that the sixth defendant's evidence was admissible to show that the defendants had no defence to the action. Since it did not arise from his role as legal adviser to the defendant companies or Ghaith Pharaon but from his role as a company officer, his evidence did not attract professional privilege. Nor was there any reason for the evidence to be withheld merely because it concerned communications between an employer and its employee (page 94, lines 30–33; page 105, lines 31–37; page 106, line 20 – page 107, line 24).

(3) In any event, since the events described in his affidavit and the documents created at that time came into existence as part of an unlawful scheme to defraud the creditors of the companies concerned, the defendants could not claim that that evidence was privileged (page 105, line 38 – page 106, line 19).

(4) Whilst the civil immunity agreement between the liquidators of BCCI and the sixth defendant (under which he had given evidence in several other jurisdictions in respect of the group's business affairs) was a factor affecting the weight to be given to his evidence, it did not affect its admissibility (page 107, lines 25–41).

(5) Since the plaintiff was a Cayman Islands incorporated company, the power of its directors to conduct business on its behalf was governed by Cayman law and no other. Under that law the appointment of the receiver by the court operated to vest the management of the company in the receiver alone and accordingly the directors, having had notice of the court's order, had no power to transfer shares in the first and second defendants to the third and fourth defendants as they had purported to do. Those transfers would be set aside (page 102, line 37 – page 104, line 5).

1997 CILR 93

    (6) The directors had also acted in breach of their fiduciary duty to act *bona fide* in the best interests of the plaintiff company. Since their purpose in transferring the shares was clearly improper, given the value of the assets which the shares represented and the fact that no consideration had been paid, the directors' resolutions were ineffective and the transfers void. In these matters the independent evidence of the plaintiff's receiver supported the sixth defendant's testimony, and since no defence had been raised, damages would be awarded against those defendants against whom the plaintiff had sought such relief (page 104, lines 8–29; page 105, lines 14–24).

**Cases cited**:
(1) *Adamson, Ex p., In re Collie*, [1878] 8 Ch. D. 807, considered.
(2) *Balabel* v. *Air India*, [1988] Ch. 317; [1988] 2 All E.R. 246, *dicta* of Taylor, L.J. applied.
(3) *Barclays Bank PLC* v. *Eustice*, [1995] 1 W.L.R. 1238; [1995] 4 All E.R. 511.
(4) *Bartlett* v. *Barclays Bank Trust Co. Ltd. (No. 2)*, [1980] Ch. 539; [1980] 2 All E.R. 92.
(5) *Bullivant* v. *Att. Gen. (Victoria)*, [1901] A.C. 196; [1900-3] All E.R. Rep. 812, applied.
(6) *Carl Zeiss Stiftung* v. *Rayner & Keeler Ltd. (No. 2)*, [1967] 1 A.C. 853; [1966] 2 All E.R. 536, applied.
(7) *Dawson, Re, Union Fidelity Trustee Co. Ltd.* v. *Perpetual Trustee Co. Ltd.*, [1966] 2 N.S.W.R. 211; (1966), 84 W.N. (N.S.W.) 399, applied.
(8) *Gamlen Chemical Co. (U.K.) Ltd.* v. *Rochem Ltd.* [1980] 1 W.L.R. 614; [1980] 1 All E.R. 1049.
(9) *Hogg* v. *Cramphorn Ltd.*, [1967] Ch. 254; [1966] 3 All E.R. 420.
(10) *Home & Overseas Ins. Co. Ltd.* v. *Mentor Ins. Co. (U.K.)*, [1990] 1 W.L.R. 153; [1989] 3 All E.R. 74.
(11) *International Credit & Inv. Co. (Overseas) Ltd.* v. *Adham*, [1994] BCLC 66, *dicta* of Harman, J. applied.
(12) *International Credit & Inv. Co. (Overseas) Ltd.* v. *Adham*, 1996 CILR 89.
(13) *Kilderkin Invs.* v. *Player* 1984-85 CILR 63, applied.
(14) *Minter* v. *Priest*, [1929] 1 K.B. 655.
(15) *Metzger* v. *D.H.S.S.*, [1978] 1 W.L.R. 1046; [1977] 3 All E.R. 444.
(16) *Moss S.S. Co. Ltd.* v. *Whinney*, [1912] A.C. 254; [1911-13] All E.R. Rep. 344, observations of Lord Atkinson applied.
(17) *Nocton* v. *Ashburton (Lord)*, [1914] A.C. 932; [1914-15] All E.R. Rep. 45, *dicta* of Viscount Haldane, L.C. applied.
(18) *Patten* v. *Burke Publishing Co. Ltd.*, [1991] 1 W.L.R. 541; [1991] 2 All E.R. 821.
(19) *Smith (Howard) Ltd.* v. *Ampol Petroleum Ltd.*, [1974] A.C. 821; [1974] 1 All E.R. 1126.

---

1997 CILR 94

**Legislation construed**:
Grand Court Rules, 1995, O.13, r.6(1): The relevant terms of this paragraph are set out at page 95, lines 13–20.
O.14, r.1: The relevant terms of this rule are set out at page 95, lines 3–9.

