# Exhibit G

20-F 1 d346488d20f.htm FORM 20-F

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

———————

# FORM 20-F

———————

**(Mark One)**

☐    **REGISTRATION STATEMENT PURSUANT TO SECTION 12(B) OR 12(G) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2016.**

OR

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☐    **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Date of event requiring this shell company report _____**

**For the transition period from _____ to _____**

**Commission file number: 001-35145**

———————

# NQ MOBILE INC.
**(Exact name of Registrant as specified in its charter)**

———————

**N/A**
**(Translation of Registrant's name into English)**

**Cayman Islands**
**(Jurisdiction of incorporation or organization)**

**No. 4 Building, 11 Heping Li East Street**
**Dongcheng District, Beijing 100013**
**The People's Republic of China**
**(Address of principal executive office)**

**Roland Wu, Chief Financial Officer**
**Tel: +86 (10) 8565-5555**
**E-mail: roland@nq.com**
**Fax: +86 (10) 8565-5518**
**No. 4 Building**
**11 Heping Li East Street**
**Dongcheng District**
**Beijing 100013**
**The People's Republic of China**
**(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)**

**Securities registered or to be registered pursuant to Section 12(b) of the Act:**

| <u>Title of Each Class</u> | <u>Name of Exchange on Which Registered</u> |
|---|---|
| **Class A common shares, par value US$0.0001 per share** | **New York Stock Exchange\*** |

\*    Not for trading, but only in connection with the listing on New York Stock Exchange of the American depositary shares, or the ADSs. Currently, one ADS represents five Class A common shares.

———————————————

**Securities registered or to be registered pursuant to Section 12(g) of the Act:**

**None**
**(Title of Class)**

**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:**

**None**
**(Title of Class)**

———————————————

Indicate the number of outstanding shares of each of the Issuer's classes of capital or common stock as of the close of the period covered by the annual report. 438,236,787 Class A common shares (excluding 10,292,605 Class A common shares represented by ADSs that are reserved for issuance upon the exercise of outstanding options and 892,495 Class A common shares represented by ADSs that have been repurchased but not cancelled), par value US$0.0001 per share, and 50,352,968 Class B common shares, par value US$0.0001 per share, as of December 31, 2016.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes  ☐    No  ☒

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934    Yes  ☐    No  ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities

**Table of Contents**

We do not believe that we or our oversea subsidiaries meet all of the conditions above and thus we do not believe that we or our oversea subsidiaries are PRC resident enterprises, though a substantial majority of the members of our management team as well as the management team of our offshore holding companies are located in China. However, we have been advised by our PRC counsel, Jincheng Tongda & Neal, that there remains uncertainty regarding the interpretation and implementation of the EIT Law and its implementation rules, and there is no assurance that we or our oversea subsidiaries will not be treated as a PRC resident enterprise. If we are considered as a resident enterprise and earn income other than dividends from our PRC subsidiaries, a 25% enterprise income tax on our global income may significantly increase our tax burden and materially and adversely affect our cash flow and profitability. Dividends paid between PRC companies are not generally subject to PRC withholding tax. However, it is unclear whether this exemption applies to foreign companies considered PRC residents under the EIT law. Accordingly, if we or our oversea subsidiaries are treated as a PRC resident enterprise, it is uncertain whether dividends we or our oversea subsidiaries receive from our PRC subsidiaries would be subject to PRC withholding tax.

**The enforcement of the Labor Contract Law and other labor-related regulations in the PRC may adversely affect our business and our results of operations.**

China enacted the Labor Contract Law effective on January 1, 2008. The Labor Contract Law introduces specific provisions related to fixed-term employment contracts, part-time employment, probation, consultation with labor union and employee assemblies, employment without a written contract, dismissal of employees, severance, and collective bargaining, which together represent enhanced enforcement of labor laws and regulations. According to the Labor Contract Law, an employer is obliged to sign an unlimited-term labor contract with any employee who has worked for the employer for ten consecutive years. Further, if an employee requests or agrees to renew a fixed-term labor contract that has already been entered into twice consecutively, the resulting contract must have an unlimited term, with certain exceptions. The employer must also pay severance to an employee in nearly all instances where a labor contract, including a contract with an unlimited term, is terminated or expires. In addition, the government has continued to introduce various new labor-related regulations after the Labor Contract Law. Among other things, new annual leave requirements mandate that annual leave ranging from five to 15 days is available to nearly all employees and further require that the employer compensate an employee for any annual leave day the employee is unable to take in the amount of three times the employee's daily salary, subject to certain exceptions. We cannot assure you that our employment practices do not or will not violate the Labor Contract Law and other labor-related regulations. If we are subject to severe penalties or incur significant liabilities in connection with labor disputes or investigations, our business and results of operations may be adversely affected.

Under the Social Insurance Law and the Administrative Measures on Housing Fund, employees are required to participate in pension insurance, work-related injury insurance, medical insurance, unemployment insurance, maternity insurance and housing funds and employers are required, together with their employees or separately, to pay the social insurance premiums and housing funds for their employees. These laws designed to enhance labor protection tend to increase our labor costs. In addition, as the interpretation and implementation of these regulations are still evolving, our employment practices may not be at all times be deemed in compliance with the regulations. As a result, we could be subject to penalties or incur significant liabilities in connection with labor disputes or investigations.

**Risks Related to Our ADSs**

**The trading price for our ADSs has been and may continue to be volatile.**

The trading price of our ADSs has been and may continue to be subject to significant fluctuations. From January 1, 2016 to April 15, 2017, the trading price of our ADSs on the New York Stock Exchange ranged from US$3.03 to US$5.35 per ADS, and the closing price on April 19, 2017 was US$3.60, per ADS. The trading price for our ADSs may continue to be volatile and subject to wide fluctuations in response to factors including the following:

- regulatory developments in our target markets affecting us, our customers or our competitors;

34

Table of Contents

- announcements of studies and reports relating to the quality of our services or those of our competitors;

- changes in the economic performance or market valuations of other companies that provide mobile security and management solutions;

- actual or anticipated fluctuations in our quarterly results of operations and changes or revisions of our expected results;

- changes in financial estimates by securities research analysts;

- conditions in the value-added telecommunication or internet services industries;

- announcements by us or our competitors of new services, acquisitions, strategic relationships, joint ventures or capital commitments;

- additions to or departures of our senior management;

- sales or perceived potential sales of additional shares or ADSs;

- negative publicity and allegations about our company, our products and services, our financial results or our market position; and

- market and volume fluctuations in the stock market in general.

