# Exhibit 1

# IN THE MATTER OF AN ARBITRATION UNDER THE ADMINISTERED ARBITRATION RULES OF THE HONG KONG INTERNATIONAL ARBITRATION CENTRE (2018)

## HKIAC/A18221

**BETWEEN:**

### ZHONGZHI HI-TECH OVERSEAS INVESTMENT LTD.,

Claimant

**and**

### LINK MOTION INC.,

Respondent

---

## Final Award

---

## 16 February 2021

**Tribunal:**

Richard Ziegler, Presiding Arbitrator
Gavin Denton, Co-arbitrator
Simon Powell, Co-arbitrator

Pursuant to Article 35 of the Administered Arbitration Rules of the Hong Kong International Arbitration Centre, effective 1 November 2018, and Paragraph 50 of Procedural Order No. 1 issued by the Tribunal on 23 June 2019, the Tribunal issues the following Final Award:

## Table of Contents

**Table of Abbreviations and Citations** ................................................................ 4

II.  History of the Proceeding ........................................................ 7

A.  The Parties and their Counsel.......................................................... 7

B.  Arbitration Agreement ................................................................ 8

C.  Seat, Applicable Law and Rules .......................................................... 9

D.  Constitution of the Tribunal ........................................................ 9

E.  The Parties' Pleadings, Claims and Defenses ........................................ 9

F.  Conferences, Procedural Orders and Decisions ................................... 12

G.  The Evidentiary Hearing and Post-Hearing Activities............................ 16

III. Factual Background ................................................................ 17

A.  The Original Note, the Shi Cooperation Agreement and the Revised Note ............ 17

B.  The Tongfang Note ................................................................ 19

C.  The Two Pledge Agreements and the Cooperation Agreement .......................... 21

D.  Link Motion's Board Meeting.......................................................... 25

E.  The Post-Meeting Events ........................................................ 27

IV. Analysis and Decision........................................................ 28

A.  Zhongzhi's Claim to Enforce the Note ........................................................... 28

B.  Respondent's Counterclaims ...................................................................... 31

1.  The Fraudulent Conveyance Counterclaim .................................................. 32

   a. The Creditor Standing Requirement ...................................................... 33

   b. The Proof of Fraudulent Intent ............................................................ 36

   c. The Requested Damages Remedy ........................................................ 39

   2. The Aiding and Abetting Breach of Fiduciary Duty Counterclaim ..................... 42

C.  Allocation of Costs ................................................................................. 59

   V.  Award ......................................................................................... 61

## Table of Abbreviations and Citations

| | |
|---|---|
| ADS | American Depositary Shares of Link Motion |
| Claimant or Zhongzhi | Zhongzhi Hi-Tech Overseas Investment Ltd. |
| Clmt. Stmt. of Claim | Claimant's Statement of Claim, 30 August 2019 |
| Clmt. Stmt. of Def. to Ctrclm. | Claimant's Statement of Defence to Counterclaim and Reply, 17 April 2020 |
| Cooperation Memorandum | Memorandum of Cooperation between Zhongzhi and Link Motion, September 2018, R-009 |
| HKAO | Hong Kong Arbitration Ordinance |
| HKIAC | Hong Kong International Arbitration Centre |
| HKIAC Rules | Administered Arbitration Rules of the HKIAC (2018) |
| Jurisdiction Decision | Decision and Order on Claimant's Motion to Dismiss Counterclaims for Lack of Jurisdiction, 12 March 2020 |
| Note | Revised Convertible Note issued 9 November 2017, C-4 |
| NQ International | NQ International Limited, now known as Link Motion International Ltd. |
| NYDCL | New York Debtor & Creditor Law |
| Receiver | Robert W. Seiden, Esq., appointed pursuant to order of the United States District Court for the Southern District of New York of 1 February 2019, *Wayne Baliga v. Link Motion Inc. et al.*¸ 1:18-cv-11642 |
| Respondent or Link Motion | Link Motion Inc., formerly known as NQ Mobile Inc. |
| Resp. Stmt. of Def. & Ctrclm. | Respondent's Statement of Defence & Counterclaim[s], 18 October 2019 |
| Resp. Rejoinder | Respondent's Rejoinder, 29 May 2020 |
| RPL | RPL Holdings Limited |
| Share Charge | Share Charge over the issued share capital of NQ International Limited, C-15 |
| Dr. Shi | Vincent Wenyong Shi, Respondent's former Chairman of the Board |
| Shi Cooperation Agreement | Cooperation Agreement among Zhongzhi, RPL and Dr. Shi, 23 September 2016, R-003 |

| Tongfang Note Pledge | Senior Note Pledge Agreement by NQ International Limited, September 2019 (C-14) |
|---|---|
| Tongfang Note | Fixed Rate Senior Note due Dec. 14, 2018 by Tongfang Investment Fund Series SPC on behalf of Tongfang M&A Fund SP in the amount of RMB 1.77 billion |
| Tr. _/ | Transcription of evidentiary hearing held 21 and 22 July 2020.  The number before the "/" designates in which of the four 3-hour sessions the testimony occurred |
| Two Pledge Agreements | The Tongfang Note Pledge and the Share Charge |
| Witness Statements: | |
| Guo Stmt. | Witness Statement of Lingyun Guo, 28 May 2020 (supplied by Respondent) |
| Mathison 1st Stmt. | Witness Statement of Matthew Mathison, 18 October 2019 (supplied by Respondent) |
| Mathison 2d Stmt. | Supplemental Witness Statement of Matthew Mathison, 28 May 2020 (supplied by Respondent) |
| Wu Stmt. | Witness Statement of Xichuan [Vincent] Wu, 17 April 2020 (supplied by Claimant) |

## I.    Overview

1.    This Overview provides a concise summary of the Parties' claims and counterclaims and the Tribunal's decisions.  It does not purport to describe all of the Parties' contentions or the Tribunal's analysis, which are addressed in the succeeding sections of this Final Award.

2.    Claimant, Zhongzhi Hi-Tech Overseas Investment Ltd., initiated this arbitration to enforce a promissory note issued in November 2017 by Respondent, Link Motion Inc., in the amount of US$132 million, plus accrued interest.  Payment in full was due under the Note on 3 October 2018 and has not been paid.

3.    The Note was unsecured when issued, but Link Motion provided collateral to Zhongzhi to secure repayment in mid-September 2018, about six weeks before the Note's maturity date.

5

4.   Respondent, Link Motion, does not challenge the validity of the Note or contend that payment has been made.  Instead, it pleads two counterclaims asserting that the issuance of the security shortly in advance of the maturity date was unlawful.  Link Motion seeks damages from Zhongzhi in the purported amount of the collateral – about US$270 million – and characterizes its counterclaims as a defence of set off to Zhongzhi's claim to enforce the Note.

5.   A federal court in New York City appointed a Receiver to manage Link Motion's affairs on 1 February 2019, a few weeks after this proceeding was commenced.  The New York court's order expressly referred to this arbitration proceeding, requiring the company to "immediately halt [then-Chairman Dr. Shi's] oversight of the dispute and arbitration between Link Motion and Zhongzhi."  RLA-002 (court order, § I.2.(iv)).

6.   The collateral Link Motion provided to Zhongzhi comprised substantially all of its assets. The security was provided in two agreements that Link Motion now challenges in its counterclaims: the "Share Charge" agreement, under which Link Motion pledged its shares in its wholly-owned operating subsidiary NQ International Limited,[1] and the "Tongfang Note Pledge" agreement, under which the subsidiary (*i.e.,* NQ International Limited) granted a security interest in a senior note issued to it by Tongfang Investment Fund Series SPC in the amount of RMB 1,770,000,000 (about US$270 million).

7.   Respondent's counterclaims assert that the issuance of the Two Pledge Agreements to Zhongzhi was a fraudulent conveyance for which Zhongzhi is liable, and resulted from Dr. Shi's breach of fiduciary duties to Link Motion that Zhongzhi aided and abetted.  The Parties agree that the counterclaims are governed by New York law, which the Note selects as its governing law.

---

[1] It appears that before the Share Charge was executed NQ International had changed its name to Link Motion International Ltd. on 27 March 2018.  Clmt. Post-Hearing Br. ¶ 146 n.190; C-26 (correspondence referencing name change).  The Parties have referred to the subsidiary solely by its earlier name and this award uses the Parties' terminology.

6

8.    After considering all of the evidence, including the testimony of witnesses at an evidentiary hearing and various documentary exhibits, and considering the Parties' legal arguments, we conclude as follows (for the reasons explained below in this Final Award):

    a.  Claimant has succeeded in its claim and is entitled to payment of the Note, with pre-award and post-award interest at 8% per annum;

    b.  Respondent lacks standing under New York law to claim that the Two Pledge Agreements are an actionable fraudulent conveyance, and for that and other reasons that counterclaim is dismissed;

    c.  Claimant aided and abetted Dr. Shi's breach of fiduciary duty in obtaining the Two Pledge Agreements, which we therefore declare to be invalid and unenforceable; and

    d.  Respondent has not established that it suffered any quantifiable harm from the issuance of the Two Pledge Agreements and consequently Link Motion is not entitled to monetary damages that could serve as a set off to its liability on the Note.  Respondent's counterclaim is therefore granted only to the extent of the declaratory relief of invalidity and unenforceability.

    e.  The Parties shall bear their own attorneys' fees and expenses, except that Claimant shall pay Respondent for the fees and expenses it incurred with respect to Claimant's motion to dismiss the counterclaims for lack of arbitral jurisdiction. The Parties shall share equally the administrative costs of the arbitration and the Tribunal's fees and Respondent shall therefore pay to Claimant the amount by which Claimant has deposited more than its half share of such costs.

## II.    History of the Proceeding

### A. The Parties and their Counsel

9.    The Claimant is Zhongzhi Hi-Tech Overseas Investment Ltd., a company organized under the laws of the Cayman Islands and headquartered in Beijing China.

10.     The record indicates that Zhongzhi is an investment fund that is an affiliate of the
        Zhongzhi Enterprise Group, which as of 2016 had more than 10,000 employees.  R-001
        (Link Motion announcement of issuance of original note).

11.     Zhongzhi is represented by Arthur Ma, Xing Wan, Mark Young and Sharon Yang of
        DaHui Lawyers in Beijing, China.

12.     The Respondent is Link Motion Inc., formerly known as NQ Mobile, Inc.  Like
        Zhongzhi, Link Motion is organized under the laws of the Cayman Islands and is
        headquartered in Beijing.  As of 2016 Link Motion described itself as "a leading global
        provider of mobile internet services" including entertainment, advertising, security and
        game publishing platforms.  *Id.* Until it was de-listed in 2019, Link Motion's American
        Depositary Shares were traded on the New York Stock Exchange.

13.     Respondent's participation in this arbitration is managed by its court-appointed Receiver,
        Robert Seiden.  Mr. Seiden is represented in that capacity by Amiad Kushner, Steven
        Seiden, Dov Gold, Zhengling Zhang and Andrew Sklar of the Seiden Law Group LLP,
        New York, New York, U.S.A.

## B. Arbitration Agreement

14.     The Note provides at Section 7.5 for arbitration of disputes as follows:

> Any dispute arising out of or relating to this Note ("Dispute") shall be
> referred to and finally resolved by arbitration at the Hong Kong
> International Arbitration Centre in accordance with the Hong Kong
> International Arbitration Centre Administered Arbitration Rules then in
> force.

Cl. Ex. 4 §7.5.

15.     In the Tribunal's Jurisdiction Decision of 12 March 2020 (noted in Paragraph 41 below)
        the Tribunal determined that the scope of the arbitration provision is broad and
        encompasses not only Claimant's claim to enforce the Note but also Respondent's two

counterclaims.  The Tribunal held that this exercise of arbitral jurisdiction was authorized by Section 34(3) of the HKAO for the reasons explained in the Jurisdiction Decision.

## C.  Seat, Applicable Law and Rules

16.   In accordance with Section 7.5 of the Note, the place of the arbitration is Hong Kong (and, as such, the procedural law of the arbitration is Hong Kong law) and the substantive law of the dispute is governed by the internal laws of the State of New York.  The language of the arbitration is English.

17.   The applicable rules are the Administered Arbitration Rules of the HKIAC (2018).  On 12 February 2019, the HKIAC initially determined that the Expedited Procedure provided by Article 42 of the HKIAC Rules should apply to this proceeding at Claimant's request and on the apparent consent of the Respondent (provided by its then-Chairman, Dr. Shi).  This determination was rescinded by the HKIAC following the withdrawal of Respondent's consent by counsel for the Receiver and upon the written recommendation of the Tribunal submitted on 13 July 2019, described at paragraph 34 below.

## D.  Constitution of the Tribunal

18.   On 18 April 2019 the HKIAC confirmed the appointments as Co-Arbitrators of Gavin Denton by Claimant on 6 March 2019 and Simon Powell by Respondent on 20 March 2019. Pursuant to Articles 8 and 9 of the Rules and the Arbitration Clause, the HKIAC appointed Richard Ziegler as the Presiding Arbitrator on 20 May 2019.  The HKIAC transmitted the file to the Tribunal on 20 May 2019.

## E.  The Parties' Pleadings, Claims and Defenses

19.   This proceeding was commenced on 20 December 2018, when Zhongzhi filed its Notice of Arbitration.  After a delay occasioned by the appointment of the Receiver by the New York Court to manage Link Motion's participation in this arbitration, as discussed below, Zhongzhi filed its Statement of Claim on 30 August 2019 with accompanying exhibits and legal authorities.

20.     Link Motion filed its Statement of Defence and Counterclaim[s] on 18 October 2019 with
        accompanying exhibits, a witness statement and legal authorities.  Zhongzhi filed its
        Statement of Defence to Counterclaim and Reply on 17 April 2020 with accompanying
        exhibits, a witness statement and legal authorities.  Link Motion filed its Rejoinder on 29
        May 2020 with additional exhibits, witness statements and legal authorities.

21.     Zhongzhi alleges a single claim for breach of contract against Link Motion arising from
        the Note issued by Respondent on 9 November 2017.

22.     Claimant alleges that Respondent has failed, despite Claimant's timely demand, to pay
        either the principal amount of US$132 million or the final semiannual interest amount
        due on the maturity date of US$5.28 million.  Clmt. Stmt. of Claim ¶¶ 9, 13-15, 25-26.

23.     Claimant seeks an award requiring Respondent to pay the amounts due under the Note as
        of the maturity date in the total amount of US$137,280,000 and interest on that amount at
        the Note's 8% rate from the maturity date until payment is made.  *Id.*  ¶ 33.

24.     Link Motion admits Claimant's factual allegations concerning the issuance, terms and
        non-payment of the Note.  Resp. Stmt. of Def. & Ctrclm. ¶¶ 25, 44-45.  Respondent
        alleges, however, that the circumstances surrounding the issuance of collateral to
        Zhongzhi shortly before the Note's maturity date, in the form of the Two Pledge
        Agreements involving substantially all of Link Motion's assets, were highly irregular and
        involved a breach of fiduciary duty by Respondent's then-Chairman, Dr. Shi.
        Respondent alleges that Dr. Shi had personal liability with respect to the Note in certain
        circumstances and caused Link Motion to provide security for the Note's repayment to
        avoid his own potential personal liability to Claimant.

