UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LINK MOTION INC., a Cayman Islands limited company f/k/a NQ MOBILE INC.,<br><br>       Plaintiff,<br> -against-<br><br>DLA PIPER LLP (US), a Maryland limited liability partnership, CARYN G. SCHECHTMAN, a natural person, and MARC A. SILVERMAN, a natural person,<br><br>       Defendants, | Civil Action No.: _____<br><br>COMPLAINT |

Plaintiff Link Motion Inc. f/k/a NQ Mobile Inc. ("LKM" or the "Company"), by its undersigned attorneys, brings this complaint against Defendants DLA Piper LLP (US) ("DLA") and Caryn G. Schechtman ("Schechtman"), and Marc A. Silverman ("Silverman" and together with DLA, the "Defendants").

### I. NATURE OF THE ACTION

1. This is an action for legal malpractice arising from Defendants' failure to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession in representing the Company in connection with the purported shareholder derivative action entitled *Baliga v. Link Motion Inc., et al.*, Case No. 1:18-cv-11642 (the "Derivative Action"). Purported derivative plaintiff Wayne Baliga commenced the Derivative Action on December 14, 2018 and, the next day, moved by order to show cause for the entry of a preliminary injunction and appointment of a receiver to take control over the Company and its assets in the People's Republic of China (the "PRC").

2. At the time of Baliga's order to show cause, Defendants had been acting as corporate counsel for the Company and, therefore, knew or should have known (i) that, pursuant

to the internal affairs doctrine, the laws of the Cayman Islands governed the standing of Baliga to bring derivative claims on behalf of the Company, (ii) under applicable Cayman Islands law only registered shareholders of the Company had legal standing to bring derivative claims on behalf of the Company, and (iii) Baliga was not a registered shareholder and, therefore, had not legal standing to bring a derivative action.

3. Defendants failed to advise the Company of Baliga's lack of standing and, instead, breached their duty of care by consenting to entry of a temporary restraining order (the "TRO"), entry of a preliminary injunction, and appointment of a receiver. But-for Defendants' failure to provide the correct advice the Company would not have consented to, and the Court would not have entered, the TRO or preliminary injunction or appoint a receiver. Defendants' malpractice caused massive damage to the Company because once appointed the Receiver drained the Company's cash for the payment of his fees, terminated all of the Company's employees in the PRC and destroyed the Company's remaining value.

## II. JURISIDCTION AND VENUE

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of a State and citizens or subjects of a foreign state.

5. This Court has jurisdiction over each of the Defendants because each of them is either a legal or natural person conducting business and operating in this District, has, as set forth herein, engaged in tortious conduct that occurred in this District, or is otherwise an individual with sufficient minimum contacts with this District under federal and/or N.Y. CPLR § 302(1), (2), or (3).

6. Venue is proper in this district in accordance with 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

### III. PARTIES

7. Plaintiff is a limited company organized under the laws of the Cayman Islands. Plaintiff's principal office located in the PRC.

8. Upon information and belief, Defendant DLA is a limited liability partnership organized under the laws of the State of Maryland and authorized to conduct business in the State of New York. Upon information and belief, DLA maintains offices in New York at 1251 Avenue of the Americas, 27th Floor, New York, NY 10020.

9. Upon information and belief, Defendant Schechtman is a natural person residing in or otherwise maintaining a legal office in New York at 1251 Avenue of the Americas, 27th Floor, New York, NY 10020. Upon information and belief, Defendant Schechtman is an attorney authorized to practice law in the State of New York.

10. Upon information and belief, Defendant Silverman is a natural person residing in or otherwise maintaining a legal office in New York at 1251 Avenue of the Americas, 27th Floor, New York, NY 10020. Upon information and belief, Defendant Silverman is an attorney authorized to practice law in the State of New York.

