# Exhibit F

June 11, 2021 Baliga v. Link Motion Inc. et al., No. 1:18-cv-11642



# LOAN AGREEMENT

Our reference: CB20160090A

**THIS LOAN AGREEMENT** is entered into on 26 Jul 2016

**BETWEEN:**

A. **China Merchants Bank Co., Ltd., Luxembourg Branch,** having its registered office at 20, Boulevard Royal, L-2449 Luxembourg, registered with the Luxembourg Trade and Companies Register under number B193833 (hereafter referred to as the "**Bank**"); and

B. NQ Mobile Inc., a limited company incorporated and existing under the laws of Cayman Islands, having its registered office at PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands and registered with the Companies Registry under number 183784 (hereafter referred to as the "**Borrower**", and together with the Bank, the "**Parties**", and each a "**Party**").

**IT IS AGREED** as follows:

## § 1 DEFINITIONS

"**Agreement**" means this loan agreement, as amended, supplemented or modified from time to time in accordance with its terms.

"**Availability Period**" means the period of three (3) months from the signing date of this Agreement.

"**Break Costs**" means the amount (if any) by which:

- the interest which the Bank should have received for the period from the date of receipt of all or any part of its participation in a Loan or any sum unpaid under this Agreement to the last day of the current Interest Period in respect of such Loan or such unpaid sum;

exceeds:

- the amount which the Bank would be able to obtain by depositing an amount equal to the principal amount of such Loan or such unpaid sum received by the Bank on deposit with a leading bank, to be chosen by the Bank at its sole discretion, in the relevant interbank market for a period starting on the Business Day following receipt or recovery and ending on the last day of the current Interest Period.

"**Business Day**" means any day other than a Saturday, Sunday, legal holiday or other day on which commercial banks in Luxembourg are required to close. The execution of any business decision communicated to the Bank outside a Business Day will be executed on the next following Business Day.

"**Default**" means an Event of Default or any event or circumstance specified in Clause 12 (*Events of Default*) which would (with the expiry of a grace period, the giving of notice,




the making of any determination under this Agreement or any combination of any of the foregoing) be an Event of Default.

"**Drawdown Notice**" means a drawdown notice substantially as set out in Schedule 1.

"**Event of Default**" means any event or circumstance specified as such in Clause 12 (*Events of Default*).

"**Final Repayment Date**" means the Repayment Date with respect to a single Loan made during the Availability Period or the last Repayment Date in case of multiple Loans made during the Availability Period.

"**Interest Period**" means, in relation to a Loan, each period determined in accordance with Clause 6.2 (*Interest Periods*) and, in relation to any sum unpaid under this Agreement on its due date, each period determined in accordance with Clause 6.4 (*Default interest*).

"LIBOR" means the London Interbank Offered Rate for deposits for the relevant period as displayed on the appropriate page (being currently Reuters screen page) or other specialized publications and, if any such rate is below zero, LIBOR will be deemed to be zero. Such LIBOR is quoted on the second quotation day (or as determined by the market practice in the London inter-bank market) prior to the first day of the relevant Interest Period. If Reuters page displaying LIBOR for the relevant Interest Period is replaced or service ceases to be available, then the Bank will specify to the Borrower another pricing index or another interest rate to be applied to the relevant Loan or Loans, such rate shall be determined by the Bank acting reasonably and in accordance with the basic objective of such new pricing index which shall be securing the Bank's internal cost of funding.

"**Loan**" means a loan made or to be made under the Agreement or the principal amount outstanding for the time being of that loan.

"**Margin**" means 1.13% p.a.

"**Repayment Date**" means with respect each Loan to be made hereunder within the Availability Period twenty four (24) month(s) from the signing date of each Loan corresponding Drawdown Notice or seven (7) Business Day(s) prior to the expiry date of the SBLC/Guarantee, whichever is the earliest

"**SBLC** or **Guarantee**" means the standby letter of credit or guarantee issued by China Merchants Bank Co., Ltd., Beijing Branch with respect each Loan to be made hereunder within the Availability Period.

