# Exhibit A

June 11, 2021                                              Baliga v. Link Motion Inc. et al., No. 1:18-cv-11642

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WAYNE BALIGA, derivatively on behalf of
LINK MOTION INC. (F/K/A NQ MOBILE INC.)

                              Plaintiff,

            -against-

LINK MOTION INC. (F/K/A NQ MOBILE INC.),
VINCENT WENYONG SHI,
JIA LIAN,
XIAO YU,

                              Defendants,

            -and-

LINK MOTION INC. (F/K/A NQ MOBILE INC.),

                              Nominal Defendant.

Civil Action No.: 1:18-cv-11642

**REPLY DECLARATION OF
VINCENT WENYONG SHI IN
FURTHER SUPPORT OF
MOTION TO DISMISS AND
DISCHARGE OF RECEIVER**

---

VINCENT WENYONG SHI declares, pursuant to 28 U.S.C. 1746, as follows:

1.      I am the individual defendant named in this action. Although I reserve my rights to object to service of process and personal jurisdiction, I make this reply declaration in further support of the motion to dismiss this action and discharge the receiver appointed to manage the affairs of defendant Link Motion Inc. ("LKM").

**Background**

2.      I am a citizen of the People's Republic of China (the "PRC") and a resident of Beijing. I am one of the founders of Beijing NetQin Technology Co. Ltd. ("Beijing Technology"), a company organized under the laws of the PRC with headquarters in Beijing.

3.      Beijing Technology was formed in 2005 and operates business segments including software-as-a-service, mobile communications, and other telecommunications related businesses. LKM. I have been on the board of directors of Beijing Technology or its parent companies or

affiliated entities since 2005. For much of the history of Beijing Technology, the business was known as "NetQin" or "NQ." For purposes of this declaration, however, I will refer generally to the Beijing Technology and all of its affiliated entities as "Link Motion" and to specific entities by their respective names and/or the named defined for them in this declaration.

4.      In and around late 2010 and 2011, Link Motion desired to list the company on the New York Stock Exchange (the "NYSE"). However, PRC laws restrict ownership and control over businesses operating in the telecommunications field in PRC. Accordingly, Link Motion reorganized into a "variable interest entity" ("VIE") structure for the purpose of complying with PRC laws restricting ownership of telecommunications related businesses.

**The VIE Structure and Restrictions on Foreign Ownership of PRC Telecommunication Businesses**

5.      In connection with obtaining a listing on the NYSE, Link Motion filed a form F-1 registration statement with the Securities and Exchange Commission (the "S.E.C.") on March 15, 2011. In the F-1, the company described the VIE structure as follows:

> PRC laws and regulations currently limit foreign ownership of companies that provide value-added telecommunications services. To comply with these restrictions, we conduct our operations in China primarily through contractual arrangements between our wholly-owned PRC subsidiary, NetQin Beijing, and our affiliated entity, Beijing Technology. Beijing Technology holds the qualifications, licenses and permits necessary to conduct our operations in China.
>
> NetQin Beijing, as our wholly owned subsidiary, has entered into a series of contractual agreements with Beijing Technology and its shareholders, which enable us to:
>
> •      exercise effective control over Beijing Technology;
>
> •      receive substantially all of the economic benefits of Beijing Technology in consideration for the technical and consulting services provided by and the intellectual property rights licensed by NetQin Beijing; and

> • hold an exclusive option to purchase all of the equity interests in Beijing Technology when and to the extent permitted under PRC laws, regulations and legal proceedings.
>
> As a result of these contractual arrangements, we are considered the primary beneficiary of Beijing Technology, and we treat it as our consolidated affiliated entity under the generally accepted accounting principles in the United States, or U.S. GAAP. . . .

(Form F-1, at p.4. Available at https://www.sec.gov/Archives/edgar/data/1509986/000095012311025625/h04742fv1.htm.)

