# Exhibit B

F-1 1 h04742fv1.htm F-1

Table of Contents

As filed with the Securities and Exchange Commission on March 15, 2011

Registration No. 333-

# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

## Form F-1

### REGISTRATION STATEMENT
### UNDER
### THE SECURITIES ACT OF 1933

# NetQin Mobile Inc.
*(Exact name of Registrant as specified in its charter)*
**Not Applicable**
*(Translation of Registrant's name into English)*

| **Cayman Islands** | **7372** | **Not Applicable** |
|---|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(Primary Standard Industrial Classification Code Number)* | *(I.R.S. Employer Identification Number)* |

**No. 4 Building**
**11 Heping Li East Street**
**Dongcheng District**
**Beijing 100013**
**The People's Republic of China**
**(86-10) 8565-5555**

*(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)*

**Law Debenture Corporate Services Inc.**
**400 Madison Avenue, 4th Floor**
**New York, New York 10017**
**(212) 750-6474**

*(Name, address, including zip code, and telephone number, including area code, of agent for service)*

*Copies to:*

| | |
|---|---|
| **Z. Julie Gao, Esq.** | **Leiming Chen, Esq.** |
| **Skadden, Arps, Slate, Meagher & Flom LLP** | **Simpson Thacher & Bartlett LLP** |
| **c/o 42/F, Edinburgh Tower, The Landmark** | **35/F, ICBC Tower** |
| **15 Queen's Road Central** | **3 Garden Road, Central** |
| **Hong Kong** | **Hong Kong** |
| **(852) 3740-4700** | **(852) 2514-7600** |

**Approximate date of commencement of proposed sale to the public:  as soon as practicable after the effective date of this registration statement.**

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box.  ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462I under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

### CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to be Registered(1) | Proposed Maximum Aggregate Offering Price(2)(3) | Amount of Registration Fee |
|---|---|---|
| Class A common shares, par value $0.0001 per share | $100,000,000 | $11,610 |

(1)  American depositary shares issuable upon deposit of the Class A common shares registered hereby will be registered under a separate registration statement on Form F-6 (Registration No. 333-    ). Each American depositary share represents     Class A common shares.

(2)  Includes Class A common shares that are issuable upon the exercise of the underwriters' option to purchase additional shares. Also includes Class A common shares initially offered and sold outside the United States that may be resold from time to time in the United States either as part of their distribution or within 40 days after the later of the effective date of this registration statement and the date the shares are first bona fide offered to the public. These Class A common shares are not being registered for the purpose of sales outside the United States.

(3)  Estimated solely for the purpose of determining the amount of registration fee in accordance with Rule 457(o) under the Securities Act of 1933.

The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until the Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to such Section 8(a), may determine.

Table of Contents

The information in this preliminary prospectus is not complete and may be changed. Neither we nor the Selling Shareholders may sell these securities until the registration statement filed with the Securities and Exchange Commission is declared effective. This preliminary prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.

Subject to Completion, Dated     , 2011

# NetQin Mobile Inc.



## American Depositary Shares
**Representing**     **Class A Common Shares**

This is the initial public offering of NetQin Mobile Inc., or NetQin. We are offering     American Depositary Shares, or ADSs, and the selling shareholders identified in this prospectus are offering an aggregate of     ADSs. Each ADS represents     Class A common shares, par value $0.0001 per share. We will not receive any proceeds from the ADSs sold by the selling shareholders. We have applied for listing of our ADSs on the New York Stock Exchange, or the NYSE, under the symbol "NQ." We expect that the initial public offering price of the ADSs will be between $    and $    per ADS.

Prior to this offering, there has been no public market for our ADSs or common shares.

**Investing in our common stock involves risk. See "Risk Factors" beginning on page 13.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus. Any representation to the contrary is a criminal offense.**

|  | Per ADS | Total |
|---|---|---|
| Public offering price | $ | $ |
| Underwriting discounts and commissions | $ | $ |
| Proceeds, before expenses, to NetQin | $ | $ |
| Proceeds, before expenses, to the selling shareholders | $ | $ |

We have granted the underwriters the right to purchase up to     additional ADSs to cover over-allotments.

## Piper Jaffray & Co.

The date of this prospectus is     , 2011

Table of Contents



**We are a leading SaaS provider of consumer-centric mobile Internet services focusing on security and productivity**

## 67.7% of mobile security market share in China
as of December 31, 2010 according to report issued by Frost & Sullivan in January 2011

For 4th quarter 2010   **3,240,000**   average monthly paying user accounts

As of December 31, 2010   **71,690,000**   cumulative registered user accounts

**in more than 100 countries**

Table of Contents



Table of Contents

**PROSPECTUS SUMMARY**

*This summary highlights information contained elsewhere in this prospectus and does not contain all of the information that you should consider in making your investment decision. Before investing in the ADSs, you should carefully read this entire prospectus, including our financial statements and related notes included in this prospectus and the information set forth under the headings "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations."*

**Overview**

We are a leading software-as-a-service, or SaaS provider of consumer-centric mobile Internet services focusing on security and productivity. According to a January 2011 report prepared by Frost & Sullivan, a third-party market research firm, we are the dominant provider in the mobile security industry in China with a 67.7% market share as of December 31, 2010, as measured by the number of registered user accounts. We provide a comprehensive suite of mobile Internet services that protect mobile users from security threats and enhance their productivity. As of December 31, 2010, the number of registered user accounts for our services reached approximately 72 million in over 100 countries, representing a sizeable share of the fast-growing market for mobile Internet services. Our technological innovation and global significance have been widely recognized through distinctions such as the 2011 Technology Pioneer Award bestowed by the Davos World Economic Forum in September 2010.

With significant advances in wireless technologies and the expanding usage of smartphones and other advanced mobile devices, mobile Internet is becoming an essential means of communication and mobile security is becoming a fundamental need in mobile users' daily lives. We believe we are well positioned to capture market opportunities presented by the rapidly evolving mobile Internet industry. Our cloud-client computing platform combines our cloud-side mobile security knowledge repository and our client-side applications to provide mobile anti-malware, anti-spam, privacy protection, data backup and restore and other services to users worldwide. Leveraging our cloud-side resources, we believe we have compiled one of the largest, most comprehensive mobile security knowledge repositories in the world, including mobile malware, spam messages, malicious websites and other threats. In addition, we offer user-centric client-side mobile security and productivity applications optimized for mobile devices. Our industry-leading mobile security knowledge repository grows continually as new security threats are identified through our own technology or through the contribution of security knowledge from our users and mobile ecosystem participants. As a result, our platform becomes increasingly more powerful as we continue to grow our user base and open our platform to more mobile ecosystem participants, which we believe presents a significant entry barrier to potential competitors.

Our vision is to become the most trusted mobile Internet cloud service company by providing trusted intelligent mobile experiences to our users. We began our business by offering mobile security services to address a fundamental and rapidly growing need of mobile users. Building upon the success of our mobile security offerings and our users' trust in our services, we continue to develop and introduce new services to enhance the productivity of mobile users. Our services are compatible with a wide range of handset models and almost all currently available operating systems for smartphones, including Android, Symbian, iOS, BlackBerry OS and Windows Mobile. We offer our services to users globally through an innovative "Freemium" SaaS business model. Our Freemium SaaS offerings provide users with free services and the ability to choose from a selection of premium services to meet individual needs. Our current service offerings include:

• *Mobile security:*  Our mobile security services are designed to protect users from mobile malware threats, data theft and privacy intrusion. We provide mobile malware scanning, Internet firewall, account and communication safety, anti-theft, performance optimization, hostile software rating and reporting and other services.

• *Mobile productivity:*  Our mobile productivity services are designed to intelligently enhance time and relationship management, including screening incoming calls, filtering unwanted spam short messaging services messages, or SMS messages, protecting communication privacy and managing calendar activities. In addition, we offer cloud-side synchronization of personal data, including address books, text messages, calendars and other data.

1

Table of Contents

- *Personalized intelligent cloud services:* We provide personalized intelligent cloud services such as "NQ Space" accessible by users through the Internet and across a variety of Internet-enabled devices. These services utilize synchronized user information to provide tailored user experience and extend the functionalities of our core services. For example, mobile users' contact information which has been stored in the cloud can be used to seamlessly link calendar activities across related contacts.

Since our inception, we have focused on building a large and engaged user base. Our cumulative registered user accounts as of December 31, 2008, 2009 and 2010 were 15.18 million, 35.63 million and 71.69 million, respectively. Our average monthly active user accounts for the three months ended December 31, 2008, 2009 and 2010 were 5.46 million, 11.96 million and 25.44 million, respectively, and our average monthly paying user accounts for the three months ended December 31, 2008, 2009 and 2010 were 1.03 million, 1.14 million and 3.24 million, respectively. Substantially all of our users are smartphone users, which we believe have attractive demographic characteristics.

We generate revenues primarily through the sale of user subscriptions to our premium mobile Internet services. We have grown significantly since we commenced our operations. Our total net revenues increased from $4.0 million in 2008 to $5.3 million in 2009 and to $17.7 million in 2010, representing a compound annual growth rate, or CAGR, of 111.4%. We incurred a net loss of $3.6 million in 2008, $5.2 million in 2009, and $9.8 million in 2010. Our net loss amounts reflect the impact of non-cash share-based compensation expenses of $1.2 million in 2008, $1.2 million in 2009, and $12.6 million in 2010.

In February 2011, we granted options to purchase 8,020,000 common shares to Dr. Henry Yu Lin, the chairman of the board of directors and chief executive officer, Dr. Vincent Wenyong Shi, a director and the chief operating officer of our company, and Ying Han, an independent director. The vesting period of these options ranges from one to six years. Our board of directors also approved the acceleration of vesting schedules of employees' options to purchase 14,994,000 common shares. As a result, we expect to incur aggregate share-based compensation charges of approximately $13.3 million in the first quarter of 2011 and in subsequent periods over the vesting period of the newly granted options. In addition, in March 2011, we granted options to purchase 1,101,825 common shares to our executive officer and employees with a vesting period ranging from immediately upon this offering to four years. Share-based compensation expenses relating to the February and March option grants and the February option acceleration will materially and adversely affect our financial results in the first quarter of 2011 and in subsequent periods over the vesting period of the newly granted options.

