# Exhibit H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WAYNE BALIGA, derivatively on behalf of LINK MOTION INC. (F/K/A NQ MOBILE INC.)<br><br>       Plaintiff,<br>-against-<br><br>LINK MOTION INC. (F/K/A NQ MOBILE INC.), VINCENT WENYONG SHI, JIA LIAN, XIAO YU,<br><br>       Defendants,<br>-and-<br><br>LINK MOTION INC. (F/K/A NQ MOBILE INC.),<br><br>Nominal Defendant. | Civil Action No.: 1:18-cv-11642<br><br>**DECLARATION OF HUA JINGYUAN IN FURTHER SUPPORT OF MOTION TO INTERVENE** |

HUA JINGYUAN declares, pursuant to 28 U.S.C. 1746, as follows:

1. I am over the age of eighteen and competent to make this declaration.

2. I am the sole owner and director of China AI Capital Limited ("Intervenor-Plaintiff" or "China AI") and, therefore, am duly authorized to make this declaration on its behalf.

3. I make this declaration in support of China AI's motion for an Order granting Intervenor-Plaintiff (i) leave, pursuant to Fed. R. Civ. Proc. 24(a)(2), to intervene as of right and file its Third-Party Complaint and (ii) modifying, pursuant to Fed. R. Civ. Proc. 60, the preliminary injunction and receivership order entered on February 1, 2019 (ECF Dkt. No. 26).

4. I am knowledgeable about the matters set forth herein. The source of my knowledge is my review of the records available to China AI, records that are publicly available, and my own personal experience.

1

5. I have reviewed the letters of May 2, 2020 and May 20, 2020 by Robert W. Seiden (the "receiver"), the receiver appointed in this action. The receiver's letters contain numerous factual errors and incorrect conclusions that are contrary to the truth.

**China AI Capital Limited**

6. China AI is a British Virgin Islands limited company formed on November 9, 2017. Annexed hereto as **Exhibit A** is a true and correct copy of the memorandum and articles of association of China AI.

7. Annexed hereto as **Exhibit B** is a true and correct copy of the current register of members of China AI, which accurately reflects all changes in ownership of the company.

8. China AI was formed by Mr. Chi Rui as an investment vehicle. When Mr. Chi formed China AI it was wholly-owned by Mr. Chi. *See* Ex. B.

9. In June 2018, Mr. Yu "Bruson" Li and Mr. Chi decided to jointly invest in LKM and to hold the investment through China AI. Mr. Li and Mr. Chi agreed to each contribute to the investment 50/50.

10. Accordingly, Mr. Chi sold to Mr. Li 50% of the issued and outstanding shares of China AI.

11. In and around January 2019, Mr. Li purchased Mr. Chi's entire interest in China AI and, therefore, became the sole owner of China AI.

12. In August 2019, I purchased 100% of the issued and outstanding shares of China AI from Mr. Li. I hold my interest in China AI through a personal investment vehicle named True Hero Ventures Limited, a British Islands limited liability company that is wholly-owned by me. I acquired China AI using my own personal funds.

2

13. Annexed hereto as **Exhibit C** is a true and correct copy of the current register of shareholders of True Hero Ventures limited.

14. Neither Vincent Shi, Henry Lin, have or ever had an interest in China AI or its holdings of LKM stock.

**The Receiver Makes Inaccurate Statements**
**About The HH Medic Group**

15. HH Medic Group is an online medical consulting services company founded in 2015 by Mr. Li.

16. The HH Medic Group is organized as a "variable interest entity" ("VIE") structure. The VIE structure is commonly used by Chinese companies who expect to raise capital from foreign investors (i.e., non-citizens of the People's Republic of China [the "PRC"]).

