**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| WAYNE BALIGA, derivatively on behalf of LINK MOTION INC. (F/K/A NQ MOBILE INC.) | 1:18-cv-11642-VM-DCF |
| Plaintiff, -against- | |
| LINK MOTION INC. (F/K/A NQ MOBILE INC.), VINCENT WENYONG SHI, JIA LIAN, XIAO YU, | |
| Defendants, -and- | |
| LINK MOTION INC. (F/K/A NQ MOBILE INC.), | |
| Nominal Defendant. | |

**VINCENT WENYONG SHI'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO DISSOLVE THE**
**PRELIMINARY INJUNCTION AND DISCHARGE THE RECEIVER**

FELICELLO LAW P.C.
366 Madison Avenue
3rd Floor
New York, New York 10017
Tel. (212) 584-7806
*Attorneys for Defendant Vincent Wenyong Shi*

On the brief:   Michael James Maloney

i

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT ................................................................................... 1

PROCEDURAL HISTORY ....................................................................................... 2

STATEMENT OF FACTS ......................................................................................... 6

    A.    Background ......................................................................................... 6

    B.    The Receiver's Allegations of Misconduct Lack any Basis in Law or Fact ............... 10

    C.    The Receiver's Agent in the PRC Has Caused Damage to the Company ................... 12

ARGUMENT ......................................................................................................... 15

I.    The Receiver Should Be Discharged ................................................................. 15

II.    The Preliminary Injunction Should Be Dissolved ................................................ 20

III.    The Court Should Return All Property, Rights, and Claims to the Company and Its Board of Directors and Direct an Accounting ...................................................... 23

CONCLUSION ...................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Ass'n of Jewish Camp Operators v. Cuomo*, 470 F. Supp. 3d 197 (S.D.N.Y. 2020) ...................... 21

*Chambers v. Blickle Ford Sales, Inc.*, 313 F.2d 252 (2d Cir. 1963).................................. 16

*Chambers v. Time Warner, Inc.*, No. 00 Civ. 2839 (JSR), 2003 U.S. Dist. LEXIS 3652 (S.D.N.Y. Mar. 10, 2003)................................................................................................ 20

*Chi. Title & Tr. Co. v. Fox Theatres Corp.*, 164 F. Supp. 665 (S.D.N.Y. 1958).............................. 18

*Citibank, N.A. v. Nyland (CF8) Ltd.*, 839 F.2d 93 (2d Cir. 1988) .................................... 16

*Fed. Sav. & Loan Ins. Corp. v. PSL Realty Co.*, 630 F.2d 515 (7th Cir. 1980)........................ 16, 23

*Hester Indus., Inc. v. Tyson Foods, Inc.*, 882 F. Supp. 276 (N.D.N.Y. 1995) ................................. 21

*Howe v. Bank of New York Mellon*, 783 F. Supp. 2d 466 (S.D.N.Y. 2011)...................................... 17

*Marco v. Dulles*, 177 F. Supp. 533 (S.D.N.Y. 1959)................................................. 17

*Melgen v. Bank of Am. Corp. (In re Bank of Am. Corp. Sec.)*, No. 09 MD 2058 (PKC), 2013 U.S. Dist. LEXIS 176295 (S.D.N.Y. Dec. 11, 2013) ........................................................ 22

*Prudential Ins. Co. of Am. v. Hilton Hotels Corp.*, 1995 U.S. Dist. LEXIS 18900, 1995 WL 758781 (S.D.N.Y. Dec. 20, 1995) ................................................................ 19, 20

*Ramgoolie v. Ramgoolie*, 2017 WL 564680 (S.D.N.Y. Feb. 10, 2017) .......................................... 16

*Ramgoolie v. Ramgoolie*, No. 16-CV-3345, 2016 WL 11281385 (S.D.N.Y. Dec. 20, 2016) .......... 16

*Roof v. Conway*, 133 F.2d 819 (6th Cir. 1943).................................................. 23

*Rosen v. Siegel*, 106 F.3d 28 (2d Cir. 1997) ................................................. 16

*Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328 (2d Cir. 1995) ......................................... 21

*Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105 (2d Cir. 1997).................................................................. 5

*U.S. Bank Nat. Ass'n v. Nesbitt Bellevue Prop LLC*, 859 F.Supp.2d 602 (S.D.N.Y. 2012) ............... 16

*U.S. ex rel. Willoughby v. Howard*, 302 U.S. 445, 58 S. Ct. 309, 82 L. Ed. 352 (1938) ................ 24

*United States v. Bradley*, No. 4:05-cr-59, 2012 U.S. Dist. LEXIS 205081 (S.D. Ga. Feb. 9, 2012) .................................................................................. 23, 24

*Varsames v. Palazzolo*, 96 F.Supp.2d 361 (S.D.N.Y. 2000)............................................................ 16

Defendant Vincent Wenyong Shi ("**Shi**"), by and through his undersigned counsel, hereby submits this memorandum of law in support of his motion (i) to discharge the Temporary Receiver; and (ii) to dissolve this Court's prior-issued preliminary injunction. Submitted herewith are the Declarations of Shi, dated June 11, 2021 ("**Shi Decl.**"), and Michael James Maloney, Esq., dated June 11, 2021 ("**Maloney Decl.**").

## PRELIMINARY STATEMENT

This motion raises the discrete issue of whether Robert W. Seiden ("**Seiden**"), the court-appointed receiver, should be discharged and the preliminary injunction dissolved.  The appointment of a receiver to take control of a public company is an extraordinary remedy available to protect the assets of a company when there is no adequate remedy at law. When Plaintiff Wayne Baliga ("**Plaintiff**" or "**Baliga**") applied for the receivership and preliminary injunction on December 14, 2018, he represented to the Court that he was suing derivatively as a shareholder of Link Motion Inc. f/k/a NQ Mobile Inc. ("**LKM**" or the "**Company**").  But Plaintiff is not, and has never been, a shareholder of the Company. Nor does he purportedly act derivatively on behalf of the Company because he voluntarily dismissed all derivative claims in October 2020, when he filed the Second Amended Complaint.  Plaintiff now seeks only money damages against the Company for legal claims, creating a direct conflict between Plaintiff and the Company.

