**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

WAYNE BALIGA, derivatively on behalf of
LINK MOTION INC. (F/K/A NQ MOBILE INC.)

       Plaintiff,

   -against-

LINK MOTION INC. (F/K/A NQ MOBILE INC.),
VINCENT WENYONG SHI, JIA LIAN, XIAO YU,

       Defendants,

   -and-

LINK MOTION INC. (F/K/A NQ MOBILE INC.),

       Nominal Defendant.

1:18-cv-11642-VM-DCF

---

**RECEIVER'S RESPONSE TO DEFENDANT VINCENT WENYONG SHI'S**
**MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION AND**
**<u>DISCHARGE THE RECEIVER</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

I.   THE MOTION MISREPRESENTS THE RECEIVER'S WORK AND THE
CIRCUMSTANCES WHICH LED TO HIS APPOINTMENT ...................................................... 2

   A.   The Receiver Has Disclosed the Company's VIE Structure ................................................. 2

   B.   The Receiver Had No Notice of the Arbitration Against Shi in Which the Company
   Was Not a Party .......................................................................................................................... 3

   C.   Shi Shuttered LKM's Operations and Stole LKM's Funds ................................................. 6

   D.   Shi Conflates an $88 Million Transfer With Other Transactions ........................................ 8

   E.   Shi Did Not Pay LKM Employees ...................................................................................... 10

   F.   Shi Has Cut Off Funding For the Receivership to Block The Receiver's Work .............. 11

II.   SHI'S CLAIMS ARE BARRED UNDER THE RECEIVERSHIP ORDER .................... 13

## <u>TABLE OF AUTHORITIES</u>

Cases

*Cf. C. Laborers' Pension Fund v. Dimon*, 14 CIV. 1041 PAC, 2014 WL 3639185, at *4 (S.D.N.Y. July 23, 2014) ............................................................................................................................. 14

Robert Seiden (the "Receiver"), in his capacity as the temporary Receiver for Link Motion

Inc. (the "Company" or "LKM") under the Receivership Order (ECF 26; the "Receivership

Order"), by his undersigned counsel, respectfully submits this Response to Defendant Vincent

Wenyong Shi's (the "Defendant" or "Shi") Motion to Dissolve the Preliminary Injunction and

Discharge the Receiver (ECF 230; the "Motion"), together with the accompanying Declaration of

Lilin "Francis" Guo.[1]

## PRELIMINARY STATEMENT

In response to Plaintiff's motion seeking Court authorization for the Receiver convert

Plaintiff's shares, the Receiver cited well established law for the proposition that a receiver is an

officer of the Court and is "not an agent of the parties."[2]  Against that backdrop, the Receiver

sought instructions from the Court as to whether the Receiver had authority to convert Plaintiff's

shares.  The same principles apply here: the Receiver is not a party to this action and is not an

advocate for any of the parties.  The Receiver submits this response for the limited purposes of (i)

responding to the Motion's allegations concerning the Receiver, including correcting the Motion's

misrepresentations regarding the Receiver's work, and (ii) bringing to the Court's attention the

fact that Shi's purported claims against the Receiver in the Motion are barred by the Receivership

Order.[3]

---

[1] All references to "ECF" are references to the docket in *Baliga, derivatively on behalf of Link Motion Inc. v. Link Motion Inc., et al.*1:18-cv-11642-VM-DCF (S.D.N.Y.).  Citations to the "Guo Decl." are citations to the Declaration of the Receiver's Agent Lilin "Francis" Guo attached hereto.

[2] *See* ECF 204 at 1 (internal citations omitted).

