**IN THE MATTER OF AN ARBITRATION**
**AND**
**IN THE MATTER OF THE 2018 HKIAC ADMINISTERED ARBITRATION RULES**

**BETWEEN:**

| | |
|---|---|
| **Tongfang Investment Fund Series SPC** | |
| **(Cayman Islands)** | **Claimant** |

     **and**

| | |
|---|---|
| **Xinjiang NQ Mobile Venture Capital** | |
| **Investment Co. Ltd.** | |
| **(新疆网 (秦移动创业 投资有限公司 )** | |
| **(Mainland China)** | **1st Respondent** |
| | |
| **Link Motion Inc. (formerly NQ Mobile Inc.)** | |
| **(Cayman Islands)** | **2nd Respondent** |

**Dispute relating to**
**(1) A Share Purchase Agreement dated 30 March 2017 and**
**(2) A Supplemental Agreement dated 31 March 2017**

**Case No: HKIAC/A19086**

**FINAL AWARD**

## I.    INTRODUCTION

1.      On 30 March 2017 the Claimant (Tongfang), the 1st Respondent (Xinjiang NQ) and the 2nd Respondent (Link Motion) entered into a Share Purchase Agreement (SPA).  By the SPA, Xinjiang NQ agreed to sell and Tongfang agreed to buy 63% of the equity in FL Mobile Jiutian Technology Co. Ltd. (FL Mobile) for RMB 2,520 million. On 31 March 2017 Tongfang, Xinjiang NQ, Link Motion, Beijing NQ Technology Co Ltd (Beijing NQ Technology), FL Mobile, Beijing Showself Technology Co Ltd (Beijing Showself) and Mr. Vincent Shi Wenyong (Mr. Shi)[1]

---

[1] The SA identified Mr. Shi's role as follows:

    2.1  The parties agree and acknowledge that, NQ [that is, Link Motion] has hereby agreed to entrust SHI Wenyong [that is, Mr. Shi] to hold its legal shares in FL Mobile and Showself [that is, Beijing Showself] (the "Entrusted Shares") before the Closing of the Share Purchase Transactions, and SHI Wenyong agrees to accept NQ's entrustment to hold these Entrusted Shares on behalf of NQ.

    2.2  SHI Wenyong agrees to be registered as the shareholder of FL Mobile and [Beijing] Showself. Shi Wenyong and each party acknowledges that the ownership of the Entrusted Shares registered under the name of SHI Wenyong shall be owned entirely  for  the  benefit  of  NQ  before  the  Closing  of  the  Share  Purchase

entered into a Supplemental Agreement (SA).[2]  The SA stated that the parties were entering into such agreement "to make special arrangements in relation to the Share Purchase Transactions and other related matters".  The SA defined the "Share Purchase Transactions" as the purchase of FL Mobile under the SPA and the purchase of Beijing Showself under a different (but related) share purchase agreement (the Beijing Showself SPA).[3]

2.     Tongfang says that, pursuant to the SPA, it paid the full consideration for the purchase of FL Mobile. Tongfang complains that, notwithstanding such payment, the Respondents have not transferred the relevant FL Mobile shares to Tongfang. Accordingly, in these arbitration proceedings, Tongfang claims the return of the consideration of RMB 2,520 million or, alternatively, damages, together with interest and costs.  The main issue in this arbitration is therefore whether Tongfang is entitled to have the amount of RMB 2,520 million returned to it by the Respondents.

3.     Tongfang commenced these proceedings by a first Notice of Arbitration dated 23 April 2019 against Xinjiang NQ and a second Notice of Arbitration also dated 23 April 2019 against Link Motion.  The two Notices of Arbitration alleged that the Respondents had breached the SPA and SA.  By a letter dated 24 May 2019 to the Hong Kong International Arbitration Centre (HKIAC), Tongfang's solicitors clarified that it was Tongfang's "wish to commence one arbitration only comprising all parties, namely against both Xinjiang NQ ... and Link Motion".

