# EXHIBIT B



**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 4 OF 2020 (MRHJ)**

**BETWEEN:**

**ROBERT W. SEIDEN, IN HIS CAPACITY AS**
**TEMPORARY RECEIVER OF LINK MOTION INC.**

**PLAINTIFF**

**AND:**

**LINK MOTION INC.**

**DEFENDANT**

**<u>FOURTH AFFIDAVIT OF ROBERT W. SEIDEN</u>**

I, **ROBERT W. SEIDEN**, of 322 Eighth Avenue, Suite 1704, New York, New York 10001, United States of America, do solemnly and sincerely **AFFIRM** and say as follows:

**Introduction**

1.      I am the same Robert W. Seiden who has sworn three previous affidavits in this proceeding.   I am the temporary receiver (**Receiver**) of Link Motion Inc. (the **Company**), the defendant in this proceeding, under an order made by the United States District Court for the Southern District of New York (the **US Court**) dated 1 February 2019 (the **Receivership Order**).   In my capacity as Receiver, I am the plaintiff in this proceeding.  This Court recognized my appointment by the US Court as Receiver by an order dated 3 February 2020 (the **Recognition Order**).

2.      There is now produced and shown to me marked **RWS-4** a bundle of true copies of various documents to which I will refer in this affidavit.  Except where otherwise stated, or the context requires, references in this affidavit to "pages" are to pages of Exhibit RWS-4.

This affidavit was filed by KSG, attorneys for the Plaintiff, whose address for service is 4th Floor Harbour Centre, 42 North Church Street, PO Box 2255, Grand Cayman KY1-1107, Cayman Islands [MR/02477]

1

3.      The facts set out in this affidavit are within my knowledge.  Where any matter set out in this affidavit is not within my direct knowledge, I set out the source of my knowledge and believe that the matter is true.  Where I refer in this affidavit to communications with or advice from attorneys, or to any ongoing legal proceedings, I do not intend to waive any privilege and no privilege is waived.

4.      I make this affidavit in connection with the summons issued on my behalf as Receiver for the following orders from the Court:

4.1.    authorizing the Receiver to call an extraordinary general meeting of the shareholders of the Company for the purpose of putting certain resolutions to the shareholders for the appointment of additional directors;

4.2.    authorizing the Receiver to call an extraordinary general meeting of the shareholders of the Company for the purpose of putting certain resolutions to the shareholders for the removal of certain directors and ratifying the actions of the Receiver and its agents;

4.3.    directing the Receiver to call these extraordinary general meetings in the same manner and as nearly as possible as that in which general meetings are to be convened by the directors of the Company under the Company's Amended and Restated Articles of Association.

5.      As explained in more detail below, the genesis of this application is a request from Mr Lilin Guo (**Mr Guo**), who is the registered owner of shares representing approximately 40% of the voting rights in the Company, that shareholder meetings be convened for the purpose of removing certain members of the Company's board of directors in accordance with the internal corporate governance procedures.  The Receiver supports this course of action because as further explained in paragraphs 12 to 14 below, Mr Guo has informed me that this will greatly assist the receivership efforts inside the People's Republic of China (**PRC**).

This affidavit was filed by KSG, attorneys for the Plaintiff, whose address for service is 4th Floor Harbour Centre, 42 North Church Street, PO Box 2255, Grand Cayman KY1-1107, Cayman Islands [MR/02477]

2

**Receivership Efforts and Hurdles**

6.      A detailed background to the Receivership is set out in my first affidavit, sworn 10 January 2020.  In this section, I highlight the key facts set out in that affidavit and provide an update on relevant events since my first affidavit.

7.      The Company is a Cayman Islands exempted company that, together with its subsidiaries, carried out a multinational business in the development, licensing, and sale of technology and services in the smart car and smart ride industry.  The principal executive offices of the Company were in Beijing, PRC, while the Company had commercial offices in other jurisdictions including the US and Hong Kong.  Until January 2019, the Company was listed on the New York Stock Exchange through an American depositary share program with Deutsche Bank Trust Company Americas (**Deutsche**).

