UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
WAYNE BALIGA,

                   Plaintiff,                   **REPORT AND RECOMMENDATION**

    -against-                         18-cv-11642 (VM) (VF)

LINK MOTION INC. (F/K/A NQ MOBILE
INC.), VINCENT WENYONG SHI,
ROLAND WU, and ZEMIN XU,

                   Defendants.
------------------------------------------------------X

**VALERIE FIGUEREDO, United States Magistrate Judge**

**TO THE HONORABLE VICTOR MARRERO, United States District Judge**

      Plaintiff Wayne Baliga ("Plaintiff") commenced this action against Defendants Link

Motion Inc. ("LKM" or the "Company"), Vincent Wenyong Shi ("Shi"), Roland Wu ("Wu"),

and Zemin Xu ("Xu") to recover damages and equitable relief for Defendants' alleged violation

of the federal securities laws and state common law. Plaintiff's suit arises from his purchase and

ownership of American Depository Shares ("ADS") of LKM. More specifically, Plaintiff seeks

to recover losses resulting from an alleged "multi-year fraud" where Defendants failed to

disclose the self-dealing nature of a transaction undertaken by LKM.  Plaintiff alleges: (1)

violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the

"Exchange Act"), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, as against all

Defendants; (2) violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as against

the individual Defendants; (3) common-law fraud as against all Defendants; (4) negligent

misrepresentation as against all Defendants; and (5) unjust enrichment as against only Shi. On

1

December 1, 2021, LKM and Shi moved to dismiss Plaintiff's Second Amended Complaint

("SAC") (ECF No. 166), pursuant to Federal Rule of Civil Procedure 12(b)(6). See ECF Nos.

261-62.

For the reasons set forth below, I respectfully recommend that LKM and Shi's Motion to

Dismiss be **DENIED in part and GRANTED in part**.

## FACTUAL BACKGROUND

### A.  Facts Alleged in the Complaint[1]

#### 1.  *Background of the Parties*

LKM, formerly known as NQ Mobile Inc., is incorporated in the Cayman Islands with its

principle executive offices located in Beijing, People's Republic of China (the "PRC"). SAC ¶

17. Founded by Defendant Shi and Henry Lin ("Lin"), LKM is a multinational technology

company that develops, licenses, supports, and sells mobile-software platforms, including mobile

games and social-media platforms, as well as services that focus on the smart car and smart-ride

business. Id. ¶¶ 17, 25. Prior to the Company renaming itself in 2018, the Company's securities

traded on the New York Stock Exchange ("NYSE") under the ticker "NQ." Id. ¶ 17. Thereafter,

LKM securities traded on the NYSE under the ticker "LKM." Id.

In 2014, Shi became LKM's Chairman of the Board—a position he held until his removal

by the Court-appointed Receiver, Robert W. Seiden (hereinafter, the "Receiver"), in March

2019. Id. ¶ 18. Defendant Wu was LKM's Chief Financial Officer from June 2015 until his

resignation in September 2018. Id. ¶ 19. Defendant Xu was LKM's President since December

---

[1] The factual allegations recounted herein are taken from the Second Amended
Complaint. For purposes of this motion to dismiss, I accept as true all well-pled factual
allegations and draw all reasonable inferences in Plaintiff's favor. ATSI Communications, Inc. v.
Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

2010, and became the Chief Executive Officer in December 2014, until his resignation in September 2018. Id. ¶ 20. Between January 21, 2014, and January 18, 2019 (the "Relevant Period"), Plaintiff purchased and owned LKM securities in the form of ADS. Id. ¶¶ 16, 126.

   2. *Background of the Alleged Fraud*

In late 2014, in connection with a purported "anti-corruption" campaign led by the Chinese government, Henry Lin, one of LKM's founders, was "disappeared" for four months. Id. ¶ 32. Seeking to seize control of LKM, in December 2014, Shi "engineered Lin's formal resignation as LKM's CEO." Id. ¶ 33. LKM issued a press release stating that Lin resigned due to "personal reasons unrelated to the company." Id. Shi subsequently became Chairman of the Board of LKM—a position previously held by Lin—and he exercised "total control" over LKM. Id. ¶¶ 34, 70.

In early 2015, Lin "reappeared," but remained uninvolved in LKM's management and operations. Id. ¶ 35. In 2016, Shi "forged or forced the forgery of Lin's signature on a letter purportedly by Lin announcing his resignation" from RPL Holdings Ltd. ("RPL"), one of LKM's larger shareholders. Id. In response to his removal from RPL, Lin complained to LKM's Board of Directors that his removal by Shi had been improper. Id. ¶ 36. Lin's complaint led to an internal investigation conducted by LKM's Independent Special Committee of its Board of Directors and carried out by LKM's independent counsel, Loeb & Loeb LLP (the "Internal Investigation"). Id. As LKM's Chairman, Shi knew of the Internal Investigation but concealed its existence from LKM shareholders. Id. ¶ 37.

In September 2016, Zhongzhi Hi-Tech Overseas Investment Ltd. ("Zhongzhi"), an international investment fund and institutional investor in China, entered into a Note Purchase Agreement (the "Purchase Agreement") with LKM, pursuant to which Zhongzhi agreed to

purchase a $220 million convertible note (the "Convertible Note") from LKM. Id. ¶¶ 3, 38. That same month, Zhongzhi, RPL, and Shi "entered into a cooperation agreement, by which Shi personally guaranteed to pay to the interest owed to Zhongzhi on the Convertible Note at 10% per annum on the principal balance of the note prior to its maturity date, and an additional 2.5% of the balance after the maturity date." Id.

By the end of 2016, LKM was generating hundreds of millions of dollars a year in revenue, stemming largely from the success of two of its corporate assets, FL Mobile Jiutian Technology Co., Ltd. ("FL Mobile"), a developer, publisher, and operator of games for mobile phones, and Beijing Showself Technology Co., Ltd. ("Showself"), a mobile-video platform for social media. Id. ¶ 2. Revenues from FL Mobile and Showself accounted for 83% of LKM's total revenue in 2016. Id. ¶ 28. Between 2015 and 2017, LKM tried "no less than three times to sell FL Mobile on both the Hong Kong and mainland China exchanges," but the deals "failed to come to fruition." Id. ¶ 30. In its 2016 annual report, LKM stated that FL Mobile and Showself represented "a significant portion of [LKM's] operations," and that if LKM divested itself of FL Mobile and Showself, "revenues and operating results might be greatly reduced." Id. ¶ 28. At that time, LKM ADS were trading at around $4.00 per share, and LKM had a market capitalization in the billions of dollars. Id. ¶ 2.

Meanwhile, by late 2016, Shi was under significant financial pressure. Id. ¶ 38. The Internal Investigation concerning Lin was "looming over" Shi, and Shi "was also personally liable for millions of dollars" in connection with corporate debt (the Convertible Note) owed to Zhongzhi. Id. ¶¶ 3, 37, 39. Both Shi and Zhongzhi have a financial interest in an entity known as Tongfang Investment Fund Series SPC ("Tongfang SPC"). Id. ¶ 39. Prior to March 2017, Shi was a significant shareholder of FL Mobile, owning a 22% equity interest, which LKM had

disclosed to its shareholders. Id. ¶ 29. Plaintiff alleges that to "generate the cash to pay off the Convertible Note, Shi used Tongfang SPC" and "engineer[ed]" the sale of LKM's most valuable assets, FL Mobile and Showself, to himself in a "secretly self-dealing transaction." Id. ¶ 39.

3.  *The Tongfang SPC Transaction*

On March 30, 2017, LKM announced that it had entered into an agreement with Tongfang SPC (the "Tongfang Transaction"). Id. ¶ 40. Tongfang SPC agreed to acquire 63% of LKM's equity interest in FL Mobile for RMB 2.52 billion and 65% of LKM's equity interest in Showself for RMB 800 million. Id. The total consideration to be paid to LKM was RMB 3.32 billion—approximately $516 million. Id.  Under the agreement, Tongfang SPC would make a nominal upfront payment of RMB 150 million (approximately $23 million), after which LKM would transfer FL Mobile and Showself to Tongfang SPC, with Tongfang SPC obligated to pay the remaining balance of RMB 3.17 billion by May 31, 2017. Id. If Tongfang SPC failed to pay the remaining balance by May 31, 2017, FL Mobile and Showself would be transferred back to LKM. Id.

Plaintiff contends that the "Tongfang Transaction was a fraud perpetrated by Shi to loot the Company of its most valuable assets, effectively handing them over to Shi without fair consideration to shareholders." Id. ¶ 41. To perpetrate this fraud and make the Tongfang Transaction appear free from self-dealing and conflicts of interest, Defendants made at least three types of materially false and misleading statements. Id. First, Defendants "falsely and repeatedly represented" that Tongfang SPC, the buyer in the Tongfang Transaction, "was a corporate affiliate of Tsinghua Tongfang, a bona fide Chinese state-owned computer manufacturing giant based in Beijing." Id. ¶ 42. These misleading statements gave the Tongfang Transaction the "imprimatur of legitimacy" by "representing to investors that the transaction was

a fair, arms-length negotiation between two aboveboard entities conducted for a legitimate business purpose." Id. ¶¶ 42, 59. Tongfang SPC, however, was not an affiliate of Tsinghua Tongfang but, instead, was an entity owned and controlled by Shi. Id. ¶¶ 46, 77, 83.  The allegedly false statements include:

- In a press release dated March 30, 2017, attached to a Form 6-K filed by LKM and signed by Shi (the "March 2017 Press Release"), LKM stated that it "had entered into definitive agreements . . . with [Tongfang SPC,] . . . an affiliate of Tsinghua Tongfang." LKM made a substantively identical statement in a press release attached to a Form 6-K dated April 7, 2017, and signed by Shi.

- In LKM's 2016 annual report, attached to a Form 20-F, dated April 25, 2017 (the "2016 Annual Report") and signed by Shi (with certifications pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Wu and Xu), LKM stated that, "In March 2017, the Group entered into definitive agreements . . . with [Tongfang SPC,] . . . an affiliate private equity investment fund of Tsinghua Tongfang."

- In a press release attached to a Form 6-K, dated November 13, 2017, and signed by Shi, LKM stated that Tongfang SPC was "an affiliate of Tongfang Securities Limited, a part of Tsinghua Tongfang." LKM made substantively identical statements in press releases attached to Form 6-Ks dated November 21, 2017, and December 15, 2017, both signed by Shi.

Id. ¶¶ 43-45, 78-82.

Second, Defendants "made materially false and misleading statements and omissions concerning Shi's actual interest in the Tongfang Transaction, failing to disclose Shi's significant ownership interest in Tongfang SPC and that he would receive an equity interest in both FL Mobile and Showself as a result of the Tongfang Transaction." Id. ¶ 47, 84. And although Defendants previously disclosed Shi's 22% equity interest in FL Mobile, Defendants failed to disclose that "Tongfang SPC was a sham entity owned and controlled by Shi" that Shi used "to effectuate the transfer of LKM's equity interest in FL Mobile and Showself to himself." Id. ¶¶ 29, 47-50, 84. The alleged false and misleading statements include:

- In the March 2017 Press Release, LKM stated that Shi "has equity interest in FL Mobile and will continue to participate with the Investor in the future."

- In the 2016 Annual Report, LKM stated that Shi entered into a "share purchase agreement with FL Mobile and Xinjiang NQ, pursuant to which, Dr. Shi acquired 22% equity interest in FL Mobile by terminating the relevant contractual arrangements and paying Xinjiang NQ a total consideration of RMB 880 million," and that LKM had "transferred [its] equity interests in FL Mobile and Showself (Beijing) to [Tongfang SPC] . . . and are in the process [of] collect[ing] [the] remaining purchase price and clos[ing] the whole FL Mobile and Showself (Beijing) Divestment."

Id. ¶¶ 48, 85-87.

Plaintiff alleges that the statements were materially false and misleading because "the 'parties' had no plans to execute the [Tongfang Transaction] under the terms represented to investors." Id. ¶ 50. Instead, "[o]ne day after the Tongfang Transaction was announced, on March 31, 2017—and eight months before the deal closed and any substantial amount of money was ever paid to LKM—LKM transferred its equity interest in FL Mobile and Showself[,] not to Tongfang SPC[,] but to Shi," whose "stake in FL Mobile jumped from 22[%] to 79[%]." Id. ¶¶ 50, 88. Defendants "failed to disclose that Shi would become an equity owner in Showself or that he would be the recipient of LKM's entire equity interest" in Showshelf. Id. ¶¶ 51, 88. Moreover, Tongfang SPC "delayed payment multiple times" and never provided the agreed upon RMB 3.32 billion for FL Mobile and Showself by the deadline of May 31, 2017. Id. ¶ 52. By May 31, 2017, Tongfang SPC had paid only the nominal sum of RMB 150 million, with the remaining RMB 3.17 billion (approximately $492 million) still outstanding. Id.

