## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WAYNE BALIGA, derivatively on behalf of LINK MOTION INC. (F/K/A NQ MOBILE INC.)<br><br>Plaintiff,<br><br>-against-<br><br>LINK MOTION INC. (F/K/A NQ MOBILE INC.), VINCENT WENYONG SHI, JIA LIAN, XIAO YU,<br><br>Defendants,<br><br>-and-<br><br>LINK MOTION INC. (F/K/A NQ MOBILE INC.),<br><br>Nominal Defendant. | 1:18-cv-11642-VM-DCF<br><br>**DECLARATION OF DEFENDANT VINCENT WENYONG SHI** |

VINCENT WENYONG SHI declares, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am one of the above-named individual defendants in this action. I make this declaration in response to the letters dated January 9 and January 12, 2023 on behalf of Robert W. Seiden, the court-appointed receiver (the "Receiver") for Link Motion Inc. ("LKM"), a Cayman Islands company (Dkt. 382 and Dkt. 385), and the Court's Orders of January 12, 2023 (Dkt. 384) and January 13, 2023  (Dkt. 386).

2.      In the January 9, 2023 letter, the Receiver referred to an invoice (the "Maples Invoice") submitted by Maples and Calder Service Europe Limited ("Maples") requesting payment of $3,219.51 on or before January 31, 2023 in order to maintain LKM's good standing in the Cayman Islands. Dkt. 382-1. The Receiver claims that if LKM does not pay the Maples Invoice by January 31, 2023, "LKM [will] be struck off the Cayman Register" and LKM "may not (i) commence legal proceedings; (ii) carry on any business or in any way deal with the assets of the

company; (iii) defend any legal proceeding; (iv) make any claim or claim any right for, or in the name of the company; or (v) act in any way with respect to the affairs of the company." Dkt. 382 at 1 and n.2.

3.    In the January 12, 2023 Order, the Court directed LKM to "immediately transfer funds sufficient to pay the Maples Invoice to the Receiver and directs the Receiver to timely execute payment." Dkt. 384.

4.    In his January 12, 2023 letter, filed shortly after the January 12, 2023 Order, the Receiver claims that he "lacks access to LKM funds" and "cannot cause LKM to replenish the Receivership Account." The Receiver asserts that an order holding me personally liable to fund $103,219.51 of the receivership costs is required "to preserve the status quo." The Receiver refers to veil-piercing arguments in his November 18, 2022 memorandum of law in support of this position. Dkt. 375.

5.    In the January 13, 2023 Order, the Court directs me to show cause why I should not be personally liable for payment of $103,912.51 of receivership costs.

6.    It is my understanding that the Receiver's claim of imminent dissolution of LKM is incorrect and will be addressed by my counsel.

7.    I deny the Receiver's claim that I "dominated" LKM.

8.    Before the appointment of the Receiver, I was one of eight directors. Corporate action required Board approval.

9.    I did not have control over or the ability to make transfers from the accounts of LKM. I have not had signatory authority over any LKM bank accounts since 2011, when LKM was first listed in the United States.

10.    From 2014 until sometime in 2020, Mr. Xu Zemin had control over LKM's Chinese

bank accounts as the registered legal representative for those accounts. In China, transactions in a bank account cannot be completed without the consent of the registered "legal representative."

11.     After the Receiver was appointed in February 2019, the Receiver assumed control over LKM. Based on the Receiver's prior submissions, LKM's subsidiaries, including the Chinese subsidiaries referred to as "WFOEs"[1] and the variable interest entity ("VIE") Chinese operating companies, were previously transferred to the Receiver's agent, Mr. Lilin "Francis" Guo, in the 2019 to 2020 time period.

12.     I did not take any legal or other action to oppose the transfer of control over the subsidiaries and VIE companies to the Receiver and his agents.

13.     I had no control over LKM, its subsidiaries, or VIE companies after the Receiver and Mr. Guo assumed control in 2019 and 2020.

14.     When the Receiver and Mr. Guo assumed control over the subsidiaries and VIE companies, they also assumed legal control over the bank accounts of those companies.

15.     I have reviewed the Receiver's accounting filed on November 18, 2022 and noted that he was able to access funds in the bank accounts of LKM's subsidiaries and VIE companies in Hong Kong, China, and other locations. Therefore, the assertion in the Receiver's January 12, 2023 letter that he "lacks access to LKM funds" is incorrect. The Receiver has access to LKM's bank accounts, but he had already spent all of LKM's money.

