**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WAYNE BALIGA, derivatively on behalf of LINK MOTION INC. (F/K/A NQ MOBILE INC.)<br><br>       Plaintiff,<br>-against-<br><br>LINK MOTION INC. (F/K/A NQ MOBILE INC.), VINCENT WENYONG SHI, JIA LIAN, XIAO YU,<br><br>       Defendants,<br>-and-<br><br>LINK MOTION INC. (F/K/A NQ MOBILE INC.),<br><br>Nominal Defendant. | 1:18-cv-11642-VM-DCF<br><br>**DECLARATION OF**<br>**MICHAEL JAMES MALONEY**<br>**IN OPPOSITION TO ACCOUNTING**<br>**SUBMITTED BY ROBERT W. SEIDEN** |

MICHAEL JAMES MALONEY declares, pursuant to 28 U.S.C. § 1746, as follows:

1. I am an attorney duly admitted to practice law before the United States District Court for the Southern District of New York. I am a partner of Felicello Law P.C. and counsel of record for Defendant Vincent Wenyong Shi ("Dr. Shi") and Link Motion Inc., a Cayman Islands company (the "Company" or "LKM").

2. On February 1, 2019, Robert W. Seiden was appointed as temporary receiver (the "Receiver") for LKM. Dkt. 26 (the "Appointment Order").

3. On August 25, 2022, the Court directed the Receiver to account for the activities and claims of the receivership. Dkt. 313. On September 29, 2022, the Court set a schedule requiring the Receiver to file his accounting by November 18, 2022 and set a scheduling for supplementation, briefing, and objection to the accounting. Dkt. 359.

1

4. I make this declaration in response to: (i) the Receiver's accounting submitted on November 18, 2022 (Dkt. 376) (the "Accounting") and (ii) the Receiver's request to find Dr. Shi personally liable for unpaid expenses of the Receivership (Dkt. 375 at 16-20). I also submit this declaration in support of Dr. Shi's objections to the Accounting.

**A. The Receiver failed to submit adequate records in support of his Accounting.**

5. The Receiver's Accounting claims expenses of $3,231,673.47 as follows:

   a. $2,472,415.86 – Fees and expenses charged by the Receiver and his law firm, Seiden Law Group ("SLG");

   b. $15,000 – Fees and expenses of the Hong Kong International Arbitration Centre ("HKIAC");

   c. $235,594.00 – Fees and expenses of the Receiver's Hong Kong counsel and co-receiver;

   d. $104,000.00 – Fees of the Receiver's translators;

   e. $21,601.49 – Fees and expenses of the Receiver's Cayman Islands counsel; and

   f. $3,109.51 – Fees and expenses of LKM's Cayman Islands registrar.

6. In support of these expense claims, the Receiver submits voluminous time entries and certain other supporting materials. Dkt. 376-4, 376-5, 376-7, and 376-8 at 1 to 27.

7. All of the time entries submitted by the Receiver are redacted to conceal the nature of the work performed.

8. The time entries show the initials of the timekeepers but fail to include information sufficient to identify the full names of the timekeepers or their qualifications and titles.

9. The only unredacted supporting materials are the invoices for the HKIAC arbitration fees and the Cayman Islands corporate registrar. Dkt. 376-6 and 376-8 at 31.

10. Dr. Shi and LKM do not object to the expenses for HKIAC arbitration fees in the amount of $15,000 or fees for the Cayman Islands registrar in the amount of $3,109.51.

11. Dr. Shi and LKM object to the remaining $3,213,563.96 of the Receiver's expense claims.

**B. The Receiver failed to fully account for valuable LKM assets that came into his possession and control during the receivership.**

12. The Court's Appointment Order directed the Receiver to "take any act necessary to preserve and safeguard the Company's assets, including monitoring and, if necessary to prevent dissipation, taking sole control over the Company's assets, subsidiaries, and bank accounts." Dkt. 26 at § II(2)(a).

13. The Appointment Order also granted the Receiver the authority to act through agents "as the Receiver deems appropriate in order to carry out his duties, including for the collection, preservation, maintenance and operation of the Company's assets." *See* Dkt. 26 at § II(2)(f).

