**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WAYNE BALIGA, derivatively on behalf of LINK MOTION INC. (F/K/A NQ MOBILE INC.)<br><br>                         Plaintiff,<br>          -against-<br><br>LINK MOTION INC. (F/K/A NQ MOBILE INC.), VINCENT WENYONG SHI, JIA LIAN, XIAO YU,<br>                         Defendants,<br>          -and-<br><br>LINK MOTION INC. (F/K/A NQ MOBILE INC.),<br><br>Nominal Defendant. | 1:18-cv-11642-VM-DCF |

**MEMORANDUM OF LAW IN OPPOSITION TO ACCOUNTING SUBMITTED BY**
**COURT-APPOINTED TEMPORARY RECEIVER ROBERT W. SEIDEN**

FELICELLO LAW P.C.
366 Madison Avenue 3rd Floor
New York, New York 10017
Tel. (212) 584-7806

*Attorneys for Defendant Vincent Wenyong Shi*

Of counsel:    Michael James Maloney
               Rosanne E. Felicello

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

INDEX OF ENGLISH AND CHINESE ENTITY NAMES .......................................... v

DEMONSTRATIVE ORGANIZATION CHART ........................................................ vi

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 3

    A.    The Receiver was appointed to collect and preserve LKM's assets. ............................ 3

    B.    The Court ordered the Receiver to account. ................................................................. 4

    C.    The Receiver failed to meet his burden to account for expenses. ................................ 5

    D.    The Receiver failed to account for any of the valuable assets that came into his possession and control during the receivership. ........................................................... 6

    E.    The Receiver acted recklessly and with gross negligence by giving Mr. Guo control over LKM's assets in China without appropriate safeguards. ....................................... 8

    F.    The Receiver's pre-October 5, 2020 actions were unnecessary, unreasonable, and outside the scope of his authorized duties. ................................................................... 9

    G.    The Receiver's post-October 5, 2020 actions were unnecessary, unreasonable, and failed to confer a genuine benefit upon the Company. ................................................ 10

    H.    The Receiver's veil-piercing arguments lack merit. ................................................... 12

ARGUMENT ............................................................................................................... 18

POINT I.    THE COURT SHOULD REJECT $3,213,563.96 OF THE RECEIVER'S EXPENSE CLAIMS. .................................................................................... 18

    A.    The Receiver's expense claims should be rejected because he has failed to submit adequate supporting records. ........................................................................................ 18

    B.    Claims for the Receiver's pre-October 5, 2020 activities should be rejected as unnecessary and unreasonable. .................................................................................... 20

    C.    Claims for post-October 5, 2020 activities should be rejected as unnecessary, unreasonable, and failing to confer a genuine benefit on the Company. ..................... 21

POINT II.    THE RECEIVER SHOULD BE SURCHARGED FOR LOSS OF COMPANY ASSETS. ......................................................................................................... 21

POINT III.    THE COURT SHOULD REJECT THE RECEIVER'S REQUEST TO PIERCE THE CORPORATE VEIL. ...................................................................... 22

    A.    Cayman Island law does not permit veil piercing as requested by the Receiver. ........ 22

B.  Even if New York law applied to the Receiver's claim, the Receiver's request is procedurally defective. ............................................................................................22

CONCLUSION ...................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Apex Mar. Co. v. OHM Enters.*, 2011 U.S. Dist. LEXIS 35707 (S.D.N.Y. Mar. 30, 2011)...........23

*Balmer v. 1716 Realty LLC*, No. 05 CV 839 (NG) (MDG), 2008 U.S. Dist. LEXIS 38113
(E.D.N.Y. May 9, 2008) ........................................................................25

*Breeden v. Bennett (In re Bennett Funding Grp., Inc.)*, 220 B.R. 74 (Bankr. N.D.N.Y. 1997) .....23

*Coskery v. Roberts & Mander Corp*, 200 F.2d 150 (3d Cir. 1952).........................................19, 20

*Epperson v. Entm't Express, Inc.*, 242 F.3d 100 (2d Cir. 2001)....................................................23

*Fannie Mae v. Olympia Mortg. Corp.*, No. 04 CV 4971 (NG) (MDG), 2006 U.S. Dist. LEXIS
70175 (E.D.N.Y. Sept. 28, 2006)....................................................................24

*Genn v. New Haven Bd. of Educ.*, No. 3:12-cv-00704(CSH), 2017 U.S. Dist. LEXIS 73348 (D.
Conn. May 15, 2017)......................................................................19, 20

*In re Gilbert*, 276 U.S. 294 (1928) .........................................................................19, 20

*JDM Long Island, LLC v. U.S. Bank Nat'l Ass'n*, No. 10-CV-5564(JS)(AKT), 2014 U.S. Dist.
LEXIS 163320 (E.D.N.Y. Nov. 21, 2014)..............................................................18, 20

*Kaisha v. Lotte Int'l Am. Corp.*, Civil Action No. 15-5477 (MCA) (LDW), 2019 U.S. Dist.
LEXIS 71754 (D.N.J. Apr. 26, 2019) ....................................................................19

*Key Bank v. Anton*, 241 A.D.2d 482 (NY App. Div. 2nd Dept. 1997)........................................18

*Lakah v. UBS AG*, 996 F. Supp. 2d 250 (S.D.N.Y. 2014) .............................................................23

*Morris v. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135 (1993) ...................................................23

*N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136 (2d Cir. 1983)....................19

*NetSoc, LLC v. Chegg Inc.*, No. 18-CV-10262 (RA), 2020 U.S. Dist. LEXIS 232321 (S.D.N.Y.
Dec. 10, 2020) ......................................................................19

*Peacock v. Thomas*, 516 U.S. 349 (1996).........................................................................23

*Phelan v. Middle States Oil Corp.*, 154 F.2d 978 (2d Cir. 1946).........................................22

*Scott v. City of N.Y.*, 626 F.3d 130 (2d Cir. 2010) ....................................................1, 19

*Sherry v. United States Bank Nat'l Ass'n*, 662 F. App'x 39 (2d Cir. 2016) ............................18, 20

*United States v. Code Prods. Corp.*, 362 F.2d 669 (3d Cir. 1966).........................................19, 20

**Rules**

Fed. R. Civ. Proc. 7.................................................................................................23

Fed. R. Civ. Proc. 8.................................................................................................23

Fed. R. Civ. Proc. 9(b)............................................................................................23

**Other Authorities**

3 Clark, TREATISE ON THE LAW & PRACTICE OF RECEIVERS (1959) § 699.1...............22

*Hurstwood Properties (A) Ltd v Rossendale Borough Council [2021] UKSC 16* .......................23

Robert C. Art & Minkang Gu, *China Incorporated: The First Corporation Law of the People's Republic of China*, 20 Yale J. Int'l L. 273 (1995)....................................................25

