# Exhibit E



**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 4 OF 2020 (MRHJ)**

**BETWEEN:**

### ROBERT W. SEIDEN, IN HIS CAPACITY AS
### TEMPORARY RECEIVER OF LINK MOTION INC.

**PLAINTIFF**

**AND:**



### LINK MOTION INC.

**DEFENDANT**

### <u>SUMMONS</u>

LET ALL PARTIES CONCERNED attend before the Judge in Chambers at the Law Courts, George Town, Grand Cayman on the __14th__ day of __July__, 2020, at __9:30am__ upon an application by the Plaintiff for the following orders:

1.     Further to the Court's 3 February 2020 order recognizing the appointment, powers and functions of the Plaintiff in the Cayman Islands:

    (a)     recognizing the power of the Plaintiff to issue 44,702,750 Class B common shares in Link Motion Inc. to Mr Guo Lilin pursuant to the terms of a Secured Convertible Promissory Note dated 18 May 2019 made between Mr Guo and Link Motion Inc. and approved by the United States District Court for the Southern District of New York; and

    (b)     authorizing the Plaintiff to take all necessary corporate actions on behalf of Link Motion Inc. to issue and allot the shares as described above in paragraph 1(b) and to enter, or cause to be entered, the issuance and allotment of the shares on Link Motion Inc.'s Register of Members.

2.     Pursuant to Order 63, rule 3(4) of the Grand Court Rules, directing that all documents filed with the Court in connection with this application, including this summons, the Second Affidavit of Robert W. Seiden sworn 19 June 2020, Exhibit RWS-2, and any

1

order made on the application, be sealed on the Court file and not open to inspection by any party or person other than the Plaintiff except with leave of the Court granted on an application made on at least 7 business days' notice to the Plaintiff.

3.      Such further orders or directions as counsel may advise or the Court considers just.

DATED this 19th day of June, 2020.

**KSG ATTORNEYS AT LAW**
Attorneys for the Plaintiff

TO:                     The Registrar of the Financial Services Division

TIME ESTIMATE:          The estimated length for the hearing of this summons is 0.5 hours.

This Summons was issued by KSG Attorneys at Law, attorneys for the Plaintiff, whose address for service is 4th Floor Harbour Centre, 42 North Church Street, PO Box 2255, Grand Cayman KY1-1107, Cayman Islands [MR/1550]

2



**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

<div align="right">

**CAUSE NO: FSD 4 OF 2020 (MRHJ)**

</div>

**BETWEEN:**

<div align="center">

**ROBERT W. SEIDEN, IN HIS CAPACITY AS**
**TEMPORARY RECEIVER OF LINK MOTION INC.**

</div>

<div align="right">

**PLAINTIFF**

</div>

**AND:**

<div align="center">

**LINK MOTION INC.**

</div>

<div align="right">

**DEFENDANT**

</div>

<div align="center">

**SECOND AFFIDAVIT OF ROBERT W. SEIDEN**

</div>

I, **ROBERT W. SEIDEN**, of 469 Seventh Avenue, 5th Floor, New York, New York 10018, United States of America, do solemnly and sincerely **AFFIRM** and say as follows:

1.      I am the same Robert W. Seiden who has sworn one previous affidavit in this proceeding. I am the temporary receiver (**Receiver**) of Link Motion Inc. (the **Company**), the defendant in this proceeding, under an order made by the United States District Court for the Southern District of New York (the **US Court**). In my capacity as Receiver, I am the plaintiff in this proceeding. This Court recognized my appointment by the US Court as Receiver by an order dated 3 February 2020 (the **Recognition Order**).

2.      There is now produced and shown to me marked **RWS-2** a bundle of true copies of various documents to which I will refer in this affidavit. Except where otherwise stated, or the context requires, references in this affidavit to "pages" are to pages of Exhibit RWS-2.

3.      The facts set out in this affidavit are within my knowledge. Where any matter set out in this affidavit is not within my direct knowledge, I set out the source of my knowledge and believe that the matter is true. Where I refer in this affidavit to communications

with or advice from attorneys, or to any ongoing legal proceedings, I do not intend to waive any privilege and no privilege is waived.

4.      I make this affidavit in connection with the summons issued on my behalf as Receiver, seeking Cayman Islands recognition of my power to issue certain shares in the Company to Mr. Guo Lilin pursuant to a convertible note instrument and authorization to take the steps necessary to issue those shares. I also request that the Court make a sealing order to keep the documents associated with this application confidential, consistent with the way the US Court dealt with this matter.

**Entry Into Promissory Note**

5.      The Court will be familiar with the relevant background to the receivership. In my first affidavit in this proceeding, sworn 10 January 2020, I explained the relevant events leading up to the receivership and outlined the efforts I have taken since my appointment as Receiver by the US Court pursuant to an Order Granting Preliminary Injunction and Appointing Temporary Receiver dated 1 February 2019 (the **Receivership Order**).

6.      As explained in my first affidavit, I have taken steps in various jurisdictions to investigate the affairs of the Company and to take control of its assets and undertaking as contemplated by the Receivership Order. This has included significant work in the People's Republic of China (the **PRC**) where most of the Company's valuable assets are located. Mr. Guo has been instrumental in my efforts in the PRC. In exercise of my powers as Receiver I have caused him to be appointed to several positions within the Company and its subsidiaries to assist in those efforts.

7.      My efforts in China required funding which was unavailable from the assets of the Company under my control. Mr. Guo was willing to provide funding, and in May 2019, I negotiated a Secured Convertible Promissory Note (the **Note**) made between the Company and Mr. Guo. Under the Note:

   (a)      Mr. Guo agreed to make a loan to the Company of the renminbi (**RMB**) equivalent of US$1,500,000 (the **Loan**), with a total return equivalent to 1.25

times the original principal amount and a maturity date on the first anniversary of the Note.

(b)     The Loan would be used to pay for professional services and operational expenses incurred in the PRC (excluding Hong Kong).

(c)     Repayment of the Loan in cash would be contingent on successful recovery of liquid funds by the Receiver.

(d)     Mr. Guo had the option at any time to convert the outstanding amount of the Loan to Class B common shares in the Company at a price of US$0.10 per ADS (American Depositary Share) equivalent, where one ADS is equivalent to 5 common shares (consistent with the depositary share arrangement under which the Company's shares were listed for trading in the United States as described in my first affidavit).

A copy of the Note, dated 18 May 2019, is at pages 1 to 4 of RWS-2.

9.     On 18 June 2019, I wrote to the US Court seeking approval of the Note. That same day, the US Court approved the Note by endorsing my letter. A copy of that letter with the US Court's approval is at pages 5 to 8 of RWS-2.

10.    On 14 January 2020, I wrote to the US Court to clarify that the Loan was not to be used to cover costs outside of the PRC, including Hong Kong. The revised Note was approved by the US Court on 17 January 2020. A copy of that letter with the US Court's approval is at pages 9 to 13 of RWS-2.

11.    In accordance with the terms of the Note, Mr. Guo advanced the Loan, which has been partially drawn down by the Receiver on behalf of the Company in accordance with the Court Order appointing the Receiver.

**Conversion of Promissory Note**

12.   On 22 May 2020, Mr. Guo provided a written notice to the Receiver that he wished to exercise his conversion rights under the Note. A copy of Mr. Guo's conversion notice is at page 14 of RWS-2.

13.   As of 22 May 2020, the outstanding balance of the Loan was RMB 5,085,387.06, equivalent to US$894,055 based on that day's RMB/USD exchange rate of 7.11 RMB per USD. Based on the conversion formula set out in the Note, Mr. Guo is entitled to convert the Loan into 44,702,750 Class B shares in the Company (the **Shares**). An analysis of the expenses paid from the Loan and the calculation for conversion, prepared by my team, is at pages 15 to 17 of RWS-2.

14.   Based on advice of counsel and the documentation provided to me as stated below, I am satisfied that the Company has sufficient authorized but unissued share capital to issue the Shares. The Company's current Memorandum of Association states that the Company's share capital is US$180,000 divided into (*a*) 1,560,000,0000 Class A common shares with a par value of US$0.0001 each and (*b*) 240,000,000 Class B common shares with a par value of US$0.0001 each. A copy of the Company's current Memorandum and Articles of Association is at pages 18 to 60 of RWS-2. The Company's Register of Members dated 24 March 2020, which I have received from the Company's registered office, shows that the Company has issued only 75,528,407 Class B common shares. A copy of the Register of Member as of 24 March 2020 is pages 61 to 70 of RWS-2.

15.   I am also satisfied, based on advice from my Cayman Islands attorneys, that the issue of the Shares is consistent with the Company's Memorandum and Articles of Association and, subject to approval of this Court and Cayman Islands law.

16.   On 1 June 2020, I wrote to the US Court advising that Mr. Guo had provided a conversion notice under the Note and seeking approval to convert the Loan into the Shares. On 5 June 2020, the US Court granted that approval and ordered that:

(a)   The Receiver is authorized to exercise the rights, powers and privileges of the directors of the Company in order to take all necessary corporate actions on

behalf of the Company to issue and allot the Shares and to enter, or cause to be entered, the issuance and allotment of the Shares on the Company's Register of Members.

(b)     The Receiver is authorized and directed to file an application with this Court to convert the Loan into the Shares by no later than 30 June 2020, and requested the aid and assistance of this Court in giving effect to the terms of the order.

A copy of my 1 June 2020 letter to the Court, without exhibits attached, is at pages 71 to 72 of RWS-2. A copy of the US Court's 5 June 2020 order is at pages 73 to 75 of RWS-2.

17.     Paragraph 5 of the Recognition Order states that:

> The US Receiver shall have liberty to apply to this Court in respect of any matter concerning Link Motion Inc., the interpretation and implementation of this Order and for any further orders to give further and better effect to the recognition by this Court of the Receivership Order.

18.     Accordingly, further to the Receivership Order, the Recognition Order and the US Court's 5 June 2020 order, I now make this application for this Court to recognize my power to issue the Shares and authorize me to take all necessary corporate actions on behalf of the Company to issue the Shares so that the conversion will be effective under Cayman Islands law.

**Request for Sealing Order**

19.     I request that the Court make a sealing order under Order 63, rule 3(4) of the Grand Court Rules to ensure that the material filed in connection with this application remains confidential. The information concerning the Note, including the documents filed with the US Court in connection with the approval of the Note and the conversion, are not publicly available and are held by the US Court under seal. A sealing order will therefore ensure consistency between the two courts' approaches.

20.    Disclosure of this information to third parties not approved by the Receiver, and in particular the Individual Defendants (as defined in my first affidavit), will severely prejudice the ongoing efforts to maintain, preserve and gain control of the Company's affairs and recover its assets by revealing sensitive funding details. I acknowledge that, if the Court grants the relief sought on this application, that the issuance of the Shares will be recorded on the Company's Register of Members which is available to every registered shareholder.

AFFIRMED before me at New York, New York, this 19
day of June, 2020

_____

**ROBERT W. SEIDEN**

MICHAEL T STOLPER
Notary Public, State of New York
No. 02ST6299051
Qualified in Nassau County
Commission Expires March 17, 2024

This affidavit is filed by KSG Attorneys at Law, attorneys for the Plaintiff, whose address for service is 4th Floor Harbour Centre, 42 North Church Street, PO Box 2255, Grand Cayman KY1-1107, Cayman Islands [MR/1550]

<div align="right">
Plaintiff
R Seiden
Second
RWS-2
_____ June 2020
</div>

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

<div align="right">

**CAUSE NO: FSD 4 OF 2020 (MRHJ)**
</div>

**BETWEEN:**

<div align="center">

**ROBERT W. SEIDEN, IN HIS CAPACITY AS**
**TEMPORARY RECEIVER OF LINK MOTION INC.**
</div>

<div align="right">

**PLAINTIFF**
</div>

**AND:**

<div align="center">

**LINK MOTION INC.**
</div>

<div align="right">

**DEFENDANT**
</div>

---

<div align="center">

**EXHIBIT RWS-2**
</div>

---

This is the exhibit marked RWS-2 to the Second Affidavit of Robert W. Seiden.

AFFIRMED before me at New
York, New York, this _19ᵗ_
day of June, 2020

MICHAEL T STOLPER
Notary Public, State of New York
No. 02ST6299051
Qualified in Nassau County
Commission Expires March 17, 20_24_

7
</div>

THIS NOTE AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

本票据及根据本票据可发行的任何证券尚未根据 1933 年证券法（经修订）（"证券法"）或特定州的证券法进行登记。这些证券不得提供、出售或以其他方式转让、质押或典押，除非根据有效的登记声明和豁免、法案和适用的国家证券法允许。

## Link Motion, Inc.

## SECURED CONVERTIBLE PROMISSORY NOTE
## Link Motion Inc.有担保可转换本票

May XX, 2019
2019 年 5 月18日

RMB equivalent of USD1,500,000
价值 1,500,000 美元的人民币：

Whereas,
鉴于,

FOR VALUE RECEIVED from **Mr. Guo Lilin** (**"The Lender"**, or **"The Holder"** of this Note) in the form of an RMB equivalent of a USD1,500,000.00 loan to Link Motion Inc. (**"The Borrower" or "The Company"**), the **Borrower** designates bank account of its WFOE NQ Mobile (Beijing) Technology Co. Ltd (网秦无限（北京）科技有限公司) to receive this amount subject to the approval of the Court-Appointed Temporary Receiver and the U.S. Federal Court for the Southern District of New York, in the matter of Baliga v. Link Motion, Inc. The amount will only be used to pay for professional services (legal and accounting etc.) incurred in mainland PRC (excluding HK) and PRC Team management related and other lawful expenditures on behalf of the **Borrower**. Any single expenditure above RMB equivalent of USD10,000 out of the amount should be approved in writing by Temporary Receiver in advance, and the general expenditures should be sent to KLC Certified Public Accountants at end of each month for review, and then through it submit to Temporary Receiver and US Court for filing.

对于从郭力麟先生（"贷款人"，或称本可转换本票的"持有人"）处收到的价值为 1,500,000 美元的人民币的借款，根据法院指定临时接管人及美国联邦纽约南区法院的批准（关于 Baliga 诉 Link Motion Inc.案），Link Motion Inc. (以下简称"借款人"）指定的收款账户为其在中国境内的独资子公司网秦无限（北京）科技有限

1 / 4

公司的银行账户，帐户内资金，只限用于与在中国境内(不含香港)接管相关的各项
专业服务支出（法务、会计等）、团队工作费用等合法支出。上述费用中单笔支出
超过相当于 1 万美元的人民币的费用，须预先书面征得临时接管人的同意。每月整
体支出经 KLC 审核后，发送给纽约接管人报法院备案。

**The Borrower** hereby promises to pay to the order of Mr. **Guo Lilin**, the principal sum in
RMB equivalent of USD1,500,000.00. **The Borrower** will be paid in RMB inside China.
However, payment on this Note shall be contingent on successful recovery of liquid funds
as a result of the ongoing efforts by the Court Appointed Temporary Receiver and his team.
The **Borrower** hereby agrees that the Holder has the option to convert the amount at any
time to Class B Common Equity, and the **Borrower** shall then cause the equivalent of
principal and the accrued interests to be converted into Class B Common Equity within
specified time upon The Lender's notification.
借款人在此承诺，向郭力麟先生（以下简称"持有人"）支付与 1,500,000 美元价
值相等的人民币的借款。借款应在中国境内以人民币偿还。但本票据还款的先决条
件为：法院指定临时接管人及其团队通过持续努力成功收回流动资金。借款人在此
承诺，持有人可以在任意时间选择转股，借款人在接到转股指令后将在规定的时间
内将促使相应金额的本金与累积的利息转换为 B 股。

Upon the  termination of the Receivership of LKM, the **Holder** is entitled to take back the
unused part of the above amount in the Bank Account (thereby reducing by such amount
the principal and interest to be paid on this note), or choose not to take back the unused
part of the above amount and notify the Borrower for conversion.
在法院裁定终止接管时，持有人有权选择取回账户内该笔资金剩余未使用的部分
（并因此从此本票应付的本金和利息中扣除），或选择不取回账户内该笔资金剩余
未使用的部分并通知转股。

1. <u>Maturity Date</u>. Unless earlier converted pursuant to Section 4, this Note will
   automatically mature and be due and payable on the one-year anniversary of the date
   hereof (the "<u>Maturity Date</u>").
   到期日。除非根据第 4 条提前转换，否则本票据将在订立一周年自动到期应付
   （"到期日"）。

2. <u>Interest Rate</u>. The outstanding principal amount of this Note, shall return 1.25 times of
   the original principal amount. In no event will the interest rate under this Note exceed
   that permitted by applicable law in either the United States or the Peoples Republic of
   China. If any interest or other charge or amount due hereunder is determined in finality
   by a court of competent jurisdiction to have exceeded the maximum amount permitted
   by law, then the interest, charge or other amount shall be reduced to the maximum
   permitted by law, and the **Holder** may credit any excess amount previously collected

2 / 4

against future interest obligations and/or the outstanding principal balance or other amounts due hereunder, or refund the amount to the Company.

利率。对于本票据的未偿本金，其利息应为原有本金的 1.25 倍。在任何情况下，本票据下的利率都不得超过适用的美国或中华人民共和国法律允许的利率。如果有管辖权的法院最终裁定本协议项下的任何利息或其他费用或金额超过法律允许的最大金额，则该利息、费用或其他金额应减少至法律允许的最大金额，持有人可将之前多收取的任何金额贷记于未来的利息义务中和/或未付本金余额或本协议项下到期的其他款项，或将其退还给公司。

3. <u>Interest Payments</u>. Subject to Section 4, all principal and interest from recovered funds of the Borrower due hereunder shall be payable on the Maturity Date as defined above. In the event that any payment to be made hereunder shall be or become due on a Saturday, Sunday or any other day on which banking institutions in New York are required by law to be closed, such payment shall be or become due on the next succeeding business day.

利息支付。根据第 4 条的规定，本协议项下到期的所有本金和利息应在上述到期日支付。如果本协议项下的任何付款在星期六、星期日或纽约州法律规定的法定银行假日内到期，则该付款应顺延至下一个工作日。

4. <u>Conversion</u>. 转换

The lender has the right to either be reimbursed at the agreed-upon multiplier as outlined above in paragraph 2 or, at the the Lender's choosing, opt to convert the amount loaned plus earned and accrued interest into Class B Common Equity at $0.10 per ADS equivalent, in which one ADS will equal to 5 Class B Common shares. The **Borrower** should convert the equivalent amount (Principal + Interests) into Class B Common Equity within two weeks of the lender's notification. It is the **Borrower**'s responsibility to issue and register the Class B Common Equity under the name of the **Holder**. These shares shall be validly issued, subject to Court approval and conforming to the U.S. securities laws and Articles of Incorporation of the Company, and shall be issued and delivered to the **Holder** following necessary procedures.

持有人有权以上述第二条所述比率取得本金及利息，也可由贷款人选择将贷款金额及应得利息以 0.10 美元/ADS 的价格转为 B 类普通股，1 个 ADS 对应的 B 类普通股为 5 股。持有人提出转股指令后，借款人应在两周内将对应金额（本金+利息）转换成B股并登记到持有人名下。按本条约定发行并将相对应的B股登记到持有人名下是借款人（发行人）的工作与责任。该股份须在法院批准及符合美国证券法的情况下根据公司章程合法发行，并须遵守必须的发行和授予持有人的程序。

3 / 4

In issuing the above Class B Common Equity, the Receiver shall exercise the shareholders' rights on behalf of all shareholders (including public shareholders, and Class B Common Equity shareholders with all founders included) and rights of the Board of Directors within the legal framework, such as by obtaining necessary prior Court approval and complying with U.S. securities laws and terms of Articles of Incorporation of the Company, .

