## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WAYNE BALIGA, derivatively on behalf of LINK MOTION INC. (F/K/A NQ MOBILE INC.)<br><br>       Plaintiff,<br><br>  -against-<br><br>LINK MOTION INC. (F/K/A NQ MOBILE INC.), VINCENT WENYONG SHI, JIA LIAN, XIAO YU,<br><br>       Defendants,<br><br>  -and-<br><br>LINK MOTION INC. (F/K/A NQ MOBILE INC.),<br><br>Nominal Defendant. | 1:18-cv-11642-VM-DCF<br><br><br>**DECLARATION OF DEFENDANT VINCENT WENYONG SHI** |

VINCENT WENYONG SHI declares, pursuant to 28 U.S.C. § 1746, as follows:

1.  I am a named defendant in this action. I make this declaration in response to the declaration of Mr. Lilin "Francis" Guo, dated June 1, 2023, and filed in this action at ECF Docket No. ("Dkt") 428. This declaration is based on my personal knowledge.

2.  I am a registered director of Link Motion Inc. ("LKM"), a Cayman Islands company.

3.  Before the appointment of Robert W. Seiden, as the temporary receiver (the "Receiver") for Link Motion Inc. ("LKM"), I served as the Chief Operating Officer of LKM.

4.  By way of my interest in RPL Holdings Ltd. ("RPL"), I am a beneficial owner of Class B shares of stock in LKM. RPL has been a registered owner of Class B shares of LKM stock since the formation of LKM.

5.  There are many inaccurate, misleading, and incorrect statements in Mr. Guo's

declaration.

6.     In paragraph 2 of his declaration, Mr. Guo states that he was "one of LKM's largest original shareholders." I dispute this statement because Mr. Guo was not a registered shareholder of LKM until June 2020 at the earliest.

7.     I have reviewed the copy of LKM's register of shareholders, dated October 22, 2018, filed in this action at Dkt. 130-1. This document lists all of the duly registered shareholders of LKM as of October 22, 2018. Mr. Guo name does not appear on the register. Mr. Guo's name does not appear on the registry of shareholders until June 2020 at the earliest.

8.     Mr. Guo was an owner of American Depositary Shares ("ADSs") of LKM. Owners of LKM ADSs are not registered shareholders and have different rights than owners of registered shares of LKM stock.

9.     Mr. Guo submitted with his declaration a document entitled Consulting Agreement. Dkt. 428-1 (the "Consulting Agreement").

10.    Upon reviewing the Consulting Agreement, I recognized it as a form of agreement prepared by LKM's inhouse legal counsel in connection with a "buyback" program announced by LKM on November 13, 2017.

11.    Annexed hereto as **<u>Exhibit A</u>** is at true and correct copy of the Form 6-K and press released filed with the S.E.C. on November 14, 2017 regarding the buyback program.

12.    Appendix 1 to the Consulting Agreement describes the terms for LKM's buyback of Mr. Guo's ADSs. It is my understanding that a English language translation of Appendix 1 is being submitted with this declaration.

13.    In paragraph 4 of his declaration, Mr. Guo claims that Mr. Xu Zemin is my "associate" and insinuates that Mr. Xu Zemin acted at my direction or control. This is not true.

14.     Mr. Xu Zemin acted on his own. Whatever actions Mr. Xu Zemin took in response to Mr. Guo's actions were taken independently of me. I had no involvement in those legal proceedings.

15.     The Chinese court papers that I have reviewed show that Mr. Xu Zemin acted of his own accord to protect his own legal interests because of his status as the registered legal representative of LKM's wholly-owned Chinese subsidiaries.

16.     Every company in China is required to register one individual as its "legal representative." A legal representative is ordinarily appointed by the board or shareholders of the company. Chinese law places certain legal obligations and responsibilities on every person registered as a legal representative. For example, a Chinese company's registered legal representative is the ultimate controller of bank accounts held in that company's name and is ordinarily named as a party in lawsuits in which the company is named as a party.

