# SEIDEN | LAW

**VIA ECF**

Hon. Valerie Figueredo
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

June 23, 2023

Re: *Baliga, et al. v. Link Motion Inc., et al.*, 1:18-cv-11642-VM-VF (S.D.N.Y.)

Dear Judge Figueredo,

      We write on behalf of Robert Seiden in his capacity as the Court-appointed temporary receiver ("Receiver") over Link Motion Inc. ("LKM") in advance of the hearing scheduled for June 27, 2023 and pursuant to the Court's June 13, 2023 order directing the Receiver to respond to certain contentions raised in Shi's objections to the Receiver's accounting.

### 1. Accounting for LKM's Onshore Entities

      Shi alleges in various submissions that the Receiver has failed to account for LKM's subsidiaries in Mainland China, including "Beijing Technology," "NQ Mobile" and "NQ Infinity." *See* ECF 393 at 2, 396 at 6-7. At no point in any of these submissions does Shi or Shi's counsel (who inappropriately submitted a declaration attesting to purported statements by Shi, *see* ECF 394 ¶¶ 56, 59, 61), provide any basis for this assertion beyond an assumption that the Receiver's appointment of Mr. Lilin Guo ("Guo") as legal representative of LKM's subsidiaries somehow gave Guo control of all bank accounts of these Chinese subsidiaries. *Id.* ¶ 61, ECF 396 at 6-7. *That is not how this process works in the People's Republic of China* (the "PRC"). Mere appointment as a legal representative of a company is meaningless with respect to accessing the assets and/or financial information of that company that is in possession of a bank. This must be obtained through control of the registration files, including the corporate seal.

      As the Receiver has informed the Court previously, *see, e.g.*, ECF 161 at 2, 375 at 9-11, 428 ¶¶ 5-6, Guo made attempts to change the corporate seals for each of the LKM subsidiaries at their banks beginning in April 2019, and was prevented from obtaining them *by Shi*. As detailed in the attached affirmation of Francis "Lilin" Guo ("Guo Aff.") and attached exhibits, Shi and his associates filed lawsuits in the PRC and defrauded Chinese banks in order to prevent Guo from obtaining those seals. For example, with respect to NQ Infinity (which Shi refers to as NQ Mobile), Guo, following his appointment by the Receiver, filed paperwork with the appropriate Beijing authority ("Beijing MSA") to qualify as NQ Infinity's legal representative. Guo Aff. ¶ 3. Guo then contacted NQ Infinity's bank, China Merchants Bank (CMB) in order to change NQ Infinity's registration files with CMB and to remove Shi's authority. *Id.* ¶ 4. In response, Shi's associate Zemin Xu ("Xu") filed a series of actions seeking injunctive relief before Chinese courts and challenging Guo's status with the Beijing MSA. *See id.* ¶¶ 7-9. For his part, in late April

# SEIDEN | LAW

2019 Shi sent a falsified document to CMB purporting to be an LKM shareholder resolution (and which CMB later produced in a lawsuit, and which is attached to Guo's Affirmation as Exhibit 2), claiming that LKM would be changing the Beijing MSA registration back from Guo to Shi. *Id.* ¶ 5. The same day, Shi sent another falsified letter to the Beijing MSA claiming that Guo's registration was fraudulent and that it should be restored to Shi. *Id.* ¶ 6 and Ex. 3. Shi and Xu's claims were ultimately rejected by both the courts and by the Beijing MSA, but not until July of 2020, at which time Guo again attempted to change NQ Infinity's official seal with CMB. *Id.* ¶¶ 9-10. It was only at that time that Guo obtained bank information concerning NQ Infinity and discovered that Shi and his associates had looted the company of nearly $89 million, as previously reported to this Court. *Id.* ¶ 10; *see also* ECF 161 at 2-3, 375 at 4.[1]

Xu also refused Guo's demands to turn over NQ Infinity's seal and documents. Guo Aff. ¶ 11. This resulted in Guo filing a lawsuit against Xu on NQ Infinity's behalf. *Id.* ¶ 12. In that lawsuit, a witness testified that the corporate seals had last been given to an NQ Infinity employee, Lei Li, who the witness testified *was Shi's assistant. Id.* ¶¶ 12-13 and Ex. 6. The lawsuit was dismissed because the court determined that Xu did not possess the seal and documents but rather Shi's assistant did. *Id.* ¶ 14. To this day, neither Guo nor the Receiver have obtained *any* documents from NQ Infinity. *Id.* ¶ 15.

