UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WAYNE BALIGA, derivatively on behalf of LINK MOTION INC. (F/K/A NQ MOBILE INC.)<br><br>Plaintiff,<br>-against-<br><br>LINK MOTION INC. (F/K/A NQ MOBILE INC.), VINCENT WENYONG SHI, JIA LIAN, XIAO YU,<br><br>Defendants,<br>-and-<br><br>LINK MOTION INC. (F/K/A NQ MOBILE INC.),<br><br>Nominal Defendant. | 1:18-cv-11642-VM-VF<br><br>**DECLARATION OF LILIN "FRANCIS" GUO** |

LILIN "FRANCIS" GUO declares, pursuant to 28 U.S.C. §1746, as follows:

1.  My name is Lilin "Francis" Guo, a citizen of the People's Republic of China ("PRC"). I am a representative of Mr. Robert W. Seiden (the "Receiver"), in his capacity as the court-appointed receiver over defendant, Link Motion Inc. ("LKM" or the "Company") in the PRC. In April 2018, the Receiver appointed me as the legal representative of an LKM subsidiary, NetQin Infinity (Beijing) Technology Co., Ltd. ("NQ Infinity"), a wholly foreign owned entity (the "WFOE") in the PRC. I submit this declaration in response to defendant Vincent Wenyong Shi's ("Shi") objections (ECF 393-396) to the Receiver's accounting (ECF 375-376; "Accounting").

1

**LKM's Subsidiaries in China**



See LKM's Form 20-F Annual Report at 58-59.[1]

2.	As shown by the above organization chart, LKM through its Hong Kong subsidiary LKM International, directly holds three companies in China, *i.e.*, NQ Infinity, NQ Mobile, and LKM Beijing.  NQ Infinity further controls NQ Tianxia via contractual agreements.  NQ Tianxia owns NQ Xinjiang.

---

[1] *See* https://www.sec.gov/Archives/edgar/data/1509986/000119312517137511/d346488d20f.htm

2

**The Receiver's Dispute with Shi over the Control of WFOEs**

*NQ Infinity*[2]

3.  In April of 2019, in order to secure and preserve LKM funds and in accordance with a shareholder resolution made by LKM International, the Receiver appointed me as the legal representative of NQ Infinity. ECF 161.  On April 16, 2019, my team filed the required documentation with the Beijing Municipal Administration for Industry and Commerce (now the Beijing Municipal Market Supervision Administration) ("Beijing MSA") reflecting my appointment as the legal representative of NQ Infinity. *See* ECF 161; ECF 394-4 at 4.

4.  On April 18, 2019, I communicated with China Merchants Bank ("CMB"), NQ Infinity's main bank, and requested that CMB update NQ Infinity's registration information that was on file with CMB (including but not limited to NQ Infinity's seals, business license, and CMB's digital keys) to revoke Shi's authority to access and use NQ Infinity's bank accounts at CMB. *See* ECF 161.

5.  On April 26, 2019, three months after the Receivership Order's issuance, Shi, by using nullified seals[3], executed and sent CMB a purported LKM International shareholder resolution that falsely claimed that "***Mr. Wenyong Shi, the executive director of Link Motion International, is authorized, approved, and directed, on behalf of [LKM International], to execute [] back [to] the previous registration of [NQ Infinity] in [Beijing MSA] and take such further actions such as director or officer shall deem necessary, appropriate or advisiable in order to carry out the intent and purposes of the foregoing resolutions***." *See* **Exhibit 2** (emphasis added).

---

[2] In Shi's submission, this entity is translated as "NQ Mobile."

[3] On March 15, 2019, LKM International adopted a new company common seal.  *See* **Exhibit 1**.

