```
                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK
---------------------------:
WAYNE BALIGA,                  :
                Plaintiff,     : Case No.: 18-cv-11642

       v.                      :

LINK MOTION INC., et al.,      : New York, New York

                Defendants.    : June 27, 2023

---------------------------: CONFERENCE


           TRANSCRIPT OF STATUS CONFERENCE HEARING

         BEFORE THE HONORABLE VALERIE FIGUEREDO

            UNITED STATES MAGISTRATE JUDGE



  APPEARANCES:

  For Plaintiff:        GREENBERG TRAURIG, LLP
                        BY: Brian Straw, Esq.
                        77 W. Wacker Drive
                        Chicago, Illinois 60601


  For Defendant:        SEIDEN LAW, LLP
  Link Motion           BY:  Amiad M. Kushner, Esq.
                             Jen Blecher, Esq.
                             Tony Zhang, Esq.
                        322 Eighth Avenue - Suite 1200
                        New York, New York 10001


  For Defendant         FELICELLO LAW, P.C.
  Vincent Wenyong       BY:  Michael Maloney, Esq.
  Shi                        Roseanne Felicello, Esq.
                             Kristie Blase, Esq.
                        366 Madison Avenue
                        New York, New York 10017


  Proceedings recorded by electronic sound recording;
  Transcript produced by transcription service

          AMM TRANSCRIPTION - 631.334.1445
```

```
 1              THE DEPUTY CLERK:  Good afternoon.  This is
 2    the matter of Baliga, et al. v. Link Motion Inc.
 3    et al.; Case Number 18-cv-11642.  The Honorable
 4    Valerie Figueredo presiding.
 5              Counsel, please state your appearances for
 6    the record, starting with counsel for the receiver.
 7              MR. KUSHNER:  Good afternoon, Your Honor.
 8    My name is Amiad Kushner from Seiden Law.  We
 9    represent Robert Seiden in his capacity as the
10    receiver, and with me are my colleagues from
11    Seiden Law.  To my right is Jen Blecher.  To my left
12    is Tony Zhang.  And I just want to note for the
13    record that Steven Seiden from the receiver's office
14    is watching in the galley.
15              THE COURT:  Good afternoon, everyone.
16              MR. MALONEY:  Good afternoon, Your Honor.
17    This is Michael Maloney from Felicello Law P.C. on
18    behalf of defendant, Vincent Wenyong Shi.  And with
19    me are my colleagues, Roseanne Felicello and Kristie
20    Blase.
21              THE COURT:  Good afternoon.
22              MR. MALONEY:  Thank you.
23              MR. STRAW:  Good afternoon, Your Honor.
24    Brian Straw on behalf of plaintiff, Wayne Baliga.
25              THE COURT:  Good afternoon, Mr. Straw.
```

1    You're welcome to stay there, but if you want to

2    take a seat, that's also cool too.  It's up to you.

3            MR. STRAW:  I'm happy standing.  Thank you.

4            THE COURT:  Okay.  Perfect.

5            I usually don't use the computer during

6    arguments or anything, but because there were so

7    many voluminous appendixes to the various letters, I

8    printed the letters, but, obviously, have tried not

9    to kill unnecessary trees, so I'm just going to log

10   into the computer.

11           But in the meantime, the reason I asked for

12   the conference on this was, you know, this case has

13   been going on for a while.  And at least for a good

14   portion of it, it was under Magistrate Judge Freeman

15   and, obviously, Judge Marrero.  But this is all to

16   say that a lot of what the parties argued in their

17   accounting papers was, you know, not something that

18   I had any familiarity with, so there were just a lot

19   of questions that sort of arose.

20           Mr. Kushner, I'm happy to hear you out.  I

21   did have -- there was one topic that I really wanted

22   to flesh out that I had questions on, so I can go

23   ahead and start the discussion there, and then if

24   there's -- you know, I'm sure that will organically

25   lead to other questions.  And then if there's

```
1    anything you think would be helpful to add on,
2    I'm -- you know, I'm happy to hear everyone out.
3    But the first thing that I was curious about was --
4    you know, we looked at all the cases you cited for
5    piercing the corporate veil.  And, again, this seems
6    to be something that arises in the context where a
7    party's raising it as a cross claim or a claim in
8    the complaint or a counterclaim.  This seems to --
9    and, again, correct me if I'm wrong, but it seems
10   this is coming up not in the complaint, but in terms
11   of, you know, this motion for an accounting of the
12   expenses.
13           Do you have any case that would allow us
14   to, I guess, look at the factors for piercing the
15   corporate veil where the allegation is not -- you
16   know, I -- an accounting is a remedy, right?  It's a
17   type of relief.  And it struck me as, from the cases
18   that you cite, that for piercing the corporate veil,
19   you're really looking at needing to have asserted a
20   claim.
21           That was long winded and I'm sorry.  I
22   apologize.
23           MR. KUSHNER:  No.  Your Honor, thank you.
24   No, I understand the question.
25           I think it's true that, as a general
```

AMM TRANSCRIPTION - 631.334.1445

```
1    matter, what we're asking for is not the typical
2    fact pattern.  Often, receivers are brought in and
3    they have funding and they assert pleadings in which
4    piercing the corporate veil is one of the requested
5    forms of relief.  That's not where we are.  So we
6    have not cited and we're not aware of a case in
7    which a court pierced the corporate veil in the
8    context of an accounting without there have --
9    without there being a prior pleading to which the
10   receiver can refer to.
11          That said, doesn't mean that you can't
12   grant that relief.  I think that you may get to the
13   relief we're seeking in two ways.  One, you could
14   find that, notwithstanding the fact that the
15   receiver has not actually brought a pleading
16   asserting a claim for piercing the corporate veil
17   because this is an accounting.  And one of the
18   functions of the Court, in determining or in
19   approving an accounting, is figuring out are the
20   revenues and expenses accounted for properly.  And
21   if they're -- one of the parties has caused the
22   receiver to expend funds more than would otherwise
23   be required under the circumstances, or, perhaps, as
24   we allege, one of the parties has looted the estate
25   in a manner that frustrates the receiver's
```

1    activities, we think the Court, in the context of an

2    accounting, can order the party that looted the

3    funds of the estate and frustrated the receiver from

4    performing his duties.  We think that's within the

5    authority of the Court.  But even if --

6           THE COURT:  But can I just ask you a

7    question?  When you say it's "within the authority

8    of the Court," is that because there's some -- I

9    guess it would have to be as a matter of equity, but

10   is there some case or something you could point me

11   to to support that?

12           MR. KUSHNER:  The -- I don't know the case

13   right now, Your Honor.  You know, we could search

14   for such a case.  We certainly have cited cases

15   piercing the corporate veil in the receivership

16   context.  But Your Honor is correct that those --

17   you know, the *Fannie Mae* case, for example, involved

18   a pleading.

19          So, sitting here today, I'm not aware of a

20   case that pierced the corporate veil without an

21   actual claim asserted in a pleading for piercing the

22   corporate veil, but I don't think that that -- the

23   fact that there's no case law precedent standing

24   alone is a bar to such a finding, but...

25          THE COURT:  But let me ask you even more

1    broadly, like, because it sounded like you were

2    saying -- you know, putting aside the corporate

3    veil, it sounded like you were potentially making

4    some type of, like, equitable remedy argument that

5    you thought it could potentially be in the Court's

6    equitable powers to grant this type of remedy.

7         So even if you don't have a case on -- that

8    pierces the corporate veil, is there any other type

9    of case in this accounting sphere where potentially

10   someone got the damages -- the unrecoverable amount

11   that had -- once you showed it's been looted or

12   mismanaged or it frustrated the efforts of the

13   receiver that has -- that somehow there's an

14   individual who's gotten personal liability aside

15   from the corporate -- the piercing the corporate

16   veil context?

17        MR. KUSHNER:  Your Honor is correct that we

18   are relying on principles of equity.  And we believe

19   that the Court, sitting in equity, has the authority

20   to effectively pierce the corporate veil, but I

21   don't have a case right now.  We can look for such a

22   case and submit it to Your Honor.

23        But separate from that, Your Honor, we

24   believe that, alternatively, the Court has the

25   authority, the inherent authority, to enforce its

```
 1    own orders.  In this case, the Court issued the
 2    receivership order.  It ordered that the company be
 3    turned over to the receiver, including the books and
 4    records, control of all the company's subsidiaries.
 5    And we've provided you with a lot of evidence that
 6    Mr. Shi has frustrated the Court's receivership
 7    order.
 8            Just take one example.  The -- all this
 9    paper that we've expended on, the missing
10    $89 million, we allege that Shi effectively looted
11    that money from the company.  But critically, Your
12    Honor, it was done after the receivership order was
13    issued by the Court.  Talking about mid- to late
14    2019.  So if Your Honor finds, for example, that, in
15    violation of the receivership order, the defendant,
16    Shi, looted the company and stole tens of millions
17    of dollars, Your Honor has the inherent authority,
18    in, sort of, determining a remedy for that
19    violation, to impose some type of liability upon
20    Mr. Shi.
21            THE COURT:  You're almost arguing for a
22    sanction, then?
23            MR. KUSHNER:  Yes.
24            THE COURT:  Maybe -- so I recognize this is
25    a little bit unethical, but since we're just focused
```

1    on this topic of the ability to provide this type of

2    relief, the piercing the corporate veil, or

3    potentially something more loosely described as a

4    sanction, before we switch gears to talk about some

5    of the other issues, I was going to just maybe see

6    if -- Mr. Maloney, if you wanted to respond.  We

7    could address this topic as -- we can go back and

8    forth as often as necessary, but then we could

9    switch to some other topics.  This is -- this itself

10   is its own discrete issue that I think we could just

11   resolve first and then move on.

