UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

WAYNE BALIGA,

                            Plaintiff,

                                                              **18-CV-11642 (VM) (VF)**

          -against-                                           <u>**REPORT &**</u>
                                                              <u>**RECOMMENDATION**</u>

LINK MOTION INC. (F/K/A NQ MOBILE INC.),                      <u>**FILED UNDER SEAL**</u>
VINCENT WENYONG SHI, ROLAND WU,
XIAO YU and ZEMIN XU,

                            Defendants.

----------------------------------------------------------------X

**VALERIE FIGUEREDO, United States Magistrate Judge**

**TO: THE HONORABLE VICTOR MARRERO, United States District Judge.**

          On August 11, 2023, I issued a Report and Recommendation approving the Accounting

submitted by the Court-appointed Receiver for Link Motion Inc. ("LKM"), Robert W. Seiden

(the "Receiver").[1] In that Report and Recommendation, I did not resolve the disputes pertaining

to the fees and expenses of the Receiver's agent in China, Lilin "Francis" Guo ("Guo") or

whether the Receiver's fees should be paid by Defendant Vincent Wenyong Shi ("Shi"). Also

before the Court is Baliga's and the Receiver's objection to the continued representation of LKM

by Shi's counsel, Felicello Law P.C. ("Felicello"), specifically as it relates to the motion to

dismiss the Third Amended Complaint. For the reasons set forth below, I recommend that Guo's

expenses be **APPROVED** in the amount set forth herein, and that the Receiver's request to hold

Shi personally liable for those expenses be **DENIED**. Further, I recommend that Baliga's

---

[1] The "Accounting" is of the Receiver's receipts and expenses (including cash
disbursements and unfunded liabilities), as presented in the Declaration of Robert W. Seiden and
exhibits submitted along with the Receiver's brief in support of his Accounting. <u>See</u> ECF Nos.
375, 376.

objection to Felicello's continued representation of LKM and Shi for purposes of moving to dismiss the Third Amended Complaint be **DENIED**.

## BACKGROUND[2]

A. Guo's Expenses

In April 2019, the Receiver informed the Court that he had appointed Guo as the Receiver's agent in China. See ECF No. 43 at ¶ 10. At the time of his appointment, Guo held over six million American Depository Shares of LKM, for which his total investment was approximately $20 million between 2017 and 2018. See ECF No. 477-1 at ¶ 2. Guo was also among the group of LKM shareholders (referred to as "LKMForward") who had "spearheaded" the appointment of the Receiver in New York and had donated funds to finance the Receiver's legal representation in this matter. See ECF No. 435 at ¶¶ 5-7, 13-15; ECF No. 459-1.

After his appointment as the Receiver's agent in China, Guo sought to establish control of, manage, and pursue recovery efforts on behalf of LKM's subsidiaries in China. ECF No. 477-1 at ¶¶ 10-18. Through his duties as the Receiver's agent, Guo and his team incurred numerous and significant expenses totaling approximately ¥ 6,938,821 (approximately $1,042,985).[3] See ECF No. 477-1 at ¶¶ 3, 5, 7; see also ECF No. 477 at 8 ("Guo advanced no less than $1.1 million

---

[2] I assume the parties' familiarity with the factual and procedural background of this case which has been detailed in numerous opinions. See e.g., ECF Nos. 275, 372, 461, 465, 466, 508. Only the facts relevant to the accounting of Guo's expenses and Felicello's representation of LKM are discussed here.

[3] Guo based his currency conversions on the average exchange rate between the Chinese Yuan (RMB) and the U.S. Dollar (USD) in the year in which he paid the expense. See ECF No. 477-1 at n. 2, 5, 6. The rates Guo used for his conversions from Chinese Yuan to U.S. Dollar were 1 USD = 7.11 RMB in 2019; 1 USD = 6.45 RMB in 2020; and 1 USD = 6.46 RMB in 2021. Id.

of his own funds.").[4] Guo's efforts required him to maintain the Beijing office of LKM's

WFOE[5], hire a team of professionals, and travel frequently for meetings with Beijing authorities.

See ECF No. 477-1 at ¶¶ 10-11; ECF No. 477 at 15 n.5. He also hired accounting, legal, and

translational professionals in China to help achieve the Receiver's goal of monitoring and

safeguarding LKM's assets and litigating on behalf of the company. See ECF No. 477-1 at

¶¶ 10-18; ECF No. 26 at § II, ¶ 2(a), (e). Guo and his team of professionals "filed applications

and participated in numerous meetings with Chinese government authorities"; represented LKM

in numerous matters, including arbitration proceedings; identified and tracked unusual fund

movements related to certain LKM bank accounts; and reviewed LKM's financial documents to

determine potential damages from the improper withdrawal of funds from LKM accounts. See

ECF No. 477-1 at ¶¶ 10-18. Guo's position also required him to defend numerous lawsuits in

China where Shi's associates sought to delay Guo's access to the bank accounts of LKM

subsidiaries. See ECF No. 428 at ¶¶ 6-7, 17. Guo's team also represented LKM in numerous

legal proceedings and administrative applications. See ECF No. 477-1 at ¶¶ 12-18. For example,

Guo's team defended LKM subsidiaries in legal actions brought by third parties, such as lawsuits

by former employees for wrongful termination, and arbitrations brought by LKM's creditors. See

id. at ¶¶ 14-15, 18. The Receiver also represented that Shi tried to defeat Guo's efforts and

frustrate the work of the Receivership, which in turn increased expenses. See ECF No. 375 at 12-

---

[4] The page numbers referenced herein for citations to the electronic docket ("ECF") are to
the ECF-generated pagination in those documents, except for citations to ECF Nos. 396, 486,
490, 507, and 521, which reference the original pagination in those documents.

[5] "WFOE" is an acronym for "wholly foreign owned entity." See, e.g., ECF No. 473 at 8;
ECF No. 477-1 at ¶ 1.

13, 16-17 (listing prior status reports and updates to the Court detailing Shi's efforts to "frustrate the Receivership") (citing ECF Nos. 30, 43, 50, 128, 143, 161, 173, 220, 239-1, 269, 293, 365).

To support his expenses, Guo submitted translated VAT invoices, wire transfers, and other invoices that captured expenses related to office rent, utilities, and maintenance; purchase of office equipment; travel expenses; business meetings; legal services; and translation services. See ECF Nos. 448-1, 448-2, 448-3, 513-1, 513-2, 513-3; see also ECF No. 477-1 at ¶¶ 4, 6, 8.

On March 9, 2022, the Honorable Debra C. Freeman issued a Report and Recommendation, recommending that the Receiver be discharged. See ECF No. 275 at 1, 39. Judge Freeman recommended that "prior to his discharge (and by a date certain to be set by the Court), the Receiver be required to provide a full accounting of the activities performed during the period of his appointment and the costs thereof." Id. at 40. On August 25, 2022, the Honorable Victor Marrero adopted Judge Freeman's Report and Recommendation. See ECF No. 331 at 2. On September 29, 2022, the Court ordered the Receiver to submit "an accounting of the receivership together with any supporting documentation (the 'Accounting')." ECF No. 359 at 1.

On August 11, 2023, after receiving the requested briefing and holding a hearing on the issue of the Receiver's accounting (see ECF No. 434), I issued a Report and Recommendation, recommending that the Receiver's Accounting as of November 18, 2022, be approved, because the expenses were appropriate and for the benefit of LKM (see ECF No. 466). During the course of his appointment, the Receiver incurred $3,231,673.47 in expenses, not including Guo's expenses. See ECF No. 466 at 8. Of that amount, $1,077,117.38 remain unpaid. Id.

At the time the Receiver submitted his brief in support of an Accounting, Guo was missing and unreachable in China and the only records the Receiver had pertaining to Guo's expenses were filed under seal. See ECF No. 376 at ¶¶ 40-41; ECF No. 375 at 12 n.2.

Consequently, the Receiver did not include Guo's expenses in his submissions in support of an Accounting, and the Court did not address Guo's expenses in its August 11, 2023 Report and Recommendation. See ECF No. 466 at 28. The parties have since submitted briefing addressing the issue of Guo's expenses. See ECF Nos. 473, 477, 486.

On September 18, 2023, Shi submitted objections to Guo's compensation and expenses. See ECF No. 473. The Receiver responded to Shi's objections on October 10, 2023. See ECF No. 477. On October 24, 2023, Shi filed his reply brief. See ECF No. 486. On June 5, 2024, the Court directed the Receiver to submit a full categorization of Guo's expenses. See ECF No. 509. The Receiver submitted a full categorization of Guo's expenses by year on June 11, 2024. See ECF No. 513. On June 13, 2024, Shi filed a sur-reply in opposition to Guo's expenses. See ECF No. 514. On July 8, 2024, the Court held a conference to discuss the categories of expenses Guo incurred as the Receiver's agent. See ECF Nos. 519, 523; see also Hr'g Tr. (July 8, 2024).