*A. Bueno, Q.C.*, *C.G. Quin* and *D.A. Harris* for the plaintiff;
*L.F.R. Cohen, Q.C.* and *H. St.J. Moses* for the eighth defendant;
The other defendants did not appear and were not represented.

    SMELLIE, J.: The plaintiff, "AHC," applied for summary judgment pursuant to the Grand Court Rules, O.14. The application proceeded upon AHC's writ and statement of claim seeking declaratory relief, orders for breaches of fiduciary duty, compensation for those breaches and
15    accounts—all equitable remedies.
    Service of the proceedings, including the present application and affidavits in support, has been effected upon all but the third and fourth defendants ("Rhone" and "Loire") which are Panamanian corporations. Attempts to effect service upon them through diplomatic channels have
20    been unsuccessful. The application for summary judgment was sought,

therefore, to be effective as against the other defendants although no relief was sought against the sixth defendant ("Whitbeck"). The eighth defendant ("ICIC") had been joined at its own request and by order of this court was to be bound by the results, and supported AHC's application.

25   For reasons which I believe are patently clear from the circumstances, I was satisfied that AHC should be allowed to proceed to final judgment. Formal judgment was entered after the hearing on February 17th, 1997. I have none the less taken the time to give written reasons in this matter because of the obvious importance of the case in this and other

30   jurisdictions. I also have in mind the rules which advise that declaratory judgments should not ordinarily be given without a due consideration of the merits. These reasons are intended therefore to reflect that consid eration of the merits of the case: see *Metzger* v. *D.H.S.S.* (15) ([1977] 3 All E.R. at 451) and *Patten* v. *Burke Publishing Co. Ltd.* (18) and the

35   notes to O.15, r.6(2) of the Rules of the Supreme Court in 1 *The Supreme Court Practice 1997*, para. 15/16/2, at 252-253.

*Jurisdiction of the court to grant summary judgment*

This is a purely technical but important preliminary point of jurisdiction. The Grand Court Rules, O.14, r.1(1) permits an application for summary judgment to be made against a defendant who has given

40   notice of intention to defend the action. As the fifth and seventh defendants (Laith Pharaon and Djouhri) have respectively failed to give that notice, a preliminary question for the court arises as to the applica bility of O.14 to the case, as it relates to those defendants.

1997 CILR 95

Counsel for AHC submitted that the answer is to be found in O.13, r.6(1) as read with O.14, r.1(1). Rule 1(1) provides:

"Where in an action to which this rule applies a statement of claim has been served on a defendant and that defendant has given

5   notice of intention to defend the action, the plaintiff may, on the ground that the defendant has no defence to a claim included in the writ, or to a particular part of such a claim, or has no defence to such a claim or part except as to the amount of any damages claimed, apply to the Court for judgment against the defendant."

10   Rule 1(2) provides that para. (1) applies to every action begun by writ in the court other than three categories of actions to none of which the present action belongs. Order 13, r.6(1) provides:

"Where a writ is endorsed with a claim of a description not mentioned in rules 1 to 4 then, if any defendant fails to give notice

15   of intention to defend, the plaintiff may, after the prescribed time and, if that defendant has not acknowledged service, upon filing an affidavit proving due service of the writ on him and, where the statement of claim was not endorsed on or served with the writ, upon serving a statement of claim on him, proceed with the action as

20   if that defendant had given notice of intention to defend."

There is ample evidence which I accept that the requirements of service

have been met in respect of Laith Pharaon and Djouhri notwithstanding their failure to acknowledge service or to give notice of intention to defend. The requirement of the Grand Court Rules, O.13, r.6(1) that the claim not come within rr. 1-4 was also satisfied. The categories of claims mentioned in rr. 1-4 are confined to common law claims, namely, claims for a liquidated demand (r.1); claims for unliquidated damages (r.2); claims in detinue (r.3), and claims for possession of land (r.4). The present claims clearly do not come within them.

In relation to money claims, AHC's action sounds not in damages at common law, but instead as claims in equity for compensation to make good the losses suffered as the result of the fraudulent conduct and breaches of fiduciary duty alleged. Such claims are exclusively within the equity jurisdiction of the courts. The principle was explained more than a century ago in *Ex p. Adamson, In re Collie* (1) ([1878] 8 Ch. D. at 819, *per* James and Baggallay, L.JJ.):

> "The Court of Chancery never entertained a suit for damages occasioned by fraudulent conduct or for breach of trust. The suit was always for an equitable debt or liability in the nature of debt. It was a suit for the restitution of the actual money or thing, or value of the thing, of which the cheated party had been cheated."