In addition, the stock market in general, and the market prices for companies with operations in China in particular have experienced volatility that might have been unrelated to the operating performance of such companies. The securities of some China-based companies that have listed their securities in the United States have experienced significant volatility since their initial public offerings, including, in some cases, substantial price declines in the trading prices of their securities. The trading performances of the securities of these China-based companies after their offerings may affect the attitudes of investors toward Chinese companies listed in the United States, which consequently may impact the trading performance of our ADSs, regardless of our actual operating performance. In addition, any negative news or perceptions about inadequate corporate governance practices or fraudulent accounting, corporate structure or other matters of other China-based companies, such as news of the SEC initiating administrative proceedings against and imposing sanctions on the China affiliates of the Big Four public accounting firms for refusing to produce audit work papers and other documents related to China-based companies under investigation by the SEC for potential accounting fraud, may also negatively affect the attitudes of investors towards China-based companies in general, including us, regardless of whether we have engaged in any inappropriate activities. The global financial crisis and the ensuing economic recessions in many countries have also contributed and may continue to contribute to extreme volatility in the global stock markets, such as the large decline in share prices in the United States, China and other jurisdictions in late 2008, early 2009 the second half of 2011, part of 2012, and since the beginning of 2016. These broad market and industry fluctuations may adversely affect the price of our ADSs, regardless of our operating performance.

***Because we do not expect to pay dividends in the foreseeable future, you must rely on price appreciation of our ADSs for return on your investment.***

We currently intend to retain most, if not all, of our available funds and any future earnings to fund the development and growth of our business. As a result, we do not expect to pay any cash dividends in the foreseeable future. Therefore, you should not rely on an investment in our ADSs as a source for any future dividend income.

Our board of directors has discretion as to whether to distribute dividends, subject to our memorandum and articles of association and certain restrictions under Cayman Islands laws. Even if our board of directors decides to declare and pay dividends, the timing, amount and form of future dividends, if any, will depend on, among other things, our future results of operations and cash flow, our capital requirements and surplus, the amount of distributions, if any, received by us from our subsidiaries, our financial condition, contractual restrictions and other factors deemed relevant by our board of directors. Accordingly, the return on your investment in our ADSs will likely depend entirely upon any future price appreciation of our ADSs. There is no guarantee that our ADSs will appreciate in value or even maintain the price at which you purchased the ADSs. You may not realize a return on your investment in our ADSs and you may even lose your entire investment in our ADSs.

**Table of Contents**

*Telecommunications Networks Code Number Resources*

On January 23, 2014, the MII issued the amendment of Administrative Measures on Telecommunications Networks Code Number Resources to administer the code number resources including mobile communications network code number. According to the administrative measures, the entity shall apply to the MII for a code number to be used in the inter-provincial operations and shall apply to the relevant CAB for a separate code number for intra-provincial operations. The administrative measures specify the qualifications for a code number, required application materials and application procedures.

*Specifications for Telecommunications Services*

On March 13, 2005, the MII issued the Specifications for Telecommunications Services specifying the telecommunications service qualities to which all telecommunications mobile payment service providers in the PRC should conform, which was effective on April 20, 2005. It also requires all telecommunications services providers to establish a sound service quality management system and make periodical reports to the relevant telecommunications authorities.

*Foreign Investments in Value-Added Telecommunications Services Industry*

Foreign direct investment in telecommunications services industry in China is regulated under Regulations on the Administration of Foreign-Invested Telecommunications Enterprises, or the FITE Regulations. The FITE Regulations were issued by the State Council on December 11, 2001 and amended by the State Council on September 10, 2008 and February 6, 2016. According to the FITE Regulations, foreign investors' ultimate equity interests in any entity providing value-added telecommunications services in the PRC may not exceed 50%. A foreign investor must demonstrate a good track record and prior experience in providing value-added telecommunications services outside the PRC prior to acquiring any equity interest in any value-added telecommunications services business in the PRC.

On July 13, 2006, the MII issued the Notice Regarding Strengthening the Administration of Foreign Investment in Operating Value-Added Telecommunications Businesses, or the MII Notice, which prohibits value-added telecommunications services operation license holders, including Trans-regional Value-Added Telecommunications Services Operation License and Telecommunications Value-Added Services Operation License holders, from leasing, transferring or selling their licenses to any foreign investors in any manner, or providing any resources, premises or facilities to any foreign investors for illegal operation of telecommunications services business in the PRC. The MII Notice also requires that, (1) value-added telecommunications services operation license holders or their shareholders must directly own the domain names and trademarks used by such license holders in their daily operations; (2) each license holder must have necessary facilities for its approved business operations and maintain such facilities in the regions specified by its license; and (3) all value-added telecommunications mobile payment service providers are required to maintain network and internet security in accordance with the standards set forth in relevant PRC regulations. If a license holder fails to comply with the requirements in the MII Notice and fails to remedy such non-compliance within a designated period, the MIIT or relevant CABs may take administrative actions against such license holder, including revocation of their valued-added telecommunications services operation licenses. We provide our services through our controlled affiliated entity that own Value-Added Telecommunications Services Operation Licenses. We believe our controlled affiliated entity is in compliance with the MII Notice.

47

Table of Contents

The MOFCOM published a discussion draft of the proposed Foreign Investment Law (the "Draft") in January 2015 aiming to, upon its enactment, replace the trio of existing laws regulating foreign investment in China. The Draft embodies an expected PRC regulatory trend to rationalize its foreign investment regulatory regime in line with prevailing international practice and the legislative efforts to unify the corporate legal requirements for both foreign and domestic investments. The MOFCOM is currently soliciting comments on the Draft and substantial uncertainties exist with respect to its enactment timetable, interpretation and implementation. The Draft, if enacted as proposed, may materially impact the viability of our current corporate structure, corporate governance and business operations. The Draft expands the definition of foreign investment and introduces the principle of "actual control" in determining whether a company is considered as an FIE. Under the Draft, the entities established in China but "controlled" by foreign investors will be treated as FIEs, whereas an entity set up in a foreign jurisdiction would nonetheless be, upon market entry clearance by the MOFCOM, treated as a PRC domestic investor provided that the entity is "controlled" by PRC entities and/or citizens. In this connection, "control" is broadly defined in the draft law to cover the following summarized categories: (i) holding, directly or indirectly, not less than 50% of shares, equities, share of properties, voting rights or other similar rights of the enterprise; (ii) holding, directly or indirectly, less than 50% of shares, equities, share of properties, voting rights or other similar rights of the enterprise, but falling under any of the following circumstances: (1) having the right to directly or indirectly appoint not less than half of the members of the board of directors or other similar decision-making body of the enterprise; (2) having the ability to ensure that its nominees occupy not less than half of seats in the board of directors or other similar decision-making body of the enterprise; or (3) holding voting rights sufficient to impose significant impacts on any resolution of the board of shareholders, at the general meeting of shareholders, or of the board of directors or other decision-making body of the enterprise; or (iii) having the power to exert decisive influence, via contractual or trust arrangements, over the subject entity's operations, financial matters or other key aspects of business operations. Once an entity is determined to be an FIE, it will be subject to the foreign investment restrictions or prohibitions set forth in a "negative list," to be separately issued by the State Council later, if the FIE is engaged in the industry listed in the negative list. Unless the underlying business of the FIE falls within the negative list, which calls for market entry clearance by the MOFCOM, prior approval from the government authorities as mandated by the existing foreign investment legal regime would no longer be required for establishment of the FIE.