25.     Significantly, Respondent emphasizes that the new security agreements lacked any
        consideration in favor of Link Motion, as Zhongzhi did not agree to extend the maturity
        date of the Note or otherwise extend any benefit to Link Motion in exchange for the Two
        Pledge Agreements.  Respondent also alleges that the circumstances of the Link Motion
        Board's approval of the Two Pledge Agreements were the result of Dr. Shi's breach of
        fiduciary duties.

26.     These factual allegations by Respondent underlie its Counterclaims that the Two Pledge
        Agreements constituted a fraudulent transfer to Claimant of Respondent's key assets
        under New York's Debtor and Creditor Law, and that Claimant aided and abetted Dr.
        Shi's breach of his fiduciary duties in arranging the Two Pledge Agreements.   Resp.
        Stmt. of Def. & Ctrclm. ¶¶ 76-79, 82-84, 93-97.  Respondent seeks relief in the form of
        damages on each of its two Counterclaims.  It measures the damages as the value of the
        collateral, which it claims is approximately US$270 million.  *Id.* ¶ 33.

27.     Respondent also invokes a right to set off, alleging that:

                …to the extent the Tribunal determines that [Respondent] bears any
                liability to [Claimant} under the terms of the Revised Convertible Note,
                [Respondent] shall be entitled to set off that amount based upon the
                amounts awarded to [Respondent].

        Resp. Stmt. of Def. & Ctrclm. ¶ 100 (c).

28.     Zhongzhi asserts multiple defenses to Link Motion's counterclaims.  As a factual matter,
        it asserts that it did not engage in any form of wrongdoing in obtaining the Two Pledge
        Agreements, as it was merely pursuing its legitimate business interests in attempting to
        ensure payment of a substantial debt.  It also alleges that it provided consideration to Link
        Motion in the form of a simultaneous "Memorandum of Cooperation," which, although
        non-binding, would facilitate Link Motion's transition into the "field of smart cars and
        smart ride."  In addition, it also denies having any knowledge of any breach of duty by
        Dr. Shi.   Moreover, Zhongzhi stresses that in any event Link Motion has not suffered
        any damages by issuing the Two Pledge Agreements.

29.     As a legal matter, Zhongzhi contends that Link Motion cannot assert a fraudulent
        conveyance claim under New York law because it is not a creditor.  It also contends that
        the transaction by which the Two Pledge Agreements were issued did not involve any of
        the "badges of fraud" required to establish Respondent's statutory claim, and that the
        statute does not authorize a damages remedy, even if damages were proven, except in
        unusual circumstances not present here.  Zhongzhi defends the claim that it aided and
        abetted Dr. Shi's alleged breach of fiduciary duty by invoking the factual positions

11

described above and contending that none of its activities in connection with obtaining the collateral could constitute the "substantial assistance" Link Motion must prove to establish that claim.

### F.  Conferences, Procedural Orders and Decisions

30.    The Tribunal conducted a Case Management Conference on 13 June 2019 by telephone. The Tribunal had submitted a draft initial procedural order to the Parties for their review in advance of the Case Management Conference; following discussion of the draft order at that conference, the Tribunal issued Procedural Order No. 1 on 23 June 2019, to govern these proceedings.

31.    At the Conference, Respondent reported that court action had taken place two days earlier concerning an application filed on 27 March 2019 by Dr. Shi to discharge the court-appointed receiver, and that Mr. Seiden's appointment as Receiver had been reaffirmed by the court on 11 June 2019.  Respondent stated that it had been unable to obtain access to books, records and other information necessary for it to determine its defense and position in this proceeding while the discharge application was pending, but that the recent rejection of that motion would enable it to attempt to do so.  In light of the foregoing, Respondent requested that the Tribunal enter a stay of all proceedings in this matter for six months.

32.    Respondent also noted at the conference its objection to the applicability of the Expedited Procedure set out in Article 42 of the Rules during the Case Management Conference. As noted, the HKIAC had granted Claimant's request that Article 42 should apply on the consent of Respondent's then-chairman Dr. Shi.

33.    Claimant opposed both of Respondent's applications.  Following the conference, the Parties made written submissions on Respondent's application for a stay and its request that the Expedited Procedure of Article 42 should no longer apply.

34.    The Tribunal conducted oral argument by telephone on both applications on 11 July 2019.  Two days later, on 13 July 2018, it issued a written recommendation to the HKIAC that the Expedited Procedure should no longer apply.  The Tribunal's

recommendation noted that the proceeding was not an appropriate candidate for the application of Article 42 because (a) of the substantial dollar amount at issue;  (b) the arbitration agreement required a three-person tribunal, which is inconsistent with the Expedited Procedure; (c) Claimant had not identified a compelling need for expedited proceedings; and (d) the factual circumstances appear complex in light of the allegations of mismanagement and breach of duties that had led the court in New York to appoint the Receiver.  The Tribunal's recommendation pointed out that the HKIAC could not have been aware of these factual complications when it accepted the Claimant's request for application of Article 42, to which the now-removed Chairman of Link Motion had consented without any participation by counsel for Respondent.  Indeed, the Receiver was appointed the very next day after Dr. Shi expressed that consent.

35.   The HKIAC accepted the Tribunal's recommendation on 30 July 2019 and determined that Article 42 should no longer apply to this proceeding.

36.   On that same date the Tribunal issued Procedural Order No. 2, in which it denied Link Motion's request for a six-month stay but took other steps to ensure that Respondent would have adequate time to investigate and prepare its defence.  Those steps included directing the Parties to prepare a draft Procedural Timetable for the Tribunal's review that would provide that Respondent's Statement of Defence would be due no earlier than ten weeks following the issuance of Procedural Order No. 2.  The order observed that the next steps in the proceeding fall primarily upon Claimant in preparing its Statement of Claim, and that the Receiver had also been afforded time for investigation during the period the stay application was pending.  Moreover, the Order expressly authorized the Receiver to seek leave to extend the date for submission of the Statement of Defence, not later than four weeks before the deadline, for good cause shown.

37.   The Tribunal, on 8 August 2019, issued Procedural Order No. 3, which annexed a Procedural Timetable based upon the draft jointly submitted by the Parties the day before.

38.   Thereafter, on 22 November 2019, the Parties submitted their respective Redfern schedules identifying a disclosure dispute, as contemplated by the Procedural Timetable.  On that same date Claimant also submitted an application to dismiss Link Motion's two counterclaims on the ground the Tribunal lacked jurisdiction over them.  The

13

jurisdictional application was related to the disclosure dispute as Claimant had objected to all of Respondent's document requests on the sole ground that they related to the counterclaims over which the Tribunal lacked jurisdiction.

39.    The Tribunal conducted a conference with the Parties by telephone on these issues on 9 December 2019.  On the following day it issued Procedural Order No. 4, which set out a briefing schedule on Claimant's jurisdictional application.  That Order also overruled Claimant's objections to Respondent's document requests, noting that the Tribunal necessarily has authority to compel disclosure of information pertinent to the merits of claims that are subject to jurisdictional challenge in view of the discretion afforded tribunals by Section 34(1)(3) of the HKAO to defer the adjudication of jurisdictional challenges to proceedings on the merits.  The Order directed Claimant to provide all responsive non-privileged documents by 23 December 2019.  These included the Two Pledge Agreements, of which the Receiver had not previously obtained any copies.  Resp. Post-Hearing Br. ¶ 107 n.124.

40.    The Parties submitted their briefs in connection with Claimant's application to dismiss the counterclaims for lack for jurisdiction on 23 December 2019 (Claimant's Supplemental Memorandum), 15 January 2020 (Respondent's Objection), and 23 January 2020 (Claimant's Reply).

41.    The Tribunal held oral argument on Claimant's jurisdictional challenge by telephone on 5 February 2020.  In advance of the argument the Tribunal had circulated on 31 January, by email, a list of topics that it requested the Parties address in their remarks.  The Tribunal issued its Decision and Order on Claimant's Motion to Dismiss Counterclaims for Lack of Jurisdiction on 12 March 2020.  The decision applied the analytical framework supplied by Section 34(3) of the HKAO, which expressly addresses an arbitral tribunal's authority to hear counterclaims.  Thus, the decision considered the dual criteria set out in that statutory provision – whether the counterclaim "aris[es] out of the dispute" already submitted to arbitration, and whether the subject of the counterclaim "falls within the scope of the same arbitration agreement" – and applied them to the pleadings at issue. The Tribunal's decision determined that both criteria were satisfied and consequently

rejected Claimant's jurisdictional application.  The decision also allocated Respondent's costs to the Claimant but deferred quantifying or assessing them.

42.    Thereafter, the Parties on 17 March 2020 jointly submitted a revised Procedural Timetable necessitated by the global COVID-19 pandemic and its associated global travel restrictions.  Those circumstances made it impracticable for the evidentiary hearing to be held in person in Hong Kong on 30 March – 3 April 2020, as had been provided in the timetable embraced by Procedural Order No. 3.  The proposed new timetable, which the Tribunal approved in Procedural Order No. 5 issued on 19 March 2020, adjourned the evidentiary hearing to take place, depending on public health considerations, either in person in London on 20-24 July 2020 or in person in Hong Kong on 7-11 September 2020.  Neither the Parties nor the Tribunal contemplated at that time that the evidentiary hearing might be conducted by remote videoconference.

43.    By June 2020 the continued public health issues created by the pandemic led the Parties to propose that the evidentiary hearing be conducted by remote video conference on the dates Procedural Order No. 5 had provided for a hearing in London.  They jointly submitted a proposed procedural order to govern an evidentiary hearing conducted remotely on 12 June 2020.  After providing comments on that draft order, the Tribunal issued Procedural Order No. 6 on 24 June 2020.

44.    Procedural Order No. 6 provided that the evidentiary hearing would be conducted remotely each day in two three-hour sessions.  Because the participants would be located in time zones 12 hours apart, the three-hour sessions were scheduled between 8:00 and 11:00, either am or pm depending on the participant's location in the time zone in the eastern United States or the time zone applicable in Hong Kong and Beijing.  The Order required the Parties to prepare for the remote video proceeding by ensuring that they and their witnesses had adequate equipment and internet access, specified appropriate lighting and other conditions, set out a process for display of exhibits to witnesses, provided an emergency communications plan in the event of technical difficulties, and included other provisions to ensure that the Parties and their witnesses would be fully and fairly heard. The Order required that the Parties and Tribunal participate in a test of the remote video arrangement on 14 July 2020; that test took place as scheduled and was successful.

45.     At the request of the Parties, the Tribunal issued a revised Procedural Order No. 6 on 3 July 2020, modifying the sequence in which Respondent's witnesses would be called to testify.

### G. The Evidentiary Hearing and Post-Hearing Activities

46.     The evidentiary hearing took place, remotely on the Zoom videoconference platform, in two three-hour sessions each day on 22 and 23 July 2020 in Hong Kong (21, 22 and 23 July in New York).  As contemplated by Procedural Order No. 6, each three-hour session took place from 8:00 to 11:00 in the morning or evening depending on the participant's time zone. The Parties retained a technical support vendor, Epiq, to ensure the effectiveness of the remote videoconference proceeding.

47.     Counsel participated from Beijing (Claimant) and New York (Respondent).  The witnesses testified from Beijing and Dallas, Texas, U.S.A.  The arbitrators participated from Hong Kong (Mr. Powell), Perth, Australia (Mr. Denton) and Connecticut, U.S.A. (Mr. Ziegler).  Claimant's corporate representatives were Yan Du, Lilian Peng, Lisa Xu and Xichun Vincent Wu.  Respondent's corporate representative was Steven Seiden. Pursuant to Paragraph 14 of Procedural Order No. 6, the hearing was deemed to take place in Hong Kong.

48.     Although some connectivity issues emerged, which necessitated that Respondent alter its order of witnesses, the remote proceeding was successful.  All witnesses, counsel and members of the Tribunal were able to be heard and seen, and no Party made any objection at any time to the conduct of the evidentiary hearing by remote videoconference.

49.     The first of the four sessions was devoted to opening statements by both Parties.

50.     The Parties called three witnesses: the Claimant called Xichun Vincent Wu during the second session; the Respondent called Matthew Mathison during the third session and Lingyun Guo during the fourth session.  The direct testimony of each witness was provided by their previously-filed written witness statements, so the evidentiary hearing

16

was focused on cross-examination of the witnesses by opposing counsel.   The members of the Tribunal also questioned the witnesses.  Mr. Wu and Ms. Guo testified through interpreters.  A stenographic transcript was made available to counsel and the Tribunal in electronic format in real time.

51.    The evidentiary record comprises the witness' testimony and the documentary exhibits offered by the Parties, Claimant's exhibits C-001 to C-034 and Respondent's exhibits R-001 to R-019, all of which were admitted without objection.

52.    Following the evidentiary hearing the Tribunal provided a note to the Parties on 6 August 2020 entitled "Tribunal's Topics to be Addressed by Parties in Post-Hearing Brief."  That note identified 16 questions, plus sub-parts, in categories entitled "Fraudulent Transfer Claim," "Breach of Duty Claim," "Damages," "Remedy," "Pre-Award and Post-Award Interest," and "Costs."  The Parties submitted their respective post-hearing briefs simultaneously on 11 September 2020.

53.    On 2 November 2020 the Tribunal, by email, requested that the Parties submit short supplemental briefs concerning the damages element of Respondent's counterclaim for aiding and abetting breach of fiduciary duty.  The Tribunal's order directed that Respondent submit a supplemental brief on this subject of no more than five pages by 9 November 2020, Claimant submit a reply of no greater length by 16 November 2020, and allowed Respondent to submit a reply of no more than three pages by 20 November 2020. The Parties timely filed the requested supplemental briefing. On 4 December 2020, pursuant to HKIAC Rule 31.1, the Tribunal closed the proceedings.

## III.    Factual Background

### A. The Original Note, the Shi Cooperation Agreement and the Revised Note

54.    Link Motion borrowed US$220 million from Zhongzhi on 3 October 2016, when Link Motion issued a Convertible Note in that amount at the closing of the Parties' Convertible Note Purchase Agreement dated 23 September 2016.  C-002 (Convertible Note); C-001 (Note Purchase Agreement).  This original note was due two years later, on 3 October

17

2018, and accrued interest at the simple rate of 8% per annum.  The note and the note purchase agreement were both governed by New York law.

55.    The note included a conversion feature by which the holder had the right to convert any portion or all of the principal balance (in increments of at least $1 million) into Link Motion's American Depositary Shares listed on the New York Stock Exchange.  The conversion right could be exercised at any time until two business days preceding the maturity date at a price of US$6.00 per ADS.  At the time of the note transaction, Link Motion's ADS traded at US$3.96. R-001 (Link Motion press release of 27 September 2016).

56.    The note also provided that the holder had the right to appoint one person to serve as a member of Link Motion's Board of Directors and a member of the Board's Investment Committee so long as at least 75% of the initial principal amount of the note remained outstanding.  Zhongzhi appointed its chair, Ms. Joanne Yan Zhu, to Link Motion's Board on 4 October 2016, the day after the note was issued.  R-002 (Link Motion press release of 5 October 2016).