### IV. FACTUAL BACKGROUND

**The Company**

11. The Company's predecessor business was founded in October 2005 as Beijing NetQin Technology Co. Ltd. ("Beijing Technology"), a company organized under the laws of the PRC and founded by Vincent Wenyong Shi ("Shi"), Henry Lin, and Mr. Zu Zhou.[1] At that time,

---
[1] https://www.sec.gov/Archives/edgar/data/1509986/000095012311025625/h04742fv1.htm (the "Form F-1"), p.4.

the Company was primarily engaged in research and development of products and services related to mobile security and productivity.

12. Eventually, the Beijing Technology revised its business plan to offer mobile security, mobile productivity, and personalized intelligent cloud services to a large and engaged user base. Beijing Technology generated revenues primarily through the sale of user subscriptions to premium mobile internet service subscribers primarily located in the PRC.[2]

13. In 2007, the business was reorganized into a "Variable Interest Entity" ("VIE") corporate structure. The purpose of the VIE structure was to create a holding company structure outside the PRC that would maintain a separate legal existence between Beijing Technology and other holding entities in order to comply with PRC law regarding foreign ownership of PRC technology companies, while at the same time using contractual agreements between the foreign-owned holding entities and Beijing Technology that would provide to the holding company control over, and the economic benefits of, the operations of Beijing Technology. This contractual arrangement permitted the results of Beijing Technology to be included in the holding company's consolidated financial statements.

14. In order to achieve the VIE reorganization, the Company was formed in the Cayman Islands and two subsidiaries, NetQin International Ltd. ("NetQin International") and NetQin Mobile (Beijing) Co., Ltd. ("NetQin Beijing"), were formed in the Special Administrative Region of Hong Kong and the PRC, respectively. The Company owned all of the shares of NetQin International, which owned all of the shares of NetQin Beijing. Although neither the Company, nor NetQin International nor Beijing Technology owned shares of Beijing Technology, NetQin

---

[2] Form F-1, at p.1-2.

Beijing entered into certain contractual "VIE" agreements with Beijing Technology that provided it with complete control over, and the economic benefits of, the operations of Beijing Technology.

15. By way of its 100% ownership of NetQin International and NetQin Beijing, the Company exercised the contractual rights of control provided in the VIE Agreements. By way of these agreements, the economic benefit of the operations of Beijing Technology flowed to the Company.

16. Beijing Technology had no right to terminate the VIE Agreements. Accordingly, the Company had a reasonable expectation that it would enjoy the contractual benefits of the VIE Agreements going forward.

### The Initial Public Offering

17. In and around 2011, the Company filed with the Securities and Exchange Commission (the "S.E.C.") a Form F-1 registration statement under the Securities Act of 1933 ("'33 Act") in connection with an initial public offering of American Depository Shares (each an "ADS" and together the "ADSs") representing shares of Class A common shares of the Company.[3] Each ADS was evidenced by an ADR. In connection with the offering, the Company applied to list its ADSs on the New York Stock Exchange under the symbol "NQ."

18. In the Form F-1, the Company disclosed that holders of ADSs are not shareholders of the Company:

> American Depositary Shares
>
> Deutsche Bank Trust Company Americas, as depositary, will register and deliver the ADSs. Each ADS will represent ownership of common shares deposited with the office in Hong Kong of Deutsche Bank AG, Hong Kong Branch, as custodian for the depositary. Each ADS will also represent ownership of any other securities, cash or other property which may be held by the depositary. The depositary's corporate trust office at which the ADSs will be administered is located at 60 Wall Street, New York, NY 10005,

---

[3] Form F-1.

> USA. The principal executive office of the depositary is located at 60 Wall Street, New York, NY 10005, USA.
>
> The Direct Registration System, or DRS, is a system administered by The Depository Trust Company, or DTC, pursuant to which the depositary may register the ownership of uncertificated ADSs, which ownership shall be evidenced by periodic statements issued by the depositary to the ADS holders entitled thereto.
>
> ***We will not treat ADS holders as our shareholders and accordingly, you, as an ADS holder, will not have shareholder rights***. Cayman Islands law governs shareholder rights. The depositary will be the holder of the common shares underlying your ADSs. As a holder of ADSs, you will have ADS holder rights. A deposit agreement among us, the depositary and you, as an ADS holder, and the beneficial owners of ADSs sets out ADS holder rights as well as the rights and obligations of the depositary. The laws of the State of New York govern the deposit agreement and the ADSs.[4]

(emphasis added).