§ 2 **PRINCIPAL AMOUNT**

Subject to the terms and conditions hereinafter set forth, the Bank agrees to provide to the Borrower and the Borrower agrees to accept from the Bank, one or several Loans in an aggregate principal amount of United State Dollars Ten Million (USD 10,000,000.-) (the "**Total Commitment**") for the purposes of (i) repurchase the Convertible Senior Notes



issued by the Borrower from unrelated company [illegible] or 2) working capital of [illegible] subsidiary – Linkmotion Holdings Limited, which may be drawn down in whole or in part.

**§ 3** **DRAWDOWN CONDITIONS**

**3.1** Subject to satisfaction of the conditions precedents as set forth in Clause 4.2 below, the Borrower may draw down a Loan by delivering a written Drawdown Notice to the Bank.

**3.2** Each Drawdown Notice is irrevocable.

**3.3** A Loan may only be drawn down within the Availability Period.

**3.4** Any part of the Total Commitment which, at that time, is undrawn shall be immediately cancelled at the end of the Availability Period.

3.5 Loan proceeds will be remitted to a bank account opened in China Merchants Bank Co., Ltd., Hong Kong Branch under the Borrower's name.

3.6 If the loan purpose is to 1) repurchase the Convertible Senior Notes issued by the Borrower from unrelated company:

a. China Merchants Bank Beijing Branch shall provide a commitment letter to the Bank stating that "China Merchants Bank Beijing Branch shall inform China Merchants Bank Luxembourg branch within one business day if the Borrower transfer the drawdown proceeds out of its account in China Merchants Bank Hong Kong Branch.

b. Within fifteen (15) days after drawdown date, a lawyer's formal opinion should be provided to confirm the compliance of the transactions. The opinion should not be different from the draft below in any significant way:

- *the company may [illegible] CB issued in 2013 from a third party [illegible] is a holder of company's CB [illegible] provided that such party provides big boy letter/representation.*
- *Abovementioned repurchase need to be approved by the company's board of directors.*
- *Abovementioned repurchase need to be disclosed in a 6-K if the transaction value is significant to the company, if the transaction value is not significant to the company, the company may not disclose in 6-K.*
- *Typically, US public company client considers a transaction not in the ordinary course of business at a value that constitutes over five or ten percent of the company's assets (or cash and cash equivalent if it is a cash transaction), shareholders' equity or net income material, is significant to the company.*

c. For the first 3 months after Drawdown, the Borrower shall provide the Debt Account Statement for the [illegible] loan amount as well as remittance for used [illegible] amount [illegible] month. Before the drawdown amount being used and






transferred out of the Borrower's account, a [illegible] letter/representation by seller as well as the approval by the Borrower's board of directors [illegible] repurchase should also be provided [illegible] of the [illegible]. The Drawdown Amount [illegible] previously mentioned loan purpose within [illegible] months.

If the client cannot provide the above-mentioned documents [illegible], the loan will be [illegible] immediately [illegible] the SBLC [illegible].

3.7 [illegible]

d. Before drawdown, the Borrower [illegible] NQ [illegible] Inc. and Linkmotion Holdings Limited.

e. Within 1 month after drawdown the Borrower shall provide remittance proof from NQ Mobile Inc. to Linkmotion Holdings Limited AND from Linkmotion Holdings Limited to justify the related loan purposes. The Borrower shall also provide the related contract(s) or supporting document(s) to justify the loan purpose.

f. The total limit for this loan purpose shall not more than USD500,000.00.

3.8 The Borrower shall provide before the drawdown date a proof showing that cash, in a [illegible] at least [illegible] the SBLC or Guarantee has been deposited by the Borrower's related company in China Merchants Bank Co., Ltd., Beijing Branch.

## § 4 CONDITIONS PRECEDENT TO A LOAN

**4.1** The obligation of the Bank to grant a Loan is subject to the fulfilment to the Bank's satisfaction of the conditions precedent set out under Clause 4.2 below.