6. Accordingly, it is my understanding that LKM, the named defendant here, has no ownership interest in Beijing Technology the primary holding company in the PRC. Rather, LKM owns NetQin Mobile (Beijing) Technology Co., Ltd. ("NetQin Beijing"),[1] a PRC limited liability company. NetQin Beijing entered into a "Business Operations Agreement" with Beijing Technology.

7. The Business Operations Agreement is the primary contractual agreement that is referred to in the Form F-1.

8. By its terms, the Business Operations Agreement relating to LKM is governed by PRC law.

**PRC Law Prohibits the Rendering of Assistance to Foreign Investors**

9. In the March 15, 2011 form F-1, Link Motion described the risks related to the VIE structure of Link Motion:

> **Risks Related to Our Corporate Structure**
>
> *If the PRC government finds that the agreements that establish the structure for operating our businesses in China do not comply with PRC governmental restrictions on foreign investment in telecommunication business, or if these regulations or the interpretation of existing regulations change in the future, we*

---

[1] I refer here to the legal name of NetQin Beijing as of the date the parties entered into the Business Operations Agreement. It is possible that Mr. Seiden or his PRC agents have changed or attempted to change the legal name of this company.

*could be subject to severe penalties or be forced to relinquish our interests in those operations.*

Current PRC laws and regulations place certain restrictions on foreign ownership of companies that engage in telecommunication business, including mobile application providers. Specifically, foreign ownership in a value-added telecommunication mobile payment service provider may not exceed 50%. We conduct our operations in China principally through contractual arrangements among our wholly-owned PRC subsidiary, NetQin Beijing and an affiliated entity in the PRC, Beijing Technology, and the shareholders of Beijing Technology. Beijing Technology holds the licenses and permits necessary to conduct our businesses in China. Our contractual arrangements with Beijing Technology and its shareholders enable us to exercise effective control over this entity and treat it as our consolidated affiliated entity. For a detailed discussion of these contractual arrangements, see "Corporate Structure."

The Circular regarding Strengthening the Administration of Foreign Investment in and Operation of Value added Telecommunications Business, or the Circular, issued by the MIIT, in July 2006, reiterated the regulations on foreign investment in telecommunications businesses, which require foreign investors to set up foreign-invested enterprises and obtain a business operating license to conduct any value-added telecommunications business in China. ***Under the Circular, a domestic company that holds a telecommunications value-added services operation license is prohibited from leasing, transferring or selling the license to foreign investors in any form, and from providing any assistance, including providing resources, websites or facilities, to foreign investors that conduct value added telecommunications business illegally in China.*** Furthermore, the relevant trademarks and domain names that are used in the value-added telecommunications business must be owned by the local license holder. The Circular further requires each telecommunications value-added services operation license holder to have the necessary facilities for its approved business operations and to maintain such facilities in the regions covered by its license. In addition, all value-added telecommunications mobile payment service providers are required to maintain network and information security in accordance with the standards set forth under relevant PRC regulations. Due to a lack of interpretative materials from the regulator, it is unclear what impact the Circular will have on us or the other Chinese telecommunications and Internet companies that have adopted the same or similar corporate and contractual structures as ours.

We cannot assure you, however, that we will be able to enforce these contracts. . . .

(*Id.*, at pp.24-25)(emphasis added)

10. It is my understanding that Beijing Technology and its PRC operating subsidiaries, continue to hold the type of telecommunication value-added services operation licenses referred to the Form F-1.

11. It is also my understanding that Beijing Technology, Link Motion's counterparty to the Business Operations Agreement, continues to be subject to PRC laws prohibiting Beijing Technology from "from providing any assistance, including providing resources, websites or facilities, to foreign investors. . . ." as Link Motion disclosed in its original Form F-1.

**The Receiver Was Appointed Without the Consent of LKM**

12. It is my understanding that Marc A. Silverman, Esq., of DLA Piper LLP (US)("DLA Piper"), purported to authorize the appointment of Mr. Robert Seiden as a receiver with power to control the affairs of LKM.