**Our Industry**

Personal mobile communications and computing have advanced dramatically with the continual build out of advanced mobile infrastructure and the introduction of increasingly sophisticated portable smart devices. Wireless technology and mobile Internet have allowed for increased interaction and collaboration among individuals beyond what can be achieved through the traditional Internet. This increased level of connectivity has created increasing demand for advanced mobile Internet services, particularly in China, which has the largest mobile user population in the world.

Early mobile services were primarily based on Short Message Service, or SMS, technology and were largely focused on user entertainment. Advancements in 3G and mobile technology have led to the development of a new generation of advanced services based on mobile Internet technology to address the need for more effective and efficient use of mobile devices. A number of significant industry advancements have helped to define the mobile Internet computing paradigm. For users, specially designed mobile applications provide simple and convenient interfaces through which users can interact with mobile Internet services. For service providers, a cloud architecture provides the ability to expand the capability of mobile Internet services beyond the computing power available from individual mobile devices.

Mobile Internet services are being developed to address users' requirements for mobile security and productivity. Advanced mobile devices promote the proliferation of mobile applications and increased sharing of data among users which increase the risk of security breaches and threats. There has been increasing demand for services that address these security risks and enhance users' productivity.

2

Table of Contents

**Our Competitive Strengths**

We believe the following strengths enable us to proactively identify the trends of the mobile industry and develop innovative services to address user needs, thus making us a pioneer of the fast-growing mobile security and productivity services industry:

- leading position in the mobile security and productivity services market with a large and fast-growing global user base;

- diverse and flexible cloud-client based services portfolio with an innovative Freemium service business model;

- proprietary technology and strong research and development capabilities;

- diversified user acquisition and payment channels based on strong relationships with key players in the mobile ecosystem;

- sophisticated and proprietary business and operation support systems; and

- visionary and experienced management team with proven track record.

**Our Strategies**

Our goal is to further extend our leadership position in China and become a dominant provider of mobile security and productivity services globally. We intend to execute the following strategies to achieve our goal:

- further expand and monetize our user base;

- further diversify and enhance our services portfolio;

- maintain and strengthen our technology leadership;

- strengthen and diversify collaborative relationships with key players in the mobile ecosystem;

- further expand our presence in overseas markets; and

- establish a strong consumer brand among mobile Internet users.

**Our Challenges**

We expect to face risks and uncertainties, including those relating to:

- growth of the mobile security and productivity industry;

- our ability to further expand and monetize our user base;

- our ability to continue to develop and offer mobile security and productivity services that appeal to users;

- our ability to keep up with the technological developments in the evolving mobile Internet industry and maintain our technological leadership;

- our ability to maintain strong relationships with key players in the mobile ecosystem;

- our ability to manage our global expansion effectively and cost-efficiently;

- the complex system of regulations governing the telecommunications and software development industries in China; and

- risks associated with our control over our consolidated affiliated entity and its subsidiary, which is based on contractual arrangements rather than equity ownership.

See "Risk Factors" and other information included in this prospectus for a discussion of these and other risks and uncertainties associated with our business and investing in our ADSs.

3

Table of Contents

**Corporate History and Structure**

We commenced operations on October 21, 2005 when our founders incorporated Beijing NetQin Technology Co. Ltd., or Beijing Technology, in China. Beijing Technology is primarily engaged in the research and development of products and services related to mobile security and productivity. On March 14, 2007, our founders incorporated NetQin Mobile Inc. in the Cayman Island to become the offshore holding company for our operations in China. Our founders, Dr. Henry Yu Lin, Mr. Xu Zhou and Dr. Vincent Wenyong Shi, hold in aggregate 27.0% of our outstanding share capital indirectly through RPL Holdings Limited, a limited liability company organized under the laws of the British Virgin Islands. Our founders, if acting together, could exert substantial influence over our company and our daily operations. Immediately after this offering, our founders will collectively beneficially own     % of our outstanding share capital and     % of our aggregate voting power and will continue to have substantial influence over our company in the foreseeable future.

On May 15, 2007, we established our wholly owned subsidiary, NetQin Mobile (Beijing) Co., Ltd., or NetQin Beijing, in China. On April 26, 2010, we established NetQin International Ltd., or NetQin HK, in Hong Kong; NetQin HK became the directly wholly owned subsidiary of NetQin Mobile Inc. and the immediate holding company of NetQin Beijing. NetQin HK will conduct part of our business activities and operations outside of China. On November 5, 2010, we established NetQin US Inc., or NetQin US, in the United States, which became the directly wholly owned subsidiary of NetQin Mobile Inc. The major functions of NetQin US include analyzing market information in the U.S. mobile industry. The international business of our company will be handled by us, NetQin HK and NetQin Beijing, with the allocation of business to be determined by relevant tax considerations, among other things.

PRC laws and regulations currently limit foreign ownership of companies that provide value-added telecommunications services. To comply with these restrictions, we conduct our operations in China primarily through contractual arrangements between our wholly-owned PRC subsidiary, NetQin Beijing, and our affiliated entity, Beijing Technology. Beijing Technology holds the qualifications, licenses and permits necessary to conduct our operations in China.

NetQin Beijing, as our wholly owned subsidiary, has entered into a series of contractual agreements with Beijing Technology and its shareholders, which enable us to:

- exercise effective control over Beijing Technology;

- receive substantially all of the economic benefits of Beijing Technology in consideration for the technical and consulting services provided by and the intellectual property rights licensed by NetQin Beijing; and

- hold an exclusive option to purchase all of the equity interests in Beijing Technology when and to the extent permitted under PRC laws, regulations and legal proceedings.

As a result of these contractual arrangements, we are considered the primary beneficiary of Beijing Technology, and we treat it as our consolidated affiliated entity under the generally accepted accounting principles in the United States, or U.S. GAAP. We have consolidated the financial results of Beijing Technology in our consolidated financial statements in accordance with U.S. GAAP. For a description of these contractual arrangements, see "Corporate Structure."

On June 1, 2009, Beijing Technology set up a PRC joint venture, Fuzhou NetQin Mobile Information Technology Co., or Fuzhou NetQin, with a third party entity, Fuzhou Huihe Yitong Information Technology Co., Ltd., or Fuzhou Huihe. Fuzhou NetQin primarily engages in the research and development of mobile software and related products and services. Beijing Technology holds 51% of the equity interest in Fuzhou NetQin, while Fuzhou Huihe holds 49% of the equity interest. The financial results of Fuzhou NetQin are consolidated in the consolidated financial statements of Beijing Technology.

Table of Contents

The following chart illustrates our corporate structure as of the date of this prospectus:



(1) Beijing Technology is our consolidated affiliated entity established in China and is 52.00% owned by our chairman and chief executive officer, Dr. Henry Yu Lin, 33.25% owned by one of our directors, Xu Zhou and 14.75% owned by Dr. Vincent Wenyong Shi, our chief operating officer. The three shareholders of Beijing Technology are the three founders of our company. We effectively control Beijing Technology through contractual arrangements. See "Corporate Structure."

(2) The remaining equity interests are owned by Fuzhou Huihe.

### Corporate Information

Our principal executive offices are located at No. 4 Building, 11 Heping Li East Street, Dongcheng District, Beijing, 100013, the People's Republic of China. Our telephone number at this address is +86 (10) 8565-5555. Our registered office in the Cayman Islands is located at Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman KY1-1104, Cayman Islands. Our telephone at this address is +1 (345) 949-8066.

Investors should submit any inquiries to the address and telephone number of our principal executive offices set forth above. Our website is www.netqin.com and the information contained on this website is not a part of this prospectus. Our agent for service of process in the United States is Law Debenture Corporate Services Inc.

Table of Contents

### CONVENTIONS USED IN THIS PROSPECTUS

In this prospectus, unless the context indicates otherwise, references to:

- "we," "us," "our company," "our," and "NetQin" refer to NetQin Mobile Inc. and its subsidiaries and consolidated affiliated entities, as the context may require;

- "shares" and "common shares" refer to, prior to the completion of this offering, our common shares, par value $0.0001 per share;

- "preferred shares" refer to our Series A, Series B, Series C and Series C-1 preferred shares, par value $0.0001 per share;

- "Renminbi" or "RMB" refers to the legal currency of China;

- "registered user account" or "activated user account" means a user account that was registered with us. We calculate registered user accounts as the cumulative number of user accounts at the end of the relevant period. Each individual user may have more than one registered user account and consequently, the number of registered user accounts we present in this prospectus overstates the number of persons who are our registered users;

- "active user account" for a specific period means the registered user account that has accessed our services at least once during such relevant period; and

- "paying user account" means the user account that has paid or subscribed for our premium services during the relevant period.

Except as otherwise indicated, all information in this prospectus assumes no exercise by the underwriters of their option to purchase additional ADSs.

6

Table of Contents

**THE OFFERING**

| | |
|---|---|
| ADSs offered by us | ADSs |
| ADSs offered by the selling shareholders | ADSs |
| Total ADSs offered | ADSs |
| Price per ADS | We currently estimate that the initial public offering price will be between $    and $    per ADS. |
| The ADSs | Each ADS represents    Class A common shares. |
| ADSs outstanding immediately after this offering |    ADSs (or    ADSs if the underwriters exercise their over-allotment option in full) |
| Common shares outstanding immediately after this offering |    common shares (or    common shares if the underwriters exercise their over-allotment option in full), comprised of (i)    Class A common shares, par value $0.0001 per share (or    Class A common shares if the underwriters exercise their over-allotment option in full), and (ii)    Class B common shares, par value $0.0001 per share. |
| The ADSs | The depositary will hold the Class A common shares underlying your ADSs and you will have rights as provided in the deposit agreement. |
| | We do not expect to pay dividends in the foreseeable future. If, however, we declare dividends on our Class A common shares, the depositary will pay you the cash dividends and other distributions it receives on our Class A common shares, after deducting its fees and expenses. |
| | You may turn in your ADSs to the depositary in exchange for Class A common shares. The depositary will charge you fees for any exchange. |
| | We may amend or terminate the deposit agreement without your consent. If you continue to hold your ADSs, you agree to be bound by the deposit agreement as amended. |
| | To better understand the terms of the ADSs, you should carefully read the "Description of American Depositary Shares" section of this prospectus. You should also read the deposit agreement, which is filed as an exhibit to the registration statement that includes this prospectus. |
| Common shares | Our common shares are divided into Class A common shares and Class B common shares. Holders of Class A common shares are entitled to one vote per share, while holders of Class B common shares are entitled to ten votes per share. |
| | We will issue Class A common shares represented by our ADSs in this offering. |
| | All of our existing common shares will be redesigned as Class B common shares and our outstanding preferred shares will be automatically converted into Class B common shares upon the completion of this offering. |

7

Table of Contents

All options granted prior to the completion of this offering entitle option holders to the equivalent number of Class B common shares once the options are vested and exercised and all options to be granted after this offering will entitle option holders to the equivalent number of Class A common shares.