17. The VIE structure of HH Medic Group is as follows:

   a. The business operations of HH Medic Group in the PRC are performed at the subsidiary level by the PRC limited company Beijing Hehuan Medical Technology Co., Ltd. ("Beijing Hehuan"). As a PRC limited company, only citizens of the PRC can own shares of Beijing Hehuan.

   b. Beijing Hehuan is controlled, through business and share pledge agreements, by the wholly foreign-owned entity Hehuan (Beijing) Technology Co. Ltd. (the "HH-Medic WFOE").

   c. The HH-Medic WFOE is a wholly owned subsidiary of HH-Medic Limited, a Hong Kong limited company ("HH-Medic Limited").

   d. HH-Medic Limited is a wholly-owned subsidiary of HH-Medic Inc., a Cayman Islands limited company.

   e. Many foreign and domestic investors own shares of HH-Medic Inc.

3

18. In 2017, LKM made a second-round venture capital investment in HH-Medic Inc. It did so alongside several other venture capital investors.

19. In his letter, the receiver wrongly concludes that these investment funds were diverted to Bruson Li. The receiver's conclusion is wrong because he has confused the legal entities involved in the investment. LKM invested in HH-Medic Inc., which is the Cayman holding company of the HH Medic Group.

20. The entity that Mr. Li wholly owns and controls is HH-Medic Partner Inc., an entirely separate and distinct British Virgin Islands limited company.

21. Annexed hereto as **Exhibit D** is a true and correct copy of a Certificate of Incumbency for HH-Medic Partner Inc., dated January 16, 2019. This certificate shows that Mr. Li has been the sole shareholder and director of HH-Medic Partner Inc. from April 8, 2015.

22. Based on my review of the records, Mr. Li uses HH-Medic Partner Inc. as a personal investment vehicle through which he owns his equity interest in the HH Medic Group, which he likely acquired as the founder of HH Medic Group. It is a common practice in the PRC for a founder to hold his or her interest through a British Virgin Islands holdings company.

23. There is nothing in the records to suggest in any way that LKM ever sent money to HH-Medic Partner Inc. or that Mr. Shi has any interest in that entity.

24. Annexed hereto as **Exhibit E**, is a true and correct copy of a Series A+ Preferred Share Purchase Agreement dated as of May 24, 2017. This share purchase agreement evidences a 2017 the investment by LKM (f/k/a NQ Mobile Inc.) in HH-Medic Inc., the HH Medic Group's holding company. LKM invested alongside several venture capital funds and other companies, including CID Greater China Fund V, L.P., STCH Investment Inc., FREES Fund LP.

4

25. As set forth more fully in the share purchase agreement, in exchange for their investment each of the investors received Series A+ shares of HH Medic Inc., the Cayman Islands limited company that holds and controls the subsidiaries of the HH Medic Group.

26. LKM's investment in HH-Medic Inc. was duly authorized by its investment committee. Annexed hereto as **Exhibit F** is a true and correct translation of the LKM investment authorization form along with the original (at the time, LKM was known as NetQin Mobile Inc.).

27. Nothing in the records suggests any diversion of investment proceeds to Mr. Li, his personal investment vehicle, HH-Medic Partner Inc., or anything other than an ordinary second-round venture capital investment that was duly authorized by the investment committee of LKM. The receiver is wrong to confuse HH-Medic Inc. and HH-Medic Partner Inc. Those entities are entirely separate and distinct.

**There is no Evidence to Support the Receiver's Allegations that Bruson Li is a "Close Associate" or "Alter Ego" of Vincent Wenyong Shi**

28. I have reviewed the receiver's allegations that Mr. Bruson Li is a "close associate" or "alter ego" of Mr. Shi. I have been unable to find any evidence to support this allegation.

29. Based on my investigation and review of the records available to me, Mr. Li was trained as an engineer. After graduation, it appears that he began working for a company with offices in Beijing.

30. In and around 2010, Mr. Zhang Jun, an independent director of LKM at the time, offered Mr. Li a Vice President position at LKM (then known as NetQin Mobile Inc.).

31. At that time, Henry Lin was the CEO and Chairman of the Board of Directors of LKM, not Mr. Shi.

32. At LKM, Mr. Li's roles and duties appeared to include the ordinary management duties of a Vice President at a Beijing-based technology company.