Plaintiff misled the Court in his initial application for a temporary restraining order and the appointment of a receiver for the Company.  The claim alleged in Plaintiff's first complaint – on which the Court relied in granting his motions, and which alleged breaches of fiduciary duties by the Individual Defendants that were resulting in the looting of everything of value from the Company – is no longer part of this action.  As the Court identified in its May 26, 2021 decision, "Critically, [Plaintiff] *dropped* his breach-of-fiduciary-duty claim against the Individual Defendants – the claim that had served as the focal point of his derivative claims and the basis for the Court's Order granting

a preliminary injunction and appointing the Receiver." (Dkt. 223 (the "Decision") at 7.)  Indeed, the related allegations from the first pleading have been refuted by admissible evidence submitted in litigation since the appointment of the receiver.

A receiver should never have been appointed and keeping the receiver in place now will do additional harm to the Company.  As laid out below and in the accompanying papers, the receiver's agent in the People's Republic of China ("**PRC**") has caused, is causing, and will continue to cause, significant damage to the Company. And, as another reason to dissolve the preliminary injunction and remove the receiver: this is an action for money damages – not equitable relief – that lacks any showing of likelihood of success on the merits or irreparable harm to the plaintiff.  The Court should immediately dissolve the receivership, return management of the Company to its directors, and order an accounting.

## PROCEDURAL HISTORY

Baliga brought this action on December 13, 2018, (Dkt. No. 1), derivatively, on behalf of the Company against Defendants LKM (the Company), Shi, Jia Lian ("**Lian**"), and Xiao Yu ("**Yu**"). Upon commencement of the action, Baliga sought a temporary restraining order, preliminary injunction, and temporary receiver. (Dkt. No. 94.)  In support of his request, Baliga alleged that:

- Baliga was a shareholder of the Company having legal standing to sue derivatively on behalf of LKM;

- Shi, Lian, and Yu (together, the "**Individual Defendants**") grossly mismanaged LKM, breached fiduciary duties, and looted the Company's assets in an attempt to exit the Company;

- A preliminary injunction was needed to restrain and enjoin them from further dissipation of assets; and

- A temporary receiver was needed "to ensure the survival of the Company, including ensuring that LKM's employees are being paid and that LKM remedies its noncompliance with the New York Stock Exchange ("**NYSE**") in order to avoid being imminently delisted."

- The receiver is also needed "to ensure that the Individual Defendants no longer have authorization to represent the Company or transfer ownership of the Company's assets."

On December 14, 2018, the Court entered a temporary restraining order, and directed the parties to brief the issues of the preliminary injunction and receivership. (Dkt. No. 7.)  On January 21, 2019, the parties (without the consent of the Board of Directors of the Company)[1] submitted a "stipulation of non-opposition to a preliminary injunction and consent order to extend time to answer, move, or otherwise respond to the complaint," whereby the parties stipulated that LKM did not oppose Baliga's request for a preliminary injunction and appointment of a temporary receiver. (Dkt. No. 22.) On January 24, 2019, Baliga submitted a reply affidavit in further support of a preliminary injunction and appointment of temporary receiver, (Dkt. No. 24), outlining alleged recent developments, and requesting that Seiden be appointed as the temporary receiver. By Order dated December 1, 2019, (Dkt. No. 26), the Court issued a preliminary injunction and appointed Seiden as the Temporary Receiver.

On March 27, 2019, Shi moved to dissolve the preliminary injunction and to discharge the Receiver. (Dkt. No. 37.)  He argued that (i) there is no evidence of consent by the Board to the appointment of a receiver and Baliga has not otherwise satisfied the standard for appointment of a receiver; and (ii) failing to discharge the receiver will destroy all remaining value in LKM.  On May 22, 2019, Shi submitted a reply memorandum of law in further support of his motion. (Dkt. No. 62.)

 On June 11, 2019, the Court denied Shi's requests on the basis that "neither Link motion nor Shi ever opposed the motion leading to the Preliminary Injunction Order" and that Baliga's allegations remained "unrefuted." (Dkt. No. 64, at 21.)  The Court stated that Baliga has provided evidence that (1) Link Motion has transferred substantial assets without notice to the Board; (2) Link Motion has failed to make required filings with the SEC; (3) employees have gone without pay; and

---

[1] *See* Maloney Decl. Ex. A ¶¶ 12-16.

(4) Shi has fired employees and ordered documents removed.  The Court also granted Shi's motion to dismiss the Complaint and directed Baliga to file an amended complaint.

Thereafter, Baliga filed his First Amended Shareholder Derivative Complaint, (Dkt. No. 68), alleging substantially the same facts and derivative claims.  On August 9, 2019, the parties submitted a "Joint Status Report," whereby Shi presented the question of whether the Receiver exceeded his authority by purporting to remove Shi from his office as a director of LKM. (Dkt. No. 90.)  By letter dated March 27, 2020, (Dkt. No. 132), Shi set forth recent developments demonstrating that the receivership order was entered improperly. Indeed, Baliga was never a shareholder of LKM with standing to sue derivatively. At that time, Shi's counsel wrote to the court, (Dkt. No. 145), that he was continuing to investigate misconduct relating to the receivership. He stated as follows:

> Since the receiver successfully obtained control over LKM, its Hong Kong subsidiary, and the WFOE [wholly foreign owned company] subsidiary, we have received information suggesting that the receiver has shut down all business activities and terminated all employees. We have also received information suggesting that the receiver and his agent, Mr. Guo Lilin, are refusing to pay judgments obtained by employees for unpaid wages.

*Id*.

By motion dated November 1, 2019, non-party China AI Capital Limited ("**China AI**") moved to intervene as of right in this action as a shareholder of LKM. (Dkt. No. 111.) In papers submitted in support of its motion, China AI argued that Plaintiff had falsely sworn to the Court that he was a shareholder of LKM. (Dkt. Nos. 123-1, 129.) Plaintiff, however, was only the holder of American Depositary Shares ("**ADSs**" and each individually an "**ADS**") and did not actually own any shares of the Company. (Dkt. Nos. 129, 131.) On March 26, 2020, China AI submitted a declaration from Katharine L. B. Pearson, a Cayman Islands attorney, who opined that holders of ADSs have no standing under Cayman Island law to sue derivatively on behalf of a Cayman Islands company. (Dkt. No. 131.)

On May 4, 2020, Plaintiff submitted papers in opposition to China AI's motion, including a copy of a letter from the Receiver claiming that Shi stole $88 million from the subsidiaries operated by LKM in the PRC. (Dkt. No. 142-2.)  By letter dated July 22, 2020, (Dkt. No. 159), Shi informed the Court that the Receiver's claims were false, setting forth in detail why these statements are false, and why the Receiver's letter should be stricken.