[3] Further, the Receiver is mindful of the Court's  May 26, 2021 Order, in which the Court held that it lacked jurisdiction to authorize the Receiver to convert Plaintiff's ADRs into common shares, reasoning that "none of [Plaintiff's] current claims turn, *in any way*, on the existence, provisions, or enforceability of the Depository Agreement" relating to those ADRs and thus, Plaintiff's request for such authorization "would require the Court to engage in an impermissible advisory exercise."  ECF 221 at 12-13 (emphasis added).   The Motion raises similar concerns regarding an impermissible advisory exercise, in that it invites the Court to conduct an unrestrained "accounting of the Receiver's actions" in matters that have no connection to the claims in this action, such as Shi's contention that the Receiver

1

I.   **THE MOTION MISREPRESENTS THE RECEIVER'S WORK AND THE CIRCUMSTANCES WHICH LED TO HIS APPOINTMENT**

A.   **The Receiver Has Disclosed the Company's VIE Structure**

The Motion alleges that the Receiver never "disclosed to the Court that the Company is organized as a VIE" and that "pursuant to PRC law, the Company . . . cannot legally own" shares of certain subsidiaries that were allegedly transferred, including FL Mobile and Showself.  Motion at 18.

Contrary to the Motion's allegations, the Company's VIE structure has been fully disclosed to the Court.  The Order appointing the Receiver expressly contemplates that the Receiver would take steps to restore the Company's "senior position in the underlying assets of the FL Mobile and Showself businesses,"[4] language that reflects the contractual rights that an offshore holding company (such as LKM) holds in its mainland China subsidiaries through a VIE structure. Moreover, the Receiver expressly referenced the Company's VIE structure in a progress report to the Court:

> *The Receiver's PRC agent, respected Chinese citizen and businessman Mr. Lilin Guo, is actively pursuing efforts to secure the bank account of the WFOE in China. Mr. Guo has successfully negotiated with other significant LKM shareholders inside the PRC to assist in the process of gaining control of the **Variable Interest Entity ("VIE") contracts that maintain control over LKM's PRC subsidiaries**..*

ECF 220 at 2 (emphasis added); *see also* ECF 220-1 at 3 ("Mr. Guo legally took control of the WFOE, and this case was filed by Shi Wenyong in an attempt to refute a resolution of Beijing NQ Technology Co. Ltd. provisional shareholders' in accordance with the Variable Interest Entity

---

mishandled litigation brought by former LKM employees in China.  Motion at 4, 12, 13, 18, 19, 24.  In any event, as discussed further below, Shi's contentions are based upon misrepresentations of fact.
[4] ECF 26; the "Receivership Order" at I(2)(iii) (emphasis added).

agreements.").  Moreover, it is well known that most U.S. publicly traded Chinese companies have a VIE structure, including nearly all internet companies.[5]

### B. The Receiver Had No Notice of the Arbitration Against Shi in Which the Company Was Not a Party

The Motion contends that the "the Receiver has caused the Company to lose the Tongfang Arbitration."  Motion at 19.  Although the Motion labels this arbitration as the "Tongfang Arbitration" and claims that it was commenced by Tongfang against LKM (Motion at 15), the documentation submitted with the Motion shows that it was actually an arbitration initiated by Zhongzhi against Dr. Shi.  *See* ECF 228 at 33; *see also* ECF 228-14 at 1 (defining the Claimant as "Zhongzhi Hi-Tech Overseas Investment Ltd.").  LKM was not a party to this arbitration.

The Receiver had no notice of the arbitration by Zhongzhi against Shi, which was commenced months before the Receiver was appointed.  *See* ECF 228-14 ("On December 2018, the Claimant commenced this arbitration[.]").  It is not surprising that the Receiver was never notified of the arbitration because, as reflected in the final award in the arbitration, Shi was notified of the arbitration but LKM (a non-party) was not.  ECF 228-14 p. 1; *see also id.* ¶ 3 ("The Respondent, (Dr) Vincent Wenyong Shi"); *see also id.* ¶¶ 42, 48 (confirming the Respondent's (Dr. Shi's) address).