4.     By a letter to the parties dated 28 August 2019 HKIAC recorded that Tongfang and the Respondents had confirmed that they were agreeable to HKIAC administering this arbitration in relation to any and all claims and disputes arising out of the SPA and the SA in accordance with the 2018 HKIAC Administered Arbitration Rules (the Rules). Further, the parties having previously indicated their willingness for this arbitration to follow the Expedited Procedure as set out in Article 42 of the Rules, HKIAC's letter informed the parties that the arbitration would be so conducted.  Thereafter, by a letter 16 September 2019 HKIAC notified the parties

---

Transactions, and shall be delivered to the Purchaser upon such Closing or other time agreed by the Parties.

2.3 As the nominated shareholder by NQ, SHI Wenyong shall follow the instructions from NQ (or the Purchaser after the Closing of the Share Purchase Transactions, if properly) to exercise the shareholder's rights of the Entrusted Shares.

[2] The preamble to the SPA noted that Link Motion (then known as NQ Mobile Inc) owned 100% of NQ International Limited (NQ International) (a Hong Kong company) which in turn held 100% of NQ Mobile (Beijing) Co Ltd (a PRC company) (NQ Beijing).  The preamble to the SPA further recited that NQ Beijing controlled Beijing NQ Technology through a series of contractual arrangements (identified in the SPA as the "NQ Control Documents") and Beijing NQ Technology held 100% of Xinjiang NQ. NQ International is now known as Link Motion International Limited.

[3] The Beijing Showself SPA was also dated 30 March 2017. Under that agreement, Tongfang, agreed to purchase 65% of the equity in Beijing Showself from Beijing NQ Technology for a consideration of RMB 800 million.  As with the SPA, Link Motion was a party to the Beijing Showself SPA.

of my appointment as sole arbitrator in this matter. Such appointment was made under Article 9 of the Rules following the parties' joint designation of myself as sole arbitrator.

5.     The SPA included the following provisions:

9.4    Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of Hong Kong.

9.5    Dispute Resolution. Any dispute, controversy or claim arising out of or relating to this Agreement, including, but not limited to, any question regarding the breach, termination or invalidity thereof shall be finally resolved by arbitration in Hong Kong in accordance with the rules (the "ICC Rules") of the International Chamber of Commerce in force at the time of commencement of the arbitration.

(a)    The arbitral tribunal shall consist of three arbitrators. The arbitrators shall be appointed in accordance with the ICC Rules.

(b)    The language to be used in the arbitration proceedings shall be English.

(c)    Any arbitration award shall be (i) in writing and shall contain the reasons for the decision, (ii) final and binding on the parties hereto and (iii) enforceable in any court of competent jurisdiction, and the parties hereto agree to be bound thereby and to act accordingly.

(d)    The parties hereto expressly consent to the consolidation of arbitration proceedings commenced hereunder with arbitration proceedings commenced pursuant to the arbitration agreements contained in this Agreement In addition, the parties hereto expressly agree that any disputes arising out of or in connection with this Agreement concern the same transaction.

(e)    In the event a dispute is referred to arbitration hereunder, the parties hereto shall continue to exercise their remaining respective rights and fulfil! their remaining respective obligations under this Agreement.

(f)    It shall not be incompatible with this arbitration agreement for any party to seek interim or conservatory relief from courts of competent jurisdiction before the constitution of the arbitral tribunal.

6.     The SA contained the following clause:

9.9    Governing law and jurisdiction

(a)    This Agreement shall be interpreted, governed and enforced according to the Hong Kong law.

(b)    All of the parties agree any dispute, controversy or claim arising out of this Agreement or relating to the FL Mobile SPA[4] and the Beijing Showself SPA, including the existence, validity, interpretation, performance, breach or termination thereof or any dispute regarding non-contractual obligations arising out of or relating to this Agreement or the FL Mobile SPA and the Beijing Showself SPA shall be referred to and finally resolved by arbitration administered by the Hong Kong

---

[4] That is, the SPA.

International Arbitration Centre (HKIAC) under the HKIAC Administered Arbitration Rules in force when the Notice of Arbitration is submitted.