8.      In December 2018, Wayne Baliga (**Baliga**), who held American depositary receipts (**ADRs**) representing Class A common shares in the Company, filed a complaint in the US Court for derivative and personal actions against the Company and certain individuals involved in the senior management of the Company, including Shi Wenyong (**Shi**).  Shi, also known as Vincent Shi, is a PRC citizen who is a director and the public face of the Company.  The complaint alleged, among other things, that Shi and the other management defendants engaged in self-dealing to transfer substantial corporate assets into the control of Shi at significant losses to the Company.

9.      Part of the relief sought in the complaint was the appointment of a temporary receiver and the imposition of a temporary restraining order.  One day after the complaint was filed, the US Court made an initial temporary restraining order, which remained in effect until the US Court issued the Receivership Order.

This affidavit was filed by KSG, attorneys for the Plaintiff, whose address for service is 4th Floor Harbour Centre, 42 North Church Street, PO Box 2255, Grand Cayman KY1-1107, Cayman Islands [MR/02477]

3

10.    Since my appointment as Receiver, I have taken steps in various jurisdictions to investigate the affairs of Link Motion and to take control of its assets and undertakings as contemplated by the Receivership Order.  My team and I have also encountered difficulties in dealing with the former senior management of the Company, including in particular Shi, and the actions they have taken to thwart our recovery efforts:

10.1.  Shi has refused to cooperate with the Receiver, despite the terms of the Receivership Order expressly ordering that cooperation.  Further detail on this matter is set out in my first affidavit at paragraphs 37 and 38.

10.2.  On 12 March 2019, Shi caused the Company to issue a press release via its WeChat account stating, among other things, that the Company believed neither US or Hong Kong courts had jurisdiction over the Company and that the Company would be challenging the jurisdiction of those courts.  Further detail on this matter is set out in my first affidavit at paragraph 39(a).

10.3.  A former Company employee who has been assisting the Receiver, Matthew Mathison, has sworn evidence in the US Court that, among other things:

10.3.1.  Shi has taken steps to force certain Company employees to resign, then offered to rehire them to continue their work on the Company's revenue-generating applications through a different entity set up to receive those revenues; and

10.3.2.  Shi attended at the Company's offices to cause accounting and legal documents to be removed and to destroy and damage operating data systems and the Company's main contract management system.

Further detail on this matter is set out in my first affidavit at paragraph 39(b).

10.4.  In July 2019, some months after I exercised my power under the Receivership Order to remove Shi from his corporate positions or authorities, Shi purported to engage on behalf of the Company the same US lawyers that he had engaged to represent his personal interests in the US litigation.  Further detail on this matter is set out in my first affidavit at paragraph 40.

This affidavit was filed by KSG, attorneys for the Plaintiff, whose address for service is 4th Floor Harbour Centre, 42 North Church Street, PO Box 2255, Grand Cayman KY1-1107, Cayman Islands [MR/02477]

4

11.     More recently, Shi has frustrated or attempted to frustrate the Receiver's efforts inside the PRC.  In attempts to assume control of the Company and its subsidiaries more fully inside the PRC, I exercised my powers under the Receivership Order to appoint Mr Guo as the Chairman of the Company.  I then caused Mr Guo to be appointed as a director of Link Motion International Limited, the Company's wholly-owned Hong Kong subsidiary.  Following that appointment, Mr Guo with my consent removed the Legal Representative of Link Motion International Limited's wholly owned subsidiary in the PRC, NQ Mobile (Beijing) Co., Ltd., and officially assumed the position of Legal Representative.  I have also appointed Mr Guo to act as Chairman and Legal Representative of the Company in the PRC.