Third, to assure investors that they had no reason for concern, Defendants made false and misleading statements and omissions representing that Tongfang SPC would pay the remaining RMB 3.17 billion balance owed under the agreement. Id. ¶¶ 53, 89. Examples of these statements include:

- In a press release dated May 31, 2017, filed by LKM on a Form 6-K dated June 2, 2017, and signed by Shi (the "May 31 Press Release"), LKM stated that it "was notified by [Tongfang SPC] . . . that additional time is needed for making the payment of the

remaining purchase price for the sale of [FL Mobile and Showself] . . . The Purchaser has further communicated its confidence to the Company and is making final preparations for completing the Transactions. The Company will continue to work with the Purchaser to close the Transactions as soon as possible."

- On August 31, 2017, LKM provided an update on the Tongfang Transaction on its website stating: "[W]e have received some queries from our investors about the status of the Transaction. We are working closely with the Purchaser, and doing our best to move the Transaction forward. Currently, the Purchaser still needs additional time to complete the Transaction. However, both the Purchaser and us are confident that this Transaction will be completed soon."

- In a press release issued by LKM, attached to a Form 6-K dated November 13, 2017, and signed by Shi, LKM stated that Tongfang SPC "remains committed to completing the entire divestments . . . being all of the equity interests beneficially owned by the Company . . . [in FL Mobile and Showself]."

Id. ¶¶ 53-54, 90-92.

On November 9 and 20, 2017, LKM announced that it had received payments of RMB 800 million and RMB 400 million, respectively, from Tongfang SPC, leaving approximately RMB 1.97 billion outstanding under the agreement. Id. ¶ 55. Accordingly, seven months after the agreed-upon deadline for payment, Tongfang SPC had paid only a part of the purchase price (in USD, approximately $306 million of $516 million). Id. In a press release dated December 14, 2017, attached to a Form 6-K and signed by Shi, LKM announced the completion of the deal. Id. ¶ 56. Specifically, LKM announced that Tongfang SPC had given LKM an additional "nominal payment" of RMB 200 million, and RMB 1.77 billion in the form of a senior note (the "Senior Note"). Id. ¶¶ 56, 93. Plaintiff alleges that Tongfang SPC paid less than half of the agreed-upon purchase price in cash; it paid only RMB 1.55 billion in cash on a RMB 3.32 billion deal. Id.

4. *The "Truth" is Revealed*

On February 6, 2018, a report entitled "NQ Mobile: Undisclosed Transfer Of Subsidiaries To Chairman Introduces Significant Risks - Price Target $0" (the "February 2018 Report" or the "Report") was published on *SeekingAlpha.com*. Id. ¶ 57. The February 2018 Report "revealed

that Shi was fraudulently on both sides of the Tongfang Transaction" because LMK had "transferred all of its equity interests in FL Mobile and Showself not to Tongfang SPC but to Shi himself." <u>Id.</u> ¶ 58. The Report noted that LKM had not disclosed that "Shi would ever own any equity interest in Showself or receive LKM's entire equity interest in these assets" as part of the Tongfang Transaction. <u>Id.</u> The Report also revealed the falsity of LKM's "representations concerning the purported affiliation between Tongfang SPC and Tsinghua Tongfang." <u>Id.</u> ¶¶ 59, 61.

Plaintiff alleges the Report revealed that Shi "fraudulently exploited the use of the 'Tongfang' name to give the deal the appearance of an arm's length transaction." <u>Id.</u> ¶ 59. In that regard, the February 2018 Report revealed that "at the time of the Tongfang Transaction, LKM and Tongfang SPC had the exact same corporate address in the Cayman Islands" and that "Tongfang SPC unexpectedly dissolved itself in July 2017 and reincorporated itself with a new address in August 2017, just one day before it delayed its payments to LKM." <u>Id.</u> ¶¶ 60, 83. Defendants had represented that Tongfang SPC was an affiliate of Tsinghua Tongfang, and at a later point that it was an affiliate of Tongfang Securities Limited ("Tongfang Securities"), a part of Tsinghua Tongfang. <u>Id.</u> ¶ 61. The February 2018 Report indicated, however, that Tongfang Securities was wholly owned by "Neo-Neon," a publicly traded company in Hong Kong, which in turn was 64% owned by Tsinghua Tongfang; neither Neo-Neon's nor Tongfang Securities' publicly-available financial records report any interest in or relationship to Tongfang SPC. <u>Id.</u> ¶¶ 62, 83. Additionally, neither Neo-Neon nor Tongfang Securities had the financial capability to participate in the Tongfang Transaction. <u>Id.</u> ¶ 83. Furthermore, the February 2018 Report illustrated that following the transfer of assets, Shi remained the legal representative of FL Mobile, but that if Tongfang SPC was independent, or affiliated with Tsinghua Tongfang, it

"would have installed a new legal representative for FL Mobile" (i.e., "the Chairman of the seller would not remain the legal representative for an asset owned by the new buyer"). Id. ¶¶ 63, 83.

Additionally, the amount and terms of the Senior Note suggest that there was no affiliation between Tongfang SPC and Tsinghua Tongfang and that Shi controlled Tongfang SPC, because LKM never received payment from Tongfang SPC under the Senior Note. Id. ¶ 64. At the time of the Tongfang Transaction, Shi was Tongfang SPC's majority stakeholder and had final decision-making authority over the operations and management of Tongfang SPC. Id. ¶ 65. Plaintiff thus contends that Shi "used LKM's funds to acquire LKM's assets."  Id. ¶ 66.

> 5.  *Post-Tongfang Transaction*

Following the release of the February 2018 Report, Shi stated in a press release that "all material aspects of the FL Mobile divestment and the sale of Beijing Showself's live social video businesses were publicly disclosed, including my participation and role in the purchasing group." Id. ¶ 68. Shi also denied any connection to Tongfang SPC, maintaining that it was an "independent third party." Id. Regarding the transfer of LKM's assets to Shi, he explained that "the purchasing group requested that the shares should be registered under a new individual shareholder to satisfy structural arrangements related to future capital market requirements of the divested assets.  The arrangements [were] made to ensure the successful completion of the transaction." Id.

On May 1, 2018, LKM filed with the Securities and Exchange Commission ("SEC") "a notification of its inability to timely submit its Form 20-F for 2017," explaining that the delay was due to its "improper financial reporting, such that [its] financial statements from the second quarter of 2016 through the fourth quarter of 2017" could not be "relied upon and were

inaccurate." Id. ¶ 69. LKM admitted "significant failures to disclose transactions, including Shi's payment for his pre-Tongfang Transaction equity interest in FL Mobile." Id.

Around the same time, Lin raised new allegations against Shi, stemming from Shi's involvement in Lin's resignation, resulting in LKM initiating the Internal Investigation led by Loeb & Loeb. Id. ¶ 70. In September 2019, LKM released the findings of the Internal Investigation, which "found that Shi had fraudulently induced Lin's resignation" and that LKM's 2014 justification for Lin's resignation was "false and misleading" because Lin had not resigned "for personal reasons," but due to a "Chinese government investigation involving matters unrelated to" LKM. Id. ¶ 71.

On September 24, 2018, LKM announced that it was no longer in compliance with the NYSE listing standards requiring a 30-day average closing share price at or above $1.00. Id. ¶ 72. On December 24, 2018, LKM announced that the NYSE would apply to the SEC to delist the Company's ADS based on LKM's "abnormally low" price levels. Id. ¶ 73. Shortly thereafter, the SEC delisted LKM. Id.

In January 2019, LKM's accounting firm, Marcum Bernstein & Pinchuk LLP ("MBP"), resigned due to "the significant misrepresentations and omissions of financial reporting in [LKM's] financial statements for 2016 and 2017 and the allegations against Shi raised by Lin that were the subject of the Internal Investigation," suggesting that MBP could no longer "rely on the representations of management." Id. ¶ 74.  On February 1, 2019, the Court appointed the Receiver to "manage [LKM's] operations and protect its assets from further waste and theft." Id. ¶ 75. In March 2019, the Receiver removed Shi as Chairman of LKM. Id.

6. *LKM's Internal Controls*

Plaintiff further alleges that throughout the Relevant Period, Defendants "made

materially false and misleading statements and omissions concerning [LKM's] internal controls." Id. ¶ 95. In LKM's 2016 Annual Report, Defendants Xu and Wu signed certifications pursuant to Section 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX") "attesting to the accuracy of [LKM's] financial statements and the efficacy of its internal controls." Id. ¶¶ 95-98. Plaintiff alleges that the certifications were "false and misleading" and that LKM's internal controls were "riddled with material weaknesses and were woefully ineffective," because LKM permitted and furthered the self-dealing and fraudulent Tongfang Transaction; failed to report the Tongfang Transaction as a fraudulent transaction; and failed to remediate its internal controls to correct financial statements that misreported Shi's interest in the Tongfang Transaction and connection with Tongfang SPC. Id. ¶¶ 99-100.

## B. Procedural Background

On December 13, 2018, Plaintiff filed a Verified Shareholder Derivative Complaint, asserting claims under Section 10(b) and Section 20 of the Exchange Act, as well as various common law claims. See ECF No. 1. The complaint alleged that individual defendants Shi, Jia Lian, and Xiao Yu were in breach of their fiduciary duties to LKM and were looting LKM's assets in the PRC. Id. Plaintiff sought the appointment of a receiver, and on February 1, 2019, the Court appointed Robert W. Seiden, Esq. as the Receiver for LKM. See ECF No. 26.

On March 14, 2019, Plaintiff moved for an order of contempt against Shi (see ECF Nos. 29-32), asserting that since the Receiver's appointment, Shi had "refused to cooperate or even communicate with the Receiver," despite multiple demands by the Receiver "to open a line of communication and cooperate pursuant to the Receivership Order." See ECF No. 32 at 2. On March 27, 2019, Shi opposed the motion for contempt and moved to dismiss the Complaint (see ECF Nos. 35-37), arguing, in part, that Plaintiff had failed to allege fraud in connection with the

"purchase and sale" of securities as required by the Exchange Act. See ECF No. 37 at 2, 8-10. In a June 11, 2019 Decision & Order, the Court denied the motion for contempt, granted in part Shi's motion to dismiss, and directed Plaintiff to file an amended complaint. See ECF No. 64.

On June 20, 2019, Plaintiff filed his First Amended Shareholder Derivative Complaint. See ECF No. 65. On November 1, 2019, non-party China AI Capital Limited ("China AI"), a shareholder of LKM, moved to intervene as of right on the grounds that Plaintiff, as a holder of LKM ADS, had falsely alleged in the initial Complaint and First Amended Complaint that he "is currently and has at all material times of this Action been a shareholder." See ECF Nos. 111, 129. On September 4, 2020, the Court denied China AI's motion to intervene and directed Plaintiff to file a Second Amended Complaint to "clarify" which claims were "asserted as shareholder derivative claims, and which [were] being asserted as direct claims," and to add any "new factual allegations" that are "material" to the claims. See ECF No. 163 at 53-54.

On October 5, 2020, Plaintiff filed a Second Amended Complaint as a direct action, alleging violations by all Defendants of Section 10(b) of the Exchange Act and Rule 10b-5, violations of Section 20(a) of the Exchange Act by the individual defendants, a state-law claim for unjust enrichment against Shi, a state common-law fraud claim against all Defendants, and a state-law negligent-misrepresentation claim against all Defendants. See SAC ¶¶ 140-150, 156-176. Plaintiff also sought an order maintaining appointment of the Receiver. Id. ¶¶ 151-155. On December 1, 2021, Defendants LKM and Shi moved to dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). See ECF No. 262 (Defs.' Br.). Plaintiff filed an opposition on December 27, 2021, and on January 14, 2022, the motion was fully briefed. See ECF Nos. 263 (Pl.'s Br.), 266 (Defs.' Reply Br.). On March 9, 2022, the Honorable Debra C. Freeman issued a Report and Recommendation, recommending that the Receiver be

discharged. See ECF No. 275. The Court reasoned that Plaintiff's repleading of his claims in the Second Amended Complaint "constitute[d] a materially changed circumstance that warrant[ed] . . . discharge of the Receiver." Id.at 39.[2] On August 1, 2022, the Court held oral argument on the instant motion. See ECF No. 326.

## DISCUSSION

### A. Legal Standards on a Motions to Dismiss

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint "must plead 'enough facts to state a claim to relief that is plausible on its face.'" Green v. Dep't of Educ. of City of New York, 16 F.4th 1070, 1076-77 (2d Cir. 2021) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted). In determining if a claim is sufficiently plausible to withstand dismissal, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007); Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322, 324 (2007). The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).

---

[2] Judge Freeman's report is pending before the Honorable Victor Marrero. See ECF Nos. 275, 293-94. I thus do not address LKM and Shi's arguments opposing continuation of the Receiver. See Defs.' Br. at 20. As the parties acknowledged at oral argument on the instant motion, the issue of whether the Receiver should be discharged is the subject of a Report and Recommendation that is already pending before Judge Marrero. See August 1, 2022 Hearing Transcript (Tr.) at 7-8; see also id. at 59 (Plaintiff's counsel stating that "it is not necessary [for this Court] to consider it").