16.     It is my understanding that the Receiver claims that I transferred LKM funds to myself in the May 2019 to November 2019 period and "diverted" smartphone app revenue to myself. These allegations are incorrect.

17.     I understand that the basis of the Receiver's claim regarding fund transfers is a July

---

[1] "WFOE, an acronym for "wholly foreign owned entity," generally refers to a Chinese company that is owned and controlled by a non-Chinese company.

17, 2020 letter and attachments previously filed in this case. Dkt. 161.

18.     The Receiver claims that the exhibits to that letter show transfers during the May 2019 to November 2019 period between bank accounts held in the name of LKM's WFOEs NQ Mobile (Beijing) Co., Ltd. ("NQ Mobile") and NetQin Unlimited (Beijing) Technology Co., Ltd. ("NQ Unlimited"). Dkt. 161. The Receiver claims that these transfers were somehow for my personal benefit. This is incorrect.

19.     None of the transfers referred to in Dkt. 161 were made to me personally. Each of those transfers was made between the accounts of NQ Unlimited and NQ Mobile maintained by China Merchants Bank ("CMB"). Dkt. 161.

20.     I did not have control over or the ability to make transfers from the accounts of NQ Mobile or NQ Unlimited in 2019. The public records referred to by the Receiver in Dkt. 161 regarding control merely refer to the fact that I was still identified as the Chairman of the Board of Directors of LKM at that time.

21.     From 2014 until Mr. Guo removed him (to my understanding, by 2020), Mr. Xu Zemin had legal control over the NQ Mobile and NQ Unlimited accounts.

22.     I believe the transfers between NQ Mobile and NQ Unlimited were initiated by Mr. Xu, not me.

23.     Mr. Xu acted independently of me.

24.     I believe that Mr. Xu made the transfers referred to in Dkt. 161 for the purpose of paying off a May 2018 loan from CMB which came due in May 2019. It is my understanding that Mr. Xu had signed some of the loan documents with CMB. Copies of the CMB loan documents are being submitted by my counsel.

25.     None of these transfers or funds referred to in Dkt. 161 benefited me personally.

26.     Mr. Guo has had legal control over the NQ Mobile and NQ Unlimited bank accounts for several years but has never provided any records showing transfer of funds from the NQ Unlimited bank account to me personally.

27.     The Receiver also claims that I "diverted" smartphone app revenue away from LKM to another company. This is not true.

28.     Before the Receivership, LKM maintained accounts with Apple, Google, and related companies for the publication of smartphone apps. Revenue generated from the apps was payable to LKM through these accounts.

29.     These accounts were transferred to the Receiver in or around September 2019. Dkt. 100. The accounts were still active at that time control was transferred, and the Receiver acknowledges in his initial accounting that he received funds from the Apple, Google, and similar accounts after he assumed control over them. Dkt. 375 ¶¶ 13-14; Dkt. 376-3.

30.     In my experience, apps such as those published by LKM with Apple and Google require continuous development and maintenance. The Receiver has failed to state what, if any, he did to maintain LKM apps after assuming control over them.

31.     I have reviewed public records in China showing that shortly after obtaining legal control over LKM's WFOEs and VIE companies, Mr. Guo transferred majority ownership of those companies to himself or other third-parties unrelated to LKM.

32.     It is my understanding that Mr. Guo has failed to submit in this case any information about the operations and revenues of the WFOEs and VIE companies since he assumed control and ownership of them.

33.     It is also my understanding that the Receiver has failed to submit any records demonstrating that he caused Mr. Guo to enter into VIE contracts concerning the companies

transferred to Mr. Guo. Without a binding VIE contracts with Mr. Guo, LKM has no rights to the profits of the VIE companies.

34.     It is my understanding that Mr. Guo has now ceased communications with the Receiver. I believe that now that Mr. Guo has majority ownership of the WFOEs and VIE companies, he is currently operating them for his own personal benefit and entirely independently from LKM and the Receiver.

35.     Once the Receiver is discharged, and control over LKM is restored to the Board of Directors, I expect that the Board will seek to raise capital to refinance LKM. The Maples Invoice can be paid from proceeds raised in a refinance of LKM.

36.     However, it is not feasible for the Board to raise capital while the Receiver remains in place.

37.     Accordingly, I respectfully request that the Court deny the Receiver's request to hold me personally liable for $103,219.51 of the receivership costs. I also request that the Court deny the Receiver's veil-piercing claims and order Mr. Guo to account for his actions on behalf of the Receivership in China.

I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: January 18, 2023

Vincent Wenyong Shi