14. After his appointment, the Receiver retained Mr. Lilin "Francis" Guo as his agent in China. Dkt. *See* Dkt. 43 ¶ 10; Dkt. 142-1.

15. In March 2019, the Receiver appointed Mr. Guo as the Chairman and sole individual director of LKM's wholly owned subsidiary, Link Motion International Limited ("LKM International"). Dkt. 43 ¶ 10. Annexed hereto as *Exhibit 1* and *Exhibit 2* are true and correct copies of (1) an annual report filed with the Hong Kong Companies Registry and (2) search results obtained from http://www.qcc.com[1] for LKM International, which demonstrate that Mr. Guo was appointed as the sole individual director of LKM International.

---

[1] QCC.com is a website that provides access to publicly available information concerning Chinese corporations, directors, officers, supervisors, legal representatives and shareholder.

16.     As the sole director of LKM International, Mr. Guo has had full control over LKM's wholly owned subsidiaries in mainland China since March 2019.

17.     Except for funds transferred out of LKM's bank accounts and LKM's accounts with Apple Inc. and Google Inc., the Receiver failed to account for any of the other assets he assumed possession and control of during the receivership. *See* Dkt. 376 ¶¶ 10-14.

(i) <u>LKM's interests in Beijing Technology and other China companies</u>

18.     When this action was commenced, LKM conducted its operations principally through its wholly owned subsidiary NQ Mobile (Beijing) Co., Ltd. (also translated as NQ Infinity (Beijing) Technology Co. Ltd.) ("<u>NQ Mobile</u>") and its interests in Beijing NQ Technology Co., Ltd. (also translated as Beijing Tianxia Technology Co. Ltd.) ("<u>Beijing Technology</u>"). Dkt. 178-7 at 39;[2] *see also* Dkt. 228-4 (first Recital paragraph reciting these entities' Chinese names and describing control relationship between NQ Mobile and Beijing Technology).

19.     As set forth in the accompanying declaration of Dr. Shi, Beijing Technology generated annual revenues of approximately $10 million.

20.     LKM's interests in NQ Mobile and Beijing Technology were valuable assets of the Company.

21.     Annexed hereto as ***Exhibits 3*** through ***7*** inclusive are true and correct translations of search results obtained from http://www.qcc.com for NQ Mobile (***Exhibit 4***), Beijing Technology (***Exhibit 6***), and LKM's other relevant corporate holdings in mainland China (***Exhibits 3, 5, and 7***).[3]

---

[2] *See* section entitled "Risks Related to Our Corporate Structure" stating "We currently conduct our operations in China principally through contractual arrangements between our wholly owned subsidiary NQ Mobile (Beijing) Co. Ltd. . . ., our consolidated affiliated entity Beijing Technology and its shareholders."

[3] Prior references to LKM's Chinese holdings may have used variations of the English names for these companies. LKM is providing in its Memorandum of Law an index of each company's Chinese name and the previously used English names for each company.

22. Public records show that in April 2019, Mr. Guo obtained control over NQ Mobile by appointing himself as legal representative. Ex. 4 at 3 (*see* 'Change Log' line 3).

23. In December 2019, Mr. Guo appointed his agent, Nie Youdi, as the legal representative of Beijing Technology. Ex. 6 at 4 (*see* 'Change Log' line 3). Then, in January 2019, Mr. Guo transferred to himself a 59.675% majority share ownership of Beijing Technology. Ex. 6 at 3 (*see* 'Shareholder Information' line 1).

24. Although the Receiver's agent, Mr. Guo, obtained control over NQ Mobile and Beijing Technology, the Receiver's Accounting does not account for these assets or the revenues generated by NQ Mobile or Beijing Technology during the period of the receivership.

25. The public records also show that Mr. Guo also obtained control over two of LKM's other China subsidiaries, Beijing NQ Mobile Co. Ltd. ("NQ Infinity" or "NQ Wireless") and Link Motion (Beijing) Technology Co., Ltd. (also translated as Lingdong Zhixing (Beijing) Technology Co., Ltd.) ("Link Motion Technology"). Ex. 3 and Ex. 5, respectively.