## INDEX OF ENGLISH AND CHINESE ENTITY NAMES

| English Name | Role | Chinese Name |
|---|---|---|
| Link Motion International Ltd. ("LKM International") *f/k/a NQ Mobile International Ltd.* | Wholly owned subsidiary of Link Motion Inc. | 淩動智行國際有限公司 |
| Netqin Infinity (Beijing) Technology Co., Ltd. ("NQ Mobile") *a/k/a* NQ Mobile (Beijing) Co. Ltd., NQ Wireless (Beijing) Technology Co., Ltd. | Wholly owned subsidiary of LKM International (a "wholly foreign owned entity" or "WFOE") | 网秦无限（北京）科技有限公司 |
| Beijing Netqin Mobile Technology Co. Ltd. ("NQ Wireless" or "NQ Infinity") *a/k/a* Beijing Net Qin Mobile Technology Co. Ltd., Beijing NQ Mobile Technology Co., Ltd. | WFOE of LKM International | 北京网秦移动科技有限公司 |
| Link Motion (Beijing) Technology Co. Ltd. ("Link Motion Technology") *a/k/a* Lingdong Zhixing (Beijing) Technology Co. Ltd. | WFOE of LKM International | 淩动智行（北京）科技有限公司 |
| Beijing Netqin Tianxia Technology Co., Ltd. ("Beijing Technology") *a/k/a* Beijing NQ Technology Co., Ltd., Beijing Netqin Technology Co., Ltd., NQ Tech | former variable interest entity ("VIE") of NQ Mobile | 北京网秦天下科技有限公司 |
| Xinjiang NQ Mobile Venture Capital Investment Co., Ltd. ("Xinjiang NQ") | Wholly owned subsidiary of Beijing Technology | 新疆网秦移动创业投资有限公司 |
| FL Mobile Jutian Technology Co., Ltd. ("FL Mobile") | Former VIE of LKM and Xinjiang NQ | 北京飞流九天科技有限公司 |

## DEMONSTRATIVE ORGANIZATION CHART



Sources (Exhibits to the Declaration of Michael James Maloney dated February 3, 2023):

    Ex. 1 – Link Motion International Ltd. Annual Return filed with Hong Kong Companies Registry

    Ex. 2 – LKM International(凌動智行國際有限公司) obtained from http://www.qcc.com on January 24, 2023

    Ex. 3 – NQ Wireless (北京网秦移动科技有限公司) obtained from http://www.qcc.com on January 24, 2023

    Ex. 4 – NQ Mobile (网秦无限(北京)科技有限公司) obtained from http://www.qcc.com on January 24, 2023

    Ex. 5 – Link Motion Technology (凌动智行(北京)科技有限公司) obtained from http://www.qcc.com on
        January 24, 2023

    Ex. 6 – Beijing Technology (北京网秦天下科技有限公司) obtained from http://www.qcc.com on
        January 24, 2023

    Ex. 7 – Xinjiang NQ (新疆网秦移动创业投资有限公司) obtained from http://www.qcc.com on January 24, 2023

Defendant Vincent Wenyong Shi ("Dr. Shi"), in his own capacity and as a registered director of ("LKM" or the "Company"), hereby submits this memorandum of law in (i) support of the objections to the accounting of Robert W. Seiden, the court-appointed temporary receiver (the "Receiver") for LKM (Dkt. 376) (the "Accounting") and (ii) opposition to the request by the Receiver to pierce the corporate veil to hold Dr. Shi personally responsible for the so-called unfunded liabilities of the receivership.

## PRELIMINARY STATEMENT

The issues to be decided here are (1) whether the Receiver has properly accounted for the assets of LKM that came into his possession and control during the receivership; (2) whether the Receiver has adequately supported his expense claims; (3) whether the Receiver awarded unreasonable, excessive, and unnecessary compensation to his agent Mr. Lilin "Francis" Guo, and (4) whether the Receiver has adequately made out veil-piercing claims against Dr. Shi.

The record shows that the Receiver came into possession and control of valuable LKM assets including LKM's interest in Beijing Technology, its principal operating company which generated substantial annual revenues, a valuable promissory note, and LKM's smartphone application developer accounts. The Receiver has failed to account for these assets and, therefore, should be surcharged for value of these assets that have been lost.

The Receiver has also failed to adequately support all but $18,109.51 of his fee and expense claims. First, the Receiver fails to submit the type of contemporaneous records describing the nature of the work performed that is required in the Second Circuit. *Scott v. City of N.Y.*, 626 F.3d 130, 133 (2d Cir. 2010). Second, the Receiver claims expenses for work performed before October 5, 2020 that was actually work performed for the Plaintiff, who the Receiver was also representing during that time. Further, the Receiver improperly claims expenses for work performed after October 5, 2020 that was outside the scope of the receivership and failed to confer any benefit on

1

the Company. The Court should reject those improper expense claims.

The Receiver must also be surcharged for the excessive, unreasonable, and unnecessary compensation given to his agent, Mr. Francis "Lilin" Guo. The Receiver gave Mr. Guo a 59.675% ownership of Beijing Technology (formerly an asset of LKM) along with 86,272,750 shares of Class B common stock of LKM. These gifts to Mr. Guo stripped LKM of one of its most valuable holdings (Beijing Technology) and massively diluted the existing shareholders of LKM. The LKM shares issued to Mr. Guo should be canceled and the Receiver surcharged for the value of the 59.675% interest of Beijing Technology as contrary to the purpose of the receivership, unnecessary, and excessive.

The Court should reject the Receiver's contention that this Court may now pierce the corporate veil to hold Dr. Shi personally liable for receivership costs. Under New York choice of law principles, the law of the Cayman Islands applies to a claim to pierce the corporate veil of LKM, a company incorporated under Cayman Island law. The Cayman Courts, which following U.K. decisional law, do not recognize piercing of the corporate veil to hold an owner or controller liable for corporate obligations. As such, there is no basis for the Receiver to hold Dr. Shi personally liable for liabilities incurred by LKM during the Receivership.

Even under New York law, it would be incorrect to allow the Receiver to pierce the corporate veil to hold Dr. Shi personally liable for LKM's liabilities. Piercing the corporate veil is an extreme remedy under New York law that requires a showing of both "complete domination" of the corporation by the owner and use of this domination to commit a fraud or wrong that caused plaintiff harm. Here the Receiver has not filed any pleading asserting a veil-piercing claim; Dr. Shi has not had any control over LKM assets during the period referenced by the Receiver; and Dr. Shi has not dominated LKM during that period or done anything to cause harm to the Receiver.

The bank account transfers complained of by the Receiver were made by Mr. Xu Zemin, who had control of LKM's bank accounts during the May to November 2019 period referenced by the Receiver and acted independently of Dr. Shi. Also, the funds were transferred between accounts owned by LKM subsidiaries and not to Dr. Shi. The smartphone app accounts that the Receiver claims were "diverted" to Dr. Shi, were controlled by "Wu Xiaohua," not Dr. Shi. Thus, there is no basis for the Court to grant the Receiver's request to find Dr. Shi liable for receivership expenses.

Finally, the Court has already ruled that Plaintiff should be liable for post-October 5, 2020 receivership expenses. The Court should reject the Receiver's request that Dr. Shi – against whom no claims are made by the Receiver and who did not have control over LKM during the Receivership – be found personally liable for unfunded or unpaid costs of the Receivership.

## STATEMENT OF FACTS

### A.  The Receiver was appointed to collect and preserve LKM's assets.

Plaintiff Wayne Baliga ("Plaintiff"), represented by The Seiden Law Group ("SLG"), filed his Complaint on December 13, 2018 asserting purported derivative claims on behalf of LKM. Dkt.[1] 1. The Receiver is managing partner of SLG and claims to be highly experienced with the affairs of public companies with operations in China. Dkt. 93 ¶¶1, 2. On December 14, 2018, the Receiver and SLG requested and obtained a temporary restraining order enjoining LKM from, *inter alia*, transferring LKM's interests in FL Mobile Jutian Technology Co., Ltd. ("FL Mobile") pending a hearing on the Receiver's application for a preliminary injunction and appointment of the Receiver. Dkt. 7. LKM had entered into a Share Purchase Agreement in March 2017 to sell a 63% interest in FL Mobile to Tongfang Investment Fund Series SPC ("Tongfang"). Dkt. 228 ¶¶8-10; 228-4 (Share Purchase Agreement); Dkt. 290 ¶108(a)-(b).