接管人在法院批准及符合美国证券法的情况下在法律框架下行使全体股东的权力（包含公众股东及全体创始人在内的 B 股股东）与董事会权力、按照公司章程发行本项 B 股。

This Agreement is signed by the Court Appointed Temporary Receiver on behalf of Link Motion Inc., and is thereby legally binding upon Link Motion Inc. and the Holder. This Agreement and its terms and conditions are subject to the approval of the U.S Court (SDNY), J. V. Marrero.

本协议由法院指定临时接管人代表 Link Motion Inc.签字，因此对于 Link Motion Inc.及持有人具有法律约束力。本协议及其条款和条件须经美国纽约南区法院（SNDY）J.V. Marrero 批准。

IN WITNESS WHEREOF, the undersigned have caused this Note to be duly executed and delivered.

兹证明，以下签字人已正式签署并交付本票据。

Link Motion, Inc.

By: _____

Name: Court-Appointed Temporary Receiver for Link Motion, Inc.

（法院指定临时接管人代表 Link Motion Inc.签字）

Accepted and agreed:

出借人签字：

_____ LiLin Guo

By: _____

Name:

Title:

Address:

4 / 4

# Robert W. Seiden

Court-Appointed Temporary Receiver for Link Motion Inc.
Pursuant to The Honorable Judge Victor Marrero of the
United States District Court, Southern District of New York

Robert W. Seiden, Esq. | The Seiden Group
469 Seventh Avenue, 5th Floor
New York, New York 10018
Tel: (212) 523-0686
Email: rseiden@seidenlegal.com

**SEALED**

**VIA FAX (212) 805-6382**
Hon. Victor Marrero
Suite 1040
United States Courthouse
500 Pearl Street
New York, New York 10007

## CONFIDENTIAL AND REQUESTED TO BE KEPT UNDER SEAL

June 18, 2019

## Re: Wayne Baliga v. Link Motion Inc. et al. 1:18-cv-11642

Dear Honorable Judge Marrero,

I write this letter at a critical juncture in order to request approval of the attached compensation incentive agreement and promissory note that I have negotiated between Link Motion Inc. and Mr. Lilin "Francis" Guo ("Mr. Guo") (the "Note Agreement").

As Your Honor is aware, my Receivership team and I have been working diligently on behalf of Link Motion Inc. ("Link Motion" or the "Company") to ensure the status quo of the Company pending the outcome of the action before Your Honor. These efforts have been met with the upmost resistance by Vincent Weyong Shi ("Mr. Shi"), who continues to actively thwart the Receivership inside China and is racing to transfer assets, personnel, and records out of Link Motion's control and into other shell companies, including removing the books and records of the Hong Kong subsidiary out of the jurisdiction of Hong Kong in contravention to Hong Kong law. This has been officially reported to the Hong Kong Police and the Hong Kong Corporate Registry. In my view, there is no longer any doubt that Mr. Shi fully intends to abandon Link Motion and strip the Company of any remaining value.

My team inside China working to prevent the above from happening has been led by Mr. Guo, a large original Link Motion shareholder that I have previously appointed as a director of Link Motion, and who has been working tirelessly and relentlessly on behalf of the Receivership



# Robert W. Seiden

Court-Appointed Temporary Receiver for Link Motion Inc.
Pursuant to The Honorable Judge Victor Marrero of the
United States District Court, Southern District of New York

Robert W. Seiden, Esq. | The Seiden Group
469 Seventh Avenue, 5th Floor
New York, New York 10018
Tel: (212) 523-0686
Email: rseiden@seidenlegal.com

inside China. Mr. Guo, a well-respected middle-aged businessman, was instrumental in securing under the Receiver's control Link Motion's wholly owned Chinese entity Link Motion Beijing Co., Ltd. (the "WFOE"). Control over the WFOE is needed in order to have any chance to secure Link Motion's VIE Company, Beijing Link Motion Technology Co., Ltd. (the "VIE"), where Link Motion's remaining valuable assets are held. While securing the VIE will be painstaking and extremely difficult work, it is now within the Receivership's reach. It will, however, require extensive work, including fully consolidating control over the WFOE and taking legal action to assume control over the VIE. This is the only way to ensure remaining assets of Link Motion are preserved in accordance with Your Honor's instructions.

The Receivership is also undertaking extensive work within Hong Kong on behalf of the Company. The Receiver, through its Hong Kong counsel at Kobre & Kim, has recently appeared on behalf of Link Motion in an arbitration filed against the Company by Zhongzhi Hi-Tech Investment ("ZZ"). ZZ maintains a significant convertible note with Link Motion ("ZZ Note"). Link Motion has to date defaulted on the ZZ Note despite having had ample funds to pay it back. As alleged in the Complaint in the action before Your Honor, evidence supports the conclusion that the ZZ Note and subsequent default was a fraud that was orchestrated by Mr. Shi, who has significant conflicts of interests with ZZ, to divert Link Motion's two most valuable assets "Showself" and "FL Mobile" to ZZ. The arbitration filed by ZZ was not publicly disclosed, but rather was uncovered by my investigative team. Had the Receivership not appeared on behalf of Link Motion, ZZ would have won an award by default. Just this week, my legal team participated in an initial conference with the arbitration tribunal, and informed the tribunal of the role of the Receiver and requested a stay in the proceedings in order for the Receivership to investigate the situation and secure funding to participate fully in the proceedings. Participating in this arbitration is critical (and time consuming) if there is any chance to restore value back to Link Motion. Participation will require our legal team in Hong Kong to prepare for and participate in the arbitration.

# Robert W. Seiden

Court-Appointed Temporary Receiver for Link Motion Inc.
Pursuant to The Honorable Judge Victor Marrero of the
United States District Court, Southern District of New York

Robert W. Seiden, Esq. | The Seiden Group
469 Seventh Avenue, 5th Floor
New York, New York 10018
Tel: (212) 523-0686
Email: rseiden@seidenlegal.com

We have further been informed that Mr. Shi may have committed criminal acts within Hong Kong by transferring significant Company cash to a particular Hong Kong-listed entity that we have identified and are actively investigating. The Receivership on behalf of the Company intends on filing criminal charges against Mr. Shi for this alleged illegal theft and transfer of assets outside the control of the shareholders and Receivership.

This work within China and Hong Kong will require significant time, effort and funding. The Receivership will need to pay legal teams on the ground in both China and Hong Kong to initiate the required lawsuits and to participate in the arbitration. Additionally, in order to preserve the Company's value and the status quo of its economic and operational condition, the Receiver will need to resume paying normal day-to-day operational expenses on the ground inside China, as Mr. Guo continues to make progress, including paying Link Motion's Chinese employees (who have been working without pay for some time) and paying for new office space from which to manage the existing assets of the Company and avoid erosion of the ongoing business. If a new office space is not secured and paychecks do not resume, the Company's remaining employees will quit, and operations will completely shut down.

Mr. Guo has graciously agreed to provide the necessary effort and funding to accomplish all of the above. Under the Note Agreement, Mr. Guo will provide the Company with a loan of RMB equivalent of $1,500,000.00 to fund the lawsuits within China, the arbitration within Hong Kong, and day-to-day operations within China, including securing a new office space for the Company. The funds will be held in the WFOE's bank account within China controlled by the Receivership. All expenses using this money will be reviewed by the Receiver and his accounting professionals. Mr. Guo has further agreed that repayment of the Note Agreement is <u>contingent on the Receivership successfully recovering and securing liquid funds of the Company.</u> To the extent that Mr. Shi is successful in completely stripping the Company of its assets, and we cannot recover any funds, Guo will not be entitled to any repayment of these advances funds. In consideration for the loan and the significant risks Mr. Guo is taking, the Note Agreement provides Mr. Guo with

# Robert W. Seiden

Court-Appointed Temporary Receiver for Link Motion Inc.
Pursuant to The Honorable Judge Victor Marrero of the
United States District Court, Southern District of New York

Robert W. Seiden, Esq. | The Seiden Group
469 Seventh Avenue, 5th Floor
New York, New York 10018
Tel: (212) 523-0686
Email: rseiden@seidenlegal.com

both interest and a conversion option whereby at the maturity date, Mr. Guo can choose to convert his RMB equivalent of $1,500,000.00 into equity of the Company at $.10 per ADS equivalent.[1]

I believe this Note Agreement is fair, just, and absolutely necessary under the circumstances. If the Receivership does not secure additional funding for the above activities, the Company and its value will be imminently lost forever. Furthermore, we believe that Mr. Guo is uniquely positioned to accomplish the daunting tasks ahead of navigating the Chinese legal system and regulatory processes necessary for maintaining the status quo and for the Receivership's efforts to ultimately be successful, and to bring value back to the Company and the shareholders. The shareholder's ability to see any recovery is directly tied to the Receiver's efforts to be successful inside of China to preserve the assets and enterprise value. The immediate funding, business expertise and leadership of Mr. Guo, guided and overseen by the Receiver, are critical.

Please do not hesitate to contact me via email or telephone if your honor wishes to discuss this request in more detail.

Respectfully submitted,

Robert W. Seiden, Esq.
Court-Appointed Temporary Receiver for
Link Motion Inc.

Request GRANTED. The Note Agreement described above and attached hereto entered into by the Court-appointed receiver in this action is approved.

**SO ORDERED.**

6-18-19

DATE          VICTOR MARRERO, U.S.D.J.

---

[1] It is important to note that the ADS was trading at $0.15/ADS prior to being delisted. Thus, Mr. Guo's conversion option at $.10 per ADS is completely justified and fair.

# Robert W. Seiden

**Court-Appointed Temporary Receiver for Link Motion Inc.**
Pursuant to The Honorable Judge Victor Marrero of the
United States District Court, Southern District of New York

Robert W. Seiden, Esq. | The Seiden Group
469 Seventh Avenue, 5th Floor
New York, New York 10018
Tel: (212) 523-0686
Email: rseiden@seidenlegal.com

**VIA FAX (212) 805-6382**
Hon. Victor Marrero
Suite 1040
United States Courthouse
500 Pearl Street
New York, New York 10007



SEALED
RECEIVED
JAN 16 2020
CHAMBERS OF
JUDGE MARRERO

## CONFIDENTIAL AND REQUESTED TO BE KEPT UNDER SEAL

January 14, 2020

### Re: Wayne Baliga v. Link Motion Inc. et al. 1:18-cv-11642

Dear Honorable Judge Marrero,

I write this letter for purposes of clarification as it relates to the previously approved Promissory Note Agreement signed between the Court-Appointed Temporary Receiver for Link Motion, Inc. and Mr. Lilin (Francis) Guo. The original Note Agreement included language that the loan proceeds could be used to cover for costs outside of the PRC, including Hong Kong. The Receiver and Mr. Guo have agreed that there is no requirement for loan proceeds are to be used outside of the PRC and there is no requirements for Mr. Guo to cover any of the costs incurred in Hong Kong, including the ongoing Hong Kong arbitration proceedings. We have attached a fully executed copy of the Loan Agreement outlining these terms and conditions. We respectfully request the Court approve this revised Loan Agreement.

Please do not hesitate to contact me via email or telephone if your honor wishes to discuss this request in further detail.

Respectfully submitted,

Robert W. Seiden, Esq.
Court-Appointed Temporary Receiver for Link Motion Inc.

THIS NOTE AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT
BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE
"SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES.
THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE
TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED
UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO
AN    EFFECTIVE    REGISTRATION    STATEMENT    OR    AN    EXEMPTION
THEREFROM.

本票据及根据本票据可发行的任何证券尚未根据 1933 年证券法（经修订）（"证
券法"）或特定州的证券法进行登记。这些证券不得提供、出售或以其他方式转让、
质押或典押，除非根据有效的登记声明和豁免、决案和适用的国家证券法允许。

## Link Motion, Inc.

## SECURED CONVERTIBLE PROMISSORY NOTE
### Link Motion Inc.有担保可转换本票

**May XX, 2019**                                    **RMB equivalent of USD1,500,000**
**2019 年 5 月18日**                                  **价值 1,500,000 美元的人民币：**

Whereas,
鉴于,

FOR VALUE RECEIVED from **Mr. Guo Lilin** (**"The Lender"**, or **"The Holder"** of this
Note) in the form of an RMB equivalent of a USD1,500,000.00 loan to Link Motion Inc.
("**The Borrower" or "The Company"**), the **Borrower** designates bank account of its
WFOE NQ Mobile (Beijing) Technology Co. Ltd (网秦无限（北京）科技有限公司) to
receive this amount subject to the approval of the Court-Appointed Temporary Receiver
and the U.S. Federal Court for the Southern District of New York, in the matter of Baliga
v. Link Motion, Inc. The amount will only be used to pay for professional services (legal
and accounting etc.) incurred in mainland PRC (excluding HK) and PRC Team
management related and other lawful expenditures on behalf of the **Borrower**. Any single
expenditure above RMB equivalent of USD10,000 out of the amount should be approved
in writing by Temporary Receiver in advance, and the general expenditures should be sent
to KLC Certified Public Accountants at end of each month for review, and then through it
submit to Temporary Receiver and US Court for filing.

刘于从郭力麟先生（"贷款人"，或称本可转换本票的"持有人"）处收到的价值
为 1,500,000 美元的人民币的借款，根据法院指定临时接管人及美国联邦纽约南区
法院的批准（关于 Baliga 诉 Link Motion Inc.案），Link Motion Inc. (以下简称"借
款人"）指定的收款账户为其在中国境内的独资子公司网秦无限（北京）科技有限

公司的银行账户，帐户内资金，只限用于与在中国境内(不含香港)接管相关的各项专业服务支出（法务、会计等）、团队工作费用等合法支出。上述费用中单笔支出超过相当于1万美元的人民币的费用，须预先书面征得临时接管人的同意。每月整体支出经 KLC 审核后，发送给纽约接管人报法院备案。

The **Borrower** hereby promises to pay to the order of Mr. **Guo Lilin**, the principal sum in RMB equivalent of USD1,500,000.00. The **Borrower** will be paid in RMB inside China. However, payment on this Note shall be contingent on successful recovery of liquid funds as a result of the ongoing efforts by the Court Appointed Temporary Receiver and his team. The **Borrower** hereby agrees that the Holder has the option to convert the amount at any time to Class B Common Equity, and the **Borrower** shall then cause the equivalent of principal and the accrued interests to be converted into Class B Common Equity within specified time upon The Lender's notification.

借款人在此承诺，向郭力麟先生（以下简称"持有人"）支付与 1,500,000 美元价值相等的人民币的借款。借款应在中国境内以人民币偿还。但本票据还款的先决条件为：法院指定临时接管人及其团队通过持续努力成功收回流动资金。借款人在此承诺，持有人可以在任意时间选择转股，借款人在接到转股指令后将在规定的时间内将促使相应金额的本金与累积的利息转换为 B 股。

Upon the termination of the Receivership of LKM, the **Holder** is entitled to take back the unused part of the above amount in the Bank Account (thereby reducing by such amount the principal and interest to be paid on this note), or choose not to take back the unused part of the above amount and notify the Borrower for conversion.

在法院裁定终止接管时，持有人有权选择取回账户内该笔资金剩余未使用的部分（并因此从此本票应付的本金和利息中扣除），或选择不取回账户内该笔资金剩余未使用的部分并通知转股。

1. <u>Maturity Date</u>. Unless earlier converted pursuant to Section 4, this Note will automatically mature and be due and payable on the one-year anniversary of the date hereof (the "<u>Maturity Date</u>").
到期日。除非根据第 4 条提前转换，否则本票据将在订立一周年自动到期应付（"到期日"）。

2. <u>Interest Rate</u>. The outstanding principal amount of this Note, shall return 1.25 times of the original principal amount. In no event will the interest rate under this Note exceed that permitted by applicable law in either the United States or the Peoples Republic of China. If any interest or other charge or amount due hereunder is determined in finality by a court of competent jurisdiction to have exceeded the maximum amount permitted by law, then the interest, charge or other amount shall be reduced to the maximum permitted by law, and the **Holder** may credit any excess amount previously collected

2 / 4

against future interest obligations and/or the outstanding principal balance or other
amounts due hereunder, or refund the amount to the Company.

利率。对于本票据的未偿本金，其利息应为原有本金的 1.25 倍。在任何情况下，
本票据下的利率都不得超过适用的美国或中华人民共和国法律允许的利率。如
果有管辖权的法院最终裁定本协议项下的任何利息或其他费用或金额超过法律
允许的最大金额，则该利息、费用或其他金额应减少至法律允许的最大金额，
持有人可将之前多收取的任何金额贷记于未来的利息义务中和/或未付本金余额
或本协议项下到期的其他款项，或将其退还给公司。

3. Interest Payments. Subject to Section 4, all principal and interest from recovered funds
   of the Borrower due hereunder shall be payable on the Maturity Date as defined above.
   In the event that any payment to be made hereunder shall be or become due on a
   Saturday, Sunday or any other day on which banking institutions in New York are
   required by law to be closed, such payment shall be or become due on the next
   succeeding business day.

利息支付。根据第 4 条的规定，本协议项下到期的所有本金和利息应在上述到
期日支付。如果本协议项下的任何付款在星期六、星期日或纽约州法律规定的
法定银行假日内到期，则该付款应顺延至下一个工作日。

4. Conversion. 转换

The lender has the right to either be reimbursed at the agreed-upon multiplier as
outlined above in paragraph 2 or, at the the Lender's choosing, opt to convert the
amount loaned plus earned and accrued interest into Class B Common Equity at $0.10
per ADS equivalent, in which one ADS will equal to 5 Class B Common shares. The
Borrower should convert the equivalent amount (Principal + Interests) into Class B
Common Equity within two weeks of the lender's notification. It is the Borrower's
responsibility to issue and register the Class B Common Equity under the name of the
Holder. These shares shall be validly issued, subject to Court approval and conforming
to the U.S. securities laws and Articles of Incorporation of the Company, and shall be
issued and delivered to the Holder following necessary procedures.

持有人有权以上述第二条所述比率取得本金及利息，也可由贷款人选择将贷款
金额及应得利息以 0.10 美元/ADS 的价格转为 B 类普通股，1 个 ADS 对应的 B
类普通股为 5 股。持有人提出转股指令后，借款人应在两周内将对应金额（本
金+利息）转换成 B 股并登记到持有人名下。按本条约定发行并将相对应的 B 股
登记到持有人名下是借款人（发行人）的工作与责任。该股份须在法院批准及
符合美国证券法的情况下根据公司章程合法发行，并须遵守必须的发行和授予
持有人的程序。

3 / 4

In issuing the above Class B Common Equity, the Receiver shall exercise the shareholders' rights on behalf of all shareholders (including public shareholders, and Class B Common Equity shareholders with all founders included) and rights of the Board of Directors within the legal framework, such as by obtaining necessary prior Court approval and complying with U.S. securities laws and terms of Articles of Incorporation of the Company, .

接管人在法院批准及符合美国证券法的情况下在法律框架下行使全体股东的权力（包含公众股东及全体创始人在内的 B 股股东）与董事会权力、按照公司章程发行本项 B 股。

This Agreement is signed by the Court Appointed Temporary Receiver on behalf of Link Motion Inc., and is thereby legally binding upon Link Motion Inc. and the Holder. This Agreement and its terms and conditions are subject to the approval of the U.S Court (SDNY), J. V. Marrero.

本协议由法院指定临时接管人代表 Link Motion Inc.签字，因此对于 Link Motion Inc.及持有人具有法律约束力。本协议及其条款和条件须经美国纽约南区法院（SNDY）J.V. Marrero 批准。

IN WITNESS WHEREOF, the undersigned have caused this Note to be duly executed and delivered.

兹证明，以下签字人已正式签署并交付本票据。

Link Motion, Inc.