17.     Mr. Xu Zemin was the registered legal representative of LKM's wholly-owned Chinese subsidiaries from approximately 2015 through 2019, when he was removed by Mr. Guo. During the entire time Mr. Xu Zemin was the registered legal representative of LKM's wholly-owned Chinese subsidiaries, Mr. Xu Zemin was the ultimate controller of bank accounts held in the names of those entities because of his status as registered legal representative.

18.     The Chinese court papers I have reviewed show that Mr. Xu Zemin brought a legal claim against Mr. Guo in China because of a forged signature on papers submitted by Mr. Guo to China Merchants Bank ("CMB"). I was not a party to that lawsuit and was not involved in that case in any way.

19.     Paragraph 4 and other paragraphs in Mr. Guo's declaration contain mistranslations of the names of the relevant LKM Chinese subsidiaries. These mistranslation

present an inaccurate picture of the relevant facts.

20.    LKM's wholly-owned subsidiaries in China are referred to as "wholly owned foreign entities" or "WFOEs" because that is the term used in Chinese law when referring to an entity that is wholly owned by a non-Chinese person. The distinction between foreign owned and non-foreign owned is important for companies that need to maintain Chinese technology licenses.

21.    Mr. Guo falsely portrays LKM's corporate structure by referring to "NQ Mobile (Beijing) Co., Ltd." as "the WFOE in the PRC," suggesting that "NQ Mobile (Beijing) Co., Ltd." is LKM's only wholly owned subsidiary in China. That is not the case.

22.    LKM has another WFOEs in China named Netqin Infinity (Beijing) Technology Co., Ltd. (Chinese name: 网秦无限（北京）科技有限公司). Paragraph 4 and other paragraphs of Mr. Guo's declaration also incorrectly translates the names of the relevant WFOEs. His declaration mixes up the translations of the names of "NQ Mobile (Beijing) Co., Ltd." ("NQ Mobile") (Chinese name: 北京网秦移动科技有限公司) and "Netqin Infinity (Beijing) Technology Co., Ltd." ("NQ Wireless") (Chinese name: 网秦无限（北京）科技有限公司).

23.    The ownership and legal representatives of NQ Wireless and NQ Mobile is a matter of public record. NQ Wireless and NQ Mobile have been wholly owned by LKM, through its wholly owned Hong Kong subsidiary, since 2007 and 2014, respectively. Mr. Xu Zemin was the legal representative of these entities from 2015 to 2019. Mr. Guo was appointed as the legal representative of each of NQ Wireless and NQ Mobile on July 20, 2019 and April 16, 2019, respectively. Mr. Guo's statement in paragraph 7 that I "still control[]" is false.

24.    I also dispute Mr. Guo's characterization of the WFOE bank account at CMB referred to in paragraph 6 of Mr. Guo's declaration. That account was pledged to CMB as security for a prior foreign exchange loan to LKM. Transfers from that account were restricted

by the terms of loan and pledge documents with CMB. CMB would have disclosed this in its communications with Mr. Guo, but he has not submitted copies of those communications.

25.     The funds referred to in paragraph 7 of Mr. Guo's declaration were never transferred to me and I had no control over that entity or its accounts. Mr. Xu Zemin controlled that entity and its accounts at the time, and I lost access to my LKM email accounts, files, and offices in February and April 2019, when Mr. Guo assumed control of LKM's wholly-owned Hong Kong subsidiary and NQ Mobile and NQ Wireless, respectively.

26.     I never received or benefitted from any of the funds referenced in paragraph 7 of Mr. Guo's declaration. As stated in paragraph 24, above, the accounts in question were pledged to CMB. Based on records I have reviewed in this action, those funds were transferred to CMB in repayment of the loan. To the best of my knowledge, transfers in the WFOE accounts during that time period could only have been made with the consent of Mr. Xu Zemin, who was the registered legal representative at the time, and CMB who controlled the pledge.

27.     The statement by Mr. Guo in footnote 2 of his declaration is false. I did not "force[] the majority of WFOE employees to leave their position" or take any of the other actions claimed by Mr. Guo. These employees quit because LKM was unable to pay their salaries. Before commencement of this action, LKM was taking efforts to file its Form 20-F annual report. In LKM's subscription agreement with China AI Capital Ltd., filing of the 20-F was a condition for payment of the second tranche of the subscription price in the amount of $10,000,000. LKM intend to use these funds for corporate purposes including the payment of salaries to its employees. LKM was unable to complete the preparation and filing of its Form 20-F because of the appointment of the Receiver and entry of the preliminary injunction in this action on February 1, 2019.