The story is similar with NQ Tianxia (which Shi refers to as "Beijing Technology"). Shi represents to this Court that Guo appointed Nie Youdi ("Nie") as his legal representative for NQ Tianxia in April 2019. ECF 394 at ¶¶23, 26, 57-61; ECF 396 at 6. In fact, Guo does not know Nie and the paperwork on file with the Beijing MSA making Nie's appointment in December 2019 *is signed by Shi*. Guo Aff. ¶¶ 18-19, Ex. 7. Chinese public records previously submitted by Shi show no appointment of Nie in April 2019 by anyone, let alone by Guo. *See* ECF 394-1 at 4 of 12. Additional Beijing records show Nie appointed as legal representative for other LKM entities using falsified documents signed by Shi's associates Xu and Jiang Wu. *Id.* ¶ 20, Exs. 8 and 9. Shi is further aware that neither Guo nor anyone on Guo's behalf assumed control of NQ Tianxia in April 2019 because Shi attended an NQ Tianxia shareholder meeting in July 2019 and *voted down* a resolution to appoint Guo as its legal representative. *Id.* ¶ 21, Ex. 10.

Because Shi and his associates refused to turn over NQ Tianxia's documents and seal to Guo, Guo had to file a lawsuit in the PRC. *Id.* ¶¶ 23-24, Ex. 11. The court again found that the missing items were in the possession of Shi's assistant, Lei Li, whose whereabouts are unknown. *Id.* ¶ 25. As a result, neither Guo nor the Receiver have obtained *any* documents from NQ Tianxia. *Id.* ¶¶ 26-27. Shi makes other false allegations regarding Guo's ownership of shares in NQ

---

[1] Shi continues to make misrepresentations to the Court regarding the purpose of and nature of these transfers in his most recent letter. ECF 439. As the Receiver has previously explained and documented to this Court, the transfers went to an entity *other* than China Merchants Bank, which was dissolved shortly after receiving the transfers and which public records demonstrate was tied to a convicted criminal. ECF 239 *also* Guo Aff. ¶¶ 35-37. The Receiver will separately address Shi's most recent letter, and how it contradicts previous representations he has made about this loan, in a subsequent submission.

2

# SEIDEN | LAW

Tianxia. ECF 396 at 6-7. Those shares were obtained from existing shareholders as a result of a CIETAC arbitration. Guo Aff. ¶¶ 28-30. A copy of the award is attached to the Guo Affirmation as Exhibit 12. Shi is certainly aware of that fact because he was a party to that arbitration and has to date refused to comply with the award requiring transfer of Shi's shares to Guo. *Id.* ¶ 30.

Shi's representations regarding NQ Mobile (referred to by Shi as "NQ Wireless") and LKM Beijing (referred to by Shi as "LKM Technology") are similarly false, as detailed at ¶¶ 32-44 in the Guo Affirmation. Neither Guo nor the Receiver obtained any meaningful control over any of these entities in April 2019 as Shi alleges. No corporate documents have been obtained from any of them and, to the Receiver's knowledge, these documents remain in the possession of Shi's assistant and/or associates. Guo Aff. ¶¶ 39, 44. To the extent that Guo was able to obtain bank information from any of these entities, that information has previously been provided to this Court and is included in the accounting. The Receiver is, however, unable to provide a complete accounting for these entities due to a lack of corporate documents. For the same reason, Receiver is unable to verify or dispute Shi's claim that NQ Tianxia generated $10m in annual revenues. *See id.* ¶ 31, ECF 395 ¶ 5.

**2. Tongfang Note**

Shi alleges that "[t]he Receiver failed to account for the Tongfang Note or explain why he did not commence an action to collect on that note." ECF 393 at 3. Shi turns the truth on its head. It is Shi who looted LKM's most valuable assets in connection with the Tongfang transaction, by selling LKM's most valuable subsidiaries to Tongfang, an entity that (as evidence later obtained by the Receiver revealed) Shi himself owned and controlled. It is Shi who pledged the Tongfang Note to an LKM creditor for no consideration. Having stripped LKM of substantially all its assets (including the Tongfang Note), Shi cannot now blame the Receiver for the fact that LKM never collected on the Tongfang Note.