6. On the same day, Shi, again using nullified seals, executed and sent Beijing MSA a letter falsely claiming that "*[Lilin Guo], **a small shareholder of [LKM] (holding 1%)** hired a Hong Kong attorney and defrauded the [Beijing MSA] and changed the [NQ Infinity's] legal representative to myself without notifying China AI, [LKM], and [LKM International].*" See **Exhibit 3.**

7. On April 26, 2019, Shi's associate, Zemin Xu ("Xu"), who was NQ Infinity's previous legal representative, filed a lawsuit against NQ Infinity and me before the Beijing Haidian District People's Court ("Haidian Court"). *See id*. On May 28, 2019, Xu applied for a temporary injunction in order to restrain me from changing the registration files (including but not limited to NQ Infinity's seals, business license, and CMB's digital keys) at CMB. *Id*. The Haidian Court granted Xu's application and temporarily enjoined my team and me from making any changes to NQ Infinity's registration files (including but not limited to NQ Infinity's seals, business license, and CMB's digital keys) at CMB, and therefore, my team and I were unable to control NQ Infinity's bank accounts until the injunction is dissolved by Haidian Court. *Id*.

8. On August 22, 2019, the Haidian Court rejected Xu's claims with prejudice. *Id*. On December 24, 2019, the Beijing No. 1 Intermediate People's Court ("Beijing No.1 Court") affirmed the Haidian Court's decision (rejecting Xu's claims) and confirmed that the change of NQ Infinity's corporate records with Beijing MSA was valid. *See* ECF 161; ECF 220-1.

9. On July 23, 2019, Xu commenced an administrative claim against the Beijing MSA itself in an attempt to overturn the Beijing MSA's approval of the change of the legal representative of NQ Infinity. The Haidian Court rejected Xu's claims, and Xu appealed. On July 24, 2020, the Beijing No. 1 Court affirmed the Haidian Court's decision and rejected Xu's claims. *See* ECF 220-

1. Accordingly, my team and I were able to act as NQ Infinity's legal representative after July 24, 2020.

10. On or about July 2020, my team reinitiated the process to update NQ Infinity's seals, licenses, and digital keys that were on file with CMB. Once that process was completed, we finally had the opportunity to access NQ Infinity's bank accounts. After a close review of NQ Infinity's bank statements, my professional team and I identified 29 transactions between May and November of 2019 (before my team had access to these accounts), in which Shi used nullified seals and digital banking keys to transfer 626 million Renminbi ("RMB") (at the time valued at over $89 million U.S. dollars) to NQ Mobile, another WFOE that Shi was still controlling at that time. *See supra at 2*; *See also* ECF 239-6.

11. In the meantime, my team and I demanded Xu and his team members hand over NQ Infinity's information, documents, and assets, but all demands were refused or left with no response. For example, on May 15, 2019, my team served Xu with a letter on behalf of NQ Infinity and LKM International requesting that he transmit NQ Infinity's official seals, business license, books and records to me and cease using the company's seals. *See* **Exhibit 4**. On the same day, my team member affixed the letter to the front door of NQ Infinity's office.[4] However, all demands received no response.

12. Therefore, seeing no opportunity to obtain NQ Infinity's seals, books, and records from Xu voluntarily, on or about November 1, 2019, I caused NQ Infinity to commence an action against Xu in an attempt to compel Xu to turn over NQ Infinity's official seals, business license, and financial documents to my team ("NQ Infinity v. Xu"). *See* ECF 220-1. In response, Xu argued that "[NQ Infinity's official seals, contract seals, and legal representative seals] were

---

[4] A video recording of my team member attaching the Receiver's demand letter on NQ Infinity's front door was taken and will be provided to the Court upon request.

controlled by Yingli Liu, money management manager at the finance department." *See* **Exhibit 5**. The court found Yingli Liu testified that "she was the manager of the fund management department of [NQ Infinity] and [NQ Mobile]. Before she left her position, [she] was responsible for [] the company's seal, contract seal, and legal representative seal…" *See id*.

13. On December 22, 2020, during the Haidian Court's hearing in the matters of *NQ Infinity v. Xu* and *NQ Tianxia v. Xu*, the following colloquy occurred:

> Plaintiff: Witness, when you left your job, who did you give the company's official seals, legal representative seals, and contract seals to?
>
> Yingli Liu: Lei Li.
>
> Plaintiff: Witness, what was Lei Li's position at the company?
>
> Yingli Liu: Chairman's assistant. The company I mentioned meant to say the group of companies, with no distinction of affiliated companies.
>
> Plaintiff: Who is directly in charge of Lei Li?
>
> Yingli Liu: Is **Wenyong Shi**.