12            MR. MALONEY:  Yes.  Thank you, Your Honor.

13            As Mr. Kushner admitted, you know, there's

14   not really a case that we're aware of that supports

15   the position that a piercing claim can be made in

16   this context without the existence of a pleading.

17            With respect to the argument that the Court

18   has an inherent equitable power to award this

19   relief, the cases that we've cited in our papers in

20   the context of an accounting for a receivership say

21   that the Court has the equitable power to charge the

22   plaintiff with the cost of the unfunded

23   receivership.  We've not seen a case saying the

24   Court has the equitable power to, out of the blue,

25   pierce a corporate veil to hold another person

1    liable for cost of the receivership, and we don't

2    think the Court should make new law on that point.

3           The other thing here is that there's a

4    question of fundamental fairness, right.  If this is

5    a claim that the receiver wants to bring now at this

6    stage in the case -- this first came up, you know, I

7    think it was in January of this year.  You know,

8    it's been five years into the case, right.  Why

9    wasn't this brought earlier?  Dr. Shi should have

10   had an opportunity to address this issue earlier in

11   the case if the receiver wanted to pursue this sort

12   of relief.  That's the purpose of the process of

13   pleading.  So Dr. Shi's been deprived of that

14   opportunity.

15          The other issue here is that -- there's a

16   few other issues that we want to mention.  First of

17   all, we think the piercing claim that the receiver

18   is trying to make here is not available under Cayman

19   law.  LKM is a Cayman company, and so, therefore,

20   any piercing claim must be governed by Cayman law

21   under the internal affairs doctrine.  And as we

22   mentioned in our brief filed at Docket 393, this

23   type of piercing is not available under Cayman law.

24          THE COURT:  Is there really an -- so you

25   seem to suggest there is really a difference between

1       Cayman Islands law and New York law on this.

2                   MR. MALONEY:  Yes.  Yes, Your Honor.

3                   THE COURT:  And the one case you cite to is

4       what you want to rely on?  I know in your brief

5       there's a case from --

6                   MR. MALONEY:  We've cited a case,

7       *Hurstwood*, from the UK.  As you, I'm sure, have

8       read, Cayman Islands is an English law jurisdiction.

9       They tend to look to decisions in other English

10      civil law jurisdictions.  We found this *Hurstwood*

11      case.  We're happy to do some more research to see

12      if we can find some other cases directly on point,

13      but we think the *Hurstwood* case and the other

14      arguments we've made here are sufficient to make our

15      point that this type of piercing is not available

16      under Cayman Islands law.

17                  The other issue is that the receiver cannot

18      plead the requisite elements, even under New York

19      law.  We've addressed that in the brief.  I won't go

20      into that in detail.

21                  I think also we should talk about the

22      fundamental factual contentions that the receiver

23      makes here, which is this whole looting claim.  And

24      I -- you know, this has been a contention that the

25      receiver and plaintiff have made throughout the

 1    case, but fundamentally speaking, their records do

 2    not show any transfers to Dr. Shi.  They don't show

 3    any transfers to any company controlled by Dr. Shi.

 4    The person in control of these accounts and

 5    companies at the period in time in question was

 6    Xu Zemin.  It's our contention that Mr. Xu had his

 7    own independent interest in protecting his legal

 8    rights as a legal representative of these companies.

 9           The other thing is that the receiver and

10    Guo's story keeps changing on this point.  You know,

11    as late as June 1st, Guo submitted a declaration in

12    which he claimed that Dr. Shi continued to control

13    NQ Mobile.  And after you, Your Honor, issued your

14    June 13th order requesting follow-up, Guo submitted

15    a declaration on the 23rd in which he now admits for

16    the first time that he has controlled all the

17    "onshore entities" since 2019.  The judicial

18    opinions that Mr. Guo submitted also support this

19    fact.

20           In some of the receiver's earlier

21    submissions in this case, they made statements that

22    are inconsistent with what they -- they're making

23    now.  You know, on July 19, 2021 at Docket 239, page

24    11, Guo claimed that the funds at issue were

25    transferred in 29 separate transfers between May to

1    November 2019.  In the filing yesterday at

2    Docket 446, they claimed that 90 percent of the

3    funds were transferred immediately.

4              And if we dig down into the nitty-gritty

5    details of what they're claiming, there's some

6    really glaring inconsistencies.  For example, at

7    Docket 161 is a copy of a July 17, 2020 letter from

8    the receiver with attachments relating to these

9    transactions.  The attachments are an excerpt of

10   transactions in the account in question.  It's not

11   the full record, it's just an excerpt.  It's -- he

12   provides a limited translation of certain

13   transactions.

14             And in this document at ECF page 5 --

15   again, this is Docket 161 -- the receiver provided a

16   chart of what he claims to be the 29 transactions

17   that represent looting, but if you actually look at

18   the bank record, there are transactions that come

19   back into the account.  So Guo selected, he

20   cherrypicked transactions and added them up and

21   claims that they were looting, but he ignored

22   transactions back into the account.  And if we look

23   at -- let me find my citation here -- Docket 443-20,

24   we have Guo's current recitation of his allegedly

25   looting transactions.  He refers to the same excerpt

1    of the bank transactions.  He provides another
2    chart, but this chart includes translations of
3    transfers back into the account, but doesn't provide
4    a sum of the net that he claims to have been
5    "looted."
6              You know, fundamentally, his submissions
7    are inconsistent and contradictory.  There's no
8    clear record or evidence showing that any of these
9    funds ended up in Shi's hands.  There is a record
10   showing that the accounts were pledged to China
11   Merchants Bank as security for a loan, that it came
12   due in -- as early as March of 2019.  And I think
13   it's reasonable to submit to the Court that no bank
14   anywhere would permit funds of this -- these amounts
15   to be transferred out of these pledged accounts
16   unless they're transferred for repayment of a loan.
17             THE COURT:  Well, let me just stop you
18   right there because I hear your argument and -- but
19   I think we have the fundamental problem that it
20   seems like there's no law directly on point that
21   would allow me to even get to the merits of whether
22   we've shown adequately fraud or looting or some type
23   of bad act by Shi.
24             So, I guess, on this, you know, I think if
25   there's any other case law you want to point me to

```
1    that allows the piercing the corporate veil in a
2    similar procedural posture or, alternatively, where
3    the court has considered -- I'm going to call it a
4    sanction -- if you want to try to make that inherent
5    authority argument and posit this as a sanction, but
6    I think, you know, I would -- for obvious reasons, I
7    think I -- you -- I'm going to need to see something
8    that allows me to do it.
9            MR. KUSHNER:   A brief response on that.
10   Actually, counsel for Shi just reminded me of
11   something really important, which is that this
12   Court, through Judge Freeman's report and
13   recommendation, and Judge Marrero adopting her
14   report and recommendation, found that if the
15   plaintiff -- sorry -- if the receiver's actions
16   after October 2020 didn't benefit the company, the
17   Court could charge the expenses of the receivership
18   to the plaintiff, Baliga.   One might say that
19   there's no authority for that, either, but I think
20   under the circumstances of the case, when you're
21   dealing with an accounting, again, if the facts and
22   circumstances arguably suggest that there's some
23   party that has caused the receiver to incur a
24   liability and somehow is at fault for that, then it
25   would seem that there is an equitable principle that
```

1    allows the Court to impose liability where it may

2    fall.  And it sounds like Judge Freeman and

3    Judge Marrero had no issue with that in theory.

4          THE COURT:  Are you referring to the order

5    from March of 2022, her report and recommendation?

6          MR. KUSHNER:  I don't recall the date in

7    front of me, but it's the report and recommendation

8    which found that the receivership should be

9    dissolved pending an accounting.

10          THE COURT:  And you're saying that she

11    found -- or she suggested that Baliga himself could

12    be responsible for any expenses that were

13    unnecessary or not for the benefit of Link Motion?

14          MR. KUSHNER:  Yes.  I don't have her exact

15    words in front of me, but she did hold that,

16    depending on whether or not the receiver's actions

17    after October of 2020 benefited the company, Baliga

18    could be held personally responsible.  But if the

19    actions of the receiver benefited the company, then

20    Link Motion itself would have to bear those

21    expenses.