The Receivership Order states that the Receiver "is personally not responsible for any of the out-of-pocket expenses incurred in fulfilling his duties under this Order." See ECF No. 26 at § II, ¶ 6. In his submissions in support of the Accounting, the Receiver represented that the expenses that remained unpaid were "unfunded liabilities" of the Receivership because "there are no funds currently available to the Receivership that would enable the Receiver to pay these expenses." ECF No. 466 at 8 (citing ECF No. 375 at 12). The Receiver thus requests that the Court hold Shi personally liable for the unfunded liabilities of the Receivership, which also include Guo's expenses. ECF No. 375 at 12, 19-23. Shi objected, arguing that none of the pleadings in this action have asserted veil-piercing claims or otherwise requested that he be found personally liable to fund costs of the Receivership. See ECF No. 396 at 12.

During a conference on June 27, 2023, counsel for the Receiver acknowledged that he was not aware of any authority whereby a Receiver was permitted to pierce the corporate veil at this posture in a case, absent a claim for such relief in a pleading. <u>See</u> ECF No. 451 at 4-7. The Court directed the parties to submit supplemental briefing on the veil-piercing issue and to address whether the Court's equitable powers and inherent authority allow it to hold Shi personally liable for the unfunded liabilities of the Receivership. <u>See</u> ECF No. 451 at 7-8, 29; <u>see also</u> ECF Nos. 518, 521, 525.

     B.  <u>LKM's Counsel</u>

Also before the Court is Baliga's objection to Felicello's continued dual representation of Shi and LKM. <u>See</u> ECF Nos. 505, 506, 507. At the inception of the case, LKM was represented by DLA Piper LLP ("DLA Piper"). <u>See, e.g.</u>, ECF No. 23 at 1. The Court granted DLA Piper's request to withdraw as attorney of record on March 1, 2019, leaving LKM without counsel. <u>See</u> ECF No. 28. Felicello entered a notice of appearance on behalf of Shi on March 28, 2019. <u>See</u> ECF No. 38.

On October 5, 2020, Baliga filed a Second Amended Complaint. <u>See</u> ECF No. 166. In anticipation of filing a motion to dismiss, counsel for Baliga, Shi, and the Receiver agreed that Shi's counsel at Felicello would represent LKM "with respect to its interests in the motion to dismiss that Shi intends to file." <u>See</u> ECF No. 174 at 1. The parties agreed that as it related to the then-forthcoming motion to dismiss, "Shi and LKM have an identity of interests and will likely raise overlapping, if not substantively identical defenses and, therefore, the parties do not perceive a present conflict of interest between the Company and Shi with respect to the motion to dismiss." <u>Id.</u> The Court endorsed the letter, directing Felicello to "duly file a notice of appearance for LKM" and ordering that the dual representation was "approved without prejudice

to the parties' rights to raise any relevant issues in the future." ECF No. 175 at 1. Felicello filed a

notice of appearance on behalf of LKM on November 4, 2020, the same day Shi and LKM

moved to dismiss the Second Amended Complaint. See ECF Nos. 176, 177.

On June 21, 2023, I recommended that the Second Amended Complaint be dismissed

without prejudice (see ECF No. 441), and on July 28, 2023, Judge Marrero adopted the Report

and Recommendation in its entirety, affording Baliga the opportunity to file a third amended

complaint, "amending only the common law fraud claims in order to allege additional facts to

support the element of reliance" (see ECF No. 461 at 6-7). On September 11, 2023, Baliga filed

the Third Amended Complaint. See ECF No. 470. On October 11, 2023, Felicello filed a motion

to dismiss the Third Amended Complaint on behalf of Shi and LKM. See ECF No. 480. On

October 25, 2023, Baliga notified the Court that he did "not concede that [Felicello] had

authority to file the Motion to Dismiss the Common Law Fraud Claim on behalf of [LKM]."

ECF No. 489 at 1. The Court held a conference on November 14, 2023, and the parties then

briefed the issue of whether Felicello could represent LKM and Shi for the motion to dismiss the

Third Amended Complaint. See ECF Nos. 492, 500, 505, 506, 507.

## GUO'S EXPENSES AND SHI'S PERSONAL LIABILITY

A. Legal Standard[6]

The Receivership Order explicitly states that the Receiver "is authorized in his sole

discretion to delegate specific tasks to his representatives, agents and professionals." ECF No. 26

at § II, ¶ 2(f). The Court may award the expenses of the Receiver's agent so long as those

expenses are "necessary and adequately documented," and not for services that are duplicative of

---

[6] The Court refers the parties to the legal standard in the August 11, 2023 Report and
Recommendation, which addressed the legal principles applicable to the Receiver's Accounting.
See ECF No. 466 at 9-11.

those performed by the Receiver. See JDM Long Island, LLC v. U.S. Bank Nat. Ass'n, No. 10

Civ. 5564 (JS) (AKT), 2014 WL 6632644, at *8 (E.D.N.Y. Nov. 21, 2014) (internal quotation

marks and citation omitted); see also 65 Am. Jur. 2d Receivers § 176 (2024) (noting that

evidence supporting a receiver's accounting may be produced by affidavit). Consequently, the

expenses must be "itemize[d]" and the Receiver must demonstrate that the expenses were

"necessarily incurred." See Gasser v. Infanti Int'l, Inc., 358 F. Supp. 2d 176, 181 n.10 (E.D.N.Y.

2005) (internal quotation marks and citations omitted). Ultimately, it is the "receiver's burden to

justify his account." Sherry v. United States Bank Nat'l Ass'n, 662 F. App'x 39, 41 (2d Cir.

2016) (internal quotation marks and citation omitted); see also 65 Am. Jur. 2d Receivers § 176

(2024) ("The burden of proof rests with the receiver to prove its accounting.").

    B.  Discussion

        1.  *Accounting of Guo's expenses*

      During his time as the Receiver's agent, from 2019 to 2021, Guo advanced

approximately $1,042,985 of his own funds to pay for expenses needed to carry out the

Receiver's work in China. See ECF No. 477-1 at ¶¶ 3-8; see also ECF No. 477 at 8. Guo's

expenses included paying for legal services, maintaining the Beijing office of LKM's WFOE,

defending lawsuits against LKM, and travel related to fulfilling his duties as the Receiver's

agent. See, e.g., ECF No. 477-1 at ¶¶ 1, 4, 6, 8; see also ECF Nos. 448, 448-1, 448-2, 448-3, 513,

513-1, 513-2, 513-3. Guo also paid himself a salary of $15,000 per month during his tenure as

the Receiver's agent, totaling $345,000 for the 23 months Guo served as the Receiver's agent.

See ECF No. 428 at ¶¶ 8 n.3, 10 n.5, 12 n.6. Shi objects to payment of Guo's expenses on

various grounds: Guo's expenses are inaccurate, contradictory, and unreliable (see ECF No. 473

at 23); Guo's VAT invoices should not be considered adequate documentation and are fraudulent

(see id. at 23-25; ECF No. 473-1); Guo seeks reimbursement for improper personal expenses (see ECF No. 473 at 25); and Guo's compensation was not reasonable (see id. at 8, 14-15, 26-27). For the reasons set forth below, I recommend that $1,042,985 of Guo's expenses be approved, but that Guo's requested compensation of $345,000 be denied.

### a. Reliability of Guo's submissions

Shi argues that Guo's accounts are "inaccurate and unreliable." ECF No. 473 at 23. To support this argument, Shi points to a single instance where Guo submitted a receipt for an expense that was not incurred on behalf of the Receiver. See id. at 24. Specifically, Shi points to a wire transfer showing a $50,000 payment by Guo to Baliga's counsel. See ECF No. 448-2 at 97; ECF No. 473 at 24. Guo does not dispute that the $50,000 was not an expense incurred on behalf of the Receiver. See ECF No. 477 at 10. Instead, Guo explains that the receipt was inadvertently included when he compiled five years' worth of records in a short period of time. See ECF No. 460-1 at ¶ 10. As Guo explains, neither he nor the Receiver ever sought reimbursement for this expense. See ECF No. 477 at 14-15; see also ECF No. 460 at 2 (stating that this payment was not part of the Receivership's expenses and he had not sought reimbursement for this as part of the accounting); ECF No. 460-1 at ¶¶ 10-11. In other words, although the receipt for the $50,000 payment was inadvertently included with the Receiver's submission of translated receipts, the $50,000 payment was not included in the Receiver's calculation of expenses or in the total amount of expenses for which the Receiver sought approval. To further clarify that this payment was not included in the Receiver's calculation of expenses, the Receiver removed it from the full categorization of expenses submitted to the Court on June 11, 2024. See ECF No. 513-2 at 8.