The definitive pronouncements came later in the speech of Viscount Haldane, L.C. in *Nocton* v. *Lord Ashburton* (17) ([1914] A.C. at 951-952):

> "…[I]t is known that in cases of actual fraud the Courts of Chancery and of Common Law exercised a concurrent jurisdiction

1997 CILR 96

> from the earliest times. For some of these cases the greater freedom which, in early days, the Court of Chancery exercised in admitting the testimony of parties to the proceedings made it a more suitable tribunal. Moreover, its remedies were more elastic. Operating in personam as a Court of conscience it could order the defendant, not, indeed, in those days, to pay damages as such, but to make restitution, or to compensate the plaintiff by putting him in as good a position pecuniarily as that in which he was before the injury."

He continued (*ibid.*, at 956-957):

> "Courts of Equity had jurisdiction to direct accounts to be taken, and in proper cases to order the [fiduciary] to replace property improperly acquired from the client, or to make compensation if he had lost it by acting in breach of a duty which arose out of his confidential relationship to the man who had trusted him. This jurisdiction, which really belonged to the exclusive jurisdiction of the Court of Chancery, had for the client the additional advantage that, as is illustrated by the judgment of Lord Hatherley L.C. in *Brodick* v. *Garrick*…the Statute of Limitations would not apply when the person in a confidential relationship had got the property into his hands."

AHC instituted this action pursuant to directions of this court and has elected to seek equitable remedies. It was entitled to do so. By so doing it seeks the advantage of coming within the rules of O.14 to be able to move to summary judgment. That is an important recourse in the present circumstances where important defendants have chosen not to take part in the proceedings of which they have notice.

I am persuaded that AHC should be permitted to seek its judgment on the merits under O.14 as if defendants Laith Pharaon and Djouhri had respectively given notice of intention to defend, pursuant to O.13, r.6(1). As regards the other defendants (except Rhone, Loire and Whitbeck), O.14 applies directly. Indeed, the duly appointed directors of the first and second defendants, "BAHC" and "ATH" indicated to the court that they will regard themselves as bound by the outcome of these proceedings.

It is also appropriate that I should here identify the important equitable principles which will later govern the assessment of compensation. The measure of the fiduciary's liability for breach of fiduciary duty is the loss caused thereby to the person to whom the duty is owed. It is plain from the settled principles already cited that if a breach has been committed, then the fiduciary is liable to place the trust estate in the same position as it would have been if no breach had been committed. Considerations of causation, foreseeability and remoteness do not readily enter into the matter. The principles in this approach are not confined to an inquiry as to whether the loss was caused by or flowed from the breach. Rather, the inquiry in each instance would appear to be whether the loss would have

1997 CILR 97

happened if there had been no breach. Thus the obligation in equity to make restitution imposed upon defaulting fiduciaries is of a more absolute nature than the common law obligation to pay damages for tort or breach of contact.

The foregoing summary of the principles of equitable compensation is extracted from the judgment of an Australian court in *Re Dawson, Union Fidelity Trustee Co. Ltd.* v. *Perpetual Trustee Co. Ltd.* (7) and which has been cited with approval in Underhill & Hayton, *Law of Trusts and Trustees*, 14th ed., at 734-735 (1987) and by Brightman, L.J. in *Bartlett* v. *Barclays Bank Trust Co. Ltd. (No. 2)* (4) ([1980] Ch. at 543). *Snell's Equity*, 29th ed., at 287-288 (1990) also provides a useful summary. The liability for compensation founded in the directors Laith Pharaon and Djouhri for breach of their fiduciary duties owed to the company and expressed in the formal judgment is to be assessed according to those principles.

Order 14, r.1 required AHC to show that there was plainly no defence to the claim before it might have been permitted to proceed to summary judgment: *Home & Overseas Ins. Co. Ltd.* v. *Mentor Ins. Co. (U.K.)* (10) ([1990] 1 W.L.R. at 158). I was satisfied from the evidence produced in the affidavits in support that this standard had been met by AHC.

*The history and facts*

AHC is a company incorporated in the Cayman Islands. At all material times up to and including November 10th, 1992 the directors and officers of AHC were Laith Pharaon, Whitbeck and Djouhri. By an order dated November 10th, 1992, this court, in Cause No. 389 of 1992, appointed Mr. John Matthew as receiver and manager over the assets and undertakings of AHC. That appointment was made until after judgment or further order, the court then being satisfied that the assets of AHC were in jeopardy from those then in control of AHC.

From the undisputed evidence it is shown that up to and including November 10th, 1992 AHC was the absolute owner of the following property:

(a) 100% of the issued share capital of Buenos Aires Hotel Corp. S.A. ("BAHC"), the first defendant herein, a company incorporated in Panama. That share capital consisted of two shares which were issued by BAHC to AHC. BAHC holds approximately 76% of the shares of HCA S.A. ("HCA"), an Argentine company which is the owner of the Park Hyatt Hotel in Buenos Aires. The remaining shares in HCA were held by a related company, Hotel Corp. of Chile S.A. ("HCC").

(b) 100% of the issued share capital of Argentina Trading Holdings Inc. ("ATH"), a company incorporated in Panama. ATH also held 100% of the issued share capital of Jojoba Saltena S.A. and 50% of Jojoba Saudamericana S.A. Both companies are incorporated in Argentina and each owns and operates a jojoba plantation in Argentina.