Under the Draft, variable interest entities that are controlled via contractual arrangement would also be deemed as FIEs, if they are ultimately "controlled" by foreign investors. Therefore, for any companies with a VIE structure in an industry category that is on the "negative list," the VIE structure may be deemed legitimate only if the ultimate controlling person(s) is/are of PRC nationality (either PRC companies or PRC citizens). Conversely, if the actual controlling person(s) is/are of foreign nationalities, then the variable interest entities will be treated as FIEs and any operation in the industry category on the "negative list" without market entry clearance may be considered as illegal. Moreover, for the enterprises which are not incorporated under the laws of China (foreign investors) but are "controlled" by Chinese investors, they may submit documentary evidence to apply for identifying their investment as the investment by Chinese investors when they applying for the market entry clearance to engage in any investment as set out in the "negative list" in China. The competent authorities of foreign investment will grant the review opinion on whether the said investment is identified as the investment by Chinese investors.

**Regulations Concerning Internet and Mobile Businesses**

*Online Music and Entertainment*

On November 20, 2006, the MOC issued Several Suggestions of the MOC on the Development and Administration of Internet Music, or the Suggestions, which became effective on the same date. The Suggestions, among other things, reiterate the requirement for an internet service provider to obtain an internet culture operation license to carry out any business relating to internet music products. In addition, foreign investors are prohibited from operating internet culture businesses. However, the laws and regulations on internet music products are still evolving, and there have not been any provisions clarifying whether music products will be regulated by the Suggestions or how such regulation will be carried out.

On August 18, 2009, the MOC promulgated the Notice on Strengthening and Improving the Content Review of Online Music, or the Online Music Notice. According to the Online Music Notice, only "internet culture operating entities" approved by the MOC may engage in the production, release, dissemination (including providing direct links to music products) and importation of online music

products. The content of online music shall be reviewed by or filed with the MOC. Internet culture operating entities should establish a strict self-monitoring system of online music content and set up a special department in charge of such monitoring.

In 2011, the MOC greatly intensified its regulation of the provision of online music products. According to the series of Notices on Clearing Online Music Products that are in Violation of Relevant Regulations promulgated by the MOC since January 7, 2011, entities that provide any the following will be subject to relevant penalties or sanctions imposed by the MOC: (a) online music products or relevant services without obtaining corresponding qualifications, (b) imported online music products that have not passed the content review of the MOC or (c) domestically developed online music products that have not been filed with the MOC. Thus far, we believe that we have eliminated from our platform any online music products that may fall into the scope of those prohibited online music products thereunder.

48

Table of Contents

**Regulations Relating to Dividend Withholding Tax**

The EIT Law imposes a withholding tax of 10% on dividends distributed by a foreign-invested enterprise to its immediate holding company outside China, if such immediate holding company is considered a "non-resident enterprise" without any establishment or place within China or if the received dividends have no connection with the establishment or place of such immediate holding company within China, unless such immediate holding company's jurisdiction of incorporation has a tax treaty with China that provides for a different withholding arrangement. Holding companies in Hong Kong, for example, are subject to a 5% withholding tax rate.

In August 2015, the State Administration of Taxation promulgated the Administrative Measures for Non-Resident Taxpayers to Enjoy Treatments under Tax Treaties, or Circular 60, which became effective on November 1, 2015. Circular 60 provides that non-resident enterprises are not required to obtain pre-approval from the relevant tax authority in order to enjoy the reduced withholding tax rate. Instead, non-resident enterprises and their withholding agents may, by self-assessment and on confirmation that the prescribed criteria to enjoy the tax treaty benefits are met, directly apply the reduced withholding tax rate, and file necessary forms and supporting documents when performing tax filings, which will be subject to post-tax filing examinations by the relevant tax authorities. Accordingly, our Hong Kong subsidiary may be able to enjoy the 5% withholding tax rate for the dividends they receive from our PRC subsidiary, if it satisfies the conditions prescribed under Circular 81 and other relevant tax rules and regulations. However, according to Circular 81 and Circular 60, if the relevant tax authorities consider the transactions or arrangements we have are for the primary purpose of enjoying a favorable tax treatment, the relevant tax authorities may adjust the favorable withholding tax in the future.

*Labor Protection*

Pursuant to the Employment Contracts Law of the People's Republic of China, or ECL, promulgated by the Standing Committee of the National People's Congress on June 29, 2007 and became effective on January 1, 2008 and the Implementing Regulations of the PRC Employment Contracts Law promulgated and effective on September 18, 2008, an employer establishes an employment relationship with an employee from the date when the employee is put to work, and a written employment contract shall be entered into on this same day. If an employment relationship has already been established with an employee but no written employment contract has been entered into simultaneously, a written employment contract shall be entered into within one month from the date the employee commences work. If an employer fails to enter into a written employment contract with an employee for more than one month but less than one year as of the date on which the employment commences, it shall pay the employee twice his/her salary for each month of that period and rectify the situation by subsequently entering into a written employment contract with the employee. If the employee refuses to enter into the written contract with the employer, the employer shall issue a written notice to the employee to rescind the employment relationship, and pay severance to the employee in accordance with relevant provisions of the ECL.

**C.    Organizational Structure**

As of April 15, 2017, we mainly operate our business through the following significant subsidiaries and consolidated affiliated entities:

- Beijing NQ Technology Co., Ltd., or Beijing Technology, our consolidated affiliated entity in the PRC;
- NQ Mobile (Beijing) Co., Ltd., or NQ Beijing, our wholly owned subsidiary in the PRC;
- NQ (Beijing) Co., Ltd., or NQ Tongzhou, our wholly owned subsidiary in the PRC;
- NQ International Limited, our wholly owned subsidiary in Hong Kong;
- Beijing NQ Mobile Co., Ltd., or NQ Yizhuang, our wholly owned subsidiary in the PRC;
- Xinjiang NQ Mobile Venture Capital Investment Co., Ltd., or Xinjiang NQ, a wholly owned subsidiary of Beijing Technology in the PRC.