57.    On 23 September 2016, the date of the note purchase agreement, Zhongzhi entered into a separate agreement directly with Dr. Shi and a company with which he was affiliated, RPL Holdings Limited.  That agreement, entitled "Cooperation Agreement" (referred to here as the Shi Cooperation Agreement[2]) states that RPL was the controlling shareholder of Link Motion, owning 10.6% of the outstanding shares of Link Motion and "approximately 54.3% voting power."   R-003.  The agreement provides that Dr. Shi and RPL would jointly and severally make certain additional payments to Zhongzhi in connection with the note, and in exchange RPL would share in Zhongzhi's potential profit if it converted the note into Link Motion's ADS.

---

[2] This contract is referred to in this award as the "Shi Cooperation Agreement" to distinguish it from the later Memorandum of Cooperation entered into between Zhongzhi and Link Motion in September 2018 in connection with the Two Pledge Agreements, which is referenced here as the "Cooperation Memorandum."

58.  Specifically, the Shi Cooperation Agreement obligated Dr. Shi and RPL to pay an additional 2% interest to Zhongzhi on the outstanding balance of the note, semiannually in arrears, and an additional 2.5% of the balance on the maturity date unless by that time Zhongzhi had converted the note into ADS.  In exchange, the contract provided that in the event of conversion, Zhongzhi would pay to RPL half of the profit earned if it sold the ADS at a price higher than US$6.90 per ADS.

59.  The evidentiary record does not address whether Dr. Shi or RPL made the 2% semi-annual interest payments to Zhongzhi.  It is undisputed that the price of Link Motion's ADS did not reach the US$6.00 conversion price by the maturity date of the note.

60.  The Parties revised the original note about thirteen months later, on 9 November 2017, pursuant to a Partial Redemption Agreement and Amendment to the Convertible Note. C-003.  At that time Link Motion redeemed US$88 million of the principal balance of the original note and issued a restated and amended convertible note in the amount of the remaining balance of US$132 million.  C-002 (Note).  The maturity date of 3 October 2018, the interest rate and the conversion feature remained unchanged.

61.  Although the partial redemption reduced the outstanding principal balance below the 75% threshold required for Zhongzhi's contractual right to appoint a member of Link Motion's Board of Directors, and the terms of the revised note retained that 75% requirement (applied to "the initial principal amount" of US$220 million, § 4.3, C-004), Ms. Zhu remained a member of Link Motion's Board.

62.  Since Claimant did not exercise its conversion rights while the note was outstanding, the principal amount of US$132 million became due on the maturity date of 3 October 2018, along with a semiannual interest payment due of US$5,280,000, for a total amount due on the maturity date of US$137,280,000.

## B.  The Tongfang Note

63.  Link Motion's principal asset in the fall of 2018 was a note held by its wholly-owned subsidiary NQ International in the amount of RMB 1.77 billion (about US$270 million)

issued by Tongfang Investment Fund Series SPC ("Tongfang").   NQ International obtained the Tongfang Note as a result of Link Motion's divestitures to Tongfang in March 2017 of two of its principal operating businesses, Beijing Feiliu Jiutian Technology Co., Ltd., known as FL Mobile, and Showself (Beijing) Technology Co., Ltd. After that transaction was consummated, the deadline for payment by Tongfang of a substantial portion of the cash purchase price was initially extended and ultimately converted into the RMB 1.77 billion Tongfang Note.  Resp. Stmt. of Def. & Ctrclm. ¶¶ 29-30, 32-33, 35; R-013 (Link Motion Form 20-F for 2016 at F-8).

64.   The Tongfang Note was issued on 14 December 2017 with a one-year maturity.  It provided for simple 8% annual interest payable annually in arrears on 12 December 2018, two days before the maturity date of 14 December 2018.  R-005 (Tongfang Note).

65.   An affiliate of Zhongzhi also obtained an interest in a separate note issued by Tongfang at the same time that Tongfang issued its RMB 1.77 billion note to Link Motion's subsidiary.  Zhongzhi acknowledges that a member of the Zhongzhi Enterprise Group obtained "an indirect creditor interest in" a Tongfang note issued "[s]imultaneously with the issuance of the Tongfang Note…"  Wu Stmt. ¶ 12.  The note in which the Zhongzhi affiliate has an interest, referred to as a "mezzanine" note, is subordinate to the Tongfang Note held by NQ International.  It did not mature until December 2020 (after the hearing was conducted in this matter), *id.,* in contrast to the December 2018 maturity of the Tongfang Note held by NQ International, but Tongfang defaulted in its payment of interest due annually.  Tr. 2/115:2-8, 116:14-18 (Mr. Wu).

66.   Respondent alleges that Dr. Shi owns 16.35% of Tongfang's stock, became a director of Tongfang "in or about December 2017," and "has a *controlling* interest in Tongfang." Resp. Stmt. of Def. & Ctrclm. ¶¶ 38-39 (original emphasis).  Respondent cites two documentary exhibits for these factual propositions, but does not explain the authors, dates or circumstances of the creation of such documents and neither document is self-explanatory.  R-006 (entitled "Analysis of the Terms between Dr. Shi and the Company Associated with the Divestment of FL Mobile and Showself Following the Closing (Prepared by Link Motion Inc)) and R-007 (entitled "Project Happy – Due Diligence

Questionnaire, U.S. Litigation").  Accordingly, the Tribunal's analysis does not rely on these factual allegations.

67.     Respondent's witness, Matthew Mathison, testified at the hearing that Zhongzhi obtained its indirect interest in the junior Tongfang note as part of the transaction by which Link Motion paid US$88 million to Zhongzhi in partial redemption of its original note.[3]  The Parties did not adduce any additional evidence bearing on this testimony.

## C. The Two Pledge Agreements and the Cooperation Agreement

68.     On 12 September 2018, three weeks before the Note was to become due on 3 October 2018, Link Motion provided security to Zhongzhi for repayment of the Note.  Link Motion pledged all of its shares in its subsidiary NQ International, and NQ International pledged the Tongfang Note, to Zhongzhi. These obligations were documented in the Tongfang Note Pledge and the Share Pledge agreements.  C-14, C-15.   Both agreements are governed by Hong Kong law.

69.     The Two Pledge Agreements authorize Zhongzhi, upon the occurrence of an event of default under the Note, to sell the Note (in the case of the Tongfang Note Pledge) and sell the shares (in the case of the Share Charge) and apply the proceeds to the balance due under the Note.  The agreements require Zhongzhi to pay any surplus to Link Motion after deducting its costs and expenses, including attorneys' fees.  C-14 (Tongfang Note Pledge § 13), C-15 (Share Charge §§ 9.1-9.6).

70.     Zhongzhi had requested that Link Motion provide the Two Pledge Agreements in the summer of 2018.  Zhongzhi's request followed a series of events that led it to believe that

---

[3] Testimony by Mr. Mathison:

I know that Zhongzhi, or its related subsidiaries, invested in Tongfang.  That investment in Tongfang was paid back to them through the company in the early conversion of the convertible note previously.  And their role in ownership in Tongfang was also tied with Vincent's [Dr. Shi's] role and ownership and control of Tongfang….the dollars that they put into Tongfang, the same day, those dollars were returned to ZZ [Zhongzhi] from Link Motion.  So they got a position, a stake in Tongfang, and they did so without actually being out any money and got a portion of their convertible note repaid. Tr. 3/51:21-52:3, 52:12-17.

21

the repayment of the Note by Link Motion on the maturity date in October 2018 was in jeopardy.  Link Motion had publicly announced in May 2018 that it would need to delay the filing of its annual Form 20-F with the United States Securities and Exchange Commission because it did not have the required audited financial statements for 2017. Two weeks later it announced that its was experiencing significant financial reporting problems: it advised that its previously-issued audited financial statements for 2016 "should no longer be relied upon," and that its publicly-disclosed but unaudited statements for 2017 and the first quarter of 2018 were also unreliable.  Wu Stmt. ¶¶ 15-16.  C-019 (Link Motion press release of 1 May 2018); C-020 (Link Motion Press Release of 15 May 2018).

71.     Link Motion's mid-May announcement also indicated that a committee of independent members of its Board of Directors was investigating, with the assistance of outside counsel, allegations of mismanagement by "a former senior executive of the company." C-020 (Link Motion Press Release of 15 May 2018).  Although not identified in the press announcement, the allegations were made against Dr. Shi by Dr. Henry Lin, Link Motion's co-founder and former Chairman and Chief Executive Officer.[4]  R-018 (Link Motion Press Release of 10 September 2018).

72.     These circumstances led Zhongzhi to undertake due diligence on Link Motion in an effort to assess its ability to repay the Note.  Wu Stmt. ¶ 19.  When Dr. Shi told Ms. Zhu, the Zhongzhi chair who was a Link Motion director, that Link Motion would likely be unable to make a timely payment under the Note, Zhongzhi sought advice from its outside counsel, the United States-based law firm Dorsey & Whitney, concerning "possible legal protections."  The law firm suggested that Zhongzhi seek security for the Note.  That advice led Zhongzhi, based on its "knowledge of Link Motion's available assets," to select the Tongfang Note and Link Motion's shares of NQ International "as target assets for security."  Wu Stmt. ¶¶ 22, 25.

---

[4] The cross-examination at the evidentiary hearing by Claimant of Respondent's witness Linguan Guo, a director of Link Motion and its Chief Strategic Officer, revealed that she is the wife of Dr. Lin.  Tr. 4/64:8-10.

73.   Thereafter, in August 2018 Ms. Zhu discussed the possible pledges with Dr. Shi.  Link
      Motion's President and General Counsel, Justin Chen, and Chief Financial Officer,
      Roland Wu, were involved in the process in their legal and financial areas of
      responsibility.  *Id.* ¶¶ 26-27.   Dorsey & Whitney prepared drafts of the pledge
      agreements, which Ms. Zhu sent to Link Motion in mid-August 2018.  Zhongzhi's
      Vincent Wu and Ms. Zhu had two meetings at Link Motion's offices, on 21 and 22
      August, to discuss updated versions of the draft agreements.  No revisions were made
      thereafter.  *Id.* ¶¶ 28-32.

74.   At the same time that the Parties entered into the Two Pledge Agreements they also
      entered into a "Memorandum of Cooperation" under which they agreed to cooperate with
      each other in resolving problems.  R-009 (Cooperation Memorandum). The memorandum
      described two "commercial arrangements" (under a heading of that name): first, a
      "'Smart Automobile Fund' in smart cars and smart ride field" of US$200 million, with
      each party to contribute half that amount; and second, Link Motion's agreement "to
      provide further security measures for repayment of [the] convertible note held by"
      Zhongzhi.  The document identified the security as pledges of the Tongfang Note and the
      shares in NQ International.  *Id.* Art. 2.1-2.1.4, 2.3.

75.   Zhongzhi's in-house legal team had drafted the Cooperation Memorandum, which
      Dorsey & Whitney reviewed.  Zhongzhi provided it to Link Motion.  Wu Stmt. ¶ 33.

76.   The provision of the Cooperation Memorandum describing Link Motion's agreement to
      provide the Two Pledge Agreements also provided that:

>                Party B [Link Motion] agrees and accepts that Party B has obtained fair,
>                sufficient and reasonable consideration from Party A [Zhongzhi] for the
>                pledge stipulated in Items (i) [Tongfang Note Pledge] and (ii) [Share
>                Charge] above.  Party B hereby agrees that it shall not raise any plea
>                against the validity or enforceability of the relevant pledge agreements on
>                the grounds that the pledge stipulated in Items (i) and (ii) above has not
>                been given fair, sufficient or reasonable consideration, or block in any
>                other way Party A's exercise of its relevant rights as pledgee.

R-009, Art. 2.3.

77.    In light of the foregoing provision concerning the adequacy of consideration, and Zhongzhi's reliance in this arbitration on the Cooperation Memorandum as the consideration for the Two Pledge Agreements, Clmt. Stmt. of Def. to Ctrclm. ¶ 103, it bears noting that the Cooperation Memorandum qualified Zhongzhi's obligation to fund the Smart Automobile Fund by providing that Zhongzhi "has the right to unilaterally decide at any time to execute or terminate the execution of" that project "without any compensation liability" to Link Motion.  More generally, the document expressly stated that:

> This Memorandum only serves as an expression of the cooperation intention of the parties.  The provisions of this MOU are not legally binding unless the parties further sign a legally valid written contract.

78.    Dorsey & Whitney advised Zhongzhi that the Two Pledge Agreements required the approval of Link Motion's Board of Directors.  Dr. Shi apparently agreed.  Wu Stmt. ¶ 34.

79.    In early September 2018, Link Motion's then-Vice President of Capital Markets, Matthew Mathison, learned of the plan to provide substantial security to Zhongzhi in connection with the Note.  In discussions with Mr. Chen, Link Motion's president and general counsel, as well as with the company's outside counsel at the United States-based law firm DLA Piper, he learned that "it was improper for Link Motion to pledge assets to Zhongzhi without receiving any consideration in return," and that "DLA … advised that directors who authorized such a pledge could incur personal liability."  Mathison 1st Stmt. ¶¶12-14.  He had a number of conversations with board members on this subject.  *Id.* ¶ 14; Tr. 3/12:20-14:8 (Mr. Mathison).

80.    Mr. Mathison testified that he explicitly told both of Zhongzhi's executives, Ms. Zhu and Mr. Wu, in emails to the Board on which they were included as well as in "multiple, more than one emails directly to both of them" that the advice of Link Motion's inside and outside counsel was that Link Motion could not provide the pledge agreements to Zhongzhi without adequate consideration.  Tr. 3/49:14-50:9 (Mr. Mathison).

D. Link Motion's Board Meeting

81.   Link Motion's Board met on the morning of 11 September 2018.  The circumstances of this meeting are among the central pillars of Respondent's counterclaims.

82.   According to the minutes, the Board "reviewed and discussed the" Cooperation Memorandum and approved a resolution "that the Memo in the form attached hereto…and the additional securities described therein be acknowledged and approved…."  C-023 (Minutes of 11 September 2018 Board meeting).  The minutes do not otherwise make any reference to the Two Pledge Agreements.

83.   Notice of the meeting was first given 67 minutes before the meeting began, according to Board member Lingyun Guo, one of Respondent's witnesses.  Guo Stmt. ¶¶ 3-4.  A copy of the WeChat message by which the corporate secretary, Ms. Ying Xu, gave notice to directors of the meeting suggests that notice was provided 98 minutes in advance.  C-034 (WeChat messages of 11 September 2018).   The message advised that the purpose of the meeting was "to discuss the provision of supplemental security for Zhongzhi's Convertible Note and subsequent cooperation."  *Id.*

84.   Mr. Mathison, who was based in Link Motion's office in Dallas, Texas, learned of the impending Board meeting shortly after the WeChat notice was issued, around 9 pm in Dallas (10 am in Beijing).  He immediately "reached out to members of the board of directors on an urgent basis, seeking to enlist their aid in stopping Dr. Shi from carrying out his plan."  Mathison 1st Stmt. ¶¶ 15-16

85.   Only four of Link Motion's 10 directors attended the meeting.  Two directors declined to attend, the president and general counsel, Justin Chen, and the chief executive officer, Zemin Xu, because they opposed the Two Pledge Agreements but did not want to disapprove formally at a meeting chaired by Dr. Shi.  Both resigned their positions shortly before or after the meeting because of Dr. Shi's insistence on providing the collateral to Zhongzhi without any consideration, as did non-director Roland Wu, the company's Chief Financial Officer.  Tr. 3/18:15-25, 26:8-18 (Mr. Mathison); C-008 (letter from counsel for J. Chen describing pledge agreements as a "contributing factor"

25

in his resignation); Mathison 1st Stmt. ¶ 18; R-10 (Link Motion press release of 14 September 2018, reporting resignations of Messrs. Chen and Xu as officers and board members, and of Roland Wu as chief financial officer).