19. On April 29, 2011, the NYSE certified approval for listing and registration under the Securities Act of 1933 (the "`33 Act") the ADSs of the Company.[5]

20. On May 4, 2011, the S.E.C. issued a notice of effectiveness for the Company's offering.

21. On May 5, 2011, the Company's ADSs were listed on the NYSE.

## The Founders Dispute

22. On October 28, 2014, the Company announced that the Board of Directors, after evaluating numerous strategic options, elected to reject a proposed privatization offer, in favor of remaining a public company.

---

[4] *Id.*, at p.136.
[5] https://www.sec.gov/Archives/edgar/vprr/1100/11006555.pdf

23. In connection with its evaluation of strategic options, the Board of Directors elected to pursue a strategy to divest its legacy business segment, such as FL Mobile and Showself, and transition to traffic-based advertising and smartcar model.[6]

24. Henry Lin opposed this change in the Company's business plan.

25. On December 10, 2014, the Company announced the resignation of Henry Lin from his positions as Co-CEO and Chairman of the Board of Directors. Henry Lin represented to the Company that he was stepping down because "he [was] unable to perform his duties in [those] capacity[ies] due to personal reasons unrelated to the Company." As a result of Henry Lin's resignation, the Company appointed Shi as Chairman of the Board of Directors.[7]

26. Despite the difficulties caused by Henry Lin's resignation, the new Board of Directors and management continued to implement its strategic plan to divest its legacy business segments and transition the company to the traffic-based advertising and smartcar model.

### The LKMForward Conspiracy

27. From late 2016 through the present, Henry Lin, Guo Lingyun, Li Tiewei and others, engaged in a bad faith campaign to falsely malign Shi and the Company's new business plan.

28. On or about Lin and LKM Forward made unfounded allegations against the Company's current management. In response to these allegations, the Company formed a special committee of independent directors to investigate. In November 2016, the special committee retained Loeb & Loeb LLP to investigate the allegations.[8]

29. On August 27, 2018, Loeb & Loeb LLP reported to the Board of Directors the results of its investigation. Loeb & Loeb LLP reported that there was no basis to conclude that

---

[6] https://www.sec.gov/Archives/edgar/data/1509986/000119312514447273/d840367dex991.htm
[7] https://www.sec.gov/Archives/edgar/data/1509986/000119312514438951/0001193125-14-438951-index.htm
[8] https://www.sec.gov/Archives/edgar/data/1509986/000114420418048725/tv502622_ex99-1.htm

Henry Lin's resignation was not authorized or ratified by him. Loeb & Loeb LLP also reported that the allegations regarding the FL Mobile transactions were not supported by any sufficient evidence.[9]

30.     In light of the special committee's conclusions that Henry Lin's allegations lacked merit, Henry Lin, Mathison, Khan, Guo Lingyun and Li Tiewei and certain other persons the identities of whom are not known at this time formed an unincorporated association "LKMForward" in or around October 2018.

31.     On or about October 10, 2018, LKMForward formed the website lkmforward.com. On the website, they described LKMForward as "a small group of LKM shareholders who could not stand idly by while the Company and investor capital was taken out from under us, and all other similarly situated investors, and removed to China. . . ."[10]  They described themselves as "shareholders and investors" and threatened to take legal action on behalf of and in the name of the Company. In fact, neither Mathison nor Henry Lin were registered shareholders of the Company with standing to act derivatively under Cayman law.

32.     On October 17, Mathison posted a copy of an "open letter" in which he openly advocated for the removal of the Board of Directors duly elected by the shareholders of the Company.[11] Much of the content of Mathison's letter alleges claims that are derivative in nature and, therefore, belong to the Company. Mathison is not, and  never has been, a registered shareholder of the Company with standing to bring derivative claims under Cayman law.