**4.2** Conditions Precedent:

A) The Bank shall have received a written Drawdown Notice duly signed by the Borrower two (2) Business Days prior to the relevant drawdown date, unless otherwise agreed by the Bank in its sole discretion;

B) The representations of the Borrower in this Agreement shall be correct;

C) No Default is outstanding or would result from the proposed Loan;

D) Payment of fees and transaction costs;

E) The Bank shall have received certified copies of corporate approvals and any other documents evidencing necessary corporate action and government approvals, which may be necessary, for the entry into this Agreement, any relevant legal opinions and any related documents or any other documents or authorisations requested by the Bank;

F) Satisfactory credit and security documentation in agreed form;

G) Evidence of full compliance with all "know your customer" and ultimate beneficial owner ("**UBO**") requirements; and



§ 5 **DURATION**

The Borrower shall repay each Loan and other amounts outstanding related to said Loan in full by the Repayment Date. All amounts outstanding under this Agreement shall be repaid in full by the Final Repayment Date.

§ 6 **INTEREST**

**6.1 Calculation of interest**

6.1.1 The rate of interest on each Loan for each Interest Period is the percentage rate per annum which is the aggregate of the applicable:

Floating interest rate of three (3) month Libor + 1.13% p.a. [LIBOR rate will be defined in the Drawdown Notice].

6.1.2 The interest rate shall be compounded of four (4) digits after the decimal point with the last digit to be rounded up.

**6.2 Interest Periods**

6.2.1 The first Interest Period for a Loan shall start on the date on which such Loan is made under this Agreement.

6.2.2 Each subsequent Interest Period for a Loan shall start on the last day of its immediately preceding Interest Period.

6.2.3 Each Interest Period shall be three (3) months.

6.2.4 No Interest Period shall extend beyond the Repayment Date.

6.2.5 The Borrower is free to select the Interest Period within the limits as defined in Clause 6.2.3 hereof. In that respect, it shall inform in writing the Bank by the second last day of its immediately preceding Interest Period. If the Bank does not receive the instruction from the Borrower by that deadline, the Bank will follow the minimum Interest Period.

**6.3 Accrual and payment of interest**

Any interest, commission or fee accruing under this Agreement will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 360 days. The Borrower shall pay accrued interest on a Loan on the last day of each Interest Period applicable to such Loan.

**6.4 Default interest**

6.4.1 If the Borrower fails to pay any amount payable by it under this Agreement on its due date, interest shall accrue on the overdue amount from the due date up to the date of actual payment (both before and after judgment) at a rate which is ten (10) percent per



annum higher than the rate which would have been payable if the overdue amount had, during the period of non-payment, constituted a Loan in the currency of the overdue amount for successive Interest Periods, each of a duration selected by the Bank (acting reasonably). Any interest accruing under this Clause 0 shall be immediately payable by the Borrower on demand by the Bank.

6.4.2 The unpaid but due interest may be capitalized in conformity with article 1154 of the Luxembourg Civil Code. For the avoidance of doubt, capitalisation of interest shall occur only for interest not paid for a period of more than one year. The Borrower hereby agrees in advance to have the unpaid interest due for a period of more than one year compounded and that as of the capitalization, such unpaid interest will in turn produce interest at the relevant applicable interest rate.

**§ 7 REPAYMENT**

**7.1 Repayment**

7.1.1 The Borrower selects to repay the Loans in such way as set out in paragraph below:

in one lump sum upon maturity.

7.1.2 If the Borrower intends to extend the Loan, it shall apply to the Bank in writing sixty (60) Business Days prior to the Maturity Date thereof. After the Bank has consented in writing, both Parties will enter into a loan extension agreement. In the absence of such agreement in writing, no extension shall apply.

**7.2 Reborrowing**

The Borrower cannot reborrow any part of a Loan which is repaid.