13. To my knowledge, the board of directors of LKM did not authorize Mr. Silverman or DLA Piper to consent to the appointment of a receiver or to sign the stipulation submitted to the Court in this action.

14. Without waiving any attorney-client privilege, DLA Piper unilaterally threatened the board of directors of LKM that the law firm would sign the stipulation unless disputed "within 24 hours" on the basis that DLA Piper "assume[d]" that the board consented to the appointment.

15. There is a 12 hour time difference between New York and Beijing and it ordinarily requires more than 24 hours' time to organize action by the board or directors. Moreover, it was my understanding that DLA Piper had been retained to represent LKM for certain corporate matters. In my experience, it can sometimes take a substantial amount of time for PRC-based companies and individuals to locate and retain U.S. litigation counsel.

16. Nonetheless, it is my understanding that Mr. Silverman signed the stipulation without proper consideration or action of the board of directors of LKM.

### I Believe that PRC Law Prohibits Me from Assisting Mr. Seiden

17. As described above, it is my understanding that PRC law prohibits holders of "a telecommunications value-added services operation license," such as Beijing Technology, from "providing any assistance, including providing resources, websites or facilities, to foreign investors. . . ."

18. Through a holding company, I continue to be a shareholder of Beijing Technology. I am also a member of the board of directors of Beijing Technology.

19. Therefore, I am concerned that if I respond to Mr. Seiden's demands or otherwise provide assistance to him as he has demanded, I will be in violation of PRC law. I am also concerned that all of the PRC affiliates of LKM, such as Beijing Technology, would be exposed potentially to similar legal risk in the PRC if they assisted Mr. Seiden.

20. It would be unfair and inequitable to order me to comply with directives of Mr. Seiden when such compliance would be in violation of the PRC, where I live and reside.

### Recent Activity in the PRC Concerning Link Motion Has Caused Substantial Harm to Link Motion's Business

21. It is my understanding that after his appointment as receiver, Mr. Seiden was appointed as a co-receiver in Hong Kong Special Administrative Region ("Hong Kong"). Link Motion's Hong Kong holding company is Link Motion International Ltd. ("LKM Hong Kong")

22. Shortly after Mr. Seiden's appointment as co-receiver in Hong Kong, Mr. Guo Linlin was appointed as a member of the board of directors of LKM Hong Kong.

23.     LKM Hong Kong owns a PRC affiliate named NetQin Unlimited (Beijing) Technology Co., Ltd. ("NetQin Unlimited"). It is my understanding that another Link Motion shareholder, Mr. Xu Zemin, was the legal representative of NetQin Unlimited in the PRC.

24.     Subsequent to the appointment of Mr. Guo as a director of LKM Hong Kong, Mr. Guo claimed to also be the legal representative of NetQin Unlimited in the PRC.

25.     Mr. Guo's appointment as legal representative of NetQin Unlimited was never authorized. Accordingly, Mr. Xu commenced a legal proceeding in the PRC against Mr. Guo demanding a judgment that Mr. Guo's appointment as representative of NetQin Unlimited be nullified and Mr. Xu duly appointed as the appropriate legal representative of that entity. The basis for Mr. Xu's demand for relief was that Mr. Guo had obtained status as legal representative by filing fraudulent papers.

26.     Mr. Xu provided to me a copy of a Judicial Forensics Opinion issued in connection with his action against Mr. Guo. The Judicial Forensics Opinion concludes that Mr. Xu's signature on a legal document that appoint Mr. Guo as representative of NetQin Unlimited was forged.

27.     I believe that Mr. Guo is acting at the direction and under the control of Mr. Seiden.

28.     Mr. Guo's and Mr. Seiden's actions in the PRC have caused substantial harm to the operations of Link Motion and the shareholders of Link Motion.

I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: May 21, 2019

_____

Vincent Wenyong Shi