Each Class B common share is convertible into one Class A common share at any time by the holder thereof. Class A common shares are not convertible into Class B common shares under any circumstances. Upon any transfer of Class B common shares by a holder thereof to any person or entity which is not an affiliate of such holder and which is not any of our founders or any affiliates of our founders, such Class B common shares shall be automatically and immediately converted into the equal number of Class A common shares.

In addition, if at any time our three founders, Dr. Henry Yu Lin, Mr. Xu Zhou and Dr. Vincent Wenyong Shi and their affiliates collectively own less than 5% of the total number of the issued and outstanding Class B common shares, each issued and outstanding Class B common share shall be automatically and immediately converted into one Class A common share, and we shall not issue any Class B common shares thereafter.

Furthermore, if at any time more than fifty percent (50%) of the ultimate beneficial ownership of any holder of Class B common shares (other than our founders or our founders' affiliates) changes, each such Class B common share shall be automatically and immediately converted into one Class A common share.

| | |
|---|---|
| Option to purchase additional ADSs | We have granted to the underwriters an option, exercisable within 30 days from the date of this prospectus, to purchase up to an additional      ADSs. |
| Reserved ADSs | At our request, the underwriters have reserved for sale, at the initial public offering price, up to an aggregate of      ADSs offered in this offering to some of our directors, officers, employees, business associates and related persons through a directed share program. |
| Use of proceeds | We estimate that we will receive net proceeds of approximately $      million from this offering (after deducting underwriting discounts and commissions and estimated offering expenses payable by us). These estimates are based upon an assumed initial public offering price of $      per ADS, the mid-point of the range shown on the front cover page of this prospectus. |

We intend to use the net proceeds from this offering as follows:

• approximately      million for investments in technology, infrastructure and research and development activities;

• approximately      million for the expansion of sales and marketing efforts; and

• the remainder for general corporate purposes, including working capital needs and potential acquisitions of complementary businesses (although we are not currently negotiating any such acquisitions).

8

Table of Contents

| | |
|---|---|
| | See "Use of Proceeds" for more information. |
| | We will not receive any of the proceeds from the sale of ADSs by the selling shareholders. |
| NYSE symbol | NQ |
| Depositary | Deutsche Bank Trust Company Americas |
| Lock-up | We and all of our directors, executives and shareholders, and certain option holders have agreed with the underwriters not to sell, transfer or dispose of any ADSs, shares or similar securities for a period of 180 days after the date of this prospectus. In addition, through a letter agreement, we will instruct Deutsche Bank Trust Company Americas, as depositary, not to accept any deposit of any common shares or issue any ADSs for 180 days after the date of this prospectus unless we consent to such deposit or issuance, and not to provide consent without the prior written consent of the representatives of the underwriters. The foregoing does not affect the right of ADS holders to cancel their ADSs and withdraw the underlying common shares. See "Underwriting" for more information. |
| Risk factors | See "Risk Factors" and other information included in this prospectus for a discussion of risks you should carefully consider before investing in the ADSs. |

The number of common shares that will be outstanding immediately after this offering:

- is based upon 164,990,213 common shares outstanding as of the date of this prospectus, assuming the conversion of all outstanding preferred shares into 114,637,272 Class B common shares immediately upon the completion of this offering;

- includes 25,369,000 common shares underlying options that have been exercised which we will issue the equivalent number of Class B common shares to the option holders after the completion of this offering;

- excludes      common shares issuable upon the exercise of options outstanding as of the date of this prospectus, at a weighted average exercise price of $    per share; and

- excludes      common shares reserved for future issuances under our 2011 Share Incentive Plan.

Except as otherwise indicated, all information in this prospectus assumes no exercise by the underwriters of their option to purchase additional ADSs.

9

Table of Contents

# RISK FACTORS

*An investment in our ADSs involves significant risks. You should consider carefully all of the information in this prospectus, including the risks and uncertainties described below, before making an investment in our ADSs. Any of the following risks could have a material adverse effect on our business, financial condition and results of operations. In any such case, the market price of our ADSs could decline, and you may lose all or part of your investment.*

**Risks Related to Our Business and Industry**

### Our limited operating history makes it difficult to evaluate our business and prospects.

We commenced operations in October 2005 and have experienced rapid growth since then. As such, we have a limited operating history for you to evaluate our business, financial performance and prospects. It is also difficult to evaluate our prospects because we may not have sufficient experience to address the risks frequently encountered by fast-growing companies entering new and rapidly evolving markets such as the mobile security and productivity market. We incurred net losses in 2008, 2009 and 2010, and we may continue to incur losses in the future. Our ability to achieve, maintain and increase net profit may be affected by various factors including the development of our industry, the continued acceptance of our products and services by users, our ability to maintain good relationships with other participants in the mobile ecosystem and our ability to control our costs and expenses. We may not be able to sustain our profitability on a quarterly or annual basis. Due to our limited operating history, our historical growth rate may not be indicative of our future performance. We cannot assure you that we will grow at the same rate as we did in the past. You should consider our prospects in light of the risks and uncertainties that fast-growing companies with a limited operating history may encounter or to which such companies may be exposed.

### Our Freemium service business model is new in our industry and we may not be able to continuously meet user demand and increase the number of paying users, which may have material and adverse effects on our business and results of operations.

Our Freemium service business model provides users with free services and the flexibility to choose from a selection of premium services to meet users' individual needs. This model is relatively new in the mobile security and productivity industry. The success of our business model depends on, among other factors, our ability to convert our registered user accounts into paying user accounts by improving and marketing our existing products and services and developing and pricing new products and services in response to evolving user needs. Although we constantly monitor and research user needs, we may be unable to meet user demands on a continuous basis or anticipate future user demands, which will adversely affect our ability to convert free user accounts into paying user accounts, and materially and adversely affect our business and results of operations. In addition, we may not be able to maintain and increase the prices of our premium products and services, which may have material and adverse effects on our growth and prospects.

### The mobile security and productivity industry may not grow as quickly as expected, which may materially and adversely affect our business and prospects of future growth.

Our business and prospects depend on the continued development of the mobile security and productivity industry in China and overseas. As a relatively new industry, the mobile security and productivity industry has only begun to experience substantial growth in recent years both in terms of number of users and revenues. We cannot assure you, however, that the industry will continue to grow as rapidly as it did in the recent past. The growth of the mobile security and productivity industry is affected by numerous factors, such as users' general communication experience, technological innovations, development of smartphones and other mobile devices, development of mobile Internet-based telecommunication services and applications, regulatory changes, and the macroeconomic environment. If the mobile security and productivity industry in China or globally does not grow as quickly as expected or if we fail to benefit from such growth by successfully implementing our business strategies, our business and prospects may be materially and adversely affected.

13

Table of Contents

Upon completion of this offering, we will become subject to the Sarbanes-Oxley Act of 2002. Section 404 of the Sarbanes-Oxley Act, or Section 404, will require that we include a report from management on the effectiveness of our internal control over financial reporting in our annual report on Form 20-F beginning with our annual report for the fiscal year ending December 31, 2012. In addition, beginning at the same time, our independent registered public accounting firm must report on the effectiveness of our internal control over financial reporting. If we fail to remedy the material weaknesses identified above, our management and our independent registered public accounting firm may conclude that our internal control over financial reporting is not effective. This could adversely impact the market price of our ADSs due to a loss of investor confidence in the reliability of our reporting processes. We will need to incur costs and use management and other resources in order to comply with Section 404.

*We have limited business insurance coverage, which could expose us to substantial costs and diversion of resources that in turn may have an adverse effect on our results of operations and financial condition.*

Insurance companies in China currently do not offer as extensive an array of insurance products as insurance companies do in more developed economies. Consistent with customary industry practice in China, we do not maintain business interruption insurance, real property insurance or key employee insurance for our executive officers. We have determined that the costs of insuring for these risks and the difficulties associated with acquiring such insurance on commercially reasonable terms make it impractical for us to have such insurance. Uninsured damage to any of our equipment or buildings or a significant product liability claim may result in our incurring substantial costs and the diversion of resources, which could have an adverse effect on our results of operations and financial condition.

**Risks Related to Our Corporate Structure**

*If the PRC government finds that the agreements that establish the structure for operating our businesses in China do not comply with PRC governmental restrictions on foreign investment in telecommunication business, or if these regulations or the interpretation of existing regulations change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations.*

Current PRC laws and regulations place certain restrictions on foreign ownership of companies that engage in telecommunication business, including mobile application providers. Specifically, foreign ownership in a value-added telecommunication mobile payment service provider may not exceed 50%. We conduct our operations in China principally through contractual arrangements among our wholly-owned PRC subsidiary, NetQin Beijing and an affiliated entity in the PRC, Beijing Technology, and the shareholders of Beijing Technology. Beijing Technology holds the licenses and permits necessary to conduct our businesses in China. Our contractual arrangements with Beijing Technology and its shareholders enable us to exercise effective control over this entity and treat it as our consolidated affiliated entity. For a detailed discussion of these contractual arrangements, see "Corporate Structure."

The Circular regarding Strengthening the Administration of Foreign Investment in and Operation of Value added Telecommunications Business, or the Circular, issued by the MIIT, in July 2006, reiterated the regulations on foreign investment in telecommunications businesses, which require foreign investors to set up foreign-invested enterprises and obtain a business operating license to conduct any value-added telecommunications business in China. Under the Circular, a domestic company that holds a telecommunications value-added services operation license is prohibited from leasing, transferring or selling the license to foreign investors in any form, and from providing any assistance, including providing resources, websites or facilities, to foreign investors that conduct value added telecommunications business illegally in China. Furthermore, the relevant trademarks and domain names that are used in the value-added telecommunications business must be owned by the local license holder. The Circular further requires each telecommunications value-added services operation license holder to have the necessary facilities for its approved business operations and to maintain such facilities in the regions covered by its license. In addition, all value-added telecommunications mobile payment service providers are required to maintain network and information security in accordance with the standards set forth under relevant PRC regulations. Due to a lack of interpretative materials from the regulator, it is unclear what impact the Circular will have on us or the other Chinese telecommunications and Internet companies that have adopted the same or similar corporate and contractual structures as ours.