5

33. During the period 2010 to 2014, Henry Lin served as the Chairman of the Board of Directors of LKM. From late 2014 until recently, Vincent Shi served as Chairman of the Board of Directors of LKM. I have found no evidence suggesting that Mr. Li favored either of the founders of LKM, Henry Lin and Vincent Wenyong Shi, over the other. Rather it appears that for the majority of time that Mr. Li held his position at LKM, Henry Lin was the Chairman and CEO of the company, not Mr. Shi.

34. Mr. Li resigned from his position as Vice Chairman of LKM in 2015. Shortly thereafter, he founded the HH Medic Group.

**The Payment to the Luxembourg Branch of China Merchants Bank Was a Legitimate Business Transaction Made in Repayment of a Loan from China Merchants Bank**

35. Based on my experience and knowledge concerning the operation and management of technology companies in Beijing, it is customary for such companies to enter into loan agreements with foreign branches of Chinese banks for the purpose of raising funds in a foreign currency (e.g., United States Dollars) in order to satisfy corporate obligations.

36. Ordinarily, Chinese banks making such loans require borrowers to pledge to a Beijing branch of the bank cash denominated in Chinese renminbi ("RMB") in an amount approximately equal to the principal and interest of the loan. The Beijing Branch will issue a guarantee of payment to the foreign branch. The foreign branch of the bank will then disburse proceed denominated in a foreign currency.

37. These types of loans are necessary because PRC laws and regulation ordinarily prevent Chinese companies and banks from freely converting their RMB cash reserves into foreign currencies, such as the United States Dollar.

38. On page F-64 of LKM's fiscal year 2016 annual report, the Company describes its 4.00% Convertible Senior Notes due October 15, 2018 (the "Notes"). Annexed hereto as **Exhibit**

6

**G** is a true and correct copy of an excerpt of the 20-F report. Among other things, the company reported that holders of the Notes had an option to require LKM to repurchase the Notes at an agreed upon value.

39. LKM also reported that, in and around July 2016, holders of the Notes exercised their option to require LKM to repurchase the Notes. These Notes would need to be repurchased in United States Dollars.

40. In order to raise sufficient United States Dollars to complete the repurchase, LKM entered into a loan agreement with China Merchants Bank.

41. Annexed hereto as **Exhibit H and I** are true and correct copies of a Loan Agreement and Amendment to Loan Agreement, dated July 26, 2016 and September 20, 2016, respectively, between China Merchants Bank, Luxembourg branch, as lender, and LKM, as borrower.

42. The Loan Agreement evidence a loan by China Merchants Bank to LKM of up to U.S.D.$10,000,000 for the purpose of repurchasing the Notes.

43. As security for the loan, LKM pledged to the Beijing branch of China Merchants Bank cash denominated in RMB of approximately the same principal balance of the loan. The Beijing branch then guaranteed payment of the loan to the Luxembourg branch. *See* Ex. H, at §1; Ex I, at §1.

44. The terms of the loan required LKM to repay the loan by way of payments in United States Dollars to China Merchants Banks' Luxembourg branch.

45. Annexed hereto as **Exhibit J** is a true and correct copy of a translation of an Accounting Voucher and related records (along with the originals) showing the disbursement of these loan proceeds in four installments into LKM's bank account in Hong Kong.

7

46. Annexed hereto as **Exhibit K** is a true and correct copy of a translation of an Accounting Voucher and related records (along with the originals) demonstrating that LKM fully satisfied its loan to China Merchants Bank by way of a July 2018 payment to China Merchants Bank's Luxembourg branch as required under the loan agreement.

47. As reported by LKM in the 20-F report, the company repurchased the Notes as it was contractually required to do.

48. Based on the foregoing, the payment to the Luxembourg branch of China Merchants bank was nothing more than an ordinary loan repayment. The receiver was wrong to infer a wrongful purpose from the payment to the Luxembourg branch of China Merchants Bank.

**The Receiver Has Not Accurately Described The Damage That He Has Done to the Company**

49. I dispute the characterization of the facts set forth in the receiver's letter of May 20, 2020.

50. In his letter, the receiver claims that Vincent Shi has control over NetQin Unlimited (Beijing) Technology Co., Ltd., LKM's wholly-foreign owned entity (the "LKM WFOE"). This is incorrect.