By Memorandum and Order dated September 4, 2020, (Dkt. No. 163), the Court reviewed the parties' submissions regarding Baliga's standing to sue derivatively and recognized that "because a federal court must satisfy itself that it has subject-matter jurisdiction over a case before it may act, it may consider the issue of standing *sua sponte* at any time." (Dkt. No. 163) (citing *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 107 (2d Cir. 1997)).  Because it was unclear whether Baliga was asserting derivative or direct claims, or a combination of both, the Court directed Baliga to file a Second Amended Complaint that identified which of his claims were derivative and which were direct and that established sufficient grounds to show that Plaintiff had standing to sue derivatively.

Plaintiff filed his Second Amended Complaint (the "**SAC**") on October 5, 2020. (Dkt. No. 166.)  The SAC asserts only direct claims for violations of sections 10(b) and 20 of the Securities and Exchange Act of 1934, re-appointment of the receiver, unjust enrichment, fraud, and negligent misrepresentation.  In a status conference held on October 15, 2020, counsel for Baliga confirmed that Plaintiff was asserting only direct claims in the SAC – all derivative claims were "intended" to be stripped.  Nowhere did Baliga "acknowledge[] []or address[], in any filing, the fact that, in initially obtaining the Preliminary Injunction and Receivership Order, he had relied primarily – arguably, exclusively – on the fiduciary-duty claim that he had now abandoned, and had told the

Court that it need not consider how likely he was to succeed on any of his other claims." (Decision at 8.)

The Court permitted Baliga to make a motion seeking to compel the Receiver to convert his ADSs into shares of the Company. (*See* Dkt. 203.)  On May 26, 2021, the Court denied Plaintiff's motion and invited Shi and the Company to renew the motion to dismiss the SAC and the motion to dissolve the preliminary injunction and discharge the Receiver. (Decision at 15.)  The parties agreed, with the Court's approval, that the instant motion to dissolve the preliminary injunction and discharge the Receiver could be resolved without a separate submission from the Company. (Dkt 175.)

## STATEMENT OF FACTS

### A.     Background

The Company is organized under the laws of the Cayman Islands.[2]  In accordance therewith, the shareholders' identities are maintained on a Cayman Islands register.[3]  Only shareholders identified on the register of shareholders have standing to sue derivatively on behalf of the Company.[4]  The Company operates as a "Variable Interest Entity" ("**VIE**"), whereby its wholly owned subsidiary in the PRC has by contract (the "**Control Documents**") control over and rights to the economic benefits of operating companies located in the PRC.[5]  The Company does not own and has never owned shares of the operating companies in the PRC.[6]  The VIE structure exists to permit

---

[2] *See* Maloney Decl. Ex. B, at 9-10, 53-54 (unless otherwise noted, all citations to page numbers of Exhibit B are to page numbers appearing in the lower right-hand corner of the exhibit).

[3] *See* Shi Decl. Ex. B, ¶ 22.

[4] *See* Shi Decl. Exs. B, C.

[5] *See* Maloney Decl. Ex. B, at 9-10, 48, 53-54 .

[6] *See* Maloney Decl. Ex. G, at 97-98, 224-25, 227-33 (unless otherwise noted, all citations to page numbers of Exhibit G are to page numbers appearing in the lower right-hand corner of the exhibit).

foreign owned companies to obtain control over and rights to economic benefits of technology companies operating in the PRC that by PRC law may not be owned by non-PRC persons.[7]

In 2011, the Company made an initial public offering of ADSs on the New York Stock Exchange ("**NYSE**").[8] ADS holders are not registered shareholders.[9] Upon its initial public offering in 2011, the Company disclosed this fact in its Form F-1: "[w]e will not treat ADS holders as our shareholders and accordingly, you, as an ADS holder, will not have shareholder rights. Cayman Islands law governs shareholder rights."[10] Instead, each ADS represents rights and interests to five shares of common stock held in trust by a depositary.[11] Only the depositary is listed as a registered shareholder. *See* Shi Decl. Ex. A.

On December 13, 2018, Baliga filed his Verified Shareholder Complaint. Maloney Decl. Ex. C (Dkt. No. 1). He alleged that he "is currently and has at all material times of this Action been a shareholder." Maloney Decl. Ex. C ¶ 4 (Dkt. No. 1). He purported to bring the action derivatively, in the right and for the benefit of the Company. Maloney Decl. Ex. C ¶ 32 (Dkt. No. 1). He filed his complaint by and through his counsel, the Seiden Group.[12] Baliga's allegations were false because he is not a registered shareholder and lacks standing to sue derivatively on behalf of the Company; rather he merely holds ADSs.[13]

On December 14, 2018, Baliga sought an order (i) preliminarily enjoining the Company and the Individual Defendants from taking certain corporate actions; and (ii) appointing Seiden as

---

[7] *See id.* .
[8] *See generally* Maloney Decl. Ex. B.
[9] *See* Maloney Decl. Ex. B, at 141.
[10] *See id.*
[11] *See id.*
[12] *See* Maloney Decl. Ex. C.
[13] *See* Shi Decl. Exs. A, B, C; Maloney Decl. Ex. B, at 141.

Receiver (Seiden is the managing director of the law firm then representing Baliga).[14] On January 24, 2019, Baliga filed an affidavit in support of his application for the preliminary injunction and the appointment of Seiden.[15]  He stated therein, "I am fully familiar with the facts and circumstances surrounding this action."[16]  Baliga referred to himself as a "shareholder."[17]  Baliga further stated that "this Court should appoint Robert W. Seiden . . . as the temporary receiver over the Company. I specifically hired Mr. Seiden's law firm to pursue this action for me."[18]  Baliga failed to disclose to the Court that he was not a registered shareholder of the Company.

Without the consent of the Board of Directors of the Company ("**Board**"), the law firm of DLA Piper LLP (US) appeared on behalf of the Company and signed a consent to the preliminary injunction and appointment of a receiver. Maloney Decl. Ex. A, ¶¶ 12, 16.  The Board did not have an adequate opportunity to oppose Baliga's application. (*Id.*)

On February 1, 2019, the Court entered an Order granting the preliminary injunction and appointing Seiden as receiver (the "Receiver Order").[19]  The provisions of the Receiver Order were drafted by Baliga's counsel.  In the Receiver Order, the Court preliminarily enjoined the Company and the Individual Defendants from entering into certain transactions relating to assets of the Company and affirmatively required them to take certain "corrective" actions.[20]  The Receiver Order also appointed the Receiver and granted to him the power to take possession of the Company's assets and to "assume full control of the Company by removing . . . any director, officer, employee,

---

[14] Dkt. No. 7.

[15] *See* Maloney Decl. Ex. D.