In fact, Shi communicated with the arbitral panel.  The final award reflects that "the Respondent ha[d] contacted the Tribunal as regards certain procedural aspects of this Arbitration."  *See* Award ¶ 89.  But Shi did not file "evidence or substantive defence submissions despite many

---

[5] *See, e.g.*, *O'Melveny & Myers Publishes Paper on VIE Structures in China: What you Need to* Know (Nov. 1, 2011), https://www.omm.com/resources/alerts-and-publications/publications/omelveny-myers-publishes-paper-vie-structures-in-china-what-you-need-to-know?sc_lang=zh-CN ("***The [VIE] structure has become commonplace and is used by many of China's most well known offshore-listed companies***, including Alibaba, Baidu, Dangdang, Focus Media, New Oriental, Sina and Tudou. For several emerging industries in China, including Internet and private education, ***almost all major players have adopted VIE structures to attract foreign venture capital financing and complete offshore listings***.") (emphasis added).

opportunities having been provided to him to do so under the Tribunal's procedural orders.  [Shi] has not provided any explanation to the Tribunal for its failure to do so."  *See* ECF 228-14 ¶ 88.

Shi thus turns the truth on its head.  While alleging in the Motion that the Receiver caused the company to lose the arbitration, the truth is that the Receiver had no notice of the arbitration (which was against Shi personally), and that Shi defaulted in the arbitration by failing to submit any defense or evidence.[6]

Defendant's allegations that the Receiver "claimed that he intervened in the Tongfang Arbitration on behalf of the company, but it appears that he did not" conflates what he incorrectly labels as the "Tongfang Arbitration" with the Zhongzhi Arbitration (*see* ECF 210; ECF 210-1).

Pursuant to the Receiver's obligations under the Receivership Order, the Receiver upon being appointed halted "Defendant Shi's oversight of the dispute and arbitration between *the Company* and Zhongzhi."  Receivership Order at ¶ I(2) at iv (emphasis added); *see also* ECF 210; *see also* ECF 210-1 ¶¶ 13, 19.   As reported to the Court in the Receiver's March 2, 2021 Letter (ECF 210), after a lengthy international arbitration, as well as extensive pre-hearing and post-hearing submissions, the three member Tribunal unanimously found that Shi had breached his fiduciary duties to LKM by causing LKM to enter into agreements that pledged substantially all of its assets to Zhongzhi for no consideration.  As the Tribunal held in its final award issued on February 16, 2021:

> • "*Dr. Shi plainly disregarded counsel's advice in negotiating and approving the two agreements. All of these facts establish that he breached his fiduciary duty to Link Motion in negotiating the two pledge agreements with Zhongzhi. The fact that Link Motion's Chief Executive Officer, President and General Counsel and Chief Financial Officer resigned their positions in connection with the*

---

[6] Defendant's claim that "the arbitrator granted Tongfang's request for recission without opposition, meaning that these business units will now be legally returned to the Company's control" (Motion at 15) lacks a specific page citation and any basis in fact based on the arbitral award. *See generally* ECF 228-14.

*issuance of the Two Pledge Agreements reinforces this conclusion.*" ECF 210-1 ¶152.

- "*Dr. Shi compounded this manifest breach of his fiduciary duty by participating in an approval process by the Board of Directors that was deeply flawed. [] [T]he directors were provided less than two hours' notice of the Board meeting at which the pledge agreements were considered. Although the WeChat message the corporate secretary utilized to notify directors of the imminent meeting identified 'additional securities' as a topic to be addressed at the meeting, it was not informative that the Board would be considering pledging substantially all of the company's assets to Zhongzhi to secure payment of the Note on which the company was seemingly poised to default only three weeks in the future.*" ECF 210-1 ¶ 153.

- "*Troubling here is that the minutes do not reflect any discussion whatever of the decision to offer security to Zhongzhi, much less the choice to do so without obtaining anything in return or the consequences for Link Motion three weeks later when it defaulted on the Note and the two pledge agreements became enforceable by Zhongzhi.*" ECF 210-1 ¶ 154.