(c) The Parties agree that the expedited procedure shall apply irrespective of the amount in dispute, the number of arbitrators shall be one, and the seat of arbitration shall be Hong Kong.

(d) The arbitration proceedings could be conducted in Chinese or English.

7.    It will be seen from the foregoing that the dispute resolution clauses in the SPA and SA are inconsistent with each other. The former provides for ICC arbitration with three arbitrators, while the latter stipulates for HKIAC arbitration under a sole arbitrator. However, as recorded in HKIAC's letters of 28 August and 16 September 2019 mentioned in paragraph 4 above, the parties have since agreed that the present dispute should be administered by HKIAC and conducted under the Expedited Procedure with me as sole arbitrator. That agreement by the parties overrides and supersedes any inconsistencies between the dispute resolution clauses in the SPA and the SA. I am consequently satisfied that I have jurisdiction to determine the parties' disputes in this matter arising out of the SPA and SA.

8.    According to Article 42.1 of the Rules, the Expedited Procedure currently applies in the following situations: (a) where the amount in dispute representing the aggregate of any claim and counterclaim (or any set-off defence) does not exceed HK$25 million; (b)where the parties so agree; and (c) in cases of exceptional urgency. Given Article 42.1(b) and the parties' agreement to use the Expedited Procedure, I am also satisfied that, despite the claim of RMB 2,520 million in this case being in excess of HK$25 million, this arbitration may be conducted pursuant to the Expedited Procedure.

9.    The Respondents have not been legally represented in this arbitration. Instead, by email dated 5 May 2019 Mr. Shi confirmed to HKIAC that he was acting on behalf of the Respondents. The Respondents (through Mr. Shi) have therefore been aware of these proceedings. But the Respondents have opted not to submit any document in this reference.

10.    By Procedural Order No.1 dated 23 September 2019, I gave directions for the filing of pleadings (with any factual witness statements and expert reports relied upon to be attached to the same). Tongfang filed a Statement of Claim together with the Witness Statement of Zhou Hongbin.[5]  The Respondents did not file any Statement of Defence.

11.    By a letter attached to an email dated 21 October 2019 Tongfang's solicitors noted such failure and wrote: "In the circumstances, we propose, and subject to the view of the sole arbitrator, that the following order be made 'No discovery unless otherwise ordered and the parties to file their respective written submissions within 14 days from the date of order to be made herein'."  By a letter attached to an email dated 19 November 2019 Tongfang's solicitors repeated their proposed direction.  By email dated 22 November 2019, Mr. Shi stated that the Respondents had no comment on the proposed direction. I consequently made a direction on 24 November 2019 along the lines suggested by Tongfang's solicitors. In

---

[5] Mr. Zhou is a director of Tongfang.

4

particular, I directed that written closing submissions should be filed by Monday 9 December 2019.

12.    Tongfang submitted written closing submissions by the stipulated deadline. By email dated 10 December I asked the Respondents to confirm by 12 December whether they would be making any closing submissions. In addition, I directed that Tongfang make any written cost submissions by 16 December and that the Respondents reply to such cost submissions by 23 December. On 11 December 2019 Mr. Shi emailed that the Respondents would not be filing any closing submissions. Tongfang provided its cost submissions on 16 December 2019. The Respondents did not file any response to such cost submissions.  On 9 January 2020 I emailed the parties that "[i]n the absence of any reply cost submissions from the Respondents by Friday 10 January, the arbitration proceedings will be closed as at that date and I will proceed to make an award". Accordingly, the Respondents not having submitted any reply cost submissions as at 10 January 2020, these proceedings were closed on that date.

13.    Article 42.2(e) of the Rules provides that, where resort is made to the Expedited Procedure, "the arbitral tribunal shall decide the dispute on the basis of documentary evidence only, unless it decides that it is appropriate to hold one or more hearings".  In my view, in light of the circumstances summarised above, it is appropriate, especially in the interests of saving time and cost, for this case to be decided on the basis of documents alone.