12.     Mr Guo's efforts to date to assist the Receivership in the PRC have resulted in significant progress.  However, he has encountered significant hurdles being thrown up by Shi in his attempts to frustrate the Receivership:

12.1.   Shi is in control of the primary bank accounts of the Company's wholly-foreign-owned enterprise (**WFOE**) in China.  On 26 April 2019, Zemin Xu (**Xu**), a close associate of Shi and the former legal representative of the Company's WFOE, without disclosing the existence of the Receivership, filed a preservation order application with the People's Court of Haidian District Court in Beijing, China (the **Haidian Court**).  On 28 May 2019, the Haidian Court granted the application and the Receiver had no practical ability to object to this application. As of today, the Court's order still prevents the Receiver from properly safeguarding Company assets as Mr Guo is not an official director of the Company on the Company's register of directors and Shi still is.

12.2.   In August 2019, after the Receiver was appointed by the US Court, Shi, without notifying the Receiver and without receiving any type of authorization from the Company, filed a bankruptcy petition against Jiutian Logistic Co., Ltd. (**JiuTian**), on behalf of Xinjiang NQ Mobile Venture Capital Co., Ltd. Subsequently, Shi, through JiuTian's subsidiary, Beijing Wanpu Century Technology Co., Ltd., filed an action against NQ (Beijing) Technology Co., Ltd. (**NQ Beijing**) and successfully obtained an order dated 4 March 2020, to freeze NQ Beijing's company account to prevent the Receiver from issuing payrolls to employees.  To date, an enforcement order issued by Haidian Court still

This affidavit was filed by KSG, attorneys for the Plaintiff, whose address for service is 4th Floor Harbour Centre, 42 North Church Street, PO Box 2255, Grand Cayman KY1-1107, Cayman Islands [MR/02477]

5

prevents the Receiver's use of the WFOE account to pay employee salary.  Shi was able to file the bankruptcy petition and control the Company's seal due to his power as a member of the Board on the Cayman registry.

12.3.   From 15 May 2019 to 5 November 2019, when Mr Guo had no access to the WFOE bank account, approximately US$89,000,000 was transferred out from the WFOE's bank account to another account held by an entity named "Beijing NQ Mobile Technology Limited."  This entity is believed to be controlled by Shi, as it is one of the corporate entities within the PRC that has to date not been within the Receiver's reach.  Xu was the legal representative of this company at the time of the transfers.  Xu and Shi were able to transfer these funds in part because Shi still had his official title as a director of the Company under PRC law.

12.4.   In December 2019, Shi, by exercising his power as a member of the board of directors of the Company, jointly submitted a series of documents to the Beijing Administration for Industry and Commerce (**BAIC**) with Xu that changed the legal representatives of two WFOEs, NQ Mobile (Beijing) Co., Ltd., and Link Motion (Beijing) Technology Co., Ltd., to a farmer, Youdi Nie.  Shi and Xu used NQ International Limited's old official seal, which was voided by the Receiver and publicly notarized in Hong Kong (the **Voided Seal**), the proper jurisdiction, to execute and submit the documents to the BAIC.  Shi, by exercising his power as a board member on the Cayman register, without giving notice or seeking approval from the Receiver, illegally used the Voided Seal to execute documents and appoint a new WFOE legal representative.  Shi further used the Voided Seal to execute documents, as well as to submit applications that would substantially harm the Receiver's performance in China.  Mr Guo has received NQ International Limited's board resolution and is in the process of reversing the change of legal representatives of the WFOEs.

12.5.   Since 2019, Shi has continuously used the Voided Seal, and initiated approximately thirteen separate actions in China's courts and arbitral tribunals in an attempt to overturn or prevent the Receiver and Mr Guo's performance. I have been informed by Mr Guo that Shi has held himself out as a formal director of the Company to the courts and arbitral tribunals. For example, Shi filed claims to the Haidian Court and tried to refute the legitimate shareholder

This affidavit was filed by KSG, attorneys for the Plaintiff, whose address for service is 4th Floor Harbour Centre, 42 North Church Street, PO Box 2255, Grand Cayman KY1-1107, Cayman Islands [MR/02477]