For complaints alleging securities fraud, courts apply the heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). In re Synchrony Fin. Sec. Litig., 988 F.3d 157, 166 (2d Cir. 2021). Rule 9(b) "requires that averments of fraud be stated with particularity." Id. (quoting Anschutz Corp. v. Merrill Lynch & Co., Inc., 690 F.3d 98, 108 (2d Cir. 2012)). In addition, under the PSLRA, the standard for plausibility is heightened and "exacting" in an effort to curb "abusive litigation by private parties." Tellabs, 551 U.S. at 313. The PSLRA requires plaintiffs to "specify each misleading statement; . . . set forth the facts on which a belief that a statement is misleading was formed; and . . . state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." In re Synchrony, 988 F.3d at 167 (internal quotation marks and citation omitted) (emphasis added). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324. In assessing the sufficiency of scienter allegations, the inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter," not whether any individual allegation meets that standard. Id. at 323-24. It is not sufficient for the court to consider "[t]he literal truth of an isolated statement . . . the proper inquiry requires an examination of defendants' representations, taken together and in context." In re Synchrony, 988 F.3d at 171 (internal quotation marks and citation omitted). Even at the motion to dismiss stage, a plaintiff "may not cherry pick certain public statements for its complaint and divorce them from the universe of disclosed information to plausibly allege fraud." Id.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), a court can consider documents that are either attached to the complaint or incorporated by reference. Chambers v.

Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). Even where a document is not incorporated by reference into the complaint, a court may consider it on a motion to dismiss if the document is "integral" to the complaint. Id. at 153 (citation omitted). A document is integral to the complaint if the plaintiff relies on the document's "terms and effect" when drafting the complaint. Id. ("[A] plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession [by the plaintiff] is not enough.") (emphasis in original).

Finally, a court on a motion to dismiss can consider "matters of which judicial notice may be taken" pursuant to Federal Rule of Evidence 201(b). Id. at 153 (citation omitted). This exception allows a court to consider facts that are either "generally known within the trial court's territorial jurisdiction," or facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). And "when a district court decides a motion to dismiss a complaint alleging securities fraud, it may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC, particularly where [the] plaintiff has been put on notice by defendant's proffer of these public documents." Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991). Such filings "are relevant not to prove the truth of their contents but only to determine what the documents stated." Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991). Similarly, courts can take judicial notice of news articles and media reports so long as they do "not take judicial notice of the documents for the truth of the matters asserted in them, but rather to establish that the matters [had] been publicly asserted." Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 424-25 (2d Cir. 2008) (citation omitted) (alteration in original); see also LC Capital Partners, LP v. Frontier Ins. Grp., Inc., 318 F.3d 148, 155 (2d Cir. 2003) (taking judicial

notice of National Underwriter article in evaluating whether plaintiffs had inquiry notice);

DoubleLine Cap. LP v. Odebrecht Fin., Ltd., 323 F. Supp. 3d 393, 436 (S.D.N.Y. 2018) ("[T]he

Court may, and does, take judicial notice of the *fact* of these news reports . . . 'without regard to

the truth of their contents.'") (citation omitted) (emphasis in original).

### B. Exchange Act § 10(b) and SEC Rule 10b-5 Claims

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection

with the purchase or sale of any security . . . any manipulative or deceptive device . . . in

contravention of [SEC] rules and regulations." 15 U.S.C. § 78j(b). The statute "bars conduct

'involving manipulation or deception, manipulation being practices . . . that are intended to

mislead investors by artificially affecting market activity, and deception being misrepresentation,

or nondisclosure intended to deceive.'" Ganino v. Citizens Utilities Co., 228 F.3d 154, 161 (2d

Cir. 2000) (quoting Field v. Trump, 850 F.2d 938, 946-47 (2d Cir. 1988)).

SEC Rule 10b-5, in turn, declares it unlawful for any person, directly or indirectly, to:

"(a) employ any device, scheme, or artifice to defraud, (b) make any untrue statement of a

material fact or to omit to state a material fact necessary in order to make the statements made, in

the light of the circumstances under which they were made, not misleading, or (c) engage in any

act, practice, or course of business which operates or would operate as a fraud or deceit upon any

person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

1. *Statute of Limitations*

As an initial matter , Defendants Xu and Wu have not been served and have not appeared

in this action. See Tr. at 28-29, 55 (confirmation by both defense counsel and Plaintiff's counsel

that Xu and Wu have not been served to their knowledge). LKM and Shi have nevertheless

moved to dismiss the Exchange Act claims as against Xu and Wu based solely on an argument

that the claim is barred by the statute of limitations. LKM and Shi argue that LKM has standing

to assert this argument in support of dismissal on behalf of Xu and Wu because LKM would face

potential indemnification obligations if the claim proceeds as against Wu and Xu. See Defs.'

Reply Br. at 13, n.16. "Federal courts as a general rule allow litigants to assert only their own

legal rights and interests, and not the legal rights and interests of third parties." Farrell v. Burke,

449 F.3d 470, 494 (2d Cir. 2006). In any case, even if LKM had standing to raise a statute of

limitations argument on behalf of Wu and Xu (an issue I do not decide), the argument would fail

because, as discussed below, it is meritless.

Securities fraud claims, including those brought under Sections 10(b) and Rule 10b-5, are

timely if filed no later than "2 years after the discovery of the facts constituting the violation" or

"5 years after such violation." 28 U.S.C. §1658(b); Merck & Co. v. Reynolds, 559 U.S. 633, 638

(2010). Defendants argue that Plaintiff's Exchange Act claims are barred by the statute of

limitations (only as to LKM, Wu, and Xu). See Defs.' Br. at 18-19. According to Defendants,

because Plaintiff was on notice of the alleged fraudulent conduct by LKM, Wu, and Xu no later

than February 2018 (when *Seeking Alpha* released the Report), the statute of limitations ran by

February 2020, several months before Plaintiff filed the Second Amended Complaint on October

5, 2020. Id.

Conversely, Plaintiff contends that all of the claims are timely. As against LKM, Plaintiff

argues that the Exchange Act claims relate back to the previously filed derivative complaints.

Pl.'s Br. at 18-19. As against Xu and Wu, Plaintiff contends that the Exchange Act claims are

based on alleged misrepresentations made in Section 302 and 906 SOX certifications, which

Plaintiff argues he was not aware of, or on inquiry notice of, until January 2019, when LKM's

auditors announced their resignation due to significant misrepresentations and omissions in

LKM's 2016 financial statements. Id. at 19. Plaintiff thus argues that the statute of limitations for the Exchange Act claims as against Wu and Xu did not run until January 2021, approximately three months *after* the Second Amended Complaint was filed. Id. Plaintiff is correct that none of the claims as against any defendant is time barred.

As is relevant here, "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B); Caldwell v. Berlind, 543 F. App'x 37, 40 (2d Cir. 2013); City of New York v. FedEx Ground Package Sys., Inc., 351 F. Supp. 3d 456, 474 (S.D.N.Y. 2018). Rule 15(c) is to be "liberally construed" and was designed "to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities." Siegel v. Converters Transp., Inc., 714 F.2d 213, 216 (2d Cir. 1983) (internal quotations and citation omitted). "The 'central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading.'" Slayton v. Am. Exp. Co., 460 F.3d 215, 228 (2d Cir. 2006) (quoting Stevelman v. Alias Research Inc., 174 F.3d 79, 86 (2d Cir. 1999)). While claims "based on an 'entirely distinct set' of factual allegations" will not relate back, where the amended complaint "renders prior allegations more definite and precise, relation back occurs." Slayton, 460 F.3d at 228 (citations omitted).

Plaintiff's Exchange Act claims against LKM relate back to the filing of the shareholder derivative complaint on December 13, 2018. Plaintiff's First and Second Shareholder Derivative Complaints (ECF Nos. 1, 65) alleged violations of Section 10(b) and Rule 10b-5, claiming that defendants disseminated various false or misleading statements and omissions in connection with

LKM "transferring ownership of [its] most valuable assets." See ECF No. 1 at ¶¶ 2-3, 46-49;

ECF No. 65 at ¶¶ 2-3, 47-50. These prior complaints described the Tongfang Transaction (ECF

Nos. 1, 65 at ¶¶ 23-26), and specifically alleged that press releases issued by LKM concerning

the sale of FL Mobile and Showself "were materially false and/or misleading because they

misinterpreted and failed to disclose" certain "adverse facts pertaining to the Company's

business and operations which were known to Defendants or recklessly disregarded by them,"

including "Shi's interest in the transaction" (id. at ¶ 25). These prior complaints, albeit in less

detail, described virtually the same conduct alleged in Plaintiff's Second Amended Complaint

filed in October 2020, and thus Plaintiff's instant claims relate back to those earlier complaints.

See Slayton, 460 F.3d at 229 (allowing claims to relate back to original complaint where all

claims revolved around misrepresenting the same high-yield investment scheme);

Stevelman, 174 F.3d at 86 (initial complaint alleging "inadequate internal controls" put

defendant on notice of allegations in amended complaint that defendant improperly recognized

revenues and violated GAAP standards);  In re Chaus Sec. Litig., 801 F.Supp. 1257, 1264

(S.D.N.Y. 1992) (allegations of accounts receivable manipulation in amended complaint related

back because it was a "natural offshoot" of the "basic scheme" of defrauding investors by

misrepresenting earnings and profitability alleged in initial complaint). Here, because allegations

in the Second Amended Complaint concern the same "general fact situation" and "conduct,

transaction, or occurrence" (i.e., the Tongfang Transaction) as set forth in Plaintiff's original

pleadings, the claims relate back. See Fed. R. Civ. P. 15(c)(1)(B); Slayton, 460 F.3d at 228.

Accordingly, Plaintiff's Exchange Act claim as against LKM is not time barred.

Defendants Xu and Wu, on the other hand, were not named defendants in the First and

Second Shareholder Derivative Complaints. As to them, the limitations period prescribed in

§ 1658(b)(1) — i.e., "two years after the discovery of the facts constituting the violation"—

began to run once Plaintiff discovered, or once a "reasonably diligent" plaintiff would have

discovered, facts indicating existence of the fraud. Merck, 559 U.S. at 646-47. Plaintiff asserts

that he did not become aware of Xu's and Wu's alleged misconduct (their signing SOX

certifications attesting to the accuracy of LKM's financial statements and the efficacy of its

internal controls) until January 11, 2019, when MBP, LKM's accounting firm, resigned based on

"the significant misrepresentations and omissions of financial reporting in the Company's

financial statements for 2016 and 2017," suggesting that MBP could no longer "rely on the

representations of management." SAC ¶ 74; Pl.'s Br. at 19.

On a motion to dismiss, a defendant "cannot satisfy the heavy burden of establishing

inquiry notice as a matter of law" unless they "can produce uncontroverted evidence [that]

irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent

scheme.'" In re eSpeed, Inc. Sec. Litig., 457 F. Supp. 2d 266, 279 (S.D.N.Y. 2006) (internal

quotation marks and citation omitted) (alteration in original). The Second Circuit is "decidedly

reluctant" to deem claims untimely "absent a manifest indication that plaintiffs could have

learned the facts underpinning their allegations" prior to the statutory limitations period. Id.

(quoting Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 169 (2d Cir. 2005)); LC Capital

Partners, 318 F.3d at 154 (opining that "whether a plaintiff had sufficient facts to place it on

inquiry notice is often inappropriate for resolution on a motion to dismiss.") (internal quotation

marks and citation omitted). Here, Defendants have not come forth with any uncontroverted

evidence demonstrating the date of Plaintiff's inquiry notice with respect to the conduct

underlying the claims against Xu and Wu. Accepting Plaintiff's allegations as true, the statute of

limitations did not begin to run until January 2019, when Plaintiff alleges that he discovered the

alleged misconduct by Xu and Wu. As Plaintiff filed his instant complaint well within the two-year statute of limitations period, the claims against Xu and Wu are timely.

2. *Plaintiff has Adequately Pled a Claim for Securities Fraud under Section 10(b) and Rule 10b-5*

Count I of the Second Amended Complaint avers that Defendants made a series of material misstatements and omissions concerning the self-dealing nature of the Tongfang Transaction: (1) failing to disclose the affiliation between Tongfang SPC and Tsinghua Tongfang; (2) failing to disclose Shi's financial interest in the Tongfang Transaction; and (3) misrepresenting that LKM would receive complete payment by Tongfang SPC for its purchase of FL Mobile and Showself.[3] To state a claim for securities fraud under Section 10(b) and Rule 10b-5, "a plaintiff must allege that each defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." In re Synchrony, 988 F.3d at 167 (quoting Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 100 (2d Cir. 2015)).