26. Mr. Guo obtained control over NQ Wireless and Link Motion Technology by appointing his agent Nie Youdi, as legal representative of those entities.[4] Ex. 3 at 4 (*see* 'Change Log' line 5); Ex. 5 at 3 (*see* 'Change Log' at line 4).

27. The Receiver's Accounting also does not account for revenue or operations of NQ Infinity or Link Motion Technology during the period of the receivership.

---

[4] Mr. Guo later appointed another agent, Li Hexia, as legal representative for NQ Mobile, Link Motion Technology, and Beijing Technology.

*(ii)* <u>The Tongfang Note</u>

28. When the Receiver was appointed, LKM held a Senior Note (the "<u>Tongfang Note</u>") issued by Tongfang Investment Fund Series SPC ("<u>Tongfang</u>"), a Cayman Islands segregated portfolio company, in the amount of ¥1,770,000,000 renminbi ("<u>RMB</u>") (approximately USD $206,000,000). *See* LKM press release dated December 14, 2017, annexed hereto as ***Exhibit 8***.

29. A true and correct copy of the Tongfang Note is annexed hereto as ***Exhibit 9***.

30. The Tongfang Note was received by the Company in consideration of LKM's agreement to sell its interest in FL Mobile to Tongfang. *See* Ex. 8; *see also* LKM press releases dated November 9, 2017 and April 10, 2018, annexed hereto as ***Exhibit 10*** and ***Exhibit 11***, respectively.

31. By way of a special purpose VIE structure, LKM retained rights over and a security interest in FL Mobile pending payment in full of the Tongfang Note. *See* Dkt. 228 ¶¶ 11-12; 228-5 (Supplemental Agreement providing for escrow of shares under LKM's control).

32. The Tongfang Note matured on December 14, 2018 and provided for a grace period of between 15 and 30 days. Ex. 9 at 9 (*see* Annex ¶ 1.3) and 10 (Annex ¶ 4.1(a) and (b)).

33. The Receiver was aware of the Tongfang Note and issued a "statutory demand" to Tongfang in or around April 2019. Dkt. 43 ¶ 4.

34. The Receiver's Accounting fails to describe any actions by the Receiver to complete the sale of FL Mobile to Tongfang.

35. The Receiver's Accounting fails to describe any actions by the Receiver to commence an action against Tongfang to collect on the Tongfang Note.

36. It is LKM's and Dr. Shi's contention that the Receiver's acts and omission respecting the Tongfang Note constituted recklessness and gross negligence that proximately caused LKM to lose the value of the Tongfang Note.

(iii) *Smartphone application developer accounts at Apple Inc. and Google Inc.*

37. As of December 1, 2018, LKM also owned and maintained valuable application developer accounts with Apple Inc. and Google Inc. *See* Dkt. 178-7 at 109 (*see 'Mobile Value Added Service Revenues'*); *see also* Declaration of Vincent Wenyong Shi dated January 18, 2023, Dkt. 387 (the "Jan. 18, 2023 Shi Decl.") ¶¶ 28-30.

38. It is Dr. Shi's and LKM's contention that LKM's application developer accounts constituted valuable assets of the Company. *See* Dkt. 178-7 at 109 (*see* 'Mobile Value Added Service Revenues').

39. Prior filings show that the Receiver and his agents assumed control over LKM's Apple Inc. and Google Inc. by no later than September 2019. Dkt. 100.

40. The Receiver's Accounting papers confirm that the Receiver obtained access to LKM's Apple Inc. and Google Inc. developer accounts and withdrew funds. Dkt. 376 ¶¶ 13-14.

41. As set forth in the Jan. 18, 2023 Shi Decl., LKM's application developer accounts with Apple Inc. and Google Inc. required payment of annual fees and regular maintenance and updating in order to maintain revenue from these assets. Dkt. 387 ¶¶ 28-30.

42. The Receiver's Accounting fails to describe any efforts to maintain the status of those accounts or to maintain and update the smartphone applications published by LKM through the developer accounts.