---

[1] All citations to "Dkt. _" refer to documents filed in this action on ECF at the referenced ECF Docket No.

The Receiver was appointed pursuant to an Order entered on February 1, 2019 (the "Appointment Order"). Dkt. 26. The Appointment Order directed the Receiver to "take any act necessary to preserve and safeguard the Company's assets, including monitoring and, if necessary to prevent dissipation, taking sole control over the Company's assets, subsidiaries, and bank accounts." Dkt. 26 at §II(2)(a). The Receiver retained Lilin "Francis" Guo as his agent to collect and preserve LKM's assets in China and Hong Kong. Decl.[2]  ¶14; Dkt. 32 ¶10; Dkt. 142-1.

### B.    The Court ordered the Receiver to account.

In her March 9, 2022 Report & Recommendation (the "R&R"), Magistrate Judge Freeman's recommended that the Receiver be discharged. The basis for discharge was Plaintiff's filing of a Second Amended Complaint on October 5, 2020 which asserted only direct claims. Decl. ¶¶71, 72; Dkt. 275 at 42 (recommendation no. 2). The R&R further recommended that the Court require "the Company to pay the *reasonable* costs incurred by the Receiver in the performance of his duties authorized by the Court up to October 5, 2020" and that the parties should "brief the question of whether the cost of the Receiver's activities after that date should be borne by the Company or Baliga." Dkt. 275at 42 (recommendation no. 5) (emphasis added).

The Court adopted this recommendation in its August 25, 2022. Dkt. 331. In its Order, the Court agreed with Magistrate Judge Freeman "that Baliga should bear costs of the receivership that 'would not have arisen but for [the continuation of the Receiver's appointment after October 5, 2020],' but even as to the period after October 5, 2020, 'expenses that the corporation would have had to incur had there been no receiver, and expenses that confer[red] a genuine benefit upon the corporation, should be charged to it.'" Dkt. 331 at 19.

The Receiver filed his accounting on November 18, 2022. Dkt. 375, 376. In his Accounting,

---

[2]  All citations to "Decl. ¶_" refer to the Declaration of Michael James Maloney dated February 3, 2023. Dkt. 394. References to "Ex. _" refer to the exhibits attached thereto.

the Receiver set forth his accounting of "receipts" recovered during the period of the receivership. The Receiver reports gaining access to multiple LKM bank accounts in Texas, Hong Kong, and mainland China. Dkt. 376 at ¶12. The Receiver reports recovering cash from these accounts in the amount of $371,568.29. Dkt. 376 ¶12. The Receiver also reports recovering funds from LKM's "commercial partners," which include Apple Inc., "DAPP Global Limited," Facebook Ireland Ltd., ACH-Google LLC, and PayPal, Inc. Dkt. 376 ¶14. These "commercial partners" are the application publishers that provided application developer accounts to LKM, which LKM used to publish, maintain, and generate revenue from its smartphone apps. Decl. ¶37. Total cash recovered from LKM's "commercial partners" is reported as $1,832,987.80. The Receiver reports total receipts of $2,204,556.09 and claimed expenses of $3,231,673.47.

### C.    The Receiver failed to meet his burden to account for expenses.

The Receiver claims expenses for himself and his law firm, SLG, in the amount of $2,472,415.86. In support of these claimed expenses, the Receiver submitted copies of time entries that were entirely redacted except for hourly rates and time expended on each entry. Dkt. 376-4. The Receiver failed to provide contemporaneous records describing the nature of the work performed or an index identifying the professionals who performed the work and their respective qualifications. The Receiver also claims fees charged by Hong Kong co-receiver in the amount of $235,594.00 and fees for other counsel and translators in the amount of $505,554.10. All of the back-up for these expenses are also redacted except for the hourly rates and time expended on each entry. Dkt. 376-5, 376-7, and 376-8 at 1-27. The redacted entries fail to describe the nature of the work performed.

Without unredacted contemporaneous records describing the nature of the work performed and the role and qualifications of the professionals attached to each entry, it is impossible to evaluate the necessity or reasonableness of any of the work reflected in those time entries.

The Receiver also claims Hong Kong International Arbitration Centre ("HKIAC") arbitration fees of $15,000 and Cayman registrar fees in the amount of $3,109.51. The supporting materials for these claims were not redacted. Dr. Shi does not object to these unredacted expenses.

Total expenses incurred by the Receiver amount to $3,231,673.47. Dr. Shi objects to $3,213,563.96 of the claimed expenses.

### D. The Receiver failed to account for any of the valuable assets that came into his possession and control during the receivership.

#### 1. The Receiver failed to account for Beijing Technology and LKM's other interests in China.

At the time the Receiver was appointed, LKM conducted its operations in China principally through its wholly owned subsidiary NQ Mobile (Beijing) Co., Ltd. (also translated as NQ Infinity (Beijing) Technology Co. Ltd.) ("NQ Mobile") and its consolidated affiliate Beijing NQ Technology Co., Ltd. (also translated as Beijing Tianxia Technology Co. Ltd.) ("Beijing Technology"). Decl. ¶18. LKM's rights to Beijing Technology were secured through "variable interest entity" ("VIE") contracts. Decl. ¶¶85-91. Beijing Technology generated annual revenues of ¥68,000,000 (approximately USD $10,000,000) and, therefore, was a valuable asset of LKM. Beijing Technology also held interests in several other Chinese companies. Shi Decl.[3] ¶5.

In or around March 2019, the Receiver granted Mr. Guo—as agent to the Receiver—authority to take possession and control of LKM's assets in China. Decl. ¶¶15, 16, 55-61 and Exs. 1-7. In December 2019, Mr. Guo obtained control over LKM's wholly owned subsidiary NQ Mobile. Decl. ¶¶55-61. Mr. Guo then used his control over NQ Mobile to gain control over Beijing Technology in April 2019 by appointing his agent, Nie Youdi, as legal representative and transferring to himself 59.675% of the shares of Beijing Technology. Decl. ¶¶55-61 and Ex. 6. Mr.

---

[3] All citations to "Shi Decl. ¶__" refer to the Declaration of Vincent Wenyong Shi dated February 3, 2023. Dkt. 395.

Guo also assumed control over LKM's other subsidiaries NQ Wireless and Link Motion Technology. Decl. ¶¶55-61.

Because Mr. Guo was retained as the Receiver's agent, the Receiver is obligated to account for the LKM assets that came into Mr. Guo's possession and control. The Receiver's Accounting fails to account for the revenues and other assets of Beijing Technology, NQ Mobile, NQ Wireless, and Link Motion Technology.

>    2.    The Receiver failed to account for the Tongfang Note

At the time of appointment, LKM held a Senior Note (the "Tongfang Note") issued by Tongfang, a Cayman Islands segregated portfolio company, in the amount of ¥1,770,000,000. Decl. ¶28, Ex. 9. The Tongfang Note was received by the Company in consideration of LKM's agreement to sell its interest in FL Mobile to Tongfang. Decl. ¶30; Dkt. 228-4 (Share Purchase Agreement); Dkt. 290 ¶108(a). By way of a special purpose VIE structure, LKM retained rights over and a security interest in FL Mobile pending payment in full of the Tongfang Note. Dkt. 290 ¶¶108(b)-(c); 228-5 (Supplemental Agreement providing for escrow of shares). The Tongfang Note matured on December 14, 2018 and provided for a grace period of between 15 to 30 days. Ex. 9 at 9 (*see* Annex ¶ 1.3) and 10 (Annex ¶ 4.1(a)-(b)). The Tongfang Note was valuable asset of LKM. The Receiver failed to account for any actions or omissions to preserve the value of the Tongfang Note. In particular, the Receiver failed to account for any efforts to commence an action or arbitration to collect on the Tongfang Note.