By: _____

Name: Court-Appointed Temporary Receiver for Link Motion, Inc.
（法院指定临时接管人代表 Link Motion Inc.签字）

Accepted and agreed:
出借人签字：

LiLin Guo

By: _____
Name:
Title:
Address:

4 / 4

SO ORDERED. Request GRANTED. The Promissory Note Agreement set forth above is approved.

_____
DATE 1-17-20

VICTOR MARRERO, U.S.D.J.

Guo Lilin
Holder of Link Motion Inc.
Secured Convertible Promissory Note
郭力麟
Link Motion Inc. 有担保可转换本票持有人

Attention:
Mr. Robert W. Seiden, Esq.
Court-Appointed Temporary Receiver for Link Motion, Inc.
Seiden Law Group LLP
469 Seventh Avenue, 5th Floor, New York, NY 10018, USA
致：罗伯特·W·赛登律师
赛登律师集团                                                        May 22th, 2020
美国纽约第 7 大道 469 号 5 层，10018                          2020 年 5 月 22 日

### Conversion Notification of Link Motion Inc. Secured Convertible Promissory Note
### Link Motion Inc. 有担保可转换本票行权通知

Dear Mr. Seiden,
尊敬赛登先生，

In accordance with the specific articles of the Link Motion Inc. Secured Convertible Promissory Note that signed between the Court-Appointed Temporary Receiver for Link Motion, Inc. and myself on May 18th 2019 and that became effective after Court approval on June 20th, I hereby formally submit my Conversion Notification of the Convertible Promissory Note. Please proceed with the conversion in accordance with the articles of the Court approved, effective and implemented Secured Convertible Promissory Note.

根据 2019 年 5 月 18 日接管人与本人签署并经法庭 6 月 20 日批准生效的 Secured Convertible Promissory Note 的具体约定，本人在此正式发出 Secured Convertible Promissory Note 的转股指令，请按经法庭批准并生效执行的 Secured Convertible Promissory Note 约定办理。

Yours sincerely,
你诚挚的，

Guo Lilin
Holder of Link Motion Inc. Secured Convertible Promissory Note
郭力麟
Link Motion Inc. 有担保可转换本票持有人

| | 2019年费用合计<br>Total Expenses for 2019 | | 2,207,970.14 | | |
|---|---|---|---|---|---|

费用统计（2020年）Expenses Statistics for 2020

单位：元 Unit: RMB Yuan

| 序号<br>Number | 付款时间<br>Payment Date | 费用类别<br>Payment Type | 金额Amount | 收款方 Paid To | 备注 Remarks |
|---|---|---|---|---|---|
| 1 | 1/9/20 | 咨询费 Consulting fee | 16,115.00 | 李剑锋 Frank Li | |
| 2 | Friday, January 10, 2020 | 工资 Salary | 20,000.00 | | |
| 3 | Friday, January 10, 2020 | 办公费 Office Expenses | 244.70 | 京东商城 JD.com | |
| 4 | Friday, January 10, 2020 | 咨询费 Consulting fee | 200,000.00 | 鼎业律所 Beijing B.D.L. Inernational Law Firm | 根据双方2019年7月2日签订的服务协议支付相关款项<br>Payment made followingJuly 2nd 2019 Service Agreement |
| | 1月不完全统计 | | 236,359.70 | | |
| 1 | Wednesday, February 5, 2020 | 咨询费 Consulting fee | 4,250.00 | 北京百嘉翻译服务公司 Beijing Baijia Translation Service Company | |
| 2 | Monday, February 10, 2020 | 工资 Salary | 20,000.00 | | |
| 3 | Monday, February 10, 2020 | 办公费 Office Expenses | 51.00 | 顺丰速运 SF Express | |
| 4 | Tuesday, February 11, 2020 | 咨询费 Consulting fee | 8,552.00 | 李剑锋 Frank Li | |
| 5 | Friday, February 28, 2020 | 诉讼费 Litigation Cost | 21,657.00 | 海淀法院 Haidian District Court | |
| | 2月不完全统计 | | 54,510.00 | | |
| 1 | Tuesday, March 10, 2020 | 工资 Salary | 20,000.00 | | |
| 2 | Tuesday, March 10, 2020 | 办公费 Office Expenses | 589.00 | | |
| 3 | Tuesday, March 10, 2020 | 咨询费 Consulting fee | 2,957.00 | 北京百嘉翻译服务公司 Beijing Baijia Translation Service Company | |
| 4 | Tuesday, March 10, 2020 | 咨询费 Consulting fee | 30,100.00 | 鼎业律所 Beijing B.D.L. Inernational Law Firm | |
| 5 | Thursday, March 12, 2020 | 水电费 Utilities | 1,494.19 | 中关村鸿嘉物业服务有限公司 Beijing Zhongguancun HongJia Property Service Ltd | |
| | 3月不完全统计 | | 55,140.19 | | |

| | | | | | |
|---|---|---|---|---|---|
| 1 | Friday, April 10, 2020 | 工资 Salary | 14,090.91 | | |
| 2 | Friday, April 10, 2020 | 办公费 Office Expenses | 642.70 | 含快递费、消毒液费等 Courier fees and sanitizers | |
| 3 | Friday, April 10, 2020 | 翻译费 Translation Fee | 1,853.00 | 北京百嘉翻译服务公司  Beijing Baijia Translation Service Company | |
| 4 | Friday, April 10, 2020 | 咨询费 Consulting fee | 40,056.00 | 李剑锋 Frank Li | |
| 5 | Thursday, April 16, 2020 | 租赁费 Office Rent | 116,989.84 | 北京云基地云计算科技发展有限公司 Beijing Cloud Valley Computing Technology Ltd | |
| 6 | Thursday, April 16, 2020 | 电话费 Telephone cost | 506.06 | 中关村软件园发展有限责任公司 Zhongguancun Software Park Development Co. Ltd. | |
| | 4月不完全统计 | | 174,138.51 | | |
| 1 | Wednesday, May 6, 2020 | 咨询费 Consulting fee | 50,000.00 | 北京市格平律师事务所 Beijing Geping Law Firm | 根据双方签订的服务协议支付相关款项 Payment made following service agreement signed |
| 2 | Thursday, May 7, 2020 | 租赁费 Office Rent | 288,805.28 | 北京云基地云计算科技发展有限公司 Beijing Cloud Valley Computing Technology Ltd | 根据双方签订的租赁协议支付相关款项 Payment made following Office Rent agreement signed |
| 3 | Thursday, May 7, 2020 | 咨询费 Consulting fee | 100,000.00 | 北京市君泽君律师事务所 Beijing Junzejun Law Offices | 根据双方签订的服务协议支付相关款项 Payment made following service agreement signed |
| 4 | Saturday, May 9, 2020 | 工资 Salary | 18,863.64 | | |
| 5 | Saturday, May 9, 2020 | 办公费 Office Expenses | 373.60 | | |
| 6 | Saturday, May 9, 2020 | 翻译费 Translation Fee | 404.00 | 北京百嘉翻译服务公司  Beijing Baijia Translation Service Company | |
| 7 | Saturday, May 9, 2020 | 咨询费 Consulting fee | 31,545.00 | 李剑锋 Frank Li | |
| 8 | Saturday, May 9, 2020 | 咨询费 Consulting fee | 150,000.00 | 北京市君泽君律师事务所 Beijing Junzejun Law Offices | 根据双方签订的服务协议支付相关款项 Payment made following service agreement signed |

| | | | | | |
|---|---|---|---|---|---|
| 9 | Saturday, May 9, 2020 | 咨询费 Consulting fee | 200,000.00 | 鼎业律所 Beijing B.D.L. Inernational Law Firm | 根据双方签订的服务协议支付相关款项 Payment made following service agreement signed |
| 10 | | 工资 Salary | 1,164,422.00 | 郭力麟11个月薪资（对应每月1.5万美元，合计16.5万美元）Eleven Months' Salary for Francis Guo (equivalent to USD$15000/month, totalling USD$165,000) | 按照接管人批准办理 Payment upon Receiver's approval |
| 11 | | 咨询费 Consulting fee | 352,855.00 | 高博金律师事务所（对应5万美元，待接管人提供账号等资料）Payment to Kobre & Kim (equvalaent to USD$50,000, upon bank account and other documents from Receiver) | 按照接管人批准办理 Payment upon Receiver's approval |
| | 5月不完全统计 May Statistics (Incomplete) | | 2,357,268.52 | | |
| | 合计 Total for 2020 | | 2,877,416.92 | | |
| | 累计（含以前年度）Total Amount Including 2019 | | 5,085,387.06 | | |

备注：所有服务合同均已按流程进行批准
Note:All service contracts have been approved according to procedures

**Calculation for Share Conversion**

Amount eligible for conversion **RMB 5,085,387.06**

Amount after interest **RMB 6,356,733.75**
(1.25 times Principal)

Amount in USD **$894,055**
(Using the exchange rate of 7.11 RMB per USD on May 22, 2020, the date Mr. Guo officially made the request to convert shares)

Resulting shares **44,702,750**
(Using the formula: loan amount plus earned and accrued interest converted to ADS at $.10 per ADS where one ADS equals 5 Class B Common shares)

Registrar of Companies
Government Administration Building
133 Elgin Avenue
George Town
Grand Cayman

**Link Motion Inc. (ROC# 183784)** (the "**Company**")

**TAKE NOTICE** that at an annual general meeting of shareholders of the Company held on 23 December 2013, the following special resolution was passed:

"(a) **RESOLVED**, as a special resolution:

**THAT** the Company's Articles of Association be amended by deleting Article 6(d)(iii) in its entirety and substituting therewith the following new Article 6(d)(iii) (the "**Amendment to Articles of Association**"):

'Upon any sale, pledge, transfer, assignment or disposition of Class B Common Shares by a holder thereof to any person or entity which is not an Affiliate of such holder or a Founder or an Affiliate of one or more Founders, each such Class B Common Share shall be automatically and immediately converted into one Class A Common Share; *provided that* (a) except as set forth in Article 6(d)(iv) below, a change in the beneficial ownership of Class B Common Shares from a holder of Class B Common Shares to an Affiliate of such holder or to a Founder or an Affiliate of one or more Founders shall not cause a conversion under this Article 6(d)(iii) and (b) any sale, pledge, transfer, assignment or disposition of Class B Common Shares by a holder thereof effected as part of the creation of any security interest or other encumbrance over such Class B Common Shares (including, without limitation, any transfer of legal title to such Class B Common Shares effected as part of the creation of any security interest or other encumbrance over such Class B Common Shares) shall be exempt from, and shall not trigger, the automatic conversion contemplated under this Article 6(d)(iii) unless and until the legal title to such Class B Common Shares is transferred to any person or entity which is not an Affiliate of such holder (or a Founder or an Affiliate of one or more Founders) as a result of the enforcement of such security interest or other encumbrance. In addition, if at any time more than fifty percent (50%) of the ultimate beneficial ownership of any holder of Class B Common Shares (other than a Founder or an Affiliate of one or more Founders) changes, each such Class B Common Share shall be automatically and immediately converted into one Class A Common Share. For the avoidance of doubt, the sale, pledge, transfer, assignment or disposition of Class B Common Shares by a holder thereof to any of the following shall be exempt from, and shall not trigger, the automatic conversion contemplated under this Article 6(d)(iii): (i) a Founder or an Affiliate of one or more Founders or (ii) an Affiliate of such holder. For the purposes of these Articles, "Founders" means each of Dr. Henry Yu Lin, Dr. Vincent Wenyong Shi and Mr. Xu Zhou and "Founder" means any one thereof.'

Kesherra Spence
Corporate Administrator
For and on behalf of
Maples Corporate Services Limited

Dated this 29th day of August 2018

*Filed: 29-Aug-2018 12:49 EST*
*Auth Code: G53558145054*

www.verify.gov.ky File#: 183784

Registrar of Companies
Government Administration Building
133 Elgin Avenue
George Town
Grand Cayman

**Link Motion Inc. (fka: NQ Mobile Inc.) (ROC#183784)** (the "**Company**")

**TAKE NOTICE** that at an extraordinary general meeting of the shareholders of the Company held on 27 February 2018, the following special resolutions were passed:

## II. PROPOSALS

The Chairman declared that voting of the following proposals at the Meeting shall take place by poll in accordance with the Articles of Association of the Company.

Proposal No. 1

The legal name of the Company be changed from "NQ Mobile Inc." to "Link Motion Inc." and the ticker of the Company be changed from "NQ" to "LKM."

Proposal No. 2

The Sixth Amended and Restated Memorandum of Association and the Sixth Amended and Restated Articles of Association of the Company, each as amended, supplemented or restated from time to time, be amended by changing the references to the name of the Company from "NQ Mobile Inc." to "Link Motion Inc." in its entirety.

## III. RESULTS OF VOTING

Based on the voting results, the Secretary declared that each of the proposal No. 1 to 2 has been duly passed as a special resolution.

_____
Kathy Ng
Corporate Administrator
For and on behalf of
Maples Corporate Services Limited

Dated this 5th day of March 2018

www.verify.gov.ky File#: 183784

*Filed: 05-Mar-2018 16:26 EST*
*Auth Code: D47590798463*

Registrar of Companies
Government Administration Building
133 Elgin Avenue
George Town
Grand Cayman

**NQ Mobile Inc. (ROC # 183784)** (the "**Company**")

**TAKE NOTICE** that at an annual general meeting of the shareholders of the Company held on 20 January 2016, the following special resolution was passed:

"**RESOLVED**, as a special resolution:

**THAT** the Company's Articles of Association be amended by deleting the definition of "Affiliate" in Article 1 and replacing therewith the following new definition:

'Affiliate – with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control, with such specified Person, and for individual Persons, any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, including adoptive relationships, and any entity controlled by any of the foregoing.'

**THAT** each director or officer of the Company be and is hereby authorized to take any and every action that might be necessary, appropriate or desirable to effect the foregoing resolution as such director or officer, in his absolute discretion, thinks fit."

Martina Bodden
Corporate Administrator
For and on behalf of
Maples Corporate Services Limited

Dated this 27th day of January 2016

Printed: 27-Jan-2016 12:51 EST
Filed: 29-Jan-2016 10:19 EST
Auth Code: A86996826748
www.verify.gov.ky File#: 183784

Registrar of Companies
Government Administration Building
133 Elgin Avenue
George Town
Grand Cayman

**NQ Mobile Inc. (ROC #183784)** (the "**Company**")

**TAKE NOTICE** that at an annual general meeting of the shareholders of the Company held on 19 December 2014, the following resolutions were passed:

"**RESOLVED**, as an ordinary resolution:

**THAT** the Company's authorized share capital be increased from US$80,000 divided into (a) 560,000,000 Class A Common Shares of a par value of US$0.0001 each and (b) 240,000,000 Class B Common Shares of a par value of US$0.0001 each, to US$180,000 divided into (a) 1,560,000,000 Class A Common Shares of a par value of US$0.0001 each and (b) 240,000,000 Class B Common Shares of a par value of US$0.0001 each, by the creation of 1,000,000,000 Class A Common Shares of a par value of US$0.0001 each.

**THAT** each director or officer of the Company be and is hereby authorized to take any and every action that might be necessary, appropriate or desirable to effect the foregoing resolution as such director or officer, in his absolute discretion, thinks fit."

To consider and, if thought fit, pass the following resolution:

"**RESOLVED**, as a special resolution:

**THAT** the Company's Memorandum of Association be amended by substituting the existing Section 8 in its entirety with the following new Section 8:

'The share capital of the Company is US$180,000 divided into (a) 1,560,000,000 Class A Common Shares of a par value of US$0.0001 each and (b) 240,000,000 Class B Common Shares of a par value of US$0.0001 each.'

**THAT** each director or officer of the Company be and is hereby authorized to take any and every action that might be necessary, appropriate or desirable to effect the foregoing resolution as such director or officer, in his absolute discretion, thinks fit."

*Lisa Shemwell*

_____

Lisa Shemwell
Corporate Administrator
for and on behalf of
Maples Corporate Services Limited

Dated this 23rd day of December 2014

## NETQIN MOBILE INC.

(the "Company")

WE, on behalf of Maples Corporate Services Limited, HEREBY CERTIFY THAT the following Resolution was passed by the shareholders of the Company on 18 April 2012:

"**RESOLVED**, as a special resolution:

**THAT** the change of the Company's legal name from "NetQin Mobile Inc." to "NQ Mobile Inc.", which has been approved by the resolutions of the Company's board of directors, be and hereby is authorized and approved and the Company's memorandum and articles of association be and is hereby amended to reflect the change of the Company's legal name; and

**THAT** each director or officer of the Company be and is hereby authorized to take any and every action that might be necessary, appropriate or desirable to effect the foregoing resolution as such director or officer, in his or her absolute discretion, thinks fit."

*Maples and Calder*

Maples and Calder

20 April 2012



CERTIFIED TO BE A TRUE AND CORRECT COPY

SIG.

D. EVADNE EBANKS
Assistant Registrar

Date. 20th April, 2012

REGISTRAR OF COMPANIES

APR 20 2012

CAYMAN ISLANDS

**NETQIN MOBILE INC.**

(the "Company")

WE, on behalf of Maples Corporate Services Limited, HEREBY CERTIFY THAT the following resolutions were passed by the shareholders of the Company on 11 March 2011 and became effective on 10 May 2011:

1) **Variation of Authorised Share Capital and Adoption of the Sixth Amended and Restated Memorandum and Articles of Association**

   **It was resolved, as a special resolution,** that, conditional and immediately upon the completion of the IPO, the authorised share capital of the Company be varied and increased (the **"Variation of Capital"**) as follows:

   (a)   199,647,059 Common Shares (all of which are authorised but unissued immediately prior to the completion of the IPO) be re-designated as Class A Common Shares, having the rights, preferences, privileges and restrictions set out in the Sixth Amended and Restated Memorandum and Articles of Association attached hereto as Exhibit A (the **"Sixth M&A"**) adopted pursuant to these resolutions;

   (b)   all of the 50,352,941 Common Shares issued and outstanding immediately prior to the completion of the IPO be re-designated as Class B Common Shares, having the rights, preferences, privileges and restrictions set out in the Sixth M&A adopted pursuant to these resolutions;

   (c)   all of the 114,637,272 Preferred Shares of the Company which are issued and outstanding immediately prior to the completion of the IPO be re-designated as Class B Common Shares, having the rights, preferences, privileges and restrictions set out in the Sixth M&A adopted pursuant to these resolutions;

   (d)   all of the 43,433,808 share award options that were issued and outstanding immediately prior to the completion of the IPO be re-designated as options to purchase Class B Common Shares, upon the conversion of which their holders would have the rights, preferences, privileges and restrictions set out in the Sixth M&A adopted pursuant to these resolutions;

   (e)   the authorised share capital of the Company be increased by the creation of (i) 360,352,941 Class A Common Shares of a nominal or par value of US$0.0001 each, to rank pari passu with the other Class A Common Shares, and (ii) 75,009,787 Class B Common Shares of a nominal or par value of US$0.0001 each, to rank pari passu with all other Class B Common Shares, in each case having the rights provided for under the Sixth M&A adopted pursuant to these resolutions;

1

to the intent and effect that, following the Variation of Capital pursuant to this resolution, the authorised share capital of the Company shall be US$80,000.00 divided into (a) 560,000,000 Class A Common Shares of a par value of US$0.0001 each and (b) 240,000,000 Class B Common Shares of a par value of US$0.0001 each.

**It was resolved, as a special resolution,** that the memorandum and articles of association of the Company be amended and restated, in the form of the Sixth M&A attached hereto as <u>Exhibit A</u> and that the Sixth M&A will be adopted in substitution for and to the exclusion of the Fifth M&A which is currently in effect conditional and immediately upon the completion of the IPO.