28.     Mr. Guo's statements in paragraph 16 of this declaration are also inaccurate. I have reviewed court records from China regarding the employment litigations referenced by Mr. Guo. It is my understanding that several of these court rulings have been filed in this case.

29.     Mr. Guo was named in those litigations because he registered himself as legal representative of the WFOE in the place of Mr. Xu Zemin. Under Chinese law, legal representatives of Chinese Companies must be named in these types of litigations. The available court records show that the restriction orders were entered against Mr. Guo because he contested the employees' claims without a valid legal basis.

30.     In paragraph 17 of his declaration, Mr. Guo claims that I have brought meritless lawsuits against him. That is not true. To my knowledge, it is Mr. Guo who has brought meritless legal claims. In addition to his meritless legal arguments against the former WFOE employees, I am aware of at least one lawsuit brought by Mr. Guo against CMB in the Haidan Court. To my knowledge, the Haidan Court dismissed Mr. Guo's claims against CMB. Mr. Guo then sued the Haidan Court itself, but that case was also dismissed.

31.     I have reviewed Exhibits 2, 3, and 4 to Mr. Guo's declaration. These records appear to be photos taken with a smartphone and are less than clear copies of the originals.

32.     Based on my review of the legible portions of Exhibits 2, 3 and 4, I concluded that:

a.  Mr. Guo lived in a luxurious five-star Beijing hotels named Beijing Friendship Hotel and the Hilton Beijing Capital Airport. *See* pages 77-82 of Exhibit 2 (Dkt. 428-2).

b.  Mr. Guo paid monies to a Hong Kong lawyer for personal legal expenses. *See* page 154 of Exhibit 2 (Dkt. 428-2).

c.  Mr. Guo has not reported all of the funds paid to himself for his salary. And some

of the payments to himself were made as an independent contractor, not as wages
that are required to be reported to tax authorities. *See* pages 182-184 of Exhibit 2
(Dkt. 428-2).

    d.   The payments claimed by Mr. Guo were wired from a personal account in his
own now, not the account of NQ Mobile. *See* Exhibit 3 and 4 (Dkt. 428-3, 428-4).

    e.   There are many payments made to legal entities that have not been previously
disclosed in the papers. Mr. Guo did not submit any contracts with these legal
entities. Thus, these records are not sufficient to know what services, if any, these
entities performed. *See* Exhibit 3 and 4 (Dkt. 428-3, 428-4).

33.    A full review of the expenses claimed by Mr. Guo would require clear
photocopies of these receipts along with supporting documentation.

34.    It is my contention that Mr. Guo has at all times acted in his own self-interest to
the detriment of the other registered shareholders and creditors of LKM.  Based on public
statements by the Receiver, it is my contention that Mr. Guo has been focused on gaining control
over LKM's WFOEs because those entities controls LKM primary variable interest entity
("VIE") in China, which is Beijing Netqin Tianxia Technology Co., Ltd. *a/k/a* Beijing NQ
Technology Co., Ltd., Beijing Netqin Technology Co., Ltd., NQ Tech ("Beijing Technology").
Beijing Technology holds LKM's valuable technology licenses and operational and other assets.

35.    Public records show that in December 2019, Mr. Guo transferred 59.675% of the
equity ownership of Beijing Technology to himself in his personal name. Although Mr. Guo has
been the majority owner of Beijing Technology since December 2019, neither Mr. Guo nor the
Receiver have (to my knowledge) ever disclosed the revenues and profits of Beijing Technology.
Before the commencement of this action, Beijing Technology generated annual revenues of

approximately $10,000,000. If Mr. Guo had a dispute with LKM under the Consulting Agreement, he should have brought a claim under the terms of that agreement, instead of working with the Receiver to bring this action and transfer to himself majority ownership of Beijing Technology.

I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 12, 2023

Vincent Wenyong Shi