The relevant background surrounding the Tongfang Note is set forth below.

In March 2017, LKM agreed to sell its two most valuable operating subsidiaries to Tongfang Investment Fund Series SPC ("Tongfang"), a privately owned entity incorporated under Cayman Islands law. Specifically, LKM agreed to sell Tongfang (i) LKM's 63% equity interest in Beijing Feiliu Jiutian Technology Co., Ltd. ("FL Mobile") for RMB 2.52 billion, and (ii) LKM's 65% equity interest in Showself (Beijing) Technology Co., Ltd. ("Showself") for RMB 800 million (collectively, the "Tongfang Transaction").[2] Thus, the total cash consideration due to Link Motion in the Tongfang Transaction was RMB 3.32 billion, or approximately $500 million. Significantly, Tongfang was required to pay the purchase price in cash.

---

[2] *See* LKM's Annual Report on Form 20-F for the fiscal year ended December 31, 2016 (available at https://www.sec.gov/Archives/edgar/data/1509986/000119312517137511/d346488d20f.htm), at F-8. LKM's revenue from FL Mobile and Showself was approximately US $286 million in 2016, compared with LKM's total revenue of US $343 million in 2016. *See id.* at 60, F-76.

# SEIDEN | LAW

Under the terms of the Tongfang Transaction, Tongfang was required to pay the full RMB 3.32 billion purchase price by May 31, 2017.[3] However, in a press release issued on December 14, 2017, Link Motion disclosed that it had received only RMB 1.55 billion in cash of the RMB 3.32 billion purchase price, leaving RMB 1.77 billion (approximately US $270 million) unpaid.[4] LKM provided no public explanation for Tongfang's non-payment of the RMB 1.77 billion balance, notwithstanding that this was a highly irregular occurrence for an all-cash transaction of this magnitude involving a public company.

Paradoxically, in the same December 14, 2017 press release, LKM claimed that the Tongfang Transaction had been "completed," and that it had received the remaining consideration from Tongfang.[5] However, far from receiving the balance of the purchase price *in cash*, LKM admitted that it had merely obtained a "senior note" in the amount of 1.77 billion RMB (the "Tongfang Note") from Tongfang.[6] The Tongfang Note is merely an unsecured debt obligation. It is not cash.

Thus, LKM (at Shi's behest) agreed to accept from Tongfang, in lieu of RMB 1.77 billion in cash as originally agreed, a "senior note." Shi and LKM never disclosed any valid business reason for accepting this note in lieu of the all-cash purchase price as required under the terms of the Tongfang Transaction.

On December 14, 2018, the Tongfang Note matured. LKM never received payment on the maturity date, or at any time thereafter.

On April 3, 2019 (soon after this Court appointed the Receiver in February 2019), the Receiver filed a statutory demand against Tongfang at its registered office in the Cayman Islands, seeking payment on the Tongfang Note. ECF 43, at 2. Tongfang never responded to this demand.

Subsequently, the Receiver obtained documentary evidence (from the files of LKM's former counsel at DLA Piper) that Shi had a significant ownership and/or control interest in Tongfang.

Preliminarily, the Receiver discovered documentary evidence that, in November 2017 (shortly before the Tongfang Note was issued), Shi became a director of Tongfang.[7] Shi and LKM never disclosed this fact publicly. Moreover, the Receiver later uncovered a due diligence

---

[3] *Id.* at F-8.

[4] *See* ECF 394-8 (LKM press release dated December 14, 2017).

[5] *See* ECF 394-8 (LKM press release dated December 14, 2017).

[6] Shi incorrectly states that the Tongfang Note was issued in favor of LKM. The holder of the Tongfang Note is actually NQ International Limited, a wholly-owned Hong Kong subsidiary of LKM.