*See* **Exhibit 6**.

14. Relying on Yingli Liu's testimony, the Haidian Court dismissed NQ Infinity's complaint because the court believed the company's official seals, business license, and financial documents were not in Xu's possession, and therefore, the court could not compel Xu to turn over NQ Infinity's seals and documents to my team. Stated differently, NQ Infinity's official seals, business license, and financial documents were under Lei Li's control, who was Shi's assistant. My team further tried to find out Lei Li's contact information but failed. Also, nothing is left at NQ Infinity's premises.[5]

---

[5] A video was taken on May 15, 2019, showing NQ Infinity's office was locked with nothing left on the premises. A copy will be provided upon the Court's request.

15. None of NQ Infinity's executives or employees has ever provided my team with any documents. Accordingly, my team has no documents or information to arrange an accounting for NQ Infinity's assets and liabilities at this time (except NQ Infinity's bank statements my team obtained from the bank), and the location of its documents and information (that concealed by Shi and his associates) is unknown.

*NQ Tianxia*[6]

16. Under LKM's VIE structure, NQ Tianxia was previously owned by Shi, Lingyun Guo, and Xu Zhou. *See* ECF 394-6.

17. In his opposition, Shi alleges that I used my alleged "control over [NQ Infinity]" to gain control over NQ Tianxia "in April 2019 by appointing his agent, Nie Youdi, as legal representative and transferring to [myself] 59.675% of the shares of [NQ Tianxia]." *See* ECF 394 at ¶¶23, 26, 57-61; ECF 396 at 6. This is wrong.

18. On October 10, 2019, Shi filed a purported NQ Tianxia shareholder resolution with the Beijing MSA and appointed Nie Youdi ("Nie") as NQ Tianxia's director.[7] *See* **Exhibit 7**. Importantly, **the shareholder resolution was signed by Shi**. *Id*.

19. I don't know Nie and never appointed him as my agent. Contrary to Shi's unsupported assertion, the documentary evidence shows that Nie's appointment was made by Shi's associates. In addition to Nie's appointment by Shi as the legal representative of NQ Tianxia, their relationship is further evidenced by Nie's other appointments.

---

[6] In Shi's submission, this entity is translated as "Beijing Technology."

[7] At the end of 2019, Lingyun Guo, NQ Tianxia's largest shareholder at that time (52%) reported to the Beijing MSA that Shi forged her signature and illegally changed NQ Tianxia's legal representative. A certified translation of Lingyun Guo's complaint with supporting documents will be provided upon the Court's request.

20. For example, documentary evidence from Beijing MSA indicates that, on December 23, 2019, Xu filed a shareholder resolution with the Beijing MSA changing NQ Mobile's legal representative from Xu to Nie. *See* **Exhibit 8**. Likewise, on December 9, 2019, Jiang Wu, another of Shi's associates, filed a shareholder resolution with the Beijing MSA changing LKM Beijing's legal representative from Xu to Nie. *See* **Exhibit 9**. However, the Beijing MSA's corporate records indicate that Xu and Jiang Wu used the nullified LKM International seal to illegally change the LKM WFOEs' legal representatives to Nie. As I explained above, *see supra* at fn. 3, Shi and his associates illegally changed the legal representatives of the LKM WFOEs by using a nullified LKM International seal and forged LKM International's shareholder resolutions and board resolutions. Under the circumstances, I believe that Nie's appointments were orchestrated by Shi and his associates in an attempt to frustrate the Receiver's asset recovery efforts in China.

21. On July 22, 2019, NQ Tianxia held its shareholder meeting and attempted to elect its new board of directors and to appoint me as the company's new legal representative. *See* **Exhibit 10**. Shi attended the meeting and objected to the shareholder resolution. *See id*.