22          MR. MALONEY:  Your Honor, if I could

23    respond to that single point.  Mr. Kushner is

24    correct that Judge Freeman did find that if

25    receiver's actions after October 5, 2020 were not

```
 1    for the benefit of the receivership, the expenses of
 2    that, those activities, could be charged to the
 3    plaintiff.  And she cited federal case law to
 4    support that principle.  And it's our contention
 5    that there -- the cases that Judge Freeman signed --
 6    cited there represent a line of case authority in
 7    U.S. law, and that's consistent with equitable law
 8    going back into ancient times with respect to
 9    receiverships.  That theory of authority stands for
10    the proposition that the costs of the
11    receivership -- the question is whether the costs of
12    the receivership are borne by the estate, the
13    company or the person, the party who requested that
14    the Court appoint the receiver; i.e., the plaintiff
15    in this case.  That authority does not stand for the
16    proposition that the Court can assign the cost of
17    the receivership to a third party or even a
18    defendant.  And I am happy to brief that issue.
19              THE COURT:  No.  She -- it's at page 40 of
20    her decision --
21              MR. MALONEY:  I believe it's that.
22              THE COURT:  -- where she cites a
23    Ninth Circuit case --
24              MR. MALONEY:  Correct.
25              THE COURT:  That makes the point that the
```

1   court maintained the discretion to charge the

2   receiver's expenses either to the corporation or to

3   the party who wrongfully obtained the receiver's

4   appointment.

5           I think it sounds -- and, again, I'd be

6   open if you wanted to submit a letter motion or

7   brief this, but it sounds like, potentially, the

8   avenue that you might want to consider is this idea

9   of a sanction, although this is just -- this was the

10  first time this was discussed.  But it sounds like

11  the authority on the inherent discretion, at least

12  with regards to Judge Freeman's order, sounds like

13  it's potentially limited to either LKM or the party

14  who wrongfully obtained the receiver's appointment.

15          Is there anything else either side wants to

16  say on this?

17          MR. MALONEY:  Yes, there is, Your Honor.

18  Can you give me a moment?  I'm just going to look

19  through my notes here.

20          MR. STRAW:  I'd also like to interject for

21  a moment.

22          THE COURT:  Oh, sure.

23          MR. STRAW:  At Docket 331, at page 19 --

24  that's Judge Marrero's order accepting the report

25  and recommendation -- you can see what he did on

1    this point.  And he notes that as to the period

2    after October 5, 2020, expenses that the corporation

3    would have had to incur had there been no receiver,

4    and expenses that convert a genuine benefit upon the

5    corporation should be charged to it.

6            So I think that it's important as we

7    proceed through the rest of this hearing that those

8    expenses after October 5, 2020 under Judge Marrero's

9    order, that either the corporation would have had to

10   incur or that conferred a genuine benefit to the

11   corporation should be charged to the corporation.

12           THE COURT:  But I guess I'm a bit confused.

13   I guess I don't understand the point you're trying

14   to make, in all honesty, because I thought the

15   corporation had no money left, or LKM, right?

16   There's no money to pay the -- it sounds like you

17   recovered -- you're seeking somewhere around 3.9, I

18   think, in expenses, or you had 3.9, and there's an

19   unfunded difference there.

20           MR. KUSHNER:  It was an unfunded liability

21   of just over 1 million at the time we submitted the

22   accounting brief.

23           THE COURT:  So I'm a little confused as to

24   what you mean by assigning them to the corporation

25   because it sounds like that still wouldn't give them

1    a recovery of anything.

2              MR. STRAW:  My point that I'm flagging is

3    we're getting into that point where defendant, Shi,

4    is saying it should be charged to Baliga.  And I'm

5    highlighting that, under the judge's order, it's

6    only assignable to Baliga where it would not have

7    arisen but for the continuation of the receiver's

8    appointment.  And it had no -- the -- it -- the

9    corporation -- and the corporation wouldn't have

10   otherwise had to incur those expenses or there was

11   no genuine benefit to the company.

12             THE COURT:  Right.  Yeah.  I think he was

13   just pointing -- or I understood you to just be

14   saying, if anyone should bear the cost here, it's

15   definitely not Shi, who's, like, a third party.

16   It's either the corporation or the person who --

17   like, if we can show it -- wrongfully obtained the

18   receiver.  But I don't think you were saying it

19   would automatically go to Baliga.

20             MR. STRAW:  That --

21             THE COURT:  I think you were identifying

22   the two parties under the case law that could

23   potentially be held personally liable, LKM or

24   Baliga, not necessarily that in this instance that

25   should even happen.

```
 1              MR. MALONEY:  Correct.  Correct.

 2              THE COURT:  Okay.

 3              MR. MALONEY:  We do contend that Baliga

 4    should bear the cost, but, correct, we -- that's my

 5    contention.

 6              THE COURT:  Right.

 7              MR. KUSHNER:  Your Honor, Shi's not --

 8    just -- he's not a third party, obviously.  I mean,

 9    he's a defendant in the case, and, obviously, we've

10    alleged that he dominates Link Motion and has

11    orchestrated all these -- all this misconduct.  So

12    we're going to look for case law either under the

13    sanctions prong, or if there's something in the

14    equitable universe, so to speak, we'll send it to

15    you.  But he's --

16              THE COURT:  Feel free to just -- you can go

17    as broad as you would like, but you'd have --

18    anything you think could support what you would like

19    here, basically.

20              MR. KUSHNER:  We will search and send you a

21    supplemental submission on that.

22              THE COURT:  Okay.

23              MR. MALONEY:  Your Honor, one more point on

24    the question of this shifting the cost of the

25    receivership after October 5, 2020.  As we
```

1   discussed, and as Your Honor recognized from

2   Judge Freeman's report and recommendation, there is

3   a line of cases that say that the expenses can be

4   charged to the plaintiff or the party who wrongfully

5   obtained the receivership.  In this case, the

6   question is the actions of the receivership after

7   October 5, 2020.

8          I'd like to direct your -- the Court's

9   attention to ECF page 97 of Docket 448-2.  This was

10  filed yesterday.  This document is a translation of

11  a record of a wire transfer made by Mr. Guo, the

12  receiver's agent in China, to Greenberg Traurig in

13  the amount of 50,000 U.S. dollars.  The records

14  indicate that it happened in early November 2020,

15  shortly after Baliga dropped his derivative claims

16  and proceeded with direct claims.  And as is evident

17  from Docket Entry 184, a few days later, on November

18  11th, Greenberg Traurig substituted in as counsel

19  for plaintiff, Baliga, in place of the Seiden Law

20  firm.

21         So at this time, what we have here is Guo,

22  an agent of the receiver, himself, an arm of the

23  court, charged with protecting the interests of the

24  company, paying the legal fees of a plaintiff suing

25  the company for money damages.  We think this fact

1 is relevant to the question of who bears

2 responsibility for the cost of receivership after

3 October 5, 2020.

4    THE COURT:  What -- it was 448-2.  And what

5 was the specific page number that you referenced?

6    MR. MALONEY:  This is ECF page 97 of

7 Document 448-2 filed last evening.  And the --

8 this -- that page is the translation.  The original

9 appears at ECF page -- I apologize.  I'm going to

10 have to follow up with the -- that second ECF cite.

11 The original is in the same document.  It's --

12 appears later in the document, and I'll follow up

13 with that.  It's a little hard to read on my copy.

14    THE COURT:  Yeah, no worries.

15    Does this show when the wire transfer was

16 actually sent?  Because I don't see a date on this.

17    MR. MALONEY:  So the original is a

18 screenshot of a wire transfer record on a computer

19 screen, and it appears in between documents that

20 appear to be in chronological order.  And it appears

21 in between a document dated November 4, 2020 and a

22 document dated -- let me -- I believe the next

23 document was dated December 3, 2020.

24    THE COURT:  Mr. Kushner, do you -- are --

25 do you know what the -- the wire transfer to

```
1    Greenberg Traurig, was that for legal fees?
2              MR. KUSHNER:  This is the first time I'm
3    hearing about this.  I don't know what that's for.
4    We could look into it.
5              THE COURT:  This was Exhibit 2 to your
6    letter from last night.
7              MR. MALONEY:  Your Honor, this is Exhibit B
8    to the letter filed last evening at Docket 448.
9    It's a -- it's one of the larger, voluminous ones.
10             THE COURT:  Yeah.  This is completely off
11   topic, but one of the questions I did have was, at
12   what point did the Seiden Law Group stop
13   representing Baliga?
14             MR. KUSHNER:  It was around the time that
15   the amended complaint was filed, I believe, in
16   October of 2020.  So the complaint, as originally
17   filed, was a derivative action, and then it was
18   amended to remove derivative claims.  At that point,
19   Mr. Baliga hired Greenberg Traurig, and Seiden Law
20   stopped representing Mr. Baliga and represented the
21   receiver's office only.
22             THE COURT:  Is there anything else you
23   wanted to add, Mr. Maloney, on this, or...
24             MR. MALONEY:  On that point, I think I'm
25   fine.  I also would like to submit some additional
```

1   case law on that issue.