Contrary to Shi's objection, Guo's requested expenses are reliable because they are itemized, categorized, and evidenced by over 300 receipts, invoices, and wire transfers. See ECF Nos. 428, 448-1, 448-2, 448-3, 513-1, 513-2, 513-3. Guo has met his obligation under the Receivership Order by submitting invoices and receipts. See ECF No. 26 at § II, ¶ 6 ("All professionals retained by the Receiver shall submit invoices to the Receiver, which shall be submitted to the Court"). Guo has also satisfied his burden to "itemize" expenses and "demonstrate that [each expense] was necessarily incurred" by providing sufficient detail regarding the nature of each expense and explaining whether it related to office maintenance and hiring professionals, legal expenses, or travel expenses. Gasser, 358 F. Supp. 2d at 181 n.10 (internal quotation marks and citations omitted). The Receiver has provided detailed records, categorizations, explanations, and the underlying receipts (in the form of wire transfers, receipts, and VAT invoices) to support these expenses. See ECF Nos. 448-1, 448-2, 448-3. Guo has also filed a sworn declaration providing necessary context for these expenses and attesting to their validity (see ECF No. 477-1), as well as providing a catalogue of categorized expenses corresponding to specific VAT invoices, receipts, and wire transfers (see ECF Nos. 513-1, 513-2, 513-3). See also 65 Am. Jur. 2d Receivers § 176 (2024) (explaining that "evidence in support [of a receiver's accounting] may be produced by affidavit"). The inadvertent inclusion of one inappropriate receipt in the documentation submitted to the Court should not cast doubt on the otherwise well supported expenses, especially because that $50,000 payment is not included in the $1,042,985 sought by the Receiver on behalf of Guo. In short, the expenses submitted by Guo are reasonable, adequately documented, and concern expenditures that were in furtherance of the Receivership Order.

b.  *Sufficiency of Guo's VAT invoices*

Shi contends that the VAT invoices[7] Guo submitted to support his expenses are insufficient to "demonstrate the [necessity] of these expenses and to provide adequate documentation," claiming that the VAT invoices were paid out of a LKM account. See Hr'g Tr. at 18-22 (July 8, 2024); see also ECF No. 473 at 23-25. For example, Shi points to an expense from June 26, 2019, and argues that the expense was paid from a LKM account and therefore was not an expense personally incurred by Guo. See ECF No. 473 at 24-25 (citing ECF No. 448-1 at 36). Shi then summarily claims that the majority of Guo's VAT invoices were paid from a LKM account and therefore should not be approved. See ECF No. 473 at 25; see also ECF No. 473-1 (listing the expenses Shi claims are "fraudulent" because he believes they were disbursed from LKM accounts and are thus not expenses incurred by Guo).

As the Receiver explains, Shi's objection to the June 26, 2019 expense is based on a factual misunderstanding. In furtherance of his argument, Shi quotes from a section of the VAT invoice concerning "customer details" of the "purchaser." See ECF No. 477 at 13. But the customer identified on a VAT invoice is not necessarily the entity that paid for the expense reflected in the invoice. A VAT invoice does not include information about the bank account from which the expense was paid. See ECF No. 465 at 3-5. Instead, a VAT invoice identifies the name of the entity on behalf of whom a payment was made. See id. "For general VAT invoices, only the entity name and tax number are required; for special VAT invoices, the address, telephone, and entity bank details shall be completed." See ECF No. 477 at 13; ECF No. 465 at 4. There thus is no information on a VAT invoice concerning the bank account from which the

---

[7] Guo explains that VAT invoices are government-issued receipts in China. According to Guo, such invoices are issued using government-controlled software and forms, and "provide[] proof of the purchase of goods or services." See ECF No. 428 at ¶ 9 n.4.

invoice was paid, and the reference to LKM on the invoice is simply to identify the entity on behalf of whom a payment was made. Shi thus has not shown that any of the VAT invoices reflect expenses paid by LKM from a LKM account.

Shi further argues that even if there is no evidence that the VAT invoices were paid out of a LKM account, there is no evidence that Guo himself paid the invoices, either. See Hr'g Tr. at 22 (July 8, 2024). Guo concedes that the VAT invoices do not include information about who paid the invoice. See, e.g., ECF No. 465 at 5; Hr'g Tr. at 16 (July 8, 2024). But, as Guo explains, LKM subsidiaries in China have no money or assets to pay the VAT invoices, and Shi points to no other party who would have paid these expenses. See Hr'g Tr. at 29 (July 8, 2024).[8] Further, Guo attests to having paid these invoices himself. See ECF No. 428-1 at ¶¶ 8, 10, 12; see also ECF No. 477-1 at ¶ 4. The VAT invoices, Guo's affidavit, and the factual context surrounding LKM's financial condition are sufficient to support a finding that Guo paid for these expenses himself.

Shi's final argument with regards to the VAT invoices is that several VAT invoices Guo submitted are fraudulent, and that those corresponding expenses should be deducted if the Court approves Guo's accounting. See ECF No. 473 at 25; ECF No. 473-1. Guo, however, has provided government-issued VAT invoices for each expense for which he seeks reimbursement. And to the extent Shi has pointed to specific VAT invoices that Shi claims are fraudulent, Guo

---

[8] To the extent Shi argues that another entity or individual—besides LKM or Guo—paid a VAT invoice, that factual quibble is irrelevant. In the hypothetical scenario that Guo enlisted another to pay a VAT invoice on behalf of LKM, Guo's reimbursement to the paying party upon receiving Court approval would be solely between Guo and whoever advanced payment for the expense reflected in the VAT invoice. See ECF No. 26 at § II, ¶ 2(f) ("The Receiver is authorized in his sole discretion to delegate specific tasks to his representatives, agents and professionals.").

has provided additional information concerning the expense incurred. See ECF Nos. 477-1 at ¶¶ 4, 6, 8; 448-1; 448-2; 448-3; 513-1; 513-2; 513-3.

Nevertheless, there are six pairs of VAT invoices that are facially identical, and Guo has not proffered sufficient evidence to demonstrate that these invoices are not duplicates. See, e.g., ECF No. 448-1 at 103, 114. Those six pairs of VAT invoices have the same invoice code, were issued on the same date, and reflect the same expense amount.[9] See ECF No. 448-1 at 103, 105, 106, 109, 111, 112, 114, 115, 116, 117, 119, 120.[10] Further, the descriptions Guo provided for those invoices are identical. See ECF No. 513-1 at 11-13. Therefore, the expenses evidenced at these VAT invoices should be counted only once in Guo's accounting. Removing these duplicate costs deducts only ¥138 or $19.37 from the ultimate figure for Guo's reasonable expenses. Even after subtracting the duplicate entries, the receipts Guo submitted evidence legitimate expenses adding up to at least the requested reimbursement amount of $1,042,985.[11] See ECF No. 477-1 at ¶¶ 3-8; ECF Nos. 513-1, 513-2, 513-3. The duplicate VAT invoices account for a nominal amount of the overall expenses and do not give rise to any indication that Guo's VAT invoices are otherwise unreliable or fraudulent such that the expenses are not supported by "adequate[]

---

[9] Guo addressed an example of a duplicate VAT invoice during the July 8, 2024 hearing. See Hr'g Tr. at 31 (July 8, 2024). The example addressed at the hearing, however, involved two entries with identical invoice numbers but different dates. See id. Unlike the example from the hearing (see ECF No. 448-1 at 142-43), the entries identified as duplicates herein all have the same invoice code, same date, and same expense amount.

[10] The following VAT invoices appear twice in Guo's submissions if receipts: No. 20326314 (ECF No. 448-1 at 103, 114); No. 18575154 (id. at 105, 119); No. 11252913 (id. at 106, 116); No. 03222855 (id. at 109, 117); No. 21407110 (id. at 111, 115); No. 18168816 (id. at 112, 120).

[11] Guo submitted receipts indicating total expenditures of $1,607,890.61. See ECF Nos. 513-1, 513-2, 513-3. Guo, however, seeks reimbursement for only $1,042,985 in expenses. See ECF No. 477-1 at ¶¶ 3, 5, 7.

document[ation]." See JDM Long Island, LLC, 2014 WL 6632644, at *8 (internal quotation marks and citation omitted).

### c. Reimbursement for personal expenses

Guo seeks reimbursement for expenses related to travel and office maintenance. See e.g., ECF No. 477-1 at ¶¶ 4, 6, 8. Shi identifies several of those expenses as "personal expenditures that are meritless and should be rejected." See ECF No. 473 at 25. Shi points to expenses for hotel costs and room service, travel expenses, rent for office space for Guo and his team, and utilities. See ECF No. 473-1. Guo's expenses can be broadly grouped into three categories: expenses for travel related to fulfilling Guo's role as the Receiver's agent; office maintenance and company operation; and legal expenses. See, e.g., ECF Nos. 513-1, 513-2, 513-3. As explained below, each of those categories of expenses reflect necessary costs related to the Receivership and are not Guo's personal expenses.

With regards to Guo's request for reimbursement for travel expenses, Guo explains that the hotel and travel expenses were necessitated by his work on behalf of the LKM subsidiaries. See ECF No. 477-1 at 6 n.3. For example, Guo needed to travel to Beijing several times—more than a thousand miles from his home—to meet with Chinese government authorities and appear for litigation proceedings against LKM. See ECF No. 477 at 12 n.5. Shi claims that Guo paid for "luxury hotel rooms." ECF No. 473 at 8. But Guo explains in his declaration that most of the hotels where he stayed were not luxury hotels and ranged in price from $35 to $200 per night, with the exception of one hotel from 2019, which averaged $300 per night. See ECF No. 477-1 at 10 n.4. Further, Guo's travel expenses were made in furtherance of the Receivership Order, consistent with his duties to represent, defend, and act on behalf of LKM. Id. at 6 n.3 Shi does not dispute that travel performed by Guo on behalf of the Receiver and in furtherance of the

Receivership Order would be a proper expense for which Guo could obtain reimbursement. See ECF No. 473 at 23-25. Additionally, the costs are reasonable and well-documented. See Matter of T.J. Ronan Paint Corp., 469 N.Y.S.2d 931, 937 (1st Dep't 1984) (including travel expenses in the commission award for a receiver).