1997 CILR 98

That undisputed evidence of ownership is contained in the affidavit of Simon Andrew Charlton filed in support of the application and where he describes in detail the records and other evidential material which he has inspected and upon which he relies for that conclusion of ownership. These include the original corporate records of BAHC and ATH and the share certificate books which are now in the custody of the Argentine judicial authorities in Buenos Aires.

Mr. Charlton is a senior manager of the Forensic Services Division of the international audit firm of Deloitte & Touche, the liquidators world-wide of BCCI and related companies, including the eighth defendant, ICIC. The liquidators of ICIC are assisting AHC in the conduct of this action. It was at their instance, as liquidators of ICIC, that this court appointed the receiver over AHC on November 10th, 1992. That appointment was continued by order of this court on May 31st, 1995 following on the trial in the same cause which lasted some 18 weeks in which, among others, Ghaith Rashad Pharaon ("Ghaith Pharaon"), Pharaoh Holdings Ltd. ("Pharaoh") and Concorde International Trading S.A. ("Concorde S.A.") were joined as defendants (see *International Credit & Inv. Co. (Overseas) Ltd.* v. *Adham* (12)). In that action it was determined in respect of those defendants that they had knowingly participated in a conspiracy to defraud the plaintiff ICIC and were liable in

damages flowing from that conspiracy. Those findings were also deemed to give rise to causes of action against them for breaches of fiduciary duty, knowing assistance in such breaches, breach of trust and knowing participation in breaches of trust.

It was a consequence of the outcome of that trial that directions were given to the receiver to take steps to secure and collect in the assets of AHC, including the commencement of these proceedings. That action, as is the present, was a direct offshoot of the worldwide collapse of the BCCI Group of which ICIC (Overseas) and BCCI (Overseas), both former Cayman Islands banking entities now in liquidation, were affiliates. Thus, the consequence of the judgment in *International Credit & Inv. Co. (Overseas) Ltd.* v. *Adham*, when taken with the earlier appointment of the receiver over the assets of AHC, is very significant. For present purposes, so also is the connection to Concorde S.A.

Concorde S.A. is a Panamanian company owned or controlled by Ghaith Pharaon through its parent company Pharoah, a Bahamian company. Concorde S.A. was also cited in the Schedule to the order of receivership made by this court on November 10th, 1992. Listed amongst its assets placed into receivership by that order are the shareholdings in and assets and undertakings of AHC. Thus the standing of the receiver in the present action is clear. He is the court-appointed receiver over assets within the jurisdiction of Concorde S.A. including AHC itself, the plaintiff herein. He was also appointed receiver over the assets of Ghaith Pharaon situated within the jurisdiction including certain other companies

1997 CILR 99

known to belong to Ghaith Pharaon but not relevant for present purposes. Neither that order of November 10th, 1992, nor the judgment of this court in *International Credit & Inv. Co. (Overseas) Ltd.* v. *Adham* (12) has been challenged on appeal.

I have taken the time for that excursion into the history and outcome of that case only in so far as it affects the present matter. That cause dealt with many other issues of relevance to the wider liquidation of ICIC. That history is nevertheless intended to serve as informative background, as I am mindful that this matter is still likely to engage the courts of other jurisdictions. I turn now to events which transpired after the making of the order of November 10th, 1992 which bear directly upon the present matter.

As already noted, it is clear from the evidence that the entire issued share capital both of BAHC and ATH were assets of AHC as at November 10th, 1992, when the receiver was appointed.

The following account of subsequent events comes from the evidence of Whitbeck presented in these proceedings. Whitbeck, an American lawyer, served between 1979 and 1996 as legal adviser to the group of non-Saudi companies owned by Ghaith Pharaon and his family. He was based in Paris, where he was employed as general counsel to Concorde International S.A.R.L, which is described as the French service company

for the group. But that was not the only capacity in which he was employed. He also served as a director and/or officer of various companies in the group, including AHC, Concorde S.A. and BAHC, for each of which he was director and secretary until November 10th, 1992. Whitbeck has entered into a co-operation agreement with the liquidators of ICIC and BCCI which involves him giving evidence in aid of the liquidation generally. He has given evidence in proceedings here, in England, Argentina and in Panama. I will later express my findings on the separate issue candidly and properly raised by the counsel for both AHC and ICIC as to the admissibility of Whitbeck's evidence in this application. For now, I extract verbatim some relevant aspects of Whitbeck's affidavit evidence upon which I rely:

"6.1 On October 28th, 1992 orders were made in the Grand Court of the Cayman Islands and the High Court of Justice in England against Ghaith Rashad Pharaon ('Ghaith Pharaon') and certain companies controlled by him restraining him and them in very broad terms from disposing of or dealing with their assets or the assets of companies controlled by them.

6.2 On November 2nd, 1992, the Supreme Court of the Bahamas made similar restraining orders against Pharaon and Pharoah Holdings Ltd. ('Pharoah'), one of the companies within the effective control of Pharaon which was incorporated in the Bahamas. The Bahamian court further appointed a receiver over all the assets and undertakings of Pharoah.