58

**Table of Contents**



 Equity interest.

Contractual arrangements including exclusive technical consulting services agreement, exclusive business cooperation agreement, business operation agreements, powers of attorney, equity disposition agreements, loan agreements and equity interest pledge agreements.

(1)     The shareholders of Beijing Technology are Dr. Vincent Wenyong Shi, our founder, chief operating officer and chairman of the board, Ms. Lingyun Guo, our chief strategy officer and director, and Mr. Xu Zhou, our founder, holding 14.75%, 52.00% and 33.25% of Beijing Technology's equity interests, respectively. Dr. Shi, Ms. Guo and Mr. Zhou also collectively own RPL, which holds 10.3% of common shares and 53.5% of voting power in our Company.

## D.    Property, Plants and Equipment

Our principal executive office and headquarter in Beijing is located on premises comprising approximately 6115square meters at 11 Heping Li East Street, Dongcheng District, Beijing, China, which we lease from an unrelated third party. We plan to renew our lease when it expires. The premises are shared by NQ Beijing, Beijing Technology and some subsidiary companies. The lessor of the leased premises in Beijing has valid title to the property. We believe that our existing facilities are adequate for our current and foreseeable requirements.

We also lease an aggregate of approximately 9,979 square meters of office space in Beijing, Tianjin, Shanghai, Shenzhen, Taipei, Hong Kong, Gyeonggi-do and Texas all from unrelated third parties.

We made capital expenditures of US$3.7 million, US$0.5 million and US$0.7million, for the years ended December 31, 2014, 2015 and

Table of Contents

**NQ MOBILE INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(All numbers in the following Notes are expressed in thousands, except for share and per share data)**

## 1. PRINCIPAL ACTIVITIES AND ORGANIZATION

*(a) Principal activities*

NQ Mobile Inc. ("NQ Mobile", or the "Company"), through its subsidiaries, its variable interest entity ("VIE"), and the VIE's subsidiaries, is principally engaged in the provision of mobile Internet services in the People's Republic of China (the "PRC" or "China") and overseas markets. NQ Mobile's service portfolio includes mobile security, productivity and privacy protection, mobile games as well as related applications (e.g. live mobile social video platform, vlife wallpaper, music radar, healthcare, themed-wallpaper and desktop applications etc.) and advertising for the consumer market and an entire mobility solution set for the enterprise market. The Company, its wholly-owned and majority-owned subsidiaries, VIE and wholly-owned subsidiaries of the VIE are hereinafter collectively referred to as the "Group".

*(b) Reorganization and FL Mobile and Showself Transaction*

The Company was incorporated as a limited liability company under the laws of the Cayman Islands on March 14, 2007. The Company was 100% owned by RPL Holdings Limited ("RPL"). RPL is a limited liability company organized under the laws of British Virgin Islands ("BVI"), which was owned and controlled by Dr. Henry Yu Lin, Dr. Vincent Wenyong Shi, and Mr. Xu Zhou (collectively, the "Founders"). In 2015, one of the shareholders changed from Dr. Henry Yu Lin to Ms. Lingyun Guo. The others remain the same. Therefore, the shareholders become Ms. Lingyun Guo, Dr. Vincent Wenyong Shi, and Mr. Xu Zhou (collectively, the Controlling Shareholders).

In May 2007, the Company established NQ Mobile (Beijing) Co., Ltd. ("NQ Beijing" or "NQ WFOE") as a wholly foreign-owned enterprise in the PRC. In June 2007, the Company undertook a reorganization (the "Reorganization") to become the ultimate holding company of the Group. Prior to the Reorganization, the Group's business was operated by Beijing NQ Technology Co. Ltd. ("Beijing Technology"), a company wholly owned and controlled by the Controlling Shareholders, which commenced operations on October 21, 2005. By entering into a series of agreements (collectively, "NQ VIE Agreements") with the Controlling Shareholders and NQ Beijing, Beijing Technology became a variable interest entity whose primary beneficiary is NQ Beijing. Consequently, the Company as the parent of NQ Beijing became the ultimate primary beneficiary of Beijing Technology and has consolidated financial statements of Beijing Technology and its subsidiaries. Beijing Technology was the predecessor of the Group and operated all of the business of the Group prior to the Reorganization.

From 2012 to 2016, the Group established several subsidiaries and consolidated affiliated entities to support their expansion, including NQ (Beijing) Co., Ltd. ("NQ Tongzhou") in January 2013, Beijing NQ Mobile Co., Ltd. ("NQ Yizhuang") in September 2014, NQ Technology (Guizhou) Co., Ltd. ("NQ Guizhou") in December 2015, Showself (Beijing) Technology Co., Ltd. ("Showself (Beijing)") in July 2015, Xinjiang NQ Mobile Venture Capital Investment Co., Ltd. ("Xinjiang NQ") in February 2016. During the same period, the Group also acquired companies including NationSky through Beijing Technology ("Nation Sky"), Beijing Fanyue Information Technology Co., Ltd. ("Fanyue"), Beijing Tianya Co., Ltd. ("Tianya"), Best Partners Ltd. ("Best Partners"), Beijing Trustek Technology Co., Ltd. ("Beijing Trustek"), Beijing Showself Technology Co., Ltd.("Beijing Showself"), Linkmotion Holdings Ltd. ("Linkmotion"), Shanghai Launcher Software Technology Co., Ltd. ("Launcher ") and Glory Team Ltd. ("Glory"). Beijing Showself was reorganized as a wholly owned subsidiary of Showself (Beijing) in June 2016.

During 2010 and 2012, the Group acquired 100% of the equity interests in FL Mobile Jiutian Technology Co., Ltd. ("FL Mobile"). Following subsequent reorganization in 2014, FL Mobile became one of the Group's consolidated affiliated entities and controlled by the Group through contractual arrangements.

In August 2015, the Group entered into a framework agreement (the "FL Framework Agreement") with Beijing Jinxin Rongda Investment Management Co. Ltd. ("Beijing Jinxin"), a subsidiary of Tsinghua Holdings Co., Ltd., to begin the divestment of the FL

Mobile business ("FL Mobile Divestment"). In connection with the FL Mobile Divestment, FL Mobile was reorganized as a subsidiary of Xinjiang NQ in March 2016.

The Group has discussed the FL Mobile Divestment with several potential purchasers since 2015, including Gansu Huangtai Wine-Marketing Industry Co., Ltd. and Shenzhen Prince New Materials Co., Ltd., both listed on the Shenzhen Stock Exchange, and private equity investment fund. These three transactions, however, did not come to fruition due to various reasons, including ongoing changes in the capital market conditions and uncertainty surrounding relevant policies in China.