86.  Of the four directors who attended the Board meeting, two had a conflict of interest with respect to the Two Pledge Agreements, Dr. Shi and Joanne Zhu.  As noted above, Dr. Shi had a personal financial interest as a result of the Shi Cooperation Memorandum, which imposed liability upon him for any interest Link Motion failed to pay, and, in the event the conversion did not occur, an additional 2.5% of the outstanding balance of the Note since inception.  Ms. Zhu was the Chair of Zhongzhi, the beneficiary of the Two Pledge Agreements.  (Claimant's contention that a provision of Link Motion's Memorandum of Association alleviated these conflicts is addressed Section III.B.2 of this award.)

87.  The only other two directors who attended the meeting, Jia Lian and Xiao Yu, had joined the Board for the first time the day before.  R-018 (Link Motion press release of 10 September 2018); Mathison 2d Stmt. ¶¶ 21-22.  According to Mr. Mathison, they had no prior involvement with Link Motion and were friends of Dr. Shi.  *Id.*

88.  One of the Board members who did not attend the Meeting, Co-Chairman Rui (Larry) Chi, told Mr. Mathison that he should not be so concerned that Zhongzhi was not providing any consideration for the agreements because Link Motion knew "'we can't sign them without getting anything in return.  We need more time to get a formal extension granted.  Don't worry.  We're not going to sign the pledge agreement until we get something in return.'"  Tr. 3/40:12-23 (Mr. Mathison).

89.  Nonetheless, Zhongzhi's Mr. Wu visited Link Motion's office in Beijing the next day to have Mr. Lian Jia, the new Board member who had been appointed Acting Chief Executive Officer at the Board meeting, execute the documents.  A colleague returned to Link Motion's office the following day to obtain the signature of Roland Wu.  Wu Stmt. ¶ 38.

E. The Post-Meeting Events

90.   Because Link Motion's ADS traded well below the US$6.00 conversion price as the
      Note's maturity date approached – on 2 October 2018 they traded at $0.66 per share, and
      had traded for less than US$1.00 throughout 2018 –  Zhongzhi let its conversion right
      expire without exercising it.  C-012 (trading price data); Clmt. Stmt. of Claim ¶ 13. The
      principal balance of US$132 million under the Note was therefore due on 3 October 2018
      along with the prior six months' accrued interest, to be paid in arrears, of US$5,280,000.

91.   Link Motion failed to pay the balance due under the Note of US$137,280,000 on the
      maturity date of 3 October 2018.  The following day Claimant sent a written demand
      letter to Respondent declaring an event of default under the Note and requiring "strict
      performance" by Respondent of its obligations under the "Security Documents," which
      comprised the Two Pledge Agreements.  C-013; Resp. Stmt. of Def. & Ctrclm. ¶¶ 60-61.

92.   By the end of that month Zhongzhi had decided to enforce its rights under the Tongfang
      Note Pledge.  It sent Tongfang an email attaching the executed pledge agreement and
      form of transfer; it requested that Tongfang issue "new document certificates
      accordingly."  C-024 (email of Xichun Wu to Daniel Li of Tongfang, 31 October 2018).
      Tongfang responded three weeks later acknowledging receipt of the executed agreement
      and committing to alert Zhongzhi "of any change to such Senior Note."  *Id.*

93.   Zhongzhi interpreted Tongfang's response as a rejection of its request.  Wu Stmt. ¶ 43.
      Zhongzhi denies that it "acquired ownership or control over, or otherwise received any
      payment or other benefit" from the Tongfang Note.  *Id.* ¶ 46.

94.   Zhongzhi also sent a letter to Tongfang demanding payment of its interest in the
      mezzanine note issued by Tongfang in light of the default in interest payments and
      Zhongzhi's consequent demand for acceleration of the principal balance.  Tongfang did
      not respond, and Mr. Wu testified at the hearing that Zhongzhi intends to initiate legal
      proceedings under that note. Tr. 2/116:14-117:1 (Mr. Wu).

95.     Zhongzhi states that it has not enforced the Share Charge or acquired or taken control of any shares of NQ International.  *Id.* ¶ 46.

96.     Because Zhongzhi's counsel advised that "it would be difficult to enforce the Pledge Agreements due to a variety of legal issues," Zhongzhi elected to initiate this arbitration against Link Motion.  *Id.* ¶ 45; Clmt. Post-Hearing Br. ¶ 37 n. 52.

97.     After this proceeding had been initiated but before the Receiver obtained copies of the Two Pledge Agreements, the Receiver on 1 April 2019 made a demand of Tongfang to pay the past-due Tongfang Note and accrued interest.  C-027.  The demand was unsuccessful, as the Receiver has not collected the balance due. Resp. Post-Hearing Br. ¶ 107 n.124. It appears that the Receiver has not taken any additional legal action to attempt to recover on the Tongfang Note.  Clmt. Post-Hearing Br. ¶ 160 and n.202.

## IV.    Analysis and Decision

### A. Zhongzhi's Claim to Enforce the Note

98.     Zhongzhi has established all the elements of its claim to enforce the Note.  Link Motion does not dispute that it issued the Note to Zhongzhi on 9 November 2017, that Zhongzhi had paid it the US$220 million due under the original note on 3 October 2016, that the principal balance was reduced to US$132 million by Link Motion's partial redemption of US$88 million, resulting in the issuance of the revised Note, that  the Note is valid and enforceable, and that Link Motion failed to pay the balance due of principal and interest of US$137,280,000 on 3 October 2018, the maturity date.

99.     Zhongzhi sent Link Motion a written demand for payment on 4 October 2018.  C-013.  It is undisputed that Respondent made no payment to Claimant in respect of the Note thereafter.  Clmt. Stmt. of Claim ¶ 15.

100.    The sole defence Link Motion has asserted in this proceeding to Zhongzhi's claim to enforce the Note is one of set off.  Link Motion claims that the damages to which it is entitled from Zhongzhi on one or both of its Counterclaims is at least equal to the amount

it owes to Zhongzhi under the Note.  Resp. Stmt. of Def. & Ctrclm. ¶¶ 99-100; Tr.
1/53:6-8, 14-17 (Respondent's counsel: "the counterclaims operate by way of a setoff.
And that is a defence….because the counterclaims operate or [are] plead[ed] as a setoff,
they are effectively a defence to claimant's claim….").

101.    For the reasons explained below, the Tribunal does not award any damages to Link
Motion on its counterclaims.

102.    Accordingly, Claimant Zhongzhi is entitled to an award against Respondent Link Motion
in the amount of US$137,280,000.

103.    The only contested issue in respect of Zhongzhi's claim under the Note is whether
Zhongzhi is entitled to pre-award interest.  Respondent contends that the text of the Note
forecloses pre-award interest because it calls for the payment of interest only "until
maturity or such earlier or later time as the principal becomes due and payable
hereunder…."  C-002; Resp. Post-Hearing Br. ¶ 124.  Claimant contends that
Respondent's argument should be disregarded because Respondent did not raise it in any
of its written submissions but asserted it for the first time in counsel's opening statement
at the evidentiary hearing.  Clmt. Post-Hearing Br. ¶ 223 (citing Tr. 1/53:21-54:15).
Claimant also argues that "it is common practice in international arbitration for a
Tribunal to award interest on amounts due."  *Id.* ¶ 224 (citing CL-40, Redfern & Hunter
on International Arbitration at 442).

104.    We have little difficulty in determining that Claimant is entitled to pre-award interest.
Although the HKIAC Rules are silent about pre-award interest, Section 79 of the HKAO
authorizes tribunals seated in Hong Kong, as is the case here, to "grant simple or
compound interest from the dates, at the rates, and with the rests [sic] that the tribunal
considers appropriate."  Cl-41 at 448; Clmt. Post-Hearing Br. ¶ 224.  Significantly, New
York law, which governs the Note, views pre-award interest as appropriate "to
compensate the prevailing party for the loss of use of money that the prevailing party was
entitled to receive from the date its claim arose until the date of the award."  RL-091,
New York City Bar Association, *Awards of Interest in International Commercial
Arbitration: New York Law and Practice,* 55 Am. Rev. Int'l Arb. 55 (2017).  As

Zhongzhi notes, pre-award interest is typically awarded in breach of contract cases, and such interest is paradigmatically appropriate where the breached contract is a promissory note. Consequently, we award pre-award interest from the maturity date until the date of issuance of this award.

105.     The Parties agree that the Note's interest rate of 8% should be applied to set pre-award interest. Clmt. Post-Hearing Br. ¶¶ 227, 231; Resp. Post-Hearing Br. ¶ 114-123. The amount of pre-award interest, from the maturity date of 3 October 2018 through 16 February 2021, the date of this Award, is US$26,117,049.[5]

106.     There does not appear to be any dispute that post-award interest should accrue on the amount of the Award at the same rate as the pre-award interest rate. Clmt. Post-Hearing Br. ¶ 229-230, 231 (proposing 8% contract rate rather than New York's statutory rate of 9%); Resp. Post-Hearing Br. ¶¶ 114-115, 125 n. (post-award interest should be contract rate; New York's statutory rate does not apply in arbitration proceedings). Accordingly, we award simple interest at 8% per annum on the amount due to Claimant from Respondent under the Note, net of the amount due to Respondent from Claimant for certain fees and expenses as provided below in Paragraphs 198 and 199. The daily amount of post-award interest is US$30,070.12.[6]

---

[5] This amount is calculated by applying 8% simple annual interest to the amount due under the Note of US$137,280,000, which yields US$10,982,400 per year, or US$30,088.767 per day (using 365 days); since 868 days elapsed from the maturity date of 3 October 2018 through 16 February 2021, the date of this Award, the total pre-award interest is 868 x US$30,088.767 or US$26,117,049.

[6] As explained below in Paragraphs 199(e) and (g), the amount due under the Note of US$137,280,000 is reduced as of the date of the award to US$137,194,931 to reflect the net amount of US$85,069 owed by Claimant to Respondent in respect of (i) Respondent's fees and expenses in connection with the Jurisdiction Decision allocated to Claimant in the amount of US$191,784.93, offset by (ii) the US$106,715.97 that Respondent must pay to Claimant to effectuate the Tribunal's decision expressed in Paragraph 198 that the administrative costs and expenses of this arbitration are to be borne equally. Applying 8% simple interest per annum to the amount of US$137,194,931 yields annual interest totaling US$10,975,594 and daily post-award interest of US$30,070.12.

### B. Respondent's Counterclaims

107.   At the outset, we address two threshold issues that arise with respect to both of Respondent's counterclaims.

108.   First, Respondent contends that the choice of New York law to govern the Note, which also appears in the initial note purchase agreement, the original note, and the partial redemption agreement, demonstrates that New York's substantive law should apply to Link Motion's counterclaims and defenses in this proceeding.  Resp. Stmt. of Def. & Ctrclm. ¶¶ 66-70.  Although the Two Pledge Agreements at issue in both counterclaims designate the law of Hong Kong as the governing law, so that it is plausible that Hong Kong law might be deemed pertinent, Claimant has agreed that the Tribunal should apply New York law to Link Motion's two counterclaims against it.  Clmt. Stmt. of Def. to Ctrclm. ¶ 55 n.57 ("…Claimant does not contest the applicability of New York law solely for the two causes of actions now pleaded by the Respondent.")

109.   As a result, the Tribunal addresses both counterclaims by applying the principles of New York law.

110.   Second, Claimant argues that Link Motion does not have standing to assert its counterclaims to the extent they seek damages involving the Tongfang Note because that note is held by its subsidiary, NQ International.  Claimant points out that NQ International is not a party to this proceeding, and that under New York law a parent company cannot assert a claim for losses incurred by its subsidiary.  *Id.* ¶¶ 57-61.  Respondent points out that it is not seeking damages on behalf of its subsidiary but rather the damages it has suffered directly, as the parent entity, from the diminution of value of its ownership interest in its subsidiary.  Resp. Rejoinder ¶¶ 18-23.

111.   Respondent contends that it has standing to pursue its Tongfang Note-related counterclaims, notwithstanding that the note is owned by its subsidiary, because it has limited the damages it seeks to the injury it suffered, as distinguished from its subsidiary's losses.  It explains that the Share Charge conveyed a security interest in its

equity in NQ International and the Tongfang Note Pledge separately eroded the value of that equity.  Resp. Rejoinder ¶¶ 18-19.

112.   The case Claimant relies upon to support its position raises the distinction between direct claims by shareholders against third parties that seek to recover the shareholders' own losses and derivative claims by shareholders that seek recovery of the losses sustained by the company the shareholders own.   Clmt. Stmt. of Def. to Ctclm. ¶ 59 n.59 (citing CL-13, *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.,* 10 Civ. 5762 (PAE) (S.D.N.Y. 2013)).   Although this distinction can be nuanced under New York law, it is clear here that Link Motion's counterclaims seek recovery of injury sustained directly by it, and consequently Link Motion has standing to assert them.  Indeed, as Respondent notes, the decision Zhongzhi invokes was subsequently vacated by the appellate court precisely on the ground that the lower court had misapplied the distinction between direct and derivative claims.  RL-025, *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.,* 803 F.3d 92 (2d Cir. 2015); Resp. Rejoinder ¶ 24 n.16.

113.   The cases cited by Respondent support a parent company's standing to assert tort claims against a third party where it suffered harm from the loss of its equity in a subsidiary, RL-023, *Pacific Electric Wire & Cable Co. Ltd. v. Set Top International Inc.,* 2005 WL 578916, *8 (S.D.N.Y. 2005), or from the diminution in value of that equity caused by the dissipation of the subsidiary's assets.  RL-024, *In re First Central Financial Corp.,* 269 B.R. 502 (Bankr. E.D.N.Y. 2001).  Those decisions fully support Link Motion's standing to assert its counterclaims against Zhongzhi notwithstanding that the key asset at issue, the Tongfang Note, is owned by Link Motion's subsidiary.

1.   <u>The Fraudulent Conveyance Counterclaim</u>

114.   Link Motion's first counterclaim is premised on New York's statutory remedy for creditors harmed by a debtor's fraudulent conveyances.  That statute, Section 276 of the New York Debtor & Creditor Law, provides as follows:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

RL-006.

115.  Link Motion contends that it engaged in fraudulent conveyances when it provided the Two Pledge Agreements to Zhongzhi.  As this description of the counterclaim suggests, Link Motion's invocation of Section 276 appears anomalous:  a typical fraudulent conveyance claim is brought by a defrauded creditor against the transferor of the asset. In contrast, this counterclaim is brought by the transferor against its single largest creditor.