33.     In a post, dated October 17, 2018, the LKMForward conspirators stated "[t]he shareholders initiative at LKM forward has retained the Seiden Group as its legal counsel in this

---

[9] https://www.sec.gov/Archives/edgar/data/1509986/000114420418048725/tv502622_ex99-1.htm
[10] http://lkmforward.com/about-us/ (accessed March 1, 2020).
[11] http://lkmforward.com/matts-tweet/ (accessed March 1, 2020).

matter. The group has experience in both shareholder rights actions and expertise in resolving disputes and achieving recovery for investors in China."

### Retention of DLA

34. In and around July 2018, the Company engaged Defendant DLA. The scope of DLA's representation included "general corporate advice as well as in connection with an issuance of Class B Shares." As counsel for the Company "in connection with an issuance of Class B Shares," DLA knew or should have known the identities of each registered shareholder of the company.

### Wrongful Derivative Action by Baliga

35. In or around the October to December 2018 period, The Seiden Law Group, a New York Law firm, recruited Baliga to bring the Baliga Action against the Company.

36. In his Verified Shareholder Derivative Complaint, Baliga alleged that "Mr. Baliga is currently and has at all material times of this Action been a shareholder of LKM." (Dkt. No. 1, at ¶ 4). Mr. Baliga further alleged that "Mr. Baliga brings this action derivatively in the right and for the benefit of LKM to redress the wrongful and illegal conduct outlined herein by the Individual Defendants" and "Mr. Baliga will adequately represent the interests of LKM and its shareholders in enforcing and prosecuting its rights." (Dkt. No. 1, at ¶¶ 32, 33).

37. The foregoing allegations were false at the time Mr. Baliga made them because Mr. Baliga is not, and never has been, a registered shareholder of the Company with the legal authority to represent the interests of LKM and its shareholders.

## Baliga is not a Shareholder and Lacks Standing to Bring Derivative Claims

38. Pursuant to the internal affairs doctrine, the internal affairs of the Company, including the standing of any investor as a shareholder, are governed by the laws of the jurisdiction of incorporation, which in this case is the law of the Cayman Islands.

39. Under the laws of the Cayman Islands, only registered title owners of shares are recognized as shareholders of the Company who have standing to bring derivative claims on behalf of the Company. Under the laws of the Cayman Islands, beneficial owners do not have standing to bring derivative claims on behalf of the Company.

40. Mr. Baliga is merely an owner of ADRs of the Company. As such, he is only a beneficial owner of shares of stock in the Company.

41. As the holder of only ADRs, Baliga was not a registered shareholder of the Company under Cayman law. At the time he commenced the Baliga Action, Baliga did not have standing to assert any derivative claims on behalf of the Company under the laws of the Cayman Islands.

42. There is no exception under the rule of *Foss v. Harbottle* (1843) 67 ER 189 or Cayman Islands law that would have operated to give rise to any standing on behalf of Baliga to bring any derivative claim on behalf of the Company.

43. Based on Mr. Baliga's false allegations as to his standing to bring derivative claims, he applied to this Court for the appointment of a receiver and entry of a temporary restraining order, and preliminary injunction.[12]

---

[12] DLA Piper LLP (US), acting without direction or authority from the Board of Directors, improperly signed a stipulation falsely claiming that the Company did not oppose the entry of a preliminary injunction. (*See* ECF Dkt No. 23).

44. The Court entered a temporary restraining order on December 14, 2018 (the "TRO").

## Legal Malpractice by Defendants

45. On or about December 13, 2018, DLA received copies of the papers filed in the Baliga Action and correspondence from Baliga's counsel.

46. In an email to the Company dated December 14, 2018, Defendant Schechtman advised that DLA would send an associate to appear before the Court in connection with Baliga's application for a temporary restraining order (the "TRO"). Thus, DLA undertook to represent the Company in this matter. In doing so, DLA undertook the duty to represent the Company competently.