**§ 8 PREPAYMENT**

**8.1 Illegality**

If it becomes unlawful in any applicable jurisdiction for the Bank to perform any of its obligations as contemplated by this Agreement or to fund or maintain all or any part of a Loan:

8.1.1 the Bank shall promptly notify the Borrower upon becoming aware of that event;

8.1.2 the Bank shall not be obliged to disburse any Loan and may cancel with immediate effect any undrawn part of the Total Commitment; and

8.1.3 the Borrower shall repay each Loan on the last day of the Interest Period for such Loan occurring after the Bank has notified the Borrower or, if earlier, the date specified by the Bank in the notice delivered to the Borrower (being no earlier than the last day of any applicable grace period permitted by law).

**8.2 Voluntary prepayment and cancellation**



The Borrower may, if it gives the Bank not less than five Business Days' (or such shorter period as the Bank may agree in writing) prior notice, voluntarily prepay prior to the Repayment Date a Loan or cancel any part of the undrawn Total Commitment, in whole or in part.

**8.3 Terms of prepayment**

**8.4** Any notice of prepayment or cancellation given by any Party under this Clause 8 shall be irrevocable and, unless a contrary indication appears in this Agreement, shall specify the date or dates upon which the relevant prepayment is to be made and the amount of that prepayment.

**8.5** Any prepayment under this Agreement shall be made together with accrued interest and the Break Costs.

**8.6** Amounts prepaid may not be re-borrowed and no cancelled part of the Total Commitment may be re-instated.

**§ 9 PAYMENTS**

**9.1** Payments of any amounts due under this Agreement shall be remitted by the Borrower in immediately available funds not later than 12 noon Central European Time on the due date for payment thereof to such bank account as may have been notified to the Borrower by the Bank in writing prior to the due date.

**9.2** If any day on which any payment shall be made is not a Business Day, such payment shall be made on the Business Day immediately following the due date.

**9.3** The Borrower may validly instruct the Bank by fax or e-mail to pay out (in full or in part) the credit amount. Payment may be made solely to the bank account opened in China Merchants Bank Co., Ltd., Hong Kong Branch under the Borrower's name after all the conditions for drawing down the credit have been met. The Borrower acknowledges that instructions sent by fax or e-mail will have the same probative force as any instructions written and signed by them. The Borrower accepts that they themselves will bear any and all prejudicial consequences arising from fraud, mistakes, lack of authorisation or delays, unless they can provide proof or serious error, intent or fraud on the part of the Bank or its employees.

**9.4** All payments in respect of this Agreement shall (except as required by law) be made free and clear of and deductions or withholding for taxes, levies, duties or charges of any nature (the "**Taxes**") now or hereafter imposed, levied, collected, withheld or assessed in Luxembourg. The Borrower shall (within three Business Days of demand by the Bank) pay to the Bank an amount equal to the loss, liability or cost which the Bank determines will be or has been (directly or indirectly) suffered for or on account of Tax by the Bank in



respect of this Agreement, other than with respect to any Tax assessed on the Bank under the law of Luxembourg if that Tax is imposed on or calculated by reference to the net income received or receivable (but not any sum deemed to be received or receivable) by the Bank.

**9.5** The Borrower shall indemnify the Bank in respect of any stamp duty or other similar Taxes (by whomsoever payable) which may be or become payable in connection with the execution, delivery, performance, registration, production, amendment or attempted enforcement or enforcement of this Agreement or any document connected therewith.

**9.6** All amounts payable under or pursuant to this Agreement or any document connected therewith are exclusive of all value added, sales or other indirect taxes, which are, accordingly, payable by the Borrower in addition to the amounts in respect of which such Taxes are chargeable.

## § 10 SECURITY AND GUARANTEE

**10.1** The SBLC/Guarantee issued by China Merchants Bank Co., Ltd., Beijing Branch to the Bank, securing all liabilities of the Borrower under this Agreement.

**10.2** If there is any change to the security under this Agreement which is adverse to the Bank's credit rights, the Borrower shall promptly notify the Bank and provide additional security acceptable to the Bank. Otherwise, the Bank shall have the right to suspend the disbursement of a Loan, accelerate the Loans, and recover all or part of the Loan which has been drawn, make claims under the SBLC/Guarantee and terminate this Agreement.