24

Table of Contents

We cannot assure you, however, that we will be able to enforce these contracts. Although we believe we are in compliance with current PRC regulations, we cannot assure you that the PRC government would agree that these contractual arrangements comply with PRC licensing, registration or other regulatory requirements, with existing policies or with requirements or policies that may be adopted in the future. PRC laws and regulations governing the validity of these contractual arrangements are uncertain and the relevant government authorities have broad discretion in interpreting these laws and regulations. If the PRC government determines that we do not comply with applicable laws and regulations, it could revoke our business and operating licenses, require us to discontinue or restrict our operations, restrict our right to collect revenues, block our websites, impose additional conditions or requirements with which we may not be able to comply, or take other regulatory or enforcement actions against us that could be harmful to our business. The imposition of any of these penalties would result in a material and adverse effect on our ability to conduct our business. The PRC government may also require us to restructure our operations entirely if it comes to find that our contractual arrangements do not comply with applicable laws and regulations. It is unclear how such mandatory restructuring could impact our business and operating results, as the PRC government has not yet found such contractual arrangements to be in non-compliance. However, any such restructuring may cause significant disruption to our business operations.

*We rely on contractual arrangements with our consolidated affiliated entity in China and its shareholders for our operations, which may not be as effective as direct ownership in providing operational control and may negatively affect our ability to conduct our business.*

Since PRC laws restrict foreign equity ownership in companies engaged in value-added telecommunication businesses like us in China, we rely on contractual arrangements with our consolidated affiliated entity, Beijing Technology, and its shareholders to operate our business in China. These contractual arrangements may not be as effective as direct ownership in providing us with control over Beijing Technology. Beijing Technology and its shareholders may fail to take certain actions required for our business or follow our instructions despite their contractual obligations to do so. If they fail to perform their obligations under their respective agreements with us, we may have to rely on legal remedies under PRC law, including seeking specific performance or injunctive relief, which may not be effective.

Although we have been advised by Jincheng Tongda & Neal, our PRC legal counsel, that each contract under these contractual arrangements is valid, binding and enforceable under current PRC laws and regulations, these contractual arrangements may not be as effective in providing us with control over Beijing Technology as direct ownership of Beijing Technology. In addition, Beijing Technology or its respective shareholders may breach the contractual arrangements. We cannot assure you that when conflicts of interest arise, Beijing Technology and its respective shareholders will act completely in our interests or that conflicts of interests will be resolved in our favor. In any such event, we would have to rely on legal remedies under PRC law.

All of these contractual arrangements are governed by PRC law and provide for the resolution of disputes through arbitration in the PRC. Accordingly, these contracts would be interpreted in accordance with PRC law and any disputes would be resolved in accordance with PRC legal procedures. Uncertainties in the PRC legal system could limit our ability to enforce these contractual arrangements, which may make it difficult to exert effective control over our consolidated affiliated entities, and our ability to conduct our business may be negatively affected.

*Contractual arrangements with Beijing Technology may result in adverse tax consequences to us.*

Under applicable PRC tax laws and regulations, arrangements and transactions among related parties may be subject to audit or scrutiny by the PRC tax authorities. We could face material and adverse tax consequences if the PRC tax authorities were to determine that the contractual arrangements among NetQin Beijing, Beijing Technology and its respective shareholders were not entered into on an arm's-length basis and therefore constituted unfavorable transfer pricing arrangements. An unfavorable transfer pricing arrangements could, among others, result in an upward adjustment on taxation. In addition, the PRC tax authorities may impose late payment penalties and interest on Beijing Technology for the adjusted but unpaid taxes. Our results of operations may be materially and adversely affected if Beijing Technology's tax liabilities increase significantly and it is required to pay late payment penalties and interests.

25

Table of Contents

*The shareholders of our affiliate variable interest entity may have potential conflicts of interest with us, which may materially and adversely affect our business and financial condition.*

All of the shareholders of our variable interest entity, Beijing Technology, are individuals who are our founders or executive officers. Conflicts of interest may arise between the dual roles of those individuals who are both executive officers of our company and shareholders of our variable interest entity. We do not have existing arrangements to address potential conflicts of interest between those individuals and our company and cannot assure you that when conflicts arise, those individuals will act in the best interest of our company or that conflicts will be resolved in our favor. If we cannot resolve any conflicts of interest or disputes between us and those individuals, we would have to rely on legal proceedings, which may materially disrupt our business. There is also substantial uncertainty as to the outcome of any such legal proceeding.

*We may rely principally on dividends and other distributions on equity paid by our PRC and HK subsidiaries to fund any cash and financing requirements we may have. Any limitation on the ability of our PRC and HK subsidiaries to pay dividends to us could have a material adverse effect on our ability to conduct our business.*

We are a holding company, and we rely principally on dividends and other distributions on equity paid by our wholly-owned PRC subsidiary, NetQin Beijing, and our wholly-owned Hong Kong subsidiary, NetQin HK, which is the direct holding company of NetQin Beijing, for our cash and financing requirements, including the funds necessary to pay dividends and other cash distributions to our shareholders and service any debt we may incur. If NetQin Beijing or NetQin HK, as the case may be, incurs debt on its own behalf in the future, the instruments governing the debt may restrict its ability to pay dividends or make other distributions to us. In addition, the PRC tax authorities may require us to adjust our taxable income under the contractual arrangements NetQin Beijing currently has in place with Beijing Technology in a manner that would materially and adversely affect its ability to pay dividends and other distributions to us.

Under PRC laws and regulations, NetQin Beijing, as wholly foreign-owned enterprises in the PRC, may pay dividends only out of its cumulative profits as determined in accordance with PRC accounting standards and regulations. In addition, wholly foreign-owned enterprises such as NetQin Beijing is required to set aside at least 10% of their cumulative after-tax profits each year, if any, to fund certain statutory reserve funds, until the aggregate amount of such a fund reaches 50% of their respective registered capital. At their discretion, they may allocate a portion of their after-tax profits based on PRC accounting standards to staff welfare and bonus funds. These reserve funds and staff welfare and bonus funds are not distributable as cash dividends. The registered capital of NetQin Beijing is $30 million. NetQin Beijing has been in cumulative loss pursuant to PRC accounting standards since its inception and therefore, in accordance with applicable PRC laws and regulations, it has not commenced to contribute to the statutory reserve fund.

Any limitation on the ability of NetQin Beijing to pay dividends or make other distributions to us could materially and adversely limit our ability to grow, make investments or acquisitions that could be beneficial to our business, pay dividends, or otherwise fund and conduct our business. See "Risk Factors — Risks Related to Doing Business in China — Our global income and the dividends that we may receive from our PRC subsidiaries may be subject to PRC taxes under the PRC Enterprise Income Tax Law, which would have a material adverse effect on our results of operations."

In addition, under the PRC Enterprise Income Tax Law and the Implementing Rules, both of which became effective on January 1, 2008, dividends generated from the business of our PRC subsidiary, NetQin Beijing after January 1, 2008 and payable to us may be subject to a withholding tax rate of 10% if the PRC tax authorities subsequently determine that we are a non-PRC resident enterprise, unless there is a tax treaty with China that provides for a different withholding arrangement.

26

Table of Contents

***PRC regulation of loans to, and direct investment in, PRC entities by offshore holding companies and governmental control of currency conversion may restrict or prevent us from using the proceeds of this offering to make loans to our PRC subsidiary and consolidated affiliated entities or to make additional capital contributions to our PRC subsidiary, which may materially and adversely affect our liquidity and our ability to fund and expand our business.***

We are an offshore holding company conducting our operations in China through our PRC subsidiary and consolidated affiliated entities. We may make loans to our PRC subsidiary and consolidated affiliated entities, or we may make additional capital contributions to our PRC subsidiary.

Any loans we issue to our PRC subsidiary, which is treated as a foreign-invested enterprise under PRC law, are subject to PRC regulations and foreign exchange loan registrations. Pursuant to Article 18 of the Provisional Rules on Management of Foreign Debt effective on March 1, 2003, the total amount of foreign debts of a foreign-invested company shall be subject to a statutory limit which is the difference between the amount of total investment and the amount of registered capital of such foreign-invested company. The current amount of total investment and amount of registered capital of our PRC subsidiary are $32.9 million and $30 million, respectively, and the current statutory limits on the loans to the PRC subsidiary is $2.9 million. Such statutory limits can increase if the amount of total investment of the PRC subsidiary increases; under PRC laws and regulations, the maximum amount of total investment of a foreign-invested company with a registered capital of more than $12 million shall not exceed three times of its registered capital. For example, loans by us to NetQin Beijing to finance its activities cannot exceed statutory limits and must be registered with the local counterpart of the State Administration of Foreign Exchange, or SAFE. We may also decide to finance NetQin Beijing by means of capital contributions. These capital contributions must be approved by the PRC Ministry of Commerce or its local counterpart. Due to the restrictions imposed on loans in foreign currencies extended to any PRC domestic companies, we are not likely to make such loans to our consolidated affiliated entities, Beijing Technology and Fuzhou NetQin, each a PRC domestic company. However, if such loans become necessary for the operations of our PRC subsidiary or consolidated affiliated entities, these statutory limits and other restrictions may materially and adversely affect our liquidity and ability to fund operations in the PRC by limiting a source of cash for these PRC entities. Meanwhile, we are also not likely to finance the activities of our consolidated affiliated entities by means of capital contributions due to regulatory restrictions relating to foreign investment in PRC domestic enterprises engaged in our line of business.

On August 29, 2008, SAFE promulgated the Circular on the Relevant Operating Issues Concerning the Improvement of the Administration of the Payment and Settlement of Foreign Currency Capital of Foreign Invested Enterprises, or SAFE Circular 142, regulating the conversion by a foreign-invested enterprise of foreign currency registered capital into RMB by restricting how the converted RMB may be used. SAFE Circular 142 provides that the RMB capital converted from foreign currency registered capital of a foreign-invested enterprise may only be used for purposes within the business scope approved by the applicable governmental authority and may not be used for equity investments within the PRC. In addition, SAFE strengthened its oversight of the flow and use of the RMB capital converted from foreign currency registered capital of a foreign-invested company. The use of such RMB capital may not be altered without SAFE approval, and such RMB capital may not in any case be used to repay RMB loans if the proceeds of such loans have not been used. Violations of SAFE Circular 142 could result in severe monetary or other penalties.