51. Based on the records of LKM that I have available to me, Zemin Xu was the legal representative of the LKM WFOE, with authority to act on behalf of and control that entity, from 2015 until in or around March 2019. In March 2019, Mr. Guo Lilin, the agent of the receiver, became the registered as the Chairman and legal representative of the LKM WFOE.

52. Annexed hereto as **Exhibits L, M, and N** are true and correct copies of translations of orders from the Haidian court in Beijing, PRC (along with the originals). Based on these orders, it appears that Mr. Xu disputed Mr. Guo's appointment as Mr. Guo as the Chairman and legal representative of the LKM WFOE. *See* Ex. L. Mr. Xu alleged that Mr. Guo

8

achieved his position by forging the signature of Mr. Xu. As a temporary measure, the Haidian court ordered that the WFOE's bank account be restricted during the pendency of the litigation. *See* Exs. L and M.

53. As set forth at page 10 of Exhibit N, during litigation relating to the forgery, Mr. Guo admitted that he forged the signature. Ultimately, the court ruled that Mr. Guo could continue as Chairman and legal representative of the LKM WFOE because its sole shareholder had voted to appoint him to those positions and the irregularity arising from the forged signature should be overlooked.

54. Nothing in these records suggests that Mr. Shi had any involvement in the litigation between Mr. Xu and Mr. Guo. Mr. Shi was not party to the case, was not called as a witness, and did not offer evidence. *See* Ex. N.

55. I also dispute the receiver's allegations that it was the actions of Mr. Xu or Mr. Shi that have prevented Mr. Guo from paying judgments in favor of former employees.

56. As discussed above, Mr. Guo became the Chairman and legal representative of the LKM WFOE in March 2019. In that position, he had full legal power to act on behalf of that entity. Once the change was made, Mr. Xu nor anyone else had legal authority to act on behalf of the LKM WFOE.

57. Around the same time, Mr. Guo was also appointed as the legal representative of LKM's Hong Kong subsidiary. Annexed hereto as **Exhibit O**, is a true and correct copy of a filing with the Hong Kong Special Administrative Region's Company Registrar showing that Mr. Guo acquired legal control LKM's Hong Kong subsidiary in March, 2019.

58. In his position as legal representative of LKM's Hong Kong subsidiary, Mr. Guo has legal authority to act on behalf of the company and access its bank accounts, including the

9

account into which China AI deposited $10,000,000 for its purchase of LKM shares in the later half of 2018.

59. In an Order entered in this action on September 25, 2019, the Court granted the receiver access to LKM's Google account and the funds contained therein. I am informed and believe that the receiver now also has control over LKM's Apple and Facebook operating accounts.

60. Thus, beginning at least in March 2019 and continuing throughout 2019 and to the present, Mr. Guo has had access to LKM accounts at least in Hong Kong and several social media accounts that had substantial funds.

61. Annexed hereto as **Exhibits P, Q, R, and S** are true and correct copies of translations (along with the originals) of orders affirming judgments entered against the LKM WFOE and in favor of former employees for unpaid wages.

62. The original judgments had previously been entered against the LKM WFOE in 2019, when Mr. Guo already had control over the LKM WFOE and access to numerous accounts belonging to LKM and in which there were funds sufficient to pay these judgments. *See* Exs. P, Q, R, S, referring to original judgments.

63. I know of no reasons why the receiver could not have used some of the LKM funds to pay the former employees. Based on the docket of this case, I am informed and believe that on several occasions in 2019, the Court has authorized the receiver to pay himself, Mr. Guo and other professionals from corporate funds. Thus it appears that the receiver and Mr. Guo had funds available to them and were using them to at least pay themselves.

64. Instead of paying the wages owed to these employees after issuance of the original judgments, the receiver's agent, Mr. Guo, appealed the judgments. *See* Exs. P, Q, R, S.