[16] Maloney Decl. Ex. D, ¶ 1.

[17] *Id.*

[18] Maloney Decl. Ex. D, ¶ 3.

[19] Maloney Decl. Ex. E (the "February 1, 2019 Order").

[20] Maloney Decl. Ex. E, ¶¶ 1,2 .

independent contractor, or agent of the Company."[21]   The Receiver Order granted the Receiver authority to appoint directors and officers for the Company.  These portions of the order were drafted by Baliga's counsel in connection with his application to the Court for the appointment of Seiden.[22]

On March 14, 2019, the Receiver moved for an order of contempt against Shi. (Dkt. No. 29.) Shi opposed the motion and moved to dismiss the Verified Shareholder Complaint on various grounds. (Dkt. Nos. 35-37.)  Shi, in his capacity as a duly appointed director of the Company, also attempted to make arguments on behalf of the Company regarding lack of personal jurisdiction and discharge of the Receiver.  In a June 11, 2019 Decision & Order, the Court denied the application for contempt and granted in part Shi's motion to dismiss.[23]   The Court, however, denied Shi's arguments made on behalf of the Company.

Contemporaneously, the Receiver took possession of cash and other assets belonging to the Company.[24]   In a Form 6-K filed with the Securities and Exchange Commission (the "**S.E.C.**") on March 26, 2019, the Receiver stated that he had removed Shi as Chairman and Chief Executive Officer and appointed Mr. Lilin "Francis" Guo ("**Guo**") as his replacement, "subject to the laws of the Cayman Islands."[25]   By Order dated June 20, 2019, the Court approved a request by the Receiver to approve a "compensation incentive agreement and promissory note" between the Company and Guo. (Dkt. No. 71.)  At or around the same time, the receiver appointed Guo as the director and attorney-in-fact of the Company's PRC "wholly foreign owned entity," Beijing Technology.[26]   None of the foregoing corporate actions were approved by the Board at any duly noticed meeting.  But for the appointment of the Receiver pursuant to the Receiver Order, the foregoing actions would have

---

[21] Maloney Decl. Ex. E, ¶ 2.b.
[22] Dkt. No. 22.
[23] Maloney Decl. Ex. F.
[24] *See* Shi Decl. ¶ 26.
[25] *See* Maloney Decl. Ex R.
[26] *See* Maloney Decl. Ex. H, ¶¶ 51-52.

ordinarily required the consent of the Board.  The Receiver has also charged fees for his "services" and retained Guo and other "professionals," all at the expense of the Company. (Dkt. Nos. 54, 59.)

### B.    The Receiver's Allegations of Misconduct Lack Any Basis in Law or Fact

In arguing for the appointment of the receiver and the preliminary injunction, Baliga relied on allegations in the Verified Shareholder Derivative Complaint regarding alleged transfers of the Company's interests in the "FL Mobile," "Showself," "SyberOS," and "Rideshare" operating companies in the PRC.  Baliga alleged that Shi wrongfully transferred shares of "FL Mobile," "Showself," "SyberOS," and "Rideshare" operating companies to himself.[27]  These allegations are without any basis in law or fact because, as fully disclosed in the Company's filings with the S.E.C., the Company never owned any shares of these companies to begin with.[28]  In accordance with the VIE structure, the Company only owned interest in these entities through Control Documents giving the Company the contractual right to control and receive the economic benefits from those businesses.[29]  The shareholders of "FL Mobile," "Showself," "SyberOS," and "Rideshare" held their shares merely as nominees for the benefit of the Company.

Apparently (belatedly) realizing the falsity of his allegations in his initial Verified Shareholder Derivative Complaint that Shi had wrongfully transferred LKM's interests in "SyberOS" and "Rideshare," Baliga  failed to allege any unlawful conduct with respect to those interests in his Second Amended Complaint filed on October 5, 2020.[30]

In opposition to the motion by China AI Limited ("**China AI**") to intervene, Baliga made new allegations that Shi and China AI had conspired to secrete away assets of the Company via a payment to a bank in Luxembourg. Baliga relied entirely on conclusions reached by the Receiver

---

[27] *See* Maloney Decl. Ex. C.
[28] *See* Maloney Decl. Ex. B, at 9-10, 29-31, 53-56, Ex. G, at 97-98, 224-25, 227-33.
[29] *See id*.
[30] *See* Dkt. No. 166, SAC.

based on a so-called "investigation."[31]  This "investigation" somehow managed to overlook the Company's public disclosures that, in 2013, it had issued approximately $172,500,000 in 4.00% Convertible Senior Notes due October 15, 2018 (the "**Notes**").[32]  This fact was disclosed in the Company's 20-F annual report, which, like all other public company reports, is easily accessible online.[33]

The Company was obligated to repurchase the Notes in United States Dollars, but most of LKM's cash reserves were held in Chinese Renminbi ("**RMB**"), a fact also disclosed in the Company's annual report.[34]  Due to the PRC's severe restrictions governing conversion of RMB denominated funds into foreign currencies (*e.g.*, the U.S. Dollar),[35] the Company entered into loan agreements with the Luxembourg branch of China Merchants Bank Ltd. ("**China Merchants Bank**"), which required the Company to pledge its RMB cash to the Beijing branch of China Merchants Bank as security for loans from the Luxembourg branch denominated in U.S. Dollars for the purpose of repurchasing the Notes.[36]  The loan agreements with China Merchants Bank specifically mention repurchase of the Notes and required that the Company repay these loans to the Luxembourg branch on or before July 31, 2018.[37]  Once repaid, the Beijing branch returned to the Company the RMB cash pledged for the loan.  China AI has produced copies of these loan documents and accounting vouchers evidencing the disbursement of loan proceeds to the Company

---

[31] Dkt. No. 142-1, at 2.

[32] *See* Maloney Decl. Ex. G, at 69, 137, 320-21; Maloney Decl. ¶¶ 35, 48.

[33] *See* Maloney Decl. Ex. G, at 69, 137, 320-21; Maloney Decl. ¶ 38.

[34] *See* Maloney Decl. Ex. G, at 68 ("[W]e repurchased all of the outstanding 4.00% convertible notes due 2018 upon exercise of the put option by holders of the notes."), 137, 320-21 (disclosing a repurchase price of "US$172,500[,000]"); Maloney Decl. ¶ 38.

[35] *See* Maloney Decl. Ex. G, at 55.

[36] *See* Shi Decl. ¶ 18.