- "*This failure is exacerbated by the limited discussion the minutes reflect took place, to wit, that the 'Directors reviewed and discussed the Memo of the Company to Zhongzhi in the form attached hereto as Exhibit A.' The record shows the attached document was the Cooperation Memorandum, not either of the Two Pledge Agreements. Since the Cooperation Memorandum recited, falsely, that Link Motion 'has obtained fair, sufficient and reasonable consideration from' Zhongzhi in exchange for the pledges of the Tongfang Note and all of Link Motion's shares in NQ International, nothing in the record shows that the two new directors – who had joined the Board the day before – were aware that the transaction they were being asked to approve in fact lacked any consideration.*" ECF 210-1 ¶ 155.

- "*The record also does not show that the two new directors were made aware that the company's General Counsel, Chief Financial Officer, and outside securities counsel each opposed the Two Pledge Agreements and believed that approval violated the directors' fiduciary duties.*" ECF 210-1 ¶ 156.

- "*This evidentiary record demonstrates that Dr. Shi breached his fiduciary duty of care in approving the pledge agreements.*" ECF 210-1 ¶ 157.

5

- "*Dr. Shi also breached his fiduciary duty of loyalty to Link Motion because [] he had a direct, personal financial interest in the repayment of the Note in view of the obligation he had undertaken in the Shi Cooperation Agreement to pay any interest that Link Motion failed to pay. R-003 (Shi Cooperation Agreement, § 1.1). The pledge agreements Dr. Shi negotiated and shepherded through the Board approval process were self-evidently intended to help ensure such repayment, in which case Dr. Shi's personal financial exposure would be reduced.*"  ECF 210-1 ¶ 157.

The Tribunal further held that Zhongzhi aided and abetted Shi's breaches of fiduciary duty and rescinded the pledge agreements.  *See* ECF 210; *see also* ECF 210-1 at ¶¶ 4, 6, 26, 63, 173, 183, 199(d)(i) ("The Tribunal determines and declares that the Tongfang Note Pledge and the Share Charge (as defined in this Award) are each invalid and unenforceable, and have so been from inception.").

### C.  Shi Shuttered LKM's Operations and Stole LKM's Funds

Shi's arguments that "the Receiver, through his agent, Guo, began to shut down the operations of the Company in the PRC" (Motion at 12) is a distortion of the truth.  As previously explained to the Court, it was the Defendant who "[w]ithout the Receiver's authorization, [] fired employees and formed a new company to receive revenues for Company applications."  *See* ECF 50 ¶ 6-12 ("Shi and a small group of his supporters came into the office and ordered the employees in the Legal, Human Resources, and Accounting departments to assist them in removing accounting and legal documents, and to help them destroy and damage operating data systems and the company's main contract management system."); *see also* Guo Decl. ¶ 2 ("Shi forced the majority of employees to leave their jobs by suspending their wages, ransacked the Company's office space in Beijing and removed its financial documents, carried away its business license and bank keys and company seals, formed new companies, and took the Company's software applications to take the Company's revenues."); *see also* ECF 50-4 (e-mail correspondence

showing that company accounts were being migrated to new companies); *see also* ECF 50-5 (communications with a former director of the Company who stated that they were taking legal documents and destroying the Company's systems); *see also* ECF 50-6 (same).

After shuttering the Company, Shi sought to gain control over the Company's Chinese bank account for the wholly foreign owned company (the "WFOE"), in direct violation of the Receivership Order. *See* Receivership Order at II(2)(d) ("The Receiver shall have access to all present bank accounts or other accounts of the Company"); *see also* Guo Decl. ¶¶ 4-10. After Mr. Guo was appointed the legal representative over the WFOE in April 2019, Zemin Xu, a known associate of Shi's, immediately filed a lawsuit challenging Mr. Guo's designation and for a preservation order (the "Preservation Order") in the People's Court of Haidian District in Beijing, China (the "Haidian Court") to stop Mr. Guo from gaining access to Company funds. *See* Guo Decl. ¶ 6-7; *see also* ECF 220-3 at 2. Mr. Guo won his lawsuits against Zemin Xu in August and December of 2019. *See* Guo Decl. ¶ 6. Mr. Guo did not gain access to the WFOE bank account until the Preservation Order was lifted in June of 2020. *See* Guo Decl. ¶ 7.