14.    By email dated 16 January 2020, I wrote to the parties raising a number of queries, as follows:
> 1.    Having now gone through the arbitration papers and submissions in detail, I note that paragraph 6 of the Witness Statement of Zhou Hongbin (filed by the Claimant) states: "By 18th December 2017, the Claimant paid the entirety of the Consideration to the 1st Respondent and performed all its duties under the FL Mobile SPA."
> 2.    May I request the Claimant to provide particulars (along with any supporting documents) as to the manner how and dates when the consideration of RMB 2,520 million (including any instalments thereof) was paid to the Respondents?
> 3.    The Claimant is asked to provide the requested particulars and supporting documents by Friday 7 February 2020.  The Respondents will thereafter have until Friday 14 February 2020 to submit any comments that they may wish to make on the particulars and supporting documents furnished by the Claimant.

15.    By email dated 7 February 2020, Tongfang submitted a Supplemental Witness Statement of Zhou Hongbin.  By email of the same date I gave leave for the submission of that witness statement as it had been provided in response to my email queries of 16 January 2020. The Respondents did not file any comments or other material in answer, whether on 14 February 2020 or at all.

16.    By email dated 15 February 2020, I wrote to the parties seeking further clarification, as follows:

I refer to the Claimant's email of 7 February 2020 and the Supplemental Witness Statement of Zhou Hongbin attached thereto. The following further matters arise:

(1)   In paragraph 4 of his Supplemental Statement, Mr. Zhou refers to four investor companies. These appear to be: (1) *Hangzhou Zhouyu Guquan Touzi Hehuo Qiye (Youxian Hehuo)*, (2) Vast Stone Limited, (3) China Create Capital Limited, and (4) *Hangzhou Lengqin Touzi Hehuo Qiye (Youxian Hehuo)*. Are these four investor companies related to or independent of the Respondents? If they are related, what (if any) implications would that have in respect of the Claimant's action for reimbursement of RMB 1,350 million?

(2)   The Instrument dated 14 December 2017 at DL-7 [namely, an *Instrument Constituting Fixed Rate Senior Notes in the Amount of RMB 1,770,000,000* (the Issuance)] refers to the Claimant acquiring 79.34% of FL Mobile. However, the FL Mobile SPA only refers to the acquisition of 63% of FL Mobile. What is the reason for the discrepancy?

(3)   The Claimant incurred a liability of RMB 1,770 million to NQ International pursuant to the Senior Note issued on 14 December 2017. By clause 3.3 of the Subscription Agreement dated 8 December 2017 between the Claimant (acting on behalf of Tongfang M&A Fund SP) and NQ International, it was in effect agreed that, instead of NQ International paying the RMB 1,770 million subscription amount for the Senior Note and the Claimant then using such amount as part payment for the FL Mobile and Beijing Showself shares, the parties would deem the subscription amount for the Senior Note to have been paid by NQ International and the Claimant immediately to have used such sum as part consideration for the FL Mobile and Beijing Showself shares. If so, it would seem that NQ International was using its own funds to purchase FL Mobile and Beijing Showself shares. Further, in relation to the claim that the Respondents re-pay any part of the RMB 1,770 million, the Respondents would appear to be entitled to a defence of set-off, that is, the Respondents could set off the repayment of any part of the RMB 1,770 million sought by the Claimant against an equivalent amount due from the Claimant pursuant to the Senior Note. To what extent (if at all) is the foregoing understanding mistaken and what (if any) implications would the foregoing have in respect of the Claimant's action for reimbursement of any part of the RMB 1,770 million?

(4)   As for the payments of US$20 million on 12 December 2017 and US$10 million on 21 December 2017, these appear to have originated from NQ International's account with the Claimant. The funds then seem to have been transferred to NQ Mobile's [that is, Link Motion's] account with the Claimant, both payments having been annotated "For the partial settlement of

NQ Assets". If so, the payments would not appear to have been from the Claimant itself or from independent investors on whose behalf the Claimant was acting. To what extent (if at all) is the foregoing understanding mistaken and what (if any) implications would the foregoing have in respect of the Claimant's action for the reimbursement of US$30 million (RMB 200 million)?