6

meeting held by Mr Guo on 22 July 2019.  The Court rejected Shi's claims and issued a judgment on 30 July2020.  Beijing No. 1 Intermediate People's Court further denied Shi's appeal on 27 October 2020.  Further, in an arbitration proceeding initiated by NQ (Beijing) Technology Co., Ltd., in front of the China International Economic and Trade Arbitration Commission (**CIETAC**) against Shi, Shi sought CIETAC's recognition of an agreement (the **Shi Agreement**) between China AI Capital Limited and WFOE, NQ World Technology Co., Ltd. (**NQW**) and the Company.  The Shi Agreement was signed by Shi without the participation of NQW's controlling shareholder, Lingyun Guo.   The Shi Agreement would have made any change in Link Motion's VIE agreements subject to the unanimous consent of the Company and China AI.  The arbitral tribunal found that the Shi Agreement would have impacted the safety of the investor funds, the stability of the VIE structure, and corporate control.  CIETAC rejected Shi's request and issued an award on 4 September 2021 that required Shi and Xu Zhou to transfer the shares they hold in NQW to Mr Guo and Lingyun Guo, cooperate in the procedure to change the registration and administration relating to the title transfer of the shares, and for Shi and Zhou Xu to bear CIETAC's full fee.  A copy of the CIETAC 4 September 2021 Award is at pages 1 to 63 of RWS-4.  It is Mr Guo's understanding that Shi is still in control of the Voided Seal and Shi is still informing Chinese courts and arbitral tribunals that he is a formal director of the Company.

13.   Mr Guo has explained to me that the above issues stem from the fact that Shi remains a director of the Company on the Company's register of directors.  Despite the legal effect of the Receivership Order and Recognition Order under US and Cayman law being that Shi has no control over the Company, I understand from Mr Guo, and from my own experience on other asset recovery matters, that many governmental and commercial entities in the PRC do not recognize the effect of foreign court orders but will continue to refer to and rely on corporate documents such as the Company's register of directors in determining who is entitled to represent a company.

14.   Mr Guo has further explained to me that if the Company's register of directors could be amended to remove Shi from it, Shi's ability to obstruct the Receivership in the PRC in the way that he has been doing will be severely curtailed.  Based on legal advice I have received from my Cayman Islands and US attorneys, I have advised Mr Guo that

This affidavit was filed by KSG, attorneys for the Plaintiff, whose address for service is 4th Floor Harbour Centre, 42 North Church Street, PO Box 2255, Grand Cayman KY1-1107, Cayman Islands [MR/02477]

7

the Receiver does not have the power to remove Shi from the Company's register of directors, because the Receiver does not have that power under Cayman Islands law. However, if the usual internal corporate procedures were followed that would lead to the removal of a director, then the Company's register of directors would be updated in the normal course.

**Request for Shareholder Meeting**

15.     As a result of the circumstances described above, my team (including my Cayman Islands attorneys) and Mr Guo entered into discussions about possible routes to remove Shi as a director of the Company consistent with Cayman Islands law and the Company's governing documents in a way that would be reflected on the Company's register of directors.

16.     Under the Company's current Articles of Association (the **Articles**, a copy of which is at pages 64 to 106 of RWS-4):

16.1.    A director may be removed from office at any time by a "Special Resolution" of the shareholders, meaning a resolution passed by a majority of at least two-thirds of all shareholders voting on the resolution at a general meeting.  (Article 78(c) at page 94)

16.2.    The Company may elect additional directors by an "Ordinary Resolution" of the shareholders, meaning a resolution passed by a simple majority of all shareholders voting on the resolution at a general meeting.  (Article 78(b) at page 93)

16.3.    The power to call a general meeting is vested in the first instance in the directors.  However, there is a process for shareholders to requisition an extraordinary general meeting if shareholders holding not less than one-third in par value of the Company's share capital request one.  (Article 55 at page 89)

This affidavit was filed by KSG, attorneys for the Plaintiff, whose address for service is 4th Floor Harbour Centre, 42 North Church Street, PO Box 2255, Grand Cayman KY1-1107, Cayman Islands [MR/02477]

8

17.     Although Mr Guo is a significant individual shareholder in the Company, he is unable to requisition an extraordinary general meeting under the Articles:

   17.1.   The Company's share capital is divided into Class A and Class B common shares, each of which have a par value of US$0.0001.