For the reasons that follow, Plaintiff's allegations in the Second Amended Complaint are sufficient to adequately plead a securities fraud claim under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

---

[3] The SAC discusses a fourth category of alleged misstatements or omissions in connection with LKM's internal controls made specifically by Defendants Xu and Wu. See SAC ¶¶ 95-100. As noted in Section B(1) above, Xu and Wu have not appeared in this action. Further, LKM and Shi have moved to dismiss the Exchange Act claims against Xu and Wu on the sole ground that the claims are untimely. I thus do not address in this section whether Plaintiff's allegations concerning this category of alleged misstatements satisfy the elements of a Section 10(b) and Rule 10b-5 claim.

a.   *Purchase or Sale of Securities*

Section 10(b) and Rule 10b-5 prohibit securities fraud "in connection with the purchase or sale" of securities. 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5. Therefore, to have standing to bring a claim under Section 10(b) and Rule 10b-5, the plaintiff must be an actual purchaser or seller of securities. Caiola v. Citibank, N.A., New York, 295 F.3d 312, 322 (2d Cir. 2002) (citations omitted). Consequently, persons injured by "decisions to hold or refrain from trading" in securities do not have standing to assert Section 10(b) and Rule 10b-5 claims. Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC, 376 F. Supp. 2d 385, 402 (S.D.N.Y.2005) (quoting First Equity Corp. v. Standard & Poor's Corp., 869 F.2d 175, 180 n.2 (2d Cir.1989)); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 749 (1975).

In the Second Amended Complaint, Plaintiff alleges that he was a "purchaser and owner of LKM securities during the Relevant Period." SAC ¶ 16. As support for that allegation, Plaintiff includes a list of his purchases of LKM securities, illustrating 33 total purchases, between January 21, 2014, and August 17, 2018. Id. ¶ 126. Plaintiff has thus adequately alleged that he purchased securities of LKM from 2014 through mid-2018.

b.   *Misrepresentations or Omissions of Material Fact*

Section 10(b) and Rule 10b-5, alone, "do not create an affirmative duty to disclose any and all material information." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011). As a result, the Second Circuit has consistently held that "an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993); see Glazer v. Formica Corp., 964 F.2d 149, 157 (2d Cir. 1992). Such a duty may arise when there is "a corporate insider trad[ing] on confidential information," a "statute or regulation requiring disclosure," or a corporate

23

statement that would otherwise be "inaccurate, incomplete, or misleading." Glazer, 964 F.2d at

157 (quoting Backman v. Polaroid Corp., 910 F.2d 10, 12 (1st Cir. 1990) (en banc)); accord Oran

v. Stafford, 226 F.3d 275, 285-86 (3d Cir. 2000).

      "To support a claim of securities fraud, the stated or omitted fact must be material."

Constr. Laborers Pension Tr. for S. California v. CBS Corp., 433 F. Supp. 3d 515, 531 (S.D.N.Y.

2020). A fact is material if it "would have been viewed by a reasonable investor as having

significantly altered the total mix of information available." Basic Inc. v. Levinson, 485 U.S.

224, 231-32 (1988) (internal quotation marks and citation omitted); Ganino, 228 F.3d at 162. In

other words, to be material there must be "a substantial likelihood that a reasonable person would

consider it important in deciding whether to buy or sell shares of stock." Constr. Laborers, 433 F.

Supp. 3d at 531 (quoting Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt.

LLC, 595 F.3d 86, 92-93 (2d Cir. 2010)); In re Magnum Hunter Res. Corp. Sec. Litig., 26 F.

Supp. 3d 278, 291 (S.D.N.Y. 2014), aff'd, 616 F. App'x 442 (2d Cir. 2015). "Materiality is

determined in light of the circumstances existing at the time the alleged misstatement occurred."

Ganino, 228 F.3d at 165; see also Spielman v. General Host Corp., 402 F. Supp. 190, 194

(S.D.N.Y. 1975) ("The determination of materiality is to be made upon all the facts as of the

time of the transaction and not upon a 20-20 hindsight view long after the event.") (footnote

omitted), aff'd, 538 F.2d 39 (2d Cir. 1976). Thus, for example, a company's overstatement of

fourth quarter earnings would not be rendered immaterial "simply because profits for the year as

a whole were not affected by the misrepresentation," because a prospective purchaser of the

company's securities is "entitled to a full disclosure of all the facts that were known" to the

company at the time of the overstatement. Ganino, 228 F.3d at 165 (citation omitted).

      "A complaint may be dismissed for failure to allege materiality only if the alleged

misstatements 'are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 291 (S.D.N.Y. 2008) (citing Ganino, 228 F.3d at 162). An omitted fact may be immaterial if the information is trivial, see Basic, 485 U.S. at 231, or is "so basic that any investor could be expected to know it," Levitin v. PaineWebber, Inc., 159 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citation omitted). The issue of materiality "requires delicate assessment of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." Constr. Laborers, 433 F. Supp. 3d at 540 (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976)); see also Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc., 367 F. Supp. 3d 16, 31 (S.D.N.Y. 2019) ("Materiality is a fact-intensive inquiry more appropriate for summary judgment or trial.").

An alleged statement or omission must also be false or misleading. Constr. Laborers, 433 F. Supp. 3d at 531. Whether a statement is misleading is evaluated not only by the "literal truth" of the statement but also "by [the] context and manner of presentation." Singh v. Cigna Corp., 918 F.3d 57, 63 (2d Cir. 2019) (internal quotation marks and citation omitted). Moreover, "a material misstatement must be false at the time it was made." In re Express Scripts Holdings Co. Secs. Litig., 773 F. App'x 9, 12 (2d Cir. 2019) (citation omitted). Courts consider "statements" to include assertions made by a company in its public filings, such as SEC reports. See, e.g., S.C. Ret. Sys. Grp. Tr. v. Eaton Corp. PLC, 791 F. App'x 230, 235 (2d Cir. 2019); Stratte-McClure, 776 F.3d at 101; In re Veeco Instruments, Inc. Sec. Litig., 235 F.R.D. 220, 227 (S.D.N.Y. 2006).

However, "rosy predictions" and "expressions of puffery and corporate optimism" do not give rise to securities violations because they are not material. Magnum Hunter, 26 F. Supp. 3d

at 291 (quoting <u>Novak v. Kasaks</u>, 216 F.3d 300, 315 (2d Cir. 2000) and <u>Rombach v. Chang</u>, 355 F.3d 164, 174 (2d Cir. 2004)); <u>In re Express Scripts</u>, 773 F. App'x at 13. "Puffery encompasses statements [that] are too general to cause a reasonable investor to rely upon them" and "lack the sort of definite projections that might require later correction." <u>In re Vivendi, S.A. Sec. Litig.</u>, 838 F.3d 223, 245 (2d Cir. 2016) (internal quotation marks and citations omitted) (alteration in original). "When contingent or speculative future events are at issue, the materiality of those events depends on a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of company activity." <u>Magnum Hunter</u>, 26 F. Supp. 3d at 291 (citation omitted).

Plaintiff alleges that Defendants LKM and Shi made materially false or misleading statements and omissions concerning: (1) the purported affiliation between Tongfang SPC and Tsinghua Tongfang; (2) Shi's financial interest in the Tongfang Transaction; and (3) Tongfang SPC's payment in full of the agreed-upon amount for the sale of FL Mobile and Showself. <u>See</u> SAC ¶¶ 76-94.

The first two categories of alleged false or misleading statements and omissions relate to: (1) LKM's statements suggesting that Tongfang SPC was affiliated with Tsinghua Tongfang, when in fact, Tongfang SPC was owned and controlled by Shi and had no formal affiliation with Tsinghua Tongfang; and (2) LKM's statements omitting the truth regarding Shi's financial interest in the Tongfang Transaction, including that LKM's equity interests in FL Mobile and Showself would be transferred to Shi, who owned and controlled Tongfang SPC.

With respect to the first category, Plaintiff alleges that Defendants "falsely and repeatedly represented that the buyer in the Tongfang Transaction, Tongfang SPC, was a corporate affiliate of Tsinghua Tongfang, a bona fide Chinese state-owned computer manufacturing giant based in

Beijing," giving the Tongfang Transaction the "imprimatur of legitimacy" by "representing to investors that the transaction was a fair, arms-length negotiation." Id. ¶¶ 42, 59. The SAC includes examples of various false statements to this effect made by LKM in public press releases and SEC filings in 2017, including representations that Tongfang SPC was "an affiliate of Tsinghua Tongfang," "an affiliate private equity investment fund of Tsinghua Tongfang," and "an affiliate of Tongfang Securities Limited, a part of Tsinghua Tongfang." Id. ¶¶ 43-45, 78-82. In support of his allegations that LKM's statements about the affiliation between Tongfang SPC and Tsinghua Tongfang were false or misleading, Plaintiff alleges that: (1) at the time of the Tongfang Transaction, LKM and Tongfang SPC had the exact same corporate address in the Cayman Islands; (2) Tongfang SPC unexpectedly dissolved itself and reincorporated with a new address, just one day before it delayed its payments to LKM for a second time; (3) Neo-Neon and Tsinghua Tongfang, Tongfang Securities' supposed parent entities, report no financial interest in, or relationship to, Tongfang SPC; (4) neither Neo-Neon nor Tongfang Securities had the financial capability to take part in the Tongfang Transaction, because neither entity had the cash to pay for FL Mobile and Showself; (5) Shi remained the legal representative of FL Mobile after the close of the Tongfang Transaction, which would not have occurred if Tsinghua Tongfang or an independent Tongfang SPC had purchased FL Mobile; and (6) the terms of the Senior Note were so one-sided and beneficial to Tongfang SPC that LKM never would have accepted the Senior Note as consideration had Shi not been on both sides of the deal. Id. ¶ 83.

With respect to the second category of false or misleading statements and omissions, Plaintiff alleges that Defendants misrepresented "Shi's actual interest in the Tongfang Transaction, failing to disclose Shi's significant ownership interest in Tongfang SPC and that he would receive an equity interest in both FL Mobile and Showself as a result of the Tongfang

Transaction." Id. ¶¶ 47, 84. The alleged misleading statements included those representing that Shi "ha[d] equity interest in FL Mobile and will continue to participate with the Investor in the future" and that LKM "transferred [its] equity interests in FL Mobile and Showself [ ] to [Tongfang SPC]" and will "collect the remaining purchase price and close the whole FL Mobile and Showself [ ] Divestment." Id. ¶¶ 48, 85-87. Plaintiff alleges that these misstatements failed to disclose the fact that "Tongfang SPC was a sham entity owned and controlled by Shi" used "to effectuate the transfer of LKM's equity interest in FL Mobile and Showself to [Shi]." Id. ¶¶ 49, 84. As alleged in the SAC, Shi's "stake in FL Mobile jumped" from 22% to 79% and LKM's "entire equity interest" in Showself was transferred to Shi.  Id. ¶¶ 50-51, 88.

        As to both the first and second categories of statements and omissions, Plaintiff has adequately alleged materiality. Plaintiff alleges that LKM was generating "hundreds of millions of dollars a year in revenue, in large part because of the success of" FL Mobile and Showself, which accounted for 83% of LKM's total revenue in 2016. Id. ¶¶ 2, 28. Moreover, according to LKM's 2016 Annual Report, FL Mobile and Showself "represent[ed] a significant portion of [LKM's] operations." Id. ¶ 28. LKM further indicated in the 2016 Annual Report that if it divested itself of FL Mobile and Showself, "revenues and operating results might be greatly reduced." Id. Given the significance of FL Mobile and Showself to LKM's revenues, details surrounding the divestiture of those two important assets would be something a "reasonable investor would have considered significant in making investment decisions." Ganino, 228 F.3d at 161. Indeed, if, as alleged (SAC ¶¶ 56, 65-66, 93), the Tongfang Transaction was a sham by which Shi "used LKM's funds to acquire LKM's assets," it is not "obvious[ ]," at this pleading stage, that a reasonable investor would have considered that information "unimportant" in making an investment decision. In re Take-Two, 551 F. Supp. 2d at 291; see Sawabeh Info.

Servs. Co. v. Brody, 832 F. Supp. 2d 280, 302-03 (S.D.N.Y. 2011) (finding allegation that acquired corporation's former officers failed to disclose agreements transferring all of corporation's intellectual property to a company officer, and entitling that officer to substantial severance pay, prior to selling all of its outstanding shares to the acquiring corporation, was sufficiently pled as a material omission). Moreover, the SAC alleges that the price of LKM ADS dropped upwards of 40% in a single day—directly coinciding with the release of the February 2018 Report—which further supports a finding that the misstatements and omissions were material. See Yi Xiang v. Inovalon Holdings, Inc., 254 F. Supp. 3d 635, 643 (S.D.N.Y. 2017) (finding statement sufficiently plead as material "given the significant impact the alleged misstatement had on the stock price" of the company, where defendants' stock price dropped 30% following disclosure of a previously undisclosed tax rate increase); SAC ¶ 118.