C. **The Receiver failed to properly supplement his Accounting.**

43. Pursuant to the Court's Order (Dkt. 359), Dr. Shi and LKM requested that the Receiver supplement his Accounting by letter dated December 16, 2022.

44. A true and correct copy of the request to supplement is annexed hereto as *Exhibit 12*.

45. Counsel for the Receiver and Dr. Shi met and conferred by teleconference on January 5, 2023.

46. On January 20, 2023, the Receiver served supplemental papers on undersigned counsel.

47. A true and correct copy of the Receiver's supplemental papers are annexed hereto as *Exhibit 13*.

48. In his supplemental papers, the Receiver:

   a. Declined to account for assets that came into his possession or control during the receivership (Ex. 13 at 2-3);

   b. Provided a chart describing which invoices issued by the professionals listed in his Accounting (Ex. 13 at 5-11);

   c. Produced copies of engagement letters with the retained professionals (Ex. 13 at 6-26); and

   d. Confirmed that there are no other outstanding liabilities other than those identified in the Accounting and the Receiver's claims for continuing compensation (Ex. 13 at 3) (*see* 'Engagement Letters; Receivership's Liabilities'); and

   e. Declined to provide further details regarding Mr. Guo's compensation (Ex. 13 at 3-4).

49. Counsel for the Receiver and Dr. Shi met and conferred again on January 26, 2023.

50. The Receiver declined to provide any further supplementation.

51. Upon review of the records, it appears that many of the Receiver's submissions suffer from mistranslations of the Chinese names of LKM's relevant subsidiaries and affiliated companies.

52. On January 27, 2023, I wrote to counsel for the Receiver to clarify the variations of the English names used to refer to LKM's subsidiaries and affiliated entities and the Receiver's contention that Mr. Guo did not obtain control over NQ Wireless and Link Motion Technology.

53. A true and correct copy of my January 27, 2023 letter is annexed hereto as ***Exhibit 14***.

54. The Receiver has declined to further supplement his Accounting. Despite the Receiver's confirmation that there are no other undisclosed liabilities, the Accounting fails to disclose any tax liabilities or payments made to any tax authorities during the period of the receivership.

**D. The Receiver's contention that Mr. Guo did not obtain control over NQ Wireless or Link Motion Technology is without merit.**

55. In his January 27, 2023 letter, counsel for the Receiver concedes that Mr. Guo obtained control over NQ Mobile, Ex. 13 at 2 (last paragraph), but contends that Mr. Guo did not obtain control over NQ Wireless or Link Motion Technology. Ex. 13 at 3 (first full paragraph, alleging that Dr. Shi continues to control those entities) (although the Receiver refers to these entities by different English names, based on my review of the records in this proceeding this appears to be a mistranslation of the Chinese names).

56. It is Dr. Shi's contention that the Receiver's position regarding Mr. Guo's control over NQ Wireless and Link Motion Technology is incorrect. LKM International is the sole shareholder of both NQ Wireless and Link Motion Technology. As the Chairman and sole

9

individual director of LKM International, Mr. Guo had control over LKM International's rights to NQ Wireless and Link Motion Technology.

57. Also, public records show that when Mr. Guo obtained control over Beijing Technology in December 2019, he appointed Nie Youdi as legal representative of that company. Ex. 6 at 4 (*see* 'Change Log' at line 3).

58. As stated in paragraph 10 of the Jan. 18, 2023 Shi. Decl., Dkt. 387, the legal representative of a Chinese company has control authority over transaction in a company's bank accounts.

59. It is Dr. Shi's contention that the appointment of Nie Youdi as legal representative by Mr. Guo, the majority shareholder, demonstrates that Nie Youdi acts on behalf of Mr. Guo.

60. The public records also show that Nie Youdi was appointed as legal representative of NQ Wireless and Link Motion Technology in December 2019. Ex. 3 at 3 (*see* 'Change Log' at line 5); Ex. 5 at 3 (*see* 'Change Log' at line 4).