>    3.    The Receiver failed to account for LKM's application developer
>            accounts with Apple Inc. and Google Inc.

LKM owned certain application developer accounts with smartphone application publishers such as Apple Inc. and Google Inc. Decl. ¶37. LKM's developer accounts with Apple and Google were the means by which LKM published, maintained, and received income from its

smartphone applications. Dkt. 387 ¶¶28-30. LKM's developer application accounts required the payment of annual fees. Dkt. 387 ¶¶28-30. LKM's smartphone applications also required regular maintenance and updates in order to continue generating revenue from users. Dkt. 387 ¶¶28-30.

The Receiver obtained possession of LKM's application developer accounts with Apple and Google no later than September 2019. Decl. ¶39; Dkt. 100. The Receiver failed to account for the actions he took to preserve the value of these accounts, which ordinarily include the payment of annual fees and retention of professionals to maintain and update the smartphone applications.

### E. The Receiver acted recklessly and with gross negligence by giving Mr. Guo control over LKM's assets in China without appropriate safeguards.

Before appointment of the Receiver, LKM secured its rights over Beijing Technology through VIE contracts with NQ Mobile and the individual shareholders of Beijing Technology. Decl. ¶85. The purpose of VIE contracts is to comply with Chinese law governing foreign ownership of technology companies while ensure the rights of foreign investors. Decl. ¶85. These contracts are widely used by international companies with operations in China. Decl. ¶86.

The Receiver granted Mr. Guo free and unencumbered control over all of LKM's rights to Beijing Technology without requiring Mr. Guo to execute any of the typical VIE contracts ordinarily required to preserve LKM's interests and without obtaining any other form of security or safeguards in favor of LKM or rights of reversion to the Receiver. Decl. ¶¶87-92.

Using the authority and control granted to him by the Receiver, Mr. Guo appointed his agent, Nie Youdi, as legal representative of Beijing Technology and transferred to himself 59.675% of the shares of Beijing Technology, making Mr. Guo the outright majority owner and controller of Beijing Technology and all of its assets. Decl. ¶¶23, 57, Ex. 6. Beijing Technology generated annual revenues of ¥68,000,000 (approximately USD $10,000,000). Shi Decl. ¶5. Beijing Technology also held a 100% interest in Xinjiang NQ and interests in several other Chinese

companies. Ex. 6 at 3-4.[4]  These interests have substantial value and are now under the control of Mr. Guo. Because Beijing Technology was transferred to Mr. Guo without the protections afforded by typical VIE contracts, neither the Receiver nor LKM has any legal basis for recovery of that company or its assets.

In June 2019, the Receiver made an *ex parte* application to the Court for approval of "compensation incentive agreement and promissory note" with Mr. Guo. Decl. ¶79; Dkt. 71. While the terms of this contract remain sealed, subsequent proceedings have revealed that its true purpose was to "convert" Mr. Guo's "compensation" into shares of Class B common stock of LKM. Decl. ¶80. Nothing in the available record suggests that the Receiver took any efforts to require Mr. Guo to sign contracts providing for typical VIE protections, rights of reversion to the Receiver, or any other safeguards to protect LKM's interests in Beijing Technology.

**F.    The Receiver's pre-October 5, 2020 actions were unnecessary, unreasonable, and outside the scope of his authorized duties.**

In the Accounting, the Receiver claims expenses for work performed by his law firm, SLG, before October 5, 2020. Before November 2020, the Receiver's law firm, SLG, also represented Plaintiff. Decl. ¶¶63-66. During the pre-October 5, 2020 period, the Receiver and SLG spent substantial time (i) attacking China AI's share ownership and standing to bring a motion to intervene to seek dismissal of the derivative claims based on Plaintiff's lack of standing and (ii) supporting Plaintiff's other litigation activities concerning his derivative claims. Decl. ¶¶67-68. These activities were not in furtherance of the receivership but were part of SLG's representation of the Plaintiff. Thus, that portion of the Receiver's expense claims concerning activities directed against China AI and in representation of Plaintiff during the pre-October 5, 2020 period must be rejected as unnecessary and outside the scope of the receivership.

---

[4]  The section translated as "overseas investment" refers to Beijing Technology's interests in other companies.

**G.    The Receiver's post-October 5, 2020 actions were unnecessary, unreasonable, and failed to confer a genuine benefit upon the Company.**

In his Accounting, the Receiver sets forth a list of his post-October 5, 2020 activities. Dkt. 376 ¶ 38(a)-(bb). The following post-October 5, 2020 activities are unnecessary, unreasonable, and did not confer a benefit on the Company:

1.    Activities concerning the Receiver's efforts to call and extraordinary general meeting ("EGM") of the shareholders of LKM.

In his submissions, the Receiver claimed that it was necessary to call an EGM to remove Dr. Shi as a director of LKM and appoint Mr. Guo in his place. Decl. ¶74(a); *see*, *e.g.*, Dkt. 188. The Receiver claimed that this was necessary to obtain control over LKM assets in China. Decl. ¶75; Dkt. 188 at 1. But the Receiver's claims are refuted by the public records in China, which show that Mr. Guo did, in fact, obtain control over all of LKM's WFOEs and VIE companies no later than December 2019. Decl. ¶¶55-61, 75. In fact, Mr. Guo successfully transferred majority ownership of Beijing Technology to himself by December 2019 at the latest. Ex. 6. Accordingly, the Receiver's EGM activities were neither necessary nor conferred a genuine benefit on LKM.

2.    Activities concerning China AI Capital Ltd.'s ("China AI") share ownership and subscription agreement.

The Receiver improperly pursued claims against China AI for a purported breach of the terms of its Subscription Agreement with LKM because China AI did not make the second installment payment of $10,000,000. Decl. ¶74(b); Dkt. 194, 205. LKM never satisfied the condition precedent in the Subscription Agreement (as amended) of LKM filing its Form 20-F annual report for 2018 and becoming current on its S.E.C. reporting obligations. Decl. ¶76; Dkt. 209, 209-1. Accordingly, there was never any basis to assert a breach by China AI and the Receiver's China AI activities were unnecessary and failed to confer a benefit upon the Company.

3.    Opposing the motion to discharge the Receiver.

10

Dr. Shi first filed a motion to discharge the Receiver on November 4, 2020. Dkt. 180. The motion to discharge the Receiver was based on the fact that Plaintiff had withdrawn his derivative claims on October 5, 2020 and, therefore, there was no basis to continue the receivership. *See* Dkt. 183. Under Cayman law, Plaintiff was not a registered shareholder and lacked standing to assert the derivative claims alleged in his original and first amended pleadings. Dkt. 183 at 5-6. The Receiver's preparation of papers in opposition to the motion to discharge the Receiver, Dkt. 239, were unnecessary because it was the Receiver's law firm, SLG, that represented the Plaintiff in connection with Plaintiff's false allegations of derivative standing in the Complaint and First Amended Complaint. Thus, the Receiver's actions in opposing the motion to discharge was actually in further of SLG's representation of Plaintiff, not the receivership.

### 4. Activities concerning conversion of ADSs into registered shares of LKM stock.

In December 2020 and May 2022 (Dkt. 195, 200, 304), the Receiver requested Court approval to convert Plaintiff's ADSs into registered shares of stock. Decl. ¶74(c). The Receiver's activities seeking to convert ADSs into registered shares of LKM stock were unnecessary because, as the Court observed in multiple rulings, the conversion of ADSs was outside the scope of the action. Dkt. 221, 252, 331 at 21-22.