## 2) Conversion

**It was resolved, as a special resolution,** that, conditional and immediately upon the completion of the IPO, all of the Common Shares and Preferred Shares of the Company which are issued and outstanding immediately prior to the completion of the IPO, be converted into Class B Common Shares on a 1:1 basis immediately upon completion of the IPO (the **"Conversion"**), as follows:

(a)    every Common Share held by a member of the Company shall be re-designated as one Class B Common Share, having such rights, preferences, privileges and restrictions as set out in the Sixth M&A adopted pursuant to these resolutions, and the re-designation of such shares as Class B Common Shares shall be registered in the register of members of the Company; and

(b)    every Preferred Share held by a member of the Company shall be re-designated as one Class B Common Share , having such rights, preferences, privileges and restrictions as set out in the Sixth M&A adopted pursuant to these resolutions, and the re-designation of such shares as Class B Common Shares shall be registered in the register of members of the Company.

**It was further resolved, as a special resolution,** that every issued and outstanding options granted by the Company pursuant to the 2007 Global Share Plan shall entitle the option holders to a number of Class B Common Shares equivalent to the number of Common Shares as originally set out in the relevant award agreement, and upon exercise of these options, the Class B Common Shares issued as a result shall be registered in the register of members of the Company.

*Maples and Calder*

Maples and Calder

10 May 2011

*[Registrar of Companies seal: REGISTRAR OF COMPANIES — MAY 10 2011 — CAYMAN ISLANDS]*

CERTIFIED TO BE A TRUE AND CORRECT COPY

SIG.

V. Daphne Whitelocke
Assistant Registrar

Date 10 May 2011

2

## EXHIBIT A

**THE COMPANIES LAW (2010 REVISION)**
**OF THE CAYMAN ISLANDS**
**COMPANY LIMITED BY SHARES**

**SIXTH AMENDED AND RESTATED MEMORANDUM OF ASSOCIATION**

**OF**

**NETQIN MOBILE INC.**

(Adopted by a Special Resolution
passed on March 11, 2011 and
effective conditional and immediately upon the completion of the Company's initial public offering of
Class A Common Shares represented by American Depositary Shares)

1.     The name of the Company is NetQin Mobile Inc.

2.     The registered office of the Company shall be at the offices of Maples Corporate Services
       Limited, PO Box 309, Ugland House, Grand Cayman KY1-1104, Cayman Islands, or at such
       other place as the Directors may from time to time decide.

3.     Subject to the following provisions of this Memorandum, the objects for which the Company is
       established are unrestricted and the Company shall have full power and authority to carry out
       any object not prohibited by the Companies Law (2010 Revision) or as the same may be revised
       from time to time, or any other law of the Cayman Islands.

4.     Nothing in this Memorandum shall permit the Company to carry on a business for which a
       license is required under the laws of the Cayman Islands unless duly licensed.

5.     The Company shall not trade in the Cayman Islands with any person, firm or corporation except
       in furtherance of the business of the Company carried on outside the Cayman Islands provided
       that nothing in this clause shall be construed as to prevent the Company effecting and
       concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its
       powers necessary for the carrying on of its business outside the Cayman Islands



2

6.   The liability of each Member is limited to the amount from time to time unpaid on such Member's shares.

7.   Shares in the Company shall be issued in the currency of the United States of America.

8.   The share capital of the Company is US$80,000.00 divided into (a) 560,000,000 Class A Common Shares of a par value of US$0.0001 each and (b) 240,000,000 Class B Common Shares of a par value of US$0.0001 each.

9.   The Company has the power to redeem or purchase any of its shares and to increase or reduce the said capital subject to the provisions of the Companies Law (2010 Revision) and the Articles of Association and to issue any part of its capital, whether original, redeemed or increased with or without any preference, priority or special privilege or subject to any postponement of rights or to any conditions or restrictions and so that unless the conditions of issue shall otherwise expressly declare every issue of shares whether declared to be preference or otherwise shall be subject to the powers hereinbefore contained.

10.  The Company has the power to register by way of continuation as a body corporate limited by shares under the laws of any jurisdiction outside the Cayman Islands and to be deregistered in the Cayman Islands.

11.  Capitalized terms that are not defined in this Memorandum of Association bear the same meaning as those given in the Articles of Association of the Company.



REGISTRAR OF COMPANIES
EXEMPTED
CAYMAN ISLANDS

CERTIFIED TO BE A TRUE AND CORRECT COPY
SIG.
V. Daphene Whitelocke
Assistant Registrar
Date. 10, May 2011

3

THE COMPANIES LAW (2010 REVISION)
OF THE CAYMAN ISLANDS
COMPANY LIMITED BY SHARES

SIXTH AMENDED AND RESTATED ARTICLES OF ASSOCIATION

OF

**NetQin Mobile Inc.**

(Adopted by a Special Resolution
passed on March 11, 2011 and
effective conditional and immediately upon completion of the Company's initial public offering of
Class A Common Shares represented by American Depositary Shares)

**INTERPRETATION**

1.   In these Articles, Table A in the First Schedule in the Companies Law does not apply and unless otherwise defined, the defined terms shall have the meanings assigned to them as follows:

| | |
|---|---|
| "AFFILIATE" | with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control, with such specified Person; |
| "ARTICLES" | these Articles of Association of the Company as altered or added to, from time to time; |
| "BOARD" | the board of Directors for the time being of the Company; |
| "BUSINESS DAY" | a day (excluding Saturdays or Sundays), on which banks in Hong Kong, Shanghai, Beijing and New York are open for general banking business throughout their normal business hours; |
| "CHAIRMAN" | the Chairman of the Board appointed pursuant to Article **Error! Reference source not found.**; |
| "CLASS A COMMON SHARE" | Class A Common Share in the share capital of the Company; |
| "CLASS B COMMON SHARE" | Class B Common Share in the share capital of the Company; |

4

286999.02-Hong Kong Server 1A - MSW

| | |
|---|---|
| "COMMON SHARES" | Class A Common Shares and Class B Common Shares, collectively; |
| "COMMISSION" | Securities and Exchange Commission of the United States of America or any other federal agency for the time being administering the Securities Act; |
| "COMPANIES LAW" | the Companies Law (2010 Revision) of the Cayman Islands and any statutory amendment or re-enactment thereof. Where any provision of the Companies Law is referred to, the reference is to that provision as amended by any law for the time being in force; |
| "COMPANY" | NetQin Mobile Inc., a Cayman Islands company limited by shares; |
| "COMPANY'S WEBSITE" | the website of the Company, the address or domain name of which has been notified to Members; |
| "DIRECTORS", "BOARD OF DIRECTORS" and "BOARD" | the directors of the Company for the time being, or as the case may be, the Directors assembled as a Board or as a committee thereof; |
| "ELECTRONIC" | the meaning given to it in the Electronic Transactions Law (2003 Revision) of the Cayman Islands and any amendment thereto or re-enactments thereof for the time being in force and includes every other law incorporated therewith or substituted therefore; |
| "ELECTRONIC COMMUNICATION" | electronic posting to the Company's Website, transmission to any number, address or internet website or other electronic delivery methods as otherwise decided and approved by not less than two-thirds of the vote of the Board; |
| "IN WRITING" | includes writing, printing, lithograph, photograph, type-writing and every other mode of representing words or figures in a legible and non-transitory form and, only where used in connection with a notice served by the Company on Members or other persons entitled to receive notices hereunder, shall also include a record maintained in an electronic medium which is accessible in visible form so as to be useable for subsequent reference; |
| "MEMBER" | the meaning given to it in the Companies Law; |
| "MEMORANDUM OF ASSOCIATION" | the Memorandum of Association of the Company, as amended and re-stated from time to time; |

5

| | |
|---|---|
| "MONTH" | calendar month; |
| "ORDINARY RESOLUTION" | a resolution: |

    (a)    passed by a simple majority of votes cast by such Members as, being entitled to do so, vote in person or, in the case of any Member being an organization, by its duly authorized representative or, where proxies are allowed, by proxy at a general meeting of the Company; or

    (b)    approved in writing by all of the Members entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Members and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments if more than one, is executed;

| | |
|---|---|
| "PAID UP" | paid up as to the par value and any premium payable in respect of the issue of any shares and includes credited as paid up; |
| "PERSON" | any individual, partnership, firm, corporation, limited liability company, association, trust, unincorporated organization or other entity, as well as any syndicate or group that would be deemed to be a person under section 13(d)(3) of the Securities Exchange Act; |
| "REGISTER OF MEMBERS" | the register to be kept by the Company in accordance with the Companies Law; |
| "SEAL" | the Common Seal of the Company (if adopted) including any facsimile thereof; |
| "SECURITIES ACT" | the Securities Act of 1933 of the United States of America, as amended, or any similar federal statute and the rules and regulations of the Commission thereunder, all as the same shall be in effect at the time; |
| "SECURITIES EXCHANGE ACT" | the Securities Exchange Act of 1934 of the United States of America, as amended, or any similar federal statute and the rules and regulations of the Commission thereunder, all as the same shall be in effect at the time; |
| "SHARE" | any share in the capital of the Company and includes a fraction of a share; |

6

"SIGNED"                          includes a signature or representation of a signature affixed by mechanical means or an electronic symbol or process attached to or logically associated with an electronic communication and executed or adopted by a person with the intent to sign the electronic communication;

"SPECIAL RESOLUTION"             the meaning given to it in the Companies Law and includes a unanimous written resolution;

"STATUTES"                        the Companies Law and every other laws and regulations of the Cayman Islands for the time being in force concerning companies and affecting the Company;

"SUBSIDIARIES"                    with respect to any Person, any or all corporations, partnerships, limited liability companies, joint ventures, associations and other entities controlled by such person directly or indirectly through one or more intermediaries; and

"YEAR"                            calendar year.

2.      In these Articles, save where the context requires otherwise:

    (b)     words importing the singular number shall include the plural number and vice versa;

    (c)     words importing the masculine gender only shall include the feminine gender;

    (d)     words importing persons only shall include companies or associations or bodies of persons, whether corporate or not;

    (e)     "MAY" shall be construed as permissive and "SHALL" shall be construed as imperative;

    (f)     a reference to a dollar or dollars (or $) is a reference to dollars of the United States;

    (g)     references to a statutory enactment shall include reference to any amendment or re-enactment thereof for the time being in force;

    (h)     any phrase introduced by the terms "including", "include", "in particular" or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms; and

7

(i)     Section 8 of the Electronic Transactions Law (2003 Revision) shall not apply.

3.     Subject to the last two preceding Articles, any words defined in the Companies Law shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

## PRELIMINARY

4.     The business of the Company may be conducted as the Directors see fit.

5.     The registered office of the Company shall be at such address in the Cayman Islands as the Directors shall from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

## RIGHTS AND RESTRICTIONS ATTACHING TO COMMON SHARES

6.     The rights and restrictions attaching to the Common Shares are as follows:

(a)     Income

Holders of Common Shares shall be entitled to such dividends as the Directors may in their absolute discretion lawfully declare from time to time.

(b)     Capital

Holders of Common Shares shall be entitled to a return of capital on liquidation, dissolution or winding-up of the Company (other than on a conversion, redemption or purchase of shares, or an equity financing or series of financings that do not constitute the sale of all or substantially all of the shares of the Company) in accordance with these Articles and subject to the Companies Law.

(c)     Attendance at General Meetings and Voting

Holders of Common Shares have the right to receive notice of, attend, speak and vote at general meetings of the Company. Holders of Class A Common Shares and Class B Common Shares shall, at all times, vote together as one class on all matters submitted to a vote by the Members . Each Class A Common Share shall be entitled to one (1) vote on all matters subject to the vote at general meetings of the Company, and each Class B Common Share shall be entitled to ten (10) votes on all matters subject to the vote at general meetings of the Company.

(d)     Conversion

8

(i)   Each Class B Common Share is convertible into one (1) Class A Common Share at any time by the holder thereof. The right to convert shall be exercisable by the holder of the Class B Common Share delivering a written notice to the Company that such holder elects to convert a specified number of Class B Common Shares into Class A Common Shares.  In no event shall Class A Common Shares be convertible into Class B Common Shares.

(ii)   If at any time Dr. Henry Yu Lin, Mr. Xu Zhou and Dr. Vincent Wenyong Shi, together with their Affiliates, collectively are registered (in the Register of Members) as the holders of less than 5% of the total number of the issued and outstanding Class B Common Shares of the Company, each issued and outstanding Class B Common Share shall be automatically and immediately converted into one Class A Common Share, and no Class B Common Shares shall be issued by the Company thereafter.

(iii)   Upon any sale, pledge, transfer, assignment or disposition of Class B Common Shares by a holder thereof to any person or entity which is not an Affiliate of such holder, a Founder or a Founder's Affiliate, each such Class B Common Share shall be automatically and immediately converted into one Class A Common Share; *provided that*, except as set forth in Article 6(d)(iv) below, a change in the beneficial ownership of Class B Common Shares from a holder of Class B Common Shares to an Affiliate of such holder shall not cause a conversion under this Article 6(d)(iii). In addition, if at any time more than fifty percent (50%) of the ultimate beneficial ownership of any holder of Class B Common Shares (other than the Founders or the Founders' Affiliates) changes, each such Class B Common Share shall be automatically and immediately converted into one Class A Common Share. For the avoidance of doubt, the pledge, transfer, assignment or disposition of Class B Common Shares by a holder thereof to any of the following shall be exempt from, and not trigger, the automatic conversion contemplated under this Article 6(d)(iii): (i) a Founder or a Founder's Affiliate or (ii) to a limited partner or a shareholder of such holder.

(iv)   For the avoidance of doubt, a transfer shall be effective upon the Company's registration of such transfer in its Register of Members. For purposes of Article 6(d)(iii) and Article 6(d)(iv), "beneficial ownership" shall have the meaning defined in Rule 13d-3 under the U.S. Securities Exchange Act of 1934, as amended.

(v)   Any conversion of Class B Common Shares into Class A Common Shares pursuant to these Articles shall be effected by means of the re-designation of the relevant Class B Common Share as a Class A Common Share. Such conversion shall become effective forthwith upon entries being made in the Register of Members to record the re-designation of the relevant Class B Common Shares as Class A Common Shares.

(vi)   Save and except for voting rights and conversion rights as set out in Articles 6(c) and (d), the Class A Commons Shares and the Class B Common Shares shall rank pari passu and shall have the same rights, preferences, privileges and restrictions.

## ISSUE OF SHARES

7.   Subject to the provisions, if any, in the Memorandum of Association, these Articles and to any direction that may be given by the Company in a general meeting, the Directors may, in their

9

absolute discretion and without approval of the existing Members, issue Shares, grant rights over existing shares or issue other securities in one or more series as they deem necessary and appropriate and determine the designations, powers, preferences, privileges and other rights, including dividend rights, conversion rights, terms of redemption and liquidation preferences, any or all of which may be greater than the powers and rights associated with the Shares held by existing Members, at such times and on such other terms as they think proper. The Company shall not issue shares in bearer form.

7A.   Without prejudice to the generality of Article 7, the Directors may, in their absolute discretion and without approval of the existing Members, provide, out of the unissued Shares, for series of preferred shares to be issued by the Company. Before any preferred shares of any such series are issued, the Directors shall fix, by resolution or resolutions, the following provisions of the preferred shares thereof:

(b)   the designation of such series, the number of preferred shares to constitute such series and the subscription price thereof if different from the par value thereof;

(c)   whether the shares of such series shall have voting rights and, if so, the terms of such voting rights, which may be general or limited;

(d)   the dividends, if any, payable on such series, whether any such dividends shall be cumulative, and, if so, from what dates, the conditions and dates upon which such dividends shall be payable, the preference or relation which such dividends shall bear to the dividends payable on any shares of any other class or any other series of preferred shares;

(e)   whether the preferred shares of such series shall be subject to redemption by the Company, and, if so, the times, prices and other conditions of such redemption;

(f)   the amount or amounts payable upon preferred shares of such series upon, and the rights of the holders of such series in, a voluntary or involuntary liquidation, dissolution or winding up, or upon any distribution of the assets, of the Company;

(g)   whether the preferred shares of such series shall be subject to the operation of a retirement or sinking fund and, if so, the extent to and manner in which any such retirement or sinking fund shall be applied to the purchase or redemption of the preferred shares of such series for retirement or other corporate purposes and the terms and provisions relative to the operation thereof;

(h)   whether the preferred shares of such series shall be convertible into, or exchangeable for, shares of any other class or any other series of preferred shares or any other securities and, if so, the price or prices or the rate or rates of conversion or exchange and the method, if any, of adjusting the same, and any other terms and conditions of conversion or exchange;

10

(i)     the limitations and restrictions, if any, to be effective while any preferred shares of such series are outstanding upon the payment of dividends or the making of other distributions on, and upon the purchase, redemption or other acquisition by the Company of, the existing Shares or shares of any other class of shares or any other series of preferred shares;

(j)     the conditions or restrictions, if any, upon the creation of indebtedness of the Company or upon the issue of any additional shares, including additional shares of such series or of any other class of shares or any other series of preferred shares; and

(k)     any other powers, preferences and relative, participating, optional and other special rights, and any qualifications, limitations and restrictions thereof.

Without limiting the foregoing and subject to Article **Error! Reference source not found.**, the voting powers of any series of preferred shares may include the right, in the circumstances specified in the resolution or resolutions providing for the issuance of such preferred shares, to elect one or more Directors who shall serve for such term and have such voting powers as shall be stated in the resolution or resolutions providing for the issuance of such preferred shares. The term of office and voting powers of any Director elected in the manner provided in the immediately preceding sentence of this Article 7A may be greater than or less than those of any other Director or class of Directors.

7B     The powers, preferences and relative, participating, optional and other special rights of each series of preferred shares, and the qualifications, limitations or restrictions thereof, if any, may differ from those of any and all other series at any time outstanding. All shares of any one series of preferred shares shall be identical in all respects with all other shares of such series, except that shares of any one series issued at different times may differ as to the dates from which dividends thereon shall be cumulative.

### REGISTER OF MEMBERS AND SHARE CERTIFICATES

8.     The Company shall maintain a Register of Members and a Member shall only be entitled to a share certificate if the Directors resolve that share certificates shall be issued. Share certificates (if any) shall specify the share or shares held by that person and the amount paid up thereon, provided that in respect of a share or shares held jointly by several persons the Company shall not be bound to issue more than one certificate, and delivery of a certificate for a share to one of several joint holders shall be sufficient delivery to all. All certificates for shares shall be delivered personally or sent through the post addressed to the Member entitled thereto at the Member's registered address as appearing in the Register of Members.

9.     All share certificates shall bear legends required under the applicable laws, including the Securities Act.

10.    Any two or more certificates representing shares of any one class held by any Member may at the Member's request be cancelled and a single new certificate for such shares issued in lieu on payment (if the Directors shall so require) of US$1.00 or such smaller sum as the Directors shall determine.

11

11.  If a share certificate shall be damaged or defaced or alleged to have been lost, stolen or destroyed, a new certificate representing the same shares may be issued to the relevant Member upon request subject to delivery up of the old certificate or (if alleged to have been lost, stolen or destroyed) compliance with such conditions as to evidence and indemnity and the payment of out-of-pocket expenses of the Company in connection with the request as the Directors may think fit.

12.  In the event that shares are held jointly by several persons, any request may be made by any one of the joint holders and if so made shall be binding on all of the joint holders.

## TRANSFER OF SHARES

13.  (a)  Shares of the Company are transferable; provided that the Board may, in its sole discretion, decline to register any transfer of any share which is not fully paid up or on which the Company has a lien.

     (b)  The Directors may also decline to register any transfer of any share unless:

          (i)    the instrument of transfer is lodged with the Company, accompanied by the certificate for the shares to which it relates and such other evidence as the Board may reasonably require to show the right of the transferor to make the transfer;

          (ii)   the shares transferred are free of any lien in favor of the Company;

          (iii)  the instrument of transfer is in respect of only one class of shares;

          (iv)   the instrument of transfer is properly stamped, if required;

          (v)    in the case of a transfer to joint holders, the number of joint holders to whom the share is to be transferred does not exceed four; and

          (vi)   a fee of such maximum sum as the New York Stock Exchange may determine to be payable, or such lesser sum as the Board may from time to time require, is paid to the Company in respect thereof.