[7] *See* Analysis of the Terms between Dr. Shi and the Company Associated with Divestment of FL Mobile and Showself Following the Closing, attached hereto as Exhibit 1, at 2.

memorandum (also from DLA's files) in connection with a proposed transaction involving Tongfang and a Hong Kong listed company which revealed that:

> [Tongfang] is a limited partnership incorporated in Cayman Islands . . . **It is held . . . as to 65.12% by True Hero Ventures Limited, which in turn is 100% beneficially owned by Dr. Shi [].
> . . . . Dr. Shi has the final decision of all matters in relation to the operation and management of [Tongfang], and, effectively, controls [Tongfang] in terms of investment in Showself.**[8]

In other words, this evidence indicated that Shi was the ultimate majority owner of Tongfang, a fact which was never disclosed publicly by Shi or LKM and not publicly available (as a private Cayman entity, Tongfang's ultimate ownership is hidden from public view). A search of the Cayman Islands Registry still lists Shi as a registered director. A copy of the registry search result is attached as Exhibit 3. This evidence also indicates that the Tongfang Transaction was a conflicted transaction in which Shi orchestrated the sale of LKM's most valuable assets to an entity that he himself owned and controlled.[9]

Under these conflicted circumstances, it is not surprising that Tongfang (controlled by Shi) never paid the full purchase price for FL Mobile and Showself in cash, and that Tongfang (controlled by Shi) never paid any amounts due under the Tongfang Note.

Turning the truth on its head, Shi now accuses the Receiver of failing "to collect" on the Tongfang Note. ECF 393 at 3. But if anyone is responsible for Tongfang's failure to pay the amounts due under the Tongfang Note, it is Shi, whom the evidence indicates is the majority owner and controller of Tongfang.

Shi's unclean hands go even further than this.

In September 2018, at Shi's behest, LKM entered into two pledge agreements in which it pledged substantially all of its assets, *including the Tongfang Note*, to a creditor, Zhongzhi Hi-Tech Overseas Investment Ltd ("Zhongzhi"), *for no consideration*.[10] Given that the Tongfang Note was pledged to Zhongzhi, LKM no longer had the right to enforce the Tongfang Note.

---

[8] *See* Project Happy Due Diligence Questionnaire, attached hereto as Exhibit 2 at Appendix 2.

[9] Indeed, as a director and controller of Tongfang, Shi had fiduciary duties to Tongfang even as he was supposedly negotiating on behalf of Link Motion.

[10] On September 14, 2018, LKM issued a press release stating in relevant part that "*[LKM] has entered into agreements to pledge its Senior Note issued by Tong Fang and shares of NQ International Inc. to Zhongzhi as additional securities for the Convertible Note held by Zhongzhi.*" *See* Exhibit 4 attached hereto. However, Shi and LKM failed to disclose that LKM had pledged substantially all of its assets to Zhongzhi for no consideration.

**SEIDEN | LAW**

Indeed, in 2021, an eminent panel of three arbitrators convened by the Hong Kong International Arbitration Centre unanimously held that the Receiver had proved its claim that Shi breached his fiduciary duties to LKM by pledging LKM's assets (including the Tongfang Note) to Zhongzhi for no consideration, and that Zhongzhi had aided and abetted Shi's breaches of fiduciary duty. The Tribunal's award (which has been filed on the docket at ECF 210-1) concluded that "***Dr. Shi plainly breached his fiduciary duties and Zhongzhi substantially assisted him in doing so***." ECF 210-1 at ¶ 145.

The Tribunal found in relevant part:

- "[T]he Two Pledge Agreements lacked any consideration. That fact is particularly stark in light of the undisputed fact that the Tongfang Note, and Link Motion's shares in its subsidiary NQ International, comprised substantially all of its assets." ECF 210-1, at ¶ 132.

- "***Dr. Shi plainly disregarded counsel's advice in negotiating and approving the two agreements. All of these facts establish that he breached his fiduciary duty to Link Motion in negotiating the two pledge agreements with Zhongzhi***. The fact that Link Motion's Chief Executive Officer, President and General Counsel and Chief Financial Officer resigned their positions in connection with the issuance of the Two Pledge Agreements reinforces this conclusion." ECF 210-1, at ¶ 152 (emphasis added).

- "[N]othing in the record shows that [LKM's] two new directors – who had joined the Board the day before – were aware that the transaction they were being asked to approve in fact lacked any consideration." ECF 210-1, at ¶ 155.