22. However, as I explained above, *see supra* at ¶18, on October 10, 2019, Shi provided Beijing MSA with a forged NQ Tianxia shareholder resolution which illegally changed NQ Tianxia's legal representative to Nie. I understand that in his opposition, Shi falsely contends that in April 2019 I appointed my agent, Nie, as the legal representative of NQ Tianxia. This is wrong. Nie was appointed as director of NQ Tianxia by Shi (*see* Exhibit 7) and further was appointed by Shi's associate as the legal representative of NQ Tianxia on the same day (*see id*). Nie is not my agent. There is no basis for Shi's misrepresentation that I "appoint[ed] Nie[] as legal representative [of NQ Tianxia]."

8

23.     On July 26, 2019, my team and I requested that Xu hand over NQ Tianxia's official seals, business license, and financial documents that were misappropriated by Shi. Xu refused. Because Xu refused to provide my team with the necessary business licenses, Shi's litigation against NQ Tianxia challenging NQ Tianxia's shareholders' resolution, and Shi illegally changed the company's legal representative to Nie, my team and I were unable to file an application to change NQ Tianxia's legal representative with the Beijing MSA.

24.     Therefore, in 2019, NQ Tianxia commenced an action against Xu in an attempt to obtain its official seals, business license, and financial documents that were misappropriated by Shi ("NQ Tianxia v. Xu"). *See* **Exhibit 11**.

25.     The Haidian Court also found Yingli Liu, who was in charge of NQ Tianxia's official seals, contract seals, and legal representative's seals, had turned over these seals to Lei Li, Shi's assistant. *See Supra* at ¶¶12-13.

26.     None of NQ Tianxia's executives or employees has ever provided my team with any documents. Accordingly, my team has no documents or information to arrange an accounting for NQ Tianxia's assets and liabilities at this time. The location of NQ Tianxia's documents and information (that were concealed by Shi and his associates) is unknown.

27.     As of the date of this declaration, NQ Tianxia's legal representative is still Nie Youdi, who was appointed by Shi. *See supra* at ¶18. My team and I have no access to any company books and records nor did my team ever get control over any of NQ Tianxia's assets.

28.     In addition, there is no basis for Shi to allege that I "transfer[ed] to [myself] 59.675% of the shares of [NQ Tianxia]." ECF 396 at 6. According to the company's corporate records, NQ Tianxia has not issued any new equity shares since its inception. *See* ECF 394-6. Accordingly, I can only acquire NQ Tianxia's shares from existing shareholders.

29. Indeed, I acquired my NQ Tianxia shares from existing shareholders following the China International Economic and Trade Arbitration Commission's ("CIETAC") arbitration award in connection with an arbitral proceeding between NQ Tianxia and Shi (Shi appeared in the proceeding) in connection with disputes of the performance of the Share Disposal Agreement under the VIE structure. *See* ECF 268-2. Specifically, NQ Tianxia, in accordance with the Share Disposal Agreement, requested Shi and Xu Zhou to transfer their NQ Tianxia shares to Lingyun Guo and me. *Id*. Shi and Xu Zhou refused to honor their contractual obligations. *Id*.

30. In September 2021, CIETAC ordered Shi to transfer his interest in 10.325% of NQ Tianxia's shares to Lingyun Guo and me and ordered Xu Zhou to transfer his interest in 23.275% of NQ Tianxia's shares to me and his interest in 9.975% of NQ Tianxia's shares to Lingyun Guo. ECF 268-2, at 27. CIETAC further issued an award that permitted Lingyun Guo to further transfer the 36.4% of NQ Tianxia's shares she had received to me. *See* **Exhibit 12**. However, due to Shi's refusal to comply with the CIETAC ruling, I never received Shi's 10.325% interest in NQ Tianxia's shares and only acquired 59.675% (23.275% from Xu Zhou plus 36.4% from Lingyun Guo)[8].