2          THE COURT:  On the -- on which issue?

3          MR. MALONEY:  This is the issue of the

4   authority of the Court to pierce the corporate veil

5   under circumstances like this.

6          THE COURT:  Oh, yes.  Yes.

7          MR. MALONEY:  I know Your Honor has

8   mentioned the -- this concept of sanctions.  I mean,

9   I also would like an opportunity to be heard on

10  that, but it's hard to respond because no

11  application has been made.

12         THE COURT:  Yes.  Yeah, no, on the concept

13  of sanctions, which has literally come up today, you

14  know, especially because this sounds like we're

15  treading new ground here, and this is -- obviously

16  has to go in an R&R to Judge Marrero, if you find

17  authority that you want to make an argument around,

18  I'm certainly going to give you, Mr. Maloney, time

19  to respond.  Just because, otherwise, it's not to

20  the benefit of Judge Marrero if I just rule without

21  a complete fleshing out of this notion of sanctions

22  because this isn't the typical context in which

23  sanction -- or a sanctions-like argument would come

24  up.

25         There's potentially -- I'm just trying to

```
1    think of an efficient way to get this resolved
2    quickly, because this case has -- is -- you know,
3    has been around for a while.
4           One thing that seemed pretty
5    straightforward from the briefing is I could
6    potentially give you an answer as to the pre-2020,
7    the post-2020 in terms of this argument that it
8    wasn't -- the receiver wasn't diligent, that the
9    efforts weren't for the benefit of the company, so
10   everything raised in the briefs up to the corporate
11   piercing.
12          I could potentially give you a decision on
13   that and wait for briefing on, you know, whether you
14   can try to personally seek this -- the difference
15   that you're missing from Shi.  I don't know if
16   that's an option that the parties would want,
17   though.
18          MR. KUSHNER:  I think that makes sense
19   because it would help, at least from the receiver's
20   standpoint, to know what expenses are at issue and
21   whether it makes sense to actually seek some kind of
22   contribution from Mr. Shi.  I mean, if Your Honor
23   finds that it's a de minimis amount, for example,
24   that --
25          THE COURT:  Right.  It might not be worth
```

```
 1    your time to -- related to -- so I don't know.
 2              Mr. Maloney, did you have a view on that?
 3              MR. MALONEY:  I also think that it may be
 4    useful to break this up into parts and resolve
 5    what's more easily resolvable now and then, you
 6    know, reserve the other parts for later.  I think
 7    the pre-October 5, 2020 expenses may be one of those
 8    issues that are susceptible to, sort of, an interim
 9    report and recommendation.
10              We also submit that the Court should
11    consider an interim report and recommendation about
12    return of control of the company.  The traditional
13    standard when a receiver is discharged is that the
14    receiver remains in office until the accounting is
15    resolved.  We think the Court has the equitable
16    power to return control earlier.  Judge Freeman
17    found that the reason to continue the receivership
18    ceased in October 5, 2020, you know, almost three
19    years ago, and there really is no reason to continue
20    the receivership for any further period of time.
21              I think also, if the Court is inclined to
22    break this up into parts and to consider the
23    pre-October 5, 2020 period, we think it would be
24    important to know who paid the Seiden Group's legal
25    fees when they were retained by Baliga to bring this
```

1    case.  We made a submission at Document 435.  It's

2    our contention that Guo actually paid those fees, or

3    that Guo retained the Seiden Group before this case

4    was filed.  We think the revelation that Guo paid

5    Greenberg Traurig's fees supports that contention,

6    and so we think that's a relevant factual issue that

7    should be fleshed out.

8           THE COURT:  Mr. Kushner, did you have a

9    response just to that?  It sounds like we're all

10    maybe of the opinion that we should take this

11    piecemeal, which I'm happy to do just to keep things

12    moving along.  But this other notion that -- this

13    idea of who paid your firm's legal fees, I don't

14    know if you want to respond to that.

15           MR. KUSHNER:  Yeah, Your Honor, I don't

16    think that discovery should be one-sided.  We'd love

17    to take Dr. Shi's deposition.  There are a lot of

18    things that we'd like discovery on.  The notion that

19    you're just going to open up the receiver's office

20    to discovery without giving us access to things that

21    we want and also at this very late stage, we would

22    oppose that unless it's, sort of, reciprocal.

23           With respect to returning control of the

24    company back to the board and taking it away from

25    the receiver, Mr. Shi has repeatedly asked

1    Judge Marrero for that relief, and it's been

2    repeatedly denied.  Judge Marrero has held that the

3    receiver is going to remain in place until the

4    accounting is completed.  Mr. Shi asked for control

5    to be returned to the board sooner -- in other

6    words, before the accounting is completed, and Judge

7    Marrero has rejected that repeatedly.  So we

8    would -- we don't think that -- we think that issue

9    has already been resolved.

10           THE COURT:  Okay.  So why don't we do this,

11   I will issue an R&R that addresses the

12   reasonableness of the pre- and post-October 2020

13   fees.  So addressing the issue of whether they

14   were -- you know, the receiver was diligent, whether

15   their fees and costs incurred were reasonable and

16   for the genuine benefit of the company.  All of that

17   would be encompassed in an R&R to Judge Marrero.

18           I will not touch the issue of the piercing

19   the corporate veil.  I'll wait for Mr. Kushner to

20   provide any supplemental authority you'd like.

21   Given that this seems to be an issue that's somewhat

22   novel, at least in this procedural context, I'm

23   happy to give you as many pages as you want to brief

24   it.  And then when that comes in, I can give you as

25   much time as you'd like to respond to it.

```
1                MR. MALONEY:  Thank you, Your Honor.
2                THE COURT:  The one category that we
3      haven't touched is this -- these separate letter
4      motions that came in concerning the redacted or
5      sealed attorney invoices.  I can point you to the
6      relevant ECF numbers, but my recollection of this is
7      that the receiver filed the attorney invoices under
8      seal with certain redactions, and Shi is opposing
9      them being maintained under seal.
10               We reviewed the invoices, and you're
11     certainly correct, and there's ample case law in the
12     circuit that says you can -- you know, to the extent
13     the -- revealing the nature of the -- revealing the
14     description of the billing would reveal legal
15     strategy, the motivation for the client to hire the
16     attorney.  Something of substance that's privileged,
17     that gets redacted.  But in our review of the
18     invoices, there seemed to be some things that
19     were -- that did not fall into that category.  And
20     so I'm just flagging it for you that, for resolution
21     of that issue, it's likely that you're not going to
22     be able to keep all the invoices under seal, that
23     it's going to require some more narrowly tailored
24     redactions to the descriptions of the work, that it
25     would actually reveal, you know, privileged -- the
```

```
 1    substance of privileged communications, the
 2    motivations for the attorneys' retention or legal
 3    strategy, something that's tied to the actual
 4    attorney work product provided as opposed to --
 5    there were some that just seem like you could --
 6    there wouldn't be disclosure of that type of
 7    information if it wasn't -- if it was disclosed.
 8              Does that make sense?
 9              MR. KUSHNER:  Yes.
10              THE COURT:  Okay.  So since this is the
11    approach I think we've all, sort of, settled on, on
12    the reasonableness of these expenses, the parties
13    briefed this, so I didn't really have any questions.
14    I'm happy to hear from anyone if you want to touch
15    upon it, but really the main question was this idea
16    of piercing the corporate veil.
17              MR. KUSHNER:  With respect to the -- just
18    in terms of the sequence of events, Your Honor --
19              THE COURT:  Yes.
20              MR. KUSHNER:  -- can we submit the
21    supplemental brief on the piercing issue after we've
22    seen your report and recommendation?
23              THE COURT:  Yes, because I do think it
24    makes sense depending on the outcome.  If you don't
25    want to expend the fees to do that, that seems
```

1   perfectly reasonable.

2           The one thing I forgot to mention also

3   related to the reasonableness of the attorney fees

4   is -- so the invoices include attorney initials, or

5   what I'm assuming are attorney initials.  Perhaps

6   there might be some paralegal initials.  But there

7   was no -- I looked at the various declarations, but

8   there's no declaration that explains, like, you

9   know -- I don't -- I'm going to take initials.  So,

10  like, JEW was a senior associate with X level of

11  experience and something to justify the hourly rate.

12          We looked back -- I know some of these

13  expenses had been previously approved in various

14  orders by Judge Marrero that were filed under seal

15  in the vault.  We pulled those, and for some of

16  them, the underlying invoices, we couldn't find.  So

17  either they were maintained in chambers and have

18  since -- we couldn't get a hold of them.  And for --

19  and then for, I think, one or two that we saw, there

20  still wasn't an explanation as to, you know, this

21  initial represents a partner's work, 15 years of

22  experience, an expert in this field, et cetera;

23  something to allow us to judge the reasonableness of

24  the hourly rate for the individuals.

25          So that was something I wanted to ask about

1  because, otherwise, it becomes hard to judge whether

2  the hourly rate is reasonable if I don't know who's

3  performing the work, or the experience and

4  background of the person performing the work.