Turning to expenses for office maintenance and operation, Shi does not explain why he believes these expenses are "personal expenses" of Guo. See ECF No. 473 at 20. Shi makes the conclusory assertion that "[t]he records also show substantial claims for personal expenditures," without explaining how purchases related to rent, office furniture, and utilities are personal expenses of Guo rather than expenses in furtherance of the Receivership Order. Id. at 25. Logically, the utilities, facilities, and equipment used for Guo and his team to pursue litigation on behalf of LKM and to monitor and safeguard LKM's assets would be expenses of the Receivership. Therefore, I recommend that Guo's submitted expenses described as payments for office maintenance, office equipment, office rent, company operation, professional services (excluding legal services), and labor be approved in full. See ECF No. 513-1 at 2-6, 8-16, 18; ECF No. 513-2 at 2-6, 9-13; ECF No. 513-3 at 2-5, 7-8.

Finally, Shi also challenges the legal expenses for which Guo seeks reimbursement, arguing that Guo has failed to provide "any time entries to support these claims or otherwise demonstrate that these claims relate to work performed for the benefit of LKM." See ECF No. 473 at 25. Guo submitted receipts reflecting approximately $884,452 in legal expenses. See ECF Nos. 513-1 at 16-17; ECF No. 513-2 at 3-9; ECF No. 513-3 at 2. These expenses include payment to various law firms in China: the law firms Beijing Anjie and Beijing Tianchi Juntai for their representation of LKM WFOE in the arbitrations before China International Economic and Trade Arbitration Commission and a court case to inform the validity of an arbitration

agreement; the Beijing Geping Law Firm for its representation of LKM WFOE in several matters in trial and appellate courts; the Beijing Dingye Law Firm for its representation of LKM WFOE in several matters in trial and appellate courts; the Hainan Xiangrui Law Firm for its representation of LKM WFOE in matters before the appellate court and the highest court in Beijing; and Kobre & Kim LLP for serving as co-counsel for LKM in an International Chamber of Commerce arbitration before the Hong Kong International Arbitration Centre. See 477-1 at ¶¶ 12-18; ECF No. 513-1 at 16-17; ECF No. 513-2 at 3-9; ECF No. 513-3 at 2. Of Guo's $884,452 in legal expenses, approximately $45,597 were paid to four other law firms, without identifying the matters in which the firms represented or advised LKM: KLC Corporate Advisory and Recovery Limited; W.K.TO & Co Solicitors & Notaries; Epiq Hong Kong Limited; and KSG Attorneys Limited. See ECF No. 513-1 at 16; ECF No. 513-2 at 8-9. The submitted receipts for legal expenses also include administrative court fees, arbitration fees, and annual registration fees. See ECF No. 513-2 at 8-9; ECF No. 513-3 at 2.

In response to Shi's challenge, Guo provided a lengthy explanation of his need to retain the services of Beijing Anjie, Beijing Tianchi Juntai, Beijing Geping, Beijing Dingye, Hainan Xiangrui, and Kobre & Kim LLP to represent LKM in numerous legal proceedings and other matters. See ECF No. 477-1 at ¶¶ 12-18; ECF No. 477-2. A review of these records indicates that the law firms performed work in pursuit of LKM's interests, including, but not limited to, work in arbitration proceedings with the Chinese International Economic and Trade Arbitration Commission; proceedings related to securing a business license for NQ Tianxia, one of LKM's WFOE in China; and "hundreds of employment lawsuits brought by former employees wrongfully terminated." See, e.g., ECF No. 477-1 at ¶¶ 13, 15, 18. To be sure, Guo did not provide time sheets from the lawyers for each firm for the work they performed on behalf of

LKM, but Guo explained that "[i]t is a common practice in [China] that a law firm charges a flat fee for its legal services related to a specific matter." <u>See</u> ECF No. 477-1 at ¶ 19. Therefore, Guo has adequately documented his payments to Beijing Anjie, Beijing Tianchi Juntai, Beijing Geping, Beijing Dingye, Hainan Xiangrui, and Kobre & Kim LLP for legal expenses.

Guo, however, does not provide any information for his payments to KLC Corporate Advisory and Recovery Limited, W.K.TO & Co Solicitors & Notaries, Epiq Hong Kong Limited, and KSG Attorneys Limited, beyond the invoices from those firms. <u>See</u> ECF No. 513-1 at 16; ECF No. 513-2 at 8-9. Because Guo provides neither time entries nor an explanation of the nature of the work performed by those firms on behalf of LKM, the submissions reflecting approximately $45,597 in payments should not be approved.

In sum, Guo submitted adequate documentation for necessary legal expenses totaling $838,855, incurred for work performed by Beijing Anjie, Beijing Tianchi Juntai, Beijing Geping, Beijing Dingye, Hainan Xiangrui, and Kobre & Kim LLP, and for other expenses such as court fees, arbitration fees, and annual registration fees.

> ### d.   *Reasonableness of Guo's compensation*

With approval from the Receiver, Guo also paid himself a salary of $15,000 per month for his work on behalf of the Receiver. <u>See</u> ECF No. 477 at 9, 15 n.5; <u>see e.g.</u>, ECF No. 419-8 at 35 (identifying Guo's monthly salary of $15,000). Shi argues that Guo's "generous 'salary'" is a personal expense that should not be borne by LKM. ECF No. 473 at 8. Under the Receivership Order, the Receiver's professionals, including agents such as Guo, "shall be paid on an hourly

basis at a reasonable and customary rate for such work to be approved by the Court." ECF No. 26 at § II, ¶ 6.

The amount of compensation to be awarded a receiver or his agent "is squarely within the court's discretion," and a court is to consider the following factors when determining the reasonableness of the compensation: "(1) the complexity of problems faced, (2) the benefits to the receivership estate, (3) the quality of the work performed, and (4) the time records presented." Sec. & Exch. Comm'n v. Platinum Mgmt. (NY) LLC, No. 16 Civ. 6848 (BMC), 2018 WL 4623012, at *4 (E.D.N.Y. Sept. 26, 2018) (internal quotation marks and citation omitted). Guo was tasked with tackling complex problems, such as "assembling a team of professionals in China in order to establish control of, manage and pursue recovery efforts on behalf of LKM's Mainland China subsidiaries" (ECF No. 477 at 8), and supervising the defense of LKM in "hundreds" of lawsuits and arbitrations (ECF No. 477-1 at ¶ 18; see also ECF No. 477 at 9). But Guo has not provided any time records reflecting the hours he spent fulfilling his obligations as the Receiver's agent. Instead, Guo makes the conclusory assertion that his role as the Receiver's agent demanded "a disproportionate amount of [his] time" and "became a full-time job."[12] ECF No. 477 at 9. Even if it were true that Guo worked full-time as the Receiver's agent (a proposition that seems highly unlikely given that it appears Guo had other employment), the lack of time records makes it impossible for the Court to assess the reasonableness of Guo's $15,000 monthly salary. Although Guo's services undoubtedly benefited LKM and required a

---

[12] Tellingly, Guo makes no representation that he had no other employment and was working solely as the Receiver's agent for the 23 months during which he drew the $15,000 monthly salary. Guo has his "own well-established company in China which is not related to LKM" with "operation[s that] ha[ve] no relationship with [his] position as [the] Receiver's agent." ECF No. 477-1 at ¶ 22. It is thus hard to credit Guo's assertion that working as the Receiver's agent "became a full-time job," given his other responsibilities for his company. ECF No. 477 at 9.

significant amount of his time, the record before the Court is insufficient to assess the reasonableness of Guo's salary. Moreover, Guo's flat salary contravened the Receivership Order, which required that individuals retained by the Receiver be paid at an hourly rate. ECF No. 26 at § II, ¶ 6. I thus recommend that Guo's requested salary of $15,000 per month not be approved.

In sum, I recommend that Guo's expenses as part of the Receiver's Accounting be approved in the amount of $1,042,985.

### 2. *Guo's conflict of interest*

Shi argues that Guo's compensation and expenses should be denied because he has a conflict of interest. See ECF No. 473 at 14-15, 26-27. Specifically, Shi contends that Guo funded the litigation that led to the appointment of the Receiver so that he could be appointed the Receiver's agent with control over LKM in China. Id. Shi's argument is meritless.