6.3 On November 9th, 1992, a further order was made by the Bahamian court appointing a receiver over all the assets and undertakings of Concorde International Trading S.A. ("Concorde S.A."), so far as such assets and undertakings were situated within the Bahamas.

6.4 On November 10th, 1992, a further order ('the Cayman receivership order') was made by the Grand Court of the Cayman Islands appointing a receiver over a wide range of assets alleged to belong to or be within the control of Pharaon. The assets over which the Cayman receiver was appointed were stated to include all the assets and undertakings of AHC.

7.0 Knowledge of the orders made:

7.1 Pharaon's son, Laith Ghaith Pharaon ('Laith Pharaon'), Farid Djouhri ('Djouhri') and I became aware of the making of the Cayman receivership order on the evening of November 17th, 1992. I can say that without any doubt because I have a very clear recollection of the events of the night which I describe below.

7.2 By November 17th, 1992, Djouhri and I were aware of the earlier orders that had been made. Laith Pharaon, Djouhri and I served as officers of various of the companies involved in those proceedings and for that reason at least we had become aware of

what was going on. I am able to say that Ghaith Pharaon's attorney, Berge Setrakian ('Setrakian') of Whitman & Ransom, was certainly aware by then that both orders of October 28th, 1992 and that dated
25  November 2nd, 1992 had been made. An application had earlier been made on November 2nd, 1992 to the English court for copies of the evidence used to obtain orders from it. It is hard to imagine that such an application was made without Ghaith Pharaon's knowledge and approval.
30      8.0 November 17th, 1992
    8.1 On the evening of November 17th, 1992, I received a copy of the Cayman receivership order. I think that it was received by fax from the registered office in the Cayman Islands of the various companies involved, although I cannot be quite sure of this without
35  access to the files that I then kept.
    8.2 My reaction to receiving the Cayman receivership order was to send a copy of it immediately by fax to Setrakian who was master minding the global strategy for the defence of Ghaith Pharaon in the matters arising out of his exposure to BCCI and ICIC. Many conver
40  sations took place over the course of the following hours between me and Setrakian. What I was instructed by him to do was as follows:
        (a) I was to cause meetings to be held that evening of the boards of directors of two of the Cayman Islands companies mentioned in the Cayman receivership order which still held
45      significant assets; and

1997 CILR 101

        (b) I was to cause resolutions to be passed transferring significant assets of those Cayman Islands companies to Panamanian companies which Setrakian had arranged to acquire that evening. The Panamanian companies were 'off the
5       shelf' and had never traded. They included Rhone Development S.A. ('Rhone').
        8.3. To implement Setrakian's instructions, I telephoned Djouhri and Laith Pharaon and asked them to return immediately to our group office at 4 Place de la Concorde, Paris. They did so and I
10      showed them the Cayman receivership order and informed them what Setrakian had told us to do. After discussions between us, we held a number of meetings of the boards of directors of various of the Cayman Islands companies.
        8.4. One of the meetings which we held that evening was of AHC.
15      The directors of AHC were Laith Pharaon, Djouhri and myself and I was also its secretary. At that meeting we resolved as its directors to transfer to Rhone the shares owned by AHC in BAHC. I believe that I have had a copy of this resolution at my home since November 1992 and if so I will produce it."
20      That "resolution" was produced to the liquidators by Whitbeck. He also separately produced to the liquidators other purported resolutions and a

     document entitled an "Assignment of Rights" which purports in different ways, mutually inconsistent in some important respects, to transfer away the assets of AHC, including its shares in BAHC. In further affidavit evidence of Simon Andrew Charlton, the similar manner in which the shares in ATH were purportedly transferred to Loire by Laith Pharaon, Djouhri and Whitbeck is described. Confirmation of his evidence in that regard arises independently from the original "resolutions" which were handed over to him by Whitbeck, copies of which were also exhibited in evidence. These "resolutions" and the "assignment" are all covered by the declaratory orders setting them aside and are annexed to the judgment order granted upon the present application.

    I do not intend in detail to traverse the defects and inconsistencies which appear in these documents, because of the primary conclusions reached as to the plain nature of this case. I will instead comment briefly on this aspect when I come to consider the reasons for relying on Whitbeck's evidence. In his affidavit, Whitbeck proceeds to give in some detail an account of the steps taken by himself and the other directors of AHC—Laith Pharaon and Djouhri—to falsify the various books and records of the respective companies in the attempt to give apparent effect to the aforesaid resolutions. The scheme he describes went so far as to involve an application to a Panamanian court for authority to be granted to BAHC (a Panamanian company) to issue a duplicate share certificate in Rhone's name. To that end, the Panamanian court was misinformed that the BAHC share certificates,

1997 CILR 102

misrepresented to have been earlier issued to Rhone, had been lost or misplaced. The truth was that the only BAHC share certificates in existence (always properly owned by AHC) and its books had been seized and taken away during a raid on the offices at 4 Place de la Concorde, jointly conducted by the French and Argentine authorities in aid of the latter's investigations in that country. Those investigations have been into matters relating to the true ownership of HCA—the Argentine company which owns the Park Hyatt Hotel in Buenos Aires and 76% of which is in turn owned by BAHC.