F-7

Table of Contents

As part of FL Mobile Divestment, (i) the Group sold 22% of equity interests in FL Mobile to Dr. Vincent Wenyong Shi, the Company's chairman and chief operating officer, for a consideration of RMB880 million (US$127million) via a termination and share purchase agreement in March 2016, however, 5.66% of the equity interests transferred was reverted in November 2016, as both the Company and Dr. Vincent Wenyong Shi have the right to revert the transaction entirely, such consideration was recorded as consideration received from shareholder on the balance sheet as of December 31, 2016, (ii) the Group sold 12% of equity interests in FL Mobile to Xinjiang Yinghe Equity Investment Management Limited Partnership ("Xinjiang Yinghe"), an affiliate of the management of FL Mobile, however, such transaction was terminated and reverted in November 2016, (iii) the Group sold a total of 20.66% of equity interests in FL Mobile to several affiliates of Beijing Jinxin in May 2016 and August 2016.

In March 2017, the Group entered into definitive agreements (the "Agreements") with Tongfang Investment Fund Series SPC (the "Investor"), affiliate private equity investment fund of Tsinghua Tongfang. Pursuant to the terms of the Agreements, the Investor will acquire (i) 63% equity interests in FL Mobile, being all of the equity interests beneficially owned by the Company, for a cash consideration of RMB2,520 million and (ii) 65% equity interests in Showself (Beijing) Technology Co., Ltd ("Showself (Beijing)"), a live social video business, being all of the equity interests beneficially owned by the Company, for a cash consideration of RMB 800 million. The Investor had paid RMB150 million in cash as the non-refundable earnest money which will be counted towards the payment of the purchase price. The Investor will pay the remaining amount of the total consideration on or before May 31, 2017 after the Company delivers all of its equity interests in FL Mobile and Showself (Beijing). The consummation of the Transactions is subject to customary closing conditions (see Note 24(b)).

The Company has transferred their equity interests in FL Mobile and Showself (Beijing) to these purchasers pursuant to their contracts with them, and are in the process to collect remaining purchase price and close the whole FL Mobile and Showself (Beijing) Divestment. In addition to purchasing FL Mobile and Showself (Beijing), the affiliate private equity fund of Tsinghua Tongfang also has the option to purchase US$100 million worth of Class A Common shares of the Company at a price of US$1.05 per share, or US$5.25 per ADS within 3 months after the date of the full payment pursuant to the agreements to purchase FL Mobile.

*(c) Divestment of NationSky*

On November 26, 2015, the Group entered an agreement with former member of management of Beijing NationSky Network Technology Co., Ltd ("NationSky") and a third party to divest 100% of the equity interests of NationSky with cash consideration of RMB510,000. On December 30, 2015, the transaction was closed with all consideration received by the Group, and the registration with Industrial and Commercial Registration had been completed.

F-8

Table of Contents

*(d) Subsidiaries, VIE and VIE's subsidiaries*

As of December 31, 2016, details of the Company's major subsidiaries***, VIE and the VIE's subsidiaries are as follows.

| Name | Date of Incorporation or Acquisition | Place of Incorporation | Relationship | Principal Activities |
|---|---|---|---|---|
| **Subsidiaries** | | | | |
| NQ International Limited ("NQ HK") * | April 26, 2010 | Hong Kong | Wholly-owned subsidiary | Consumer mobile security services in overseas markets |
| NQ Mobile US Inc. ("NQ US")** | November 5, 2010 | United States | Wholly-owned subsidiary | Consumer mobile value added services and advertising services in US and overseas markets. |
| NQ Mobile (Beijing) Co., Ltd. ("NQ Beijing" or "NQ WFOE") | May 15, 2007 | The PRC | Wholly-owned subsidiary | Consumer mobile security services in PRC and overseas markets, and technology consulting and services |
| NQ (Beijing) Co., Ltd. ("NQ Tongzhou") | January 5, 2013 | The PRC | Wholly-owned subsidiary | Software design and development for computer and mobile devices and other technology consulting services |
| Best Partners Ltd. ("Best Partners") | September 6, 2013 | Cayman Islands | Wholly-owned subsidiary of FL Mobile Inc. | Mobile advertising services |
| Beijing NQ Mobile Co., Ltd. ("NQ Yizhuang") | September 29, 2014 | The PRC | Wholly-owned subsidiary | Consumer mobile security services in PRC and overseas markets, and technology consulting and services |
| FL Mobile Inc. | January 21, 2013 | Cayman Islands | Wholly-owned subsidiary | Mobile advertising and mobile games services |
| Linkmotion Holdings Ltd. ("Linkmotion") | June 15, 2015 | Cayman Islands | 67%-owned subsidiary | Optimization of software and hardware in vehicle platform |
| **Variable Interest Entities** | | | | |
| Beijing Technology | October 21, 2005 | The PRC | VIE of NQ Beijing | Consumer mobile security services in PRC market and research and development |
| **Subsidiaries of VIE** | | | | |
| Qingyun (Tianjin) Financial Management Co., Ltd. ("Tianjin Qingyun") | February 21, 2012 | The PRC | Wholly-owned subsidiary of Beijing Technology | Financial management services |
| FL Mobile | November 30, 2012 | The PRC | 63%-owned subsidiary of Xinjiang NQ | Mobile games and advertising |
| Beijing Fanyue Information Technology Co., Ltd. ("Fanyue") | March 21, 2013 | The PRC | Wholly-owned subsidiary of FL Mobile | Off-line user acquisition services |
| FL Mobile (Beijing) Co., Ltd. ("FL Beijing") | June 3, 2013 | The PRC | Wholly-owned subsidiary of FL Mobile Hong Kong Limited | Mobile advertising and mobile games services |
| Beijing Wanpu Century Co., Ltd. ("Wanpu Century") | September 6, 2013 | The PRC | Wholly-owned subsidiary of FL Mobile | Advertising services based on mobile internet platform in the PRC |
| Beijing Tianya Co., Ltd. ("Tianya") | September 24, 2013 | The PRC | Wholly-owned subsidiary of Beijing Technology | Mobile healthcare application developments and search engine marketing in healthcare industry |
| Chengdu Ruifeng Technology Co., Ltd. ("Ruifeng") | October 15, 2013 | The PRC | Wholly-owned subsidiary of Beijing Technology | Enterprise mobility system development and iOS training program |
| Shanghai Yinlong Information Technology Co., Ltd. ("Yinlong") | November 11, 2013 | The PRC | Wholly-owned subsidiary of Beijing Technology | Mobile music search, matching and recognition software services |
| Beijing Trustek Technology Co., Ltd. ("Beijing Trustek") | January 10, 2014 | The PRC | Wholly-owned subsidiary of Xinjiang NQ | Enterprise mobility solutions and services |
| Tianjin Huayong Wireless Technology Co., Ltd. ("Huayong") | January 31, 2014 | The PRC | 68%-owned subsidiary of Beijing Technology | Research and development of live wallpapers |
| Showself (Beijing) Technology Co., Ltd. ("Showself") | May 15, 2014 | The PRC | 65%-owned subsidiary of Beijing Technology | Development and operation of live mobile social video platform |
| Glory Team Ltd. ("Glory") | October 1, 2015 | Seychelles | Wholly-owned subsidiary of FL Mobile Hong Kong Limited | Mobile games distribution |
| Beijing Century Hetu Software Technology Co., Ltd. ("Hetu") | October 1, 2015 | The PRC | Wholly-owned subsidiary of FL Mobile | Mobile games design and development |
| Shanghai Launcher Technology Co., Ltd. ("Launcher") | February 29, 2016 | The PRC | 51%-owned subsidiary of Beijing Technology | Mobile desktop |
| Xinjiang NQ Mobile Venture Capital Investment Co., Ltd. ("Xinjiang NQ") | January 28, 2016 | The PRC | Wholly-owned subsidiary of Beijing Technology | Financial management services |