### a. The Creditor Standing Requirement

116.  Not surprisingly, Zhongzhi argues that Section 276 does not permit Link Motion's claim. It asserts that Link Motion, as the transferor, lacks standing to obtain a remedy under the statute.  This "no standing" defense is separate from the other standing issue Zhongzhi has raised, addressed above, involving Link Motion's right to assert claims involving harm to its subsidiary.  Zhongzhi stresses that a Section 276 claim must be brought for the benefit of creditors, and the record does not reveal that Link Motion has any material creditors other than Zhongzhi.  Zhongzhi points out that since Link Motion is a holding company without business operations of its own, it is unlikely to have any material creditors apart from its note holder.  Clmt. Post-Hearing Br. ¶¶ 19-20.

117.  In response, Link Motion acknowledges that it has not identified any creditors other than the one it is suing.  Resp. Post-Hearing Br. ¶¶ 4, 6.  But Link Motion points to a body of case law that confers standing for fraudulent conveyance claims upon the transferor in narrow circumstances.  Relying on the seminal decision of the United States Court of Appeals for the Seventh Circuit in *Scholes v. Lehman,* RL-004, 56 F.3d 750 (7th Cir. 1995), subsequently embraced in principle by the Second Circuit (which encompasses the federal courts in New York) in *Eberhard v. Marcu¸* CL-015, 530 F.3d 122 (2d Cir. 2008), Respondent argues that a transferor entity may assert a Section 276 claim where the transfer is caused by corrupt managers and the entity is effectively the transferor in name only.  In such circumstances, the nominal transferring company is itself the victim of its management and can be characterized as a "creditor" of its own management.  Resp. Post-Hearing Br. ¶¶ 1-3 (citing RL-040, *Cobalt Multifamily Inv'rs I, LLC v. Arden,* 46 F.

33

Supp. 3d 357 (S.D.N.Y. 2014) (where "transfers were effectively 'coerced' by corrupt management…the corporation itself functions as the 'creditor' for standing purposes")).

118.    In sum, Respondent makes the bold argument that "Because Link Motion is the relevant 'creditor,' it is not necessary for Link Motion to demonstrate that it had *other* creditors besides Claimant when the pledge agreements were signed or that it reasonably anticipated having such creditors."  Resp. Post-Hearing Br. ¶ 8 (original emphasis).

119.    Yet the *Scholes* exception to the usual standing requirement under Section 276 is very limited, and applies only where the corporation is so exclusively a vehicle for the misconduct of its corrupt management that the corporation is, in the colorful phrasing of the *Scholes* court, nothing more than the "robotic tool" of the dishonest manager and is itself an "evil zombie[]."  Clmt. Stmt. of Def. to Ctrclm. ¶ 70 (quoting *Scholes,* 56 F.3d at 754-55).  This stringent standard is most typically satisfied where the corporate entity is the instrument by which a fraudster has perpetrated a Ponzi scheme.  *Id.*

120.    Indeed, although Respondent has cited several cases that recognize the *Scholes* principle, very few of them actually apply that principle to impose liability in favor of the transferor entity.  *See, e.g., Eberhard v. Marcu;*  Clmt. Post-Hearing Br. ¶ 12 n.17 (effectively distinguishing RL-003, *Barnet v. Drawbridge Special Opportunities Fund LP,* 2014 WL 4393320 (S.D.N.Y. 2014) and RL-005, *In re Platinum-Beechwood Litigation,* 2019 WL 4934967 (S.D.N.Y. 2019)).  And one that does, RL-043, *Fed. Nat. Mortg. Ass'n v. Olympia Mortg. Corp.,* 2011 WL 2414685 *7 (E.D.N.Y. 2011), involved circumstances in which the dominant individual of an insolvent corporation made multiple transfers from the corporation without any consideration over a period of more than five years and thus "resemble[d] the situation in *Scholes* far more closely than … the situation in *Eberhard.*"

121.    In an effort to establish its fraudulent conveyance counterclaim, Respondent necessarily seeks to characterize Link Motion as merely the "robotic tool" of Dr. Shi.  Yet Respondent's proof falls well short of the *Scholes* standard.  Respondent relies on the facts that support its claim that Dr. Shi breached his fiduciary duties to Link Motion, particularly his misconduct in "subvert[ing] any meaningful board review of the Pledge

34

Agreements." Resp. Rejoinder ¶ 30. Those actions by Dr. Shi were indeed wrongful, as discussed below in connection with Respondent's second counterclaim. Nonetheless, proof of a single instance of a corporate governance failure, no matter how intentional or meaningful, does not transform an otherwise genuine business organization into an "evil zombie" or "robotic tool."

122.   It is undisputed that Link Motion was a global enterprise whose securities were traded on the New York Stock Exchange. It had professional managers whom the Receiver does not allege were complicit in Dr. Shi's misconduct – indeed, the Receiver hired one of those executives as a consultant to assist the Receiver's work in marshaling Link Motion's assets. Tr. 3/11:2-4 (Mr. Mathison). Its Board of Directors included five independent directors in the period prior to the events in question here.[7] C-030 (Link Motion Form 20-F for 2017).

123.   The proof Respondent offered to rebut these fundamental facts, beyond the circumstances of the 11 September 2018 Board meeting itself, was far from compelling. Thus, Respondent submitted evidence that Dr. Shi's approval was needed for "any corporate decision," Mathison 2d Stmt. ¶ 5, but the only example of that shown was his refusal to approve the payment of an invoice from outside securities counsel. *Id.* Respondent also presented the testimony of Link Motion director Lingyun Guo to the effect that Dr. Shi disregarded suggestions made by Board members, so there was no point in her asking for the meeting of 11 September to be adjourned. Tr. 4/89:19-90:9. This evidence shows that Dr. Shi was by far and away the dominant force in Link Motion's management, but it does not show that Link Motion was a wholly corrupted enterprise akin to a Ponzi scheme.

124.   We therefore conclude that Link Motion's counterclaim under Section 276 of the NYDCL fails for lack of standing. As the transferor of the Two Pledge Agreements,

---

[7] The composition of the Board by the time of the approval of the Two Pledge Agreements on 11 September 2018 may have changed, however, in view of Mr. Mathison's testimony that newly-added directors Jia Lian and Xiao Yu were friends of Dr. Shi. Paragraph 87 above. R-018 (Link Motion press release of 10 September 2018 reporting resignations of independent directors Ethan Hu and Jian Qi and election of Jia Lian and Xiao Yu as independent directors).

Link Motion may not sue its creditor Zhongzhi to obtain relief under a statutory scheme designed to protect creditors against improper asset transfers.  Clmt. Stmt. of Def. to Ctrclm. ¶ 65 ("Respondent has flipped the very purpose of the law on its head").

### b. The Proof of Fraudulent Intent

125.   Even if Link Motion had standing to assert this counterclaim, however, it would founder because it fails to satisfy the additional requirement for relief under Section 276 that the transfer was made with the "actual intent … to hinder, delay, or defraud either present or future creditors."  Notably, Respondent must establish this element by "clear and convincing evidence."  Clmt. Stmt. of Def. to Ctrclm. ¶ 93 (citing RL-010, *Marine Midland Bank v. Murkoff,* 120 A.D. 2d 122, 126 (N.Y. 2d Dep't 1986).

126.   Although Respondent initially argued that "the evidence overwhelmingly establishes that Zhongzhi extracted the Pledge Agreements with the actual intent to defraud,"  Resp. Stmt. of Def. & Ctrclm. ¶ 79, by the time of the evidentiary hearing it had shifted its position, contending that the only actor whose intent it must show to have been fraudulent was the transferor's, not the transferee Zhongzhi.  Tr. 1/56:18-58:20 (Mr. Kushner).  Thereafter, the Claimant concurred in its post-hearing submission that only the intent of the transferor is at issue in a fraudulent conveyance action.  Clmt. Post-Hearing Br. ¶ 24.

127.   Reflecting its theory that the transfer was the work of Dr. Shi and not that of Link Motion itself, Respondent contends that the relevant intent is that of Dr. Shi.  Tr. 1/58:16-18 (Mr. Kushner: "as long as Dr. Shi made transfers with fraudulent intent, the intent to defraud element is satisfied").

128.   Since fraudulent intent typically evades direct proof, the courts permit aggrieved parties to prove intent by showing "badges of fraud."  The Parties agree that these indicia of the necessary fraudulent intent include a "secret and hasty transfer not in the usual course of business" and "the lack or inadequacy of consideration."  Resp. Stmt. of Def. & Ctrclm. ¶ 81 (citing RL-009, *Kim v. Ji Sung Yoo,* 311 F. Supp. 3d 598 (S.D.N.Y. 2018); Clmt. Stmt. of Def. to Ctrclm. ¶ 95 (same).

36

129.   At the outset we note that Respondent seeks to prove "an intent to defraud Link Motion."
Resp. Stmt. of Def. & Ctrclm. ¶ 84.   Stated in that fashion, Respondent necessarily has
combined its argument on intent with its argument on standing: the intent the statute
requires is to defraud "either present or future creditors," not the transferor.
Respondent's theory of intent can therefore be successful only if its theory of standing –
that Link Motion is the victim-creditor – is successful.   As discussed above, Respondent
has not prevailed on that theory.

130.   Thus, however compelling the evidence may be that Dr. Shi used the Two Pledge
Agreements to defraud Link Motion, that proof may (and does) establish Link Motion's
contention that Dr. Shi breached his fiduciary duties to the company of which he was
Chief Operating Officer and Chairman of the Board, but cannot establish that he or Link
Motion acted to defraud actual creditors.

131.   For the sake of completeness we note that Respondent's proof of the badges of fraud
would not be sufficient to establish actual intent even if Link Motion had creditors
beyond Zhongzhi.   Respondent emphasizes two sets of "badges of fraud" to show the
necessary fraudulent intent: first, the absence of consideration for the pledge agreements,
and second, the "secret and hasty" manner in which the agreements were effected.   Resp.
Stmt. of Def. & Ctrclm. ¶ 82.   We address each briefly.

132.   Respondent is correct that the Two Pledge Agreements lacked any consideration.   That
fact is particularly stark in light of the undisputed fact that the Tongfang Note, and Link
Motion's shares in its subsidiary NQ International, comprised substantially all of its
assets.   Zhongzhi declined even to extend the impending maturity date of the Note in
exchange for obtaining substantial collateral and transforming itself from an unsecured
note holder to a secured creditor.

133.   Zhongzhi therefore is compelled to argue, seemingly half-heartedly, that the Cooperation
Memorandum supplied the consideration needed to support the Two Pledge Agreements.
It argues that because Link Motion was on the verge of default under the Note, it "needed
to find a way to continue working with the Claimant.   The Pledge Agreements were
entered alongside a Cooperation Memorandum that would explore the opportunity to

37

create a new fund for investing in new technologies that could have served as a potential lifeline for the Respondent. Such an opportunity could provide consideration to grant the pledges under the Pledge Agreements." Clmt. Stmt. of Def. to Ctrclm. ¶ 103.

134.    Zhongzhi's reliance on the Cooperation Memorandum to supply consideration is unquestionably flawed because that agreement was non-binding. Zhongzhi argues that the "opportunity to create a new fund" that might be "a potential lifeline" for Link Motion "could provide consideration" for the pledges, but that opportunity was essentially illusory: the operative provision in Section 2.1.1 at most called for Zhongzhi to "try to raise US$100 million from investors by using its fund-raising capability" (in contrast to Link Motion's commitment to "invest[] US$100 million in cash), but any value for Link Motion of that aspirational goal on Zhongzhi's part was eliminated by Section 2.1.4 of the document, which afforded Zhongzhi "the right to unilaterally decide at any time to execute or terminate the execution of the Smart Automobile Fund project without any compensation liability to" Link Motion. Moreover, the Memorandum expressly recited in Section 4.1 that it "only serves as an expression of the cooperation intention of the parties" and that its "provisions … are not legally binding…." R-009 (Cooperation Memorandum).

135.    This absence of any consideration for the Two Pledge Agreements is a fundamental aspect of Link Motion's counterclaim for aiding and abetting breach of fiduciary duty, as discussed below, but standing by itself it is not necessarily dispositive of an intent to defraud for purposes of Link Motion's counterclaim for fraudulent conveyance. That is because this transfer of assets without consideration was not made to a non-creditor transferee (for example, a family member, corporate affiliate or other related party) but to a genuine creditor holding a substantial antecedent debt. New York's Debtor & Creditor Law (prior to its amendment at year-end 2019) provided in its Section 272(b) that "fair consideration is given for property … [w]hen received in good faith to secure …antecedent debt …." RL-092. Although that provision applies to claims for "constructive fraud" that do not require proof of actual intent, and the Parties agree that a claim of actual fraudulent intent under Section 276 can be established notwithstanding the existence of "fair consideration" as defined in Section 272(b), Clmt. Post-Hearing Br.

38

¶ 77; Resp. Post-Hearing Br. ¶ 46, New York's statutory scheme plainly recognizes that a security interest granted for antecedent debt is less troublesome than property transfers in other circumstances.

136.   Respondent's key additional "badge of fraud" – the "secret and hasty" process by which the Two Pledge Agreements were prepared and issued – was undermined by the evidentiary record.  Although the Board meeting at which the agreements were approved was unquestionably conducted in haste, with wholly inadequate notice, the testimony establishes that the pledge agreements had been discussed openly for weeks before the Board met, and that both Link Motion's President and General Counsel, Mr. Chen, and the Chief Financial Officer, Mr. Wu, were involved in some aspects of that process.  Wu Stmt. ¶ 27.  The testimony also revealed that Link Motion's outside securities counsel was aware of the proposed agreements.  Mathison 1st Stmt. ¶¶ 13-14.

137.   Equally significant, Link Motion's United States-based Vice President of Capital Markets, Mr. Mathison, not only discussed the agreements with Messrs. Chen and Wu but also directly with Dr. Shi and members of the Board of Directors, including Link Motion's Co-Chairman Larry Chi.  Tr. 1/13:3-10 (Mr. Mathison); Mathison 1st Stmt. ¶ 14-15.  Moreover, some directors chose not to attend the hastily-called meeting not because they were unaware that the pledge agreements would be discussed but precisely because they knew they would be called upon to vote on those agreements at the meeting and preferred not to do so.  Tr. 3/18:15-25 (Mr. Mathison).

138.   As a result, the evidence does not support the allegation that the Two Pledge Agreements were conceived and executed in "secret."  As discussed below, the circumstances of the Board meeting support the counterclaim arising from Dr. Shi's breach of fiduciary duty but do not supply "clear and convincing" proof of an actual intent to defraud creditors.

c. The Requested Damages Remedy

139.   A final infirmity in Respondent's fraudulent conveyance counterclaim is its attempt to obtain a remedy in the form of monetary damages.  The typical remedy afforded under the statute is an order to set aside the offending conveyance.  Resp. Stmt. of Def. &

Ctrclm. ¶ 85; Clmt. Post-Hearing Br. ¶ 59.  Respondent abjures any such remedy here, however, as it seeks the monetary value of the collateral to use as a set off against its substantial indebtedness to Zhongzhi under the Note.