47. As a result of its representation of the Company, DLA knew or should have known at the time of the December 14, 2018 email that Baliga was not a registered shareholder and, therefore, lacked standing to bring any derivative claims or seek entry of the TRO. In the email, Defendants failed to advise the Company that Baliga was not a registered shareholder and, therefore, lacked standing to bring any derivative claims or seek entry of the TRO.

48. Upon information and belief, DLA failed to argue to the Court that Baliga was not a registered shareholder and, therefore, lacked standing to bring any derivative claims or seek entry of the TRO. The Court entered a TRO on December 14, 2018.

49. On December 19, 2018, Defendants wrote to the Company regarding a request by counsel for Baliga to consent to an extension of the TRO until a ruling on Baliga's application for a preliminary injunction. In the email, Defendants failed to advise the Company that Baliga was not a registered shareholder and, therefore, lacked standing to bring any derivative claims or seek entry of the TRO or a preliminary injunction.

11

50. Notwithstanding the fact that Baliga had no standing to bring the Baliga Action, or to seek entry of the TRO, on December 21, 2018, co-signed a "Joint Letter" that was filed in the Baliga Action at Docket No. 7.

51. In the Joint Letter, Defendants stated on behalf of the Company that "[the Company] does consent" to the TRO. Defendants submitted this consent without the informed consent or authorization of the Company.

52. On January 15, 2019, the Defendants wrote an email to the Company regarding the pending application by Baliga for entry of a preliminary injunction and appointment of a receiver. In the email, Defendants failed to advise the Company that Baliga was not a registered shareholder and, therefore, lacked standing to bring any derivative claims or seek entry of the TRO, a preliminary injunction or entry of a preliminary injunction.

53. On January 19, 2019, the Defendants wrote an email to the Company advising that "if we do not hear back from you within 24 hours, DLA will assume that we have Link Motion's consent not to oppose the motion." In the email, Defendants failed to advise the Company that Baliga was not a registered shareholder and, therefore, lacked standing to bring any derivative claims or seek entry of the TRO, a preliminary injunction or entry of a preliminary injunction.

54. On January 21, 2019, the Defendants signed a "Stipulation" filed in the Baliga Action at Docket No. 22.

55. In the Stipulation, Defendants stipulated that the Company "does not oppose the Preliminary Injunction." In the stipulation, Defendants purported to make only a limited appearance and "has preserved and is not waiving and have not waived any objections, defenses or responses to the Complaint."

56. Defendants made this stipulation without the informed consent of the Company.

57. On February 1, 2019, granting Baliga's request, the Court entered an order appointing the Receiver, who also happens to be employed by The Seiden Group[13]

58. The appointment of the Receiver and entry of the preliminary injunction has caused the Company to suffer damages because following his appointment the Receiver substantially and materially interfered with the Company's business relations respecting its operations and assets in the PRC. Among other things, the Receiver has (i) seized assets and cash in the PRC that that otherwise would have accrued to the benefit of the Company pursuant to the terms of the VIE Agreements, (ii) purported to remove Mr. Shi as a director and attorney-in-fact of Beijing Technology, appoint Guo "Francis" Lilin in his place, and (iii) otherwise interfered with the Company's expectation of control over Beijing Technology. As such, the duly elected Board of Directors has been deprived of the control over and economic benefit of the operations of Beijing Technology that the Company reasonably expected to enjoy and otherwise would have enjoyed pursuant to the VIE Agreements.

59. The foregoing actions have cause damage to the Company by way of the loss of profits and business revenue caused by the interference with the ability of the duly appointed Board of Directors' ability to manage the affairs of its operations in the PRC and the incurrence of unnecessary costs and expenses, including amounts charged by the Receiver from assets of the Company.