**10.3** The SBLC should be demonstrated in United State Dollars. The Outstanding Loan Balance to Security Ratio (LTV ratio) should be maintained at 100% or less.

## § 11 REPRESENTATIONS, COVENANTS AND UNDERTAKINGS

**11.1** The Borrower makes the following representations and warranties to the Bank on the date of this Agreement and on each day when the Borrower has an obligation under this Agreement:

A) The Borrower is lawfully registered and incorporated under the laws of Cayman Islands, and may lawfully carry on business activities within the scope as permitted under its business license;

B) The Borrower has the capability of performing its rights and obligations under this Agreement;



C) The execution and implementation of this Agreement will not violate or conflict with any law or administrative regulation to which the Borrower shall be subject and will not cause the Borrower to breach other contracts by which the Borrower shall abide and the documents or Articles of Association approving the incorporation of the Borrower;

D) All materials provided by the Borrower to the Bank are true and accurate, complete without any concealment.

E) The Borrower warrants to the Bank that, under this Agreement, there is no such situation of duplicated loans for the same project.

F) The Borrower shall provide a report to the Bank (at least on a yearly basis) setting out in details the company's business operation, the project progress and the utilization of funds.

**11.2** Before the obligations under this Agreement are performed in full, the Borrower makes the following undertakings to the Bank:

A) It will pay the Loan principal and interest as well as other amounts payable in full and on time according to this Agreement;

B) Save as otherwise prescribed under Luxembourg laws, the liabilities under this Agreement will at all times rank *pari passu* with all other same-ranking liabilities of the Borrower;

C) It will, when the Bank requests, timely provide financial statements for each period and such other materials which reflect the Borrower's debt servicing ability, including all account opening banks, account numbers, deposit balance, etc., and actively cooperate with the Bank's supervision and inspection on utilization of a Loan;

D) If there occurs financial deterioration or other situation which may affect the safety of a Loan, it shall immediately notify the Bank and take effective steps to ensure that the Loan principal and interest be repaid within such term as agreed hereunder;

E) In case of any material adverse change in business operation which might affect the solvency of the Borrower, or any changes of the registered capital or business scope or ownership of the Borrower, formal written notice shall be submitted to the Bank at least thirty (30) days before the event, and consent from the Bank shall be given. If the circumstances abovementioned may adversely affect the creditor's rights of the Bank, the Borrower shall take effective measures to guarantee the repayments of the Loan principal and interest due according to this Agreement.

F) If there is winding-up, dissolution, suspension of business for rectification, or the Borrower's business license is cancelled, the Borrower shall repay the Loan principal and interest immediately;



Case 1:18-cv-11642-VM-DCF Document 155-8 Filed 05/29/20 Page 11 of 17

G) In case of change of its Articles of Association, legal representative, business scope (excluding events described in Article 11.2E hereof), communication address and other material matters, it shall notify the Bank immediately after such change; and

H) If it involves or may involve into any litigation or arbitration in relation to material economic disputes or such other litigation or arbitration which will have or may have substantial impact on the Bank's rights hereunder, it shall notify the Bank immediately.

**§ 12 EVENTS OF DEFAULT**

**12.1 General**

Each of the events or circumstances set out in Clause 12 is an Event of Default (save for Clause 12.2 (*Acceleration*)).

12.1.1 Any one of the following events or circumstances shall be deemed to be an Event of Default hereunder, whether the occurrence thereof is voluntary or involuntary or comes about or be effected by operation of law or otherwise, if not remedied, when such event is capable to be remedied, to the satisfaction of the Bank within the grace period as defined by the Bank in its sole discretion on a case by case basis:

A) The Borrower does not pay on the due date any amount payable pursuant to this Agreement at the place, account and in the currency in which it is expressed to be payable;

B) The Borrower fails to perform its obligations hereunder or breaches its representations, warranties or undertakings hereunder in any respect;

C) Any other indebtedness of the Borrower fails to be repaid after maturity (including being declared to be accelerated), or the Borrower fails to perform or breaches any obligation or document in relation to any other indebtedness, security or other obligations of it, which has affected or may affect the Borrower's ability to perform its obligations hereunder;