In light of the various requirements imposed by PRC regulations on loans to and direct investment in PRC entities by offshore holding companies, including SAFE Circular 142, we cannot assure you that we will be able to complete the necessary government registrations or obtain the necessary government approvals on a timely basis, if at all, with respect to future loans by us to our PRC subsidiary or any consolidated affiliated entities or with respect to future capital contributions by us to our PRC subsidiary. If we fail to complete such registrations or obtain such approvals, our ability to use the proceeds we expect to receive from this offering and to capitalize or otherwise fund our PRC operations may be negatively affected, which could materially and adversely affect our liquidity and our ability to fund and expand our business.

27

Table of Contents

**Risks Related to this Offering**

*There has been no public market for our common shares or ADSs prior to this offering, and you may not be able to resell our ADSs at or above the price you paid, or at all.*

Prior to this initial public offering, there has been no public market for our common shares or ADSs. We have applied to list the ADSs on the NYSE. Our common shares will not be listed on any exchange or quoted for trading on any over-the-counter trading system. If an active trading market for our ADSs does not develop after this offering, the market price and liquidity of our ADSs will be materially and adversely affected.

Our negotiations with the underwriters will determine the initial public offering price for our ADSs which may bear no relationship to their market price after the initial offering. We cannot assure you that an active trading market for our ADSs will develop or that the market price of our ADSs will not decline below the initial public offering price.

*The market price for our ADSs may be volatile.*

The market price for our ADSs is likely to be volatile and subject to wide fluctuations in response to factors including the following:

- regulatory developments in our target markets affecting us, our customers or our competitors;

- announcements of studies and reports relating to the quality of our services or those of our competitors;

- changes in the economic performance or market valuations of other companies that provide mobile security and management solutions;

- actual or anticipated fluctuations in our quarterly results of operations and changes or revisions of our expected results;

- changes in financial estimates by securities research analysts;

- conditions in the value-added telecommunication or Internet services industries;

- announcements by us or our competitors of new services, acquisitions, strategic relationships, joint ventures or capital commitments;

- additions to or departures of our senior management;

- fluctuations of exchange rates between the RMB and the U.S. dollar;

- release or expiry of lock-up or other transfer restrictions on our outstanding common shares or ADSs; and

- sales or perceived potential sales of additional common shares or ADSs.

In addition, the securities market has from time to time experienced significant price and volume fluctuations that are not related to the operating performance of any particular companies. These market fluctuations may also have a material adverse effect on the market price of our ADSs.

*Because our initial public offering price is substantially higher than our net tangible book value per share, you will experience immediate and substantial dilution.*

If you purchase ADSs in this offering, you will pay more for your ADSs than the amount paid by our existing shareholders for their common shares on a per ADS basis. As a result, you will experience immediate and substantial dilution of approximately $    per ADS, representing the difference between the assumed initial public offering price of $    per ADS, the midpoint of the estimated range of the initial public offering price, and our net tangible book value per ADS as of December 31, 2010, after giving effect to the automatic conversion of our preferred shares immediately upon the completion of this offering, and our issuance of Class B common shares for all exercised options after this offering and the net proceeds to us from this offering. In addition, you will experience further dilution when common shares are issued in connection with the exercise of share options in the future.

36

***Because we do not expect to pay dividends in the foreseeable future after this offering, you must rely on price appreciation of our ADSs for return on your investment.***

We currently intend to retain most, if not all, of our available funds and any future earnings after this offering to fund the development and growth of our business. As a result, we do not expect to pay any cash dividends in the foreseeable future. Therefore, you should not rely on an investment in our ADSs as a source for any future dividend income.

Our board of directors has complete discretion as to whether to distribute dividends. Even if our board of directors decides to declare and pay dividends, the timing, amount and form of future dividends, if any, will depend on, among other things, our future results of operations and cash flow, our capital requirements and surplus, the amount of distributions, if any, received by us from our subsidiaries, our financial condition, contractual restrictions and other factors deemed relevant by our board of directors. Accordingly, the return on your investment in our ADSs will likely depend entirely upon any future price appreciation of our ADSs. There is no guarantee that our ADSs will appreciate in value after this offering or even maintain the price at which you purchased the ADSs. You may not realize a return on your investment in our ADSs and you may even lose your entire investment in our ADSs.

***Substantial future sales or perceived potential sales of our ADSs in the public market could cause the price of our ADSs to decline.***

Sales of our ADSs or common shares in the public market after this offering, or the perception that these sales could occur, could cause the market price of our ADSs to decline. Upon completion of this offering, we will have          common shares outstanding including          Class A common shares represented by ADSs. All ADSs sold in this offering will be freely transferable without restriction or additional registration under the Securities Act. The remaining common shares outstanding after this offering will be available for sale, upon the expiration of the 180-day lock-up period beginning from the date of this prospectus, subject to volume and other restrictions as applicable under Rules 144 and 701 under the Securities Act. Any or all of these shares may be released prior to the expiration of the lock-up period at the discretion of the representatives. To the extent shares are released before the expiration of the lock-up period and sold into the market, the market price of our ADSs could decline.

Upon completion of this offering, certain holders of our common shares will have the right to cause us to register under the Securities Act the sale of their shares, subject to the 180-day lock-up period in connection with this offering. Registration of these shares under the Securities Act would result in ADSs representing these shares becoming freely tradable without restriction under the Securities Act immediately upon the effectiveness of the registration. Sales of these registered shares in the form of ADSs, in the public market could cause the price of our ADSs to decline.

***You may not have the same voting rights as the holders of our common shares and may not receive voting materials in time to be able to exercise your right to vote.***

Except as described in this prospectus and in the deposit agreement, holders of our ADSs will not be able to exercise voting rights attaching to the shares represented by our ADSs on an individual basis. Holders of our ADSs will appoint the depositary or its nominee as their representative to exercise the voting rights attaching to the shares represented by the ADSs. You may not receive voting materials in time to instruct the depositary to vote, and it is possible that you, or persons who hold their ADSs through brokers, dealers or other third parties, will not have the opportunity to exercise a right to vote.

***Your right to participate in any future rights offerings may be limited, which may cause dilution to your holdings, and you may not receive cash dividends if it is impractical to make them available to you.***

We may from time to time distribute rights to our shareholders, including rights to acquire our securities. However, we cannot make rights available to you in the United States unless we register both the rights and the securities to which the rights relate under the Securities Act or an exemption from the registration requirements is available. Under the deposit agreement, the depositary will not make rights available to you unless both the rights and the underlying securities to be distributed to ADS holders are either registered under the Securities Act or exempt from registration under the Securities Act. We are under no obligation to file a registration statement with

37

Table of Contents

respect to any such rights or securities or to endeavor to cause such a registration statement to be declared effective and we may not be able to establish a necessary exemption from registration under the Securities Act. Accordingly, you may be unable to participate in our rights offerings and may experience dilution in your holdings.

The depositary of our ADSs has agreed to pay to you the cash dividends or other distributions it or the custodian receives on our common shares or other deposited securities after deducting its fees and expenses. You will receive these distributions in proportion to the number of common shares your ADSs represent. However, the depositary may, at its discretion, decide that it is impractical to make a distribution available to any holders of ADSs. For example, the depositary may determine that it is not practicable to distribute certain property through the mail, or that the value of certain distributions may be less than the cost of mailing them. In these cases, the depositary may decide not to distribute such property to you.

**_You may be subject to limitations on transfer of your ADSs._**

Your ADS are transferable on the books of the depositary. However, the depositary may close its transfer books at any time or from time to time when it deems expedient in connection with the performance of its duties. In addition, the depositary may refuse to deliver, transfer or register transfers of ADSs generally when our books or the books of the depositary are closed, or at any time if we or the depositary deems it advisable to do so because of any requirement of law or of any government or governmental body, or under any provision of the deposit agreement, or for any other reason.

**_You may face difficulties in protecting your interests, and your ability to protect your rights through the U.S. federal courts may be limited because we are incorporated under Cayman Islands law, we conduct substantially all of our operations in China and substantially all of our directors and officers reside outside the United States._**

We are incorporated in the Cayman Islands and conduct a majority of our operations in China through our PRC subsidiary and consolidated affiliated entities. Substantially all of our directors and officers reside outside the United States and a substantial portion of their assets are located outside of the United States. As a result, it may be difficult or impossible for you to bring an action against us or against these individuals in the Cayman Islands or in China in the event that you believe that your rights have been infringed under the securities laws or otherwise. Even if you are successful in bringing an action of this kind, the laws of the Cayman Islands and of China may render you unable to enforce a judgment against our assets or the assets of our directors and officers. There is no statutory recognition in the Cayman Islands of judgments obtained in the United States, although the courts of the Cayman Islands will generally recognize and enforce a non-penal judgment of a foreign court of competent jurisdiction without retrial on the merits. For more information regarding the relevant laws of the Cayman Islands and China, see "Enforceability of Civil Liabilities."

Our corporate affairs are governed by our memorandum and articles of association, as amended and restated from time to time, and by the Companies Law (2010 Revision) and common law of the Cayman Islands. The rights of shareholders to take legal action against us and our directors, actions by minority shareholders and the fiduciary responsibilities of our directors are to a large extent governed by the common law of the Cayman Islands. The common law of the Cayman Islands is derived in part from comparatively limited judicial precedent in the Cayman Islands as well as from English common law, which provides persuasive, but not binding, authority. The rights of our shareholders and the fiduciary responsibilities of our directors under Cayman Islands law are not as clearly established as they would be under statutes or judicial precedents in the United States. In particular, the Cayman Islands has a less developed body of securities laws than the United States and provides significantly less protection to investors. In addition, Cayman Islands companies may not have standing to initiate a shareholder derivative action in U.S. federal courts.

As a result, our public shareholders may have more difficulty in protecting their interests through actions against us, our management, our directors or our major shareholders than would shareholders of a corporation incorporated in a jurisdiction in the United States.

38

Table of Contents

***You must rely on the judgment of our management as to the use of the net proceeds from this offering, and such use may not produce income or increase our ADS price.***

We intend to use the net proceeds of this offering for investments in technology, infrastructure and research and development efforts, the expansion of sales and marketing efforts, and other general corporate purposes, among others. However, our management will have considerable discretion in the application of the net proceeds received by us. For more information, see "Use of Proceeds." You will not have the opportunity, as part of your investment decision, to assess whether proceeds are being used appropriately. You must rely on the judgment of our management regarding the application of the net proceeds of this offering. The net proceeds may be used for corporate purposes that do not improve our efforts to maintain profitability or increase our ADS price. The net proceeds from this offering may be placed in investments that do not produce income or that lose value.