10

65. Only Mr. Guo, as the registered legal representative of the LKM WFOE, could make the decision to appeal. Mr. Xu was no longer the legal representative and, therefore, could play no role in deciding to appeal those judgments.

66. Mr. Guo's grounds for appeal lacked any basis in fact or law and the court affirmed the judgments. *See* Exs. P, Q, R, S.

67. After Mr. Guo lost his appeals, the court entered a restriction order against Mr. Guo. Annexed hereto as **Exhibit T**, is a true and correct copy of a translation of a judgment (along with the original) against Mr. Guo, which precludes him from using public transit and engaging in other activities until he causes the judgments in favor of the former employees to be paid. It is my understanding that these type of orders are commonly issued against people who fail to pay debts without justification.

68. I do not know of any reason that would prevent the receiver and Mr. Guo from using the funds available to them from the Hong Kong bank account or the Google, Apple, or Facebook accounts, to pay these former employees. Therefore, it is Mr. Guo's fault that the restriction order was entered against him.

**China AI's Application is Timely**

69. I dispute Plaintiff's contention that China AI's application to intervene is untimely.

70. When this case was filed, Plaintiff alleged that he was a shareholder of LKM. When I acquired my interest in Chain AI in August 2019, I believed that many of Plaintiff's allegations would ultimately be found meritless.

71. Nonetheless, at that time I had no reason to believe that Plaintiff's allegations as to such a basic issue as share ownership were false.

11

72. Further, when I acquired my interest in China AI, I understood and believed that the receiver had been appointed by this Court to preserve the status quo, not shutdown the company, terminate its employees, and refuse to pay judgments to wages owed. I understood and believed that the receiver was required by law to act as a fiduciary acting in the best interests of all shareholders, including China AI.

73. I reasonably relied on the receiver fulfilling his duties as a fiduciary. At that time, China AI had no reason to believe that the receiver would not act in the best interests of China AI and all of the other shareholders.

74. I only learned that the receiver was not acting in the best interests of the company gradually over the course of the second half of 2019, when it became clear that the actions (and inaction) of the receiver and his agent, Mr. Guo, was resulting in severe damage to the company.

75. It was only in late 2019, when it became clear that the receiver and Mr. Guo were shutting down the company. I am informed and believe that neither the receiver not Mr. Guo has ever visited the company's offices. The receiver acts only through agents, such as Mr. Guo. Mr. Guo has done nothing the maintain and preserve LKM's operations. It appears that Mr. Guo began shutting down the company's operations without ever speaking to actual shareholders of the company. Instead, Mr. Guo shutdown all operations and discharged all of the company's employees, thereby depriving the company of revenues that would have been generated from operations.[1]

76. Based on Mr. Guo's actions, I can only conclude that Mr. Guo either acts with little or no supervision by the receiver or that the receiver is complicit with Mr. Guo's bad faith actions.

---

[1] As referenced in the orders affirming the judgments in favor of the former employees, the employee's damages run to March 2019, which is the same month in which Mr. Guo took over legal control over the LKM WFOE. *See* Exs. P, Q, R, S.

12

77. Although my investigation is not yet complete, it is my understanding that the receiver never reported to this Court all of the foregoing facts. I do not believe that the Court, when it appointed the receiver, intended for the operation of LKM to be liquidated and its employees discharged without the payment of wages.

78. In the fall of 2019, when I learned that Mr. Guo was causing such damage to the business, I retained counsel in the United States to assist China AI in protecting its interests. China AI filed its motion to intervene on November 1, 2019.

79. Since then, I have been informed that the receiver is the managing partner of the same law firm that is representing Plaintiff and, therefore, has an economic interest in the outcome of Plaintiff's claims. It is also my understanding that the receiver has been paying himself from funds that belong to LKM while the company's former employees remain unpaid.

80. Further, I have reason to believe that the receiver's agent, Mr. Guo Lilin, is working with Henry Lin's wife, Mrs. Guo Lingyun, to try to obtain control over the company's assets for themselves.

I declare under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct.

Executed on: May 27, 2020

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　仇景元
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Hua Jingyuan