[37] *See* Shi Decl. Ex. F, § 2 ("for the purpose of . . . repurchase the Convertible Senior Notes issued by the Borrower"); Maloney Decl. Ex G, at 55.

and the Company's repayment in full in July 2018.[38]  This was a commonplace international loan transaction for the purpose of obtaining foreign currency necessary to satisfy corporate obligations, nothing nefarious, and all disclosed to the Company's shareholders.  Yet, Plaintiff and the Receiver claimed it was suspicious, without any documentary support, and without apparently even reading the Company's public disclosures.

### C.     The Receiver's Agent in the PRC Has Caused Damage to the Company

Beginning in 2019, the Receiver, through his agent, Guo, began to shut down the operations of the Company in the PRC.[39]  These actions resulted in judgments being entered against the Company in favor of former employees seeking wages.  At the time Seiden took control over the Company's accounts, the Company had available to it cash balances in excess of $1 million.[40] Instead of paying the wage judgments, Guo appealed them without any basis in law or fact.[41] Predictably, the judgments have now been affirmed.[42]

These harms to the Company are wholly attributable to the Receiver, who retained Guo to act on his behalf in the PRC.  Since March 2019, Guo has been the only legal representative of the Company's PRC operating companies.[43]  As such, only Guo, and no one else, can act legally on behalf of those entities.  It was, therefore, Guo's decision to wrongfully appeal the judgments, which led to the predictable denial by the appeals court.  Guo and the Receiver have had access to the Company's other bank accounts and social media accounts for some time[44] and, therefore, could

---

[38] *See* Shi Decl. Exs. F, G, H, I.

[39] *See* Maloney Decl. Ex. H, ¶¶ 49-68, 74-75.

[40] *See* Shi Decl. ¶ 26.

[41] *See* Maloney Decl. Ex. H, ¶¶ 63-67; Maloney Decl. Exs. I, J, K, L.

[42] *See* Maloney Decl. Ex. I; Maloney Decl. Exs. I, J, K, L.

[43] *See* Maloney Decl. Ex. H, ¶¶ 63-67; Maloney Decl. Exs. I, J, K, L.

[44] *See* Maloney Decl. Ex. H, ¶¶ 58-60; *see*, *e.g.*, Dkt. Nos. 78 (July 1, 2019 order authorizing Receiver to disburse funds for expenses), 97 (September 19, 2019 order authorizing Receiver to disburse funds for expenses), 100 (September 25, 2019 order directing Google to submit funds to the Receiver).

have paid the Company's former employees.  Indeed, they have been paying themselves from Company funds instead of the former employees.[45]  For the reasons stated below, it is imperative that the Court remove the Receiver and permit the Board to resume control of the Company.

### D.    The Grounds for the Receivership Are Now Refuted in Fact

The key grounds upon which Baliga sought appointment of the receiver are as follows:

*First*, *Baliga alleged that he had standing to sue derivatively and request the appointment of a receiver on behalf of the Company. See Maloney Decl. Ex. C, ¶¶ 4, 32-35 (Dkt. No. 1) and Mem. of Law (Dkt. No. 94).*

Baliga now asserts zero claims derivatively, apparently "conced[ing] he lacked standing to do so" initially. (Decision at 14.)  As Shi (and China AI) has asserted from the beginning of this action, Plaintiff's allegations as to his legal standing to sue derivatively were false because Plaintiff was never a shareholder of the Company. *See*, *e.g.*, Shi Decl. Ex. B *and* Shi Decl. Ex. C.  When Shi and China AI challenged Plaintiff's standing to bring derivative claims, he first claimed some of his claims in his so-called "Shareholder Derivative Complaint" "had actually been asserted derivatively and others directly, regardless of whether that would even have been permissible." (Decision at 14.) When the Court specifically instructed Plaintiff to identify which claims were direct and which were derivative, Plaintiff instead filed a wholly new complaint, adding 30 pages of allegations, and "alter[ed] dramatically the entire character of his pleading, no longer identifying it as a derivative suit, dropping his fiduciary-duty claim altogether, and turning the action into what is now apparently intended to be solely a direct suit against the Company and its officers, predominantly based on allegations of securities fraud." (*Id.* at 15.)

It is now clear that Plaintiff did not have standing to sue derivatively when he commenced this action and does not have standing today.

---

[45] *See id.*

*Second*, Baliga alleged wrongful transfers of legacy business units of the Company (i.e., SyberOS, Rideshare and Showself. See Maloney Decl. Ex. M, ¶¶ 3, 4 (Dkt. No. 92) and Mem. of Law (Dkt. No. 94); see generally Maloney Decl. Ex. C.

In response, Shi maintains that, as set out in the Company's public filings, the Company never owned the PRC companies; rather, it obtained economic and control rights via the Control Documents in accordance with the VIE structure. *See* Maloney Decl. Ex. B, at 9-10, 173-174; Maloney Decl. Ex. G, at 227, 229-237.   In 2015, the Company, considered and authorized by the Board and disclosed publicly, began a plan to divest its legacy assets.   The transfers complained of did not involve assets held directly by the Company; they were the divesture of assets held by PRC companies that were under the control of the Company pursuant to the Control Documents. See Maloney Decl. Ex. G, at 70-71, Ex. H.   The Company retained all of the assets it owned directly. *See generally* Mem. of Law (Dkt. No. 37); Reply Mem. of Law, ¶¶ 33-43 (Dkt. No. 62); Proposed Compl. in Intervention (Dkt. No. 124); *see generally* Maloney Decl. Ex. G, at 70-71.   Shi notes that Baliga has waived all claims with respect to SyberOS and Rideshare by failing to assert any claims concerning those assets in the SAC.   Further, Shi submits that Baliga's allegations fail as a matter of law because he does not allege that any of the Company's rights under the Control Documents were transferred, terminated, or otherwise impaired by the transactions that occurred in connection with the Company's 2015 divestiture plan. (*See* Dkt. 179, at 10-14.)   Shi has submitted S.E.C. filings demonstrating that the Company has never owned any shares of those companies and that, in fact, it would be against PRC law for the Company to own such shares.