Once Mr. Guo gained access to the WFOE account he was shocked to find that Shi had stolen all of the Company's funds. *See* Guo Decl. ¶¶ 8-10, 13; *see* Guo Decl. Ex. D at 2-3 (Shi in February of 2018 stated that the Company had roughly $460 million); *see also* ECF 220-4 at 2 ("It has been reported to the Receivership that Defendant Shi, through his associates, sought to obstruct the Receivership's ability to preserve these Company funds by gaining access to this Account without proper authorization and thereby transferring money out of it for his own personal benefit and to the detriment of the Company."); *see* also ECF 220 at 4. Mr. Guo continues to seek redress in the PRC related to the looting of LKM's funds, including bringing claims against China

7

Merchants Bank based on its failure to prevent Shi's illicit transfers.  *See* Guo Decl. ¶ 9, fn. 2; *see also* ECF 220 at 5. [7]

### D.  Shi Conflates an $88 Million Transfer With Other Transactions

Defendant claims that an $88 million transfer from LKM's accounts was a legitimate repayment of a loan.  *See* Motion at 15; *see also* ECF 228 ¶¶ 23-25.  This claim conflates an $88 million transfer with a different set of transfers (totaling approximately $89 million) that have been challenged by the Receiver and that occurred at different times.  *See* Guo Decl. ¶¶ 8-9 (discussing $89 million in transfers challenged by the Receiver, which occurred through 29 individual transfers between May and November of 2019); *see also* Guo Decl. Ex. E (detailing the 29 transfers); *see* ECF 220-4 at 2-3 (same); ECF 228-13 (e-mail chain cited by Shi, which relates to an $88 million transfer in March 2019 that was due on May 31, 2019).

Shi's claim that it was not him but Zemin Xu who made the $89 million in transfers between May and November of 2019[8] is refuted by governmental records.  *See* Guo Decl. Ex. C at 3 (State Administration of Taxation – Beijing E-tax Bureau records identifying Shi as the "Person in charge of Finance"); *see also* Guo Decl. ¶ 5; *see also* ECF 220-4 at 2 ("Defendant Shi is the only person who could have made these transfers.  Records that the Receivership was lawfully able to secure from the Beijing Electronic Taxation Bureau system, a government agency for company tax and financial information in the PRC, demonstrates that Defendant Shi's title was 'Person responsible for company finance' of the WFOE at the time of the transfers, indicating he

---

[7] Defendant's allegations that the Receiver's investigation said "Shi and China AI had conspired to secrete away assets of the Company via a payment to a bank in Luxembourg" is wrong.  *See* Motion at 10. As stated in the Receiver's May 2, 2020 letter (ECF 142-1 at 3), which Defendant's rely on in the Motion (Motion at 10-11), the Receiver only stated that it did not pay itself with any funds from China AI as those funds were "contemporaneously rushed to an account that is inaccessible to the Receiver."  *See* ECF 142-1 at 3.

[8] *See* ECF 228-10 at 1 ("Mr. Shi was never a signatory on the accounts identified by the Receiver. It appears that Mr. Zemin Xu, in his capacity as legal representative of the entities in question, had signatory power over those accounts.")

directly controlled the WFOE's bank seal, bank account coded password, and the funds in the account.").