The Claimant is requested to respond to the above matters by 24 February 2020. In light of the two rounds of further questions from the Tribunal, the Claimant is also requested to update by 24 February 2020 the costs for which it is claiming in this arbitration. The Respondents are thereafter to have until 2 March for any comments in reply.

17. By email dated 24 February 2020 Tongfang requested an extension until 9 March to reply to my email of 15 February. The reason for the extension was the difficulty in obtaining instructions from Mainland China due to the COVID-19 quarantine restrictions imposed by the PRC government. I granted the request and gave the Respondents a corresponding extension until 16 March 2020 in which to submit any comments in answer. In the normal course of events, in accordance with Article 42.2(f) of the Rules, this Final Award was to have been communicated to the parties within 6 months after transmission of the case file to me on 16 September 2019 (that is. by 16 March 2020). As a result of the extension allowed by me due to the exceptional circumstances arising from the COVID-19 situation in Mainland China, this Final Award is now being issued a few days after the six month period provided for in the Rules. By email dated 18 March 2020, I applied to the HKIAC pursuant to Article 42.2(f) for an extension of the time for communication of the Final Award until 20 March 2020. By email dated 18 March 2020, the HKIAC granted my request and revised the relevant time limit to 20 March 2020.

18. By email dated 9 March 2020, Tongfang submitted a 2nd Supplemental Witness Statement of Zhou Hongbin, an updated Statement of Costs, and Supplemental Submissions in response to the matters raised in my email of 15 February. As of the date of this Final Award, the Respondents have not submitted any comments on Tongfang's response.

## II.   DISCUSSION

*A.   Is Tongfang entitled to the return of RMB 2,520 million from the Respondents?*

19. In his Supplemental Witness Statement, Mr. Zhou observed that Tongfang "basically treated [the SPA and Beijing Showself SPA] as one large transaction with an aggregate consideration of RMB 3,320 million". According to Mr. Zhou, the consideration of RMB 2,520 million was paid by instalments as follows:

(1)   Between 30 March and 20 November 2017, Tongfang caused four of its fund investors to transfer a total of RMB 1,350 million to Link Motion and Beijing NQ Technology. More particularly: (1) *Hangzhou Zhouyu Guquan Touzi Hehuo Qiye (Youxian Hehuo)* transferred RMB 18 million and 32 million on 30 March 2017; (2) Vast Stone Limited transferred HK$112,669,950 on 31 March 2017; (3) China Create Capital Limited transferred HK$117,343,331 on 9 November 2017; and (4)

*Hangzhou Lengqin Touzi Hehuo Qiye (Youxian Hehuo)* transferred RMB 600 million and RMB 100 million on 9 November 2017 and RMB 320 million and RMB 80 million on 20 November 2017. Link Motion acknowledged receipt of the same on 1 December 2017.

(2)   On 14 December 2017 Tongfang issued a Senior Note for the balance of RMB 1,770 million to NQ International. By clause 3.3 of a Subscription Agreement dated 8 December 2017 between Tongfang (on behalf of Tongfang M&A Fund SP (a Tongfang segregated portfolio)) and NQ International, it was agreed that:

> Payment of the subscription monies for the Senior Notes shall be deemed to be settled by the Senior Notes Subscribers by the delivery of an acknowledgement of receipt duly accepted by [NQ International] in the amount of RMB 1,770,000,000, representing partial payment of the consideration for the acquisition of [FL Mobile] ... and [Beijing Showself] ...

Tongfang's obligation to redeem the Senior Note (valued at RMB 1,770 million as at 14 December 2017) was thereafter to be set off against the delivery by NQ International of shares in FL Mobile and Beijing Showself. This set-off arrangement was acknowledged by a letter dated 14 December 2017 from NQ International to Mr. Daniel Li of Tongfang.

(3)   On 12 December 2017 US$20 million was transferred from NQ International's account with Tongfang to NQ Mobile's (that is, Link Motion's) account with Tongfang.   On 21 December 2017 US$10 million was transferred from NQ International's account with Tongfang to NQ Mobile's (that is, Link Motion's) account with Tongfang. The total so transferred (US$30 million) comes to about RMB 200 million.  Both payments were said to be "For the partial settlement of NQ Assets".