   17.2.   In terms of voting rights, Class A shares carry one vote per share, while Class B shares carry ten votes per share.

   17.3.   Mr Guo is the registered owner of 86,272,750 Class B common shares.  A copy of the Company's Register of Members dated 2 November 2021 is at pages 107 to 116 of RWS-4.

   17.4.   Mr Guo's shares represent approximately 40% of the voting rights, but only approximately 13% of the *par value* of all issued shares.  Accordingly, he cannot requisition a shareholders' meeting under Article 55.

18.     Based on advice from my Cayman Islands and US attorneys, I understand that the Receiver would have the authority to exercise the powers of the Company's directors under Article 55 to call an extraordinary general meeting based on the Receivership Order and the Recognition Order.  Mr Guo requested that I call such a meeting. However, given my position as a court-appointed officer, in my view it would be inappropriate for the Receiver to call an extraordinary general meeting without the approval of either the US Court or this Court.

19.     On 13 November 2020, I wrote to The Honorable Debra C. Freeman, the Magistrate Judge who is assigned to deal with pre-trial matters in the US proceeding, to request the US Court's approval to allow the Receiver to call an extraordinary general meeting to allow the shareholders to consider and vote on:

   19.1.   removing Shi as a director of the Company;

   19.2.   removing alleged Shi loyalists and co-conspirators as directors of the Company;

   19.3.   replacing any and all of the removed directors;

This affidavit was filed by KSG, attorneys for the Plaintiff, whose address for service is 4th Floor Harbour Centre, 42 North Church Street, PO Box 2255, Grand Cayman KY1-1107, Cayman Islands [MR/02477]

19.4.   appointing Mr Guo as Chairman and a director of the Company; and

19.5.   ratifying Mr Guo's rights and authorities as a director to lead the recovery efforts for the Company's assets, businesses, and property.

A copy of my letter application is at pages 117 to 118 of RWS-4.

20.   That application was dismissed without prejudice on 15 December 2020 as part of a proposal made by the parties to the US Court to hold several pending applications in abeyance pending the resolution of certain other applications.   A copy of the docket entry showing the disposition of the application is at page 119 of RWS-4.   In the circumstances, the US Court did not consider the application on the merits.

21.   In the months following, the Receiver and Mr Guo continued to discuss the possibility of calling a shareholders' meeting.   More recently, the Receiver and Mr Guo have agreed on a possible way forward for both a shareholders' meeting to be called and for that meeting to be effective to remove Shi and his accomplices as directors so that the Company's interests can be more effectively protected inside the PRC.

22.   That plan is described below, with explanations as to certain of its points:

22.1.   There would be three relevant meetings under the Articles: two extraordinary general meetings of the shareholders, and a directors' meeting to be held after the first shareholders' meeting but before the second shareholders' meeting.

22.2.   At the first shareholders' meeting, the shareholders would be asked to vote on resolutions appointing six additional directors to the Company's board – Mr Guo, Ming Dai, Weilin Guo, Hua Zeng, Xing Tang, and Li Wang.

22.2.1.   Currently, the register of directors shows that there are eight directors.   A copy of the register of directors is at pages 120 to 122 of RWS-4.

22.2.2.   Mr Guo advises that at least three of the current directors are in favour of the receivership efforts and are not allied with Shi.

This affidavit was filed by KSG, attorneys for the Plaintiff, whose address for service is 4th Floor Harbour Centre, 42 North Church Street, PO Box 2255, Grand Cayman KY1-1107, Cayman Islands [MR/02477]

10

22.2.3.  Accordingly, Mr Guo's intention for the first shareholders' meeting would be to appoint sufficient additional directors so that the directors aligned with the Receivership can outvote those aligned with Shi.