Defendants raise several arguments as to why the alleged misstatements or omissions were immaterial. First, Defendants contend that these misrepresentations or omissions could not have been material because LKM had publicly disclosed that it did not own shares of FL Mobile or Showself; its interest in those companies was in its contractual rights to control the companies. Defs.' Br. at 7-8, 14-15. This argument misses the point. As alleged in the SAC, FL Mobile and Showself accounted for 83% of LKM's total revenue in 2016—a "significant portion" of LKM's "operations," according to the Company. SAC ¶ 28; see also Tr. at 18 (confirming that LKM received "the net profits generated" by Showself and FL Mobile). Whether LKM received that economic benefit through direct ownership of the two entities or control of those two entities is of no consequence because the SAC alleges that LKM lost the economic benefit of "its most valuable and revenue-generating assets" as a result of the sham Tongfang Transaction. See SAC ¶ 1; see also id. ¶¶ 4, 6, 27, 39, 41, 77, 111. Stated differently, the fact that LKM would lose the

significant economic benefit of two valuable assets is a fact a reasonable investor might want to know in making an investment decision.[4]

Second, Defendants also contend that at the time of the misstatements or omissions, the "purportedly undisclosed facts were available to the public" as LKM had publicly disclosed its intent to divest itself of FL Mobile and Showself, and "had previously disclosed several unsuccessful attempts to divest" these assets. Defs.' Br. at 7-8, 12, 15. Defendants point to previous analyst reports published by *Seeking Alpha* from November 2016, December 2016, and June 2017.[5] Id. The November 2016 and December 2016 *Seeking Alpha* reports focus on LKM's prior failed attempts to sell FL Mobile, but do not speak to Plaintiff's allegations concerning Shi's financial interest in the Tongfang Transaction or the affiliation (or lack thereof) between Tongfang SPC and Tsinghua Tongfang. See Defs.' Br., Exs. J, K (ECF Nos. 178-10, 178-11). Further, although the June 2017 report questions the affiliation between Tongfang SPC and Tsinghua Tongfang, the report merely concludes that Tsinghua Tongfang holds more than a 60% stake in Neo-Neon Holdings Limited which, in turn, owns Tongfang Securities Limited, which, in turn, owns Tongfang SPC. Defs.' Br., Ex. L (ECF No. 178-12). It does not disclose Shi's financial interest in the Tongfang Transaction or the lack of any clear or direct affiliation

---

[4] Although Defendants contend that LKM continued to receive that financial benefit because Shi held the shares in FL Mobile and Showself as a nominee for the company (Defs.' Br. at 10, 15; Defs.' Reply Br. at 10; Tr. at 21-22), that argument raises a factual question that cannot be resolved on a motion to dismiss. See, e.g., United States v. Erb, 543 F.2d 438, 442 (2d Cir. 1976) (noting that whether an individual "was [Defendant's] nominee for holding" shares of stock was a "vital factual issue[ ]."); see also Tr. at 38 (Plaintiff's counsel arguing that Shi's status as a nominee is an "issue of fact").

[5] As noted, even on a motion to dismiss, the Court may take judicial notice of publicly available news articles and reports so long as it does so only to determine what the document stated, and not "for the truth of the matters asserted in them." See Staehr, 547 F.3d at 424-425; Kramer, 937 F.2d at 774.

between Tongfang SPC and Tsinghua Tongfang—the crux of the alleged omissions in the SAC.

Third, Defendants argue that Plaintiff has failed to allege materiality because "the day after the disclosure of the alleged fraud," the share price increased by over 20% from the previous closing price and continued to increase. Defs.' Br. at 17. As a threshold matter, "there is no requirement to allege or demonstrate any particular movement in a company's stock price in order to sustain the element of materiality on a Rule 12(b)(6) motion." S.E.C. v. Penthouse Int'l, Inc., 390 F. Supp. 2d 344, 353 (S.D.N.Y. 2005); see also Geiger v. Solomon-Page Group, 933 F. Supp. 1180, 1188 (S.D.N.Y. 1996) ("Evidence of stock price movement may be relevant to the issue of materiality but it is not determinative.") (citing cases). Moreover, "change in stock prices will be relevant to the determination of materiality only if the changes are attributable solely to disclosures correcting the alleged misstatements or omissions," Yi Xiang, 254 F. Supp. 3d at 643 (citation omitted)—a determination which cannot be made at the pleading stage. In any case, Defendants' argument ignores Plaintiff's allegation that the price of LKM's ADS dropped about 40% the same day as the alleged revelation of the fraud. See SAC ¶ 118 (alleging that stock price opened at $2.86 on February 6, 2018, and closed at $1.68 that same day, representing a 41.2% drop the day the February 2018 *Seeking Alpha* report was released). Defendants instead focus on the subsequent rise in the share price that began the day *after* the report's publication, February 7, 2018. Defs.' Br. at 17. But whether or not the rise in share price that occurred days after the alleged revelation undermines a finding that the information disclosed in the *Seeking Alpha* report was material is a question of fact not suited for resolution on a motion to dismiss. See Constr. Laborers, 433 F. Supp. 3d at 540; see also ECA & Local 17 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009) ("In order to determine whether a misleading statement is material, courts must engage in a fact-specific inquiry.")

(citation omitted); In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 360 (2d Cir. 2010)

("[B]ecause the materiality element presents a mixed question of law and fact, it will rarely be

dispositive in a motion to dismiss.") (internal quotation marks and citation omitted).

Turning to Plaintiff's third category of alleged misstatements or omissions, Plaintiff

alleges that Defendants misrepresented "that Tongfang SPC would pay the remaining balance"

owed to LKM in connection with the Tongfang Transaction. See SAC ¶¶ 53, 89. Specifically,

Plaintiff alleges that throughout the course of 2017, LKM represented that (1) Tongfang SPC

was "making final preparations for completing the Transactions," (2) LKM was working with

Tongfang SPC "to close the Transactions as soon as possible," (3) both Tongfang SPC and LKM

were "confident that th[e] Transaction [would] be completed soon," and (4) that Tongfang SPC

and LKM "remain[ed] committed to completing the entire divestments." Id. ¶¶ 53-54, 90-92.

Defendants argue that "LKM's statements about the Tongfang transaction were forward-

looking statements about contingent or speculative future events" and merely "expressed hope"

that the transaction would successfully close, and thus are not actionable under Section 10(b).

Defs.' Br. at 15-16. While statements containing simple economic projections, expressions of

optimism, and other puffery are insufficient, see, e.g., Friedman v. Mohasco Corp., 929 F.2d 77,

79 (2d Cir.1991), a defendant may be liable for misrepresentations of existing facts, see In re

Prudential Sec. Inc. Ltd. Partnerships Litig., 930 F. Supp. 68, 74-75 (S.D.N.Y. 1996). As alleged

in the SAC, these statements were more than mere predictions expressing hope or optimism

about a speculative event, and the Tongfang Transaction was not like LKM's prior attempts to

divest FL Mobile and Showself. Instead, the SAC alleges LKM and Shi represented to investors

that LKM had entered into a transaction with Tongfang SPC that would be consummated by

May 31, 2017 (SAC ¶ 40), but LKM and Shi knew that the deal would never in fact be

consummated under the agreed-upon terms (SAC ¶ 50). The statements by LKM addressed a concrete event: a binding contractual agreement under which LKM was owed a specific sum of money to be paid by Tongfang SPC by a date certain.[6] The alleged misstatements or omissions were thus more akin to misrepresentations of an existing fact than to projections or expressions of optimism. See In re Synchrony, 988 F.3d at 168 (holding that where a statement is not merely "vague expression," but is instead a "concrete description and a factual representation" it is sufficiently alleged as material, especially where "several allegations within the amended complaint specifically allege that [the defendants] knew the statement was false when made") (internal quotation marks and citation omitted).

Moreover, because of the alleged self-dealing nature of the Tongfang Transaction, the statements by LKM concerning payment and consummation of the transaction would have been made by LKM and Shi with sufficient knowledge of their falsity. Compare Lasker v. N.Y. State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996) (holding statements that a company's "business strategies [would] lead to continued prosperity . . . consist of precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable") (internal quotation marks omitted) (alteration in original), with Novak, 216 F.3d at 315 (finding alleged misstatements were actionable where plaintiff plead that "the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true").

---

[6] Consistent therewith, Counsel for LKM and Shi represented at the August 1, 2022 hearing that "Tongfang sued [LKM] in arbitration" because "the shares could not be transferred to Tongfang in performance of their agreement" following issuance of the preliminary injunction in this case. See Tr. at 23-24. This statement further underscores that LKM's statements about the Tongfang Transaction did not concern a contingent or speculative event. Rather, the transaction represented a binding agreement upon which the parties could bring suit seeking a remedy for a breach of that agreement.

For the reasons discussed above, accepting Plaintiff's allegations as true, Plaintiff has adequately pled that the alleged statements and omissions concerning the Tongfang Transaction were material.

       c.  *Scienter*

Section 10(b) and Rule 10b-5 require plaintiffs to prove scienter, "a mental state embracing intent to deceive, manipulate, or defraud." <u>Tellabs</u>, 551 U.S. at 319 (internal quotation marks and citation omitted); <u>ECA</u>, 553 F.3d at 198. Under the PSLRA, a complaint must "plead with particularity facts giving rise to a strong inference that the defendant acted with [this] state of mind. <u>Lehmann v. Ohr Pharm., Inc.</u>, 830 F. App'x 349, 352 (2d Cir. 2020) (internal quotation marks and citations omitted). To survive a motion to dismiss, the Court must find that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." <u>Tellabs</u>, 551 U.S. at 324; <u>Slayton v. Am. Express Co.</u>, 604 F.3d 758, 766 (2d Cir. 2010) ("The strong inference standard is met when the inference of fraud is at least as likely as any non-culpable explanations offered.") (internal quotation marks and citation omitted). In determining whether a strong inference of scienter exists, the allegations in the complaint are not to be reviewed in isolation; rather, the facts alleged must be "taken collectively." <u>Tellabs</u>, 551 U.S. at 322-23.

In the Second Circuit, a strong inference of scienter "can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." <u>ECA</u>, 553 F.3d at 198 (citation omitted). Sufficient allegations of motive "entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." <u>Kalnit v. Eichler</u>, 264 F.3d 131, 139 (2d Cir. 2001) (quoting <u>Novak</u>, 216 F.3d at 307); <u>see also</u> <u>ECA</u>, 553 F.3d at

198 ("Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry.") (citation omitted). "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." Kalnit, 264 F.3d at 142 (quoting Beck v. Mfrs. Hanover Tr. Co., 820 F.2d 46, 50 (2d Cir. 1987)). Conscious misbehavior "encompasses deliberate illegal behavior," whereas recklessness includes "conscious recklessness" or "a state of mind approximating actual intent, and not merely a heightened form of negligence." Novak, 216 F.3d at 308, 312 (internal quotation marks and citation omitted).

At least four types of circumstances may give rise to a strong inference of the requisite scienter. Those circumstances are where the complaint sufficiently alleges that defendants: (1) "benefitted in a concrete and personal way from the purported fraud"; (2) "engaged in deliberately illegal behavior"; (3) "knew facts or had access to information suggesting that their public statements were not accurate"; or (4) "failed to check information they had a duty to monitor." Sjunde AP-Fonden v. Goldman Sachs Grp., Inc., 18-CV-12084 (VSB), 545 F. Supp. 3d 120, 142 (S.D.N.Y. 2021) (quoting ECA, 553 F.3d at 199).

Here, Plaintiff alleges that Shi benefitted in a concrete and personal way from the purported fraud, engaged in deliberately illegal behavior, and knew facts or had access to information suggesting that LKM's public statements were not accurate. See SAC ¶¶ 102-113. Beginning with the allegations of motive in the SAC, Plaintiff does not merely allege a motive "generalized to all corporate directors or beneficial to all shareholders." Kalnit, 264 F.3d at 142. Instead, Plaintiff alleges that Shi benefited in a concrete and personal way from the allegedly

fraudulent Tongfang Transaction. Specifically, the transfer of LKM's equity interest in FL Mobile and Showself to a company owned and controlled by Shi allowed Shi to gain valuable corporate assets ("worth hundreds of millions of dollars"), enabling both a concrete financial benefit to Shi and the ability to pay off the debt he had personally guaranteed in the Convertible Note to Zhongzhi. See SAC ¶¶ 50-51, 56, 88, 93, 113. Further, Shi had the opportunity to commit the fraud based on his alleged roles on both sides of the Tongfang Transaction, as Chairman of LKM and majority owner of Tongfang SPC. See Tr. at 52 (Plaintiff's counsel arguing that Shi "engaged in a long series of actions aimed at stealing the assets of the company" with the "purpose of enriching himself" while knowing "that he was on both sides of the transaction").