61. Accordingly, Dr. Shi contends that Mr. Guo controlled NQ Wireless and LKM Technology through (i) his position as Chairman and sole individual director of LKM International, the sole shareholder of NQ Wireless and LKM Technology, and (ii) the appointment of his agent, Nie Youdi, and legal representative of those entities.[5]

**E. The Receiver's pre-October 5, 2020 activities were excessive, unnecessary, and unreasonable.**

62. In her March 9, 2022 Report & Recommendation (the "R&R"), Magistrate Judge Freeman recommended that the Receiver be discharged and the Court require "the Company to pay the *reasonable* costs incurred by the Receiver in the performance of his duties authorized by

---

[5] Mr. Guo later substituted Li Hexia as the legal representative of NQ Wireless and Link Motion Technology.

10

the Court up to October 5, 2020. . . ." Dkt. 275 at 42 (emphasis added). The Court adopted this recommendation in its August 25, 2022. Dkt. 331.

63. The Receiver is the managing partner of Seiden Law Group ("SLG"). Dkt. 376 ¶ 1.

64. SLG was counsel to plaintiff Wayne Baliga from the commencement of this action on December 13, 2018 through November 16, 2020. Dkt. 189.

65. The Receiver claims in his Accounting that SLG also spent time in support of the receivership. Dkt. 376 ¶ 20.

66. It is Dr. Shi's contention that SLG acted in a dual capacity to represent both Plaintiff and the Receiver during the period December 13, 2018 through November 16, 2020.

67. During the period December 13, 2018 through October 5, 2020, SLG devoted substantial time on behalf of Plaintiff to opposing a motion to intervene brought by China AI Capital Ltd. ("China AI"). *See, e.g.*, Dkt. 141, 142.

68. At the same time, the Receiver devoted substantial time purportedly investigating China AI's standing as a registered shareholder of LKM. *See, e.g.*, Dkt. 115, 142-1. (Dr. Shi has previously denied the Receiver's assertions in these letters, *see*, *e.g.*, Dkt. 159.)

69. It is Dr. Shi's contention that the activities of the Receiver to challenge China AI's standing to bring a motion to intervene was unnecessary and unrelated to the purposes of the receivership. Instead, these activities were undertaken to support Plaintiff's opposition to China AI's motion to intervene and defend Plaintiff's standing to bring derivative claims. *See* Dkt. 172.

70. All of the Receiver's pre-October 5, 2020 time entries were fully redacted. It is also Dr. Shi's contention that a substantial number of the other pre-October 5, 2020 time entries submitted in support of the Accounting reflect work performed in representing Plaintiff and not the Receiver's legitimate activities in connection with the receivership.

**F. The Receiver's post-October 5, 2020 activities were excessive, unnecessary, and unreasonable.**

71. On October 5, 2020, Plaintiff filed his Second Amended Complaint, Dkt. 166, which asserted only direct claims.

72. In its August 25, 2022 Order, the Court adopted Magistrate Judge Freeman's recommendation that Plaintiff's assertion of only direct claims in the Second Amended Complaint filed on October 5, 2020 "constituted a material change in these proceedings that warrants dissolution of the preliminary injunction and the discharge of the Receiver." Dkt. 331 at 7.

73. In its August 25, 2022 Order, the Court agreed with Magistrate Judge Freeman "that Baliga should bear costs of the receivership that 'would not have arisen but for [the continuation of the Receiver's appointment after October 5, 2020],' but even as to the period after October 5, 2020, 'expenses that the corporation would have had to incur had there been no receiver, and expenses that confer[red] a genuine benefit upon the corporation, should be charged to it.'" Dkt. 331 at 19.

74. After filing of the Second Amended Complaint, the Receiver devoted substantial time to the following activities:

   a. To call an extraordinary general meeting ("EGM") of the shareholders of LKM to appoint Mr. Guo as Chairman and Director of LKM and remove Dr. Shi. *See*, *e.g.*, Dkt. 188.

   b. To cancel China AI's shares of Class B common stock of LKM. *See*, *e.g.*, Dkt. 194, 205.

   c. To support Plaintiff's motion to convert shares of American Depositary Shares ("ADSs") into registered shares of Class A common stock of LKM. *See*, *e.g.*, Dkt. 204.

      d. To oppose the motion to discharge the Receiver and dissolve the preliminary injunction. *See*, *e.g.*, Dkt. 239.