### 5. Responding to Dr. Shi's motion to unseal documents.

The Receiver's activities to oppose Dr. Shi's motion to unseal documents were entirely unnecessary because it is the Receiver's statutory obligation to maintain records and permit inspection by any interested party. 28 U.S.C. § 3103(d); NY CPLR 6404.

### 6. Responding to Dr. Shi's demand for inspection of receivership records.

The Receiver's activities to oppose Dr. Shi's demand for review of receivership records were entirely unnecessary because it is the Receiver's statutory obligation to maintain records and

permit inspection by any interested party. *See* 28 U.S.C. § 3103(d); NY CPLR 6404.

**H.    The Receiver's veil-piercing arguments lack merit.**

     1.     <u>Neither the pleadings filed in this action nor the Appointment Order require Dr. Shi personally to fund the Receivership.</u>

Plaintiff has filed three pleadings in this action. Dkt. <u>1</u>, <u>65</u>, <u>166</u>. None of these pleadings asserted veil-piercing claims or otherwise requested that Dr. Shi be found personally liable to fund costs of the Receivership. The Appointment Order provided that "the *Company* shall be responsible for funding the Receivership Account. . . ." (emphasis added).

     2.     <u>There is no basis to expand the scope of the Receiver's powers and authority at this late stage.</u>

On August 25, 2022, the Court granted Dr. Shi's motion to discharge the Receiver and dissolve the preliminary injunction. Dkt. <u>331</u>. In the Decision and Order, the Court adopted Magistrate Judge Freeman's R&R (Dkt. <u>275</u>), finding that the filing of Plaintiff's Second Amended Complaint on October 5, 2020 warranted dissolution of the preliminary injunction and discharge of the Receiver. Dkt. <u>331</u>. The Court adopted the Report and Recommendation, in full, including the "recommendation that during the remaining period of the receivership the Receiver should be focused on maintaining the Company's status quo." Dkt. <u>386</u>, *citing* Dkt. <u>275</u> at 41 and Dkt. <u>331</u> (quotations omitted). The Receiver's new request to commence a veil-piercing claim would be a change to the status quo.

     3.     <u>The Receiver's claims of domination and diversion of assets are refuted by documentary evidence.</u>

In his November 18, 2022 brief, the Receiver argues that Dr. Shi dominated LKM and used this domination to frustrate the receivership and transfer LKM assets for his own benefit. Dkt. <u>375</u> at 9-10, 16-20. As detailed below, the Receiver's assertions are baseless:

     a.     <u>Dr. Shi did not dominate LKM.</u>

At the time this case was commenced in December 2018, Dr. Shi was one of eight members of the Board of Directors of LKM. Dkt. 387, Jan. 18, 2023 Shi Decl.[5]  ¶8. Dr. Shi was not a direct shareholder of LKM. Dkt. 130-1 (shareholder registry). Dr. Shi was the acting Chief Operating Officer of the Company, but he had no signatory authority over any of the Company's bank accounts and has not had such access since before the Company's initial public offering in 2015. *See* Dkt. 387, Jan. 18, 2023 Shi Decl. ¶¶9-10. The Receiver refers to Chinese public records purporting to show Dr. Shi as the individual with financial control over LKM. Dkt. 161 at 2. But these records are mischaracterized. They stand only for the proposition that Dr. Shi was still listed as the Chairman of the Board of Directors of LKM at the time those records were accessed. Dkt. 387, Jan. 18, 2023 Shi Decl. ¶20. Access to LKM's bank accounts was under the control of Mr. Xu Zemin, who was the registered legal representative of those entities and their accounts until removed by Mr. Guo in or around 2019 and 2020. Dkt. 387, Jan. 18, 2023 Shi Decl. ¶10; Dkt. 155-14 (Chinese court ruling finding the Mr. Xu was originally controller of the WFOE's bank account). In China, transactions in a bank account cannot be performed with consent of the registered legal representative of the account holder. Dkt. 387, Jan. 18, 2023 Shi Decl. ¶10.

After the Receiver was appointed, Dr. Shi's access to company offices and resources was terminated. Dkt. 387, Jan. 18, 2023 Shi Decl. ¶13. Dr. Shi had no authority or power over Mr. Xu. Dkt. 387, Jan. 18, 2023 Shi Decl. ¶23.

b.  Dr. Shi did not strip any assets from LKM.

The Receiver claims that "[b]etween May and November 2019, Dr. Shi transferred approximately ¥626 million RMB (at the time valued at over $89 million) from the WFOE accounts to an account owned by an LKM subsidiary under his control." Dkt. 375 at 10,

---

[5] All citations to the "Jan. 18, 2023 Shi Decl." refers to the Declaration of Vincent Wenyong Shi dated January 18, 2023. Dkt. 387.

subparagraph (h). The WFOEs that the Receiver is referring to are NQ Mobile and NQ Unlimited (a/r/a NQ Wireless). Dkt. 387, Jan. 18, 2023 Shi Decl. ¶18; Dkt. 161; Dkt. 388; Jan. 18, 2023 Maloney Decl.[6] ¶22.[7] In support of this claim, the Receiver cites to the July 19, 2021 declaration of Mr. Guo (Dkt. 239-1) and a July 20, 2020 letter from the Receiver attaching records purporting to show certain funds transfers. Dkt. 161. The Receiver claims these transfers were for the personal benefit of Dr. Shi. This claim is false for two reasons.

First, the transfers at issue in the Receiver's claim were made by Mr. Xu from the account of NQ Mobile to the account of NQ Unlimited to facilitate the repayment of a prior existing loan with CMB. Dkt. 387, Jan. 18, 2023 Shi Decl. ¶19; Dkt. 161; Dkt. 388, Jan. 18, 2023 Maloney Decl. ¶22. None of the records show any transfers to Dr. Shi personally. Dkt. 387, Jan. 18, 2023 Shi Decl. ¶19; Dkt. 161; Dkt. 387, Jan. 18, 2023 Shi Decl. ¶24; Dkt. 388, Jan. 18, 2023 Maloney Decl. ¶¶17-22; Dkt. 388-2, 388-3, 388-4, 388-5. In May 2018, LKM took out a loan from CMB in order to repay a prior loan obligation. Dkt. 387, Jan. 18, 2023 Maloney Decl. ¶¶17-22; Dkt. 388-2, 388-3, 388-4, 388-5. To obtain the May 2018 loan, LKM pledged a letter of credit the account of NQ Unlimited (maintained by CMB). Dkt. 388-2, 388-3, 388-4, 388-5. Mr. Xu signed the loan documents on behalf of NQ Unlimited. Dkt. 388, Jan. 18, 2023 Maloney Decl. ¶19; 388-2, 388-4, 388-5. The first loan payments came due in or around May 2019. Dkt. 388, Jan. 18, 2023 Maloney Decl. ¶20; Dkt. 388-2 at 4 (see definition of "repayment date"). Dr. Shi did not initiate or cause any of the transfers referred to in Dkt. 161. Dkt. 387, Jan. 18, 2023 Shi Decl. ¶22. Mr. Xu independently made transfers from the NQ Mobile account to the account of NQ Unlimited in

---

[6] All citations to the "Jan. 18, 2023 Maloney Decl. _" refer to the Declaration of Michael James Maloney dated January 18, 2023. Dkt. 388.

[7] In Dkt. 161, the Receiver refers to a "Beijing NQ Mobile Technology Limited," but comparison of the accountholder name on the records submitted with Dkt. 161 and LKM loan documents (Exs. C, D, and E) shows that the Receiver's translation was incorrect and the relevant accountholder was NQ Unlimited.

order to repay the May 2018 loan. Dkt. 387, Jan. 18, 2023 Shi Decl. ¶¶10, 20-24.