     (c)  If the Directors refuse to register a transfer they shall, within two months after the date on which the instrument of transfer was lodged, send to each of the transferor and the transferee notice of such refusal.

     (d)  Any one of the Directors shall have the power and authority to renounce the Company's discretion to refuse to register a transfer of shares under this Article 13 and to approve and accept a transfer of shares. Any such approval may be given in writing by any one Director, and shall be as valid and effective as if given by the Board.

12

14.   The registration of transfers may, on fourteen (14) days' notice being given by advertisement in such one or more newspapers or by electronic means, be suspended and the register closed at such times and for such periods as the Board may from time to time determine.

15.   The instrument of transfer of any share shall be in writing and executed by or on behalf of the transferor (and if the Directors so require, signed by the transferee). Without prejudice to the last preceding Article, the Board may also resolve, either generally or in any particular case, upon request by either the transferor or transferee, to accept mechanically executed transfers. The transferor shall be deemed to remain a holder of the share until the name of the transferee is entered in the Register of Members.

16.   All instruments of transfer registered may be retained by the Company.

### REDEMPTION AND PURCHASE OF OWN SHARES

17.   Subject to the provisions of the Statutes and these Articles, the Company may:

    (a)   issue shares on terms that such shares are to be redeemed or are liable to be redeemed at the option of the Company or the Member and the redemption of shares shall be effected on such terms and in such manner as the Board may, before the issue of such shares, determine;

    (b)   purchase its own shares (including any redeemable shares) provided that the Members shall have approved the manner of purchase by ordinary resolution or the manner of purchase is in accordance with the Articles **Error! Reference source not found.** and **Error! Reference source not found.**A (this authorization being in accordance with section 37(2) of the Companies Law or any modification or re-enactment thereof for the time being in force); and

    (c)   make a payment in respect of the redemption or purchase of its own shares in any manner permitted by the Statutes, including out of capital.

18.   Purchase of shares represented by American Depositary Shares listed on the New York Stock Exchange: the Company is authorised to purchase any Share represented by American Depositary Shares listed on the New York Stock Exchange in accordance with the following manner of purchase:

    (b)   the maximum number of shares that may be repurchased shall be equal to the number of issued and outstanding shares less one share; and

    (c)   the repurchase shall be at such time, at such price and on such other terms as determined and agreed by the Board in their sole discretion; provided, however, that:

13

(i)     such repurchase transactions shall be in accordance with the relevant code, rules and regulations applicable to the listing of the American Depositary Shares on the New York Stock Exchange; and

(ii)    at the time of the repurchase, the Company is able to pay its debts as they fall due in the ordinary course of its business.

18A.    Purchase of shares not represented by American Depositary Shares listed on the New York Stock Exchange: the Company is authorized to purchase any shares not represented by American Depositary Shares listed on the New York Stock Exchange in accordance with the following manner of purchase:

    (a)     the Company shall serve a repurchase notice in a form approved by the Board on the Member from whom the shares are to be repurchased at least two business days prior to the date specified in the notice as being the repurchase date;

    (b)     the price for the shares being repurchased shall be such price agreed between the Board and the applicable Member;

    (c)     the date of repurchase shall be the date specified in the repurchase notice; and

    (d)     the repurchase shall be on such other terms as specified in the repurchase notice as determined and agreed by the Board and the applicable Member in their sole discretion.

19.     The redemption or purchase of any share shall not be deemed to give rise to the redemption or purchase of any other share and the Company is not obligated to purchase any other share other than as may be required pursuant to applicable law and any other contractual obligations of the Company.

20.     The holder of the shares being purchased or redeemed shall be bound to deliver up to the Company the certificate(s) (if any) thereof for cancellation and thereupon the Company shall pay to him the purchase or redemption monies or consideration in respect thereof.

## VARIATION OF RIGHTS ATTACHING TO SHARES

21.     If at any time the share capital is divided into different classes or series of shares, the rights attaching to any class or series (unless otherwise provided by the terms of issue of the shares of that class or series) may, subject to these Articles, be varied or abrogated with the consent in writing of the holders of a majority of the issued shares of that class or series or with the sanction of a Special Resolution passed at a general meeting of the holders of the shares of that class or series.

22.     The provisions of these Articles relating to general meetings shall apply to every such general meeting of the holders of one class or series of shares except for the following:

14

(a)    separate general meetings of the holders of a class or series of shares may be called only by (i) the Chairman of the Board, or (ii) a majority of the entire Board of Directors (unless otherwise specifically provided by the terms of issue of the shares of such class or series). Nothing in this Article 22 or Article 21 shall be deemed to give any Member or Members the right to call a class or series meeting.

(b)    the necessary quorum shall be one or more persons holding or representing by proxy at least one-third of the issued shares of the class or series and that any holder of shares of the class or series present in person or by proxy may demand a poll.

23.    The rights conferred upon the holders of the shares of any class or series issued with preferred or other rights shall not, unless otherwise expressly provided by the terms of issue of the shares of that class or series, be deemed to be varied by the creation or issue of further shares ranking in priority to or pari passu therewith.

## COMMISSION ON SALE OF SHARES

24.    The Company may, in so far as the Statutes from time to time permit, pay a commission to any person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any shares of the Company. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up shares or partly in one way and partly in the other. The Company may also on any issue of shares pay such brokerage as may be lawful.

## NON-RECOGNITION OF TRUSTS

25.    No person shall be recognised by the Company as holding any share upon any trust and the Company shall not be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future, or partial interest in any share, or any interest in any fractional part of a share, or (except only as is otherwise provided by these Articles or the Statutes) any other rights in respect of any share except an absolute right to the entirety thereof in the registered holder.

## LIEN ON SHARES

26.    The Company shall have a first and paramount lien and charge on all shares (whether fully paid-up or not) registered in the name of a Member (whether solely or jointly with others) for all debts, liabilities or engagements to or with the Company (whether presently payable or not) by such Member or his estate, either alone or jointly with any other person, whether a Member or not, but the Directors may at any time declare any share to be wholly or in part exempt from the provisions of this Article. The registration of a transfer of any such share shall operate as a waiver of the Company's lien (if any) thereon. The Company's lien (if any) on a share shall extend to all dividends or other monies payable in respect thereof.

15

27.   The Company may sell, in such manner as the Directors think fit, any shares on which the Company has a lien, but no sale shall be made unless some sum in respect of which the lien exists is presently payable nor until the expiration of fourteen (14) calendar days after a notice in writing, stating and demanding payment of such part of the amount in respect of which the lien exists as is presently payable, has been given to the registered holder for the time being of the share, or the persons entitled thereto by reason of his death or bankruptcy.

28.   To give effect to any such sale, the Directors may authorise some person to transfer the shares sold to the purchaser thereof. The purchaser shall be registered as the holder of the shares comprised in any such transfer and he shall not be bound to see to the application of the purchase money, nor shall his title to the shares be affected by any irregularity or invalidity in the proceedings in reference to the sale.

29.   The proceeds of the sale shall be received by the Company and applied in payment of such part of the amount in respect of which the lien exists as is presently payable, and the residue shall (subject to a like lien for sums not presently payable as existed upon the shares prior to the sale) be paid to the person entitled to the shares at the date of the sale.

## CALLS ON SHARES

30.   Subject to the terms of allotment, the Directors may from time to time make calls upon the Members in respect of any money unpaid on their shares, and each Member shall (subject to receiving at least fourteen (14) calendar days' notice specifying the time or times of payment) pay to the Company at the time or times so specified the amount called on his shares. A call shall be deemed to have been made at the time when the resolution of the Directors authorising such call was passed.

31.   The joint holders of a share shall be jointly and severally liable to pay calls in respect thereof.

32.   If a sum called in respect of a share is not paid before or on the day appointed for payment thereof, the person from whom the sum is due shall pay interest upon the sum at the rate of eight percent per annum from the day appointed for the payment thereof to the time of the actual payment, but the Directors shall be at liberty to waive payment of that interest wholly or in part.

33.   The provisions of these Articles as to the liability of joint holders and as to payment of interest shall apply in the case of non-payment of any sum which, by the terms of issue of a share, becomes payable at a fixed time, whether on account of the amount of the share, or by way of premium, as if the same had become payable by virtue of a call duly made and notified.

34.   The Directors may make arrangements on the issue of shares for a difference between the Members, or the particular shares, in the amount of calls to be paid and in the times of payment.

35.   The Directors may, if they think fit, receive from any Member willing to advance the same all or any part of the moneys uncalled and unpaid upon any shares held by him, and upon all or any

16

of the moneys so advanced may (until the same would, but for such advance, become presently payable) pay interest at such rate (not exceeding without the sanction of an Ordinary Resolution, eight percent per annum) as may be agreed upon between the Member paying the sum in advance and the Directors. No such sum paid in advance of calls shall entitle the Member paying such sum to any portion of a dividend declared in respect of any period prior to the date upon which such sum would, but for such payment, become presently payable.

### FORFEITURE OF SHARES

36. If a Member fails to pay any call or instalment of a call on the day appointed for payment thereof, the Directors may, at any time thereafter during such time as any part of such call or instalment remains unpaid, serve a notice on him requiring payment of so much of the call or instalment as is unpaid, together with any interest which may have accrued.

37. The notice shall name a further day (not earlier than the expiration of fourteen (14) calendar days from the date of the notice) on or before which the payment required by the notice is to be made, and shall state that in the event of non-payment at or before the time appointed the shares in respect of which the call was made will be liable to be forfeited.

38. If the requirements of any such notice as aforesaid are not complied with, any share in respect of which the notice has been given may at any time thereafter, before the payment required by notice has been made, be forfeited by a resolution of the Directors to that effect.

39. A forfeited share may be sold or otherwise disposed of on such terms and in such manner as the Directors think fit, and at any time before a sale or disposition the forfeiture may be cancelled on such terms as the Directors think fit.

40. A person whose shares have been forfeited shall cease to be a Member in respect of the forfeited shares, but shall, notwithstanding the forfeiture, remain liable to pay to the Company all moneys which at the date of forfeiture were payable by him to the Company in respect of the shares, but his liability shall cease if and when the Company receives payment in full of the fully paid up amount of the shares.

41. A certificate in writing under the hand of a Director of the Company, that a share has been forfeited on a date stated in the certificate, shall be conclusive evidence of the facts therein stated as against all persons claiming to be entitled to the share. The Company may receive the consideration, if any, given for the share or any sale or disposition thereof and may execute a transfer of the share in favour of the person to whom the share is sold or disposed of and he shall thereupon be registered as the holder of the share, and shall not be bound to see to the application of the purchase money, if any, nor shall his title to the share be affected by any irregularity or invalidity in the proceedings in reference to the forfeiture, sale or disposal of the share.

42. The provisions of these Articles as to forfeiture shall apply in the case of non-payment of any sum which by the terms of issue of a share becomes due and payable, whether on account of the

17

amount of the par value of the share, or by way of premium, as if the same had been payable by virtue of a call duly made and notified.

## REGISTRATION OF EMPOWERING INSTRUMENTS

43.   The Company shall be entitled to charge a fee not exceeding one dollar (US$1.00) on the registration of every probate, letters of administration, certificate of death or marriage, power of attorney, notice in lieu of distringas, or other instrument.

## TRANSMISSION OF SHARES

44.   The legal personal representative of a deceased sole holder of a share shall be the only person recognised by the Company as having any title to the share. In the case of a share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased survivor, shall be the only person recognised by the Company as having any title to the share.

45.   Any person becoming entitled to a share in consequence of the death or bankruptcy of a Member shall upon such evidence being produced as may from time to time be properly required by the Directors, have the right either to be registered as a Member in respect of the share or, instead of being registered himself, to make such transfer of the share as the deceased or bankrupt person could have made. If the person so becoming entitled shall elect to be registered himself as holder he shall deliver or send to the Company a notice in writing signed by him stating that he so elects.

46.   A person becoming entitled to a share by reason of the death or bankruptcy of the holder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered holder of the share, except that he shall not, before being registered as a Member in respect of the share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company, provided however, that the Directors may at any time give notice requiring any such person to elect either to be registered himself or to transfer the share, and if the notice is not complied with within ninety (90) calendar days, the Directors may thereafter withhold payment of all dividends, bonuses or other monies payable in respect of the share until the requirements of the notice have been complied with.

## ALTERATION OF CAPITAL

47.   The Company may by Ordinary Resolution:

      (a)   increase the share capital by such sum, to be divided into shares of such classes and amount, as the resolution shall prescribe;

      (b)   consolidate and divide all or any of its share capital into shares of larger amount than its existing shares;

18

(c)     sub-divide its existing shares or any of them into shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any unpaid on each reduced share shall be the same as it was in case of the share from which the reduced share is derived; and

(d)     cancel any shares which, at the date of the passing of the resolution, have not been taken or agreed to be taken by any person and diminish the amount of its share capital by the amount of the shares so cancelled.

48.     Subject to the provisions of the Statutes and these Articles as regards to the matters to be dealt with by Ordinary Resolution, the Company may by Special Resolution:

(a)     change its name;

(b)     alter or add to these Articles;

(c)     alter or add to the Memorandum of Association with respect to any objects, powers or other matters specified therein; and

(d)     reduce its share capital and any capital redemption reserve in any manner authorized by law.

49.     All new shares created hereunder shall be subject to the same provisions with reference to the payment of calls, liens, transfer, transmission, forfeiture and otherwise as the shares in the original share capital.

### CLOSING REGISTER OF MEMBERS OR FIXING RECORD DATE

50.     For the purpose of determining those Members that are entitled to receive notice of, attend or vote at any meeting of Members or any adjournment thereof, or those Members that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Member for any other purpose, the Directors may provide that the Register of Members shall be closed for transfers for a stated period but not to exceed in any case thirty (30) calendar days. If the Register of Members shall be so closed for the purpose of determining those Members that are entitled to receive notice of, attend or vote at a meeting of Members such register shall be so closed for at least ten (10) calendar days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register of Members.

51.     In lieu of or apart from closing the Register of Members, the Directors may fix in advance a date as the record date for any such determination of those Members that are entitled to receive notice of, attend or vote at a meeting of the Members and for the purpose of determining those Members that are entitled to receive payment of any dividend, the Directors may, at or within 30 calendar days prior to the date of declaration of such dividend fix a subsequent date as the record date of such determination.

19

52. If the Register of Members is not so closed and no record date is fixed for the determination of those Members entitled to receive notice of, attend or vote at a meeting of Members or those Members that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Members. When a determination of those Members that are entitled to receive notice of, attend or vote at a meeting of Members has been made as provided in this section, such determination shall apply to any adjournment thereof.

## GENERAL MEETINGS

53. All general meetings of the Company other than annual general meetings shall be called extraordinary general meetings.

54. (a) The Company may hold an annual general meeting and shall specify the meeting as such in the notices calling it. The annual general meeting shall be held at such time and place as the Directors shall determine.

    (b) At these meetings the report of the Directors (if any) shall be presented.

55. The Directors may call general meetings, and they shall on a Members requisition forthwith proceed to convene an extraordinary general meeting of the Company.

    (b) A Members requisition is a requisition of Members of the Company holding at the date of deposit of the requisition not less than one-third in par value of the share capital of the Company as at that date carries the right of voting at general meetings of the Company.

    (c) The requisition must state the objects of the meeting and must be signed by the requisitionists and deposited at the Company's principal place of business (with a copy sent to the Registered Office), and may consist of several documents in like form each signed by one or more requisitionists.

    (d) If the Directors do not within 21 calendar days from the date of the deposit of the requisition duly proceed to convene a general meeting to be held within a further 21 calendar days, the requisitionists, or any of them representing more than one half of the total voting rights of all of them, may themselves convene a general meeting, but any meeting so convened shall not be held after the expiration of three months after the expiration of the second said 21 calendar days.

    (e) A general meeting convened as aforesaid by requisitionists shall be convened in the same manner as nearly as possible as that in which general meetings are to be convened by Directors.

## NOTICE OF GENERAL MEETINGS

20

55A   At least seven calendar days' notice shall be given for any general meeting. Every notice shall be exclusive of the day on which it is given or deemed to be given and of the day for which it is given and shall specify the place, the day and the hour of the meeting and the general nature of the business and shall be given in the manner hereinafter mentioned or in such other manner if any as may be prescribed by the Company, provided that a general meeting of the Company shall, whether or not the notice specified in this regulation has been given and whether or not the provisions of these Articles regarding general meetings have been complied with, be deemed to have been duly convened if it is so agreed:

   (a)   in the case of an annual general meeting by all the Members (or their proxies) entitled to attend and vote thereat; and

   (b)   in the case of an extraordinary general meeting by a majority in number of the Members (or their proxies) having a right to attend and vote at the meeting, being a majority together holding not less than ninety five percent in par value of the shares giving that right.

56.   The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Member shall not invalidate the proceedings at any meeting.

## PROCEEDINGS AT GENERAL MEETINGS

57.   No business shall be transacted at any general meeting unless a quorum of Members is present at the time when the meeting proceeds to business. At least one Member holding not less than an aggregate of one-third of all voting share capital of the Company in issue present in person or by proxy and entitled to vote shall be a quorum for all purposes.

58.   If determined by the Board of Directors and specified in the notice of a general meeting, a person may participate at a general meeting by conference telephone or other communications equipment by means of which all the persons participating in the meeting can communicate with each other. Participation by a person in a general meeting in this manner is treated as presence in person at that meeting.

59.   If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Members, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting, the meeting shall be dissolved.

60.   The Chairman of the Board of Directors shall preside as chairman at every general meeting of the Company, except as provided in Article 61 below.

61.   If at any meeting the Chairman of the Board of Directors is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, the Members present shall choose a chairman of the meeting.

21

62. The chairman of a general meeting may with the consent of any meeting at which a quorum is present (and shall if so directed by the meeting) adjourn a meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting is adjourned for 10 calendar days or more, not less than seven (7) Business Days' notice of the adjourned meeting shall be given as in the case of an original meeting. Save as aforesaid it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

63. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by one or more Members present in person or by proxy entitled to vote and who together hold not less than 10 percent of the paid up voting share capital of the Company, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

64. If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded. The demand for a poll may be withdrawn.

65. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall not be entitled to a second or casting vote.

66. A poll demanded on the election of a chairman or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

66A. A resolution (including a Special Resolution) in writing (in one or more counterparts) signed by or on behalf of all of the Members for the time being entitled to receive notice of and to attend and vote at general meetings (or, being corporations or other non-natural persons, signed by their duly authorized representatives) shall be as valid and effective as if the resolution had been passed at a general meeting of the Company duly convened and held.

## VOTES OF MEMBERS

67. Subject to any rights and restrictions for the time being attached to any class or classes of shares, every Member present in person and every person representing a Member by proxy at a general meeting of the Company shall have one vote for each share registered in his name in the Register of Members.

22

68. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register of Members.

69. A Member of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote, whether on a show of hands or on a poll, by his committee, or other person in the nature of a committee appointed by that court, and any such committee or other person, may on a poll, vote by proxy.

70. No Member shall be entitled to vote at any general meeting unless all calls or other sums presently payable by him in respect of shares in the Company have been paid.

71. On a poll, votes may be given either personally or by proxy.

72. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorized in writing or, if the appointor is a corporation, either under seal or under the hand of an officer or attorney duly authorized. A proxy need not be a Member of the Company.

73. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

74. The instrument appointing a proxy shall be deposited at the registered office or at such other place as is specified for that purpose in the notice convening the meeting, or in any instrument of proxy sent out by the Company:

    (a) not less than 48 hours before the time for holding the meeting or adjourned meeting at which the person named in the instrument proposes to vote; or

    (b) in the case of a poll taken more than 48 hours after it is demanded, be deposited as aforesaid after the poll has been demanded and not less than 24 hours before the time appointed for the taking of the poll; or

    (c) where the poll is not taken forthwith but is taken not more than 48 hours after it was demanded be delivered at the meeting at which the poll was demanded to the chairman or to the secretary or to any director;

    provided that the Directors may in the notice convening the meeting, or in an instrument of proxy sent out by the Company, direct that the instrument appointing a proxy may be deposited (no later than the time for holding the meeting or adjourned meeting) at the registered office or at such other place as is specified for that purpose in the notice convening the meeting, or in any instrument of proxy sent out by the Company. The Chairman may in any event at his discretion direct that an instrument of proxy shall be deemed to have been duly deposited. An instrument of proxy that is not deposited in the manner permitted shall be invalid.

23

75.  Votes given in accordance with the terms of an instrument of proxy shall be valid
notwithstanding the previous death or insanity of the principal or revocation of the proxy or of
the authority under which the proxy was executed, or the transfer of the share in respect of
which the proxy is given unless notice in writing of such death, insanity, revocation or transfer
was received by the Company before the commencement of the general meeting, or adjourned
meeting at which it is sought to use the proxy.

## CORPORATIONS ACTING BY REPRESENTATIVES AT MEETING

76.  Any corporation which is a Member or a Director may by resolution of its directors or other
governing body authorise such person as it thinks fit to act as its representative at any meeting
of the Company or of any class of Members or of the Board of Directors or of a committee of
Directors, and the person so authorized shall be entitled to exercise the same powers on behalf
of the corporation which he represents as that corporation could exercise if it were an individual
Member or Director.

## CLEARING HOUSES

77.  If a clearing house (or its nominee) is a Member of the Company it may, by resolution of its
directors or other governing body or by power of attorney, authorise such person or persons as
it thinks fit to act as its representative or representatives at any general meeting of the Company
or at any general meeting of any class of Members of the Company provided that, if more than
one person is so authorized, the authorisation shall specify the number and class of shares in
respect of which each such person is so authorized. A person so authorized pursuant to this
provision shall be entitled to exercise the same powers on behalf of the clearing house (or its
nominee) which he represents as that clearing house (or its nominee) could exercise if it were an
individual member of the Company holding the number and class of shares specified in such
authorisation.

## DIRECTORS

78.  (a)  The Board shall consist of not less than seven (7) Directors (exclusive of alternate
Directors), provided that the Company may from time to time by Ordinary Resolution
increase or decrease the number of Directors on the Board.

(b)  Each Director shall hold office until the expiration of his term and until his successor
shall have been elected and qualified. The Board of Directors shall have a Chairman of
the Board of Directors (the "Chairman") elected and appointed by two-thirds (2/3) of
the Directors then in office, which constitutes a super majority; a similar super majority
is also required to remove the Chairman at any time. The Directors may also elect a
Co-Chairman or a Vice-Chairman of the Board of Directors (the "Co-Chairman"). The
Chairman shall preside as chairman at every meeting of the Board of Directors. To the
extent the Chairman is not present at a meeting of the Board of Directors, the Co-
Chairman, or in his absence, the attending Directors may choose one Director to be the
chairman of the meeting. The Chairman's voting right as to the matters to be decided
by the Board of Directors shall be the same as other Directors. Subject to these Articles
and the Companies Law, the Company may by Ordinary Resolution elect any person to
be a Director either to fill a casual vacancy on the Board or as an addition to the

24

existing Board. The Directors by the affirmative vote of a simple majority of the remaining Directors present and voting at a Board meeting, or the sole remaining Director, shall have the power from time to time and at any time to appoint any person as a Director to fill a casual vacancy on the Board or as an addition to the existing Board, subject to the Company's compliance with director nomination procedures required under applicable New York Stock Exchange corporate governance rules, as long as the Company's American Depositary Shares are trading on the New York Stock Exchange.

(c)     A Director may be removed from office by Special Resolution at any time before the expiration of his term notwithstanding any agreement between the Company and such Director (but without prejudice to any claim for damages under such agreement).

(d)     A vacancy on the Board created by the removal of a Director may be filled by the election or appointment by Ordinary Resolution at the meeting at which such Director is removed or by the affirmative vote of a simple majority of the remaining Directors present and voting at a duly called and constituted Board meeting. Notwithstanding anything to the contrary in these Articles, any persons entitled to designate any individual to be elected as a director of the Board pursuant to the Article 78(b) above shall have the right to remove any such director occupying such position and to fill any vacancy caused by the death, disability, retirement, resignation or removal of any director occupying such position during the periods specified in Article 78(b).  If a vacancy is created on the Board at any time by the death, disability, retirement, resignation or removal of any director designated pursuant to the above Article 78(b), the replacement to fill such vacancy shall be designated in the same manner, in accordance with this Article 78(b), as the director whose seat was vacated.

79.     The Board may, from time to time, and except as required by applicable law or the listing rules of the recognized stock exchange or automated quotation system where the Company's securities are traded, adopt, institute, amend, modify or revoke the corporate governance policies or initiatives, which shall be intended to set forth the policies of the Company and the Board on various corporate governance related matters as the Board shall determine by resolution from time to time.

80.     A Director shall not be required to hold any shares in the Company by way of qualification. A Director who is not a Member of the Company shall nevertheless be entitled to receive notice of and to attend and speak at general meetings of the Company and all classes of shares of the Company.

## DIRECTORS' FEES AND EXPENSES

81.     The Directors may receive such remuneration as the Board may from time to time determine. The Directors may be entitled to be repaid all traveling, hotel and incidental expenses reasonably incurred or expected to be incurred by him in attending meetings of the Board or committees of the Board or general meetings or separate meetings of any class of shares or of debentures of the Company or otherwise in connection with the discharge of his duties as a Director.

25

82.     Any Director who, by request, goes or resides abroad for any purpose of the Company or who performs services which in the opinion of the Board go beyond the ordinary duties of a Director may be paid such extra remuneration (whether by way of salary, commission, participation in profits or otherwise) as the Board may determine and such extra remuneration shall be in addition to or in substitution for any ordinary remuneration provided for by or pursuant to any other Article.

## ALTERNATE DIRECTOR

83.     Any Director may in writing appoint another person to be his alternate to act in his place at any meeting of the Directors at which he is unable to be present. Every such alternate shall be entitled to notice of meetings of the Directors and to attend and vote thereat as a Director when the person appointing him is not personally present and where he is a Director to have a separate vote on behalf of the Director he is representing in addition to his own vote. A Director may at any time in writing revoke the appointment of an alternate appointed by him. Such alternate shall be deemed for all purposes to be a Director and shall not be deemed to be the agent of the Director appointing him.  An alternate Director shall cease to be an alternate Director if his appointor ceases to be a Director.

84.     Any Director may appoint any person, whether or not a Director, to be the proxy of that Director to attend and vote on his behalf, in accordance with instructions given by that Director, or in the absence of such instructions at the discretion of the proxy, at a meeting or meetings of the Directors which that Director is unable to attend personally. The instrument appointing the proxy shall be in writing under the hand of the appointing Director and shall be in any usual or common form or such other form as the Directors may approve, and must be lodged with the Chairman prior to the commencement of the meeting.

## POWERS AND DUTIES OF DIRECTORS

85.     Subject to the provisions of the Companies Law, these Articles and to any resolutions made in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution made by the Company in a general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been made.

86.     Subject to these Articles, the Directors may from time to time appoint any person, whether or not a Director of the Company, to hold such office in the Company as the Directors may think necessary for the administration of the Company, including without prejudice to the foregoing generality, the office of the Chief Executive Officer, one or more Vice Presidents, Chief Financial Officer, Chief Operating Officer, Chief Technology Officer or Controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. The Directors may also appoint one or more of their body (but not an alternate Director) to the office of Managing Director upon like terms, but any such appointment shall ipso facto determine if any Managing Director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

26

87.    The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

88.    The Directors may from time to time and at any time by power of attorney appoint any company, firm or person or body of persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney may contain such provisions for the protection and convenience of persons dealing with any such attorney as the Directors may think fit, and may also authorise any such attorney to delegate all or any of the powers, authorities and discretion vested in him.

89.    The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the following paragraphs shall be without prejudice to the general powers conferred by this paragraph.

90.    The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any persons to be members of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any of the aforesaid.

91.    The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill up any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any person so appointed and may annul or vary any such delegation, but no person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

92.    Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretions for the time being vested to them.

93.    The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

## DISQUALIFICATION OF DIRECTORS

94.    Notwithstanding anything in these Articles, the office of Director shall be vacated, if the Director:

       (a)    dies, becomes bankrupt or makes any arrangement or composition with his creditors;

27

(b)     is found to be or becomes of unsound mind;

(c)     resigns his office by notice in writing to the Company; or

(d)     shall be removed from office pursuant to Article **Error! Reference source not found.** or the Statutes.

## PROCEEDINGS OF DIRECTORS

95.     The Directors may meet together (whether within or outside the Cayman Islands) for the dispatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit.

96.     A Director may at any time summon a meeting of the Directors by prior notice to every other Director and alternate Director.

97.     Notice of a meeting of the Board shall be deemed to be duly given to a Director if it is given to such Director verbally (in person or by telephone) or otherwise communicated or sent to such Director by post, cable, telex, telecopier, facsimile, electronic mail or other mode of representing words in a legible form at such Director's last known address or any other address given by such Director to the Company for this purpose.

98.     A Director or Directors may participate in any meeting of the Board of Directors, or of any committee appointed by the Board of Directors of which such Director or Directors are members, by means of conference telephone, video conference or similar communication equipment by way of which all persons participating in such meeting can hear each other and such participation shall be deemed to constitute presence in person at the meeting.

99.     The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors and unless so fixed shall be three Directors then in office, provided that a Director and his appointed alternate Director shall be considered only one person for this purpose. A meeting of the Directors at which a quorum is present when the meeting proceeds to business shall be competent to exercise all powers and discretions for the time being exercisable by the Directors. A meeting of the Directors may be held by means of telephone or teleconferencing or any other telecommunications facility provided that all participants are thereby able to communicate immediately by voice with all other participants.

100.    If a quorum is not present at a Board meeting within thirty (30) minutes following the time appointed for such board meeting, the relevant meeting shall be adjourned for a period of at least three (3) Business Days and the presence of any four (4) directors shall constitute a quorum at such adjourned meeting. A meeting of the Directors at which a quorum is present when the meeting proceeds to business shall be competent to exercise all powers and discretions for the time being exercisable by the Directors.

28

101.    Questions arising at any meeting of the Directors shall be decided by a majority of votes and each Director shall be entitled to one (1) vote in deciding matters deliberated at any meeting of the Directors.

102.    In case of equality of votes, the Chairman shall have a second or casting vote.

103.    A Director who is in any way, whether directly or indirectly, interested in a contract or arrangement or proposed contract or arrangement with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member, shareholder, director, partner, officer or employee of any specified company or firm and is to be regarded as interested in any contract or arrangement which may thereafter be made or entered into with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract or arrangement so made or entered into. A Director may vote in respect of any contract or arrangement or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or arrangement or proposed contract or arrangement shall come before the meeting for consideration.

104.    A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

105.    Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

106.    The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

        (a)    all appointments of officers made by the Directors;

        (b)    the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

        (c)    all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

29

107.   When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

108.   A resolution in writing signed by all the Directors shall be as valid and effectual as if it had been passed at a meeting of the Directors duly called and constituted and when signed, a resolution may consist of several documents each signed by one or more of the Directors.

109.   The continuing Directors may act, notwithstanding any vacancy in their body, but if and for so long as their number is reduced below the number fixed pursuant to these Articles as the necessary quorum of Directors, then the continuing Directors may act only to increase the number or to summon a general meeting of the Company, but for no other purpose.

110.   The Board may delegate any of its powers, authorities and discretions to committees, consisting of such Director or Directors and other persons as it thinks fit, and they may, from time to time, revoke such delegation or revoke the appointment of and discharge any such committees either wholly or in part, and either as to persons or purposes. Any committee so formed shall, in the exercise of the powers, authorities and discretions so delegated, conform to any regulations which may be imposed on it by the Board. A committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within five minutes after the time appointed for holding the same, the members present may choose one of their number to be chairman of the meeting.

111.   A committee appointed by the Directors may meet and adjourn as it thinks proper. Questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

112.   All acts done by any meeting of the Directors or of a committee of Directors, or by any person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such person had been duly appointed and was qualified to be a Director.

## PRESUMPTION OF ASSENT

113.   A Director who is present at a meeting of the Board of Directors at which action on any Company matter is taken shall be presumed to have assented to the action taken unless his dissent shall be entered in the Minutes of the meeting or unless he shall file his written dissent from such action with the person acting as the Chairman or Secretary of the meeting before the adjournment thereof or shall forward such dissent by registered post to such person immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Director who voted in favour of such action.

## DIVIDENDS, DISTRIBUTIONS AND RESERVE

30

114.  Subject to any rights and restrictions for the time being attached to any class or classes of shares and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

115.  Subject to any rights and restrictions for the time being attached to any class or classes of shares and these Articles, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

116.  The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, at the discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds be properly applied and pending such application may, at the like discretion, either be employed in the business of the Company or be invested in such investments (other than shares of the Company) as the Directors may from time to time think fit.

117.  Any dividend may be paid by wire transfer to the Member or by cheque sent to the registered address of the Member or person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such person and such address as the Member or person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the person to whom it is sent or to the order of such other person as the Member or person entitled, or such joint holders as the case may be, may direct.

118.  The Directors when paying dividends to the Members in accordance with the foregoing provisions may make such payment either in cash or in specie.

119.  Dividends may be declared and paid out of profits of the Company, realised or unrealised, or from any reserve set aside from profits which the Directors determine is no longer needed. Dividends may also be declared and paid out of share premium account or any other fund or account which can be authorised for this purpose in accordance with the Companies Law.

120.  Subject to the rights of persons, if any, entitled to shares with special rights as to dividends, all dividends shall be declared and paid according to the amounts paid or credited as fully paid on the shares, but if and so long as nothing is paid up on any of the shares in the Company dividends may be declared and paid according to the amounts of the shares. No amount paid on a share in advance of calls shall, while carrying interest, be treated for the purposes of this Article as paid on the share.

121.  If several persons are registered as joint holders of any share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the share.

122.  No dividend shall bear interest against the Company.

**BOOK OF ACCOUNTS**

31

123.   The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.

124.   The books of account shall be kept at such place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

125.   The Directors shall from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Members not being Directors, and no Member (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorized by the Directors or by the Company by Ordinary Resolution.

126.   The accounts relating to the Company's affairs shall be audited in such manner and with such financial year end as may be determined from time to time by the Company by Ordinary Resolution or failing any such determination by the Directors or failing any determination as aforesaid shall not be audited.

## ANNUAL RETURNS AND FILINGS

127.   The Board shall make the requisite annual returns and any other requisite filings in accordance with the Companies Law.

## AUDIT

128.   The Directors may appoint an Auditor of the Company who shall hold office until removed from office by a resolution of the Directors and may fix his or their remuneration.

129.   Every Auditor of the Company shall have a right of access at all times to the books and accounts and vouchers of the Company and shall be entitled to require from the Directors and Officers of the Company such information and explanation as may be necessary for the performance of the duties of the auditors.

130.   Auditors shall, if so required by the Directors, make a report on the accounts of the Company during their tenure of office at the next annual general meeting following their appointment in the case of a company which is registered with the Registrar of Companies as an ordinary company, and at the next special meeting following their appointment in the case of a company which is registered with the Registrar of Companies as an exempted company, and at any time during their term of office, upon request of the Directors or any general meeting of the Members.

## THE SEAL

32

131. The Company may, if the Directors so determine, have a Seal. The Seal of the Company shall not be affixed to any instrument except by the authority of a resolution of the Board of Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of any one or more persons as the Directors may appoint for the purpose and every person as aforesaid shall sign every instrument to which the Seal of the Company is so affixed in their presence.

132. The Company may maintain a facsimile of its Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Board of Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal. The facsimile Seal shall be affixed in the presence of such person or persons as the Directors shall for this purpose appoint and such person or persons as aforesaid shall sign every instrument to which the facsimile Seal of the Company is so affixed in their presence of and the instrument signed by a Director or the Secretary (or an Assistant Secretary) of the Company or in the presence of any one or more persons as the Directors may appoint for the purpose.

133. Notwithstanding the foregoing, a Director shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

### OFFICERS

134. Subject to Article **Error! Reference source not found.**, the Company may have Chief Executive Officer, Chief Operating Officer, Chief Technical Officer, Chief Financial Officer and other executive officers as the Directors see fit. The Directors may also from time to time appoint such other officers as they consider necessary, all for such terms, at such remuneration and to perform such duties, and subject to such provisions as to disqualification and removal as the Directors from time to time subscribe.

### CAPITALISATION OF PROFITS

135. Subject to the Statutes and these Articles, the Board may, with the authority of an Ordinary Resolution:

   (a) resolve to capitalise an amount standing to the credit of reserves (including a share premium account, capital redemption reserve and profit and loss account), whether or not available for distribution;

   (b) appropriate the sum resolved to be capitalised to the Members in proportion to the nominal amount of shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

33

(i)    paying up the amounts (if any) for the time being unpaid on shares held by them respectively; or

(ii)   paying up in full unissued shares or debentures of a nominal amount equal to that sum,

and allot the shares or debentures, credited as fully paid, to the Members (or as they may direct) in those proportions, or partly in one way and partly in the other, but the share premium account, the capital redemption reserved and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued shares to be allotted to Members credited as fully paid;

(c)    make any arrangements it thinks fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where shares or debentures become distributable in fractions the Board may deal with the fractions as it thinks fit;

(d)    authorise a person to enter (on behalf of all the Members concerned) an agreement with the Company providing for either:

(i)    the allotment to the Members respectively, credited as fully paid, of shares or debentures to which they may be entitled on the capitalisation, or

(ii)   the payment by the Company on behalf of the Members (by the application of their respective operations of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing shares, an agreement made under the authority being effective and binding on all those Members; and

(e)    generally do all acts and things required to give effect to the resolution.

### NOTICES

136.   Except as otherwise provided in these Articles, any notice or document may be served by the Company or by the person entitled to give notice to any Member either personally, by facsimile or by sending it through the post in a prepaid letter or via a recognised courier service, fees prepaid, addressed to the Member at his address as appearing in the Register of Members or, to the extent permitted by all applicable laws and regulations, by electronic means by transmitting it to any electronic number or address or website supplied by the Member to the Company or by placing it on the Company's Website. In the case of joint holders of a share, all notices shall be given to that one of the joint holders whose name stands first in the Register of Members in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

137.   Notices posted to addresses outside the Cayman Islands shall be forwarded by prepaid airmail.

34

138.   Any Member present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.

139.   Any notice or other document, if served by:

(a)   post, shall be deemed to have been served five calendar days after the time when the letter containing the same is posted and if served by courier, shall be deemed to have been served five calendar days after the time when the letter containing the same is delivered to the courier (in proving such service it shall be sufficient to prove that the letter containing the notice or document was properly addressed and duly posted or delivered to the courier);

(b)   facsimile, shall be deemed to have been served upon confirmation of receipt;

(c)   recognised delivery service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service and in proving such service it shall be sufficient to provide that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier; or

(d)   electronic means as provided herein shall be deemed to have been served and delivered on the day following that on which it is successfully transmitted or at such later time as may be prescribed by any applicable laws or regulations.

140.   Any notice or document delivered or sent to any Member in accordance with the terms of these Articles shall notwithstanding that such Member be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any share registered in the name of such Member as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register of Members as the holder of the share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all persons interested (whether jointly with or as claiming through or under him) in the share.