- "The record also does not show that the two new directors were made aware that the company's General Counsel, Chief Financial Officer, and outside securities counsel each opposed the Two Pledge Agreements and believed that approval violated the directors' fiduciary duties." ECF 210-1, at ¶ 156.

- "***Dr. Shi's misconduct extends far beyond simply voting in favor of the Two Pledge Agreements at the Board meeting***. The record shows that he was the principal negotiator of the agreements on behalf of Link Motion, and, as Chairman of the Board, it can reasonably be inferred that he was responsible for the deeply flawed manner in which that meeting was conducted. ***As a result, we conclude that Dr. Shi breached his fiduciary duty of loyalty as well as his fiduciary duty of care***." ECF 210-1, at ¶ 158 (emphasis added).

Thus, yet again, Shi turns the truth on its head. Shi was the one who gave away LKM's rights under the Tongfang Note for free. Shi has no right to fault the Receiver for failing "to collect" on an asset that he gave away, in breach of his fiduciary duties.

**SEIDEN | LAW**

### 3. Application Developer Accounts with Apple and Google

Shi accuses the Receiver of failing to maintain and account for certain developer applications. ECF 396 at 7-8. Shi claims that the Receiver controlled these applications as of September 2019, *id.* at 8, but in reality, at that time the Receiver had only obtained the rights to certain funds that LKM had received due to revenue previously generated by sales of the apps on those platforms, for which the Receiver has already accounted. The software and access to the software development was maintained at LKM's China subsidiaries (*see* Shi's own objections at *id.* at 6 (admitting that LKM's operations actually took place in China). As outlined in Section 1 above, Shi and his associates engaged in obstructive and fraudulent conduct with respect to Receiver's and the Receiver's agents attempts to gain control of the China subsidiaries and never turned over any corporate documents, including access to the software application code necessary to update and continue distribution or to email accounts necessary to access software development platforms on third-party sites. *See also* Guo Aff. ¶ 52. Indeed, when the Receiver attempted to obtain control of payment flows on the Apple platform, an Apple representative informed the Receiver that an unknown person had attempted to change the entity and payment information away from Receiver. *See* Exhibit 5.

The Receiver did attempt to gain access to the software itself via the third-party platforms but could not obtain such access because the Receiver did not control the associated email accounts (which were maintained by the Chinese subsidiaries). For example, in response to a request for such access, Google informed the Receiver on February 28, 2020 that:

> Regarding account access, Google reiterates what has been communicated numerous times over several phone calls. Google cannot provide the Receiver account access because Google does not store passwords, ***a password reset would not help the receiver because the receiver does not control the email associated with the Link Motion account***, and, even if Google did store the account password, Google may not be able to provide this information per applicable privacy laws that regulate real-time access to accounts and disclosure of the content stored in them.

*See* Exhibit 6 at 2 (emphasis added).

### 4. Post October 5, 2020 Actions

Shi asserts that the Receiver's "post-October 5, 2020 actions were unnecessary, unreasonable, and failed to confer a genuine benefit upon LKM." ECF 396 at 10-12. Shi disregards the fact that during this time, the Receiver was required to respond to vexatious motion practice in this Court initiated by Shi (or defend obstructionist litigation filed by Shi and his associates in China). That is Shi's own fault; not the fault of the Receiver or the Receiver's agent, who have continued to take actions following October 5, 2020 that are for the benefit of LKM. In the PRC, these actions have included (i) continuation of litigation on behalf of NQ Infinity

7

against Shi's associate Xu, which secured a 1.36 million RMB judgment against Xu for NQ Infinity. Guo Aff. ¶ 46, (ii) prosecuting an administrative action on NQ Infinity's behalf in order to protect its assets from continued looting by Shi and his associates (*id.* ¶ 48), and (iii) attempting to recover the $89 million funds for NQ Mobile that was looted while Shi and his associates still controlled NQ Mobile's bank accounts (*id.* ¶ 49). Outside the PRC, this included preserving LKM shareholder value by seeking to cancel a portion of a dilutive share issuance for which the purchaser (China AI) had not provided full payment (ECF 194), and calling the Extraordinary General Meeting, which is required after a shareholder request and which the current board of directors refuses to call. ECF 268. The EGM would confer a benefit upon LKM by allowing the company's shareholders to remove a director who has defrauded and breached his fiduciary duties to LKM, including by looting LKM's assets, transferring LKM's most valuable subsidiaries to an entity that he owns and controls, pledging substantially all of LKM's remaining assets for no consideration (described at 3-6, *supra*)., and causing LKM to incur a significant liability in the Tongfang arbitration by appearing without authorization and refusing to defend the action (*see* ECF 269).