31. I understand that, with no documentary support, Shi alleges that NQ Tianxia "generated annual revenues of [RMB] 68,000,000 (approximately $10,000,000)." ECF 396, at 6. My team and I have no way to verify Shi's assertion because NQ Tianxia is still under his control through his agent, Nie, and I have no access to its records. Even assuming NQ Tianxia could

---

[8] In compliance with PRC law and securities regulations and according to the VIE structure agreements, I am holding NQ Tianxia's shares on behalf of NQ Infinity. I am holding NQ Tianxia's shares as a part my job but will not enjoy any rights to receive dividends (the profits shall be provided to NQ Infinity and further to LKM in accordance with the VIE agreements).

generate annual revenues of $10,000,000, as previously discussed, these funds are controlled by Shi.

*NQ Mobile*[9]

32.  As explained above, *see supra* at ¶10, in or about July 2020, my team and I identified 29 transactions between May and November of 2019, in which Shi used nullified seals and digital banking keys to transfer 626 million RMB (at the time valued at over $89 million U.S. dollars) to from NQ Infinity to NQ Mobile. My team then started to attempt to gain access to NQ Mobile's bank accounts.

33.  On February 20, 2022, my team duly filed the required documents to the Beijing MSA and successfully replaced Nie (Shi's agent) with Hexia Li, an individual appointed by the Hong Kong Receiver. Thus, my team and I were able to get access to NQ Mobile's bank statements. However, not surprisingly, Shi and his associates left no funds in NQ Mobile's account. *See* ECF 394-3.

34.  Therefore, Receiver, and his agent (including my team and I) demanded that Xu and his team members hand over NQ Mobile's information, documents, and assets, but all demands were refused or left with no response.

35.  I understand that on June 20, 2023, Shi submitted a letter and a pledge agreement to the Court for the proposition that the "account was pledged to CMB as security for a loan used to repay LKM's 4% Convertible Senior Notes due October 15, 2018 [] and that **CMB received the funds in that account as repayment for the loan**." ECF 439 (emphasis added).

36.  The attached pledge agreement does not reflect that CMB ever received the funds, and documentary evidence indicates that the funds went elsewhere. After a close review of NQ

---

[9] In Shi's submission, this entity is translated "NQ Wireless."

Mobile's bank statements, my professional team and I identified the following unusual transactions that occurred before my team and I were granted access to NQ Mobile's bank account.[10]

| Date | NQ Infinity (wire in) (RMB) | NQ Mobiles' Balance after wire in (RMB) | Zhejiang Xinbao Technology Co., Ltd. (wire out) (RMB) |
|---|---|---|---|
| 5/15/2019 | 9,000,000 | 30,000,278.58 | -9,550,000 |
| 5/19/2019 | | | -8,806,216 |
| 5/19/2019 | | | -9,652,765 |
| 6/5/2019 | 8,000,000 | 20,171,768.89 | -19,364,345 |
| 6/6/2019 | 20,000,000 | 20,807,423.89 | -20,000,000 |
| 6/10/2019 | 20,000,000 | 20,290,999.89 | -19,442,500 |
| 6/10/2019 | 9,000,000 | 9,298,499.89 | |
| 6/11/2019 | 10,000,000 | 19,008,499.89 | -18,940,372 |
| 6/12/2019 | 20,000,000 | 20,013,000 | -20,012,467.59 |
| 6/12/2019 | 20,500,000 | 20,500,532.41 | -20,441,306.18 |
| 6/13/2019 | 21,500,000 | 21,559,226.23 | -21,441,929.56 |
| 6/13/2019 | 22,000,000 | 22,117,296.67 | -22,013,714.35 |
| 6/14/2019 | 22,000,000 | 22,103,582.32 | -22,013,714.35 |
| 6/14/2019 | 23,000,000 | 23,089,867.97 | -22,942,864.63 |
| 6/14/2019 | 23,500,000 | 23,647,003.34 | |
| 6/17/2019 | | | -14,509,493.65 -9,000,000 |
| 6/17/2019 | 24,000,000 | 24,137,509.69 | -24,011,220.65 |
| 6/18/2019 | 24,500,000 | 24,626,289.04 | -24,441,272.36 |
| 6/18/2019 | 35,700,000 | 35,885,016.68 | -10,350,773 -6,301,200 -19,048,032 |
| 6/19/2019 | 45,000,000 | 45,185,011.68 | -6,030,578.57 -38,969,421.43 |
| 6/20/2019 | 10,000,000 8,000,000 | 18,185,011.68 | -18,000,000 |
| 6/21/2019 | 40,000,000 | 40,185,713.93 | -40,000,000 |
| 6/21/2019 | 20,500,000 | 20,685,713.93 | |
| 6/24/2019 | | 185,713.93 | 13,000,000 |
| 6/24/2019 | 7,500,000 | 7,685,713.93 | -7,500,000 |
| 6/24/2019 | 77,000,000 | 77,185,713.93 | -77,000,000 |
| 6/24/2019 | 16,000,000 | 16,185,713.93 | -15,000,000 |
| 6/25/2019 | 69,000,000 | 69,185,713.93 | -8,283,700 -47,003,769 |