5        MR. KUSHNER:  Your Honor, we could submit a

6  supplemental declaration explaining who the

7  timekeepers are, what their initials are, and levels

8  of experience and other support for the hourly

9  rates.

10        THE COURT:  It doesn't -- it's -- so it --

11  you know, I'm not trying to add on to your expenses.

12  It doesn't have to be super complex, but I just need

13  something to be able to say, you know, the $600 rate

14  was attributable to a senior associate with X years

15  of experience.  I mean, obviously, I can -- we can

16  pull the cases, but there's -- you know, typically,

17  what courts will say is, in this district, that type

18  of -- those years of experience and that type of

19  rate is reasonable.  But I couldn't -- without

20  knowing who the person was that was charging the --

21  for example, the $500-an-hour rate, I wouldn't be

22  able to make that reasonableness determination.

23        MR. KUSHNER:  Okay.  So we will submit

24  something.  Could it be just a letter?

25        THE COURT:  Yes.

```
 1              MR. KUSHNER:  Okay.
 2              THE COURT:  Yeah.
 3              MR. KUSHNER:  Thank you.
 4              MR. MALONEY:  Your Honor, one more point on
 5    that issue, specifically the reasonableness of the
 6    pre-October 5, 2020 expenses.  I think Your Honor
 7    has pretty comprehensively addressed the issues
 8    relating to the professional fees that are claimed,
 9    but some of the records submitted yesterday also
10    relate to that period.  Some of these records relate
11    to the expenses that Mr. Guo was claiming
12    reimbursement for.  And although these voluminous
13    records were filed yesterday, we've identified some
14    issues that we're concerned about.
15              So, for example, some of these records
16    appear to show transfers out of the same China
17    Merchants Bank account that Guo claimed was empty
18    when he obtained control of it.  So, for example,
19    this is page 22 of ECF 448-2.  Appears to show a
20    transfer out of that China Merchants Bank account on
21    September 24, 2020 for airfare.  There's no
22    supporting documentation for what that airfare was
23    necessary for.  Guo has stated in numerous papers
24    that that account was empty when he obtained control
25    of it, but he's now claiming reimbursement for funds
```

1    transferred out of that account.  He's also stated

2    in papers that he never submitted -- or, I'm sorry,

3    deposited into that account the 1.5 million he

4    claims to have lent to the receivership.

5            There's another issue that we found.  This

6    is at --

7            THE COURT:  Actually, Mr. Maloney -- and

8    this might be a question for the receiver.  But in

9    the Seiden declaration, I thought there was a

10   paragraph -- I believe it's 40 -- the receiver's

11   accounting does not include Mr. Guo's fees and

12   expenses because he had been disappeared, but he was

13   gone for a while.

14           MR. MALONEY:  That is a good point,

15   Your Honor, and it's a little unclear what's going

16   on here.  The receiver has claimed certain expenses

17   in his November 2022 accounting.  It appears that

18   one position they may be taking is that all the

19   expenses claimed by Guo for that period are

20   reasonable because they were converted into Class B

21   shares of LKM.  And so I think that's an issue that

22   needs to be part of this decision of what's broken

23   up into these periods.

24           THE COURT:  But --

25           MR. MALONEY:  In other words, would your

1    decision address only the expenses claimed by the

2    receiver in his November 18 accounting for that

3    period and leave open the issues as to whether

4    Guo's -- the shares issued to Guo for claims for

5    that period are reasonable and necessary?

6              THE COURT:  But wasn't that already

7    approved as part of a note agreement by

8    Judge Marrero?

9              MR. MALONEY:  Judge Marrero approved that,

10   but also as part of that approval, directed that

11   copies of those papers be served on counsel,

12   including me.  They were not.  And so that was

13   essentially an ex parte application that we've never

14   had an opportunity to contest until now, until

15   Your Honor ordered that those papers be unsealed.

16   This is the first opportunity we've had to address

17   those issues.

18             THE COURT:  But I'm just --

19             MR. KUSHNER:  Your Honor, I -- and I

20   actually, kind of, agree with counsel for Shi to

21   some extent on this.  After the accounting was

22   submitted, we disclosed the note agreement, and

23   Shi's counsel filed papers essentially seeking to

24   undo the issuances of shares to Mr. Guo on the basis

25   that there were irregularities with his expenses, so

1    on and so forth.  And actually, Judge Marrero, in

2    response to that, said that the issue of Mr. Guo's

3    expenses is going to be determined by Your Honor in

4    connection with the accounting.

5            So even though Mr. Guo's expenses were not

6    included in the accounting as originally submitted

7    last year, we've now supplemented the record just in

8    the last few days to include documentation of

9    Mr. Guo's expenses.  And it appears that

10   Judge Marrero is envisioning that Your Honor will

11   review those expenses as well for reasonableness.

12           THE COURT:  So let me just make sure I'm on

13   the same page with everyone.

14           ECF 448 is what the receiver filed on

15   June 26th with the certified translation of expenses

16   from 2019 through 2021, and those are the ones you'd

17   like me to review as part of this accounting to

18   determine whether they were appropriately incurred

19   by Mr. Guo?

20           MR. KUSHNER:  Yes.  And in addition to 448,

21   there's Mr. Guo's affidavit; 443, I believe.  Or,

22   I'm sorry, 443-7, which provides Mr. Guo's

23   description of what he was doing and why he was

24   incurring those expenses.  So it should be read

25   together with Mr. Guo's -- that declaration and all

1   other declarations submitted by Mr. Guo.

2           THE COURT:  Okay.  And...

3           MR. MALONEY:  Your Honor, if I may respond.

4           THE COURT:  Yes.

5           MR. MALONEY:  So I believe the order by

6   Judge Marrero that we've been discussing is at

7   Docket 440, and I believe -- I mean, the order

8   speaks for itself.  Your Honor will have an

9   opportunity to consider that.

10          I agree with Mr. Kushner that I -- it

11  appears that Judge Marrero is envisioning that the

12  particular issue of awarding to Guo Class B shares

13  of LKM as reimbursement for these claimed expenses

14  is an issue that he would like Your Honor to decide.

15  Some of those expenses do relate to the

16  pre-October 5, 2020 period.

17          And so what I would submit is that we break

18  it up into different parts, right.  So Your Honor

19  could address the professional fees included in the

20  original November 2022 accounting for that period as

21  one discrete issue, and then address the issue of

22  Guo's, you know, reimbursement through shares as a

23  separate issue.  And I think that's necessary here

24  because we haven't really had a chance to fully

25  respond to the paper submitted yesterday.

```
1              THE COURT:  Well, no, I think it's
2    necessary for a lot of reasons, but, certainly,
3    again, you know, the -- there's voluminous -- just
4    looking at the June 26th submission, it's quite
5    voluminous.  And it really wasn't touched upon, for
6    obvious reasons, because it wasn't part of the
7    accounting sought in November of 2022.  So there's
8    no way I can give you a decision on that without any
9    type of -- you know, I'm going to call it briefing,
10   but it may not -- you know, we're just -- it may not
11   come to a full-on briefing because, again, I don't
12   need people to incur unnecessary expenses, but I
13   need more than just the one-page letter with all the
14   receipts in English, right, just to understand them
15   because, for instance, you point out the airfare,
16   you know, how am I supposed to tell you that's a
17   reasonable expense without any context?
18              So I think the approach that we've talked
19   about, which, again, I'm happy to work with the
20   parties, so if there's some other approach that you
21   think is more efficient, you should definitely let
22   me know.  But I can give you -- I can give you an
23   order on the accounting, as requested, in November
24   of 2022, which involved just Seiden Law Group's
25   expenses, right?  Because you didn't seek the -- you
```

1       didn't seek recovery of Guo's expenses.

2               MR. KUSHNER:  That's right.  It was

3       primarily Seiden Law, but other --

4               THE COURT:  Right.  I know there was

5       Kobre & Kim and various other entities, but,

6       basically, the motion doesn't mention -- and, in

7       fact, it's clear that you're not seeking an

8       accounting of Guo's fees and expenses, so I can give

9       you an answer as to that.  We're going to separately

10      touch upon, once you see the decision on that,

11      potentially, the piercing the corporate veil

12      argument.  And then we should potentially discuss

13      how you want to touch this issue of Guo's expenses.

14              MR. MALONEY:  I -- that sounds like a

15      reasonable approach to me, Your Honor.

16              And then with respect to Guo's expenses,

17      obviously, the papers are voluminous.  We've

18      identified a few issues, but we will need some time

19      to address that.  We -- some of our prior briefing

20      before Marrero has touched on some of these issues,

21      which resulted in Docket 448, so some of that is

22      already on the record.  You know, I think we'll just

23      need some time to prepare a response to what was

24      filed yesterday.

25              THE COURT:  So why don't we do this, to the

1    extent you're just relying on things previously put

2    in the record, you can just point me to the ECF

3    citation.  You don't have to restate it.  But if you

4    just could, you know, make it easier and just tell

5    me where you want me to go look for your arguments,

6    I can certainly go do that.

7            Mr. Maloney, I'm happy to give you as much

8    time as you need.