At the time the Receiver appointed Guo as his agent, Guo had an equity interest in LKM through his ownership of American Depository Shares. See ECF No. 477-1 at ¶ 2. As an investor in LKM, Guo's interests were aligned with the interests of LKM's other shareholders, all of whom would have an economic interest in safeguarding LKM's operations and assets in order to preserve the value of their investment. Guo's significant financial investment in LKM[13] ensured that his interests were aligned with the Receiver's mandate to "prevent waste, dissipation, or theft of assets to the detriment of investors" (ECF No. 26 at § II, ¶ 2), because otherwise Guo risked being unable to recover the value of his investment. See ECF No. 460-1 at ¶ 6 ("I agreed to be the Receiver's agent in China because I had a significant investment in LKM (and if the

---

[13] Guo represents that he is "one of LKM's largest original shareholders." ECF No. 428 at ¶ 2. Before February 2018, Guo held more than 3 million LKM American Depository Shares, "which were valued far beyond $10 million." Id. Between February 1, 2018 and April 25, 2018, Guo "purchased an additional 940,198 LKM [American Depository Shares]" for $1,856,628.19. Id.

Company could recover its assets and get back to normal business, then my investment would potentially be recovered).").

Shi's claim that Guo orchestrated his appointment as the Receiver's agent in order to gain control over LKM in China is nonsensical. Guo took on a financial risk in becoming the Receiver's agent, because payment of his expenses and compensation and the repayment of his loan to LKM was "contingent on the Receivership successfully recovering and securing liquid funds of the Company." see ECF No. 419-1 at 5; see also ECF No. 26 at § II, ¶ 6 ("All expenses approved by the Court shall be paid promptly by the Company."). And, indeed, LKM has no financial assets such that the Receiver has incurred over $1 million in unfunded expenses, not including Guo's individual expenses. Guo also advanced significant funds to LKM, such as providing LKM the equivalent of a $1,500,000 loan to fund lawsuits in China, the arbitration in Hong Kong, and day-to-day operations in China. ECF No. 419-1 at 5.

### 3. *Shi's personal liability for the expenses of the Receiver*

The Receiver requests that the Court apportion all unpaid expenses of the Receivership to Shi and direct Shi to pay outstanding costs plus attorney's fees. See ECF No. 518 at 6, 10, 27. The Receiver contends that the Court may order Shi to pay the Receiver's and Guo's expenses either under the alter ego theory by piercing the corporate veil, through the Court's discretion to apportion costs among parties to a litigation, or under the Court's inherent authority to sanction litigants. See id. at 18-24. The Receiver also claims that the Court has the authority to impose sanctions against Shi in the form of attorney's fees. See id. at 24-27. In response, Shi argues that the record currently before the Court is insufficient to apportion costs to Shi under any of the Receiver's theories of liability. See ECF No. 521 at 11-17, 19-23. Shi further argues that the alter ego theory is inapplicable because Cayman Islands law does not allow for piercing the corporate

veil, and in any event, the Receiver's veil-piercing claim is procedurally improper. See ECF No. 521 at 17-19. For the reasons set forth below, I recommend that the Receiver's request that Shi be personally responsible for the unfunded expenses of the Receivership be denied.

### a. Piercing the corporate veil

The Receiver seeks an order directing Shi to pay the outstanding receivership expenses under an alter ego theory, which would allow the Court to pierce the corporate veil of LKM and hold Shi personally liable for those expenses. See ECF No. 518 at 20. Shi argues that the Receiver's attempt to pierce the corporate veil is unavailable under controlling Cayman Islands law (see ECF No. 521 at 17-18), and regardless of which jurisdiction's law applies, inappropriate under the record presently before the Court (see id. at 16-17) and procedurally improper (see id. at 18).

With regards to which jurisdiction's law applies to the Receiver's veil-piercing claim, "[u]nder New York law choice of law principles, the law of the state of incorporation determines when the corporate form will be disregarded." Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC, 975 F. Supp. 2d 392, 401 (S.D.N.Y. 2013) (internal quotation marks omitted) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)). Where "the same result would follow" from applying New York law in an action proceeding in a federal court sitting in New York, New York law applies. Quinn v. Teti, 2000 WL 1616806, at *2 (2d Cir. Oct. 27, 2000) (applying New York law to veil-piercing claim against defendant corporation incorporated in Idaho where the same result would follow from application of Idaho law, and parties did not dispute application of New York law).

LKM is incorporated in the Cayman Islands. See ECF No. 470 at ¶ 17. Despite Shi's contention otherwise (see, e.g., ECF No. 396 at 2, 22; ECF No. 521 at 17-18), the Cayman

Islands recognizes veil-piercing. The "Cayman Islands . . . appl[ies] English common law to analyze corporate veil piercing." Glob. Gaming Philippines, LLC v. Razon, No. 21 Civ. 2655 (LGS), 2022 WL 836716, at *7 (S.D.N.Y. Mar. 21, 2022).

Under English common law, "a court may pierce the corporate veil where: 1) an individual; 2) deliberately evades or frustrates a legal obligation; 3) by interposing a company under his control." Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, No. 8 Civ. 1789 (CGM), 2021 WL 4994435, at *7 (S.D.N.Y. Oct. 27, 2021). With regards to the third requirement, "English law imposes a temporal requirement concerning when the misuse [of the corporate form] must occur: the wrongdoer must have placed the corporation between himself and his victim *after* incurring liability." Tianbo Huang v. iTV Media, Inc., 13 F. Supp. 3d 246, 259 (E.D.N.Y. 2014) (emphasis in original). Additionally, "[t]he fact that a person engages in the 'carrying on of business using a duly incorporated, yet seemingly artificial, entity is not sufficient to justify piercing the entity's veil." In re Tyson, 433 B.R. 68, 86 (S.D.N.Y. 2010) (applying English common law). A court cannot pierce the corporate veil under English common law "merely because a court considers that it might be just to do so." Id. (collecting British cases applying the veil-piercing doctrine) (quoting Kensington Int'l Ltd. v. Congo, [2005] EWHC 2684 (Q.B.D.)) Further, "[w]hile English common law permits traditional corporate veil piercing if a person 'deliberately evades [or] frustrates [an existing legal obligation or liability] by interposing a company under his control,' it is vanishingly rare" to pierce the corporate veil under English common law. Glob. Gaming Philippines, LLC, 2022 WL 836716, at *7 (citing Prest v. Petrodel Resources Ltd. [2013] UKSC 34; JSC VTB Bank v. Alexander Katunin, [2021] BVIHC (COM) 2014/0062); see also In re Stillwater Asset Backed Offshore Fund Ltd., No. 16 Civ. 8883 (ER), 2018 WL 1610416, at *9 (S.D.N.Y. Mar. 30, 2018) ("Cayman Islands law

permits piercing corporate veils, but only in exceptional cases where special circumstances exist indicating that the corporate form is a mere façade concealing the true facts.") (cleaned up) (internal quotation marks and citations omitted).

The Receiver alleges that "Shi has fraudulently interposed LKM in order to serve his personal interests." See ECF No. 518 at 23. The Receiver argues that Shi has complete domination over LKM, because "[s]ince day one of the Receivership, Shi and his cohorts have sought to frustrate the Receiver's authority to manage LKM and disobeyed the Court's orders." ECF No. 375 at 21. For example, "Shi has purported to act on behalf of the Company by holding a meeting of LKM's board of directors to take actions on behalf of LKM in further violation of this . . . Receivership Order." Id. Additionally, Shi retained possession of a nullified LKM International's old company seal in order to "control[ ] the company"; "executed a fake LKM International Board decision to grant himself authority to act on behalf of LKM International"; and "falsely named himself as Director and authorized person on behalf of LKM International and Chairman of NQ Infinity." See ECF No. 525 at 11.

Even if all this were true, there is no evidence in the record that Shi "deliberately evade[d] or frustrate[d] an [existing] legal obligation" by "interpos[ing]" LKM, as required under English common law to pierce LKM's corporate veil and hold Shi liable for the Receiver's account. Sec. Inv. Protection Corp., 2021 WL 4994435, at *7; see also Tianbo Huang, 13 F. Supp. 3d at 259 (explaining temporal requirement of veil-piercing under English law) (citing In re Tyson, 433 B.R. at 88). LKM has existed since at least 2005. See ECF No. 1 at ¶ 6 ("Defendant Shi has been LKM's . . . Chief Operating Officer since October 2005"). Shi's conduct that the Receiver relies on to give rise to veil piercing occurred beginning in 2019, after the Receivership Order was entered. See ECF No. 518 at 10-14; ECF No. 525 at 10-12. LKM's

incorporation thus predates Shi's alleged wrongdoing. And although the Receiver points to several instances of improper conduct by Shi, "[impropriety] is not in itself sufficient to justify veil-piercing." In re Tyson, 433 B.R. at 87, 94 (holding that corporate veil could not be pierced under English law "because of the key distinction in English law between using the corporate form to evade or conceal existing legal obligations or wrongs on the one hand, and using it to insulate oneself from future or contingent liabilities on the other"). The Receiver cites to no case that would permit veil piercing under English Law in the circumstances here, where the corporate entity existed before the allegedly improper conduct and where any potential liability was incurred long after the corporate entity was formed. See, e.g., Tianbo Huang, 13 F. Supp. 3d at 260 (holding that English law did not allow veil piercing where the corporation "was formed well *before* the alleged wrongdoing") (emphasis in original); In re Stillwater Asset Backed Offshore Fund Ltd., 2018 WL 1610416, at *9. Under Cayman Islands law, it is inappropriate to pierce the corporate veil to hold Shi personally liable for the Receivership expenses under the circumstances in this case.