    Against that background Whitbeck in his present affidavit concludes as follows:

> "The attempt to transfer the shares of BAHC owned by AHC which I have described above was not a sale of them. No consideration, value or price was even discussed, still less paid for the transfer. No change of ultimate beneficial ownership was effected. The shareholder of Rhone was Laith Trading and Contracting Co. Ltd. ('LTC') of Saudi Arabia. Laith Pharaon, on behalf of LTC, executed a declaration of trust recording that the shares of Rhone were held for the benefit of the previous ultimate beneficial owners of AHC. The purpose of the transfer was to remove the shares from the ownership of AHC, a Cayman Islands company, so that they could

|    | |
|---|---|
| | not be controlled by the courts of the Cayman Islands. At no time did we give consideration to the interests of any creditor who may have existed, including any creditor of AHC or any other company. |
| 25 | The purpose was to prevent those assets being seized in connection with the proceedings which had commenced in the Cayman Islands, the Bahamas and England." |

*Effect of the transfers*

30   The primary legal premise of this application for summary judgment, developed by Mr. Bueno on behalf of AHC, is that the purported transfers were void and of no effect. I could hardly have imagined a plainer case. I concluded that there was and could be no triable defence to the claim and that AHC is entitled to the relief claimed. The legal principles can be
35   briefly discussed and I am indebted to Mr. Bueno for his admirably concise submissions, which I accept.

AHC, being a company incorporated in the Cayman Islands, is governed by Cayman law. Accordingly, its capacity to enter into or to commit itself to any form of legal transaction is governed by its consti-
40   tution which is itself governed by Cayman law. Equally, the power of the directors as the managing body of AHC to commit the company to a transaction is a matter of the constitution of the company as governed by the law of the Cayman Islands. If authority be needed for these fundamental propositions of law, see *Carl Zeiss Stiftung* v. *Rayner &*
45   *Keeler Ltd. (No. 2)* (6) ([1967] 1 A.C. at 972, *per* Lord Wilberforce and

1997 CILR 103

Dicey & Morris, 2 *The Conflict of Laws*, 11th ed., Rule 174, at 1134 (1987). Those being the principles, I need not be troubled, for present purposes, with any issue as to the law of which country would govern the transactions in question for as is stated in *Dicey & Morris* (*op. cit.*,
5   at 1135) "a legal person (*i.e.* a corporation) cannot anywhere exercise any greater power than is given to it by the legal system to which it owes its existence."

As a matter of Cayman law (by derivation from English law) once the receiver was appointed by this court over the assets and undertakings of
10   AHC, the board of directors (Laith Pharaon, Djouhri and Whitbeck) ceased to be the body capable of committing AHC to any legal transaction and, specifically for present purposes, to any transaction by which AHC could properly seek to dispose of its assets. Once that appointment was effected, the receiver became the only appropriate
15   person.

In *Kilderkin Invs.* v. *Player* (13) it was held, according to the headnote to the case in the *Cayman Islands Law Reports* (1984-85 CILR at 67) that "the appointment of the appellant as receiver and manager had the effect of vesting the complete control and management of the second
20   defendant company in the appellant as an officer of the court…thereby displacing the board of directors." In that case, the judgment of the Court

of Appeal contains an extensive review of the leading textbooks and case law on the principles. The principles are encapsulated in the following passage quoted from *Kerr on Receivers*, 16th ed., at 216 (1983) (*ibid.*, at 76):

> "The appointment of a receiver and manager over the assets and business of a company does not dissolve or annihilate the company any more than the taking possession by the mortgagee of the fee of land let to tenants annihilates the mortgagor. Both continue to exist; but the company is entirely superseded in the conduct of that business, and deprived of all power to enter into contracts in relation to that business, or to sell, pledge or otherwise dispose of the property put into the possession or under the control of the receiver and manager. The powers of the directors in this respect are entirely in abeyance so far as that business of the company is concerned, and the relevant powers of the company are exercised by the receiver under the direction of the court."

That is a venerable statement of the law. It has its provenance in the decision of the House of Lords given nearly a hundred years ago in *Moss S.S. Co. Ltd.* v. *Whinney* (16). In his speech in that case, Lord Atkinson declared the principles in almost identical terms ([1912] A.C. at 263).

It is therefore clear that as a matter of law, the board of directors of AHC (as then constituted by Laith Pharaon, Djouhri and Whitbeck) had no power to effect the transfer of its shares as they purported to do. The

1997 CILR 104

purported transfers were therefore void and of no effect. That determination is also made specifically to negate any possible suggestion that notice of this court's order of November 10th, 1992 had not reached the board of directors. It is clear from Whitbeck's evidence, which I accept, that they had actual notice of that order at the material time.