\*      NetQin International Limited was renamed to NQ International Limited on August 1, 2012.

\*\*     NetQin US Inc. was renamed to NQ Mobile US Inc. on December 14, 2011.

\*\*\*    Other consolidated entities of the Company have been omitted from this list since, considered in an aggregate as one single entity, they would not constitute a significant subsidiary.

F-9

**Table of Contents**

***(e) Variable Interest Entity***

<u>*Basic Information*</u>

PRC laws and regulations prohibit or restrict foreign ownership of companies from providing mobile value added services, mobile games and mobile advertising in the PRC where certain licenses are required for the provision of such services. To comply with these PRC laws and regulations, the Company provides services subject to such restrictions through the VIE and its subsidiaries in China. To provide the Company with the expected residual returns of the VIE and their subsidiaries, the Group entered into a series of contractual arrangements, such as power of attorney and exclusive equity purchase option agreement with the VIE and the shareholders of the VIE to enable the Company, through the Group's subsidiaries ("Primary Beneficiaries"), which give the Primary Beneficiaries the rights to direct the activities that most significantly affect the economic performance of the VIE and to acquire the equity interests in the VIE when permitted by the PRC laws, respectively to:

- exercise effective control over the VIE;

- receive substantially all of the economic benefits and residual returns, and absorb substantially all the risks of expected losses from the VIE as if they were their sole shareholders; and

- have an exclusive option to purchase all of the equity interests in the VIE.

The Group has adopted the guidance of accounting for VIE, which requires certain VIE to be consolidated by the primary beneficiary of the entities. The Group's management evaluated the relationships among the Company, NQ Beijing and Beijing Technology, and the economic benefits flow of the applicable contractual arrangements. The Group concluded that NQ Beijing is the primary beneficiary of Beijing Technology. As a result, the results of operations, assets and liabilities of Beijing Technology and its subsidiaries have been included in the Company's consolidated financial statements.

*Exclusive Technical Consulting Services Agreement* between NQ Beijing and Beijing Technology. Under the exclusive technical consulting services agreement, NQ Beijing has the exclusive right to provide to Beijing Technology the technical consulting services related to Beijing Technology's business operation. NQ Beijing owns the intellectual property rights developed by either NQ Beijing or Beijing Technology in the performance of this agreement. Beijing Technology pays to NQ Beijing quarterly service fees, determined unilaterally by NQ Beijing due to its control over Beijing Technology. The amount of service fees to be charged to Beijing Technology are determined at the sole discretion of NQ Beijing by considering, among others, the technical complexity of the services, the actual costs that may be incurred for providing the services, and the operations of Beijing Technology. As of December 31, 2016, the retained earnings in Beijing Technology was US$30,978 after being charged the service fees by NQ Beijing. The service fees are eliminated upon consolidation. This agreement is effective until NQ Beijing ceases to exist or is terminated at NQ Beijing's sole discretion by giving 30 day's advanced notice to Beijing Technology.

*Business Operation Agreements* between NQ Beijing and the shareholders of Beijing Technology. Under the business operation agreements, the registered shareholders of the VIE may not enter into any transactions that could materially affect the assets, liabilities, interests or operations of the VIE, without prior written consent from NQ Beijing. In addition, the shareholders of the VIE irrevocably appointed NQ Beijing, to vote on their behalf on all matters, including matters relating to the transfer of any or all of their respective equity interests in the VIE and appointments of the directors, chief executive officer, chief financial officer, and other senior management of the VIE. Each of these agreements will remain in effect till the date when NQ Beijing is dissolved, and can be terminated at the sole discretion of NQ Beijing.

*Powers of Attorney* executed by the shareholders of Beijing Technology in favor of NQ Beijing. Each of these powers of attorney irrevocably authorizes NQ Beijing, to vote on behalf of the registered shareholders of the VIE on matters stipulated by laws and the Article of Association of the VIE. The Powers of Attorney shall remain effective from the date it is signed to the date when NQ Beijing is dissolved in accordance with the laws of the People's Republic of China, unless the Business Operations Agreement for the VIE is terminated in advance.

*Equity Disposition Agreements* between NQ Beijing and the shareholders of Beijing Technology. The equity disposition

agreements irrevocably granted to NQ Beijing, or their designated parties, an exclusive option to purchase, to the extent permitted by the PRC law, any part or all of the equity interests in the VIE from the registered shareholders. The exercise price for the options to purchase the equity interests is the minimum amount of consideration permissible under PRC law. The options are exercisable at any time at the sole discretion of NQ Beijing, during the term of agreements. Each of the registered shareholders agrees not to transfer, pledge or dispose of its equity interests in the VIE in any way before NQ Beijing exercise their options in full or deliver the written approval. Each agreement has a term of 10 years and renewable on the same terms at the sole discretion of NQ Beijing.