140. The Parties agree that courts are empowered to award monetary damages for claims under Section 276 where the transfer cannot be effectively reversed so as to restore the parties to the *status quo ante*, but they disagree as to whether those circumstances are present here.[8]  Respondent contends that Zhongzhi took steps to enforce the Tongfang Note Pledge agreement by communicating with Tongfang and requesting the issuance of new document certificates recognizing Zhongzhi as the holder of the Note.  Resp. Post-Hearing Br. ¶¶ 38-39.  It also notes that Zhongzhi has sought to enforce its rights under the mezzanine note issued by Tongfang.  *Id.* ¶ 42.  Although Respondent acknowledges that Zhongzhi's efforts have been unsuccessful, it claims that neither it nor the Tribunal has visibility into the relationship between Zhongzhi and Tongfang and consequently it is possible that Tongfang may be making payments to Zhongzhi under the Note.  *Id.* ¶ 43.  For these reasons it claims that "the train has long since left the station."  *Id.* ¶ 44.

141. Claimant contends that the Tongfang Note Pledge was imperfectly executed in various respects so that it must initiate legal action against Tongfang to enforce the pledge and recover on the Tongfang Note, Clmt. Post-Hearing Br. ¶¶ 46-52, and the Share Charge also suffers from technical defects that make it not self-executing.  *Id.* ¶ 146 n.190.  Claimant argues forcefully that neither the Tongfang Note nor Link Motion's shares in its subsidiary have actually been transferred to Claimant, as Zhongzhi has not been recorded as the holder in Tongfang's register or recorded in the Hong Kong Companies Registry as the owner of the shares in NQ International.  *Id.* ¶ 39.  Respondent does not dispute those facts – indeed, its Rejoinder acknowledges that "Zhongzhi has not yet taken ownership or

---

[8] The Parties also appear to agree that monetary damages are available whenever setting aside the conveyance would be inadequate to restore the *status quo ante* and that older cases limiting damages to circumstances in which the inability to reverse the transfer is attributable to action by the transferee to dispose of, deprecate or otherwise interfere with the conveyed property are no longer applicable.  Resp. Post-Hearing Br. ¶ 37 (RL-033, *McGillicuddy v. Laidlaw, Adams & Peck,* 1995 WL 1081307 (S.D.N.Y. 1995) demonstrates courts have rejected rule requiring interference by transferee stated in earlier cases RL-012, *Mallouk v. American Exchange Nat. Bank,* 157 A.D. 711 (App. Div. 1913) and RL-010, *Marine Midland Bank v. Murkoff,* 120 A.D. 2d 122 (2d Dep't 1986)); Clmt. Post-Hearing Br. ¶¶ 63, 72-73.

possession of the pledged assets" and that "Link Motion has never contended that a transfer of title to the pledged assets has occurred." Resp. Rejoinder ¶¶ 73, 13. Notably, the terms of the certificate issued by Tongfang to NQ International in respect of the Tongfang Note recites explicitly that "This Certificate is not a document of title. Entitlements are determined by entry in the Register and only the duly registered holder from time to time is entitled to payment in respect of this Certificate." RL-005 (Tongfang Note).

142.    In view of the fact that the collateral has not been transferred to Claimant, and because Respondent's concerns about possible undisclosed activities are mere conjecture, we conclude that the *status quo ante* could be achieved by the invalidation of the pledge agreements if the fraudulent conveyance claim had otherwise been established. Link Motion therefore has not established that monetary damages would be available to it as a remedy under its fraudulent conveyance claim even if it had standing and had proven the necessary fraudulent intent.[9]

143.    This conclusion is reinforced by application of an additional principle of New York law, that "'a defrauded creditor is not entitled to an enhancement of position beyond what it was before the fraud.'" Clmt. Post-Hearing Br. ¶ 68 (quoting *McGillicuddy* at *7). Respondent agrees with that proposition of law. Resp. Post-Hearing Br. ¶ 37 ("a creditor cannot use the fraudulent conveyance laws to put itself in a better position than it was [in] before the conveyance"). Zhongzhi accurately points out that a damages remedy would dramatically improve Link Motion's position from its status before it pledged the Tongfang Note, as it would convert its ownership of a note of uncertain collectability into the certain elimination of a substantial liability to Claimant. Clmt. Post-Hearing Br. ¶70[10].

---

[9] A separate and further flaw in Link Motion's claim for monetary damages is its failure to prove the value of the Two Pledge Agreements sufficiently to quantify a monetary award, as discussed below in connection with its counterclaim for aiding and abetting breach of fiduciary duty.

[10] In Clmt. Post-Hearing Br., Claimant suggests that an award of monetary damages would turn the Tongfang Note "into cash" (see Clmt. Post-Hearing Br. ¶70). The Tribunal is not convinced that an award of

144.   In short, the record does not support the view that "the train has left the station," so much as that the train has been in the station since 3 October 2018 with no scheduled departure time.  Consequently, the only remedy available under the fraudulent conveyance counterclaim, if Link Motion had otherwise prevailed on that counterclaim, would be an order invalidating the Two Pledge Agreements.  As it happens, this Award grants Link Motion that relief pursuant to Link Motion's aiding and abetting counterclaim, as discussed below.

### 2. The Aiding and Abetting Breach of Fiduciary Duty Counterclaim

145.   In contrast to its fraudulent conveyance counterclaim, Link Motion's counterclaim that Zhongzhi aided and abetted Dr. Shi's breach of fiduciary duties to Link Motion in connection with the Two Pledge Agreements stands on a firmer footing.  As discussed here, Dr. Shi plainly breached his fiduciary duties and Zhongzhi substantially assisted him in doing so.  Indeed, Zhongzhi acknowledges that "the Pledge Agreements involved unusual circumstances, which may not be without suspicion."  Clmt. Post-Hearing Br. ¶ 35.  Its argument that "Respondent's narrative at most amounts to possible corporate governance issues," *id. ¶ 28,* while helpful in defending the fraudulent conveyance counterclaim, actually reinforces the essence of the aiding and abetting counterclaim.  Because Link Motion has not reasonably quantified any amount of damages it suffered by virtue of the pledge agreements, however, it is entitled only to declaratory relief that those agreements are invalid and unenforceable.

146.   The three elements Link Motion must prove under New York law to establish its counterclaim are:

> The first element is "a breach by a fiduciary of obligations to another," of which the aider and abettor had "actual knowledge";

---

monetary damages would, in fact, be such as to convert the Tongfang Note into cash. However, the Tribunal does accept that Respondent's position would be dramatically improved by an award of monetary damages, certainly by eliminating its substantial liability it would otherwise have to Claimant under the Note, and potentially by additionally providing a route to Respondent obtaining cash from Claimant.

the second element is "that the defendant knowingly induced or participated in the breach"; and

the third element is "that plaintiff suffered damage as a result of the breach.

RL-013, *In re Sharp Int'l Corp.,* 403 F.3d 43, 49 (2d Cir. 2005) (internal citations omitted).  The element that the defendant "knowingly induced or participated in" the fiduciary's breach is established by showing that the defendant provided "substantial assistance" to the fiduciary.  "Substantial assistance" is "found where the alleged aider and abettor 'affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur.'"  *Id.* at 50.

147.    We address each of the three elements in turn.

a. Dr. Shi's Breach of Fiduciary Duties

148.    It is not disputed in this proceeding that Dr. Shi owed fiduciary duties of care and loyalty to Link Motion in his capacity as Chairman of Link Motion's Board of Directors and as its Chief Operating Officer.  The proof that Dr. Shi breached those duties in connection with the Two Pledge Agreements is straightforward.

149.    First, it is not disputed that the collateral underlying the two agreements constituted substantially all of Link Motion's assets.[11]  Zhongzhi's witness Xichun Vincent Wu

---

[11] Respondent has used this phrasing throughout this proceeding without objection by Claimant.  At the evidentiary hearing, however, Respondent's witness Matthew Mathison testified that Link Motion had cash, in Renminbi, in at least the amount required to pay the Note.  Tr. 3/45:10-23,47:6-10 (Mr. Mathison) ("…we had a more than sufficient amount of renminbi inside of China….if we owed, you know, US$138 million to clear the convertible note, you know, we had like twice, more than twice as much RMB on our balance sheet, according to the last filing….And I had no reason to believe that that wasn't accurate").  Despite this testimony, Zhongzhi has not challenged the materiality to Link Motion's balance sheet of the Tongfang Note and the company's ownership of NQ International.  Moreover, Mr. Mathison based his understanding on Link Motion's year-end 2017 or first quarter 2018 filings, Tr. 3/45:15-18, but on 15 May 2018 Link Motion had publicly disavowed the reliability of such financial reports.  C-020 (Link Motion press release).  Link Motion's press release identified the improper accounting classification of term deposits totaling RMB 512 million as one of the factors that led it to report that its previously-issued financial statements for periods starting with 2016 "should no longer be relied upon."

43

testified that the collateral was Link Motion's "most valuable assets" and that "[t]hey are comparatively valuable."  Tr. 2/84:6-8.

150.   The Tribunal has found, as discussed in Section II.1.b of this award, that Zhongzhi did not furnish Link Motion any consideration in exchange for the Two Pledge Agreements. It did not extend the maturity date, lower the interest rate (as might be expected when an unsecured loan is transformed into a secured loan), or commit to take either of those steps in the future.

151.   Moreover, the evidentiary record shows that Link Motion's outside securities counsel, as well as its General Counsel, had concluded that offering security to Zhongzhi in such assets without consideration was improper and any director who approved that transaction would breach his or her fiduciary duties to the company.  Mathison 1st Stmt. ¶ 14; 2d Stmt. ¶¶ 15-18.

152.   Dr. Shi plainly disregarded counsel's advice in negotiating and approving the two agreements.  All of these facts establish that he breached his fiduciary duty to Link Motion in negotiating the two pledge agreements with Zhongzhi.  The fact that Link Motion's Chief Executive Officer, President and General Counsel and Chief Financial Officer resigned their positions in connection with the issuance of the Two Pledge Agreements reinforces this conclusion.

153.   Dr. Shi compounded this manifest breach of his fiduciary duty by participating in an approval process by the Board of Directors that was deeply flawed.  As discussed above in Section II.D. of this award, the directors were provided less than two hours' notice of the Board meeting at which the pledge agreements were considered.  Although the WeChat message the corporate secretary utilized to notify directors of the imminent meeting identified "additional securities" as a topic to be addressed at the meeting, it was not informative that the Board would be considering pledging substantially all of the company's assets to Zhongzhi to secure payment of the Note on which the company was seemingly poised to default only three weeks in the future.

154.  Respondent also makes much of the fact that the text of the pledge agreements themselves was not provided to the directors in advance of or during the meeting. Resp. Post-Hearing Br. 82.  That oversight is by itself not dispositive, as well-managed boards can approve complex transactions without necessarily reviewing the legal documentation at a board meeting, but sound corporate governance and the exercise of fiduciary duties requires that the directors understand the terms of the transaction they are approving. Troubling here is that the minutes do not reflect any discussion whatever of the decision to offer security to Zhongzhi, much less the choice to do so without obtaining anything in return or the consequences for Link Motion three weeks later when it defaulted on the Note and the two pledge agreements became enforceable by Zhongzhi.  C-023 (minutes of Board meeting of 11 September 2018).

155.  This failure is exacerbated by the limited discussion the minutes reflect took place, to wit, that the "Directors reviewed and discussed the Memo of the Company to Zhongzhi in the form attached hereto as Exhibit A."  The record shows the attached document was the Cooperation Memorandum, not either of the Two Pledge Agreements.  Since the Cooperation Memorandum recited, falsely, that Link Motion "has obtained fair, sufficient and reasonable consideration from" Zhongzhi in exchange for the pledges of the Tongfang Note and all of Link Motion's shares in NQ International, nothing in the record shows that the two new directors – who had joined the Board the day before – were aware that the transaction they were being asked to approve in fact lacked any consideration.  The resolution of approval was itself imprecise, as it in a portion of a single sentence approved both the Cooperation Memorandum in the form attached "and the additional securities described therein…."  *Id.*

156.  The record also does not show that the two new directors were made aware that the company's General Counsel, Chief Financial Officer, and outside securities counsel each opposed the Two Pledge Agreements and believed that approval violated the directors' fiduciary duties.

157.  This evidentiary record demonstrates that Dr. Shi breached his fiduciary duty of care in approving the pledge agreements.  Further, in addition to breaching that duty, Dr. Shi also

breached his fiduciary duty of loyalty to Link Motion because, as discussed above in Section II.A. of this Award, he had a direct, personal financial interest in the repayment of the Note in view of the obligation he had undertaken in the Shi Cooperation Agreement to pay any interest that Link Motion failed to pay.  R-003 (Shi Cooperation Agreement, § 1.1). The pledge agreements Dr. Shi negotiated and shepherded through the Board approval process were self-evidently intended to help ensure such repayment, in which case Dr.  Shi's personal financial exposure would be reduced.

158.   Zhongzhi argues that Dr. Shi's duty of loyalty is not implicated by these circumstances because a provision of Link Motion's amended and restated Memorandum of Association expressly authorizes a director with a direct or indirect interest in a proposed contract with the company to vote in respect of it "notwithstanding that he may be interested therein" so long as the director has "declare[d] the nature of his interest at a meeting of the Directors."  C-032 (Memorandum of Association, § 103). This provision may well immunize Dr. Shi's action in voting at the 11 September Board meeting from challenge as a breach of the duty of loyalty, because the minutes state that "each of the relevant Directors have duly and properly disclosed the nature of their respective interests, if any, relating to the matters to be discussed at the Meeting…."  C-023 (minutes of 11 September 2018 Board meeting).  But Dr. Shi's misconduct extends far beyond simply voting in favor of the Two Pledge Agreements at the Board meeting.  The record shows that he was the principal negotiator of the agreements on behalf of Link Motion, and, as Chairman of the Board, it can reasonably be inferred that he was responsible for the deeply flawed manner in which that meeting was conducted.  As a result, we conclude that Dr. Shi breached his fiduciary duty of loyalty as well as his fiduciary duty of care.

159.   We therefore need not determine Respondent's contention that the declaration of interest reflected in the Board minutes is meaningless boilerplate that is inadequate to authorize Dr. Shi's vote.  Resp. Post-Hearing Br. ¶¶ 79-81.  The evidentiary record is inadequate to allow us to make that determination, as, for example, no minutes of other Link Motion Board meetings are in the record that might enable that assessment.  We note that Ms. Zhu's conflict of interest as Zhongzhi's representative on the Board was necessarily sufficiently disclosed that Section 103 of the Memorandum of Association authorized her

46

to vote on the pledge agreements notwithstanding her conflict of interest. That conclusion does not affect our analysis of Dr. Shi's breaches of duty nor, as discussed in the next section, of Zhongzhi's substantial assistance for those breaches.

### b. Zhongzhi's Substantial Assistance

160. There is little question that Zhongzhi's actions constituted substantial assistance for Dr. Shi's breaches of duty. Although Zhongzhi's request that Link Motion provide security to help ensure repayment of the outstanding Note was an entirely appropriate action, its other actions constituted affirmative acts that induced Dr. Shi's breaches of duty:

   a. First, Zhongzhi arranged for the security to be provided in substantially all of Link Motion's assets – it is undisputed that Zhongzhi, not Link Motion, identified the collateral to be pledged as security, Wu Stmt. ¶ 25 -- without extending any consideration to Link Motion in return.

   b. Next, it caused its counsel to draft the pledge agreements, reflecting the absence of any consideration, and presented them to Link Motion for action.

   c. Third, Zhongzhi caused its in-house legal team to draft the Cooperation Memorandum, and included within it the false statement that Link Motion "has obtained fair, sufficient and reasonable consideration from" Zhongzhi in exchange for the pledges.

   d. Fourth, Zhongzhi's chair, Ms. Zhu, provided one of the critical votes at the Board meeting that was necessary to secure the approval of the pledge agreements, as without her participation the meeting would have lacked a quorum.