60. By letter dated March 1, 2019, the Defendants moved for leave to withdraw as counsel to the Company. In support of their withdrawal, Defendants claimed that the Company failed to cooperate in its representation. Defendants failed to advise the Court that Defendants had

---

[13] (ECF Dkt. No. 26).

purported to "consent" to the TRO, preliminary injunction and appointment of the receiver without the informed consent of the Company.

### FIRST CAUSE OF ACTION
### (Legal malpractice against all Defendants)

61. Plaintiff restates and realleges each of the foregoing paragraphs as if fully set forth herein.

62. The Company retained Defendants to act as its counsel in connection with the issuance of Class B Shares and, therefore, there existed an attorney client relationship between the Company and Defendants.

63. Defendants undertook to represent and defend the Company in the Derivative Action by, inter alia, appearing in and making submission on behalf of the Company in the action.

64. In undertaking the representation of the Company, Defendants represented that they possessed the ordinary and reasonable skill, diligence and knowledge of a New York attorney and had the requisite skill and experience necessary to represent the Company adequately in connection with the defense of Baliga's derivative claims.

65. Defendants breached the duty of care owed to the Company by failing to exercise the ordinary and reasonable skill, diligence, and knowledge of member of the New York Bar by errors and omissions as alleged above, including but not limited to (i) failing to advise the Company that Baliga lacked any standing to bring derivative claims or to seek a TRO, preliminary injunction, or appointment of a receiver; (ii) advising the Court that the Company consented to the TRO without first obtaining the informed consent of the Company; (iii) advising the Court that the Company did not oppose entry of the preliminary injunction or appointment of the receiver without first obtaining the informed consent of the Company; and (iv) failing to advise the Court that Baliga

lacked any standing to bring derivative claims or to seek a TRO, preliminary injunction, or appointment of a receiver.

66. But for Defendants' acts, errors and omissions, the Company would have obtained a better result in defense of the claims brought by Baliga. Specifically, had Defendants advised the Company or the Court that Baliga lacked standing, the TRO would have been avoided or dissolved, the preliminary injunction would not have been entered, and the receiver would not have been appointed.

67. As a result of Defendants' negligence and malpractice, the Company has suffered damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
**(Breach of fiduciary duty against all Defendants)**

68. Plaintiff restates and realleges each of the foregoing paragraphs as if fully set forth herein.

69. Defendants owed to the Company the fiduciary duties of loyalty, good faith, candor, and due care.

70. Defendants breached their fiduciary duties by (i) exceeding the scope of their engagement without advising the Company that Baliga lacked any standing to bring derivative claims or to seek a TRO, preliminary injunction, or appointment of a receiver; (ii) exceeding the scope of their engagement, by advising the Court that the Company consented to the TRO and did not oppose entry of the preliminary injunction and appointment of a receiver, without first obtaining the informed consent of the Company; (iii) exceeding the scope of their engagement, by advising the Court that the Company did not oppose entry of the preliminary injunction or appointment of the receiver, without advising the Court that Baliga lacked any standing to bring derivative claims or to seek a TRO, preliminary injunction, or appointment of a receiver; and (iv)

moving for leave to withdraw without asserting the defense that Baliga lacked any standing to bring derivative claims or to seek a TRO, preliminary injunction, or appointment of a receiver.

71.     As a result of Defendants' breaches of fiduciary duty, the Company has suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the Company demand judgment against Defendants, jointly and severally, and in favor of the Company as follows:

**(a)**     Awarding to the Company general, special, consequential damages in amounts to be determined at trial;

**(b)**     Awarding to the Company punitive damages;

**(c)**     Awarding to the Company pre-judgment interest, post-judgment interest, and attorney's fees;

**(d)**     Awarding the Company the costs and disbursements of this action, including reasonable allowance of fees and costs for attorneys, experts, and accountants;

**(e)**     Granting the Company such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all claims so triable.

Dated: New York, New York            [ATTORNEY SIGNATURE BLOCK]
            _____, 2021

*Attorneys for Plaintiff Link Motion Inc.*

4824-2836-5278, v. 3