D) There is any other material adverse change to the Borrower's own situation, which has affected or may affect the Borrower's ability to perform its obligations hereunder;

E) (i) The Borrower is unable or admits inability to pay its debts as they fall due, suspends making payments on any of its debts or, by reason of actual or anticipated financial difficulties, commences negotiations with one or more of its creditors with a view to rescheduling any of its indebtedness; or (ii) the value of the assets of the Borrower is less than its liabilities (taking into account contingent and prospective liabilities); or (iii) a moratorium is declared in respect of any indebtedness of the Borrower;

F) Any corporate action, legal proceedings or other procedure or step is taken in relation to:



a. the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Borrower;
b. a composition, compromise, assignment or arrangement with any creditor of the Borrower;
c. the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Borrower or any of its assets; or
d. enforcement of any security or guarantee over any assets of the Borrower, or any analogous procedure or step is taken in any jurisdiction;
e. Any expropriation, attachment, sequestration, distress or execution affects any asset or assets of a member of the Borrower;
f. It is or becomes unlawful for the Borrower to perform any of its obligations under this Agreement or any other documents signed by the Borrower with respect to the purpose hereof;
g. The Borrower repudiates this Agreement or evidences an intention to repudiate this Agreement or any other documents signed by the Borrower with respect to the purpose hereof.

12.1.2 If the Borrower fails to use the Loan towards the agreed purpose according to Article 2 hereof, the Bank shall have the right to charge default penalty at the rate of 0.1% on the misused portion on daily basis.

12.1.3 If the Borrower is in any of the following situations, the Borrower shall assume the additional expenses and losses incurred by the Bank arising therefrom, and shall at the Bank's request take remedial actions in a timely manner, and provide true and accurate materials as a result thereof:
   A) The Borrower fails to timely provide financial statements and/or other relevant materials that the Bank may request, or fails to actively co-operate with the Bank within the framework of the Bank's supervision and inspection on the use of a Loan;
   B) The contents of documents, financial statements and other relevant materials provided to the Bank are not true;
   C) The Borrower fails to give notification according to this Agreement or the content of the notice does not conform to the facts.

12.1.4 If the Borrower fails to pay the Loan, interest, penalty interest, default penalty and other fees which are due (including being declared to be accelerated) according to this Agreement, the Bank shall have the right to freeze all of the Borrower's accounts opened with the Bank until full payment thereof or to deduct the corresponding amounts from such accounts to discharge the indebtedness hereunder.



**12.2 Acceleration**

On and at any time after the occurrence of an Event of Default the Bank may by notice to the Borrower:

12.2.1 cancel any undrawn part of the Total Commitment whereupon they shall immediately be cancelled; and/or

12.2.2 declare that all or part of the Loans, together with accrued interest, and all other amounts accrued under this Agreement be immediately due and payable, whereupon they shall become immediately due and payable; and/or

12.2.3 declare that all or part of the Loans be payable on demand, whereupon they shall immediately become payable on demand by the Bank; and/or

12.2.4 exercise any of its rights under the SBLC/Guarantee or any security document signed in connection with this Agreement; and/or

12.2.5 terminate this Agreement.

## § 13 NOTICES

Any communication to be made under or in connection with any Loan shall be made in writing, and may be made by registered post to the addresses indicated below (or such other addresses as may previously have been specified by a Party in writing to the other Party) (which shall be deemed effective with acknowledgment of receipt as of the date appearing on the acknowledgement of receipt), or by fax to the numbers indicated below (or such other fax numbers as may previously have been specified by a Party in writing to the other Party) which shall be deemed effective when transmission has been completed, the transmission sheet (or similar document) being a conclusive proof thereof.

**Borrower**

Attn: ______________________________

Fax: ______________________________

**Bank**

China Merchants Bank Co., Ltd., Luxembourg Branch



**§ 14 CHARGES AND FEES**

**14.1 Commitment Fee[1]**

14.1.1 The Borrower will pay or procure that it is paid to the Bank a commitment fee accruing from the date of this Agreement computed at the rate of [illegible] per annum on the undrawn part of the Total Commitment for the Availability Period (the "**Commitment Fee**").