***Our dual-class common share structure with different voting rights will limit your ability to influence corporate matters and could discourage others from pursuing any change of control transactions that holders of our Class A common shares and ADSs may view as beneficial.***

Upon the completion of this offering, our common shares will be divided into Class A common shares and Class B common shares. Holders of Class A common shares are entitled to one vote per share, while holders of Class B common shares are entitled to ten votes per share. We will issue Class A common shares represented by our ADSs in this offering. All of our outstanding common shares prior to the offering will be redesignated as Class B common shares and our outstanding preferred shares will be automatically converted into Class B common shares upon the completion of this offering. In addition, all options issued prior to the completion of this offering entitle option holders to the equivalent number of Class B common shares once the options are vested and exercised. Due to the disparate voting powers attached to these two classes, we anticipate that our existing shareholders will collectively own approximately      % of the total voting power of our outstanding common shares immediately after this offering assuming the underwriters do not exercise their over-allotment option to purchase additional ADSs and will have considerable influence over matters requiring shareholder approval, including election of directors and significant corporate transactions, such as a merger or sale of our company or our assets. In particular, our three founders, Dr. Henry Yu Lin, Mr. Xu Zhou and Dr. Vincent Wenyong Shi, and their affiliates will own approximately      % of our outstanding common shares, representing      % of our total voting power after this offering, assuming the underwriters do not exercise their over-allotment option to purchase additional ADSs. This concentrated control will limit your ability to influence corporate matters and could discourage others from pursuing any potential merger, takeover or other change of control transactions that holders of Class A common shares and ADSs may view as beneficial.

***Our memorandum and articles of association will contain anti-takeover provisions that could adversely affect the rights of holders of our common shares and ADSs.***

We will adopt an amended and restated memorandum and articles of association that will become effective immediately upon the closing of this offering. Our new memorandum and articles of association will contain certain provisions that could limit the ability of others to acquire control of our company, including a provision that grants authority to our board directors to establish from time to time one or more series of preferred shares without action by our shareholders and to determine, with respect to any series of preferred shares, the terms and rights of that series. The provisions could have the effect of depriving our shareholders of the opportunity to sell their shares at a premium over the prevailing market price by discouraging third parties from seeking to obtain control of our company in a tender offer or similar transactions.

***Our corporate actions are substantially controlled by our directors, executive officers and other principal shareholders, who can exert significant influence over important corporate matters, which may reduce the price of our ADSs and deprive you of an opportunity to receive a premium for your shares.***

After this offering, our directors, executive officers and principal shareholders will beneficially own approximately      % of our outstanding common shares. These shareholders, if acting together, could exert substantial influence over matters such as electing directors and approving material mergers, acquisitions or other business combination transactions. Our three founders in particular, Dr. Henry Yu Lin, Mr. Xu Zhou and Dr. Vincent

39

Table of Contents

Wenyong Shi, together beneficially own 27.0% of our outstanding common shares as of the date of this prospectus and will beneficially own    % of our outstanding common shares immediately after this offering. In addition, two of our directors, Mr. James Ding and Mr. Weiguo Zhao, together beneficially own 34.3% of our outstanding common shares as of the date of this prospectus through their respective venture capital funds in which each of them indirectly and beneficially owns interests. Mr. Ding and Mr. Zhao together will beneficially own    % of our outstanding common shares and    % of our aggregate voting power immediately after this offering. If our founders and directors retain their shares in our company, they will continue to have substantial influence over our company in the foreseeable future. This concentration of ownership may also discourage, delay or prevent a change in control of our company, which could have the dual effect of depriving our shareholders of an opportunity to receive a premium for their shares as part of a sale of our company and reducing the price of our ADSs. These actions may be taken even if they are opposed by our other shareholders, including those who purchase ADSs in this offering. In addition, these persons could divert business opportunities away from us to themselves or others.

### *We may be classified as a passive foreign investment company for United States federal income tax purposes, which could subject United States investors in the ADSs or common shares to significant adverse United States income tax consequences.*

Depending upon the value of our ADSs and common shares and the nature of our assets and income over time, we could be classified as a "passive foreign investment company," or PFIC, for United States federal income tax purposes. Based upon our current income and assets (taking into account the proceeds from this offering) and projections as to the value of our ADSs and common shares pursuant to the offering, we do not presently expect to be classified as a PFIC for the current taxable year or the foreseeable future. While we do not expect to become a PFIC, if our market capitalization is less than anticipated or subsequently declines we may be a PFIC for the current or subsequent taxable years. The determination of whether we will be or become a PFIC will also depend, in part, on the composition of our income and assets, which will be affected by how, and how quickly, we use our liquid assets and the cash raised in this offering. Because there are uncertainties in the application of the relevant rules and PFIC status is a factual determination made annually after the close of each taxable year, including ascertaining the fair market value of our assets on a quarterly basis and the character of each item of income we earn, there can be no assurance that we will not be a PFIC for the current taxable year or any future taxable year.

If we were to be classified as a PFIC in any taxable year, a U.S. Holder (as defined in "Taxation — Material United States Federal Income Tax Considerations") would be subject to special rules generally intended to reduce or eliminate any benefits from the deferral of United States federal income tax that a U.S. Holder could derive from investing in a non-United States corporation that does not distribute all of its earnings on a current basis. Further, if we are classified as a PFIC for any year during which a U.S. Holder holds our ADSs or common shares, we generally will continue to be treated as a PFIC for all succeeding years during which such U.S. Holder holds our ADSs or common shares. For more information see the section titled "Taxation — Material United States Federal Income Tax Considerations — Passive Foreign Investment Considerations."

### *We will incur increased costs as a result of being a public company.*

As a public company, we will incur significant accounting, legal and other expenses that we did not incur as a private company. The Sarbanes-Oxley Act, as well as rules subsequently implemented by the Securities and Exchange Commission and the NYSE, have detailed requirements concerning corporate governance practices of public companies including Section 404 relating to internal control over financial reporting. We expect these and other rules and regulations applicable to public companies to increase our accounting, legal and financial compliance costs and to make certain corporate activities more time-consuming and costly. We are currently evaluating and monitoring developments with respect to these new rules, and we cannot predict or estimate the amount of additional costs we may incur or the timing of such costs.

40

Table of Contents

## ENFORCEABILITY OF CIVIL LIABILITIES

We were incorporated in the Cayman Islands in order to enjoy certain benefits, such as political and economic stability, an effective judicial system, a favorable tax system, the absence of exchange control or currency restrictions, and the availability of professional and support services. However, certain disadvantages accompany incorporation in the Cayman Islands. These disadvantages include a less developed body of Cayman Islands securities laws that provide significantly less protection to investors as compared to the laws of the United States, and the potential lack of standing by Cayman Islands companies to sue before the federal courts of the United States.

Our organizational documents do not contain provisions requiring disputes, including those arising under the securities laws of the United States, between us, our officers, directors and shareholders, be arbitrated.

A majority of our operations are conducted in China, and substantially all of our assets are located in China. A majority of our officers are nationals or residents of jurisdictions other than the United States and a substantial portion of their assets are located outside the United States. As a result, it may be difficult for a shareholder to effect service of process within the United States upon these persons, or to enforce against us or them judgments obtained in United States courts, including judgments predicated upon the civil liability provisions of the securities laws of the United States or any state in the United States.

We have appointed Law Deferture Corporate Services Inc. as our agent upon whom process may be served in any action brought against us under the securities laws of the United States.

Maples and Calder, our counsel as to Cayman Islands law, and Jincheng Tongda & Neal, our counsel as to PRC law, have advised us, respectively, that there is uncertainty as to whether the courts of the Cayman Islands and China, respectively, would:

- recognize or enforce judgments of United States courts obtained against us or our directors or officers predicated upon the civil liability provisions of the securities laws of the United States or any state in the United States; or

- entertain original actions brought in each respective jurisdiction against us or our directors or officers predicated upon the securities laws of the United States or any state in the United States.

Maples and Calder has further advised us that a final and conclusive judgment in the federal or state courts of the United States under which a sum of money is payable, other than a sum payable in respect of taxes, fines, penalties or similar charges, and which was neither obtained in a manner nor is of a kind enforcement of which is contrary to natural justice or the public policy of the Cayman Islands, may be subject to enforcement proceedings as a debt in the courts of the Cayman Islands under the common law doctrine of obligation without any re-examination of the merits of the underlying dispute. However, the Cayman Islands courts are unlikely to enforce a punitive judgment of a United States court predicated upon the liabilities provision of the federal securities laws in the United States without retrial on the merits if such judgment gives rise to obligations to make payments that may be regarded as fines, penalties or similar charges.

Jincheng Tongda & Neal has further advised us that the recognition and enforcement of foreign judgments are provided for under the PRC Civil Procedures Law. PRC courts may recognize and enforce foreign judgments in accordance with the requirements of the PRC Civil Procedures Law based either on treaties between China and the country where the judgment is made or on principles of reciprocity between jurisdictions. China does not have any treaties or other form of reciprocity with the United States that provide for the reciprocal recognition and enforcement of foreign judgments. In addition, according to the PRC Civil Procedures Law, courts in the PRC will not enforce a foreign judgment against us or our directors or officers if they decide that the judgment violates the basic principles of PRC law or national sovereignty, security or public interest. As a result, it is uncertain whether and on what basis a PRC court would enforce a judgment rendered by a court in the United States.

47

Table of Contents

## CORPORATE STRUCTURE

We commenced operations on October 21, 2005, when our founders incorporated Beijing Technology in the PRC. Beijing Technology is primarily engaged in the research and development of products and services related to mobile security and productivity.

On March 14, 2007, NetQin Mobile Inc. was incorporated in the Cayman Islands. Our founders, Dr. Henry Yu Lin, Mr. Xu Zhou and Dr. Vincent Wenyong Shi, currently hold in aggregate 27.0% of our outstanding share capital indirectly through RPL Holdings Limited, a limited liability company organized under the laws of the British Virgin Islands. Our founders, if acting together, could exert substantial influence over our company and our daily operations. After this offering, our founders will collectively beneficially own     % of our outstanding share capital. If our founders retain their shares in our company, they will continue to have substantial influence over our company.