Shi has further submitted sworn statements and records demonstrating that his role in connection with the transfers was as nominee for the benefit of the Company and personal guarantor of the Company's obligations (in the Control Documents) in connection with the sale of FL Mobile

and Showself to Tongfang Investment Fund Series SPC ("**Tongfang**").[46]  In April 2019, Tongfang

commenced an arbitration against the Company and Shi to rescind these divestitures (the "**Tongfang**

**Arbitration**").[47]  The Receiver claimed that he intervened in the Tongfang Arbitration on behalf of

the Company, but it appears that he did not, as the arbitrator granted Tongfang's request for recission

without opposition, meaning that these business units will now be legally returned to the Company's

control.[48]

> *Third*, Baliga alleged that Shi conspired to use Company funds to finance China AI's 2018
> purchase of shares of the Company. (See Mem. of Law in Opp'n to Mot. to intervene, at 8-9
> (Dkt. No. 141)

In response, Shi maintains that China AI submitted evidence refuting Plaintiff's claims.  *See*

Shi Decl. Exs. F, G, H, I; Shi Decl. ¶¶ 14-22.  China AI had loaned the Company money and the

Company repaid that legitimate corporate loan obligation. *See id*.  Plaintiff's claim that the

repayment of a legitimate obligation by the Company is somehow part of a nefarious plot for a

corporate lender to become an equity holder is simply not true.

> *Fourth*, Baliga alleged that Shi stole $88 million from the Company's PRC subsidiaries (see
> July 17, 2020 letter from Receiver and exhibits thereto (Dkt No. 161)).

In response, Shi maintains that these payments referenced by the Receiver in his July 17,

2020 letter were payments made for the legitimate corporate purpose of repaying a corporate loan

obligation. *See* Shi Decl. Exs. J, K, L, M; Shi Decl. ¶¶ 23-25.

## ARGUMENT

### I.    The Receiver Should Be Discharged

The appointment of a receiver is an "extraordinary" and "drastic remedy" that must be

"employed cautiously" and "usually imposed only where no lesser relief will be effective." *Rosen*

---

[46] *See* Shi Decl. ¶¶ 9-12; Shi Decl. Exs. D, E.
[47] *See* Shi Decl. ¶¶ 33-34; Shi Decl. Ex. N.
[48] *See* Shi Decl. Ex. N.

*v. Siegel*, 106 F.3d 28, 34 (2d Cir. 1997) (citing *Citibank, N.A. v. Nyland (CF8) Ltd.*, 839 F.2d 93, 97 (2d Cir. 1988) and *Chambers v. Blickle Ford Sales, Inc.*, 313 F.2d 252, 260 (2d Cir. 1963));

*Ramgoolie v. Ramgoolie*, No. 16-CV-3345, 2016 U.S. Dist. LEXIS 176912, *21, 2016 WL 11281385, at *7 (S.D.N.Y. Dec. 20, 2016), adopted by *Ramgoolie v. Ramgoolie*, 2017 U.S. Dist. LEXIS 19932, 2017 WL 564680 (S.D.N.Y. Feb. 10, 2017); *Varsames v. Palazzolo*, 96 F. Supp. 2d 361, 365 (S.D.N.Y. 2000).  Courts consider the following factors in determining whether to appoint a receiver:

> [f]raudulent conduct on the part of defendant; the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; the inadequacy of the available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and, in more general terms, plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.

*Ramgoolie*, 2016 U.S. Dist. LEXIS 176912, at *21-22 (quoting *U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Prop LLC*, 859 F. Supp. 2d 602, 610 (S.D.N.Y. 2012)).

As an initial matter, the Court should dissolve the receivership because the Plaintiff did not have standing for such equitable relief when it was granted and does not currently have standing for such relief.  That means that, at the time the Court appointed the Receiver, the Court lacked jurisdiction because Plaintiff lacked standing to request such relief derivatively on behalf of the Company. (*See* Shi Decl. Exs. B, C; Shi Decl. ¶¶ 3-6).  Plaintiff was not, and is not, a shareholder of the Company.  Without proper jurisdiction at the time it was entered, the receivership order is *void ab initio*. *Fed. Sav. & Loan Ins. Corp. v. PSL Realty Co.*, 630 F.2d 515, 521 (7th Cir. 1980) ("[W]here, as here, the court lacks jurisdiction to adjudicate the principal matter, its orders purporting to grant the ancillary relief of temporary receivership are likewise beyond its jurisdiction and as such are void ab initio." (internal citations omitted)); *see also Ramgoolie*, 2016 U.S. Dist. LEXIS 176912, at *22 (rejecting appointment of a receiver where personal jurisdiction did not exist).  The Court does

16

not have jurisdiction to continue the receivership now, because Plaintiff lacks standing for this equitable relief, having dismissed all his derivative claims when the Court asked him to clarify which claims were derivative and which were direct.

Plaintiff's new legal argument, asserted in his objection to the Decision (Dkt. No. 223), that New York law allows beneficial owners to sue derivatively is simply wrong. The law is that, pursuant to the internal affairs doctrine, "the rights of shareholders of a foreign company (including the right to sue derivatively) are determined by the law of the place where the company is incorporated." *Howe v. Bank of New York Mellon*, 783 F. Supp. 2d 466, 475 (S.D.N.Y. 2011) (internal citations omitted) (applying Cayman Islands law to the issue of standing to sue derivatively in New York). The 1959 decision cited by Plaintiff finds that beneficial owners can sue derivatively under the "law of the state of incorporation of the corporations involved here," which was Delaware in that action. *Marco v. Dulles*, 177 F. Supp. 533, 552 (S.D.N.Y. 1959). The law of the Cayman Islands, where the Company is incorporated, does not allow beneficial owners to sue derivatively and, therefore, Plaintiff never had standing. (*See* Shi Decl. Exs. B, C.)

The Plaintiff's lack of standing is compounded by his failure to be forthcoming with the Court.  Plaintiff sought this receivership without the knowledge or consent of the Company's Board, without disclosing to the Court that he lacked standing to act derivatively, and for the express purpose of taking control of the Company and replacing the existing Board.  Plaintiff did not make any demand or even provide notice to the Board of his intention to file this action and seek a receiver. (*See* Dkt. No. 1.)  The Board was given less than 24 hours' notice that supposed-counsel for the Company (which was not authorized by the Board) was not going to oppose the receivership. *See* Maloney Decl. Ex. A, ¶¶ 12-16.  Plaintiff claimed in his initial filing that he was a shareholder of the Company, when he was actually a holder of ADSs, not shares, and under Cayman law had no

standing to sue derivatively. Shi Decl. Exs. B, C.  And Plaintiff's and the Receiver's intentions vis-à-vis replacing the Board or otherwise gaining control of the Company were laid bare by their own Cayman counsel in an affidavit submitted to the Hong Kong court, reporting that the Receiver (Plaintiff's counsel) "has consulted with me about the possibility of using the powers conferred upon him under the US Order to effect changes in the composition of Link Motion's board of directors." Maloney Decl. Ex. N; Maloney Decl. ¶ 5.  Under these circumstances, the Court has the inherent power to vacate the receivership order, dissolve the receivership, and direct an accounting of the Receiver's actions. *Chi. Title & Tr. Co. v. Fox Theatres Corp.*, 164 F. Supp. 665, 669 (S.D.N.Y. 1958) ("This is basically not a retention of jurisdiction over the equity receivership per se but the exercise of a power inherent in the court in any event to ferret out and rectify frauds committed upon it. The court cannot be foreclosed from exercising such power by lapse of time, laches, estoppel or technicalities.").