Indeed, Shi had no authority to make the $89 million in transfers between May and November 2019 as the February 1, 2019 Receivership Order "restrain[ed] and enjoin[ed] Defendants from: transferring, liquidating, dissipating, assigning, and/or granting a lien or security interest or other interest in, any assets belonging to Link Motion." Receivership Order at I(1); *see also* Guo Decl. ¶ 6 ("Although the Preservation Order was granted, Xu was still discharged, Shi's status as the Person in Charge of Finance was still canceled, the seals and banking keys were still invalidated, and therefore Xu and Shi had no legal authority to access or transfer WFOE funds.").

Further, the $89 million was transferred between May and November 2019 to Beijing NQ Mobile Technology Limited, not China Merchants Bank. *See* Guo Decl. ¶ 8 ("Based upon my investigation, in 29 different transactions between May and November of 2019, Shi used the now-nullified seals and banking keys to transfer RMB 626 million (at the time valued at over USD $89 million) from the Company to a company called Beijing NQ Mobile Technology Limited (a wholly-owned subsidiary of LKM that Shi still had control of)"); *see also* ECF 220-4; *see also* ECF 159 at 1 (alleging that the transfers were to China Merchants Bank). Lastly, Zemin Xu, a known cohort of Shi's, is the legal representative of the company which received the $89 million. *See* Guo Decl. ¶ 8; ECF 220-4 ("That [Beijing NQ Mobile Technology Limited] has a similar name to the Company is likely not a coincidence. Indeed, this entity is believed to be controlled by Defendant Shi . . . Zemin Xu was the legal representative of this company at the time of the transfers.").[9]

---

[9] The Receivership has discovered numerous other transfers committed by Shi. *See* Guo Decl. ¶10.

### E.  Shi Did Not Pay LKM Employees

While the Defendant seeks to pin the blame for his not paying Company employees on Mr. Guo and the Receiver (Motion at 12-13), it was the Defendant and his cohort Zemin Xu who did not pay the wages which led to the Beijing Court's approximate $170,000 judgments (the "Employment Orders") against NetQin Unlimited, a subsidiary of LKM.  *See* Guo Decl. ¶¶ 11-14 ("[B]eginning in December 2018, Shi stopped paying employee salaries, resulting in extensive labor litigation that began before the appointment of the Receiver.  Some employees had won their labor arbitrations before I was appointed as the legal representative.  However once appointed as the legal representative in April 2019, it became my duty to manage these litigations."); *see also* ECF 229-9 at 1 ("Due to Mr. Xu's breach of loyalty and diligence obligation, NetQin Unlimited is unreasonably incurred with over 4.6 million in economic compensation debts, which is obviously unfair to NetQin Unlimited. And NetQin Unlimited did not intentionally default on Gong's wages, so NetQin Unlimited should not pay Gong Linlin economic compensation."); *see also* ECF 229-10 at 1; *see also* ECF 229-11; *see also* ECF 229-12 at 1; *see also* ECF 24 at 2(d) (prior to the Receiver being appointed "[t]he Company ha[d] done nothing to maintain its key businesses in operational status. Employees ha[d] not been paid").  While it was Shi and Zemin Xu who were responsible for Company payrolls until Mr. Guo became the legal representative,[10] once Mr. Guo did gain access to the WFOE to pay the Employment Orders, as stated above, the WFOE had already been emptied.  *See* Guo Decl. ¶¶ 7, 13.

Shi is wrong that Mr. "Guo appealed the [Employment Orders] without any basis in law or fact."  Motion at 12.  Mr. Guo's appeals of the Employment Orders were legally sound and

---

[10] Receivership Order I(1) ("[T]he Company shall be allowed to continue to process normal day-to-day operational costs, including payroll, and the Company shall provide the Receiver with ongoing reports on operating status and payroll and other disbursements.").

necessary as the Receivership did not have access to the Company records at the time to verify the underlying employee information. *See* Guo Decl. ¶ 12 ("It was incredibly difficult to manage these litigations (and to determine whether these claims were valid) as Shi refused to provide me with company data and materials including labor and personnel files, employee lists, entry dates, employment contracts, salary records, as well as the Company's financial books. My attorneys advised me that because I couldn't confirm the lawsuits underlying facts, it was my duty as the Receiver's agent to protect the interests of the Company and appeal the judgments."). Further, if the Receivership did not appeal the Employment Orders then the Company would have waived its rights and Shi would be in front of this Court now stating that the Receivership violated its fiduciary duties, this is a catch twenty-two. *See* Guo Decl. ¶ 12 ("This was the only way make sure a full and complete review of the facts was completed.").