20.   It will have been apparent from my email of 15 February 2020 that I was concerned to ascertain that the monies which Tongfang says that it paid for the relevant FL Mobile shares originated from Tongfang or accounts managed by Tongfang for investor clients, rather than from the Respondents themselves. In his 2nd Supplemental Witness Statement, Mr. Zhou responded to the queries raised by my email of 15 February as follows:

(1)   *Hangzhou Zhouyu Guquan Touzi Hehuo Qiye (Youxian Hehuo)*, Vast Stone Limited, China Create Capital Limited, and *Hangzhou Lengqin Touzi Hehuo Qiye (Youxian Hehuo)* are independent entities from the Respondent.

(2)   The Issuance refers to the acquisition of 79.34% of FL Mobile (as opposed to just 63% as stated in the SPA) because on 14 December 2017 Tongfang acquired an additional 16.34% of equity interest in FL Mobile from True Hero Ventures Limited (True Hero) by way of a subscription in kind. Tongfang and True Hero thereby became investment partners in FL Mobile.[6]

---

[6] True Hero appears from the supporting document provided by Mr. Zhou to have been controlled at the relevant time by Mr. Shi.

(3)     Mr. Zhou accepts that Tongfang incurred a liability of RMB 1,770 million to NQ International as a result of the latter's subscription to the Senior Note. But "the debt as documented by the Senior Note has been repackaged and turned into other investments for the Respondents". Accordingly, Mr. Zhou rejects the suggestion that Tongfang would be unjustly enriched by the repayment of RMB 1,770 million to Tongfang. The Respondents (Mr. Zhou says) would not be entitled to set off Tongfang's claim in this arbitration against any putative liability of Tongfang to NQ International (which in any event is not a party to this arbitration) under the Senior Note.

(4)     The remittances of US$20 million and US$10 million on 12 and 21 December 2017 respectively did not originate from the Respondents. On 8 December 2017 Nice First Investment Limited (Nice First), a company independent of the Respondents, subscribed to RMB 199,500,000 (equivalent to US$30,000,000) Mezzanine Notes issued by Tongfang. Nice First caused to be remitted the subscription amount of US$30 million to Tongfang Securities Limited (Clients' Account), the account which Tongfang had designated for that purpose, on or about 11 December 2017. The US$30 million from Nice First was then transferred to NQ International's client account. From there, the relevant remittances were made to NQ Mobile (that is, Link Motion) on 12 and 21 December 2017.

21.    On the basis of Mr. Zhou's evidence, I accept that Tongfang paid the RMB 2,520 million consideration for the FL Mobile shares by instalments as Mr. Zhou has stated. I also accept, on the evidence before me, that the full consideration was paid from resources available to Tongfang independently of the Respondents. It follows that the FL mobile shares not having been delivered to Tongfang, there has been a failure of consideration and Tongfang is entitled to the repayment of the consideration of RMB 2,520 million. I accept that there is insufficient evidence to support a conclusion that the Respondents (through NQ International) would have a defence of counterclaim against Tongfang for RMB 1,770 million.

22.    Under the SPA, Xinjiang NQ (identified in the SPA as "the Selling Shareholder") undertook to sell FL Mobile's shares to Tongfang. Non-delivery of the shares would thus constitute a breach of the SPA by Xinjiang NQ. The question arises, however, as to the basis of Tongfang's claim against Link Motion for non-delivery of the FL Mobile shares. Link Motion's liability seems to arise in part from its receipt of purchase monies as detailed above. But more particularly its liability arises from SA clause 2.1[7] whereby, in order to fulfil Xinjiang NQ's sale commitment to Tongfang under the SPA, Link Motion agreed to entrust its shares in FL Mobile to Mr. Shi and the shares so entrusted were to be transferred to Tongfang following the "Closing of the Share Purchase Transactions".[8]

[7] Clause 2.1 is set out in footnote 1 above.
[8] Defined in the SA as "the date when the Purchaser completes all its payment obligations as provided in the FL Mobile SPA, Beijing Showself SPA and this Agreement, or other date agreed by the parties, unless otherwise determined by the applicable laws and regulations or the relevant governmental authorities of the PRC".