22.3.  At the directors' meeting, which would include the newly appointed directors, the directors would vote on the forfeiture of 50% of the shares registered in the name of China AI Capital Limited (**China AI**).

22.3.1.  China AI is a company incorporated in the British Virgin Islands.  The Receiver has reason to believe that China AI is associated with Shi.

22.3.2.  The Company and China AI entered into a subscription agreement dated 19 July 2018 (the **Subscription Agreement**).  A copy of the Subscription Agreement is at pages 123 to 139 of RWS-4.  Under the Subscription Agreement, China AI subscribed for 70,175,439 Class B common shares (the **China AI Shares**) for a total subscription price of US$20,000,000.

22.3.3.  The Subscription Agreement contemplated a two-stage transaction. Contemporaneously with execution, China AI was to pay US$10,000,000 to the Company, and the Company was to issue the China AI Shares, registered as 50% fully paid and 50% unpaid.  At Closing (as defined in the Subscription Agreement), China AI was to pay the balance of the subscription price and the Company would update the register of members to show the China AI Shares as 100% paid.

22.3.4.  The first stage of the transaction completed, and the current register of members records the China AI shares as issued with 50% fully paid and 50% unpaid.

22.3.5.  The second stage of the transaction did not complete because the Company could not comply with the required conditions precedent. Because the Company is unable to comply with the conditions, the second stage could only complete if China AI agreed to waive certain

This affidavit was filed by KSG, attorneys for the Plaintiff, whose address for service is 4th Floor Harbour Centre, 42 North Church Street, PO Box 2255, Grand Cayman KY1-1107, Cayman Islands [MR/02477]

11

of those conditions or renegotiate the terms of the Subscription Agreement.

22.3.6.   The Receiver, through its counsel, engaged in correspondence with China AI in respect of the Subscription Agreement and the unpaid portion of the China AI Shares.  Copies of the relevant correspondence are at pages 140 to 155 of RWS-4.  China AI has refused to complete the second stage of the subscription except on conditions that are simply impossible for the Company to meet.

22.3.7.   The Receiver's view, based on legal advice, is that the Company is entitled under the express terms of the Subscription Agreement and the Articles to cause the unpaid portion of the China AI Shares to be forfeited and cancelled.

22.3.8.   Under the Articles, the power to forfeit unpaid shares is vested in the directors acting by resolution.

22.3.9.   Accordingly, Mr Guo's intention for the directors' meeting would be for the directors to carry out the forfeiture and cancellation of the unpaid portion of the China AI Shares so that China AI's voting power reflects its actual investment in the Company and the voting process overall is fair to all shareholders.

22.4.   At the second shareholders' meeting, the shareholders would be asked to vote on special resolutions removing Shi, Jun Zhang, Bruson Li, Jia Lian, and Xiao Yu as directors of the Company, and on ordinary resolutions that the Company comply with the Receivership Order and that all actions taken by the Receiver and the Receiver's agents since the Receiver's appointment were for the benefit of the Company and should be ratified.

22.4.1.   If the shareholders pass the special resolution to remove Shi, the Company's register of directors can be updated to reflect that removal which Mr Guo advises will greatly assist the recovery efforts in the PRC.

This affidavit was filed by KSG, attorneys for the Plaintiff, whose address for service is 4th Floor Harbour Centre, 42 North Church Street, PO Box 2255, Grand Cayman KY1-1107, Cayman Islands [MR/02477]

23.     The Receiver supports this plan:

> 23.1.   Mr Guo is a major shareholder in the Company, but because of the terms of the Articles and the current makeup of the board of directors, he is unable to compel a shareholders' meeting to be called under the usual corporate procedures.

> 23.2.   If the plan succeeds, it will be for the benefit of the Receivership and remove a serious obstacle that has prevented the Receiver from fully exercising my authority inside the PRC.

> 23.3.   The decisions to be made are for the shareholders themselves.  The Receiver's contemplated role is limited to facilitating the meetings, but the Receiver does not intend to participate in or otherwise influence the outcome of the meetings.