These allegations are sufficient to plead that Shi had motive and opportunity to perpetrate the fraud and thus give rise to a strong inference of scienter. See Tellabs, 551 U.S. at 325 ("personal financial gain may weigh heavily in favor of finding that securities fraud complaint gives rise to 'strong inference' of scienter"); In re Openwave Sys. Sec. Litig., 528 F. Supp. 2d 236, 249-50 (S.D.N.Y. 2007) (concluding that plaintiff had adequately alleged scienter because the receipt of allegedly backdated options "garnered the defendants immediate returns of up to twenty percent"); Sawabeh, 832 F. Supp. 2d at 303-04 (finding plaintiffs sufficiently pled motive by alleging that defendants' motive to defraud arose because they "were in danger of being held personally liable for . . . debts of over $700,000"); Marcus v. Frome, 329 F. Supp. 2d 464, 473 (S.D.N.Y. 2004) (finding that plaintiffs adequately alleged the defendants' motive and opportunity to commit fraud because the defendants were "alleged to have realized concrete and personal benefits," including "tangible and valuable assets and income," as a result of the alleged fraud); In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 74-75 (2d Cir. 2001) (concluding that

plaintiff sufficiently alleged motive where the allegedly fraudulent statements were quickly followed by defendant's sale of 80% of his holdings for a substantial profit).

In arguing that Plaintiff has not sufficiently pled scienter, Defendants summarily claim that Plaintiff must allege facts "to show that [Shi] or [LKM] had motive to deceive Plaintiff by engaging in the Tongfang Transaction." Defs.' Br. at 18. Defendants unsupported assertion mischaracterizes the pleading requirement for motive. See Novak, 216 F.3d at 307 (motive adequately pled where allegations demonstrate "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged" to have been made by defendants). There is no requirement that the wrongdoer be motivated by an intent to specifically harm or deceive the plaintiff or any other shareholder of the company. Thus, as discussed, Plaintiff has adequately alleged a motive sufficient to plead a strong inference of scienter as against Shi.

Although Plaintiff has alleged sufficient facts to plead that Shi acted with scienter based on motive—which alone is sufficient to survive a motion to dismiss—Plaintiff has also adequately alleged scienter based on circumstantial evidence of conscious or reckless misbehavior. A plaintiff typically alleges conscious or reckless misbehavior by pleading with specificity that the defendant had "knowledge of facts or access to information contradicting their public statements." Novak, 216 F.3d at 308. "Intentional misconduct is easily identified since it encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information" Id.

Plaintiff alleges that Shi intentionally orchestrated "a sham transaction to Tongfang SPC, an entity he owned and controlled, for his own benefit" and thus Shi's own self-dealing demonstrates that (1) he had knowledge that LKM's public statements that Tongfang SPC was

37

affiliated with Tsinghua Tongfang and that Tongfang SPC would consummate the transaction were false, and (2) he knew of his own undisclosed interest in Tongfang SPC. SAC ¶¶ 65-66, 94, 102. Such allegations are sufficient to plead conscious or reckless misbehavior by Shi because they demonstrate his knowledge of information that contradicted LKM's public statements about the Tongfang Transaction. For this reason, too, Plaintiff has pled that Shi acted with the requisite scienter. See In re Delcath Sys., Inc. Sec. Litig., 36 F. Supp. 3d 320, 334-35 (S.D.N.Y. 2014) (finding scienter sufficiently pled based on allegations that defendant, a pharmaceutical and medical device corporation, "consciously or recklessly failed to disclose" material data concerning its clinical testing, despite knowledge of facts or access to information contradicting its public statements); see also In re Magnum, 26 F. Supp. 3d at 292 (explaining that plausible allegations that a defendant "knew or had access to information contradicting material public statements," but proceeded despite such knowledge or access, "can be sufficient to plead recklessness").

Additionally, Plaintiff has alleged sufficient facts to plead scienter as against LKM. A plaintiff can plead corporate scienter by alleging facts sufficient to create a strong inference either "(1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 177 (2d Cir. 2015) (citation and internal quotation marks omitted); Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc., 531 F.3d 190, 195 (2d Cir. 2008); Lipow v. Net1 UEPS Techs., Inc., 131 F.Supp.3d 144, 160 (S.D.N.Y. 2015). While "the most straightforward way" to establish scienter for a corporate defendant "is to impute it from an individual defendant who made the challenged

misstatement," that is not required. <u>Jackson v. Abernathy</u>, 960 F.3d 94, 98 (2d Cir. 2020) (citation and internal quotation marks omitted). Indeed, "[t]he scienter of the other officers or directors who were involved in the dissemination of the fraud may also be imputed to the corporation, even if they themselves were not the actual speaker," and "a shareholder need not always identify the individuals responsible for the fraudulent statement." <u>Id.</u> at 98-99.

Shi served as LKM's Chairman of the Board from 2014 until March of 2019, the entirety of the Relevant Period as alleged by Plaintiff, and he exercised "total control" over LKM. <u>See</u> SAC ¶¶ 18, 34. As a high-ranking corporate official who is alleged to have orchestrated the fraudulent Tongfang Transaction, Shi's intent can be imputed to LKM. <u>See</u> <u>Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.</u>, 741 F. Supp. 2d 474, 491 (S.D.N.Y. 2010) ("Because the plaintiffs have successfully pleaded scienter as to . . . [the company's] then-president, CEO, and chairman, they have also pleaded corporate scienter as to [the company]."); <u>Sjunde AP-Fonden</u>, 545 F. Supp. 3d at 145 ("[G]iven that I have found that Plaintiff has sufficiently pled scienter as to two Individual Defendants . . . who comprise two of the highest-ranking officials at Goldman . . . Plaintiff has sufficiently pled scienter as to Goldman") (citation omitted); <u>Constr. Laborers</u>, 433 F. Supp. at 549 (concluding that "Plaintiffs have adequately pled corporate scienter" because scienter of the CEO and Chairman could be "impute[d]" to company); <u>In re Eletrobras Sec. Litig.</u>, 245 F. Supp. 3d 450, 469 (S.D.N.Y. 2017) (reasoning that "because the SAC properly alleges scienter against two key officers of Eletrobras, it necessarily alleges scienter against Eletrobras itself"). Thus, because Plaintiff has plausibly alleged that Shi acted with the requisite scienter, he has also pled scienter as against LKM.

d.   *Reliance*

"Reliance provides the requisite causal connection between a defendant's omission or misrepresentation and a plaintiff's injury." Basic, 485 U.S. at 243. Reliance upon the defendant's deceptive acts demonstrates "that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury." Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 810 (2011) (citation and internal quotation marks omitted). There are three ways that a plaintiff can show reliance. First, a plaintiff can show "traditional" reliance, where the plaintiff was "aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation" or omission. Id. Second, a plaintiff can show reliance by invoking the fraud-on-the-market-theory—a rebuttable presumption of reliance that applies when the plaintiff traded in securities of a company that made material misrepresentations to the public and whose securities are traded on an efficient market. Id. at 811. Third, a plaintiff can invoke the Affiliated Ute presumption of reliance, which is available "if there is an omission of material fact by one with a duty to disclose.'" Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 159 (2008) (citation omitted).

Here, Plaintiff primarily relies on a presumption of reliance based on the fraud-on-the-market theory. See SAC ¶¶ 119-122. The fraud-on-the-market theory "is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business" and consequently, misleading statements will "defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." Basic, 485 U.S. at 241-42 (citation and internal quotation marks omitted). In order to invoke this presumption, "a plaintiff must prove that: (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in

an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations

were made and when the truth was revealed." <u>Strougo v. Barclays PLC</u>, 312 F.R.D. 307, 314

(S.D.N.Y. 2016) (citing <u>Basic</u>, 485 U.S. at 241, 248 n.27).

First and foremost, the SAC adequately pleads that LKM was traded on an efficient

market. Plaintiff alleges that LKM's shares of ADS were "listed and actively traded on the

NYSE." SAC ¶ 121. Courts have held that a security listed on the NYSE or other similar national

market is presumed to trade on an efficient market. <u>See</u> <u>Strougo</u>, 312 F.R.D. at 318 (citing

<u>Wagner v. Barrick Gold Corp.</u>, 251 F.R.D. 112, 119 (S.D.N.Y. 2008)); <u>see also</u> <u>Lapin v.</u>

<u>Goldman Sachs & Co.</u>, 254 F.R.D. 168, 183 (S.D.N.Y.2008) ("[N]o argument can be made that

the [NYSE] is not an efficient market."); <u>In re Initial Pub. Offering Sec. Litig.</u>, 544 F. Supp. 2d

277, 296 n.133 (S.D.N.Y. 2008) ("[T]he federal courts are unanimous in their agreement that a

listing on the NASDAQ or a similar national market is a good indicator of efficiency"). Thus, an

allegation that LKM's securities were traded on the NYSE, a universally accepted efficient

market, is sufficient to satisfy the first element of the fraud-on-the-market theory.

Second, Plaintiff specifically alleges that "Defendants made public misrepresentations or

failed to disclose material facts during the relevant period." SAC ¶ 120. Plaintiff includes in the

SAC various examples of publicly available press releases and SEC filings where the alleged

misstatements were contained.  <u>Id.</u> ¶¶ 43-45, 48, 53-54, 78-82, 85-87, 90-92. Plaintiff has thus

adequately pled that the alleged misrepresentations were publicly known. Third, for the reasons

already discussed, the alleged misrepresentations concerning the Tongfang Transaction could be

considered material to a reasonable investor.

Finally, the fraud-on-the-market theory expressly requires that the plaintiff trade the

security "between the time the misrepresentations were made and the time the truth was

revealed," Basic, 485 U.S. at 248, n.27; Halliburton, 563 U.S. at 811. Here, Plaintiff executed a

transaction during this time frame—a purchase of 5000 ADS shares on January 19, 2018, at a

price of $3.85 per share, totaling $19,254.95. SAC ¶ 126. And, indeed, Defendants concede that

Plaintiff has alleged a transaction between the time the alleged misrepresentations or omissions

began on March 30, 2017, and the time when the alleged "truth" was disclosed to the market on

February 6, 2018. See Defs.' Br. at 2, 11; see also Tr. at 14 (counsel for Defendants stating that

Plaintiff could "potentially . . . establish a claim as to that one trade"). For these reasons, Plaintiff

has sufficiently plead each element of the fraud-on-the-market theory and is thus entitled to a

presumption of reliance at this juncture, at least as to the January 2018 transaction.

As a general rule, "[a] defendant may rebut proof of the elements giving rise to the

[fraud-on-the-market] presumption, or show that the misrepresentation in fact did not lead to a

distortion of price or that an individual plaintiff traded or would have traded despite his knowing

the statement was false." Basic, 485 U.S. at 248. Defendant claims that Plaintiff's other

transactions, before and after the January 19, 2018 purchase, are not actionable. See Defs.' Br. at

14; see also Tr. at 16-17. Defendants argue "[e]ven for Plaintiff's single trade that falls within the

timeframe of the alleged misrepresentations and 'revelation' of truth, he cannot benefit from the

presumption of reliance because [Plaintiff]'s own actions rebut any such presumption," since

after the alleged "truth" was revealed on February 6, 2018, Plaintiff continued to purchase

additional shares. Defs.' Reply Br. at 6. However, because the Affiliated Ute presumption also

applies to Plaintiff's allegations, as discussed below, these arguments necessarily fail, and each

of Plaintiff's transactions in LKM ADS remain actionable.

Plaintiff has also sufficiently pled reliance under the Affiliated Ute theory. Under the

Affiliated Ute theory, where a case "primarily" involves "a failure to disclose, positive proof of

reliance is not a prerequisite to recovery." <u>Affiliated Ute Citizens of Utah v. United States</u>, 406 U.S. 128, 153 (1972).  A plaintiff must show that the defendant had a duty to disclose and the omitted facts are material, "in the sense that a reasonable investor might have considered them important in the making of this decision." <u>Id.</u> at 153-54; <u>see also</u> <u>Stoneridge</u>, 552 U.S. at 159. A duty to disclose may arise when "a corporate insider trad[es] on confidential information, a statute or regulation requir[es] disclosure," or a statement is made that would be "inaccurate, incomplete, or misleading" without further context. <u>Stratte-McClure</u>, 776 F.3d at 101 (citation, alteration and internal quotation marks omitted).

The <u>Affiliated Ute</u> presumption is warranted where "a case could be made that it is the material omissions, not the affirmative statements, that are the heart of th[e] case." <u>Strougo</u>, 312 F.R.D. at 319. This is such a case. At its core, the complaint alleges material omissions regarding the self-dealing nature of the Tongfang Transaction, including the true nature of the affiliation between Tongfang SPC and Tsinghua Tongfang and the extent of Shi's financial interest in the Tongfang Transaction. <u>See</u> SAC ¶¶ 76-94, 123. As Plaintiff's counsel argued at the August 1, 2022 hearing, none of the statements by LKM about the Tongfang Transaction disclosed "that it was a related party transaction" where Shi "was on both sides of it." <u>See e.g.</u>, Tr. at 38-39. And once a plaintiff alleges facts sufficient to support an "obligation to disclose" and the "withholding of a material fact," the plaintiff has sufficiently alleged "the requisite element of causation in fact." <u>Affiliated Ute</u>, 406 U.S. at 154 (citations omitted).