75. Dr. Shi contends that the Receiver's activities devoted to calling an EGM were unnecessary because the only purpose of calling an EGM was to retaliate against Dr. Shi for moving to discharge the Receiver. The Receiver's purported reason for calling the EGM, to facilitate Mr. Guo's efforts to obtain control over LKM's Chinese subsidiaries, Dkt. 188 at 1, lacked any merit. As demonstrated by the public records, Mr. Guo had already obtained control over LKM's Chinese subsidiaries in April and December 2019. *See supra* ¶¶ 21-25, 55-60.

76. The Receiver's activities devoted to canceling China AI's shares were unnecessary because the documentary record demonstrated conclusively that LKM had failed to satisfy the conditions precedent to China AI's obligation to pay its second subscription installment and, therefore, there was no basis to cancel the shares for failure to pay the second installment. *See* Dkt. 209, 209-1.

77. Dr. Shi contends that the Receiver's activities to facilitate the conversion of ADSs into registered shares were unnecessary and outside the scope of legitimate purposes of the receivership because the only purpose of converting the shares was to cure Plaintiff's lack of standing to bring derivative claims.

78. The Receiver's efforts to oppose the motion to discharge the Receiver and dissolve the preliminary injunction were properly the responsibility of Plaintiff and, therefore, the Receiver's efforts to support the Plaintiff were unnecessary and outside the proper scope of the receivership.

...

**G. The compensation paid by the Receiver to Mr. Guo is excessive, unnecessary, and unreasonable.**

79. On June 18, 2019, the Receiver filed an *ex parte* application for approval of a "compensation incentive agreement and promissory note" with Mr. Guo. Dkt. 71.

80. Although the Court approved the Receiver's request to maintain the compensation agreement under seal, prior proceedings have revealed that the compensation agreement provided Mr. Guo the right to convert his compensation into shares of LKM.

81. As a result of Mr. Guo's exercise of this conversion right, the Receiver issued to Mr. Guo 86,272,750 shares of Class B common stock of LKM. Dkt. 285-3 ¶ 17.3; Dkt. 285-4 at 116 of 283.[6]

82. It is Dr. Shi's contention in this action that the issuance of these shares massively diluted the voting rights and equity interests of existing shareholders of LKM. *See* Dkt. 290 ¶ 79-82.[7]

83. In addition, the Receiver permitted Mr. Guo to obtain majority ownership and control over Beijing Technology without requiring him to execute VIE contracts or other safeguards. *See supra* ¶¶ 21-25 and *infra* ¶¶ 84-91.

84. It is Dr. Shi's contention that the transfer of majority ownership of Beijing Technology also constitutes excessive, unreasonable, and unnecessary compensation to Mr. Guo.

---

[6] Citations to pages of Dkt. 285-4 refer to ECF page numbers stamped on the upper right corner of the document.
[7] Mr. Guo was not a shareholder until the Receiver granted him shares. *See* Dkt. 290 ¶¶ 82-83.

**H. The Receiver acted with recklessness and gross negligence by transferring control to Mr. Guo without appropriate contractual safeguards or other security.**

85. LKM previously held its interest in Beijing Technology through a "variable interest entity" ("VIE") contractual arrangement in order to comply with Chinese law governing the ownership of technology companies for non-Chinese persons. Dkt. 178-7 at 163 (*see* 'Item 7 – B. Related Party Transactions') and at 230 (*see* '(e) Variable Interest Entity').[8]

86. The VIE structure is widely used by international companies with operations in mainland China. Dkt. 178-7 at 43 (*see* 3rd full paragraph).

87. LKM's VIE structure comprises of a set of contracts between LKM, NQ Mobile (Beijing) Co. Ltd, Beijing Technology, and the shareholders of the relevant VIE entity. Dkt. 178-7 at 163-166; 230-232.

88. LKM's VIE contracts ordinarily included:

   a. Business Operations Agreement (Dkt. 178-7 at 164),

   b. Equity Interest Pledge Agreement (Dkt. 178-7 at Dkt. 164),

   c. Exclusive Technical Consulting Services Agreement (Dkt. 178-7 at Dkt. 164),

   d. Equity Disposition Agreement (Dkt. 178-7 at Dkt. 166), and

   e. Loan Agreements (Dkt. 178-7 at Dkt. 166).