In 2019, control over LKM subsidiaries was transferred from Mr. Xu to Mr. Guo and his appointee Nie Youdi. *See, e.g.*, Decl. ¶¶55-61; Exs. 1-7; Dkt. 387, Jan. 18, 2023 Shi Decl. ¶11. At or around the same time, Mr. Guo obtained control over the bank accounts of these entities, including accounts for NQ Mobile and NQ Unlimited. Dkt. 387, Jan. 18, 2023 Shi Decl. ¶14; Dkt. 376 ¶¶10-12 (stating that the Receiver recovered cash from the accounts of LKM and its WFOEs); Dkt. 155-14 (Chinese court ruling awarding control over WFOE accounts to Mr. Guo). Despite access to these accounts and their records, Mr. Guo and the Receiver have failed to submit any records showing any transfers to Dr. Shi personally. Moreover, the NQ Wireless (a/r/a NQ Infinity and NQ Unlimited) account referenced in Dkt. 161 was restricted by CMB's security interest and, therefore, funds in that account could not have been transferred out of CMB during the May 2019 to November 2019 period. *See* Dkt. 388 ¶¶19-21; 388-3, 388-4, 388-5. Afterwards, these accounts were under the control of Mr. Guo and his appointee Nie Youdi. Decl. ¶¶55-61.

Second, Dr. Shi never had signing authority on the accounts in question. Dkt. 387, Jan. 18, 2023 Shi Decl. ¶¶9-10; Dkt. 155-14 (noting that Mr. Xu had originally had control over WFOE account as the registered legal representative). Without signatory authority, Dr. Shi could not access or make transfers in the accounts. Dkt. 387, Jan. 18, 2023 Shi Decl. ¶21. These accounts were controlled by Mr. Xu Zemin at the time of the transfers. Dkt. 387, Jan. 18, 2023 Shi Decl. ¶¶9, 10, 22; Dkt. 155-14. The Receiver claims that Mr. Xu is a "close associate" of Dr. Shi but this claim also is not supported by the record, which shows that Mr. Xu acted independently of Dr. Shi and was represented by his own counsel in China. *See* Dkt. 61-1, 61-2, 155-12 (Chinese court papers filed by Mr. Xu without the involvement of Dr. Shi).

The Receiver also claims that Dr. Shi formed a new company and "divert[ed]" revenues

from LKM. In support, the Receiver cites the March 28, 2019 Affidavit of Matt Mathison, Dkt. 50, in which Mr. Mathison, a disgruntled former employee of LKM, makes allegations against Dr. Shi based on hearsay communications with an unnamed individual in China and photos of files in boxes. Dkt. 50 ¶9.[8]  Mr. Mathison noted that LKM published many smartphone apps in China that generate revenue through Apple and Google. Dkt. 50 ¶7. He then alleged that Dr. Shi seized control of the apps and redirected revenue from LKM's Apple and Google accounts to his own personal benefit. Dkt. 50 ¶9. This is false. Indeed, Mathison's speculative allegation is contradicted by an email submitted with his affidavit, which states that the app accounts are controlled by "Wu Xiaohua," not Dr. Shi. Dkt. 50-4 at 1.

In any case, the Receiver admits that he has control over the Apple and Google accounts (since no later than September 2019) and has recovered $1,832,987 from these accounts. *See* Dkt. 100; Dkt. 376 ¶¶13-14. But the Receiver fails to describe any action that he took to maintain and preserve the apps published on the Apple and Google smartphone application platforms.

### 4.    Dr. Shi did not forfeit any defense against the Tongfang claim.

The Receiver refers to a February 8, 2022 status report letter, Dkt. 269, in support of his claim that, by emails sent during the period May 2019 to December 2019, Dr. Shi intentionally defaulted an arbitration claim brought by Tongfang against LKM and one of its WFOEs (the "Tongfang v LKM Arbitration"). Dkt. 375 at 10-11 subpara. (m). The arbitration related to a claim by Tongfang for breach of the March 2017 share purchase agreement between Tongfang, LKM, and one of LKM's WFOEs. Dkt. 228-14 (final award). This claim by the Receiver is unsupportable because the email communications on which it rests were sent from an LKM email server that was under the control of Mr. Guo and the Receiver at the time the emails were sent. Dkt. 388 ¶26; Dkt.

---

[8]  LKM terminated Mr. Mathison's employment in October 2018 for cause and he commenced a retaliation claim against LKM before OSHA. Dkt. 388 ¶33.

388-6.[9] Dr. Shi did not have access to those corporate LKM email addresses when the emails were sent to the arbitrator in the Tongfang v LKM Arbitration. Dkt. 388-6. Dr. Shi's sworn statements are corroborated by the findings in the final award issued in the arbitration *Zhongzhi Hi-Tech Overseas Investment Ltd. ("Zhongzhi") v. Vincent Wenyong Shi*, Case No. HKIAC18222 (the "Zhongzhi v. Shi Arbitration"), where the arbitrator acknowledged an April 2019 request by Dr. Shi that communications be sent to his personal email address and a later request by Zhongzhi that Dr. Shi's former corporate email addresses be removed from circulation because it believed that LKM was using those emails without Dr. Shi's knowledge. Dkt. 228-14 ¶¶14, 15, 28, n.12 and n.13. In any event, LKM had no defense to Tongfang's breach of contract claim, which ripened as a direct result of the commencement of this action, the entry of the preliminary injunction, and the Receiver's wrongful termination of the FL Mobile transaction. *See* Dkt. 228-14; Dkt. 43 ¶4.

> 5. The remainder of the Receiver's claims fail to support his veil-piercing claim.

The remainder of the Receiver's claims are a mix of general and conclusory assertions that Dr. Shi failed to cooperate with the Receivership. His complaints mischaracterize the facts. For example, the Receiver claims that a lawsuit commenced by Mr. Xu in China was controlled by Dr. Shi and was brought to frustrate the receivership. Dkt. 375 at 10 (*see* subpara. (g)). But the filings in the Chinese court show that (i) the lawsuit was brought by Mr. Xu, not Dr. Shi, (ii) Mr. Xu brought the lawsuit because Mr. Guo had forged Mr. Xu's signature, (iii) Dr. Shi was not a party to that litigation, and (iv) Mr. Xu was represented by his own counsel. Dkt. 61-1, 61-2, 155-12.

The Receiver's complaints of Dr. Shi's purported failure to provide documents and interference with employees are unsupported by any credible evidence. *See* Dkt. 50 (declaration of Mathison). At most, the Receiver offers hearsay from unidentified individuals and photos of

---

[9]  This document is a copy of a Declaration of Vincent Wenyong Shi dated October 24, 2022.

files in cardboard boxes. *See* Dkt. 50-5 at 5-9. The Receiver's agents clearly had access to the files in order to photograph them. *See id*. The fact that Dr. Shi challenged service of process in this action is also not a basis for personal liability because he had a legitimate basis to challenge service of process. *See* Dkt. 64 (dismissing claims against Dr. Shi for lack of service).

The Receiver's claims of lack of cooperation are undercut by the fact that Dr. Shi never appeared in or opposed any of the foreign legal proceedings commenced by the Receiver for recognition of the receivership in Hong Kong or the Cayman Islands. Dkt. 387 ¶12. Dr. Shi also took no action to interfere with the Receiver's action to assume control over LKM's Chinese WFOEs and the VIEs. Dkt. 387 ¶12; *see also* Dkt. 61-1, 60-2, 155-14 (Dr. Shi did not participate in the China litigation involving Mr. Xu).