141.   Notice of every general meeting shall be given to:

(a)   every person shown as a Member in the Register of Members on the record date for such meeting;

(b)   every person entitled to a share in consequence of the death or bankruptcy of a Member, who but for his death or bankruptcy would be entitled to receive notice of the meeting; and

(c)   each Director and Alternate Director.

No other person shall be entitled to receive notices of general meetings.

35

## INFORMATION

142.   No Member shall be entitled to require discovery of any information in respect of any detail of the Company's trading or any information which is or may be in the nature of a trade secret or secret process which may relate to the conduct of the business of the Company and which in the opinion of the Board would not be in the interests of the Members of the Company to communicate to the public.

143.   The Board shall be entitled to release or disclose any information in its possession, custody or control regarding the Company or its affairs to any of its members including, without limitation, information contained in the Register of Members and transfer books of the Company.

## INDEMNITY

144.   Every Director (including for the purposes of this Article any Alternate Director appointed pursuant to the provisions of these Articles) and officer of the Company for the time being and from time to time shall be indemnified and secured harmless out of the assets and funds of the Company against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by him, otherwise than by reason of his own dishonesty, actual fraud or willful default, in connection with the execution or discharge of his duties, powers, authorities or discretions as a Director or officer of the Company, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by him in defending (whether successfully or otherwise) any civil proceedings concerning the Company or its affairs in any court whether in the Cayman Islands or elsewhere.

145.   No such Director or officer of the Company shall be liable to the Company for any loss or damage unless such liability arises through the dishonesty, actual fraud or willful default of such Director or officer.

## FINANCIAL YEAR

146.   Unless the Directors otherwise prescribe, the financial year of the Company shall end on December 31st in each year and shall begin on January 1st in each year.

## WINDING UP

147.   Subject to these Articles, if the Company shall be wound up the liquidator may, with the sanction of an Ordinary Resolution of the Company, divide amongst the Members in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Members or different classes of Members. The liquidator may, with the like sanction, vest the whole or any part of such assets in trustees upon such trusts for the benefit of the contributories as the liquidator, with the like sanction shall think fit, but so that no Member shall be compelled to accept any shares or other securities whereon there is any liability.

36

## AMENDMENT OF MEMORANDUM AND ARTICLES OF ASSOCIATION AND NAME OF COMPANY

148.    The Company may at any time and from time to time by Special Resolution alter or amend these Articles or the Memorandum of Association of the Company, in whole or in part.

## REGISTRATION BY WAY OF CONTINUATION

149.    The Company may by Ordinary Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.



CERTIFIED TO BE A TRUE AND CORRECT COPY

SIG

V. Daphene Whitelocke
Assistant Registrar

Date. 10, May 2011

37

286999.02-Hong Kong Server 1A - MSW

# Shareholder Register - Standard Format by Fund

**As of: 03/24/2020**

User-Defined Record Selection Criteria

**Account Type(s)**

ALL

**Account Status(s)**

A

**SocialCode(s)**

ALL

**Broker/Dealer(s)**

ALL

**Branch(es)**

ALL

**Representative(s)**

ALL

**Fund(s)**

ALL

As of: 03/24/2020

**Shareholder Register - Standard Format by Fund**

Link Motion Inc. - Class A Common Shares - Base Currency: USD



| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|

**Investor ID:** 10286 **Group Desc.:** **Cust. Class. Codes :** **Broker:** Not Assigned, Not Assigned, None

**Investor:** Abali Corp.

Abali Corp.
Rm 404, Building A2, Tianda Tech Park,
No. 80, 4th Street,
Tianjin
China

| Account | Designation | Status | Acct.Type | Soc. Code | Book Shares | Total Shares | % of Tot. Shares | NAV / Share | Cash Bal. | Market Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 661944A 10286 | | | Corporation | Other | 2 | 2 | 0.00% | 1 | 0.00 | 2.00 |

**Investor ID:** 8696 **Cust. Class. Codes :** **Broker:** Not Assigned, Not Assigned, None

**Investor:** China Mobile Communications Industry Investment Limited

China Mobile Communications Industry Investment Limited
UNIT 1205 12/F, SINO PLAZA,
255 GLOUCESTER ROAD,
CAUSEWAY BAY,
HONG KONG

| Account | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 661944A 8696 | | | Corporation | Other | 2 | 2 | 0.00% | 1 | 0.00 | 2.00 |

**Investor ID:** 1011 **Broker:** Not Assigned, Not Assigned, None

**Investor:** Deutsche Bank Trust Company Americas

Deutsche Bank Trust Company Americas
60 Wall Street, New York
New York 10005
USA
Attention: ADR Department

| Account | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 661944A 1011 | | | Corporation | Other | 0 | 438,043,750 | 88.50% | 1 | 0.00 | 438,043,750.00 |

**Investor ID:** 11281 **Cust. Class. Codes :** **Broker:** Not Assigned, Not Assigned, None

**Investor:** Double Rise Investments Limited

Double Rise Investments Limited
Second Floor, Capital City,
Independence Avenue, P.O.Box 1008, Victoria

*MShare 10.9.3 (Build 20300)*

Report compiled    03/24/2020    12:17PM

Record Selection:    See Cover

Page    Page 62 of 75

**Shareholder Register - Standard Format by Fund**

**As of: 03/24/2020**

Link Motion Inc. - Class A Common Shares - Base Currency: USD

Mahe¹
Seychelles

| Account | Designation | Status | Acct.Type | Soc. Code | Book Shares | Total Shares | % of Tot. Shares | NAV / Share | Cash Bal. | Market Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 661944A  11281 | | | Corporation | Other | | 3 | 0.00% | | 0.00 | 3.00 |

| Investor ID: | 9251 | | Group Desc.: | | | | Cust. Class. Codes : | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Investor: | Feiliu Mobile Inc. | | | | | | Broker: | Not Assigned, Not Assigned, None | | |

Feiliu Mobile Inc.
Scotia Centre, 4th Floor
P.O. Box 2804
George Town
Grand Cayman KY 1-1112
Cayman Islands

| Account | Designation | Status | Acct.Type | Soc. Code | Book Shares | Total Shares | % of Tot. Shares | NAV / Share | Cash Bal. | Market Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 661944A  9251 | | | Corporation | Other | 4 | 4 | 0.00% | 1 | 0.00 | 4.00 |

| Investor ID: | 10001 | | Group Desc.: | | | | Cust. Class. Codes : | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Investor: | FINE ACE LIMITED | | | | | | Broker: | Not Assigned, Not Assigned, None | | |

FINE ACE LIMITED
P.O. Box 1239 Offshore Incorporations Centre, Victoria
Mahe
Republic of Seychelles

| Account | Designation | Status | Acct.Type | Soc. Code | Book Shares | Total Shares | % of Tot. Shares | NAV / Share | Cash Bal. | Market Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 661944A  10001 | | | Corporation | Other | 3 | 3 | 0.00% | 1 | 0.00 | 3.00 |

| Investor ID: | 9986 | | Group Desc.: | | | | Cust. Class. Codes : | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Investor: | FORTUNE NETWORK LIMITED | | | | | | Broker: | Not Assigned, Not Assigned, None | | |

FORTUNE NETWORK LIMITED
Room 510-511 D2, Nan Fung Tower 173
Des Voeux Road Central, Sheung Wan
Hong Kong

| Account | Designation | Status | Acct.Type | Soc. Code | Book Shares | Total Shares | % of Tot. Shares | NAV / Share | Cash Bal. | Market Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 661944A  9986 | | | Corporation | Other | 2 | 10,000,002 | 2.02% | 1 | 0.00 | 10,000,002.00 |



**As of: 03/24/2020**

**Shareholder Register - Standard Format by Fund**

Link Motion Inc. - Class A Common Shares - Base Currency: USD



| Investor ID: | 8811 | Group Desc.: | | | Cust. Class. Codes : | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Investor:** | | | | | | **Broker:** | Not Assigned, Not Assigned, None | | |
| | Gather Benefit Holdings Limited | | | | | | | | |
| | Gather Benefit Holdings Limited | | | | | | | | |
| | Akara Bldg, 24 De Castro Street, | | | | | | | | |
| | Wickhams Cay 1, Road Town, | | | | | | | | |
| | Tortola, | | | | | | | | |
| | British Virgin Islands | | | | | | | | |

| Account | Designation | Status | Acct.Type | Soc. Code | Book Shares | Total Shares | % of Tot. Shares | NAV / Share | Cash Bal. | Market Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 661944A  8811 | | | Corporation | Other | 1,940,636 | 1,940,636 | 0.39% | | 0.00 | 1,940,636.00 |

| Investor ID: | 10201 | Group Desc.: | | | Cust. Class. Codes : | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Investor:** | | | | | | **Broker:** | Not Assigned, Not Assigned, None | | |
| | Loneranger International Limited | | | | | | | | |
| | Loneranger International Limited | | | | | | | | |
| | Suite 13, First Floor, Oliaji Trade Centre | | | | | | | | |
| | Francis Rachel Street, Victoria | | | | | | | | |
| | Mahe | | | | | | | | |
| | Republic of Seychelles | | | | | | | | |

| Account | Designation | Status | Acct.Type | Soc. Code | Book Shares | Total Shares | % of Tot. Shares | NAV / Share | Cash Bal. | Market Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 661944A  10201 | | | Corporation | Other | 2 | 2 | 0.00% | 1 | 0.00 | 2.00 |

| Investor ID: | 7611 | Group Desc.: | | | Cust. Class. Codes : | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Investor:** | | | | | | **Broker:** | Not Assigned, Not Assigned, None | | |
| | RPL Holdings Limited | | | | | | | | |
| | RPL Holdings Limited | | | | | | | | |
| | PO Box 3444, | | | | | | | | |
| | Road Town, | | | | | | | | |
| | Tortola, | | | | | | | | |
| | British Virgin Islands | | | | | | | | |

| Account | Designation | Status | Acct.Type | Soc. Code | Book Shares | Total Shares | % of Tot. Shares | NAV / Share | Cash Bal. | Market Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 661944A  7611 | | | Corporation | Other | 0 | 45,000,000 | 9.09% | 1 | 0.00 | 45,000,000.00 |

| Investor ID: | 10696 | Group Desc.: | | | Cust. Class. Codes : | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Investor:** | | | | | | **Broker:** | Not Assigned, Not Assigned, None | | |
| | Shenzhen Chinaxyl Mobile Connection Technology Co., Ltd | | | | | | | | |
| | Shenzhen Chinaxyl Mobile Connection Technology Co., Ltd | | | | | | | | |
| | 2F, 5 Wing Kut Street, | | | | | | | | |
| | Central, | | | | | | | | |

*MShare 10.9.3 (Build 20300)*

| Report compiled | 03/24/2020 | 12:17PM | Record Selection: | See Cover | Page | 4 of 10 |
|---|---|---|---|---|---|---|

**As of: 03/24/2020**

**Shareholder Register - Standard Format by Fund**

Link Motion Inc. - Class A Common Shares - Base Currency: USD

Hong Kong SAR

| Account | Designation | Status | Acct.Type | Soc. Code | Book Shares | Total Shares | % of Tot. Shares | NAV / Share | Cash Bal. | Market Value |
|---------|-------------|--------|-----------|-----------|-------------|--------------|------------------|-------------|-----------|--------------|
| 661944A 10696 | | | Corporation | Other | 1 | | 0.00% | 1 | 0.00 | 1.00 |

| Investor ID: | 9487 | Group Desc.: | | Cust. Class. Codes : | | |
|---|---|---|---|---|---|---|
| Investor: | Top King Technology Ltd. | | Broker: | Not Assigned, Not Assigned, None | | |

Top King Technology Ltd.
Akara Bldg., 24 De Castro Street
Wickhams Cay 1, Road Town
Tortola
British Virgin Islands

| Account | Designation | Status | Acct.Type | Soc. Code | Book Shares | Total Shares | % of Tot. Shares | NAV / Share | Cash Bal. | Market Value |
|---------|-------------|--------|-----------|-----------|-------------|--------------|------------------|-------------|-----------|--------------|
| 661944A 9487 | | | Corporation | Other | 3 | 3 | 0.00% | 1 | 0.00 | 3.00 |

| Investor ID: | 10006 | Group Desc.: | | Cust. Class. Codes : | | |
|---|---|---|---|---|---|---|
| Investor: | VISION UNICORN LIMITED | | Broker: | Not Assigned, Not Assigned, None | | |

VISION UNICORN LIMITED
P.O. Box 1239, Offshore Incorporations Centre
Victoria, Mahe
Republic of Seychelles

| Account | Designation | Status | Acct.Type | Soc. Code | Book Shares | Total Shares | % of Tot. Shares | NAV / Share | Cash Bal. | Market Value |
|---------|-------------|--------|-----------|-----------|-------------|--------------|------------------|-------------|-----------|--------------|
| 661944A 10006 | | | Corporation | Other | 1 | | 0.00% | | 0.00 | 1.00 |

| Investor ID: | 10086 | Group Desc.: | | Cust. Class. Codes : | | |
|---|---|---|---|---|---|---|
| Investor: | WINSHINE BUSINESS GROUP INC. | | Broker: | Not Assigned, Not Assigned, None | | |

WINSHINE BUSINESS GROUP INC.
5C, No. 380,
Shensong Road,
Shanghai, China

| Account | Designation | Status | Acct.Type | Soc. Code | Book Shares | Total Shares | % of Tot. Shares | NAV / Share | Cash Bal. | Market Value |
|---------|-------------|--------|-----------|-----------|-------------|--------------|------------------|-------------|-----------|--------------|
| 661944A 10086 | | | Corporation | Other | 3 | 3 | 0.00% | | 0.00 | 3.00 |

| Link Motion Inc. - Class A Common Shares | 1,940,662 | 494,984,412 | 100.00% | | 0.00 | 494,984,412.00 |
|---|---|---|---|---|---|---|

14 Record(s)

**Shareholder Register - Standard Format by Fund**

As of: 03/24/2020

Link Motion Inc. - Class B Common Shares - Base Currency: USD



| Investor ID: | 7622 | Group Desc.: | | Cust. Class. Codes : | |
|---|---|---|---|---|---|
| Investor: | Banean Holdings Ltd. | | Broker: | Not Assigned, Not Assigned, None | |

Banean Holdings Ltd.
101 University Ave,
4th Floor, Palo Alto, CA 94301
United States of America

| Account | Designation | Status | Acct.Type | Soc. Code | Book Shares | Total Shares | % of Tot. Shares | NAV / Share | Cash Bal. | Market Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 661944B  7622 | | | Corporation | Other | 3 | 3 | 0.00% | 1 | 0.00 | 3.00 |

| Investor ID: | 7627 | Group Desc.: | | Cust. Class. Codes : | |
|---|---|---|---|---|---|
| Investor: | C2C INTERNATIONAL LIMITED | | Broker: | Not Assigned, Not Assigned, None | |

C2C INTERNATIONAL LIMITED
P.O. Box 957,
Offshore Incorporations Centre,
Road Town,
Tortola,
British Virgin Islands

| Account | Designation | Status | Acct.Type | Soc. Code | Book Shares | Total Shares | % of Tot. Shares | NAV / Share | Cash Bal. | Market Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 661944B  7627 | | | Corporation | Other | 4 | 4 | 0.00% | 1 | 0.00 | 4.00 |

| Investor ID: | 7618 | Group Desc.: | | Cust. Class. Codes : | |
|---|---|---|---|---|---|
| Investor: | Ceyuan Ventures Advisors Fund, LLC | | Broker: | Not Assigned, Not Assigned, None | |

Ceyuan Ventures Advisors Fund, LLC
PO Box 309, Ugland House,
Grand Cayman,
KY1-1104,
Cayman Islands

| Account | Designation | Status | Acct.Type | Soc. Code | Book Shares | Total Shares | % of Tot. Shares | NAV / Share | Cash Bal. | Market Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 661944B  7618 | | | Corporation | Other | 1 | 1 | 0.00% | 1 | 0.00 | 1.00 |

| Investor ID: | 7617 | Group Desc.: | | Cust. Class. Codes : | |
|---|---|---|---|---|---|
| Investor: | Ceyuan Ventures I, L.P. | | Broker: | Not Assigned, Not Assigned, None | |

Ceyuan Ventures I, L.P.
PO Box 309, Ugland House,
Grand Cayman,

---

*MShare 10.9.3 (Build 20300)*

Report compiled     03/24/2020     12:17PM

| Record Selection: | See Cover |
|---|---|

Page

**Shareholder Register - Standard Format by Fund**

As of: 03/24/2020

Link Motion Inc. - Class B Common Shares - Base Currency: USD

KYI-1104,
Cayman Islands

| Account | Designation | Status | Acct.Type | Soc. Code | Book Shares | Total Shares | % of Tot. Shares | NAV / Share | Cash Bal. | Market Value |
|---------|-------------|--------|-----------|-----------|-------------|--------------|------------------|-------------|-----------|--------------|
| 661944B 7617 | | | Corporation | Other | 1 | 1 | 0.00% | | 0.00 | 1.00 |

**Investor ID:** 37636    **Group Desc.:**    **Cust. Class. Codes :**

**Investor:** China AI Capital Limited *50% Full paid; 50% Nil paid    **Broker:** Not Assigned, Not Assigned, None

China AI Capital Limited *50% Full paid; 50% Nil paid
Vistra Corporate Services Centre, Wickhams Cay II, Road Town,
Tortola,  VG1110
British Virgin Islands

| Account | Designation | Status | Acct.Type | Soc. Code | Book Shares | Total Shares | % of Tot. Shares | NAV / Share | Cash Bal. | Market Value |
|---------|-------------|--------|-----------|-----------|-------------|--------------|------------------|-------------|-----------|--------------|
| 661944B 37636 | | | Corporation | Other | 0 | 70,175,439 | 92.91% | 1 | 0.00 | 70,175,439.00 |

**Investor ID:** 6162    **Group Desc.:**    **Cust. Class. Codes :**

**Investor:** Fidelity Asia Principals Fund L.P.    **Broker:** Not Assigned, Not Assigned, None

Fidelity Asia Ventures Fund L.P.
FIL Capital Management (Hong Kong) Limited,
17/F, One International Finance Centre,
1 Harbour View Street,
Central, Hong Kong SAR

| Account | Designation | Status | Acct.Type | Soc. Code | Book Shares | Total Shares | % of Tot. Shares | NAV / Share | Cash Bal. | Market Value |
|---------|-------------|--------|-----------|-----------|-------------|--------------|------------------|-------------|-----------|--------------|
| 661944B 6162 | | | Corporation | Other | 2 | 2 | 0.00% | 1 | 0.00 | 2.00 |

**Investor ID:** 6161    **Group Desc.:**    **Cust. Class. Codes :**

**Investor:** Fidelity Asia Ventures Fund L.P.    **Broker:** Not Assigned, Not Assigned, None

Fidelity Asia Ventures Fund L.P.
FIL Capital Management (Hong Kong) Limited,
17/F, One International Finance Centre,
1 Harbour View Street,
Central, Hong Kong SAR

| Account | Designation | Status | Acct.Type | Soc. Code | Book Shares | Total Shares | % of Tot. Shares | NAV / Share | Cash Bal. | Market Value |
|---------|-------------|--------|-----------|-----------|-------------|--------------|------------------|-------------|-----------|--------------|
| 661944B 6161 | | | Corporation | Other | 2 | 2 | 0.00% | 1 | 0.00 | 2.00 |

As of: 03/24/2020

**Shareholder Register - Standard Format by Fund**

Link Motion Inc. - Class B Common Shares - Base Currency: USD



| Investor ID: | 7613 | Group Desc.: | | Cust. Class. Codes : | | | | |
|---|---|---|---|---|---|---|---|---|
| Investor: | GSR Associates II, L.P. | | | Broker: | Not Assigned, Not Assigned, None | | | |

GSR Associates II, L.P.
101 University Ave.,
4F, Palo Alto,
CA 94301,
United States of America

| Account | Designation | Status | Acct.Type | Soc. Code | Book Shares | Total Shares | % of Tot. Shares | NAV / Share | Cash Bal. | Market Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 661944B  7613 | | | Corporation | Other | 4 | 4 | 0.00% | 1 | 0.00 | 4.00 |

| Investor ID: | 7621 | Group Desc.: | | Cust. Class. Codes : | | | | |
|---|---|---|---|---|---|---|---|---|
| Investor: | H.T.C. (B.V.I.) CORP | | | Broker: | Not Assigned, Not Assigned, None | | | |

H.T.C. (B.V.I.) CORP
3rd Floor, Omar Hodge Building,
Wickhams Cay I,
PO Box 362,
Road Town,
Tortola,

| Account | Designation | Status | Acct.Type | Soc. Code | Book Shares | Total Shares | % of Tot. Shares | NAV / Share | Cash Bal. | Market Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 661944B  7621 | | | Corporation | Other | 3 | 3 | 0.00% | 1 | 0.00 | 3.00 |

| Investor ID: | 7626 | Group Desc.: | | Cust. Class. Codes : | | | | |
|---|---|---|---|---|---|---|---|---|
| Investor: | JOINTLINK ENTERPRISES LIMITED | | | Broker: | Not Assigned, Not Assigned, None | | | |

JOINTLINK ENTERPRISES LIMITED
P.O. Box 957,
Offshore Incorporations Centre,
Road Town,
Tortola,
British Virgin Islands

| Account | Designation | Status | Acct.Type | Soc. Code | Book Shares | Total Shares | % of Tot. Shares | NAV / Share | Cash Bal. | Market Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 661944B  7626 | | | Corporation | Other | 4 | 4 | 0.00% | 1 | 0.00 | 4.00 |

| Investor ID: | 7620 | Group Desc.: | | Cust. Class. Codes : | | | | |
|---|---|---|---|---|---|---|---|---|
| Investor: | Pacific Growth Ventures, L.P. | | | Broker: | Not Assigned, Not Assigned, None | | | |

Pacific Growth Ventures, L.P.