The Receiver's other post-October 5, 2020 activities in the U.S., as identified at ECF 375 p.7, were responses to Shi's filings, or were largely ministerial in nature, *e.g.*, filing Court-required status reports, including with respect to the beneficial actions taken by the Receiver on LKM's behalf in China just described (*e.g.*, a-d, g, h, l-o, q, r, t, w-z), or simply seeking guidance from the Court regarding whether the Receiver had the authority to provide the unopposed relief requested by Plaintiff of his ADS share conversion (e). Shi complains about the Receiver's objection to his requests to review or unseal certain documents, citing 28 U.S.C. § 3103(d), but as the Court is aware, those requests were made to protect the safety of Guo, who had already been threatened by Shi and others, and who was taking actions at his own personal risk and expense to benefit LKM shareholders in China. *See* ECF 309 at 1-2. In any event, Shi is not a shareholder of LKM and is therefore not an "interested party." His objections based on Section 3103(d) are therefore unavailing.

Shi alleges that certain actions "were in furtherance of Plaintiff's litigation activities, not the Receivership," ECF No. 396 at 11-12, but provides no details to support this baseless and conclusory allegation. The Receiver was appointed by this Court to, among other things, "prevent waste, dissipation, or theft of assets to the detriment of investors" and "preserve and safeguard the Company's assets." ECF 26 at 3. The very purpose of the underlying litigation was to protect LKM and its shareholders by preventing Shi from continuing to loot the company. There is no allegation by Shi, let alone any supported allegation, that any of Receiver's actions personally benefitted Wayne Baliga (who has his own independent counsel) as opposed to LKM shareholders at large.

### 5. Guo's Compensation

Shi objects to the compensation granted to Guo as "excessive, unnecessary, and unreasonable." *See* ECF Nos. 393 at 3, 394 at 14, 396 at 9. As an initial matter, the amount of Guo's compensation was previously disclosed to this Court and the expenses approved. ECF 419-

8

# SEIDEN | LAW

4, 419-9.  In any event, Shi provides no evidence that Guo's salary is excessive or unreasonable. As Guo has already stated to this Court, he devoted substantial hours to his receivership agent activities, in particular with respect to having to defend against the numerous actions filed by Shi and his agents. *See* ECF 428 ¶¶ 15-16.  Reasonable hourly rates by restructuring administrators routinely reach into the hundreds of dollars. Alvarez & Marsal ("A&M") charged between $400 and $975 per hour to perform restructuring services for Kona Grill in 2019.[11]  More recently, A&M's court-appointed CEO to restructure FTX requested an hourly rate of $1,300.[12]  Even "reduced" rates that have been offered by some court-appointed receivers are substantial. *See, e.g., Sec. & Exch. Comm'n v. Davison*, 2021 WL 8201534, at *7 (M.D. Fla. Aug. 31, 2021) (reduced hourly rate of $360 hourly).  Given that Guo devotes an average of over 40 hours per week to the receivership (Guo Aff. ¶ 51), a salary of $15,000 per month works out to less than $100 per hour and is well within the range of what courts have approved.  This does not even take into account the travel and property transfer restrictions that were imposed upon Guo within China as a result of his legal representative status. ECF 428 ¶¶ 15-16.

In sum, there is no merit to Shi's objections.  Indeed, many of Shi's objections are outright false or omit material facts.  We look forward to addressing any further questions that the Court may have at Tuesday's hearing.

Respectfully submitted,

*/s/ Amiad Kushner*
Amiad Kushner

---

[11] *See* https://www.sec.gov/Archives/edgar/data/1265572/000143774919007341/ex_140467.htm
[12] *See* https://www.cnbc.com/2022/12/14/ftxs-new-ceo-john-j-ray-making-1300-an-hour.html