---

[10] *See* **Exhibit 13** – NQ Mobile's bank statements.

12

| | | | |
|---|---|---|---|
| 6/26/2019 | 70,174.47 | 1,468,419.40 | |
| 6/26/2019 | 13,827,437.90 | 15,295,857.30 | |
| 7/10/2019 | 7,000,000 | 7,006,781.55 | |
| **Total** | **626,597,612.37** | | **-587,071,655.32** |

37.     My team and I further conducted due diligence on the recipient, Zhejiang Xinbao Technology Co., Ltd., and found that this company was founded by Ou Li and Yuncai Xiang on September 3, 2018, and was dissolved on August 26, 2021.  A true and accurate copy of Zhejiang Xinbao Technology Co., Ltd.'s Qichacha[11] record is attached to this declaration as **Exhibit 14**.  My team further identified that Ou Li was prosecuted twice by the People's Prosecutor's Office for the crime of Evasion of Foreign Exchange, for evading China's currency restriction law.[12]

38.     In any event, based on my team's review of NQ Mobile's bank records, **not a single penny (of the 626 million RMB that NQ Mobile received from NQ Infinity) went from NQ Mobile's account to CMB for "repayment of the loan"** or otherwise.

39.     None of NQ Mobile's executives or employees has ever provided my team with any documents.  Accordingly, my team has no documents or information to arrange an accounting for NQ Mobile's assets and liabilities at this time, and has no knowledge of the whereabouts of NQ Mobile's documents or information (that were concealed by Shi and his associates).

---

[11] Qichacha.com is a public records database containing all China-registered legal entities' corporate records.

[12] The Taizhou City Jiaojiang District People's Court found that Zhejiang Dingtai Import and Export Company, where Ou Li was the legal representative, made false contracts and international trade records to obtain loans (in U.S. dollars) from overseas banks, and then converted the loans from U.S. dollars back into RMB for profits.  Ou Li's criminal conviction judgments will be provided upon the Court's request.

*LKM Beijing*[13]

40. On December 9, 2019, Jiang Wu, another associate of Shi's, filed a purported shareholder resolution with the Beijing MSA changing LKM Beijing's legal representative from Xu to Nie by using the nullified LKM International seal. *See supra* at ¶20.

41. On February 22, 2022, my team duly filed the required documents to the Beijing MSA and successfully replaced Nie (Shi's agent) with Hexia Li, an individual appointed by the Hong Kong Receiver. Thus, my team and I were able to get access to LKM Beijing's bank statements. *See* ECF 394-5. However, not surprisingly, Shi and his associates left no funds in LKM Beijing's account.

42. Therefore, Receiver, and his agent (including my team and I) demanded that Xu and his team members hand over LKM Beijing's information, documents, and assets, but all demands were refused or left with no response.

43. After a close review of LKM Beijing's bank statements, my professional team and I realized that LKM Beijing's balance was 40, 588.05 RMB (approximately $5,882.32 at that time) on February 14, 2019 (immediately after the Court issued the Receivership Order on February 1, 2019). When my team and I were granted access to inspect LKM Beijing's bank account, the balance was 12,535 RMB (approximately $1,790.71 at that time). *See* **Exhibit 15**. Due to Chinese courts' injunction orders in connection with numerous employment disputes, my team and I were unable to use the funds remaining in LKM Beijing's account.