9            And then if you'd like a response,

10   Mr. Kushner, I'm happy to give you as much time on

11   that.

12           MR. KUSHNER:  Yes, Your Honor, we would

13   like an opportunity to respond.  And I think this

14   procedure makes sense in the sense that Mr. Shi's

15   counsel should submit objections to the expenses

16   that Mr. Grove has submitted, and then we can

17   respond as objections.

18           THE COURT:  Right.  Does that work for

19   everyone?

20           MR. MALONEY:  Yes.

21           MS. FELICELLO:  May I ask you -- sorry.

22           THE COURT:  Yes.

23           MS. FELICELLO:  This is Roseanne.

24           The one thing -- as Your Honor mentioned,

25   we don't have a lot of the backup for these

```
 1    invoices, so we'll have airfare as an invoice, but
 2    we won't have any context for why the airfare was
 3    incurred.  Also, lots of hotel expenses with no
 4    backup for why it was incurred.  So I think it makes
 5    more sense to have the receiver's office put in some
 6    explanation as to why they claim these expenses are
 7    legitimate before -- otherwise, you know, there just
 8    is no basis.  So I think they should have to make a
 9    submission first that we then respond to.
10            THE COURT:  Well, for, I guess...
11            MR. MALONEY:  An alternative, Your Honor,
12    is if we provide the first response to the paper
13    submitted yesterday, the receiver provides an
14    opposition or something of further support, and then
15    we provide some sort of a reply.
16            THE COURT:  Well, the other thing I was
17    just thinking is -- I think what Mr. Kushner had
18    indicated was, it's not just the submission at 448
19    from yesterday, but it's also Guo's declaration at
20    443, which taken together, could potentially explain
21    the expenses at 448.  So I think I would -- I guess,
22    for purposes of raising your objections, I would
23    look at 448 and Guo's declarations at -- certainly,
24    at 443-7, which is the one you pointed to, and then
25    you obviously know the record better, so if there's
```

1   any other Guo declaration where he explains his

2   expenses.

3          MR. KUSHNER:  Yeah.

4          THE COURT:  I'm happy to give you as much

5   time as you want on these objections.  And then

6   again, I'm happy to give you a reply.

7          MR. MALONEY:  Thank you.  Thank you, Your

8   Honor.  I think we can work out a briefing schedule

9   together.

10         MR. KUSHNER:  Yes.

11         THE COURT:  The only thing before you end

12  up going -- the only thing I forgot to ask was the

13  issue I brought up with regards to the invoices for

14  Seiden Law Group.  You have the same sort of problem

15  with Kobre & Kim, where I think, there, they gave me

16  a flat rate for the associate and a flat rate for

17  the partner.  But for instance, the partner is

18  easier for obvious reasons.  But for the associate,

19  you know, I think it -- I think the flat rate was

20  something around 600.  But that might be reasonable

21  for a senior associate.  Might not be so reasonable

22  if it's a junior associate billing at that rate.  So

23  I just need to know for the entries, you know, the

24  level of experience that I'm dealing with to assess

25  whether the rate is reasonable.

```
 1              MR. KUSHNER:  So it's Seiden Law and
 2    Kobre & Kim?
 3              THE COURT:  Right.  So I think the two --
 4    and the receiver's Cayman Island counsel, KSG.
 5              MR. KUSHNER:  Okay.
 6              THE COURT:  And this doesn't have to be
 7    complex, just a declaration or a letter that
 8    explains, like, these initials correspond to this
 9    person and this person's years of experience.
10              MR. KUSHNER:  Understood, Your Honor.
11              MR. MALONEY:  Okay.
12              MR. KUSHNER:  We'll do that.
13              THE COURT:  So why don't we do this, I'll
14    work on getting you the R&R, as we discussed, based
15    off of the November 2022 accounting.  In the
16    meantime, if the parties want to meet and confer and
17    come up with a briefing schedule on Guo's expenses,
18    or Guo's expenses, and a briefing schedule on the
19    piercing the -- if you -- well, that actually will
20    come later, right, once I issue the R&R.
21              MR. KUSHNER:  Okay.
22              THE COURT:  Did I miss anything?
23              MR. KUSHNER:  No, Your Honor.
24              THE COURT:  Okay.
25              MR. KUSHNER:  That's it.
```

```
 1              MR. STRAW:  Just to clarify the briefing
 2    schedule on the piercing the corporate veil, do you
 3    anticipate that coming after resolution of Guo's
 4    expenses as well?  Because, obviously, if there is
 5    an issue with the shares, then there's the question
 6    of what happens with that.  Just a sequencing
 7    question.
 8              THE COURT:  Yeah, no, that's makes a --
 9    that's a good point, although --
10              MR. MALONEY:  From my point of view,
11    Your Honor, I -- sorry.  I didn't mean to interrupt.
12              THE COURT:  No.
13              MR. MALONEY:  From my point of view, if the
14    shares were validly issued, then they came from the
15    estate to the corporation, and if they were not,
16    then they can simply be canceled.  So I'm not sure
17    those would necessarily impact plaintiff, but I may
18    need to give that a little bit more thought.
19              THE COURT:  I just -- I read the -- I don't
20    know the note agreement provides for something other
21    than the -- so if he doesn't get reimbursed through
22    the issuance of shares, I don't know if there was
23    ever some type of other recovery, like, discussed.
24              MR. MALONEY:  Yeah.  We will, obviously,
25    identify our prior papers, but from our point of
```

1   view, repayment was contingent upon an event
2   happening that never occurred, and so Guo was never
3   entitled to repayment.  We've briefed that, and I
4   won't go into depth about that here because I know
5   you really haven't had a chance to review that, but
6   we'll identify that in the papers.
7        THE COURT:  So, I guess, to answer
8   Mr. Straw's question, it sounds like, potentially,
9   it might make sense to address Guo's expenses first
10   before doing the piercing the corporate veil.  I
11   don't know if you -- if --
12        MR. KUSHNER:  Yeah, because I think it
13   doesn't make sense to talk about piercing until we
14   know what liabilities are out there.  You may, for
15   example, find that only a certain portion of Guo's
16   expenses are reimbursable.
17        THE COURT:  Sure.
18        MR. MALONEY:  Your Honor, could I ask a
19   point of clarification?  I'm sorry.
20        THE COURT:  It's okay.
21        MR. MALONEY:  Your Honor brought up the
22   issues with the invoices and attorney fees and time
23   entry and things like that.  Will we have an
24   opportunity to review the portions that are unsealed
25   even on, like, an attorneys' eyes only basis?

```
 1    Because we, obviously, haven't had a chance to
 2    review them.
 3              THE COURT:  Yeah.  So my understanding --
 4    and you should correct me if I'm wrong -- was that
 5    all the invoices were filed under seal.  And I think
 6    what I had indicated was that that was too broad,
 7    and you're going to have to submit redactions.
 8              MR. KUSHNER:  Okay.
 9              THE COURT:  So you'd be able to see
10    everything that's unredacted because it wouldn't
11    lead to the discovery of, like, either privileged
12    information or information that relates to a legal
13    strategy or anything of that sort.
14              MR. MALONEY:  Right.  Okay.
15              THE COURT:  But to the extent they have a
16    valid redaction that would reveal something like
17    legal strategy or why an attorney was retained, I
18    think there's ample Second Circuit case law that
19    says that's -- that would still remain redacted and
20    privileged.
21              MR. MALONEY:  Okay.  Thank you.
22              MR. KUSHNER:  Yeah, just -- I'm told that,
23    Your Honor, Mr. Guo did not fund any portion of
24    Seiden Law's initial retainer in terms of the start
25    of this case.  It was the shareholders, different
```

1    people, not Mr. Guo, just to respond to that

2    contention from a few minutes ago.

3            THE COURT:  Okay.  Is there anything else

4    either side wants to raise?

5            MR. KUSHNER:  Yeah, just, sort of, a

6    philosophical point, Your Honor.

7            The receiver is an officer of the court.

8    The receiver is not a party to this case.  We

9    believe that everything that the receiver's office

10   has done has been -- everything material has been

11   approved by the Court.  We've gone out of our way to

12   notify the Court of everything that we were doing.

13   It seems as if, recently, the receiver's office is

14   being treated like a party.  I'm thinking

15   specifically of Judge Marrero ordering us to pay out

16   of pocket for the cost of the translation of some of

17   the invoices that we -- you know, the

18   Chinese-language invoices.

19           THE COURT:  Was this at 440 or --

20           MR. KUSHNER:  Yes.

21           THE COURT:  Okay.

22           MR. KUSHNER:  I just wanted to just note

23   that for the record.  And it's really -- you know,

24   it's an unfunded receivership at this point.  We are

25   working without any kind of compensation, so just

1    want to note that for the record.  And to the extent

2    we're being asked to put together submission after

3    submission after submission, we just don't want the

4    Court to lose sight of the fact that this is really

5    an unfunded receivership.