Applying New York law, piercing the corporate veil is similarly inappropriate. Under New York law, the corporate veil can be pierced only where the party seeking to pierce the veil makes a "two-part showing: (i) that the [individual] exercised complete domination over the corporation . . . ; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997). In New York, "[v]eil-piercing is done with extreme reluctance." Shantou Real Lingerie Manufacturing Co. v. Native Grp. Int'l, Ltd., 401 F. Supp. 3d 433, 439 (S.D.N.Y. 2018) (citing United States v. Funds Held in the Name or for the Benefit of Wetterer, 210 F.3d 96, 106 (2d Cir. 2000)).

The Receiver offers several allegations that Shi exercised domination over LKM and used LKM to commit fraud (see, e.g., ECF No. 518 at 21-22), but mere allegations are insufficient to justify piercing the corporate veil under New York law. See Cortlandt St. Recovery Corp. v. Bonderman, 226 A.D.3d 103, 104 (1st Dep't. 2024) ("Because New York law disfavors disregard of the corporate form, mere conclusory allegations that the corporate structure is a sham are insufficient to warrant piercing the corporate veil") (cleaned up) (internal quotation marks and citations omitted). To bolster the Receiver's allegations, the Receiver cites a decision from this Court dismissing the complaint in a related action where the Court reasoned that "the overlapping nature of legal representation as between LKM, Shi, and China AI raises the specter that Shi has been the one pulling the strings all along." Link Motion Inc. v. DLA Piper LLP, No. 22 Civ. 8313 (VM), ECF No. 30 at 18 (S.D.N.Y. May 26, 2023); see also ECF No. 518 at 22. But neither in this case nor in the related case has there been an evidentiary hearing addressing the Receiver's allegations concerning Shi's conduct. Therefore, the Receiver's allegations are "devoid of proof sufficient . . . as to how [Shi] . . . exercised 'complete domination' over the purportedly dominated [LKM]." Cortlandt St. Recovery Corp., 226 A.D.3d at 105 (quoting Matter of Morris v. N.Y. State Dep't. of Taxation & Fin., 623 N.E.2d 1157 (N.Y. 1993)); see also Advanced Techs. LLC v. HTC Corp., No. 11 Civ. 6604 (CM), 2019 WL 4198769, at *13 (S.D.N.Y. Aug. 12, 2019) (explaining that "courts rarely make veil-piercing determinations without holding an evidentiary hearing").

I therefore recommend that the Receiver's request to pierce the corporate veil in order to hold Shi personally liable for the expenses of the Receivership be denied.[14]

---

[14] Shi also argues that the Receiver's veil-piercing claim is procedurally improper. See ECF No. 521 at 18. Because veil piercing is not available on the present facts under Cayman Islands or New York law, I do not address Shi's argument that the Receiver could not have

b. *The Court's discretion to allocate costs to parties in the litigation*

As an alternative, the Receiver argues that the Court can allocate the unfunded expenses of the Receivership to Shi because "Shi is indisputably a party to this proceeding, and this Court has already determined that Shi's conduct warranted the appointment of a receiver over LKM." See ECF No. 518 at 20 (citing ECF No. 275 at 37, 41). Shi disputes this characterization and argues that "this Court lacks a sufficient record to tax receivership costs against" him. See ECF No. 521 at 14.

"The court that appointed the receiver has discretion over who will pay the receiver's costs." KeyBank Nat'l Assoc. v. Monolith Solar Assocs. LLC, No. 19 Civ. 1562 (DNH), 2022 WL 19335877, at *3 (N.D.N.Y. May 23, 2022) (citing Sec. & Exch. Comm'n v. Elliot, 953 F.2d 1560, 1576 (11th Cir. 1992)). This Court, therefore, can "determine which of the parties may be assessed" and can "apportion the costs among the various parties." Tanzer v. Huffines, 315 F. Supp. 1140, 1143 (D. Del. 1970). A court can exercise its discretion to apportion costs and "tax all the costs and expenses of the receivership . . . against the individual defendants . . . which necessitated the receivership." Id. at 1142. But in order to do so, a court needs before it a record supporting the contention that the individual defendant necessitated the receivership. Id. at 1143 (declining to hold individual defendants liable for the costs of the receivership where "[g]enuine

---

raised veil piercing at this posture, without having pled it in the complaint. It is worth noting, however, that courts in this Circuit have held that a veil-piercing claim need not be pled in the complaint. See, e.g., Thomas Indus., Inc. v. City of Bristol, 336 F. Supp. 3d 28, 34 n.6 (D. Conn. 2018) ("Alter ego status or a veil-piercing theory need not be specifically pleaded, so long as the party is on notice of such a claim"); Highland CDO Opportunity Master Fund, L.P. v. Citibank N.A., No. 12 Civ. 2827 (NRB), 2016 WL 1267781, at *22 (S.D.N.Y. Mar. 30, 2016) (considering veil-piercing claim first raised in an opposition to summary judgment and explaining that "under New York law, piercing the corporate veil does not constitute an independent cause of action, but a theory of liability") (internal quotation marks and citation omitted).

issues of fact exist[ed] with respect to the question whether the individual defendants were involved to the same extent in the transactions which prompted the appointment of a receiver in the first place").

In the Receivership Order, the Court indicated that LKM would fund the Receiver's account. See ECF No. 26 at § II, ¶ 5 ("The Company shall be responsible for funding the Receivership Account"). In other words, the Court already determined that the Receiver's expenses should be paid by LKM. Id. at § II, ¶ 6 ("All expenses approved by the Court shall be paid promptly by the Company."). This is in contrast to KeyBank Nat'l Assoc., on which the Receiver relies, where the receivership order was silent as to which entities or individuals would be responsible for paying the receiver's expenses and the court therefore exercised its discretion to allocate costs after they were incurred by the receiver. See KeyBank Nat'l Assoc., 2022 WL 19335877, at *3 (noting that "the Receivership Order is silent on the issue of allocation of receivership costs"). Despite the language in the Receivership Order (see ECF No. 26 at § II, ¶¶ 5-6), the Receiver nonetheless argues that the Court can now order Shi to pay the Receiver's expenses because Shi's conduct necessitated the appointment of a receiver over LKM. See ECF No. 518 at 20.

The Receiver claims that the Court has already held that Shi's conduct necessitated the Receivership, because Judge Freeman, in her Report and Recommendation from March 9, 2022, indicated that "the Receivership Order was duly authorized when entered." See ECF No. 518 at 20 (quoting ECF No. 275 at 37). But the Receivership Order was authorized based on Baliga's *allegations* that Shi and other directors were looting LKM's assets. See ECF No. 275 at 3-4 ("At the outset of the case, based principally on the allegations in the Complaint that Shi and the other Individual Defendants were effectively looting the Company of its assets, Baliga moved . . .

for . . . the appointment of a temporary receiver to protect the Company's assets."); see also ECF No. 26 at 2 (appointing a temporary receiver based on allegations in the Complaint and the Plaintiff's three-page supplemental affidavit at ECF No. 24). Those allegations have not yet been litigated or proven. The record that supported the Court's appointment of the Receiver does not afford a basis for the Court to apportion the receivership expenses at this time to Shi. See Tanzer, 315 F. Supp. at 1143 (declining to tax the receiver's costs on the individual defendants based on "the record which moved the Court to appoint a receiver" and postponing "taxation and allocation of the receivership's costs and expenses until after trial"); see also KeyBank Nat'l Ass'n, 2022 WL 19335877, at *6 (explaining that the court could only assess a surcharge on the receiver's account on creditors "if, and only if, the parties' factual disputes are appropriately aired").[15]

In short, the Receiver points to no case that would suggest that it is proper for the Court to exercise its discretion to allocate the costs of a receivership to an individual party absent a trial on the merits of the claims in the complaint or an evidentiary hearing. And here, the Court already determined that the costs should be borne by LKM. On the present record, it would be inappropriate to apportion the unfunded costs of the Receiver to Shi.

---

[15] The other cases the Receiver relies on to support allocating costs of the Receivership to Shi are inapposite and do not mandate the Receiver's desired outcome. For example, in Skaff v. Progress Int'l, LLC, No 12 Civ. 9045 (KPF), 2014 WL 5454825, at *9 (S.D.N.Y. Oct. 28, 2014), the question before the court was whether to order liquidation through a receivership. In Sec. & Exch. Comm'n v. Elliot, 953 F. 2d 1560, 1576-78 (11th Cir. 1992), the court addressed how to allocate the receiver's costs between secured and unsecured creditors. See also Big Cat Rescue Corp. v. G.W. Exotic Animal Mem'l Found., No. 14 Civ. 377 (SLP), 2018 WL 11386382, at *2 (W.D. Okla. July 11, 2018) ("[I]n most circumstances the fees and costs of a receiver are borne by the entity subject to receivership.").

c. *Sanctions*

Finally, the Receiver argues that the Court can hold Shi liable for the unfunded Receivership expenses "pursuant to its inherent authority to sanction litigants" who take "bad faith, vexatious, or wanton acts or actions . . . for oppressive reasons." ECF No. 518 at 24 (cleaned up) (citations omitted). The Receiver also asks the Court to award attorney's fees as a sanction. See ECF No. 518 at 26-27. In response, Shi contends that the Receiver's claim for sanctions is baseless because Shi's legal actions in this case were not frivolous or in bad faith. See ECF No. 521 at 19-23.