*Breach of fiduciary duties*

When examined from the point of view of the plain breaches of fiduciary duties from which they flowed, the transactions appear no less tainted. Indeed, so plain is the improper conduct disclosed in this case, it should hardly be dignified by a discussion of the principles. I take the time here none the less to identify those principles for the sake of the completeness of these reasons and in recognition of the probable significance of the outcome beyond the immediate jurisdiction of this court.

By virtue of their fiduciary positions, directors owe strict duties to act *bona fide* in the best interest of their company and to act only for a proper purpose: see *Hogg* v. *Cramphorn Ltd.* (9). As custodians of the company's assets under their control, their fiduciary duties are owed not to a particular shareholder but, in the usual context, to the company. The fiduciary relationship imposes upon directors duties of loyalty and good faith which are akin to those imposed upon trustees properly so called. If

25   the purpose of the directors is improper, as the admitted purposes in this case certainly were, then their decisions will be ineffective: see *Howard Smith Ltd.* v. *Ampol Petroleum Ltd.* (19). Moreover, in this case, the transactions were plainly and admittedly a fraud on AHC of which Rhone and Loire had notice as they were in the common control of the same persons as AHC. And despite valuable assets in the form of the shares of AHC and ATH being transferred to them, Rhone and Loire offered no consideration.

30   The legal principles applicable were succinctly stated by Harman, J. in the following passages from his judgment in a related action in England: *International Credit & Inv. Co. (Overseas) Ltd.* v. *Adham* (11). That case involved certain of the present parties including ICIC as plaintiff. The circumstances disclosed the same hallmarks of dishonesty which have
35   come to characterize the schemes and events uncovered by the global liquidation. The learned judge said ([1994] 1 BCLC at 75–76):

> "It seems to me that upon the whole of the evidence available to me there is no doubt whatever that in fact the transfers [of shares] made were not made pursuant to any declaration of dividend but were
40   simply made by entries in the share register in London of Attock which transfer the legal ownership of the shares from FIIL, which had been the registered proprietor, to first Lhasa and then Falcon and separately to Mr Al Falaij and Mr Adham.
> Such transfers on the face of them convey no beneficial interest.
45   No document in the evidence before me at any point ever suggested

1997 CILR 105

that the transfers are conveyances on sale and it is extremely improbable upon the facts that there was any attempt to have a sale and a transfer on sale of the shares. Thus there is never any suggestion of any payment or consideration for the shares passing
5   to FIIL from any of the registered proprietors who received the shares and the books of FIIL show that there was no receipt of any consideration. Thus it must follow that the recipients whose names appear on the share register of Attock are strangers in law to FIIL. The shares in Attock which were in November 1991 the property of
10   FIIL have been put in their names and a stranger in whose name property is put will hold that property upon a resulting trust or, if you will, a constructive trust for the owner, which is shown here to be FIIL."

In this case the purported transfers have equally been made without
15   consideration. Those responsible for the breaches of the fiduciary duties involved are answerable ultimately for any misappropriation of AHC's assets which resulted. That was the primary basis for the judgment order made herein against Laith Pharaon and Djouhri who I find were acting for the purpose of seeking to evade the receivership appointed by this court
20   and for the purpose of assisting the defendants, in particular Ghaith Pharaon, in *International Credit & Inv. Co. (Overseas) Ltd.* v. *Adham*

25
(12), to evade their liability to satisfy any judgment against them. Laith Pharaon and Djouhri were not acting for any proper purpose of furthering the business of AHC.

*The admissibility of Whitbeck's evidence*

30
   Leading counsel for the plaintiff and for ICIC both candidly advised me that a claim of privilege had been raised in the ongoing English proceedings in opposition to Whitbeck's evidence. I was told that in those proceedings some of the same defendants in these proceedings are also defendants. The point they take there is that Whitbeck's evidence is privileged as he was legal adviser to the Pharaon group, or that the evidence discloses matters which are the subject of the confidential relationship between employer and employee and in respect of which

35
confidence is not waived. I will not take time over the latter argument. Confidential communications other than those passing between a client and his legal adviser are not privileged from disclosure.

   As to the claim of legal professional privilege, the circumstances of this case reveal such a clear case of dishonesty and iniquity that I need

40
not take too long to dispose of that either. There are two clear reasons why privilege may not attach to the matters of which Whitbeck's evidence speaks. The first is that already mentioned: wrongdoing. The strong *prima facie* evidence of the fraud is disclosed in Whitbeck's affidavit evidence itself. The manner of the perpetration of the fraud was

45
further revealed by his evidence given in *International Credit & Inv. Co.*

1997 CILR 106

*(Overseas) Ltd.* v. *Adham* (12). Fraud was then found by this court to have been made out as against Ghaith Pharaon and others and against Whitbeck acting as his agent and as director of his companies: see 1996 CILR at 103-108 for a discussion of the evidence, and the headnote to the

5
case (*ibid.*, at 93-95) for Schofield, J.'s findings. For the reason of the connections already explained between that action and this, those findings, relying on Whitbeck's evidence, I regard as being highly persuasive.