F-10

Table of Contents

*Loan Agreements and Amended Loan Agreements* between NQ Beijing and the shareholders of Beijing Technology and between the Company and the shareholders of Beijing Technology. Under these agreements, an aggregate of interest-free loans of RMB46,123 from NQ Beijing and 6% interest loan of US$250 from the Company were extended to the registered shareholders of Beijing Technology for sole purpose of contributing the registered capital to Beijing Technology in exchange for 100% of the equity interest in Beijing Technology. Without the prior consent of the Company and NQ Beijing, the registered shareholders of Beijing Technology cannot approve any transaction including merger, acquisition, new investments and etc., significantly affecting the registered shareholders' rights of Beijing Technology. The loans have original terms of 10 years and are repayable if the Company and NQ Beijing decide to exercise their exclusive purchase option under Equity Disposition Agreements. The amendments requires that the loans can be settled fully only by the shareholders transferring the equity interests of Beijing Technology according to Equity Disposition Agreements to the Company and NQ Beijing.

*Equity Interest Pledge Agreements* between NQ Beijing and the shareholders of Beijing Technology. Under the equity interest pledge agreements, the registered shareholders of the VIE pledged all of their respective equity interests in the VIE to secure the VIE's obligations under the relevant Exclusive Technical Consulting Services Agreement, Exclusive Business Cooperation Agreements, Business Operation Agreements and Equity Disposition Agreements described above. Each shareholder agrees not to sell, mortgage or dispose of any of the VIE's equity interest it holds without prior written consent from NQ Beijing. These agreements are terminable only when the VIE's obligations under the other agreements are fully settled.

*Amended and Restated Business Operation Agreement, Amended and Restated Equity Interest Pledge Agreement and Amended and Restated Equity Disposition Agreement* between NQ Beijing and shareholders of Beijing Technology, entered into on June 6, 2012, reflected the increase of the registration capital of Beijing Technology from RMB10 million to RMB50 million. All the other terms remain the same as the original agreements.

Amended and Restated Business Operation Agreement, Amended and Restated Equity Interest Pledge Agreement and Amended and Restated Equity Disposition Agreement between NQ Beijing and shareholders of Beijing Technology, entered into on November 17, 2015, reflected the shareholder of Beijing Technology change from Dr. Henry Yu Lin to Ms. Lingyun Guo. All the other terms remain the same as the original agreements.

<u>*Risks in Relation to the VIE Structure*</u>

The Ministry of Commerce of PRC ("MOC") published a discussion draft of the proposed Foreign Investment Law (the "Draft") in January 2015 aiming to, upon its enactment, replace the trio of existing laws regulating foreign investment in China. The Draft embodies an expected PRC regulatory trend to rationalize its foreign investment regulatory regime in line with prevailing international practice and the legislative efforts to unify the corporate legal requirements for both foreign and domestic investments. The MOC is currently soliciting comments on the Draft and substantial uncertainties exist with respect to its enactment timetable, interpretation and implementation. The Draft, if enacted as proposed, may materially impact the viability of current corporate structure, corporate governance and business operations. The Draft expands the definition of foreign investment and introduces the principle of "actual control" in determining whether a company is considered a VIE.

Under the Draft, variable interest entities that are controlled via contractual arrangement would be deemed as VIEs, if they are ultimately "controlled" by foreign investors. Therefore, for any companies with a VIE structure in an industry category that is on the "negative list", the VIE structure may be deemed legitimate only if the ultimate controlling person(s) is/are of PRC nationality (either PRC companies or PRC citizens). Conversely, if the actual controlling person(s) is/are of foreign nationalities, then the variable interest entities will be treated as VIEs and any operation in the industry category on the "negative list" without market entry clearance may be considered as illegal. Moreover, for the enterprises which are not incorporated under the laws of China (foreign investors) but are "controlled" by Chinese investors, they may submit documentary evidence to apply for identifying their investment as the investment by Chinese investors when they applying for the market entry clearance to engage in any investment as set out in the "negative list" in China. The competent authorities of foreign investment will grant the review opinion on whether the said investment is identified as the investment by Chinese investors.

In conclusion, if the Draft enacted as proposed, it is possible that the Company's conduct of certain of its operations and businesses

through the VIE could be found by PRC authorities to be in violation of PRC laws and regulations prohibiting or restricting foreign ownership of companies that engage in such operations and businesses. If such a finding were made, regulatory authorities with jurisdiction over the licensing and operation of such businesses would have broad discretion in dealing with such a violation, including levying fines, confiscating the Company's income, revoking the business or operating licenses of the affected businesses, requiring the Company to restructure its ownership structure or operations, or requiring the Company to discontinue all or any portion of its operations. Any of these actions could cause significant disruption to the Company's business operations, and have a material adverse impact on the Company's cash flows, financial position and operating performance. The Company's management considers the possibility of such a finding by PRC regulatory authorities to be remote.

F-11

Table of Contents

In addition, it is possible that the VIE Agreements would not be enforceable in China if PRC government authorities or courts were to find that such agreements contravene PRC laws and regulations or are otherwise not enforceable for public policy reasons. In the event that the Company is unable to enforce any of these agreements, the Company would not be able to exert effective control over the affected VIE and consequently, the results of operations, assets and liabilities of the affected VIE and its subsidiaries would not be included in the Company's consolidated financial statements. If such were the case, the Company's cash flows, financial position and operating performance would be materially adversely affected. The Company's agreements with respect to its consolidated VIE are approved and in place. The Company's management believes that such agreements are enforceable, and considers it a remote possibility that PRC regulatory authorities with jurisdiction over the Company's operations and contractual relationships would find the agreements to be unenforceable under existing laws.

*Financial Information of VIE*

The financial information of Beijing Technology and its subsidiaries were presented in aggregate as follows, which were included in the accompanying consolidated financial statements:

|  | As of December 31, | |
|---|---|---|
|  | 2015 | 2016 |
|  | US$ | US$ |
| Cash and cash equivalents | 103,794 | 59,632 |
| Term deposits | 66,296 | 124,117 |
| Restricted cash | 1,640 | — |
| Other intercompany receivable to WOFEs | 608 | 51,354 |
| Other intercompany receivable | 3 | 23,967 |
| Total current assets | 287,997 | 426,428 |
| Total non-current assets | 362,919 | 333,049 |
| Total assets | 650,916 | 759,477 |
| Intercompany payable to WOFEs for the service fees | 20,139 | 19,062 |
| Other intercompany payable to WOFEs | 39,089 | 17,005 |
| Other intercompany payable | 185,551 | 222,050 |
| Total current liabilities | 312,523 | 386,174 |
| Deferred tax liabilities, non-current | 6,840 | 3,976 |
| Total liabilities | 319,363 | 390,150 |

|  | For the Years Ended December 31, | | |
|---|---|---|---|
|  | 2014 | 2015 | 2016 |
|  | US$ | US$ | US$ |
| Total net revenues | 275,372 | 377,506 | 335,760 |
| Net income/(loss) | 18,751 | 36,136 | (11,828) |

|  | For the Years Ended December 31, | | |
|---|---|---|---|
|  | 2014 | 2015 | 2016 |
|  | US$ | US$ | US$ |
| Net cash provided by/(used in) operating activities | 30,094 | 30,287 | (89,032) |
| Net cash (used in)/provided by investing activities | (9,415) | 45,017 | 41,665 |
| Net cash provided by financing activities | — | — | 603 |
| Effect of exchange rate changes on cash and cash equivalents | (2,643) | (1,018) | 2,602 |
| Net increase/(decrease) in cash and cash equivalents balance | 18,036 | 74,286 | (44,162) |