161. By these actions Zhongzhi "affirmatively assist[ed]" Dr. Shi to breach his duties and "enabl[ed] the breach to occur."

162. Claimant's arguments to the contrary are not persuasive. It contends as a general matter that it merely pursued its own business interests and that conduct in the normal course of business cannot constitute substantial assistance of another's breach of duty. Clmt. Post-

47

Hearing Br. ¶ 98 and n.139.  Yet the cases Claimant relies upon, *Kaufman v. Cohen,* CL-025, 307 A.D. 2d 113 (N.Y 1ˢᵗ Dep't 2003), and *Ferring B.V. v. Allergan, Inc.,* CL-024, 12 Civ 2650 (S.D.N.Y. 2014), can be readily distinguished, as both fall squarely within the unexceptional legal principle that "when the 'sum total of Plaintiffs's allegations concerning the … Defendants' substantial assistance' are 'not…unusual activit[ies] for those in the [Defendants'] business,' such allegations can 'hardly constitute[] assisting in a breach of fiduciary duty.'"  *Ferring* at *24. In those cases the aiding and abetting claims were unsuccessful where a defendant real estate developer was alleged merely to have helped the fiduciary acquire an interest in a building and a defendant pharmaceutical company was alleged merely to have assisted a fiduciary in developing a pharmaceutical.

163.    Zhongzhi tries to bring its conduct within the principle applied in *Kaufman* and *Ferring* by characterizing its activities as simply those "commonplace for...any party in the business of extending loans…[to] conduct due diligence, identify key assets, and draft and negotiate agreements to obtain a security interest."  Clmt. Post-Hearing Br. ¶ 98.  But that is not "the sum total" of Claimant's conduct.  Instead, its actions went beyond those benign steps by extracting a highly material security interest without any consideration, and then presenting a non-binding document for consideration by the borrower's board that falsely recited that Zhongzhi had provided "fair, sufficient and reasonable consideration" to Link Motion in exchange for the new pledge agreements.   None of the parties whose conduct was exonerated in the cases Zhongzhi cites participated in conduct comparable to that shown by the record here.

164.    Zhongzhi also seeks to excuse the false statement in the Cooperation Memorandum it drafted on the ground that it is "common legalese" and not a representation of a fact.  *Id.* But that argument is also unpersuasive, because the reason for such "legalese" is precisely to create a record that consideration has been provided to support the enforceability of the contract in which that phrase appears.  Claimant's argument about the lack of significance of this provision is also belied by the fact that its in-house legal team chose to highlight the provision by printing it in bolded text.

165.    Zhongzhi's conduct is far more analogous to the circumstances at issue in *Barnet v. Drawbridge Special Opportunities Fund LP,* RL-003, 2014 WL 4393320 (S.D.N.Y. 2014) than it is to the circumstances in *Kaufman* or *Ferring.*  In *Barnet,* the liquidators of the Octaviar Group, a group of affiliated companies in the financial service and travel businesses in Australia, asserted a claim against the Fortress Investment Group, one of the world's leading investment management and hedge fund firms, for aiding and abetting a breach of fiduciary duty by two of Octaviar's directors in circumstances remarkably similar to those at issue here.  A Fortress affiliate had lent US$250 million to one of the Octaviar companies.   Shortly before the loan was due, Fortress learned that Octaviar's liquidity had deteriorated, jeopardizing the timely repayment of the Fortress loan.  Thereafter Fortress extended the maturity date twice, obtaining partial repayment as well as access to additional financial information in return. When Octaviar thereafter announced it was spinning off its travel business and would obtain $400 million from that transaction, Fortress arranged to enter into additional arrangements with Octaviar that led Octaviar to repay the $210 million outstanding balance of its loan out of the spin-off proceeds.  One of the transactional documents Fortress presented to Octaviar contained factual misstatements, and Fortress did not offer any consideration to Octaviar for its diversion of the spin-off proceeds to Fortress.  *Barnet* at *5.

166.    When the Australian liquidators sued Fortress in a federal court in New York for aiding and abetting the breach of the Octaviar directors' fiduciary duties, Fortress moved to dismiss on the same ground Zhongzhi asserts here: it claimed its actions "simply facilitated the repayment of a valid debt…, and that as a matter of law such actions do not establish the knowing inducement element" of an aiding and abetting claim, citing the *In re Sharp Int'l* case.  The court agreed with the legal principle that "a mere demand for the repayment of a bona fide debt does not constitute a corrupt inducement to establish aiding and abetting liability." *Id.* *18.  But the court found that, as is the case here, "these defendants are alleged to have done far more than make a mere demand for the repayment of an outstanding debt" because they engaged in a transaction, involving a legal document that contained a factual misstatement, by which Octaviar discharged its right to the spin-off proceeds "for nominal or no consideration."  *Id.* *19.  So too here.

167. Next, an important requirement of the "substantial assistance" element of the aiding and abetting counterclaim is proof that Zhongzhi was aware of Dr. Shi's breaches of fiduciary duties. The record shows that this element is easily satisfied.

168. Zhongzhi, having negotiated the Two Pledge Agreements, was necessarily aware that it was not providing any consideration for them. Having drafted the Cooperation Memorandum, and chosen to put the false statement about the existence of fair and adequate consideration in bold type in that document, it was necessarily aware of that document and its misstatement. Because its chair, Ms. Zhu, was a member of Link Motion's Board and attended the Board meeting on 11 September, she was necessarily aware of the numerous deficiencies in the process by which the Board approved the pledge agreements.

169. Nor can Zhongzhi plead that it was unaware that Dr. Shi's approval for the no-consideration pledge agreements violated his duties. The record shows that Zhongzhi's outside counsel, Dorsey & Whitney, which drafted the pledge agreements, had communicated with Link Motion's outside counsel, DLA Piper, and concurred in the view that "Link Motion would need to receive consideration in exchange for such a pledge." Mathison 2d Stmt. ¶ 16.[12]

170. Finally, Mr. Mathison testified at the hearing that he personally told Zhongzhi's Ms. Zhu and Mr. Wu that the pledge agreements should not be approved by any director because they lacked consideration, and "made it very clear" that DLA Piper had advised that the directors "could not do that." Tr. 3/49:14-50:9.

---

[12] Mr. Mathison's testimony about DLA Piper's conversation with Dorsey & Whitney is hearsay, as he testified that he learned about it in a call with DLA Piper and Mr. Chen following a call in which Dorsey & Whitney had participated. Tr. 3/15:20-16:19. We credit this testimony because Claimant had ample opportunity to adduce evidence to rebut it – Mr. Mathison's witness statement was submitted nearly two months before the evidentiary hearing began – but Claimant did not call any witness to testify on this subject. Notable in this context is the absence of testimony from Joanne Zhu, Claimant's chair, who "conducted most of the negotiations [concerning the pledge agreements] with Link Motion," Wu Stmt. ¶ 26, and attended the 11 September 2018 Board meeting. Nor can the absence of rebuttal proof be attributed to a reluctance on Zhongzhi's part to reveal privileged advice from Dorsey & Whitney, as the testimony of its witness Xichun Vincent Wu reports instances of that law firm's and perhaps another's advice to Zhongzhi. Wu Stmt. ¶¶ 25 (Dorsey), 34 (Dorsey), 44 (outside legal counsel).

171.   For all these reasons we find that the evidentiary record compels the conclusion that
Zhongzhi knowingly lent substantial assistance to Dr. Shi's breaches of fiduciary duties.

c.  <u>Damages</u>

172.   In contrast to Respondent's clear proof of the first two elements of its aiding and abetting
counterclaim, it has offered little evidence that Dr. Shi's breach of duties damaged the
company, and no proof at all of how any such damage could be quantified.  Instead, it
asserts that its damages can be measured as the face amount of the Tongfang Note.  Resp.
Stmt. of Def. & Ctrclm., Relief ¶¶ a. and b.

173.   We reject Link Motion's attempt to obtain damages in the face amount of the Tongfang
Note for multiple reasons.   First, the Two Pledge Agreements grant security interests and
do not transfer ownership of the Tongfang Note (or the ownership of NQ International,
the holder of the Tongfang Note) to Zhongzhi.  Here, the face amount of the collateral
greatly exceeds the indebtedness it secures – the Tongfang Note's face amount is RMB
1.77 billion, or about $270 million, while the Note it secures requires payment of $132
million plus interest.  A security interest *a fortiori* cannot be valued at the face amount of
the collateral when that amount is nearly double the amount of the debt for which it
serves as security; the Two Pledge Agreements clearly provide that any amount that
Zhongzhi receives from foreclosure of the collateral in excess of the amount due under
the Note and its expenses must be paid to Link Motion.  Resp. Post-Hearing Br. ¶ 24.

174.   Second, the record shows that the Tongfang Note could not be valued fairly at its face
amount even in the hand of its holder.  As discussed above, it has been in default since its
maturity date of 14 December 2018.  Both Zhongzhi and the Receiver have attempted to
obtain payment from Tongfang under the note without success; the Parties agree that
formal legal proceedings will be required to enforce any payment.  Zhongzhi contends,
with good reason, that "[a] contested claim is rarely appraised at its face value" in view
of the expense, uncertainty and delay attendant upon the litigation process.  Clmt. Post-
Hearing Br. ¶150 n. 193.

175.    Third, the record is wholly silent on Tongfang's financial condition.  Link Motion has offered no evidence, through an expert witness or otherwise, concerning Tongfang's ability to pay its debts, or what price a disinterested willing buyer would be willing to pay to purchase the Tongfang Note.  Similarly, Link Motion has not offered any evidence of the value of its shares in its subsidiary NQ International; instead, it simply argues that "Given that the Tongfang Note was by far the most valuable asset held by Link Motion and its subsidiaries, the value of Link Motion's equity in NQ International is reasonably equivalent to the value of the Tongfang Note."  Resp. Post-Hearing Br. ¶ 42 n.107.

176.    Finally, Link Motion has not even attempted to show that the encumbrances on its assets created by the Two Pledge Agreements caused it any specific harm.  It has not pointed to any opportunities to sell or otherwise monetize the Tongfang Note that it was compelled to forego because of the Tongfang Note Pledge, or to any financing or other transaction that it was unable to undertake because the equity in its subsidiary was the subject of Zhongzhi's security interest.  The chronology of events suggests that the pledge agreements may not have imposed any specific financial damage on Link Motion as it went into receivership on 1 February 2019, about 20 weeks after it granted the security interests to Zhongzhi.  Clmt. Post-Hearing Br. ¶ 185.  The record is silent about any business transactions that Link Motion sought to undertake in that relatively brief time period.

177.    The closest Link Motion's proof comes to suggesting that it suffered a specific harm from the Tongfang Note Pledge is that the Receiver's effort to collect on the Tongfang Note from Tongfang was undermined by the existence of Zhongzhi's security interest, of which it was unaware in April 2019 when it sent its demand for payment to Tongfang.  Resp. Post-Hearing Br. ¶ 107 n.124.  That appears plausible, but Link Motion did not offer any witness or other testimony to provide a basis on which the Tribunal could quantify the monetary damages caused by the challenge posed by the Tongfang Note Pledge to the Receiver's effort to obtain repayment of that note from Tongfang.

178.    Respondent's only response to these deficiencies in its proof of its damages is that the burden is on Zhongzhi to establish that the Tongfang Note is worth less than its face

amount.  Resp. Rejoinder ¶ 83 n.72 ("Given that Link Motion has come forward with
evidence that Zhongzhi fraudulently transferred a note with a face value of RMB 1.77
billion, it is Zhongzhi's burden to come forward with evidence that the note's value is
less than the face amount").  Respondent relies on the proposition that "under New York
law, the value of a debt instrument that is wrongfully taken is presumed to be its face
value, plus applicable interest."  Resp. Post-Hearing Br. ¶¶ 100, 101.  Based on that
presumption, Respondent argues that "under New York law, it is not Link Motion's
burden to show that the value of the Tongfang Note is different than its face value.
Rather, once Link Motion submitted evidence of the face value of the Tongfang Note, the
burden fell on Zhongzhi to rebut this showing, and this burden has not been met." *Id.* ¶
107.

179.    Link Motion's invocation of this presumption under New York law is misplaced for at
least two reasons.  First, the evidentiary record here is sufficient to rebut any such
presumption: the fact that the Tongfang Note was more than eight months' past due at the
time of the evidentiary hearing is enough proof that the note is not currently worth its
face amount.  At least as important, however, is that the presumption of New York law
on which Link Motion relies is not applicable here.  Although Link Motion is correct that
New York law provides that, in some circumstances, a promissory note will be presumed
to be worth its face amount, that rule applies only where a negotiable note "has been
wrongfully taken or withheld from the maker;" the presumption then sets out the note
maker's "measure of damages for the conversion," RL-083, American Law Reports,
Measure of damages for conversion or loss of commercial paper, 85 A.L.R.2d 1349.  The
presumption is intended to protect the maker of a note that was stolen from potential
liability to a *bona fide* purchaser, particularly where the note had been cancelled or its
issuance had been fraudulently induced.  None of the cases Link Motion cites applies the
presumption to benefit the holder of a note, such as Link Motion.  *See, e.g.* RL-079,
*Republic of Bolivia v. International Promotions and Ventures, Ltd.,* 618 F. Supp. 202
(S.D.N.Y. 1985); RL-081, *Thayer v. Manley,* 73 N.Y. 305 (1878); Resp. Post-Hearing Br.
¶¶ 100, n. 112, n.113, 101 n.114.

180. Significantly, the cases Respondent cites also provide that even a thief need not pay any damages to the issuer, measured at the face amount or otherwise, if the wrongdoer simply returns the note, eliminating the issuer's exposure to third parties. *Id.* As a result, even if this presumption were applicable here, Zhongzhi could escape an award of damages in the face amount of the note by agreeing to cancel the pledge.

181. Accordingly, New York law does not shift the burden in this case to Zhongzhi to disprove that the Tongfang Note is worth its face amount. Since that purported burden-shifting is the only basis on which Respondent makes its claim for monetary damages in the face amount of the Tongfang Note -- and, as noted, the record does not otherwise support the quantification of monetary damages -- we cannot award such damages on the aiding and abetting counterclaim.

182. Following the Tribunal's review of the Parties' post-hearing briefs, the Tribunal requested supplemental briefing on whether the Respondent has satisfied the third required element of its aiding and abetting claim – that it has suffered damages as a result of the breach – in the event the Tribunal determines that it is unable to quantify any monetary damages attributable to the pledge agreements and that those agreements may not be valued by reference to the face amount of the Tongfang Note. Tribunal's Request for Supplemental Briefing, 2 November 2020. In response, Link Motion argued that it was entitled to the application of New York's "wrongdoer rule," under which "'when the existence of damage is certain, and the only uncertainty is as to its amount,…the burden of uncertainty as to the amount of damage is upon the wrongdoer.'" Respondent's Supplemental Post-Hearing Submission, 9 November 2020, ¶¶ 4-5 (citing CL-039, *Schonfeld v. Hilliard,* 218 F.3d 164, 174 (2d Cir. 2000)).