14.1.2 The accrued Commitment Fee shall be payable on the last day of each successive period of three months which ends during the Availability Period, on the last day of the Availability Period and, if cancelled in full, on the cancelled amount of the Total Commitment at the time the cancellation is effective.

**14.2 Arrangement fee**

The Borrower shall pay to the Bank quarterly in line with the interest period an arrangement fee in the amount equal to [illegible] of the drawdown amount per annum.

**§ 15 COSTS AND EXPENSES**

**15.1 Transaction costs**

The Borrower shall, promptly on demand, pay to the Bank the amount of all costs and expenses (including legal fees) reasonably incurred by it in connection with:

15.1.1 the negotiation, preparation, printing and entry into of this Agreement or any related document; and

15.1.2 any amendment, waiver or consent requested by or on behalf of the Borrower.

**15.2 Enforcement costs**

The Borrower must, promptly on demand, pay to the Bank the amount of all costs and expenses (including legal fees) incurred by it in connection with:

15.2.1 the enforcement of, or the preservation of any rights under, this Agreement and any related document; or

15.2.2 any proceedings instituted by or against the Bank as a consequence of it entering into this Agreement and any related document.

**§ 16 MISCELLANEOUS**

**16.1** No failure to exercise and no delay in exercising, on the part of the Bank, any right, power or privilege hereunder or under this Agreement or any other documents ancillary thereto

[1] Only applicable for a revolving loan or a fixed loan whose Availability Period exceeds [illegible] months.



shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof, or the exercise of any other right, power or privilege. No waiver by the Bank shall be effective unless it is in writing.

**16.2** This Agreement, in all its aspects (including Clause 16.3 hereof), shall be a continuing obligation of the Borrower and shall (i) be binding upon the Borrower and its successors and assigns and (ii) inure to the benefit of and be enforceable by the Bank and by its successors, transferees and assigns. The Borrower may not assign any of its obligations under this Agreement or delegate any of its duties hereunder.

**16.3** Each of the Parties expressly acknowledges and agrees that the Bank may sell, assign and contribute all of its rights hereunder.

**16.4** This Agreement constitutes the full understanding of the Parties and the complete and exclusive statements of the terms and conditions of the Parties' agreements relating to the subject matter hereof and supersedes any and all prior agreements and understandings, whether written or oral, that may exist between the Parties with respect to the subject matter of this Agreement or parts thereof. There are no side agreements to this Agreement.

**16.5** This Agreement or any term or provision hereof may not be amended, changed, modified, or waived except with the written consent of the Parties.

**16.6** The headings and captions in this Agreement are for convenience and reference purposes only and shall not be considered a part of or affect the interpretation or construction of any provision of this Agreement.

**16.7** If any provision of this Agreement is or becomes prohibited, unenforceable or void in any jurisdiction, this shall not affect the validity or enforceability of any other provisions hereof.

## § 17 GOVERNING LAW AND JURISDICTION

**17.1** This Agreement and any non-contractual obligations arising in connection therewith shall be governed by and construed in accordance with the laws of the Grand-Duchy of Luxembourg.

**17.2** Any disputes arising in respect of this Agreement, its validity or execution shall be subject to the exclusive jurisdiction of the courts of Luxembourg-City, Grand-Duchy of Luxembourg.

## § 18 COUNTERPARTS

This Agreement may be executed in any number of counterparts all of which together shall constitute one and the same agreement.



Case 1:18-cv-11642-VM-DCF Document 155-8 Filed 05/29/20 Page 16 of 17

The contract has two originals, Party A and Party B shall each have one copy, with the same legal effect.

For and on behalf of the Bank:
**China Merchants Bank Co., Ltd., Luxembourg Branch**

By:______________________
Name: Changcheng Qin
Title: Deputy General Manager

For and on behalf of the Borrower:
NC Mobile Inc

By:______________________
Name: Nan Zhang
Title: CFO