On May 15, 2007, we established our wholly owned subsidiary, NetQin Beijing, in Beijing, China. On April 26, 2010, we established NetQin HK, our directly and wholly owned subsidiary, in Hong Kong. In December 2010, we transferred all of the equity interest in NetQin Beijing to NetQin HK. NetQin HK will conduct part of our business activities and operations outside of China. On November 5, 2010, we established NetQin US in the United States, which became the directly wholly owned subsidiary of NetQin Mobile Inc. The major functions of NetQin US include analyzing market information in the U.S. mobile industry. Our international business will be handled by us, NetQin HK and NetQin Beijing, with the allocation of business to be determined by relevant tax considerations, among other things.

Applicable PRC laws and regulations currently limit foreign ownership of companies that provide value-added telecommunications services. As a Cayman Islands corporation, we are deemed a foreign legal person under PRC laws. Accordingly, our PRC subsidiary, NetQin Beijing, which is considered a wholly foreign-owned enterprise, is currently ineligible to engage in providing value-added telecommunication services. To comply with these foreign ownership restrictions, we conduct our operations in China primarily through our affiliated entity, Beijing Technology. Dr. Henry Yu Lin, Mr. Xu Zhou and Dr. Vincent Wenyong Shi, all of whom are PRC citizens, each currently owns 52.00%, 33.25% and 14.75% of Beijing Technology, respectively.

On June 1, 2009, Beijing Technology obtained 51% of the equity interests in Fuzhou NetQin. As a result, Fuzhou NetQin is 51% owned by Beijing Technology and 49% owned by Fuzhou Huihe Yitong Technology Co., Ltd., a third party entity. Fuzhou NetQin primarily engages in the research and development of mobile software and related products and services.

Our wholly owned subsidiary NetQin Beijing has entered into a series of contractual arrangements with Beijing Technology and its respective shareholders, which enable us to:

- exercise effective control over Beijing Technology;

- receive substantially all of the economic benefits of Beijing Technology in consideration for the technical and consulting services provided by and the intellectual property rights licensed by NetQin Beijing; and

- have an exclusive option to purchase all of the equity interests in Beijing Technology when and to the extent permitted under PRC laws, regulations and legal procedures.

We have been and are expected to continue to be dependent on Beijing Technology to operate our business if the then PRC law does not allow us to directly operate such business in China, or our direct operations will cause a material adverse impact on our business, including but not limited to, the inability to maintain or renew the qualifications, licenses or permits necessary for our business in China. We believe that under these contractual arrangements, we have substantial control over our consolidated affiliated entities and their respective shareholders to renew, revise or enter into new contractual arrangements prior to the expiration of the current arrangements on terms that would enable us to continue to operate our business in China after the expiration of the current arrangements, or pursuant to certain amendments and changes of the current applicable PRC laws, regulations and rules on terms that would enable us to continue to operate our business in China legally.

48

Table of Contents

The following chart illustrates our corporate structure as of the date of this prospectus:



(1)  Beijing Technology is our consolidated affiliated entity established in China and is 52.00% owned by our chairman and chief executive officer, Dr. Henry Yu Lin, 33.25% owned by one of our directors, Xu Zhou and 14.75% owned by Dr. Vincent Wenyong Shi, our chief operating officer. The three shareholders of Beijing Technology are the three founders of our company. We effectively control Beijing Technology through contractual arrangements. See "Corporate Structure."

(2)  The remaining equity interests are owned by Fuzhou Huihe.

The following is a summary of the currently effective contracts among our subsidiary NetQin Beijing, our consolidated affiliated entity Beijing Technology, and the shareholders of Beijing Technology.

**Agreements that Provide Us Effective Control over Beijing Technology**

*Business Operations Agreement.*  Pursuant to the business operations agreement dated as of June 5, 2007 among NetQin Beijing, Beijing Technology and the shareholders of Beijing Technology, Beijing Technology must appoint the persons designated by NetQin Beijing to be its directors, general manager, chief financial officer and any other senior officers. Beijing Technology agrees to accept the proposal provided by NetQin Beijing from time to time relating to employment, daily business and financial management. Without NetQin Beijing or its representative's prior written consent, Beijing Technology shall not conduct any transaction which may materially affect its assets, business, personnel, rights, liabilities or operations. In addition, the shareholders of Beijing Technology irrevocably appointed a person designed by NetQin Beijing as their attorney-in-fact to vote on their behalf on all matters of Beijing Technology requiring shareholder approval, including matters relating to the transfer of any or all of their respective equity interests in Beijing Technology, and appointment of the directors, chief executive officer, chief financial officer, and other senior management members of Beijing Technology. They further agree to withdraw such appointment and appoint another person as their power-in-fact per NetQin's request in any time. The shareholders of Beijing Technology agree to transfer any dividends, bonus or any other benefits or interests , which they received as the shareholders of Beijing Technology, to NetQin Beijing without any conditions. This agreement is effective until NetQin Beijing ceases to exist. NetQin Beijing may terminate the agreement at any time by providing 30-day's advance written notice to Beijing Technology and to each of its shareholders. Neither Beijing Technology nor any of its shareholders may terminate this agreement prior to the expiration date.

49

Table of Contents

*Equity Interest Pledge Agreement.* Pursuant to the equity interest pledge agreement dated as of August 6, 2007 among NetQin Beijing and the shareholders of Beijing Technology, as amended, the shareholders of Beijing Technology pledge all of their respective equity interests in Beijing Technology to NetQin Beijing, to guarantee Beijing Technology and its shareholders' performance of their obligations under the exclusive technical consulting services agreement, equity disposition agreement and business operations agreement. If Beijing Technology and/or any of its shareholders breach their contractual obligations under these agreements, NetQin Beijing, as pledgee, will be entitled to certain rights, including the right to sell the pledged equity interests. Without NetQin Beijing's prior written consent, shareholders of Beijing Technology shall not transfer or assign the pledged equity interests, or create or allow any encumbrance that would prejudice NetQin Beijing's interests. During the term of this agreement, Beijing Technology shall not distribute any dividends or profits; otherwise NetQin Beijing is entitled to receive all of the dividends and profits paid on the pledged equity interests. The equity interest pledge will be effective upon the completion of the registration of the pledge with the competent local branch of the SAIC, and expire when, upon NetQin Beijing's written confirmation, Beijing Technology and its shareholders have fully performed their obligations under the exclusive technical consulting services agreement, equity disposition agreement and business operations agreement. We are currently in the process of applying for registration of the pledge of Beijing Technology's equity interests with Beijing Administration for Industry and Commerce.

**Agreements that Transfer Economic Benefits to Us**

*Exclusive Technical Consulting Services Agreement.* Pursuant to the exclusive technical consulting services agreement dated as of June 5, 2007 between NetQin Beijing and Beijing Technology, NetQin Beijing has exclusive right to provide technical consulting services relating to, among other things, research and development of mobile anti-virus software, training for employees, transfer of research and development technology, public relations, market research and analysis, strategic planning and sales and marketing to Beijing Technology. Without NetQin Beijing's prior written consent, Beijing Technology shall not engage any third party for any of the technical consulting services provided under this agreement. In addition, NetQin Beijing exclusively owns all intellectual property rights resulting from the performance of this agreement. Beijing Technology agrees to pay a quarterly service fee to NetQin Beijing based on the percentage of revenue of Beijing Technology as set forth in this agreement. During the term of this agreement, NetQin Beijing shall have the right to adjust the service fees. The term of this agreement expires upon the dissolution date of NetQin Beijing under the laws and regulations of the PRC. NetQin Beijing can terminate this agreement at any time by providing 30-day's prior written notice. Beijing Technology is not permitted to terminate this agreement prior to the expiration date.

**Agreements that Provide Us the Option to Purchase the Equity Interest in Beijing Technology**

*Equity Disposition Agreement.* Pursuant to the equity disposition agreement dated as of June 5, 2007 among NetQin Beijing, Beijing Technology and the shareholders of Beijing Technology, Beijing Technology's shareholders grant NetQin Beijing or its designated representative(s) an exclusive option to purchase, to the extent permitted under PRC law, all or part of their equity interests in Beijing Technology. All of the equity interests in Beijing Technology can be acquired in considerations for the cancellation of all of the loans extended to Beijing Technology's shareholders under the loan agreements mentioned below. NetQin Beijing or its designated representative(s) have sole discretion to decide when to exercise such options, either in part or in full. NetQin Beijing or its designated representative(s) is entitled to exercise the options an unlimited number of times until all of the equity interests have been acquired, and can freely transfer the option, in whole or in part to any third party. Without NetQin Beijing's prior written consent, Beijing Technology's shareholders shall not transfer, donate, pledge, or otherwise dispose of their equity shareholdings in any way. The equity disposition agreement has a term of ten years, but may be extended at the sole option of NetQin Beijing. NetQin Beijing also has the right to require other parties to sign an updated equity disposition agreement instead of extending the existing one.

*Loan Agreements.* On June 5, 2007, NetQin Beijing and the shareholders of Beijing Technology entered into a loan agreement, pursuant to which NetQin Beijing extended interest-free loans to the shareholders of Beijing Technology with an aggregate amount of RMB6,122,500. In addition, NetQin Mobile Inc. extended a loan in the amount of $250,000 to the shareholders of Beijing Technology with an annual interest rate of 6%. In January 2011, NetQin Mobile Inc., NetQin Beijing and the shareholders of Beijing Technology entered into an agreement, which provides that the sole purpose of the loans in the amounts of RMB6,122,500 and $250,000 is to provide funds

50

Table of Contents

necessary for the capital injection of Beijing Technology and that the obligations of the shareholders of Beijing Technology to repay such loans can only be fully performed by the sale of all of its equity interests to NetQin Beijing or its designated representative(s) pursuant to the equity disposition agreement. We refer to these agreements collectively as the loan agreements. Without NetQin Beijing's prior written consent, the shareholders of Beijing Technology shall not approve any transaction which may significantly affect its assets, operations or liabilities. The term of the loan agreements is ten years, and may be extended if both parties agree in writing.