To the substantive receivership analysis, the record demonstrates that all factors now weigh strongly in favor of discharge of the receiver.  The originally alleged "fraudulent" conduct by the Individual Defendants and the Company was not that at all.  Rather, it was Plaintiff, and subsequently the Receiver, who provided the Court with false information on which it relied.  First, neither Plaintiff (Baliga) nor the Receiver (Seiden) ever disclosed to the Court that the Company is organized as a VIE and never owned any of the shares of FL Mobile, Showself, SyberOS, or Rideshare (the "PRC Portfolio Companies") that were allegedly transferred.  Second, Plaintiff and the Receiver failed to disclose to the Court that, pursuant to PRC law, the Company (as a foreign entity) cannot legally own any shares of the PRC Portfolio Companies that Plaintiff alleges were improperly transferred.  Third, Plaintiff and the Receiver failed to disclose to the Court that the Company's interests in the PRC Portfolio Companies were secured via Control Documents, none of

which were affected by the alleged transfers.  It is the Company's interests in the Control Documents, not the actual shares of the operating companies, that comprise the Company's assets in the PRC. Plaintiff has not alleged in any of his pleadings that any of the alleged transfers impaired or deprived the Company's interests in the Control Documents.  These allegations simply do not "amount to the type of fraudulent behavior that would warrant the extraordinary remedy of appointment of a receiver." *Prudential Ins. Co. of Am. v. Hilton Hotels Corp.*, 1995 U.S. Dist. LEXIS 18900, *5, 1995 WL 758781 (S.D.N.Y. Dec. 20, 1995) (rejecting plaintiff's motion for a receiver).

To the second factor, the Receiver has been taking actions that are destroying the value of the Company.  Already, the Receiver has caused the Company to lose the Tongfang Arbitration (by failing to even oppose the relief sought therein), to close some of the Portfolio Companies, and to incur additional legal and judgment expenses in the PRC for refusing to pay employee judgments and then appealing them. (Shi Decl. ¶¶ 26-31; Maloney Decl. Exs. I, J, K, L.)  These actions go against the Court's Receiver Order, which authorized the Receiver "to protect the status quo of the Company, to prevent waste, dissipation, or theft of assets to the detriment of investors, and to assure timely and objective analysis of the financial condition of the Company." (Receiver Order, § II(2).) Given the actions taken to date and the Receiver's apparent inability to understand the business structure of the Company, it is likely that the Receiver might take action to transfer shares of the remaining Portfolio Companies to the Company.  If Seiden, as Receiver, takes action to transfer shares of FL Mobile or Showself to the Company, the Company's operations would be deemed illegal under PRC law[49] and thereby destroy the remaining value in the Company.  It is the Company that stands to lose if the Receivership is continued.  Meanwhile, Plaintiff has presented no evidence that, if the receivership was not in place, any Company assets are "in imminent danger of being lost,

---

[49] Maloney Ex. G, at 80-81.

concealed, injured, diminished in value, or squandered." *Prudential*, 1995 U.S. Dist. LEXIS 18900, *5.

To the third factor, Plaintiff now seeks only money damages.  He has dropped all derivative claims. (Decision at 15.)  Any remedies are now legal in nature, not equitable.  Plaintiff does not have standing to sue derivatively on behalf of the Company, and this Court has denied Plaintiff's last-ditch effort to obtain standing via a (too late) conversion of his ADSs into shares. (*See* Decision at 12-15.)  Plaintiff's SAC seeks damages of at most $635,000, of which only approximately $20,000 of these alleged damages occurred in the time period when Plaintiff purchased the Company's securities.[50]   In contrast, the misconduct of the Receiver's agent, Mr. "Francis" Guo Lilin, has resulted in known new liabilities of the Company in excess of ¥1,083,286 (approximately $170,000).[51]

Finally, Plaintiff has no likelihood of success whatsoever on his derivative claims because he has now voluntarily dismissed all such claims. *See Chambers v. Time Warner, Inc.*, No. 00 Civ. 2839 (JSR), 2003 U.S. Dist. LEXIS 3652, at *5 (S.D.N.Y. Mar. 10, 2003) ("[A] Rule 15(a) amendment eliminating a claim is the same as a Rule 41(a) voluntary dismissal of the claim.").  The only claims remaining in this action are direct claims.

## II.    The Preliminary Injunction Should Be Dissolved

To obtain a preliminary injunction in the Second Circuit, the movant must demonstrate: (1) irreparable harm if the preliminary injunction is not issued; either (2) a likelihood of success on the merits and a "balance of equities" tipping in the movant's favor or sufficiently serious questions going to the merits to make them a fair ground for litigation and  a "balance of hardships" tipping "decidedly" in favor of the movant; and (3) that the public interest would not be disserved by the

---

[50] *See generally* Dkt. 179.
[51] *See* Maloney Decl. Ex. I, J, K, L; Shi Decl. ¶¶ 26-31.

relief.  *See Ass'n of Jewish Camp Operators v. Cuomo*, 470 F. Supp. 3d 197, 209 (S.D.N.Y. 2020)

(denying preliminary injunction); *Hester Indus., Inc. v. Tyson Foods, Inc.*, 882 F. Supp. 276, 277

(N.D.N.Y. 1995).  A preliminary injunction is an extraordinary equitable remedy that should not be

granted absent a clear showing that the moving party has met its burden of proof. *See, e.g., Hester*,

882 F. Supp. at 277.  The finding of irreparable harm – "injury for which a monetary award cannot

be adequate" – is perhaps the single most important factor necessary to the proper issuance of a

preliminary injunction. *See id.*  The party seeking injunctive relief must show "more than a mere

possibility of irreparable harm"; it must show that "irreparable harm is likely if injunctive relief is

denied." *Id.* (citation omitted).