Mr. Guo has brought claims against multiple applicable parties to hold them liable for causing the Employment Orders. S*ee* ECF 229-9 at 1 (In response to Mr. Xu 's infringement of the corporate's and shareholders' interests, NetQin Unlimited has filed a separate lawsuit in Haidian District People's Court over Mr. Xu's liability for damaging the corporate's interests."); *see also* ECF 229-10 at 1; *see also* ECF 229-11 at 1; *see also* ECF 229-12 at 1; *see generally* ECF 220-1.

### F. Shi Has Cut Off Funding For the Receivership to Block The Receiver's Work

Shi's contention that the Receiver should have paid LKM's former employees (rather than using Company funds to secure the assets and investigate Shi's misconduct) seeks to distract the Court from Shi's defiance of the Receivership Order and his attempts to frustrate the Receiver's work. Motion at 13. The Receivership Order mandates that the Company fund the Receivership.[11]

---

[11] "The Company shall be responsible for funding the Receivership Account and is directed to cooperate with the Receiver in establishing and funding the Receivership Account." Receivership Order at II(5).

Yet Shi violated the Receivership Order by doing everything he could to stop that funding.  As a result of Shi's actions, the Receiver currently lacks access to any Company funds.  *See* Guo Decl. ¶¶ 7-10, 13, 16.[12]

Shi's actions have not only harmed the Company and the Receiver's team monetarily, but they have harmed Mr. Guo's life personally.  Mr. Guo as the named legal representative of the WFOE, even without access to WFOE funds, was (under China's legal system) subject to personal sanctions as a result of the Employment Orders, thereby unfairly bearing the consequences of Shi's misconduct.  Mr. Guo has been put on a spending restriction list (the "Restriction List").  *See* Guo Decl. ¶ 14.  This Restriction List is "effectively a blacklist; it prohibits Mr. Guo from travelling by air, purchasing first class train tickets, checking into hotels, sending his children to private schools in the PRC or abroad, and visiting his family abroad." *See* ECF 220-3 at 3; *see also* Guo Decl. ¶ 14.  The Restriction List is still in place.  *See* Guo Decl. ¶ 14.  Mr. Guo has gone to great lengths, at his own personal expense, to serve the best interests of LKM.  The only way for Mr. Guo's designation on the Restriction List to be dismissed is for Defendant to return the stolen WFOE funds so LKM can satisfy the above payment disputes.  *See* Guo Decl. ¶ 14.

Further, Defendant's arguments obfuscate the truth that the Receivership is the only obstacle to Shi's looting of the Company.  Shi seeks to displace the Receiver and remove the Receiver's ability to proceed with its legal actions against Shi in China.  This would be the legal equivalent of letting the fox guard the henhouse.

The Receiver and his agent Mr. Guo have either completed or are litigating 12 actions in China against Shi or his cohorts.  *See generally* ECF 220-1.  Mr. Guo is also working with the

---

[12] Shi misleadingly cites to certain orders issued by this Court in 2019 authorizing funding for the Receiver's work from Company accounts.  Motion at 12, fn. 44. The limited funds in these accounts have been exhausted.  Further, Mr. Guo has never paid himself from Company funds.  *See* Guo Decl. ¶ 14.