Consequently, the failure to deliver the relevant FL Mobile shares to Tongfang, despite the latter's payment of the price, would constitute an actionable breach on Link Motion's part.[9]

23. Tongfang further seeks interest on the RMB 2,520 million at such rate and for such period as may be appropriate.  It seems to me that it would be appropriate in the circumstances to award simple interest at 5% per annum from the date of the Notice of Arbitration (that is, 23 April 2019) until payment.[10]

B.    *What is to be done about the costs of this arbitration?*

24.    Tongfang having prevailed in this arbitration, it should be entitled to the payment by the Respondents of its reasonable costs.

25.    Tongfang's updated costs submissions in its email of 9 March 2020 claims a total of HK$1,014,712 in costs.  That amount consists of the following:
    (1)    HK$1,200 for photocopying and clerical work.
    (2)    HK$310,000 on communications with Tongfang, its counsel and the Respondents.
    (3)    HK$65,000 for the preparation and perusal of documents.
    (4)    HK$380,000 for the fees of Tongfang's counsel.
    (5)    HK$258,512 for disbursements, namely:
        (a)    courier charges -- HK$212
        (b)    travelling expenses -- HK$300.
        (c)    HKIAC's registration fee -- HK$8,000.
        (d)    deposits with HKIAC -- HK$250,000.

26.    I will deal with the fee of HK$8,000 paid to HKIAC and Tongfang's deposit of HK$250,000 separately below.  It appears to me that the remaining sums claimed by Tongfang (in the amount of  HK$756,712) are reasonable and proportionate.  I allow them in full. The Respondents are consequently to be jointly and severally responsible for the payment of Tongfang's costs of HK$756,712 in this arbitration.  Simple interest of 5% per annum will run on the aforesaid amount from the date of this award until payment.

27.    The Tribunal's costs of this arbitration are quantified at HK$200,000.  HKIAC's fees in connection with this arbitration amount to HK$408,000 (inclusive of a registration fee of HK$8,000).  The Respondents are to be jointly and severally responsible for the payment of such costs and fees in the total amount of HK$608,000.  If Tongfang shall have paid any part of the aforesaid amount of HK$608,000, it shall be entitled to be reimbursed for such payment by the Respondents.  Simple interest of 5% will run on any amount to be reimbursed to Tongfang from the date of this award until payment.

---

[9] Reference should also be made to SA clause 5.1(b) whereby each party to the SA warranted and undertook that "it has taken all necessary action and has all requisite power and authority to enter into and perform this Agreement to which it is party in accordance with its respective terms".

[10] I note in this connection that the China Loan Prime Rate in or about April 2019 was 4.3% and is currently around 4.05%.

### III.    CONCLUSION

28.    There will be Orders that:

(1)    The Respondents are jointly and severally liable to pay the amount of RMB 2,520 million to the Claimant.

(2)    Simple interest is to run on the aforesaid amount of RMB 2,520 million at 5% per annum from 23 April 2019 until payment.

(3)    The Respondents are jointly and severally liable to pay the amount of HK$756,712 to the Claimant.

(4)    Simple interest is to run on the aforesaid amount of HK$756,712 at 5% per annum from the date of this Final Award until payment.

(5)    The Tribunal's costs and HKIAC's fees of this arbitration are respectively quantified at HK$200,000 and HK$408,000.

(6)    The Respondent shall jointly and severally bear 100% of the Tribunal's costs and HKIAC's fees, amounting to HK$608,000 in total.

(7)    If the Claimant shall have paid any part of the Tribunal's costs and HKIAC's fees, the Claimant shall be entitled to the reimbursement of such part by the Respondents jointly and severally.

(8)    Simple interest is to run on any amount to be reimbursed by the Respondents pursuant to sub-paragraph (7) above, at 5% per annum from the date of this Final Award until payment.

**[Signature on next page]**

Made in Hong Kong on     1 9 MAR 2020



Anselmo Reyes
Sole Arbitrator