24.     Accordingly, the Receiver agreed to make this application.  In my view, which is based in part on advice from my US and Cayman Islands attorneys, it is more appropriate to seek approval of this course of action from this Court because it concerns a matter of internal governance of a Cayman Islands company.

**Other Matters for Consideration**

25.     In considering this application, this Court should be aware of certain other matters:

> 25.1.   First, the US Court is currently considering a motion to discharge the Receiver:

> > 25.1.1.   On 11 June 2021, Shi filed a motion to the US Court to discharge the Receiver and declare the receivership *void ab initio*.  A copy of the motion is at pages 156 to 158 of RWS-4.

> > 25.1.2.   The Receiver filed a response to the motion and Baliga (now represented by different counsel) filed an opposition to the motion. Copies of the responses of the Receiver and Baliga to the motion are at pages 159 to 206 of RWS-4.

This affidavit was filed by KSG, attorneys for the Plaintiff, whose address for service is 4th Floor Harbour Centre, 42 North Church Street, PO Box 2255, Grand Cayman KY1-1107, Cayman Islands [MR/02477]

13

25.1.3.   Subsequently, and in compliance with an order from the US Court, Shi and Baliga each filed additional letter briefs setting out their position on whether the discharge of the Receivership should be done on an *void ab initio* basis.  Copies of those letters are at pages 207 to 216 of RWS-4.

25.1.4.   The US Court's decision on the application is pending.  I do not know when a decision will be released.

25.2.   Second, given the Company's circumstances, no shareholders' meeting will include the holders of ADRs:

25.2.1.   The Company's ADR program with Deutsche is governed by a Deposit Agreement, a copy of which, as filed with the US Securities and Exchange Commission, is at pages 217 to 281 of RWS-4.

25.2.2.   Under the ADR program, Deutsche is the registered owner of 438,043,750 Class A common shares in the Company.  Deutsche then issued the ADRs on the basis that one ADR represents 5 Class A common shares.  It is the ADRs themselves that were publicly traded and owned by public investors – not the underlying shares.

25.2.3.   In the normal course, if the Company held a general meeting, then notice would be given to Deutsche as the registered shareholder, and Deutsche would take the steps required under the Deposit Agreement to notify ADR holders of the meeting and seek the instructions of the ADR holders as to how they wished Deutsche to vote the Class A common shares attributable to the ADRs. ADR holders themselves would not have the right to attend or vote at the Company's general meeting.

25.2.4.   The Company is indebted to Deutsche for unpaid fees in respect of the ADR program.

This affidavit was filed by KSG, attorneys for the Plaintiff, whose address for service is 4th Floor Harbour Centre, 42 North Church Street, PO Box 2255, Grand Cayman KY1-1107, Cayman Islands [MR/02477]

14

25.2.5.  As part of my team's discussions with Mr Guo to plan a shareholders' meeting, my team had discussions, including multiple telephone conferences, with representatives from Deutsche to understand the ADR notice process and what Deutsche's requirements would be.

25.2.6.  Deutsche informed my team that it would require approximately US$30,000 in fees to be paid on behalf of the Company in advance for Deutsche to carry out the notice and solicitation process to ADR holders.  There is no funding available in the Receivership or to the Receiver to fund that cost.

25.2.7.  However, based on advice from my Cayman Islands attorneys, a shareholders' meeting would still be valid if notice is given to Deutsche, even if Deutsche cannot perform the usual procedures under the Deposit Agreement to notify and solicit the view of the ADR holders.

AFFIRMED before me at New York, New York, this _4 th_ day of February, 2022

_Robert Seiden_

**ROBERT W. SEIDEN**

Steven E. Seiden
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02SE6135135
Qualified in New York County
Commission Expires 12/23/202_

This affidavit was filed by KSG, attorneys for the Plaintiff, whose address for service is 4th Floor Harbour Centre, 42 North Church Street, PO Box 2255, Grand Cayman KY1-1107, Cayman Islands [MR/02477]

15