In their reply brief, Defendants attack Plaintiff's reliance on the <u>Affiliated Ute</u> presumption. Defendants, however, did not raise any argument concerning application of the <u>Affilated Ute</u> presumption in their opening brief, and it is well settled that "[a]rguments may not be made for the first time in a reply brief." <u>Knipe v. Skinner</u>, 999 F.2d 708, 711 (2d Cir. 1993).

Regardless, Defendants' argument that the <u>Affiliated Ute</u> presumption is inapplicable because Plaintiff alleges certain "positive statements," and not merely omissions, is meritless. Defs.' Reply Br. at 7-8. Where a plaintiff alleges a mixed bag of allegedly material misstatements and omissions, the existence of "affirmative misrepresentations does not at this stage in the litigation preclude" establishing reliance by way of the <u>Affiliated Ute</u> presumption. <u>Strougo</u>, 312 F.R.D. at 319 (citing <u>Dodona I, LLC v. Goldman, Sachs & Co.</u>, 296 F.R.D. 261, 270 (S.D.N.Y. 2014)); <u>see also</u> <u>City of Livonia Emps' Ret. Sys. v. Wyeth</u>, 284 F.R.D. 173, 182-84 (S.D.N.Y. 2012) (holding that a plaintiff could rely on the <u>Affiliated Ute</u> presumption where the plaintiff alleged misstatements but the case was "primarily about omissions").

Furthermore, Defendants' arguments that the timing of Plaintiff's transactions "does not match with any of the alleged misstatements" (Defs.' Br. at 2, 11), and that Plaintiff's "own actions rebut" a presumption of reliance because he continued to purchase additional shares after publication of the *Seeking Alpha* Report (Defs.' Reply Br. at 6), also miss the mark. At this stage, the complaint alleges a plausible explanation for Plaintiff's continued trading in LKM's shares. In response to the *Seeking Alpha* Report, LKM and Shi denied any wrongdoing and assured investors that the Tongfang Transaction was legitimate. As the SAC alleges, Shi "quickly went on the defensive, issuing a press release that falsely and misleadingly attempted to explain the self-dealing transaction," maintaining that "all material aspects of the [Tongfang Transaction] were publicly disclosed, including [his] participation and role in the purchasing group." SAC ¶ 68. Shi also denied his connection to Tongfang SPC, maintaining that it was an "independent third party." <u>Id.</u> Given LKM's statements, Plaintiff continued to transact in LKM's shares because he believed LKM and Shi when they denied any wrongdoing stemming from the Tongfang Transaction. <u>See</u> Tr. at 40, 42 ("[T]he disclosure starts to come out in 2018 but the

company is still putting out statements where they're denying what Seeking Alpha said . . . [T]he

fact that [Plaintiff] continued to buy . . . was [because] he believed management until [MBP]

sa[id] don't believe management."). Ultimately, whether Plaintiff's reliance was justified or

whether his subsequent trades belie any reliance on LKM's alleged misrepresentations or

omissions raises a question of fact not appropriate for resolution on a motion to dismiss. <u>See,</u>

<u>e.g.</u>, <u>Lickteig v. Cerberus Capital Management, L.P.</u>, No. 19-CV-05263 (GHW), 2022 WL

671630, at *15-16 (S.D.N.Y. Mar. 7, 2022) (noting that whether it was reasonable for plaintiff to

rely on assurances made by company's chairman "is a classic factual determination that would

be inappropriate for the Court to resolve" on a motion for summary judgment).

Thus, for the reasons discussed, Plaintiff has sufficiently pled reliance under the fraud-

on-the-market and <u>Affiliated Ute</u> theories.

          e.   *Loss Causation*

"Loss causation . . . requires a plaintiff to show that a misrepresentation that affected the

integrity of the market price *also* caused a subsequent economic loss." <u>Halliburton</u>, 563 U.S. at

812 (emphasis in original); <u>Lentell</u>, 396 F.3d at 172 ("Loss causation is the causal link between

the alleged misconduct and the economic harm ultimately suffered by the plaintiff.") (citation

and quotation marks omitted). To plead loss causation, a plaintiff must "allege not only that its

loss was foreseeable, but also that the alleged misstatement or omission concealed something

from the market that, when disclosed, negatively affected the value of the security." <u>In re AOL</u>

<u>Time Warner, Inc. Sec. Litig.</u>, 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007) (citation omitted). "In

its simplest form, this may be achieved by alleging that the market reacted negatively to a

corrective disclosure, which revealed an alleged misstatement's falsity or disclosed that allegedly

material information had been omitted." <u>Id.</u> (internal quotation marks and citation omitted). A

plaintiff may also plead loss causation by alleging that "a defendant's misstatements or omissions concealed a risk that later materialized to cause the plaintiff's loss." Id. (citation omitted).

Importantly, while "[a] plaintiff cannot satisfy loss causation by pointing to 'a slow, steady decline' in stock prices," he can do so by pointing to "'a sharp drop' resulting from the announcement of concealed facts." Sjunde AP-Fonden, 545 F. Supp. 3d at 146 (quoting In re Sec. Capital Assur., Ltd. Sec. Litig., 729 F. Supp. 2d 569, 599 (S.D.N.Y. 2010)). And "[t]he existence of intervening events that break the chain of causation, such as a general fall in the price of stocks in a certain sector, is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." Nathel v. Siegal, 592 F. Supp. 2d 452, 467 (S.D.N.Y. 2008) (internal quotation marks and citation omitted); In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig., 763 F. Supp. 2d 423, 507 (S.D.N.Y. 2011) (holding that at the motion to dismiss stage, the complaint "need not rule out all competing theories for the drop in . . . stock price; that is an issue to be determined by the trier of fact on a fully developed record"); In re Pronetlink Sec. Litig., 403 F. Supp. 2d 330, 336 (S.D.N.Y. 2005) ("Defendants' contentions that intervening causes . . . were to blame for the collapse of PNL's share price must await the trial.").

Here, Plaintiff's theory of loss causation flows from the alleged corrective disclosure made in the February 2018 *Seeking Alpha* Report. SAC ¶ 116. That report, according to Plaintiff, "revealed the fraudulent related party transaction concerning Shi's self-dealing role" in the Tongfang Transaction. Id. ¶ 57. Plaintiff alleges that he purchased "LKM securities at artificially inflated prices," and when the self-dealing nature of the Tongfang Transaction was revealed, "the value of LKM securities" declined, causing Plaintiff "economic harm." Id. ¶¶ 114, 116.  As a

46

result of the Report's disclosure, "the price of LKM ADS plummeted from an opening price of $2.86 on February 6, 2018, to close that day at $1.68, a decline of 41.2[%] on heavy trading." Id. ¶ 118. The allegation that Plaintiff purchased LKM securities at "artificially inflated prices," combined with the allegation that the share price "plummeted" 41.2% the day of the alleged revelations in the *Seeking Alpha* Report (SAC ¶¶ 7, 114, 118), are sufficient to plead loss causation. See In re Am. Int'l Grp., Inc. 2008 Sec. Litig., 741 F. Supp. 2d 511, 534 (S.D.N.Y. 2010) (finding "the sharp drops of AIG's stock price in response to certain corrective disclosures" sufficient to plead loss causation and overcome arguments at the pleading stage that "some or all of Plaintiffs' losses are attributable to forces other than . . . Defendants' material misstatements and omissions"); see also In re Ambac Financial Group, Inc. Sec. Litig., 693 F. Supp. 2d 241, 274 (S.D.N.Y. 2010) (finding that, among other reasons, allegations of stock price drops following corrective disclosures were sufficient to plead loss causation); In re Winstar Communications, No. 01-CV-3014, 2006 WL 473885, at *16 (S.D.N.Y. Feb. 24, 2006) (holding that by pleading a causal connection between the alleged misrepresentations and stock price drop, plaintiffs sufficiently alleged loss causation, and that any dispute as to whether the stock price drop was caused by other market factors is "a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss") (internal quotation marks and citation omitted).

Defendants did not raise any arguments with respect to loss causation in their opening brief. In their reply brief, Defendants argued that in cases where reliance is based on a fraud-on-the-market theory, an inflated purchase price will not itself constitute or proximately cause the relevant economic loss. Defs.' Reply at 11-12. First, as already discussed, "it is improper to raise new arguments in a reply brief." Caliko, SA v. Finn & Emma, LLC, No. 21-CV-3849 (VEC), 2022 WL 596072, at *7, n.7 (S.D.N.Y. Feb. 28, 2022). In any event, Defendants' argument fails.

Plaintiff has sufficiently pled reliance under the <u>Affiliated Ute</u> theory based on alleged material omissions and thus Plaintiff does not rely solely on the fraud-on-the-market theory.

Defendants also contend that the Second Amended Complaint does not provide "notice of 'what the relevant economic loss might be or of what the causal connection might be between that loss' and any of the purported misrepresentations." Defs.' Br. at 12 (quoting <u>Dura Pharm., Inc. v. Broudo</u>, 544 U.S. 336, 347 (2005)). However, the "pleading rules for loss causation were 'not meant to impose a great burden upon a plaintiff,'" and thus "plaintiffs need only . . . provide[] defendants with 'some indication of the loss and the causal connection that the plaintiff has in mind.'" <u>Freudenberg v. E*Trade Fin. Corp.</u>, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) (quoting <u>Dura Pharm.</u>, 544 U.S. at 346-47).[7] Plaintiff has done that here. Further, to the extent Defendant argues that the "majority" of Plaintiff's purchases are too "distant" to establish loss causation (Defs.' Reply Br. at 12), that, too, is a factual issue inappropriate for resolution on a motion to dismiss. <u>See Nathel</u>, 592 F. Supp. 2d at 467; <u>In re Bear Stearns</u>, 763 F. Supp. 2d at 507; <u>In re Pronetlink</u>, 403 F. Supp. 2d at 336.

For the reasons discussed, Plaintiff has alleged sufficient facts to plausibly state a claim with respect to loss causation.

## C. <u>Exchange Act § 20(a)</u>

Count II of the Second Amended Complaint alleges violations of Section 20(a) of the Exchange Act against the individual Defendants. Defendants' argument for dismissal of Plaintiff's Section 20(a) claim is premised solely on Plaintiff's purported failure to plead a valid Section 10(b) claim. <u>See</u> Defs.' Br. at 18. Because Plaintiff has adequately pled a Section 10(b)

---

[7] Defendants conceded at oral argument that "[t]here is case law standing for th[e] proposition" that loss causation is a fact-intensive issue. <u>See</u> Tr. at 32-33.

claim, Defendant's motion to dismiss Plaintiff's Section 20(a) claim should also be denied. Alternatively, as explained below, Plaintiff has adequately pled a Section 20(a) claim.

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable[.]" 15 U.S.C. § 78t(a). To state a claim under section 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI, 493 F.3d at 108 (citing S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996) cert. denied, 522 U.S. 812 (1997)); see also In re Citigroup Inc. Sec. Litig., 753 F. Supp. 2d 206, 248 (S.D.N.Y. 2010) (citing cases).

"Control" is defined in 17 C.F.R. § 240.12b-2 as "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." See also First Jersey, 101 F.3d at 1472-73 (adopting the same standard for a Section 20(a) claim). To plead control adequately, a plaintiff must plead "actual control, not merely control person status." In re Scottish Re Group Sec. Litig., 524 F. Supp. 2d 370, 386 (S.D.N.Y. 2007) (quotation marks and citation omitted). Generally, signing a financial statement filed by the company is enough to establish control over those who wrote the statement, as well as the content of the statement. In re Alstom SA, 406 F. Supp. 2d 433, 494 (S.D.N.Y. 2005) ("It comports with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report.") (quoting Jacobs v. Coopers & Lybrand, LLP, No. 97-CV-3374 (RPP), 1999 WL 101772, at *18 (S.D.N.Y. Mar. 1,

1999) (alteration omitted)). Additionally, a plaintiff asserting a section 20(a) claim must allege "particularized facts of the controlling person's conscious misbehavior or recklessness." In re CIT Grp. Inc. Sec. Litig., No. 08-CV-6613 (BSJ), 2010 WL 2365846, at *5 (S.D.N.Y. June 10, 2010) (citation omitted). Allegations sufficient to plead scienter for the purposes of primary liability pursuant to Section 10(b) "necessarily satisfy" the culpable participation pleading requirement for Section 20(a) claims. In re Citigroup, 753 F. Supp. 2d at 249 (citation omitted).