89. Copies of the relevant VIE contracts between LKM and its VIE companies were previously filed with the S.E.C. *See* Dkt. 178-7 at 208 (*see* Exhibits 4.5 through 4.9 in list of exhibits to S.E.C. filing).

90. The purpose of the VIE contracts is to permit Chinese individuals to hold the shares of the VIE entity while ensuring that LKM retains 100% control over the entity, its profits, and the

---

[8] The corporate structure of LKM as of December 31, 2016 has been described at pages 163-166 and 230-232[8] of its 2016 Form 20-K annual report, which was previously filed in this act at Dkt. 178-7.

disposition and voting of its shares. *See* Dkt. 178-7 at 163 (*see* 'Item 7 – B. Related Party Transactions') and at 230 (*see* '(e) Variable Interest Entity').

91. Before this action, the shareholders of Beijing Technology had all executed VIE contracts with LKM and NQ Mobile. Dkt. 178-7 at 230-32.

92. The Receiver's Accounting and other submissions fail to show that he required Mr. Guo to execute VIE contracts or provide other safeguards to ensure LKM's rights of control over Beijing Technology.

93. It is Dr. Shi's contention that the Receiver's transfer to Mr. Guo of majority ownership of the shares of Beijing Technology without the benefit of VIE contractual protections, or other security arrangements, amounts to a transfer to Mr. Guo free and clear of any safeguards ordinarily provided through VIE contracts and without adequate consideration.

**I. The Receiver's claims that Dr. Shi diverted assets and his veil-piercing arguments lack merit.**

94. In a memorandum of law filed with his Accounting, the Receiver argues that the Court should pierce the corporate veil to hold Dr. Shi personally liable for the costs of the Receivership based on the claims that Dr. Shi "dominated" LKM and transferred assets for his own benefit. *See* Dkt. 375 at 16-20. In his declaration, the Receiver also argues that Dr. Shi "diverted" funds from LKM accounts and revenues of LKM's applications. Dkt. 376 ¶¶ 16-18.

95. As set forth in the Jan. 18, 2023 Shi Decl., Dr. Shi did not dominate LKM or divert any of its assets. Dkt. 387 ¶¶ 7-30.

96. The bank accounts referenced by the Receiver were controlled by Mr. Xu Zemin the legal representative of LKM's Chinese subsidiaries at the time of the transfers. Dkt. 387 ¶ 9, 16-23. *See also* Ex. 3 at 3 (*see* 'Change Log' at lines 5 and 8); Ex. 4 at 3 (*see* 'Change Log' at lines 3 and 8) (each showing that Mr. Xu was legal representative from 2015 through 2019).

97.     I respectfully refer to and incorporate my January 18, 2022 Declaration, Dkt. 388 (the "Jan. 18, 2022 Maloney Decl."), which recites facts and exhibits showing why the Receiver's other arguments for veil-piercing lack merit. Dkt. 388 ¶¶ 11-34.

98.     Wherefore, Dr. Shi respectfully requests the Court enter an Order

(1) rejecting $3,213,563.96 of the Receiver's expense claims or, in the alternative, finding Plaintiff liable for any unpaid receivership expenses;

(2) allowing the Receiver's claims for $15,000 (arbitration fees to the HKIAC) and $3,109.51 (fees to the Cayman registrar);

(3) directing that the Receiver be surcharged for any undisclosed tax or other liabilities discovered after his discharge;

(4) directing that the shares issued to Mr. Guo be canceled and Receiver surcharged for the value of corporate assets transferred to Mr. Guo;

(5) denying the Receiver's claims for personal liability of Dr. Shi;

(6) discharging the Receiver;

(7) directing the Receiver to return control of LKM and its assets to the Board of Directors; and

(8) granting such other and further relief and the Court deems appropriate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: February 3, 2023

                                                                */s/ Michael James Maloney*
                                                                    Michael James Maloney