## ARGUMENT

**POINT I.  THE COURT SHOULD REJECT $3,213,563.96 OF THE RECEIVER'S EXPENSE CLAIMS.**

**A.  The Receiver's expense claims should be rejected because he has failed to submit adequate supporting records.**

It is the "receiver's burden to justify his account." *Sherry v. United States Bank Nat'l Ass'n*, 662 F. App'x 39, 41 (2d Cir. 2016). A court-appointed receiver justifies his account by providing records and evidence justifying the expenses incurred and explaining the necessity of the services. *See JDM Long Island, LLC v. U.S. Bank Nat'l Ass'n*, No. 10-CV-5564(JS)(AKT), 2014 U.S. Dist. LEXIS 163320, at *11 (E.D.N.Y. Nov. 21, 2014); *Key Bank v. Anton*, 241 A.D.2d 482, 484 (NY App. Div. 2d Dep't 1997) (order approving accounting reversed and matter remanded for a hearing on the ground that the receiver failed to provide records or other evidence justifying the expenses incurred or "explain[ing] [] the necessity of the services").

When assessing a receiver's fee application, "'the considerations are the time, labor and skill required, but not necessarily that actually expended, in the proper performance of the duties

imposed by the court upon the receivers, the fair value of such time, labor and skill measured by conservative business standards, the degree of activity, integrity and dispatch with which the work is conducted and the result obtained.'" *United States v. Code Prods. Corp.*, 362 F.2d 669, 673 (3d Cir. 1966), quoting *Coskery v. Roberts & Mander Corp*, 200 F.2d 150, 154 (3d Cir. 1952). "[I]n fixing allowances for services to court officers, [judges] should be most careful, and [] vicarious generosity in such a matter could receive no countenance." *In re Gilbert*, 276 U.S. 294, 296 (1928).

Here, the Receiver has submitted only redacted copies of his time records. Without access to unredacted records, it is impossible to consider the reasonableness, necessity, and "the fair value of such time, labor and skill" of the work performed by the Receiver. *Code Prods. Corp.*, 362 F.2d at 673. For this reason, federal courts routinely reject applications to seal attorney fee applications, *see*, *e.g.*, *NetSoc, LLC v. Chegg Inc.*, No. 18-CV-10262 (RA), 2020 U.S. Dist. LEXIS 232321, at *11-12 (S.D.N.Y. Dec. 10, 2020); *Kaisha v. Lotte Int'l Am. Corp.*, Civil Action No. 15-5477 (MCA) (LDW), 2019 U.S. Dist. LEXIS 71754, at *3 (D.N.J. Apr. 26, 2019) (listing cases). The Second Circuit requires fee applicants to submit records that "specify, for each attorney, the date, the hours expended, and *the nature of the work done*." *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983) (emphasis added); *see also Scott*, 626 F.3d at 133. Failure to submit records specifying "the nature of the work done" requires denial of the fee application. *Carey*, 711 F.2d at 1154; *see Genn v. New Haven Bd. of Educ.*, No. 3:12-cv-00704(CSH), 2017 U.S. Dist. LEXIS 73348, at *5 (D. Conn. May 15, 2017) (collecting cases).

The Receiver's redacted records fail to show the "the nature of the work done," identities and roles of the timekeepers, and their respective qualifications. The nature of the work done is critical in a case like this where the Receiver's law firm, SLG, represented both the Receiver and the Plaintiff. Only expenses incurred for the receivership are justified; the Receiver

is not entitled to charge Plaintiff's legal fees to the Company. *See Code Prods. Corp.*, 362 F.2d at 673, quoting *Coskery*, 200 F.2d at 154; *In re Gilbert*, 276 U.S. at 296.

The Receiver's conclusory summary of the work performed (Dkt. 375 ¶¶21, 38) does not meet the standard required in the Second Circuit. *Genn*, 2017 U.S. Dist. LEXIS 73348, at *5 (collecting cases). Confirmation of the Receiver's account without records sufficient to evaluate the reasonableness or necessity of the work performed would be the type of "vicarious generosity" to receivers that the Supreme Court rejected in *In re Gilbert*. 276 U.S. 294, 296 (1928).

**B.    Claims for the Receiver's pre-October 5, 2020 activities should be rejected as unnecessary and unreasonable.**

None of the Court's previous rulings address the reasonableness or necessity of the Receiver's pre-October 5, 2020 expense claims. The Receiver is, therefore, still obligated to demonstrate the necessity and reasonableness of his pre-October 5, 2020 activities. *See Sherry*, 662 F. App'x at 41; *JDM Long Island, LLC*, 2014 U.S. Dist. LEXIS 163320, at *11; *see also In re Gilbert*, 276 U.S. 294, 296 (1928); *Code Prods. Corp.*, 362 F.2d at 673, quoting *Coskery*, 200 F.2d at 154.

The Receiver describes his pre-October 5, 2020 activities in general terms of "negotiating" with shareholders, "gain[ing] control," "interviewing many employees," "investigating," and "initiating a series of legal actions." Dkt. 375 ¶21. But these generic terms without more fail to demonstrate the necessity of any of the pre-October 5, 2020 activities claimed in the Accounting. *See Carey*, 711 F.2d at 1148; *Genn*, 2017 U.S. Dist. LEXIS 73348, at *5 (collecting cases). The Receiver has also failed to demonstrate the reasonableness of the time he and his associated professionals spent on the pre-October 5, 2020 tasks. Accordingly, the Receiver's pre-October 5, 2020 expense claims must be rejected.

**C.      Claims for post-October 5, 2020 activities should be rejected as unnecessary, unreasonable, and failing to confer a genuine benefit on the Company.**

In addition to the Receiver's inherent duty to account for his activities, the Court has already ruled that Plaintiff is liable for any of the Receiver's post-October 5, 2020 activities that "do not confer a genuine benefit on the Company." Dkt. 331 at 19. Here, the Receiver engaged in numerous activities after October 5, 2020 that failed to confer any genuine benefit to the Company. The Receiver's actions to call and EGM to appoint Mr. Guo were entirely unnecessary. An EGM was not necessary to transfer control of the WFOEs and VIEs to Mr. Guo because he already had control over those entities. Similarly, the Receiver's actions to convert ADSs into registered shares were outside the scope of the action and designed only to transfer power and control to Mr. Guo.

**POINT II.   THE RECEIVER SHOULD BE SURCHARGED FOR LOSS OF COMPANY ASSETS.**

A receiver owes a fiduciary duty "to care for the property and manage it for the creditors, to act with assiduity and with reasonable competence." *In re C.M. Piece Dyeing Co.*, 89 F.2d 37, 40 (2d Cir. 1937) (Hand, C.J.). A receiver must report and account for all property that "he has received, and give the reason why, if any, he failed to receive and account for any or all the property as ordered by the court." 3 Clark, TREATISE ON THE LAW & PRACTICE OF RECEIVERS (1959) § 699.1, p. 1285 (citation omitted); *see also Gasser v. Infanti Int'l, Inc.*, 2011 U.S. Dist. LEXIS 60526, 2011 WL 2183549, at *24 (E.D.N.Y. June 3, 2011).

Here, the Receiver was ordered to—and did—take possession of LKM's WFOEs and VIEs, the Tongfang Note, and LKM's smartphone application accounts at Apple and Google. Despite the substantial value of these assets, the Receiver failed to account for any of them and it now appears that his agent, Mr. Guo, has ran off with those assets.