**Shareholder Register - Standard Format by Fund**

**As of: 03/24/2020**

Link Motion Inc. - Class B Common Shares - Base Currency: USD



Walker House,
Mary Street,
PO Box 265,
Grand Cayman,
KY1-9001,

| Account | Designation | Status | Acct.Type | Soc. Code | Book Shares | Total Shares | % of Tot. Shares | NAV / Share | Cash Bal. | Market Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 661944B  7620 | | | Corporation | Other | 0 | 3 | 0.00% | 1 | 0.00 | 3.00 |

| Investor ID: | 7611 | Group Desc.: | | Cust. Class. Codes : | |
|---|---|---|---|---|---|
| Investor: | RPL Holdings Limited | | | Broker: | Not Assigned, Not Assigned, None |

RPL Holdings Limited
PO Box 3444,
Road Town,
Tortola,
British Virgin Islands

| Account | Designation | Status | Acct.Type | Soc. Code | Book Shares | Total Shares | % of Tot. Shares | NAV / Share | Cash Bal. | Market Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 661944B  7611 | | | Corporation | Other | 0 | 5,352,941 | 7.09% | 1 | 0.00 | 5,352,941.00 |

| Link Motion Inc. - Class B Common Shares | | | 24 | 75,528,407 | 100.00% | 0.00 | 75,528,407.00 |
|---|---|---|---|---|---|---|---|

12 Record(s)

**Shareholder Register - Standard Format by Fund**

As of: 03/24/2020

| Grand Totals: | 26 Total Records | Book Shares | Total Shares | Cash Bal. | Market Value |
|---|---|---|---|---|---|
| | | 1,940,686 | 570,512,819 | 0.00 | 570,512,819.00 |

**End of Report**

*MShare 10.9.3 (Build 20300)*

Record Selection:          See Cover

# Robert W. Seiden

**Court-Appointed Temporary Receiver for Link Motion Inc.,
By Order of the Honorable Victor Marrero of the United
States District Court for the Southern District of New York**

469 7th Avenue, 5th Floor
New York, New York 10018
Tel: (212) 523-0686
Email: rseiden@seidenlegal.com

**VIA EMAIL**

Honorable Victor Marrero
United States Courthouse
Suite 1040
500 Pearl Street
New York, New York 10007

June 1, 2020

**REQUEST FOR THIS LETTER AND ALL ATTACHMENTS TO BE MAINTAINED
UNDER SEAL**

**Re:**   ***Baliga v. Link Motion Inc. et al.,*** **1:18-cv-11642 (S.D.N.Y.) (VM) (DCF)**

Dear Judge Marrero,

I write to you pursuant to your Honor's February 1, 2019 Order (ECF No. 26) to request
approval on behalf of Link Motion, Inc. ("LKM" or the "Company"), a company incorporated in
the Cayman Islands, to convert the current outstanding loan amount to Class B Shares in
accordance with the terms of the Secured Convertible Promissory Note (the "Note"). *See attached
Exhibit A – Promissory Note.*

By orders dated June 18, 2019 and January 16, 2020 (ECF Nos. 119, 120, respectively),
your Honor previously approved the Note between Mr. Lilin Guo ("Mr. Guo") and the Court
Appointed Receiver for Link Motion, Inc. (the "Receiver"). *See attached Exhibit B and Exhibit
C*. On May 22, 2020, Mr. Guo officially notified the Receiver of his intention to convert the Note
to Class B Shares in accordance with the terms of the Note. *See attached Exhibit D - notification
provided by Mr. Guo to the Receiver.*

Accordingly, I request the Court's approval to convert the current outstanding loan balance of the Note plus accrued interest of $894,055 to 44,702,750 Class B Shares.  *See attached Exhibit E detailing the expenses incurred to date inside the PRC and the accompanying calculation for conversion)*.

The Receiver has consulted Cayman Islands counsel at the KSG Law firm and has been advised to proceed as follows in the Cayman Islands:

1.   Upon approval by this Court, the Receiver will prepare an application with the Cayman Islands court seeking recognition of this Order and requesting approval to convert the Note to Class B shares in accordance with Cayman Islands law;

2.   Upon a granting of the application by the Cayman Islands court, the Receiver will formally register the Class B shares pursuant to paragraph 4 of the Note with the duly registered agent of LKM in the Cayman Islands.

Attached please find a proposed order which includes language provided by Cayman Islands counsel for your Honor's review and consideration.

Please do not hesitate to contact me via email or telephone if your Honor wishes to discuss this request in further detail.

Respectfully submitted,

Robert W. Seiden, Esq.
Court Appointed Temporary Receiver for Link Motion Inc.

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WAYNE BALIGA, derivatively on behalf of
LINK MOTION INC. (F/K/A NQ MOBILE INC.)

                               Plaintiff,

        -against-

LINK MOTION INC. (F/K/A NQ MOBILE INC.),
VINCENT WENYONG SHI,
JIA LIAN,
XIAO YU,

                             Defendants,

        -and-

LINK MOTION INC. (F/K/A NQ MOBILE INC.),

                      Nominal Defendant.

1:18-cv-11642

**ORDER**

---

On December 13, 2018, Plaintiff commenced this action by filing a complaint against Link Motion, Inc. ("LKM" or the "Company") and individual defendants for, *inter alia*, breach of fiduciary duty, unjust enrichment, and securities fraud.  ECF No. 1.

On February 1, 2019, the Court issued an order granting Plaintiff's request for the appointment of a temporary receiver over the Company.  ECF No. 26  (as to the Court-appointed receiver, the "Receiver").  Moreover, in its ruling, the Court ordered a temporary restraining order to enjoin Defendants from transferring, liquidating, dissipating, assigning, and/or granting a lien or security interest or other interest in any assets belonging to the Company.  ECF No. 26.

On June 18, 2019, the Court approved the Convertible Promissory Note Agreement between Mr. Lilin Guo ("Mr. Guo") and the Receiver in order to assist with funding of the Court Appointed Temporary Receivership's mandate inside the PRC.  On January 16,

2020, the Court approved the amended Convertible Promissory Note Agreement between Mr. Guo and the Receiver.  ECF Nos. 119, 120.

On June 1, 2020, the Receiver submitted a letter application (the "Application") and requested that the Court approve Mr. Guo's request to exercise his option to convert the Note to Class B Common Equity in accordance with the terms of the Note and to further approve the Receiver to take the necessary steps to register the converted shares with the Company's Cayman Island Registry.

In light of the above, and upon review of all the papers submitted by the Receiver in this action and in support of the Application, and with good cause appearing, it is hereby

**ORDERED AS FOLLOWS:**

The Receiver is authorized to exercise the rights, powers, and privileges of the directors of Link Motion, Inc. in order to take all necessary corporate actions on behalf of the Company to issue and allot the Class B Common Equity shares in accordance with the terms of the Secured Convertible Promissory Note and to enter, or cause to be entered, the issuance and allotment of the shares on the Company's Register of Members.

The Receiver's Application to convert the Secured Convertible Promissory Note to Class B Common Equity under the name of Mr. Lilin Guo is **GRANTED**.

The Receiver is authorized and directed to file with the Grand Court of the Cayman Islands an application to convert the Secured Convertible Promissory Note to Class B Common Equity under the name of Mr. Lilin Guo no later than June 30, 2020, and this Court requests the aid and assistance of the Grand Court of the Cayman Islands in giving effect to the terms of this Order.

**IT IS SO ORDERED.**

Enter:

Dated: <u>    June 5    </u>, 2020

Victor Marrero
U.S.D.J.

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

CAUSE NO: FSD 4 OF 2020 (MRHJ)

BETWEEN:

**ROBERT W. SEIDEN, IN HIS CAPACITY AS**
**TEMPORARY RECEIVER OF LINK MOTION INC.**

PLAINTIFF

AND:

**LINK MOTION INC.**

DEFENDANT

**PLAINTIFF'S**
**SKELETON ARGUMENT**
**(for hearing of summons on 14 July 2020)**

I.     **Background and Recommended Reading**

1.     These brief written submissions are made in support of the application brought by
       Robert W. Seiden, in his capacity as temporary receiver (the **Receiver**) of Link Motion
       Inc. (**Link Motion** or the **Company**), approving and authorizing the issue of Link
       Motion shares to the holder of a convertible promissory note.

2.     The Court will recall that the Receiver was appointed by United States District Court
       for the Southern District of New York (the **US Court**) under an order dated 1 February
       2019 (the **Receivership Order**). This Court recognized his appointment by an order
       dated 3 February 2020 (the **Recognition Order**).

3.     The Receiver's efforts to investigate the affairs of the Company and to take control of
       its assets and undertaking, as contemplated by the Receivership Order, has included
       significant work in the People's Republic of China (the **PRC**). Most of the Company's
       valuable assets are in the PRC.

4.     Those efforts required funding which was unavailable from the assets of the Company
       under the Receiver's control. Mr Guo Lilin, who the Court will recall has been appointed

1

by the Receiver to several positions within the Company and its subsidiaries, was willing to provide funding to the receivership. The Receiver and Mr Guo negotiated and agreed to a Secured Convertible Promissory Note which was made between the Company and Mr Guo (the **Note**). Under the Note, Mr Guo agreed to make a loan to the Company of the renminbi (**RMB**) equivalent of US$1,500,000 (the **Loan**) with a total return equivalent to 1.25 times the original principal amount. The Loan would be used to pay for professional services and operational expenses incurred in the PRC (excluding Hong Kong). Mr Guo had the option at any time to convert the outstanding amount of the Loan to Class B common shares in the Company at a price of US0.10 per ADS (American Depositary Share) equivalent, where one ADS is equivalent to 5 common shares.

5.   The US Court approved the Note on 18 June 2019. Mr Guo subsequently advanced the Loan, which has been partially drawn down by the Receiver on behalf of the Company.

6.   On 22 May 2020, Mr Guo gave a written notice to the Receiver that he wished to exercise his conversion rights under the Note. As of that date, the outstanding principal balance of the Loan was RMB 5,085,387,06 and RMB 6,356,733.75 with interest, which corresponds to 44,702,750 Class B common shares (the **Shares**) based on the conversion formula in the Note and the prevailing foreign exchange rate.[1]

7.   As contemplated by the Note, the Receiver sought the US Court's approval to convert the Note and issue the Shares. By an Order dated 5 June 2020 (the **Approval Order**), the US Court approved the conversion and directed the Receiver to make this application so that the conversion of the Note and the issue of the Shares would be effective under Cayman Islands law.

8.   The Receiver also seeks a sealing order under Order 63, rule 3(4) of the Grand Court Rules (**GCR**) to ensure that the material filed in connection with this application remains confidential. Disclosure of sensitive funding details to non-approved persons would prejudice the Receiver's continuing work. The US Court has treated the relevant documents and information as confidential and a sealing order here would ensure consistency between the two courts' approaches.

---

[1] Exhibit RWS-2 at page 17.

9.    The Court is invited to read the following materials in advance of the hearing of this application:

    (a)    the summons dated 19 June 2020;

    (b)    the Second Affidavit of Robert W. Seiden sworn 19 June 2020;

    (c)    the Secured Convertible Promissory Note dated 18 May 2019, at pages 1 to 4 of Exhibit RWS-2;

    (d)    the Approval Order, at pages 73 to 75 of Exhibit RWS-2; and

    (e)    this Skeleton Argument.

The time estimate for reading this material is 1 hour.

**II.    Recognition and Approval to Issue Shares**

10.   The Receiver seeks an order recognizing his power to issue the Shares pursuant to the terms of the Note and authorizing him to take all necessary corporate actions on behalf of Link Motion to issue and allot the Shares, including recording the issue in the Company's Register of Members. This relief is consistent with the Recognition Order and Cayman Islands law.

11.   Under the Recognition Order, this Court recognized the Receiver's appointment under the Receivership Order, including the powers and functions granted to the Receiver. The Receiver was authorized to exercise his recognized powers and functions in the Cayman Islands to the exclusion of any other person. He was also granted liberty to apply "*in respect of any matter concerning Link Motion Inc., the interpretation and implementation of this Order and for any further orders to give further and better effect to the recognition by this Court of the Receivership Order*".[2]

12.   The Note was approved by the US Court under the auspices of the Receivership Order, and funding the receivership is inherently a function of the Receiver under that order.

---

[2] Recognition Order at para 5.

In that respect, the Note is within the scope of the recognition granted in the Cayman Islands. The US Court approved its terms, including Mr Guo's conversion option.

13.    The Approval Order confirms the Receiver's authority under US law to issue the Shares and authorizes the Receiver "*to exercise the rights, powers, and privileges of the directors of* [the Company] *in order to take all necessary corporate actions on behalf of the Company*"[3] to issue the Shares and register the issued shares in the Register of Members. Like the US Court's initial approval of the Note, the Approval Order was made under the auspices of the Receivership Order.

14.    This application is therefore a supplemental request for recognition of the Receiver's powers granted to him by the US Court, within the scope of the liberty to apply clause in the Recognition Order. The Receiver's contractual obligation to issue the Shares derives from the Note that was authorized by the US Court further to the Receivership Order. This Court's approval of the Share issue is thus necessary to give further and better effect to the recognition of the Receiver.

15.    The request is consistent with Cayman Islands principles of recognition of foreign receiverships and general corporate law:

(a)    There is nothing in the terms of the Note that is objectionable under Cayman law. It represents third party funding of an office-holder's costs and expenses, which is a familiar concept in this jurisdiction.

(b)    The Receiver is not seeking recognition or authority to do something in the Cayman Islands that could not or would not be granted under Cayman law. The power to issue shares is, under the Company's Articles of Association, vested in the directors.[4] Under Cayman law, a receiver on appointment displaces the directors and is vested with their powers.[5] There is nothing that suggests that the power to issue shares could not therefore be granted to a locally-appointed receiver in appropriate circumstances.

---

[3] Exhibit RWS-2 at page 74.
[4] Exhibit RWS-2 at pages 32-33.
[5] *Canadian Arab Financial Corporation v Player*, 1984-85 CILR 63.

(c)     The issue of Shares is consistent with the Company's constitutional documents. Article 7 of the Company's Articles of Association grant the directors power "*in their absolute discretion and without the approval of the existing Members*" to issue shares "*as they deem necessary and appropriate … at such times and on such other terms as they think proper*".[6] The Company here has received due consideration for the Shares in the form of the Loan.

(d)     There are sufficient unissued shares to satisfy the conversion under the Note. The current Memorandum of Association provides for 240,000,000 Class B common shares with a par value of US$0.0001 each.[7] There are currently only 75,528,407 Class B common shares in issue.[8]

(e)     The conversion formula under the Note means that Mr Guo is effectively paying a subscription price of $0.02/share. That price is greater than the par or nominal value of the Class B common shares so does not raise any concern about issuing shares at a discount.

(f)     The US Court has specifically authorized the Receiver to make this application, and requested the aid and assistance of this Court, to give effect to the terms of the Approval Order and ensure that the issue of the Shares is done appropriately under Cayman law.[9]

16.     Accordingly, the recognition and authorization sought by the Receiver on this application is consistent with the Receivership Order and the Recognition Order, Cayman Islands law and the Company's constitutional documents. The Court is therefore requested to grant the relief sought in paragraph 1 of the Receiver's summons to give effect to the Share issue.

---

[6] Exhibit RWS-2 at pages 32-33.
[7] Exhibit RWS-2 at page 21.
[8] Exhibit RWS-2 at page 69.
[9] Approval Order, Exhibit RWS-2 at page 74.

III.   **Sealing Order**

17.   GCR Order 63, rule 3(4) provides that:

> *The Court may order that the Court file relating to any proceeding or any specific document therein be closed and not open to inspection by any party or other person except with the prior leave of the Court.*

18.   The Court of Appeal considered this rule in *Sasken Communication Technologies Limited v Spreadtrum Communications Incorporated*.[10] There, Rix JA confirmed that is not necessary for the party requesting a sealing order to "*identify a clear and present danger or a desire to inspect*". The test is whether "*for good reason, the closure of a file, in whole or in part, is needed in the interests of justice*".[11] By necessity that is a highly fact-sensitive test to be assessed within the specific factual and legal context of each case.

19.   Here, the Receiver has put documents before the Court that contain details of receivership funding in areas that are key to the Receiver's efforts. Disclosure of those details to non-approved parties may reasonably be expected to prejudice ongoing efforts to maintain, preserve and gain control of the Company's affairs and recover its assets. On that basis alone, the sealing order is justified.

20.   Additionally, the US Court has recognized these sensitivities and sealed the documents filed with it relating to the approval of the Note and the conversion. This includes all the US Court filings provided on this application. A local sealing order here will ensure consistency between the two courts' approaches and uphold principles of comity and cooperation in a cross-border proceeding.

21.   The terms of the sealing order sought, requiring any party seeking access to the sealed documents to apply to the Court on notice to the Receiver, is consistent with the principles set out in *Sasken*.[12]

---

[10] 2016 (1) CILR 1.
[11] *Sasken* at para 17.
[12] *Sasken* at para 21.

**IV.**   **Relief Sought**

22.   Based on the above, the Receiver requests that the Court make an order in the form sought authorizing the issue of the Shares to Mr Guo and sealing the documents filed in connection with this application and any order made.

23.   All of which is respectfully submitted.

<div style="text-align:right">

Mark A. Russell
**KSG Attorneys at Law**

Attorneys for the Plaintiff

7 July 2020

</div>

This Skeleton Argument is filed by KSG Attorneys at Law, attorneys for the Plaintiff, whose address for service is 4th Floor Harbour Centre, 42 North Church Street, PO Box 2255, Grand Cayman KY1-1107, Cayman Islands [MR/1550]