44. Because neither Shi, Xu, nor any LKM Beijing executive or employees has ever provided my team with any documents, my team has no documents or information to arrange an

---

[13] In Shi's submission, this entity is translated as "Link Motion Technology."

accounting for LKM Beijing's assets and liabilities at this time, and has no knowledge of the whereabouts of LKM Beijing's documents (that were concealed by Shi and his associates).

**Receiver's Post-October 15, 2020 Activities in China**

45. Without any doubt, the Receiver's (and his agent's) post-October 15, 2020 activities conferred a genuine benefits upon LKM.

46. For example, in or about October 2019, NQ Infinity commenced an action against its previous legal representative, Xu, for breach of fiduciary duties[14]. Xu appeared. On August 16, 2021, the Haidian Court found that Xu "breached his fiduciary duties to [NQ Infinity]" and ordered him to pay RMB 1,358,910.93 to NQ Infinity. Xu appealed. On July 24, 2022, the No. 1 Intermediate Court affirmed Haidian Court's decision and rejected Xu's appeal.

47. In addition, my team had to defend the lawsuits brought by Shi and Xu in an attempt to frustrate the Receiver's efforts in China. For example, on July 29, 2019, Shi brought action against NQ Tianxia claiming NQ Tianxia's shareholder resolution was illegal and invalid, and attempted to maintain his control over the company.[15] My team retained attorneys to defend against Shi's claims. On July 30, 2020, the Haidian Court rejected Shi's meritless claims. Shi appealed. On October 27, 2020, the No. 1 Intermediate Court rejected Shi's appeal and affirmed the Haidian Court's decision confirming that NQ Tianxia's shareholder resolution was valid.

48. On September 22, 2020, my team, on behalf of NQ Infinity, commenced an administrative action against the Haidian Court.[16] NQ Infinity claimed that due to Haidian Court's

---

[14] A certified translation of the PRC court's judgments ([2020] Jing 0108 Min Chu No. 328 and [2020] Jing 01 Min Zhong No. 2389) will be provided upon the Court's request.

[15] A certified translation of the PRC court's judgments ([2019] Jing 0108 Min Chu No. 56920 and [2020] Jing 01 Min Zhong No. 7149) will be provided upon the Court's request.

[16] A certified translation of the PRC court's judgment ([2021] Jing Wei Pei Jian No, 7) will be provided upon the Court's request.

improper temporary injunction in connection with Xu's claim, NQ Infinity was unable to secure its bank accounts and provided Shi and Xu opportunities to transfer NQ Infinity's funds and further cause significant damages to NQ Infinity. My professional team is currently considering filing a special petition before the Supreme People's Court.

49.     On September 2, 2021, my team commenced an action against CMB for breach of contract because CMB allowed irregular wire transfers to occur without diligent review.[17]

50.     Indeed, my team and I had to spend a significant amount of time defending Shi and Xu's frivolous lawsuits in order to grant access to LKM WFOEs' accounts.

**My Work as the Receiver's Agent in China**

51.     As detailed explained above, as the Receiver's agent in China, I have to cooperate with different professional teams handling different types of litigation over numerous companies. In addition, I have to travel to Beijing to participate in legal proceedings. I further need to negotiate with authorities in order to proceed with certain business registration filing issues. On average, I work on Receivership matters for over 40 hours per week. Indeed, in order to carry out Receiver's agent's obligations, my other business has been damaged due to a lack of sufficient time to take on new projects.

52.     None of the executives or employees in any LKM WFOE in China has ever provided me with any credentials, information, or documents relating to LKM's (and its subsidiaries) applications or sales with the Apple store or Android store. To the best of my knowledge, Shi and his associates have established another company to receive the profits generated by LKM's application (APPs). My team is investigating this issue.

---

[17] A certified translation of the PRC court's judgment ([2021] Jing 03 Min Chu No. 524) will be provided upon the Court's request.

I do not speak, read, or write English.  This Declaration has been translated into Mandarin Chinese to me.  I understand its content.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 23, 2023

Lilin "Francis" Guo