6              Yeah, my colleague wants to add a point.

7              THE COURT:  Sure.

8              MR. ZHANG:  Your Honor, this is Xintong

9    Zhang on the record.  I just want to -- following up

10   with Mr. Kushner's question about the cost because

11   in order to respond to -- I'm assuming in order to

12   respond to Maloney -- Mr. Maloney's response on

13   behalf of Shi, we have to provide even more

14   additional document to be translated from Chinese

15   language to English being certified translated.

16             For example, we probably need to translate

17   Mr. Shi's action in China in late 2019 against

18   illegal shareholder meeting resolution before

19   Chinese court that's, kind of, caused receivers

20   additional work in response to that type of claims,

21   the similar claims, kind of -- again, at least,

22   like, five to six, to my best of recollection, that

23   can -- receiver needs to be additional cost and

24   expenses to provide that translation to be certified

25   translated as well.

1          THE COURT:  Is there something you want

2     to -- is there something you propose instead?

3          MR. KUSHNER:  Well, we -- you know, if we

4     feel that, in order to respond to some of the

5     objections which come out of the process that the

6     Court has just ordered, we need to incur massive

7     out-of-pocket expenses for things like translation.

8     And we would ask for Mr. Shi to contribute to that,

9     you know, especially because he's the one

10    challenging these expenses.

11         You know, it's just a very unjust situation

12    that a court-appointed receiver who's not a party is

13    effectively being asked to go out of pocket to cover

14    the cost of the defendant's objections to the

15    receiver's expenses.  It's just -- frankly, it's --

16    we're not aware of any precedent for this, that a

17    court orders a receiver to go out of pocket to

18    conduct the functions of the receivership.

19         THE COURT:  So I -- that's a fair point,

20    and I'm certainly not trying to have you incur more

21    expenses than you've already incurred, but to the

22    extent we're talking about responding to -- for

23    instance, just in this limited -- because it sounds

24    like where you're going to -- might potentially have

25    to incur more expenses is responding to the

AMM TRANSCRIPTION - 631.334.1445

```
 1    objections of Guo's, or Guo's, expenses.

 2            Is there -- this might just be simple if

 3    you can just point me to any case that says that, in

 4    such circumstances, the court-appointed receiver

 5    shouldn't go out of pocket for those expenses.

 6    Since you said you're aware of no precedent where

 7    it's the case that the court would require the

 8    receiver to incur those costs, can you point me to

 9    any case that would say that?

10            MR. KUSHNER:  Well, Judge Marrero, sort of,

11    touched on this in his order on the translation

12    issue, and he said that the receiver can bring a

13    motion for reimbursement, that -- as we read

14    Judge Marrero's order, he thinks this is a serious

15    issue and that -- he cited Rule 37.

16            THE COURT:  Yeah.

17            MR. KUSHNER:  But again, you know, we have

18    to go out of pocket and then file -- bring a motion.

19    And, of course, we're -- the legal fees incurred in

20    preparing a motion for reimbursement of attorneys'

21    fees are themselves unfunded.  So it's -- it puts us

22    in a difficult position, Your Honor.  But we could

23    search for alternative authority, but I do think

24    Judge Marrero has spent a fair bit of time on this

25    issue.
```

1          THE COURT:  So I have Judge Marrero's order
2      at page 3, where he talks about the proper procedure
3      is not through an advance, right, but through the
4      motion for reimbursement after these costs are
5      incurred.
6          MR. KUSHNER:  He did say that, and he cited
7      some cases.  I don't think any of the cases he
8      cited, though, Your Honor -- respectfully, I don't
9      think any of them are dealing with court-appointed
10     receivers.
11         MR. MALONEY:  Your Honor, from our point of
12     view, this goes back to the nature of this
13     particular proceeding, which is a hearing to
14     determine the accounting, the receiver, and in our
15     view, the law is clear that it's the receiver's
16     burden to justify his account.  We think there's
17     plenty of federal precedent on that.  There's
18     numerous cases on that issue, and the receiver can,
19     basically, seek reimbursement from the company, if
20     he can justify that cost, or from the plaintiff who
21     obtained the receivership.  We touched on that issue
22     earlier.  That's our view of the case.  Obviously,
23     Judge Marrero -- I'm sorry -- view of that
24     particular issue.
25         Judge Marrero stated what he stated in

1    Document 440.  I do tend to agree with Mr. Kushner

2    on the point that the cases cited there are not

3    really directly on point with the fact scenario we

4    have here.  We think the case law regarding the

5    receiver's burden to justify his account is the

6    appropriate authority to look to.

7         The other issue to think about here is that

8    the receiver is right now, on that issue, justifying

9    the account of Mr. Guo, and so Mr. Guo should bear

10   that cost as well.

11        THE COURT:  So, Mr. Kushner, I want to

12   understand exactly what you would envision here.

13   So -- and I don't mean to suggest because I'm not

14   open to some other process.  I just -- I want to

15   understand what would make you -- or what would

16   potentially be an outcome that would not require the

17   receiver to continue incurring unfunded expenses.

18        So in your -- under your rubric, you

19   wouldn't want to have to -- or you don't want an

20   opportunity to, for instance, respond to whatever

21   Mr. Maloney files, objecting to the filing on Guo's

22   expenses, or if you are objecting, you would want at

23   least a portion, if not half of the cost or

24   something -- some cost-splitting with Mr. Shi?

25        MR. KUSHNER:  So here's what I propose, I

```
 1    think a distinction should be made between legal
 2    fees and out-of-pocket costs.  It's the
 3    out-of-pocket costs that we're really concerned
 4    about.  If he's objecting to Mr. Guo's expenses and
 5    he's requiring us to go out and get translations of
 6    all these Chinese-language documents, hundreds of
 7    pages, or thousands of pages, and we have to go out
 8    of pocket, as we already have, and then the Court
 9    later determines that all those expenses were
10    reasonable and overrules his objections, the concern
11    we have is that if we then bring a motion for
12    reimbursement of our expenses, his client could just
13    disappear and we'd have no way of ever recovering
14    those out-of-pocket costs.  We don't know where his
15    client is.  It's not -- his client is not here.
16    He's never appeared in this court.
17              So what we would propose is that he submit
18    an amount in escrow in the amount of the
19    out-of-pocket costs that the receiver has to incur
20    in responding to his objections.
21              THE COURT:  But only the costs related to
22    things like translation services, not legal fees.
23              MR. KUSHNER:  That's correct.  I think if
24    we're going to talk about legal fees, you know, it
25    would be in the several millions of dollars, and
```

AMM TRANSCRIPTION - 631.334.1445

```
 1    perhaps we can get that -- get to that at a later
 2    stage, you know, when we're dealing with the
 3    piercing of the corporate veil.  But at this point,
 4    we're most concerned with the out of pocket.
 5              THE COURT:  And let me just ask you -- that
 6    was not a proposal you gave to Judge Marrero when he
 7    issued -- before he issued 440, the ECF order --
 8    order at ECF 440?
 9              MR. KUSHNER:  It was not.  This is the
10    first time.  You -- because you invited me to make a
11    proposal, and this is -- yeah.
12              THE COURT:  I just want to make sure it
13    wasn't something he rejected.
14              MR. KUSHNER:  It was not.
15              THE COURT:  Okay.
16              MR. KUSHNER:  We didn't ask.  We did ask
17    that Shi be ordered to pay those expenses, but we
18    didn't propose this specific mechanism of putting
19    them in escrow.
20              THE COURT:  Right.  Mr. Maloney, did you
21    want to respond, or is it just the same response you
22    had given before?
23              MR. MALONEY:  Basically, yes, Your Honor.
24              THE COURT:  Okay.
25              MR. MALONEY:  It's probably another issue
```

1       that should be briefed, unfortunately.

2                THE COURT:  And this -- let me just --

3       ECF 440, does anyone happen to remember the letter

4       motions or the briefs that led to ECF 440?  Because

5       rather than brief another issue, it sounds like this

6       was potentially -- other than this unique escrow

7       agreement proposal, it sounds like this was already

8       all before Judge Marrero.

9                MR. MALONEY:  Judge Marrero does cite some

10      of the relevant docket entries in 440.  So on page 1

11      and 2 --

12               THE COURT:  Okay.

13               MR. MALONEY:  -- he identifies some of the

14      prior papers.  I'm not sure if this includes all of

15      the letters submitted, but it's a good start.

16               THE COURT:  Okay.  So maybe before we go

17      ahead and order any more briefing, I will take a

18      look at the documents that Judge Marrero references

19      to make sure, and I will hold off on giving you a

20      decision about this potential escrow until I look at

21      that.  And if I need anything else, I'll reach out.