A court has the inherent power to "impose monetary sanctions against a litigant . . . for misconduct." Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd., 991 F.3d 361, 367 (2d Cir. 2021). A court may also sanction any attorney who "multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927. In practice, the showing required to sanction attorneys is the same as the showing necessary to sanction litigants. See Enmon v. Prospect Cap. Corp., 675 F.3d 138, 144 (2d Cir. 2012) ("[T]he only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent power is that awards under § 1927 are only made against attorneys.") (cleaned up) (internal quotation marks and citation omitted).

With regards to monetary sanctions, "a court should sanction only 'bad faith, vexatious[ ], or wanton' acts or actions otherwise undertaken for 'oppressive reasons.'" Int'l Techs. Mktg., Inc., 991 F.3d at 368 (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991)); see also Revson v. Cinque & Cinque, P.C., 221 F.3d 71, 79 (2d Cir. 2000) (explaining that "bad faith is the touchstone of an award" under § 1927). In order to impose sanctions under Section 1927 or the court's inherent authority for bad-faith conduct, a court must find "clear evidence" and a "high degree of specificity" of bad faith. Oliveri v. Thompson, 803 F.2d 1265,

29

1272 (2d Cir. 1986) (internal quotation marks and citations omitted); see also, e.g., Liebowitz v. Bandshell Artist Mgmt., 6 F.4th 267, 281-92 (2d Cir. 2021) (affirming sanctions imposed on attorney who acted in bad faith by making false and baseless representations, "violating multiple court orders," and "pursuing a complaint with a false allegation"); Chambers, 502 U.S. at 45-55 (upholding lower court's sanction of litigant who acted in bad faith by perpetrating fraud on the court). A court also has the authority to police its own orders. See, e.g., Chambers, 501 U.S. at 46 ("The imposition of sanctions . . . reaches a court's inherent power to police itself."). The decision to issue sanctions under either Section 1927 or the Court's inherent power lies within the Court's broad discretion. See United States v. Prevezon Hldgs., Ltd., 305 F. Supp. 3d 468, 478 (S.D.N.Y. 2018) (citing Sorenson v. Wolfson, 170 F. Supp. 3d 622, 634 (S.D.N.Y. 2016)). However, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." Chambers, 501 U.S. at 44.

The Receiver argues that sanctions are proper because Shi made frivolous court filings (ECF No. 518 at 17-18, 25), the "Receiver's work 'was complicated by Shi's numerous attempts to frustrate the work of the Receivership'" (id. at 25 (citing ECF No. 466 at 20)), and Shi violated the Receivership Order by, for example, calling an unauthorized LKM board meeting, willfully ignoring the Receiver's demand letters, failing to provide the Receiver with LKM's books and records, instructing LKM's employees to ignore the Receiver's requests, and ordering the destruction of LKM's accounting and legal documents (id. at 25-26 (citing ECF Nos. 50, 83, 30)).

Turning first to the Receiver's argument that Shi made frivolous court filings, the Receiver lists several docket entries where the Receiver responded to filings the Receiver contends are frivolous. See ECF No. 518 at 16-18. Included in the Receiver's examples are Shi's

filings related to: the Receiver's Accounting; the Receiver's allegations concerning Shi frustrating the Receivership; and Shi's motion to unseal documents related to Guo. Id. The Receiver makes the conclusory statement that these filings were "frivolous" and resulted in "unnecessary expense[s]." Id. at 18. In response, Shi contends that the filings were not frivolous because, at least with regards to the motion practice regarding the Receiver's attempts to call an emergency general meeting of the LKM shareholders, Shi's motion was successful. See ECF No. 521 at 20 (citing ECF Nos. 425; 440 at 2-3).

By merely pointing to filings he believes were frivolous, the Receiver has not shown that the filings were made in "bad faith" or "multiplie[d]" the proceeding "unreasonably." See Int'l Techs. Mktg., Inc., 991 F.3d at 368-69; 28 U.S.C. § 1927. The Receiver does not offer any explanation for how the filings were made with an improper purpose or in bad faith. Further, some of the Receiver's examples of Shi's frivolous filings were facially proper filings. See ECF No. 518 at 17-18. For example, the Receiver points to Shi's objections to the Receiver's accounting as an example of how Shi's misconduct unnecessarily burdened the Receiver's work. Id. But Shi was entitled to raise objections to the Accounting as an interested party (see JDM Long Island, 2014 WL 6632644, at *11 (addressing objections to receiver's attorney's fees in connection with the receiver's final accounting)), and the Receiver's response to those objections was filed pursuant to a court order directing the Receiver to make that filing (see ECF No. 434). The Receiver has therefore failed to show how the court filings related to the Receivership were made in bad faith or unreasonably multiplied the proceeding.

The Receiver also argues that Shi's attempts to frustrate the Receiver's work and continuous violations of the Receivership Order merit sanctions. For example, according to the Receiver, Shi "willfully ignored the Receiver's numerous demand letters and failed to provide

the Receiver with LKM's books and records"; "formed a new company to receive revenues from LKM's mobile applications"; "went to LKM's office and ordered employees to remove accounting and legal documents"; "called two unauthorized LKM board meetings"; and "transferred over $89 million from LKM after the issuance of Receivership Order." ECF No. 518 at 26 (citing ECF No. 50). The Receiver does not point to a specific provision of the Receivership Order that Shi violated, but the Receiver's allegations that Shi interfered with LKM's accounting and transferred and diverted LKM assets can be read as violating the provision of the Receivership Order enjoining Defendants, including Shi, from "transferring, liquidating, dissipating, assigning, and/or granting a lien or security interest or other interest in, any assets belonging to [LKM]." ECF No. 26 at § 1, ¶ 1.

For support, the Receiver cites United States v. Paccione, 975 F. Supp. 537 (S.D.N.Y. 1997). See ECF No. 518 at 26. In Paccione, after a hearing, the court held an individual in contempt for violating the court's restraining orders that were issued to assist a receiver in collecting on a forfeiture order in a criminal case. Id. at 539-40, 544. The court held that the proper sanction for violation of the restraining order was "a fine . . . equaling the amount of damages (to be determined at the close of discovery) which the receiver ha[d] suffered" and "reimburse[ment of] the reasonable costs and expenses of the Receiver, including attorney's fees, incurred in connection with the contempt proceedings." Id. at 546. The court in Paccione, however, awarded the sanction for violation of a restraining order following a hearing where clear and convincing evidence had been adduced demonstrating that the alleged contemnor had failed to comply with the court's order. Id. at 541, 543.

Paccione is inapplicable. As the Receiver concedes, there is no contempt claim before the Court and the Court has not found Shi in contempt. See ECF No. 518 at 9. Further, and more

importantly, there has been no hearing establishing by clear and convincing evidence that Shi violated a court order. Here, the Receiver's allegations regarding Shi's conduct which frustrated the Receivership were first filed under seal, and Shi did not have an opportunity to refute the allegations when first raised. Shi was not even aware of the specific allegations made against him until years later, when the filings were unsealed. See, e.g., ECF No. 419-1 (letter from the Receiver to the Court on June 18, 2019 and unsealed on May 24, 2023 alleging that the Receivership efforts "have been met with the upmost resistance by [Shi]" and that Shi "divert[ed] [LKM's] two most valuable assets"). Even with respect to the Receiver's publicly filed status reports (see, e.g., ECF No. 220 at 4 ("in a document filed in court in China, . . . Defendant Shi is attempting . . . to further control LKM assets in China")), Shi has not had the opportunity to directly challenge the allegations against him outside the context of motion practice related to the Receiver's Accounting.

In cases where courts have imposed sanctions for violating a court order, the moving party filed a motion for sanctions or contempt, and the party sanctioned party had the opportunity to challenge the allegations that gave rise to an award of sanctions. See, e.g., Paccione, 975 F. Supp. at 543, 546 (imposing sanctions only after an evidentiary hearing on contempt motion); Liebowitz, 6 F.4th at 275-76 ("Liebowitz was ordered to file a formal opposition to the sanctions motion" and "[t]he district court concluded that an evidentiary hearing was necessary"); NASCO, Inc. v. Calcasieu Television and Radio, Inc., 124 F.R.D. 120, 123 (W.D. La. 1989) ("[a]n evidentiary hearing was held" on motion for sanctions), aff'd and remanded, 894 F.2d 696 (5th Cir. 1990), aff'd sub nom. Chambers, 501 U.S. 32 (1991). Moreover, even if the Court were to conclude that the Receiver's allegations raised in his letter submissions to the Court and in his briefs in support of the Accounting were sufficient to support an award of sanctions, the

undersigned is not aware of any authority granting sanctions for violating a court order in an amount of comparable magnitude to the sanction award sought by the Receiver here, which would exceed $2 million. See, e.g., Liebowitz, 6 F.4th at 272 (affirming imposition of "$83,517.49 in attorney's fees and $20,000 in additional monetary sanctions" where litigant "violated multiple court orders").