   In this action the fraud is pleaded in the statement of claim in terms

10
alleging dishonesty and which I find specific enough to come within the requirements of pleading: see *Gamlen Chemical Co. (U.K.) Ltd.* v. *Rochem Ltd.* (8) and *Barclays Bank PLC* v. *Eustice* (3) and the notes to the Rules of the Supreme Court, O.24, r.5 in 1 *The Supreme Court Practice 1997*, para. 24/5/12, at 436-437, where the principles are

15
discussed. It is, of course, settled law and obvious as a matter of principle in the public interest, that legal professional privilege does not extend to cases where the documents or communication in question came into existence as a step in furtherance of an unlawful scheme: *Bullivant* v. *Att.-Gen. for Victoria* (5) ([1901] A.C. at 201 and 206-207).

20
   The foregoing discussion of the principles proceeds upon the premise that Whitbeck had in fact been acting *qua* attorney when the fraudulent

  transactions were perpetrated. That is only for the purpose of disposing of a claim of privilege if it could, as a matter of fact, arise. I accept no such premise as a matter of fact. On the contrary, Whitbeck's own evidence discloses that he then acted as officer of the companies—of AHC, that which purportedly transferred, and of those which purportedly received the shares as well. The purported transfers show Whitbeck signing as secretary on each occasion. From Whitbeck's evidence it is revealed that the unlawful scheme was put in place on the instructions and advice of Ghaith Pharaon's attorney Berge Setrakian. The latter is described as "masterminding the global strategy for the defence of Pharaon in the matters arising out of his exposure to BCCI and ICIC." That being so, I am driven to the conclusion that the transactions and communications in question must be regarded as not having fallen within the ambit of legal professional privilege in the first place.

  Dishonesty aside, and while the law has not yet sought to define the limits of activities and communications as between lawyer and client to which privilege will attach, there are such limits. Put in the widest and most general terms, those limits require that the professional transactions or communications of a confidential character must be *for the purpose of getting legal advice*. An example of the limits being demarcated is to be found in the leading case of *Minter* v. *Priest* (14) and as more recently discussed in *Balabel* v. *Air India* (2) where Taylor, L.J. applied the following passage from the speech of Lord Buckmaster in the earlier case ([1988] 2 All E.R. at 251):

1997 CILR 107

> "The relationship of solicitor and client being once established, it is not a necessary conclusion that whatever conversation ensued was protected from disclosure. The conversation to secure this privilege must be such as within a very wide and generous ambit of interpretation, must be fairly referable to the relationship, but outside that boundary the mere fact that a person speaking is a solicitor, and the person to whom he speaks is his client affords no protection."

Similar limits were recognized by Lord Atkin in his speech in *Minter* v. *Priest* and cited also by Taylor, L.J. (*ibid.*, at 252):

> "[I]t is further desirable to point out, not by way of exception but as a result of the rule, that communications between solicitor and client which do not pass for the purpose of giving or receiving profess sional advice are not protected. It follows that client and solicitor may meet for the purpose of legal advice and exchange protected communications, and may yet in the course of the same interview make statements to each other not for the purpose of giving or receiving professional advice but for some other purpose. Such statements are not within the rule…."

Clearly, communications with Whitbeck for the purpose, and the documents created partially by him to give ostensible effect to the

fraudulent transactions, were all in the context of his capacity as officer of the companies. Such communications and actions may therefore not fall within the rule.

I am advised that further grounds for complaint against Whitbeck's testimony were raised in the English proceedings. They were to the effect that the incentive to give his evidence was the co-operation arrangement into which he has entered with the liquidators and that his former employers had been deceived into not seeking injunctions to restrain his testimony by his representations to them disavowing any intention to testify. Those are matters which, if relevant at all, can go only to Whitbeck's credibility and to the weight to be attached to his evidence. They do not disqualify his evidence or in any sense affect its admissibility. Matters of credit and weight are *par excellence* matters for the trial courts.

The courts of this and other jurisdictions have consistently accepted Whitbeck's evidence as credible evidence elucidating the machinations of those involved in the conspiracies to defraud. For my part, I also found significant independent aspects of the evidence to corroborate Whitbeck's testimony—not least the purported resolutions and the "Assignment of Rights." The latter, on the face of the inconsistencies which it contains, betrays the indecent haste and unlawful objects which generated it, purporting to provide as it does for two different sums—"$35m." and "US$3m."—as the consideration for the assignment of AHC's rights of ownership of BAHC's shares to Rhone. The same document signed by

1997 CILR 108

Djouhri as assignor to Rhone is inexplicably also signed by a Mr. Plutarco Camarano, purportedly on behalf of Loire as assignee. All this tangled web, when we know from Whitbeck's evidence and from the independent examination of the records by the receiver that no consideration whatsoever was paid!

*Judgment for the plaintiff.*

Attorneys: *Quin & Hampson* for the plaintiff; *Hunter & Hunter* for the eigth defendant.