F-12

Table of Contents

The VIE contributed an aggregate of 83%, 93% and 98% of the consolidated revenues for the years ended December 31, 2014, 2015 and 2016, respectively. As of December 31, 2015 and 2016, the VIE, without the recourse to the Company, accounted for an aggregate of 81% and 80%, respectively, of the consolidated total assets, and 26% and 35%, respectively, of the consolidated total liabilities. The consolidated assets of VIE mainly comprised of recognized and unrecognized revenue-producing assets. The recognized revenue-producing assets include goodwill and intangible assets acquired through business acquisitions, purchased servers and office facilities. The balances of these assets as of December 31, 2015 and 2016 were included in the line of "Total non-current assets" in the table above.

Goodwill primarily represents the expected synergies from combining the acquired business with the business of the Company. Intangible assets acquired through business acquisition are comprised of customer relationships, non-compete agreements, revenue sharing agreements, user base, technologies and games. Please refer to Note 4 – "Business Combination" for goodwill and intangible assets acquired through business combination.

All intercompany transactions and balances were eliminated upon consolidation.

In accordance with the VIE Agreements, the Company has power to direct activities of the VIE and its subsidiaries, and can have assets transferred out of the VIE and its subsidiaries without any restrictions. Therefore, the Company considers that there is no assets in the consolidated VIE and its subsidiaries that can be used only to settle obligations of the consolidated VIE except for registered capitals of US$7,251 and PRC statutory reserves of US$9,903, of their VIE and VIE's subsidiaries, as of December 31, 2016. As the VIE and its subsidiaries are incorporated as limited liability companies under the PRC Company Law, and as such the creditors of liabilities of the PRC incorporated VIE have recourse only to the assets of these entities. Accordingly, the creditors of all the liabilities of the Company's consolidated VIE do not have recourse to the Company's general credit.

Currently, there is no contractual arrangement that could require the Company to provide additional financial support to the VIE. As the Company is conducting mobile value added services, enterprise mobility, advertising business and other services through the VIE and its subsidiaries in the PRC, the Company may provide such support on a discretional basis in the future, which could expose the Company to a loss.

There are no VIE where the Company has variable interests but is not the primary beneficiary.

F-13

Table of Contents

### 17. CONVERTIBLE DEBT

In October 2013, the Company issued US$172,500 in aggregate principle amount of 4.00% Convertible Senior Notes due October 15, 2018 (the "Notes") at par. The Notes may be converted, under certain circumstances, based on an initial conversion rate of 39.0472 American depository shares ("ADSs") per US$1,000 principal amount of the Notes (which represents an initial conversion price of US$25.61 per ADS).

The Notes are the Company's general unsecured obligations that rank (1) senior in right of payment to all of the Company's indebtedness that is expressly subordinated in right of payment to the Notes, (2) equal in right of payment with all of the Company's liabilities that are not so subordinated, (3) effectively junior to any of the Company's secured indebtedness to the extent of the value of the assets securing such indebtedness, and (4) structurally junior to all indebtedness and other liabilities of the Company's subsidiaries and consolidated affiliated entities.

<u>Accounting for Convertible Senior Notes and issuance cost are summarized as follows:</u>

The Company has accounted for the Notes in accordance with ASC 470-20, as a single instrument as a non-current liability. The Notes are initially carried at the gross cash received at the issuance date.

The net proceeds the Company received from the issuance of the Notes were US$166,395. The Company will pay cash interest at an annual rate of 4.00% on the Notes, payable semi-annually in arrears on April 15 and October 15 of each year, beginning on April 15, 2014.

Debt issuance costs were US$6,834, which comprises of underwriter fees, professional fees paid to accounting and legal consultants and other miscellaneous expenses occurred specifically for the debts. Debt issuance costs were initially capitalized as deferred charges in other non-current assets and are amortized as interest expenses over the period of three years from the inception date of the Notes to the first redemption date, using the effective interest method.

The interest expense included in the consolidated statements of operations is as follows:

| | For the years ended December 31, | |
| --- | --- | --- |
| | 2015 | 2016 |
| | US$ | US$ |
| Interest expense at an annual rate of 4.00% | 6,900 | 5,175 |
| Amortization of debt issuance costs | 2,339 | 1,839 |
| **Total interest expense** | 9,239 | 7,014 |

The Company has repurchased an aggregate principal amount of US$172,500 of all the outstanding Notes upon exercise of the put option by holders of the Notes. The repurchase price equals to 100% of the principal amount of the Notes to be repurchased, plus accrued and unpaid interest up to, but excluding, October 15, 2016. The balance of the Notes as of December 31, 2016 is zero.

### *Convertible Notes issued in October 2016*

In October 2016, Pursuant to an agreement between the Company and Zhongzhi Hi-Tech Overseas Investment Ltd. ("Zhongzhi Hi-Tech"), the Company issued an aggregated principal amount of US$220,000 of convertible note with an interest of 8.0% per annum to Zhongzhi Hi-tech. The convertible note will mature in October 2018 (the "2018 Notes"). The 2018 Notes will be convertible, at the Holder's option, to the Company's American depositary shares ("ADSs"), each representing five Class A common shares of the Company, at a conversion price of US$6.00 per ADS at any time prior to the close of business on the second Business Day immediately preceding the Maturity Date, October 1, 2018.

At the same time, RPL and Dr. Shi entered into an agreement with Zhongzhi Hi-Tech, that RPL and Dr. Shi jointly agreed to pay Zhongzhi Hi-Tech additional guaranteed minimum interests of 2.0% of the principal amount of the 2018 Notes ("additional interest"). In

addition, unless the 2018 Notes is duly converted into Conversion ADSs in accordance with the terms and conditions set forth in the 2018 Notes therein, RPL and Dr. Shi agree to, jointly and severally, guarantee and pay to Zhongzhi Hi-Tech an additional accrued interests equal to two point five percent (2.50%) per annum of the principal amount outstanding under the 2018 Notes, from the date hereof until the Maturity Date if no conversation exercised ("contingent interest").

F-64