183. In reliance on this rule, Link Motion also contended that since the record shows that "the Tongfang Note has *substantial* value, even if its value cannot be quantified with precision based on the current record…a reasonable inference is that the Tongfang note is worth at least as much as the approximately US$137 million unpaid balance of the Revised Convertible Note." *Id.* ¶ 8 (original emphasis). In short, on the strength of the "wrongdoer rule" Link Motion seeks a damages award of US$137 million, a substantial

54

reduction of its prior claim of entitlement to the US$270 million face amount of the Tongfang Note.

184.   We find that the wrongdoer rule has no application here.  That rule is applied when a plaintiff is able to show some measurable actual monetary damage but the amount is subject to uncertainty.  In such circumstances, the amount shown by the plaintiff will be embraced unless the wrongdoing defendant shows that it is materially incorrect.  The wrongdoer rule does not allow a plaintiff simply to assert a quantum of damages and shift the burden to the defendant to prove the actual damages are less. *See* RL-093, *Federal Insurance Co. v. Mertz,* 2016 WL 164618 *4 (S.D.N.Y. 2016).  Instead, as that case, cited by Respondent, explains, Link Motion was obligated to submit evidence supporting "a fair and reasonable approximation" of its actual damages.  *Id.*  ("'while the damages may not be determined by mere speculation or guess, it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.  The wrongdoer is not entitled to complain that they cannot be measured with exactness and precision….'" (internal citation omitted)).  Link Motion did not put forward *any* evidence from which a fair and reasonable approximation of its damages could be made.[13]

185.   Nonetheless, our conclusion that the record does not allow us to quantify any monetary damages caused by Zhongzhi's aiding and abetting of Dr. Shi's fiduciary duty breaches does not mean that Link Motion did not suffer any harm as a result of Zhongzhi's misconduct.  To the contrary, the record is sufficient to show that Link Motion was injured in some way.  We agree with Link Motion that the pledge agreements "immediately eroded the value of Link Motion's assets even though there was no transfer

---

[13] Link Motion has made a belated request that "both Claimant and Respondent be given the opportunity to present additional evidence solely on the issue of damages, and that the Tribunal conduct an additional one day evidentiary hearing solely on the issue of damages."  Respondent's Supplemental Post-Hearing Submission ¶ 15 n.23.  Respondent had ample time to submit such proof, if it had any, in its various pleadings and at the evidentiary hearing.  This request to conduct another hearing, spurred by the Tribunal's request for supplemental briefing on the consequences of the inadequate proof of damages, is untimely and as such is not granted by the Tribunal.

of title," as it is "beyond dispute that assets which are 'free and clear' are worth more than assets that have been pledged to a third party." Resp. Rejoinder ¶¶ 42, 74, 105.

186.    In addition, common sense suggests that in the absence of the Tongfang Note Pledge, the Receiver could have taken more active steps to attempt to recover on the past-due note from Tongfang, as Respondent indicates.  Resp. Post-Hearing Br. ¶ 107 n.124.  The undisputed fact that Zhongzhi communicated directly with Tongfang, Link Motion's debtor, imposed some harm on Link Motion's interests in securing repayment of the Tongfang Note.

187.    Finally, the record shows that the circumstances surrounding the Two Pledge Agreements created great disruption and turmoil within Link Motion's management in September 2018, and culminated in the resignations of Messrs. Xu, Chen and Wu, Link Motion's Chief Executive Officer, President and General Counsel and Chief Financial Officer, respectively.  That significant disruption in Link Motion's management was caused by the breach of duties that culminated, with Zhongzhi's substantial assistance, in the Two Pledge Agreements.

188.    We therefore conclude that the third required element of the aiding and abetting counterclaim, that the misconduct caused damage, is satisfied despite the absence of any quantifiable monetary damages.[14]

---

[14] It is worth noting that a case Respondent identified for the first time in its supplemental post-hearing submission on damages, *Federal Insurance Co. v. Mertz,* observes that a *prima facie* case of breach of fiduciary duty does not require that a plaintiff show any damages, that is, "damages are not an essential element" of such a claim, where "the fiduciary relationship is one created as a matter of law and therefore involves a higher degree of accountability, such as lawyer-client, trustee-trust/beneficiary, shareholder-officer/director, employer-employee, etc." 2016 WL 164618 *3 (citations omitted).  This principle appears applicable here, as Dr. Shi's fiduciary duty arose from his status as a director and officer of Link Motion. The Tribunal acknowledges that the principle stated in *Federal Insurance* may not apply to a claim for aiding and abetting a breach of fiduciary duty.  In any event, the Tribunal does not rely upon this principle of New York law in this award because the Respondent has not made this argument and Claimant therefore has had no opportunity to address it.

d. <u>Remedy</u>

189.   The remaining question in respect of Link Motion's aiding and abetting counterclaim is the appropriate remedy to be awarded in light of the Tribunal's inability -- on the basis of the record placed before it in these proceedings -- to award monetary damages.  The Tribunal included this as one of the questions to be addressed by the Parties in their post-hearing briefs.[15]  In response to this topic, the Parties concurred that the Tribunal has broad discretion to craft an appropriate remedy whether or not specifically requested by a Party.  Clmt. Pre-Hearing Br. ¶¶ 211-216; Resp. Post-Hearing Br. ¶¶ 108, 112. Moreover, both Parties expressly included in their pleadings the usual request for whatever relief the Tribunal determines is appropriate.  Clmt. Stmt. of Claim ¶ 33(d) ("Such further, other and consequential relief as may be just and expedient"); Resp. Stmt. of Def. & Ctrclm., Relief item (e) ("Such other relief that the Tribunal deems just under the circumstances").   As Claimant notes, the Tribunal's discretionary authority is confirmed by Section 70 of the HKAO, which authorizes arbitral tribunals to award any remedy that could have been ordered by a court, and by provisions of the Hong Kong High Court Ordinance that have been interpreted by the Hong Kong courts to confer discretion "to determine the appropriate remedy based on the parties' pleaded factual cases (without being limited by the express requests for relief), as long as the parties were permitted to address the court on remedies."  Clmt. Post-Hearing Br. ¶ 212-215.

190.   The Parties' responses addressed possible remedies of rescission, injunction and declaratory relief.  Respondent opposed an award of rescission of the Two Pledge Agreements on the multiple grounds that no party has requested it, NQ International is not a party to the arbitration proceeding, and it is simply too late for rescission to be achieved.  1/66:1-67:13 (Mr. Kushner) ("why not seek rescission?  And the answer is, it's too late….The train has left the station….no party has requested that relief….a party to the senior note pledge agreement is not a party to this arbitration.  That's NQ

---

[15] The Tribunal's "Topics to be Addressed by Parties in Post-Hearing Brief," 6 August 2020, included the question: "In the event the Tribunal finds one or both counterclaim(s) has been proven, is there any remedy, apart from the requested award of damages in the face amount of the Tongfang Note, that is available to Respondent in respect of its counterclaims….?"

International"); Resp. Post-Hearing Br. ¶¶ 44-45, 109. Respondent also opposed an injunctive remedy on the ground that it would be difficult to enforce against Zhongzhi. Tr. 1/77:21-25.

191.     Link Motion has suggested that an appropriate remedy in these circumstances could be an order compelling Zhongzhi to issue a public letter to Tongfang disavowing all interests in the Tongfang Note, supported by an award of damages if Zhongzhi does not issue the letter by the award's deadline. Resp. Post-Hearing Br. ¶ 111 and Ex. A. The Tribunal declines to entertain that suggestion because Link Motion raised it for the first time in its post-hearing submission and consequently Claimant has not had the opportunity to address it. Moreover, the Tribunal finds the suggested remedy of a publicly-filed letter cumbersome; even if the concept were workable, the precise wording of any such letter ordered by the Tribunal could simply serve to generate additional disputes and proceedings, which is clearly an unattractive proposition. As one example, the proposed letter Respondent appended to its brief called upon Zhongzhi, potentially controversially, to submit to the jurisdiction of the state or federal courts in New York to resolve any disputes arising out of the letter.

192.     Claimant observed in its post-hearing submission that declaratory relief could achieve the same outcome as rescission in restoring Link Motion to the *status quo ante.* Clmt. Post-Hearing Br. ¶ 192.b., 199 (if Tribunal finds liability [on fraudulent conveyance counterclaim] but declines to rescind the pledge agreements, "the Tribunal could still make a declaratory order regarding the invalidity of…the Pledge Agreements, which would have the same substantive effect as rescission as it would ensure that Claimant cannot subsequently enforce the Pledge Agreement").

193.     We agree with Zhongzhi that under the circumstances the most appropriate remedy to be entered on Link Motion's aiding and abetting counterclaim is a declaration that the Two Pledge Agreements are, and always have been, invalid and unenforceable. We therefore make that declaration in this award.

## C.  Allocation of Costs

194.   Both Parties seek shifting of all of their legal fees, expenses and costs, as is authorized by Article 34.3 of the HKIAC Rules.  That Article empowers the Tribunal to "apportion all or part of the costs of the arbitration…between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case."

195.   Our Jurisdiction Decision allocated to Claimant the fees and expenses Respondent incurred in connection with Claimant's motion to dismiss the counterclaims for lack of arbitral jurisdiction.  Respondent has shown that amount is $191,784.93.  Resp. Post-Hearing Br. ¶ 132.  We now assess that amount against Claimant.

196.   Save for the determination noted immediately above relating to the costs incurred in connection with Claimant's motion to dismiss the counterclaims for lack of arbitral jurisdiction, we decline to allocate any Party's attorneys' fees and expenses to the other. Claimant prevailed on its claim to enforce the Note and also defeated Respondent's fraudulent conveyance counterclaim, but Respondent prevailed on its counterclaim for aiding and abetting breach of fiduciary duty. Although Respondent did not succeed in obtaining any monetary damages in this regard, the Tribunal has declared that, as a consequence of Claimant's conduct, the Two Pledge Agreements are, and always have been, invalid and unenforceable.  We note that the vast majority of the proceedings in this arbitration focused on the counterclaims, as Respondent did not contest the enforceability of the Note or assert any defense to its liability apart from the set off it sought to create on the basis of its counterclaims.  The fees and expenses the Parties incurred were therefore largely attributable to the counterclaims.  Although Claimant has succeeded in obtaining a substantial monetary award, shifting fees in its favor would effectively award it the fees that it incurred in defending against a counterclaim on which Respondent prevailed.  Conversely, although Respondent succeeded in obtaining a declaration that the Two Pledge Agreements were obtained wrongfully and are invalid, Respondent did not achieve a damages award to support a set off, which was its key objective.  For these reasons, the specific circumstances of this case lead us to exercise our discretion to

decline to shift fees in favor of either party and to leave the Parties to bear their own attorneys' fees and expenses except to the limited extent noted above.

197.    This determination is reinforced by the fact that neither Party unduly delayed or complicated these proceedings (apart from Claimant's dismissal motion on jurisdictional grounds, as to which we have allocated fees in favor of Respondent).  Indeed, the Parties are to be commended for the professionalism, skill and courtesy they displayed throughout this proceeding, and for conducting an evidentiary hearing in challenging circumstances in a highly efficient manner.

198.    For the same reasons it is appropriate that the Parties share equally the administrative costs of this proceeding, including the administrative fees of the HKIAC and the fees and expenses of this Tribunal.  Because to date Claimant has paid a disproportionate amount of the deposits for such costs, Respondent shall reimburse Claimant for the amount of such costs it has advanced in excess of its half share, which is $106,715.97 (based on the HKIAC's statement of account issued 10 November 2020 and applying an exchange rate of 1 HKD equaling 0.13 U.S. dollar).  To the extent the deposits paid by the Parties exceed the final costs, the HKIAC will refund the excess equally to both Parties.

## V.    Award

199.    For the foregoing reasons, the Tribunal makes the following Final Award.  All amounts are denominated in United States dollars:

    a.    Claimant's claim for breach by Respondent of the Revised Convertible Note (as defined in this Award) is granted.

    b.    Respondent shall pay to Claimant the amount due pursuant to the Revised Convertible Note (as defined in this Award), that is, US$137,280,000, plus simple pre-award interest calculated at the rate of 8% per annum from the maturity date of 3 October 2018 to the date of this Award, as provided in Paragraph 199(f) below, within 30 days of the issuance of this Award or, if later, immediately upon Claimant's compliance with Paragraph 199(d)(iii) below.

    c.    Respondent's counterclaim for fraudulent conveyance is dismissed with prejudice.

    d.    Respondent's counterclaim for aiding and abetting breach of fiduciary duty is granted to the following extent:

        i.    The Tribunal determines and declares that the Tongfang Note Pledge and the Share Charge (as defined in this Award) are each invalid and unenforceable, and have so been from inception.

        ii.    The Tribunal further determines and declares that any sums obtained heretofore or hereafter by Zhongzhi from Tongfang as a result of the Tongfang Note Pledge is the property of Respondent and must be credited to Respondent.

        iii.    The Tribunal further determines and declares that Claimant is obligated to return the executed originals of the Tongfang Note Pledge and Share Charge to Respondent within 14 days of the issuance of this Award.

    e.    Each Party shall bear its own attorneys' fees and expenses except that Claimant shall pay Respondent US$191,784.93, the amount of Respondent's fees and

expenses incurred in connection with the Jurisdiction Decision (as defined in this Award). The Parties shall bear equally the administrative costs and expenses of this arbitration, including the fees and expenses of the Tribunal.  Accordingly, Link Motion shall reimburse Zhongzhi the amount of US$106,715.97, which is the amount Zhongzhi paid to the HKIAC in excess of its half-share.   Link Motion shall therefore be credited with the net amount of US$85,069 against the amount due to Zhongzhi in Paragraph 199(b) above.

f.  Pre-award interest on the Note at 8% simple interest per annum from the maturity of the Note on 3 October 2018 to the date of this Award on 16 February 2021 is US$26,117,049.  The amount due under this Award is therefore US$163,311,980, which is the amount due under the Note and the pre-award interest less the US$85,069 due to Respondent from Claimant.

g.  Post-award interest accrues daily at 8% per annum on the sum of US$137,194,931, which is the amount of US$137,280,000 due under the Note less the net amount due to Respondent of US$85,069, subject to Claimant's timely compliance with Paragraph 199(d)(iii) above.  The resulting amount of daily interest is US$30,070.12. Should Claimant fail to comply with Paragraph 199(d)(iii) above, the accrual of post-award interest is suspended as from the date of this Award until such time as Claimant so complies.

h.  For the avoidance of doubt, Respondent shall pay to Claimant, not later than 30 days after the issuance of this award (or, if later, immediately upon Claimant's compliance with Paragraph 199(d)(iii) above), the sum of US$163,311,980 plus US$30,070.12 daily from 16 February 2021 until this award has been fully paid.

200.  Any other claims, counterclaims or relief requested by any Party, except as adjudicated in Paragraph 199 of this Award, are denied.  This Award fully addresses and adjudicates all claims, counterclaims and issues submitted by the Parties in this arbitration.

Seat of Arbitration: Hong Kong
Date: 16 February 2021

| | | |
|---|---|---|
| **Gavin Denton** | **Simon Powell** | **Richard Ziegler** |
| Co-Arbitrator | Co-Arbitrator | Presiding Arbitrator |