In the opinion of Jincheng Tongda & Neal, our PRC legal counsel:

- the ownership structures of our consolidated affiliated entities and our subsidiary in China, both currently and after giving effect to this offering, comply with all existing PRC laws and regulations;

- the contractual arrangements among NetQin Beijing and Beijing Technology and the shareholders of Beijing Technology that are governed by PRC law are valid, binding and enforceable, and will not result in any violation of PRC laws or regulations currently in effect; and

- each of our PRC subsidiary and our consolidated affiliated entities has all necessary corporate power and authority to conduct its business as described in its business scope under its business license. The business licenses of our PRC subsidiary and our consolidated affiliated entities are in full force and effect. Our PRC subsidiary and our consolidated affiliated entities are capable of suing and being sued and may be the subject of any legal proceedings in PRC courts. To the best of Jincheng Tongda & Neal's knowledge after due inquires, none of our PRC subsidiary, consolidated affiliated entities or their respective assets is entitled to any immunity, on the grounds of sovereignty, from any action, suit or other legal proceedings; or from enforcement, execution or attachment.

We have been advised by our PRC legal counsel, however, that there are substantial uncertainties regarding the interpretation and application of current and future PRC laws, regulations and rules. Accordingly, the PRC regulatory authorities may in the future take a view that is contrary to the above opinion of our PRC legal counsel. We have been further advised by our PRC counsel that if the PRC government finds that the agreements that establish the structure for operating our PRC businesses do not comply with PRC government restrictions on foreign investment in value-added telecommunication services, we could be subject to severe penalties including being prohibited from continuing operations. See "Risk Factors — Risks Related to Our Corporate Structure — If the PRC government finds that the agreements that establish the structure for operating our businesses in China do not comply with PRC governmental restrictions on foreign investment in Internet business, or if these regulations or the interpretation of existing regulations change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations" and "— Risks Related to Doing Business in China — Uncertainties with respect to the PRC legal system could adversely affect us."

51

[Table of Contents](#)

**DESCRIPTION OF AMERICAN DEPOSITARY SHARES**

**American Depositary Shares**

Deutsche Bank Trust Company Americas, as depositary, will register and deliver the ADSs. Each ADS will represent ownership of       common shares deposited with the office in Hong Kong of Deutsche Bank AG, Hong Kong Branch, as custodian for the depositary. Each ADS will also represent ownership of any other securities, cash or other property which may be held by the depositary. The depositary's corporate trust office at which the ADSs will be administered is located at 60 Wall Street, New York, NY 10005, USA. The principal executive office of the depositary is located at 60 Wall Street, New York, NY 10005, USA.

The Direct Registration System, or DRS, is a system administered by The Depository Trust Company, or DTC, pursuant to which the depositary may register the ownership of uncertificated ADSs, which ownership shall be evidenced by periodic statements issued by the depositary to the ADS holders entitled thereto.

We will not treat ADS holders as our shareholders and accordingly, you, as an ADS holder, will not have shareholder rights. Cayman Islands law governs shareholder rights. The depositary will be the holder of the common shares underlying your ADSs. As a holder of ADSs, you will have ADS holder rights. A deposit agreement among us, the depositary and you, as an ADS holder, and the beneficial owners of ADSs sets out ADS holder rights as well as the rights and obligations of the depositary. The laws of the State of New York govern the deposit agreement and the ADSs.

The following is a summary of the material provisions of the deposit agreement. For more complete information, you should read the entire deposit agreement and the form of American Depositary Receipt. For directions on how to obtain copies of those documents, see "Additional Information."

**Holding the ADSs**

*How will you hold your ADSs?*

You may hold ADSs either (1) directly (a) by having an American Depositary Receipt, or ADR, which is a certificate evidencing a specific number of ADSs, registered in your name, or (b) by holding ADSs in DRS, or (2) indirectly through your broker or other financial institution. If you hold ADSs directly, you are an ADS holder. This description assumes you hold your ADSs directly. If you hold the ADSs indirectly, you must rely on the procedures of your broker or other financial institution to assert the rights of ADS holders described in this section. You should consult with your broker or financial institution to find out what those procedures are.

**Dividends and Other Distributions**

*How will you receive dividends and other distributions on the shares?*

The depositary has agreed to pay to you the cash dividends or other distributions it or the custodian receives on common shares or other deposited securities, after deducting its fees and expenses. You will receive these distributions in proportion to the number of common shares your ADSs represent as of the record date (which will be as close as practicable to the record date for our common shares) set by the depositary with respect to the ADSs.

- *Cash.* The depositary will convert any cash dividend or other cash distribution we pay on the common shares or any net proceeds from the sale of any common shares, rights, securities or other entitlements into U.S. dollars if it can do so on a reasonable basis, and can transfer the U.S. dollars to the United States. If that is not possible or lawful or if any government approval is needed and cannot be obtained, the deposit agreement allows the depositary to distribute the foreign currency only to those ADS holders to whom it is possible to do so. It will hold the foreign currency it cannot convert for the account of the ADS holders who have not been paid and such funds will be held in a segregated account. It will not invest the foreign currency and it will not be liable for any interest.

- Before making a distribution, any taxes or other governmental charges, together with fees and expenses of the depositary, that must be paid, will be deducted. See "Taxation." It will distribute only whole U.S. dollars and cents and will round fractional cents to the nearest whole cent. *If the exchange rates fluctuate during a*

136

---

Table of Contents

**NETQIN MOBILE INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(In thousands, except for share and per share data)**

1.    **PRINCIPAL ACTIVITIES AND ORGANIZATION**

    *a)  Principal activities*

      NetQin Mobile Inc. ("NetQin", or the "Company"), through its subsidiaries, its variable interest entity ("VIE"), and the VIE's subsidiary is principally engaged in the provision of mobile Internet services relating to mobile security and productivity needs in the People's Republic of China (the "PRC" or "China") and overseas markets. The services delivered include anti-virus, anti-malware, anti-spam, privacy protection, data backup and recovery, and data management. The Company, its subsidiaries, its VIE and the VIE's subsidiary are hereinafter collectively referred to as the "Group".

    *b)  Reorganization*

      The Company was incorporated as a limited liability company under the laws of the Cayman Islands ("Cayman") on March 14, 2007. The Company was 100% owned by RPL Holdings Limited ("RPL"). RPL is a limited liability company organized under the laws of British Virgin Islands ("BVI"), which is owned and controlled by Dr. Henry Yu Lin, Dr. Vincent Wenyong Shi, and Mr. Xu Zhou (collectively, the "Founders").

      In May 2007, the Company established NetQin Mobile (Beijing) Co., Ltd. ("NetQin Beijing") as wholly foreign-owned enterprise in the PRC. In June 2007, the Company undertook a reorganization (the "Reorganization") to become the ultimate holding company of the Group. Prior to the Reorganization, the Group's business was operated by Beijing NetQin Technology Co. Ltd. ("Beijing Technology"), a company wholly owned and controlled by the Founders, which commenced operations on October 21, 2005. By entering into a series of agreements (collectively, "VIE Agreements") with the Founders and NetQin Beijing, Beijing Technology became a variable interest entity whose primary beneficiary is NetQin Beijing. Consequently, the Company as the parent of NetQin Beijing became the ultimate primary beneficiary of Beijing Technology and has consolidated Beijing Technology and its subsidiary's financial statements. Beijing Technology was the predecessor of the Group and operated all of the business of the Group prior to the Reorganization.

      Immediately before the Reorganization, Beijing Technology was 100% owned by the Founders and the ultimate owners' shareholdings of the Beijing Technology were identical to those of the Company. There was no change in ownership of Beijing Technology immediately before and after the Reorganization. Accordingly, the Reorganization is accounted for as a legal reorganization of entities under common control in a manner similar to a pooling-of-interests.

F-7

Table of Contents

**NETQIN MOBILE INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

### c) *Subsidiaries, VIEs and a VIE's subsidiary*

As of December 31, 2010, details of the Company's subsidiaries, VIE and the VIE's subsidiary are as follows.

| Name | Date of Incorporation | Place of Incorporation | Relationship | Principal Activities |
|---|---|---|---|---|
| **Subsidiaries** | | | | |
| NetQin International Ltd. (Hong Kong) ("NetQin HK") | April 26, 2010 | Hong Kong | Wholly-owned subsidiary | Premium mobile Internet services in overseas markets |
| NetQin US Inc. (NetQin US) | November 8, 2010 | United States | Wholly-owned subsidiary | Market intelligence and information analysis |
| NetQin Mobile (Beijing) Co., Ltd. ("NetQin Beijing") | May 15, 2007 | The PRC | Wholly-owned subsidiary | Premium mobile Internet services in PRC and overseas markets, and technology consulting and services |
| **Variable Interest Entity** | | | | |
| Beijing NetQin Technology. Co. Ltd. ("Beijing Technology") | October 21, 2005 | The PRC | VIE | Premium mobile Internet services in PRC market and research and development |
| **Subsidiary of VIE** | | | | |
| Fuzhou NetQin Mobile Information Technology Co., Ltd. ("Fuzhou NetQin") | June 1, 2009 | The PRC | Subsidiary of the VIE | Marketing and sales development |

### d) *Variable Interest Entity*

To comply with PRC laws and regulations that prohibit or restrict foreign ownership of companies that provide mobile value added service and hold service provider ("SP") license through mobile Internet in China, the Group conducts substantially all its operations through Beijing Technology which holds the SP licenses and approvals to provide such services in China. The VIE Agreements entered into between NetQin Beijing, Beijing Technology and the Founders enable the Company, through NetQin Beijing to:

- exercise effective control over Beijing Technology;

- receive substantially all of the economic benefits and residual returns, and absorb substantially all the risks of expected losses from Beijing Technology as if it were its sole shareholder; and

- have an exclusive option to purchase all of the equity interests in Beijing Technology.

Management evaluated the relationships among the Company, NetQin Beijing and Beijing Technology and concluded that NetQin Beijing is the primary beneficiary of Beijing Technology and its subsidiary. As a result, Beijing Technology and its subsidiary's results of operations, assets and liabilities have been included in the Company's consolidated financial statements.

The following is a summary of the VIE agreements:

*Exclusive technical consulting services agreement*

Under the exclusive technical consulting services agreement between NetQin Beijing and Beijing Technology, NetQin Beijing has the exclusive right to provide to Beijing Technology the technical consulting services related to Beijing Technology's business operations. NetQin Beijing owns the intellectual property rights developed by either NetQin Beijing or Beijing Technology in the performance of this agreement. Beijing Technology pays to NetQin Beijing quarterly service fees, determined unilaterally by NetQin Beijing. The quarterly service fees are eliminated upon consolidation. This agreement is effective until NetQin Beijing ceases to exist or is terminated at NetQin Beijing's sole discretion by giving 30 day's advanced notice to Beijing Technology.

F-8