Here, the Court should dissolve the previously issued preliminary injunction.  First, money

damages are not irreparable harm. *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995);

*Ass'n of Jewish Camp Operators*, 470 F. Supp. 3d at 209 ("'irreparable harm' is 'certain and

imminent harm for which a monetary award does not adequately compensate'").  The only claims

in the SAC seek money from either the Company or the Individual Defendants – Plaintiff's claims

of breach of fiduciary duty and other derivative claims are dismissed.  When the Court directed

Plaintiff to explain how he had standing to sue derivatively on behalf of the Company, Plaintiff

instead "altered dramatically the entire character of his pleading, no longer identifying it as a

derivative suit, dropping his fiduciary-duty claim altogether, and turning the action into what is now

apparently intended to be solely a direct suit against the Company and its officers, predominantly

based on allegations of securities fraud." (Decision at 15.)  Plaintiff seeks damages of, at most,

approximately $635,000.  Second, Plaintiff does not have a likelihood of success on the merits on

any derivative claim because there are none in the SAC.  He dropped the fiduciary duty claim, which

was the basis for the Court's entry of the preliminary injunction and Receiver Order. See Dkt. No.

166 (SAC) (no fiduciary duty claim); (Decision at 14.)  Nor does Plaintiff have a likelihood of success on any of the current claims in the SAC.  Plaintiff is unlikely to succeed on any of the operative claims for the single reason that he does not adequately allege reasonable reliance, an element of each of Plaintiff's claims: his Exchange Act claims against all the defendants (counts I and II), his unjust enrichment claim against Shi (count IV), and his common law fraud claim against all the defendants (count V).  In fact, nowhere in the SAC does Plaintiff allege that he ever read any of the press releases, S.E.C. filings, or analyst reports referenced in the SAC.  None of the dates on which Plaintiff alleges to have purchased ADSs match with the dates of any of the allegedly false statements found in the SAC.  As this Court has previously found, such conclusory allegations "do not allege reliance on any purported misstatements or omissions" and are properly "rejected as insufficient." *Melgen v. Bank of Am. Corp. (In re Bank of Am. Corp. Sec.)*, No. 09 MD 2058 (PKC), 2013 U.S. Dist. LEXIS 176295, at *59-60 (S.D.N.Y. Dec. 11, 2013).  (There are other fatal flaws with Plaintiff's claims, which are the basis of the upcoming motion to dismiss.)

Third, even looking past the fact that only money damages are being sought, Plaintiff fails to allege any harm to the Company's interest in the Control Documents.  As demonstrated by the evidence before the Court – materially all of which was publicly available before Plaintiff commenced this lawsuit – the only interests the Company ever had in FL Mobile and Showself were via the Control Documents, not ownership of the Portfolio Companies.  Because none of the rights or obligations in the Control Documents have been altered, and Plaintiff makes no allegations that they have been altered, there is no risk of irreparable harm.  Fourth, the balance of hardships weighs heavily in favor of the Company and its Board of Directors *status quo ante*.  The preliminary injunction prevents the Board of Directors from exercising their right and duty to manage the affairs of the Company, and has resulted in new, avoidable liabilities of at least $170,000 because of the

actions of the Receiver; the potential harm to Plaintiff is merely the prospect of an uncollectable money judgment.

### III.   The Court Should Return All Property, Rights, and Claims to the Company and Its Board of Directors and Direct an Accounting

Upon the dissolution of a receivership, the party under receivership is entitled to the return of property held by the receiver. *United States v. Bradley*, No. 4:05-cr-59, 2012 U.S. Dist. LEXIS 205081, at *9 (S.D. Ga. Feb. 9, 2012) ("Defendants are entitled to the return of their property in a condition that indicates the property received reasonable care and supervision").

As is evident from the Receiver's filings with the Court, he has taken possession of and control over accounts and other assets of the Company, including by way of recognition before the courts of the Cayman Islands and Hong Kong. (*See* Maloney Decl. Exs. O, P).  As such, these properties and assets remain property of the Court until otherwise ordered by the Court. *See Fed. Sav. & Loan Ins. Corp.*, 630 F.2d at 521 ("[U]nless the receiver has made a disposition of the property by order of the court to the original owner or to another party, upon the receiver's discharge the property remains in the custody of the court.").  Moreover, as a general principal of receivership, "[a]ll rights of action of a corporation in receivership remain in the custody of the court, until administration has been completed and the receivership terminated." *Roof v. Conway*, 133 F.2d 819, 823 (6th Cir. 1943).

For the reasons stated above, the Court should direct the Receiver to return to the Company's Board of Directors, as it existed *status quo ante*, all property and assets now in the possession, control, or custody of the Receiver.  The Court should further direct the Receiver to (i) take all steps necessary to discharge and remove Mr. Guo "Francis" Lilin as director and legal representative of the Company's subsidiaries and VIE operating companies; (ii) take all steps necessary to lift any

and all injunctions entered in other jurisdictions (e.g., Hong Kong);[52] and (iii) discontinue all powers of the Receiver pursuant to the recognition orders of the courts in the Cayman Island and Hong Kong.

Finally, the Court should direct the Receiver to account for all actions of the receivership. "By the common law every trustee or receiver of an estate has the duty of exercising reasonable care in the custody of the fiduciary estate." *Bradley*, 2012 U.S. Dist. LEXIS 205081, at *9 (quoting *U.S. ex rel. Willoughby v. Howard*, 302 U.S. 445, 450 (1938), 58 S. Ct. 309, 82 L. Ed. 352)).  While the full extent of the Receiver's and his agents' actions are not known at this time, what is known is that the Receiver has caused the Company to default in the Tongfang Arbitration and avoid its obligations to former employees by refusing to pay legitimate judgments, incurring at least $170,000 in additional liabilities, all while paying himself and his agent from the Company's accounts.  It appears that the Receiver may have breached his duty of reasonable care and supervision.  The Receiver must account for the care of the Company under his watch.

## CONCLUSION

For the foregoing reasons, the Court should enter an Order (i) dissolving the preliminary injunction in all respects; (ii) discharging the Receiver; (iii) directing the Receiver to take all actions and execute all instruments necessary to return the Board of Directors to the *status quo ante* before the appointment of the receiver; (iv) directing the Receiver to take all actions and execute all instruments necessary to return to the Board of Directors all rights to legal claims and control over

---

[52] *See* Maloney Decl. Ex. Q.

the Company and its assets; (v) directing the Receiver to account for all actions taken and monies received in connection with the receivership; and (vi) dissolving the receivership.

Respectfully submitted,

*/s/ Michael James Maloney*
Michael James Maloney, Esq.
FELICELLO LAW P.C.
366 Madison Avenue
3rd Floor
New York, New York 10017
Tel. (212) 584-7806
Direct (646) 564-3510
*Attorneys for Defendant Vincent Wenyong Shi*