Chinese police in their active investigation against the Defendant.  *See* Guo Decl. ¶¶ 15-17; *see also* ECF 220-1 at 4 ("The criminal suspects are Shi Wenyong and Xu Zemin. After a preliminary investigation, the police determined that the facts had been established and the Beijing Police have officially opened an active investigation.").  This criminal investigation involves Shi's hiring people to kidnap his former business partner and founder of LKM, Henry Lin, as well as embezzlement of LKM funds.  *See* Guo Decl. ¶ 16 ("WFOE counsel has informed me that a criminal investigation of Shi has been initiated concerning Lin's kidnapping. Beijing Chaoyang District Police (the "Beijing Police") began the criminal case in August of 2018.  As Shi misappropriated RMB440 million from an LKM subsidiary (Xinjiang NQ Venture Capital Co., Ltd.), the Beijing Police are also investigating Shi's embezzlement and misappropriation of Company funds."); *see also* Guo Decl. Ex. F at 7 ("KTH told Lin in chat that he was entrusted to watch Lin as such, the purpose is block Lin going back to the company. It is someone from Lin's company, and Lin knows him. Later KTH mentioned the name of Shi, Lin was astonished on hearing that[.]").  The WFOE's counsel was informed by the Beijing police that Shi has fled China illegally through its southern border and is currently in hiding from the authorities.  *See* Guo Decl. ¶ 17.

## II.    SHI'S CLAIMS ARE BARRED UNDER THE RECEIVERSHIP ORDER

Under the Receivership Order,

> ***The Receiver, and anyone acting on his behalf, shall have no liability to the Company, its stockholders, or any other person or entity, for any actions taken in good faith pursuant to this Order****. The Receiver shall be entitled to all protection, limitation from liability, and immunity available at law or in equity, to a court-appointed Receiver, including without limitation, all protection, limitation from liability, and immunity, to the fullest extent permitted by applicable law. Expenses, including reasonable attorney's fees, incurred by the Receiver in defending any civil, criminal, administrative, or investigative act, suit, or proceeding, arising by*

> *reason of, or in connection with the Receiver's designation as*
> *Receiver for the Company, or in the performance of his duties*
> *hereunder, shall be paid by the Company in advance of the final*
> *disposition of such action, suit, or proceeding, subject to the*
> *repayment of such amount if it shall ultimately be determined by this*
> *Court that the Receiver is not permitted to be indemnified by the*
> *Company under applicable New York law.*

Receivership Order at II(9) (emphasis added).

In the Motion Defendant alleges that "the Receiver has caused the Company to default in the Tongfang Arbitration and avoid its obligations to former employees by refusing to pay legitimate judgments, incurring at least $170,000 in additional liabilities, all while paying himself and his agent from the Company's accounts. It appears that the Receiver may have breached his duty of reasonable care and supervision." Motion at 24.  In addition to the fact that the Motion misrepresents the Receiver's actions as explained in Section I above, Shi's claims against the Receiver are barred by the broad immunity granted to the Receiver in the Receivership Order in the language quoted above.   *Cf. C. Laborers' Pension Fund v. Dimon*, 14 CIV. 1041 PAC, 2014 WL 3639185, at *4 (S.D.N.Y. July 23, 2014), aff'd, 638 Fed. Appx. 34 (2d Cir. 2016) (unpublished) ("Since JPMorgan's certificate of incorporation specifically immunizes its directors from personal liability for actions taken in good faith, Plaintiffs must plead particularized facts demonstrating that the Board acted with 'scienter i.e., that there was an 'intentional dereliction of duty' or 'a conscious disregard' for their responsibilities, amounting to bad faith[.]'").

July 19, 2021
New York, NY

                                  SEIDEN LAW GROUP LLP

                                  By:  /s/ Amiad Kushner
                                  Amiad Kushner
                                  Andrew Sklar
                                  322 Eighth Ave, Suite 1704
                                  New York, NY 10001
                                  646-766-1914
                                  akushner@seidenlawgroup.com
                                  asklar@seidenlawgroup.com

                                  *Counsel for Robert Seiden*
                                  *Court-Appointed Temporary Receiver*
                                  *for Link Motion Inc.*