Plaintiff alleges that "[d]uring the Relevant Period, the Individual Defendants acted as controlling persons of LKM . . . [and] [b]y virtue of their positions and their power to control public statements about LKM, the Individual Defendants had the power and ability to influence and control the actions of LKM and its employees, and did in fact influence and control, directly or indirectly, the decision-making of the Company." SAC ¶¶ 147-48. Plaintiff further alleges that "[t]he Individual Defendants culpably participated in LKM's violations of Section 10(b) and Rule 10b-5" and thus are liable under Section 20(a). Id. ¶ 149. Shi served as LKM's Chairman of the Board throughout the Relevant Period, and as alleged by Plaintiff, exercised "total control" over LKM. See id. ¶¶ 18, 34. Plaintiff also alleges that various SEC filings by LKM contained material misstatements and/or omissions and that those filings were signed by Shi. See id. ¶¶ 43-45, 53-54, 78-82. Additionally, as already discussed, see supra Section B(2)(c), Plaintiff has plausibly pled that Shi acted with the requisite scienter and was therefore a culpable participant in the fraud by LKM. Accordingly, Plaintiff has also adequately pled a violation of Section 20(a).

### D.  Unjust Enrichment

Count IV of the Second Amended Complaint alleges a claim of unjust enrichment as against only Defendant Shi. "The essential inquiry in any action for unjust enrichment . . . is

whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." Mandarin Trading Ltd. v Wildenstein, 16 N.Y.3d 173, 182 (N.Y. 2011) (quotation marks and citation omitted) (alteration in original). To state a claim for unjust enrichment, Plaintiff must show that "(1) the other party was enriched, (2) at [the plaintiff's] expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered." Id. (quotation marks and citation omitted). Importantly, "a plaintiff cannot succeed on an unjust enrichment claim unless it has a sufficiently close relationship with the other party." Ga. Malone & Co., Inc. v. Rieder, 19 N.Y.3d 511, 516 (N.Y. 2012) (citation omitted). "[P]laintiffs need not allege that they had a contract or were otherwise in privity with defendants. But the alleged relationship between plaintiffs and defendants must not be excessively attenuated." In re Amaranth Nat. Gas Commodities Litig., 587 F. Supp. 2d 513, 547 (S.D.N.Y. 2008), aff'd, 730 F.3d 170 (2d Cir. 2013).

Plaintiff alleges that by Shi's "wrongful acts and omissions, Shi has been and continues to be unjustly enriched at the expense of and to the detriment of Plaintiff and LKM"; "Shi has gained the benefit of ownership of certain assets belonging to LKM at the expense of LKM losing said assets"; and "[b]ecause Shi has gained this benefit at the expense of LKM, equity and good conscious requires that Defendant and/or LKM be afforded restitution." SAC ¶¶ 157-59. To the extent this claim alleges an injury to LKM, in filing the Second Amended Complaint as a direct action, Plaintiff "abandoned his prior derivative claims [on behalf of LKM] and instead chose to plead direct claims against [LKM]." See ECF No. 275 at 42. Indeed, at an October 15, 2020 conference before Judge Freeman, Plaintiff's counsel represented that the SAC asserts "direct claims *only*." Id. at 8 (emphasis in original). And, because Plaintiff is asserting a direct action against LKM and Shi, he cannot rely on any alleged damage to LKM in support of his

claim as against Shi.  See generally Scalisi v. Fund Asset Mgmt., L.P., 380 F.3d 133, 138 (2d Cir. 2004) ("A derivative suit permits an individual shareholder to bring suit to enforce a *corporate* cause of action against officers, directors, and third parties" to "protect the interests of the corporation") (citing Kamen v. Kemper Fin. Serv., 500 U.S. 90, 95 (1991)) (internal quotation marks omitted) (emphasis in original).

Moreover, to the extent the allegations in the SAC suggest that Shi received a benefit from Plaintiff's purchase of LKM shares at artificially inflated prices (SAC ¶¶ 16, 114, 143), such a benefit is too indirect to support a claim for unjust enrichment as against Shi. See Prime Mover Cap. Partners L.P. v. Elixir Gaming Techs., Inc., 898 F. Supp. 2d 673, 697 (S.D.N.Y. 2012), aff'd, 548 F. App'x 16 (2d Cir. 2013) (holding that under New York law, allegations "that defendants 'received an indirect benefit from [plaintiff's] stock purchases'" are "insufficient to sustain an unjust enrichment claim"). Instead, an unjust enrichment claim requires an allegation of a "specific and direct benefit" received by the defendant. Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000); see also Simon v. Keyspan Corp., 785 F. Supp. 2d 120, 140 n.143 (S.D.N.Y. 2011) ("Plaintiff's unjust enrichment claim . . . must be dismissed on the ground that plaintiff has failed to allege that defendants received a 'specific and direct benefit' from plaintiff.") (citation omitted). Because the SAC does not allege any facts from which to infer that Shi received a specific and direct benefit from Plaintiff, Plaintiff has failed to plausibly allege an unjust enrichment1 claim.

Accordingly, Plaintiff's unjust enrichment claim as to Defendant Shi should be dismissed.

### E. **Common Law Fraud**

Count V of the SAC alleges common law fraud as against all Defendants. To state a

claim for common law fraud, the complaint "must allege misrepresentation or concealment of a material fact, falsity, scienter on the part of the wrongdoer, justifiable reliance, and resulting injury." IKB Int'l S.A. v. Morgan Stanley, 142 A.D. 3d 447, 448 (N.Y. App. Div. 2016) (citation omitted). Such allegations must be pled with particularity. Orix Credit All., Inc. v. R.E. Hable Co., 256 A.D.2d 114, 116 (N.Y. App. Div. 1998); Megaris Furs v Gimbel Bros., 172 A.D. 2d 209, 210 (N.Y. App. Div. 1991) (noting that CPLR 3016(b) requires circumstances constituting fraud to be stated in detail). Unlike Section 10(b) and Rule 10b-5 fraud claims, common law fraud does not allow for a fraud-on-the-market theory of reliance. See Sec. Inv'r Prot. Corp. v. BDO Seidman, LLP, 222 F.3d 63, 73 (2d Cir. 2000) (noting that "federal courts repeatedly have refused to apply the fraud on the market theory to state common law cases") (collecting cases). However, "the question of what constitutes reasonable reliance is not generally a question to be resolved as a matter of law on a motion to dismiss." ACA Fin. Guar. Corp. v. Goldman, Sachs & Co., 25 N.Y.3d 1043, 1044-45 (N.Y. 2015) (citation omitted).

Plaintiff alleges that Defendants intentionally or recklessly "made material misrepresentations of material fact and/or omitted material facts" to "induce" his "reliance" in connection with investment decisions "in LKM securities." SAC ¶¶ 162-63. The SAC further alleges that Plaintiff "reasonably relied on the materially false and misleading statements and omissions alleged herein in reaching investment decisions" and "directly relied on Defendants' false and misleading statements alleged herein when deciding to purchase LKM securities and/or hold LKM securities." SAC ¶¶ 119, 124. For the reasons already discussed, Plaintiff's allegations are sufficient to plausibly allege a material misrepresentation or omission made with scienter by Defendants. See supra Section B(2)(b)-(c).

And although Defendants argue that Plaintiff cannot use the fraud-on-the-market theory

to allege reliance for a claim of common law fraud (Defs.' Br. at 22), Plaintiff has also

adequately pled reliance based on the <u>Affiliated Ute</u> theory. <u>See</u> <u>supra</u> Section B(2)(d). And,

New York Courts have applied the <u>Affiliated Ute</u> presumption in cases raising common law

fraud claims. <u>See</u> <u>Ackerman v. Price Waterhouse</u>, 252 A.D.2d 179, 198 (N.Y. App. Div. 1998)

(declining to apply fraud-on-the-market presumption but applying <u>Affiliated Ute</u>); <u>Stutman v.</u>

<u>Chem. Bank</u>, 95 N.Y.2d 24, 30, n.2 (N.Y. 2000) (citing <u>Affiliated Ute</u> and opining that "in the

securities context, proof of reliance is not required where a duty to disclose material information

has been breached"); <u>Brandon v. Chefetz</u>, 106 A.D.2d 162, 167 (N.Y. App. Div. 1985) (applying

<u>Affiliated Ute</u> and opining that "[i]n cases involving omissions, especially where open market

transactions are involved, reliance is generally presumed to flow from a finding of materiality.").

As such, Plaintiff has adequately pled a claim for common law fraud.

## F. Negligent Misrepresentation

Count VI of the Second Amended Complaint alleges negligent misrepresentation as

against all Defendants.  A claim for negligent misrepresentation under New York law requires

the plaintiff to demonstrate that "(1) the defendant had a duty, as a result of a special

relationship, to give correct information; (2) the defendant made a false representation that he or

she should have known was incorrect; (3) the information supplied in the representation was

known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff

intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her

detriment." <u>Anschutz Corp.</u>, 690 F.3d at 114 (citation omitted); <u>see also</u> <u>Mandarin</u>, 16 N.Y.3d at

180. The "duty" element "limits negligent misrepresentation claims to situations involving actual

privity of contract between the parties or a relationship so close as to approach that of privity."

<u>Blank v. TriPoint Global Equities, LLC</u>, 338 F. Supp. 3d 194, 218 (S.D.N.Y. 2018) (quoting

Anschutz Corp., 690 F.3d at 114). To show privity, a plaintiff must allege "(1) awareness that the [representations] were to be used for a particular purpose or purposes; (2) reliance by a known party or parties in furtherance of that purpose; and (3) some conduct by the defendants linking them to the party or parties and evincing defendant's understanding of their reliance." Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson, 73 N.Y.2d 417, 425 (N.Y. 1989) (citation omitted).

      As already discussed, Plaintiff has alleged that Defendants knowingly made material misrepresentations and omissions which Plaintiff relied on in the course of purchasing LKM securities. See supra Section (B)(2)(b)-(d). For this claim, Plaintiff must also allege the existence of a special relationship with Defendants. Defendants contend that Plaintiff was never a shareholder of LKM, and thus a duty or special relationship between Defendants and Plaintiffs did not exist. Defs.' Br. at 24. Plaintiff alleges that Shi had a duty "to exercise reasonable care," as Chairman of LKM, in making statements and failing to disclose information to investors of LKM. SAC ¶¶ 171-72; Pl.'s Br. at 22-23.

      A corporation has a duty "upon choosing to speak" to speak "truthfully about material issues." Caiola, 295 F.3d at 331; see also In re Lions Gate Entertainment Corp. Securities Litig., 165 F. Supp. 3d 1, 15 (S.D.N.Y. 2016). Similarly, a corporate director has a duty to "perform duties in good faith and with reasonable care." Leighton v. Poltorak, 2018 WL 2338789, at *7 n.60 (S.D.N.Y. May 23, 2018). Here, whether a special relationship existed between Shi, given his role as Chairman, and Plaintiff is a fact-specific determination not suitable for resolution at the pleading stage. See Joseph v. Mobileye, N.V., 225 F. Supp. 3d 210, 221 (S.D.N.Y. 2016) ("[W]hether the nature and caliber of the relationship between the parties is such that [Plaintiff's] reliance on a negligent misrepresentation is justified generally raises an issue of fact.") (quoting

Kimmell v. Schaefer, 89 N.Y.2d 257, 264 (N.Y. 1996)); Century Pac., Inc. v. Hilton Hotels

Corp., No. 03-CV-8258, 2004 WL 868211, at *8 (S.D.N.Y. Apr. 21, 2004) ("Courts in this

circuit have held that a determination of whether a special relationship exists is highly fact-

specific and 'generally not susceptible to resolution at the pleadings stage.'") (quoting Nasik

Breeding & Research Farm Ltd. v. Merck & Co., 165 F. Supp. 2d 514, 536 (S.D.N.Y. 2001));

see also Woori Bank v. RBS Sec., Inc., 910 F. Supp. 2d 697, 705-06 (S.D.N.Y. 2012) (noting

that a "sparsely pled special relationship of trust or confidence is not fatal to a claim for

negligent misrepresentation where the complaint emphatically alleges" the other factors

necessary to plead a claim) (internal quotation marks and citation omitted).

Thus, I recommend denying Defendants' motion to dismiss this claim.

## CONCLUSION

For the foregoing reasons, the Court respectfully recommends that Defendants LKM and

Shi's Motion to Dismiss be **DENIED** as to Plaintiff's claims alleging violations of Exchange Act

§10(b) and Rule 10b-5 thereunder, Exchange Act §20(a), common law fraud, and negligent

misrepresentation and **GRANTED** as to Plaintiff's claim alleging unjust enrichment.

Date: August 10, 2022
    New York, New York

                          Respectfully submitted,

                          _____
                          VALERIE FIGUEREDO
                          United States Magistrate Judge

**<ins>PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND</ins>**
**<ins>RECOMMENDATION</ins>**

**Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections. <ins>See also</ins> Fed. R. Civ. P. 6(a), (b), (d). A party may respond to any objections within 14 days after being served. Any objections and responses shall be filed with the Clerk of the Court. Any request for an extension of time to file objections or responses must be directed to Judge Marrero.  If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. <ins>See</ins> <ins>Thomas v. Arn</ins>, 474 U.S. 140 (1985); <ins>Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.</ins>, 596 F.3d 84, 92 (2d Cir. 2010).**

57