The Receiver appears to argue that he is relieved from his duty to account because Mr. Guo has failed to respond to the Receiver's inquiries. This is not a basis to relieve the Receiver of his

fiduciary duties. *In re C.M Piece Dyeing Co.,* 89 F.2d at 40 (it is "an error to . . . negligent administration of an estate" and "a receiver is a fiduciary . . . if his conduct does not match even with the least exacting standards of competence, he will be charged"); *Phelan v. Middle States Oil Corp.,* 154 F.2d 978, 1002 (2d Cir. 1946).

## POINT III.  THE COURT SHOULD REJECT THE RECEIVER'S REQUEST TO PIERCE THE CORPORATE VEIL.

### A.  Cayman Island law does not permit veil piercing as requested by the Receiver.

The Receiver cites New York law in support of his veil-piercing claim on the incorrect assumption that there is no conflict between New York and Cayman law regarding piercing of the corporate veil. But the Cayman Courts, following English law, do not recognize the principle of piercing the corporate veil to hold an owner or controller liable for corporate obligations. *Hurstwood Properties (A) Ltd v Rossendale Borough Council, [2021] UKSC 16* at ¶72. In *Hurstwood*, the United Kingdom Supreme Court recognized the remedy of holding a company liable for the actions of its controller or owner but declined to recognize the principle of piercing the corporate veil to hold a controller or owner liable for company obligations. *Id.* ¶72 ("we are not ourselves convinced that there is any real scope for applying such a principle in the opposite direction so as to hold a person who owns or controls a company liable for breach of an obligation which has only ever been undertaken by the company itself"). The Receiver's request should be rejected on this basis.

### B.  Even if New York law applied to the Receiver's claim, the Receiver's request is procedurally defective.

The Federal Rules of Civil Procedure require claims for relief to be alleged in a pleading in compliance with Rules 7, 8, and 9(b), none of which permit claims to be brought by motion or memorandum of law. While in some cases a pleading can be deemed amended by way of an issue

raised on a motion for summary judgment (*see* *Breeden v. Bennett (In re Bennett Funding Grp., Inc.)*, 220 B.R. 743, 753 (Bankr. N.D.N.Y. 1997)), there must first exist a pleading to amend. The Receiver also has not established any independent basis for jurisdiction over Dr. Shi on a claim for veil-piercing. *Peacock v. Thomas*, 516 U.S. 349, 357-58 (1996); *see* *Epperson v. Entm't Express, Inc.*, 242 F.3d 100, 105 (2d Cir. 2001) (explaining that there must be an independent jurisdictional basis for veil-piercing claims).

The Receiver cannot plead the requisite elements to pierce the corporate veil under New York law. Courts in this district have recognized that "[p]iercing the corporate veil is a 'narrow exception'" and should only be permitted 'under extraordinary circumstances.'" *Apex Mar. Co. v. OHM Enters.*, 2011 U.S. Dist. LEXIS 35707, at *6-7 (S.D.N.Y. Mar. 30, 2011). It is not enough to show complete domination of the corporation; there must also be a showing of a wrongful or unjust act towards the plaintiff. *Morris v. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 142 (N.Y. 1993); *Lakah v. UBS AG*, 996 F. Supp. 2d 250, 267 (S.D.N.Y. 2014) ("[E]ven where multiple . . . factors cut in favor of piercing the corporate veil, courts are highly reticent to do so where evidence of domination is incomplete.").

The Receiver cannot show that Dr. Shi dominated LKM. Dr. Shi was not the registered legal representative of LKM or its subsidiaries and Dr. Shi never had control over the Company's bank accounts. From 2014 through 2019, Mr. Xu was the Company's registered legal representative and controlled the bank accounts. Under Chinese corporate law, the role of legal representative carries significant responsibilities and powers. A person appointed as legal representative for a Chinese company "has the authority to bind a legal entity and [] is personally liable for misconduct." Robert C. Art & Minkang Gu, *China Incorporated: The First Corporation Law of the People's Republic of China*, 20 Yale J. Int'l L. 273, 275, 294 (1995). No transfers in

those accounts could be made without Mr. Xu's consent during the 2015-2019 period.

From 2019 until the present, the Receiver's agent, Mr. Guo, took control of LKM's WFOEs, Chinese VIE operating companies, and their respective bank accounts. As set above, Mr. Guo appointed himself or his agent as registered legal representatives for all the LKM subsidiaries and VIE operating companies.

The Receiver also cannot support his claims of asset stripping. The funds transfers in May through November 2019, identified by the Receiver in his November 18, 2022 memorandum (citing Dkt. 161), were made by Mr. Xu (not Dr. Shi) and related to payments due on a loan from CMB, which held a security interest in the accounts. The records submitted by the Receiver show that the funds were transferred from one LKM-subsidiary account to another LKM-subsidiary account. There are no records of any transfer of funds to Dr. Shi.

The Receiver's early 2019 claims of diverted smartphone app revenue are contradicted by the Receiver's own statements to the Court in which he acknowledges that he obtained control over the relevant Apple, Google, and similar accounts in 2019 (*see* Dkt. 100) and has recovered over $1,832,987 in funds from those accounts (*see* Dkt. 376 ¶¶13-15). Mr. Guo controlled LKM's WFOEs and Chinese operating companies from 2019 to the present. Thus, Mr. Guo is the person who must answer for app revenue during the receivership.

The Receiver's citation to *Fannie Mae v. Olympia Mortg. Corp.*, No. 04 CV 4971 (NG) (MDG), 2006 U.S. Dist. LEXIS 70175, at *6 (E.D.N.Y. Sept. 28, 2006), does not help him. In that case, the question was whether the receiver had stated valid veil-piercing claims in a crossclaim filed against the corporate owners. The case does not support the Receiver's contention that a mere corporate officer who is not an owner may be held liable for debts incurred by a company in receivership. And it does not support the contention that such relief may be awarded before a trial

on the merits. Here, there are no veil-piercing claims pending in any pleading filed in this action and the Receiver no longer has authority to bring new claims.

Also, the receiver in *Fannie Mae* alleged particular facts showing the transfer of corporate funds to the individual defendants. The only transfers cited by the Receiver were transfers of funds, pledged as security to CMB, from one LKM account to another for the purpose of satisfying legitimate corporate obligations owed to CMB. These transfers do not support a claim for piercing the corporate veil.

The Receiver's citation to *Balmer v. 1716 Realty LLC*, No. 05 CV 839 (NG) (MDG), 2008 U.S. Dist. LEXIS 38113 (E.D.N.Y. May 9, 2008), is similarly inapposite. Unlike in *Balmer*, where the principal defendant had "siphoned off millions of dollars," here the funds were transferred between LKM accounts in connection with repayment of a corporate loan. *Id*. at *21.The Receiver acknowledges recovering all of LKM's other funds. Dkt. 376 ¶¶11-14.

Finally, to state a veil-piercing claim, the Receiver must allege that wrongful acts or omissions of Dr. Shi *caused* the Receiver's "injuries." Because the Receiver and Mr. Guo have controlled LKM, its subsidiaries (including the WFOEs), the VIE companies, and their related bank accounts since 2019, 2020, 2021, and 2022, Dr. Shi could not have used any of those entities or accounts to cause injuries to the Receiver.

## CONCLUSION

For all the foregoing reasons, the Court should enter an Order granting the relief requested in the accompanying declaration of Michael James Maloney, dated February 3, 2023, and granting such other and further relief as the Court deems just and proper.

Dated:  New York, New York
        February 3, 2023

Respectfully submitted,

FELICELLO LAW P.C.

By:    */s/ Michael James Maloney*

25

Michael James Maloney
Rosanne E. Felicello
366 Madison Avenue
3rd Floor
New York, New York 10017
Tel. (212) 584-7806
mmaloney@felicellolaw.com
rosanne@felicellolaw.com
*Attorneys for Vincent Wenyong Shi*