22      But I'll -- I'm going to definitely give you a

23      decision as to, before we tackle Guo's expenses at

24      448, how that cost will be allocated, or whether

25      we're going to talk about potentially funding an

57

```
 1    escrow.
 2               MR. KUSHNER:  Thank you, Your Honor.
 3               THE COURT:  Is there anything else you
 4    wanted to raise, or...
 5               MR. KUSHNER:  No.  Thank you, Your Honor.
 6               THE COURT:  Mr. Maloney?
 7               MR. MALONEY:  Not at this time.  We had
 8    prepared responses to the questions you had stated
 9    in Docket 434, but it sounds like we'll address
10    those later.
11               THE COURT:  Oh, you wanted to reply to what
12    Mr. -- what the receiver had submitted?
13               MR. MALONEY:  Yes.  Essentially, yes, but
14    now that we're --
15               THE COURT:  Because I think their letter
16    came in on Friday was the nine-page letter?
17               MR. MALONEY:  Right.  Right.
18               THE COURT:  If you'd like to respond now,
19    I'm certainly happy to hear you out.
20               MR. MALONEY:  Okay.  Well, I mean, we've
21    touched on some of the issues; for example, the
22    Greenberg payment and things like that.  In that
23    letter, the receiver, you know, proposed or
24    submitted a response to your question about the
25    failure to account for the "onshore entities."
```

1    I touched on this earlier.  Their story has
2  changed throughout the case, right?  They, for most
3  of the case, claimed that Guo never had control of
4  these entities.  But now, in the June 23rd
5  declaration, he admits to having control of those
6  entities and what we've referred to as Beijing
7  Technology and what they referred to as Beijing
8  Tianxia.  I'm sure I'm not pronouncing that
9  correctly.
10    But he's had control of those entities
11  since 2019, but the receiver never accounted for
12  those entities in the November 2018 -- I'm sorry --
13  2022 accounting, and they haven't accounted for them
14  in that February -- I'm sorry -- June 23rd
15  submission.  And I think the clearest evidence of
16  that is the fact that they've submitted this
17  cherrypicked record from the China Merchants Bank
18  account.  They've not produced the entire records of
19  the account, and we've been able to identify at
20  least a few transactions where Guo has made
21  transfers out of that account.
22    We have submitted previously, at Docket
23  394-6, page 3 to 4, public records from China
24  showing that Beijing Technology, Beijing Tianxia,
25  holds interest in other companies.  You know,

1    Mr. Guo has had control of that entity since July

2    2019 and has failed to account for its interest in

3    those other entities.  Guo's submission from

4    yesterday also includes records relating to -- well,

5    let me back up a little bit.

6         The November 2022 accounting submitted by

7    the receiver disclosed funds that the receiver

8    received from an account at Standard Chartered Bank

9    in the name of, I believe, NQ Infinity.  I know

10   there's a question about the name, but I believe

11   it's what the receiver calls NQ Infinity.  We, now,

12   know that Mr. Guo has had access to a China

13   Merchants Bank account held in the name of

14   NQ Infinity.  And the papers submitted yesterday

15   revealed that there is a third account at Industrial

16   and Commercial Bank of China held in the name of

17   NQ Infinity.  This was not disclosed until

18   yesterday.  And this is at page 132 of ECF -- I'm

19   sorry.  I apologize.  I'm getting tired.

20        This is at Page 132 of Docket 448-2.  This

21   is one of the transfers that Mr. Guo is claiming

22   reimbursement for.  That account has not been

23   accounted for.  That bank account has not been

24   accounted for.  It's an -- should be an asset of the

25   estate.  We don't know anything about it.  And

1    whatever was in there, the transactions that

2    occurred in that account, they should be justified

3    as made for the purpose of the receivership.

4         There were some cash transactions disclosed

5    in the papers yesterday.  No explanation of where

6    this cash came from.  There's reference to an

7    agreement with a third party here.  This is page 143

8    of Docket 448-2.  Again, no explanation for that.

9    If the cash belonged to the company, or if it was

10   supposedly spent on a legitimate receivership

11   purpose, there should be a record of that, an

12   explanation, and support for that.

13        Guo now admits in his June 23rd declaration

14   that he did receive a majority of the shares of

15   Beijing Technology/Beijing Tianxia.  That was the

16   primary operating company Velcm, before the

17   receivership was appointed.  That's the company that

18   actually held the technology licenses and operated

19   the business.  Guo now owns that majority.

20        He cites to an arbitration award as a basis

21   for the transfer of shares to his own personal name,

22   but Dr. Shi was not a party to that arbitration.

23   The respondent in that arbitration was Lingyun Guo,

24   the wife of Henry Lin, who is a party aligned with

25   Mr. Guo, and they essentially reached a settlement

1   where they would agree to transfer the shares to
2   Mr. Guo personally.  There's no evidence of any
3   consideration paid by Mr. Guo for that majority
4   interest in that valuable asset.
5          I think that covers the main points I
6   wanted to address about the accounting, or lack of
7   accounting, for the "onshore entities."
8          Regarding the Tongfang note issue, the
9   receiver repeats many of the assertions he's made in
10  the past about Dr. Shi controlling Tongfang.  The
11  fundamental question on an accounting is whether the
12  receiver performed his fiduciary duty to collect on
13  an asset of the receivership.  The Tongfang note was
14  an asset of the receivership.  He admits to making a
15  demand on Tongfang for payment, but did not pursue
16  that.  He did not commence an arbitration against
17  Tongfang.
18         You know, the issue of their assertions
19  that Dr. Shi controlled Tongfang have been litigated
20  in the past.  We understand that.  But we want to
21  point out a couple documents from the record that
22  are relevant to this point.  That's Docket 394-9,
23  Docket 269-1 at paragraph 19, subparagraph 1.  These
24  documents reveal the true investors in the Tongfang
25  note.  That's Tongfang M&A Fund SP and its

1    investors, Yujiang Hai Wu, Vast Stone Limited, China

2    Create Capital Limited and Huang Zhao Lin-Qing.

3    These are the companies that purchased FL Mobile and

4    agreed to pay the amounts owed under the Tongfang

5    note.  If the receiver had commenced an arbitration,

6    he would have learned that through the arbitration

7    and most likely have obtained an award in favor of

8    the company.  He did not.

9            On the application developer accounts, this

10   is a similar story.  The e-mails submitted and the

11   other records previously submitted show that the

12   receiver knew as early as 2019 that further action

13   was required to gain access to the developer

14   accounts.  Exhibit 5 to the June 23rd letter reveals

15   that they even knew the name of the person, Lou

16   Rapice, who had access to the accounts, but the

17   receiver never followed up on that.  He never

18   brought this to the attention of the court in four

19   years.  We submit that that was a breach of the duty

20   to pursue and preserve that asset.

21           And I think we've already addressed the

22   other points that I wanted to raise in response to

23   that letter.

24           THE COURT:  Thank you, Mr. Maloney.

25           Unless anyone has anything else...

AMM TRANSCRIPTION - 631.334.1445

```
 1              MR. KUSHNER:  Just without responding to
 2    everything that was just said, I think a lot of what
 3    counsel just said will be addressed in the upcoming
 4    briefing.  With respect to the validity or
 5    reasonableness of Mr. Guo's expenses, we can deal
 6    with that there.
 7              Just very briefly, Your Honor, on Tongfang,
 8    I don't think that I heard on the record a
 9    representation as to whether or not Mr. Shi has any
10    ownership or control interest in Tongfang.
11              THE COURT:  So the Tongfang transaction --
12    because it's just been the subject of not only this,
13    but there's the China AI suit involving DLA Piper.
14    I'm very familiar with the Tongfang transaction, so
15    that's why I didn't really think I needed -- and,
16    again, the receiver's letter from June 23rd explains
17    your response on that.  So I don't know that I need
18    to hear anything else on the Tongfang transaction.
19    I think the submission that you made last week was
20    very thorough and cleared up any ambiguities I might
21    have had, or confusions.
22              MR. KUSHNER:  Thank you, Your Honor.  Then
23    nothing further.
24              THE COURT:  If you'd like to respond, I'm
25    happy to hear you out, but I'm just -- you know, I'm
```

```
 1    mindful that I'm not trying to keep you here to
 2    incur more costs.
 3              MR. KUSHNER:  Nothing further from us.
 4    Thank you.
 5              THE COURT:  Okay.  Anything, Mr. Straw,
 6    or...
 7              MR. STRAW:  No.  Thank you, Your Honor.
 8              THE COURT:  Thanks so much, everyone.  So I
 9    will go ahead -- as we discussed, I'll give you a
10    decision on the accounting as envisioned based on
11    our discussions from November of 2022 without going
12    into Guo's expenses, or Guo's expenses and the
13    piercing the corporate veil.
14              MR. KUSHNER:  Thank you, Your Honor.
15              THE COURT:  Thank you.
16              MR. MALONEY:  Thank you.
17
18
19                          0o0
20
21
22
23
24
25
```

```
 1                    C E R T I F I C A T E

 2

 3        I, Adrienne M. Mignano, certify that the

 4   foregoing transcript of proceedings in the case of

 5   Baliga v. Link Motion, Inc., Docket #18-cv-11642,

 6   was prepared using digital transcription software and

 7   is a true and accurate record of the proceedings.

 8

 9

10   Signature  _____
                    Adrienne M. Mignano

11              ADRIENNE M. MIGNANO, RPR

12

13   Date:      June 29, 2023

14

15

16

17

18

19

20

21

22

23

24

25

                 AMM TRANSCRIPTION - 631.334.1445
```