I therefore recommend that the Receiver's request for monetary sanctions in the amount of outstanding costs and expenses of the Receivership be denied.

### 4. *The validity of the Convertible Note*

On June 18, 2019, the Receiver submitted a letter to the Court seeking approval for the Convertible Note that the Receiver negotiated between LKM and Guo. See ECF No. 419-1. Under the Convertible Note, Guo provided LKM with a loan equaling approximately $1,500,000 to fund litigations involving LKM and the day-to-day operations of LKM in China. Id. at 5. Guo agreed that repayment of the Convertible Note was "contingent on the Receivership successfully recovering and securing liquid funds of [LKM]." Id. Further, "[i]n consideration for the loan and the significant risks" Guo took as the Receiver's agent, the Convertible Note provided "Guo with both interest and a conversion option whereby at the maturity date, [Guo] can choose to convert" the loan value into equity in LKM. Id. at 5-6. Judge Marrero approved the Convertible Note. See ECF No. 419-9 at 2 (citing ECF No. 119, a sealed document). On September 8, 2021, Judge Marrero approved the Receiver's application to allow Guo to exercise his option to convert the Convertible Note into equity in LKM in the form of Class B Common Shares. See id. at 3.

Shi asks that the Convertible Note and Guo's Class B Shares be vacated. See ECF No. 473 at 15-23. Shi's arguments concerning the Convertible Note, however, do not come within the scope of the work referred to the undersigned by Judge Marrero and are thus not properly

addressed in this Report and Recommendation. <u>See</u> ECF No. 483 (showing specific issues

referred to the undersigned); <u>see also</u> ECF No. 440 at 3 (where Judge Marrero reserved his

"decision on Shi's motion [to vacate the Convertible Note] until the Receiver's accounting of

expenses, including Guo's, is resolved.").

## **FELICELLO'S REPRESENTATION OF LKM**

Felicello seeks to represent LKM and Shi in moving to dismiss the common law fraud

claim in Count Five of the Third Amended Complaint. <u>See</u> ECF No. 490 at 2. Baliga objects to

Felicello's representation of LKM, arguing that a conflict of interest exists such that Felicello

should be disqualified from representing LKM, and that the Receiver should have the authority

to appoint replacement counsel for LKM. <u>See</u> ECF No. 505 at 1-4. The Receiver seeks the

Court's direction as to whether he should engage separate counsel for LKM. ECF No. 506 at 3-4.

For the reasons set forth below, I recommend that the Court allow Felicello to continue its dual

representation of Shi and LKM solely for purposes of moving to dismiss the common law fraud

claim in the Third Amended Complaint.

A. <u>Legal Standard</u>

"The authority of federal courts to disqualify attorneys derives from their inherent power

to preserve the integrity of the adversary process." <u>Hempstead Video, Inc. v. Inc. Village of</u>

<u>Valley Stream</u>, 409 F.3d 127, 132 (May 31, 2005). "Federal courts located in the State of New

York also look to the [New York Rules of Professional Conduct] in deciding disqualification

motions, although, 'because the authority to disqualify an attorney is a function of the court's

inherent supervisory power, these rules provide guidance only and are not conclusive.'" <u>Reyes v.</u>

<u>Golden Krust Caribbean Bakery, Inc.</u>, No. 15 Civ. 7127 (DF), 2016 WL 4708953, at *7

(S.D.N.Y. Sept. 1, 2016) (quoting Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc., 687 F.

Supp. 2d 381, 388 (S.D.N.Y. 2010)).

Under Rule 1.13 of the New York Rules of Professional Conduct ("RPC"), "[a] lawyer

representing an organization may also represent any of its directors, officers, employees,

members, shareholders or other constituents, subject to the provisions of Rule 1.7." RPC 1.13(d).

Rule 1.7 states that "a lawyer shall not represent a client if a reasonable lawyer would conclude

that either: (1) the representation will involve the lawyer in representing differing interests; or (2)

there is a significant risk that the lawyer's professional judgment on behalf of a client will be

adversely affected by the lawyer's own financial, business, property or other personal interests."

Id. at 1.7(a). A lawyer may, however, represent a client notwithstanding the existence of a

concurrent conflict of interest if "(1) the lawyer reasonably believes that the lawyer will be able

to provide competent and diligent representation to each affected client; (2) the representation is

not prohibited by law; (3) the representation does not involve the assertion of a claim by one

client against another client represented by the lawyer in the same litigation or other proceeding

before a tribunal; and (4) each affected client gives informed consent, confirmed in writing." Id.

at 1.7(b).

B. Discussion

The conflicts envisaged by Rule 1.7(a) are not present here. Baliga and the Receiver

argue that Shi's attempts to frustrate the Receivership evidence a conflict of interest between Shi

and LKM that should preclude Felicello from representing LKM. See ECF No. 505 at 3-4; ECF

No. 506 at 3. But Shi's conduct vis-à-vis the Receivership does not represent a conflict of

interest between Shi and LKM for purposes of a motion to dismiss the common law fraud claim

in Count Five of the Third Amended Complaint.

As an initial matter, Rule 1.13 permits a lawyer to represent the corporation and an officer or director in the same lawsuit. See RPC 1.13(d). And here, Felicello's representation of both Shi and LKM for the motion to dismiss the common law fraud claim will not "involve the lawyer in representing differing interests." See RPC 1.7(a). To the contrary, LKM's and Shi's interests are aligned. The common law fraud claim in Count Five is based on Shi's own conduct and seeks to hold Shi personally liable. See, e.g., ECF No. 470 at ¶¶ 39-44, 56-64, 175-80. LKM will also have an interest in dismissal of the claim, because Count Five is asserted directly against the company. Id. at ¶ 176. If successful, the claim would impose liability on both LKM and Shi. See, e.g., id. at ¶¶ 23-24. Therefore, Count Five, which brings a direct claim against both LKM and the individual Defendants, including Shi, does not present a conflict of interest between LKM and Shi. See Fox v. Idea Sphere, Inc., No. 12 Civ. 1342 (CM), 2013 WL 1191743, at *22 (S.D.N.Y. Mar. 21, 2013) ("'A claim by individual shareholders against the corporation and its officers for a common wrong . . . is not a derivative action and, therefore, does not preclude those parties sharing defense counsel'") (quoting 3 Legal Malpractice § 26:6 (2013 ed.)); see also Respler on Behalf of Magnum Hunter Res. Corp. v. Evans, 17 F. Supp. 3d 418, 421 (D. Del. 2014) (holding that even in derivative actions, "there exists no conflict of interest between a corporation and individual director defendants at the motion to dismiss stage").

Indeed, when Baliga and the Receiver consented to Felicello's representation of LKM and Shi for the motion to dismiss the Second Amended Complaint, the parties agreed that "Shi and LKM have an identity of interests and will likely raise overlapping, if not substantively identical defenses and, therefore, the parties do not perceive a present conflict of interest between the Company and Shi with respect to the motion to dismiss." ECF No. 174. The same identity of

interests exists for the instant motion to dismiss the common law fraud claim in the Third Amended Complaint. In filing his Third Amended Complaint, Baliga amended his common law fraud claim only "to allege additional facts to support the element of reliance." ECF No. 470 at ¶ 79 n.1 (quoting ECF No. 461) (internal quotation marks omitted). Therefore, the same identity of interests that Baliga recognized was shared by Shi and LKM for the motion to dismiss the Second Amended Complaint continues to exist for the present motion.

I therefore recommend that the Court permit Felicello to represent Shi and LKM for the limited purpose of moving to dismiss the common law fraud claim in the Third Amended Complaint.

## CONCLUSION

For the reasons discussed herein, I respectfully recommend that the Receiver's Accounting of Guo's expenses be **APPROVED** in the amount of $1,042,985, and that the Receiver's request to hold Shi personally liable for the Receiver's expenses be **DENIED**. I further recommend that Felicello Law be allowed to continue to represent LKM for purposes of moving to dismiss the Third Amended Complaint. This Report and Recommendation will be temporarily filed under seal and viewing levels are restricted to the parties and the Court. The parties shall submit proposed redactions, if any, to this report by **December 23, 2024**. The Court will review those redactions and subsequently file a redacted copy of the report on the public docket. The Clerk of Court is directed to file this Report and Recommendation under seal and restricting viewing levels to only the parties and the Court.

**SO ORDERED.**

DATED:      New York, New York
            November 25, 2024

_____
VALERIE FIGUEREDO
United States Magistrate Judge

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

**Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections. See also Fed. R. Civ. P. 6(a), 6(b), 6(d). A party may respond to any objections within 14 days after being served. Any objections and responses shall be filed with the Clerk of the Court. Any request for an extension of time to file objections or responses must be directed to the Honorable Victor Marrero. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; Fed. R. Civ. P. 6(a), 6(b), 6(d); Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).**